IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
and SIERRA CLUB,

          Plaintiffs,

v.                                  CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment on Jurisdictional Issues (ECF No. 55) and Defendant's Motion for Summary Judgment (ECF No. 57). For the reasons explained below, Plaintiffs' Motion is **GRANTED** and Defendant's Motion is **DENIED**. Specifically, the Court **GRANTS** summary judgment in favor of Plaintiffs on the issue of jurisdiction.

**I. Background**

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), West Virginia Highlands Conservancy, and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. Compl., ECF No. 1. Before proceeding to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

1

## A. Regulatory Framework

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982). All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]." This is an enforceable permit condition. *See, e.g., OVEC v. Elk Run Coal Co., Inc.*, No. 3:12-cv-0785, 2014 WL 29562, at *3, 6 (S.D. W. Va. Jan. 3, 2014).

Coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. In 1981, West Virginia received conditional approval of its state-run program, which is administered through

the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### B. Factual Background

Defendant holds WV/NPDES Permit WV1014005 and West Virginia Surface Mining Permit S200995, which regulate Defendant's mining activities at Surface Mine No. 3, located in Clay and Nicholas Counties, West Virginia. Compl. ¶¶ 33-35. This mine's Outfall 29 discharges into Stillhouse Branch, close to the Branch's confluence with Twentymile Creek. *Id.* ¶ 36.

Defendant's WV/NPDES Permit WV1014005 incorporates by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, which include § 47-30-5.1.f: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]. . . ." WV/NPDES Permit WV1014005 § C (2009 renewal of permit, noting that, among the terms and conditions incorporated by reference from the WV/NPDES Rules for Coal Mining and Facilities are the provisions found in § 47-30-5.1), ECF No. 57-8. This incorporation by reference is in accordance with state rules, which require that the water quality

3

standards rule—among other rules —"be incorporated into the WV/NPDES permits either expressly or by reference." W. Va. Code R. § 47-30-5.

West Virginia's narrative water quality standards are violated if wastes discharged from a surface mining operation "cause . . . or materially contribute to" 1) "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or 2) "[a]ny other condition . . . which adversely alters the integrity of the waters of the State." *Id.* § 47-2-3.2.e, -3.2.i. Additionally, "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." *Id.* § 47-2-3.2.i. In their Complaint, Plaintiffs allege that Defendant violated these narrative water quality standards and, therefore, the CWA and the SMCRA, by discharging excessive amounts of ionic pollution, measured as conductivity and sulfates, into the waters of West Virginia in violation of its WV/NPDES Permit and its West Virginia Surface Mining Permit.[1]

Plaintiffs have moved for partial summary judgment in their favor on jurisdictional issues. Pls.' Mot. Part. Summ. J.; *see also* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 56. Specifically, Plaintiffs assert that they have standing as a matter of law through their members James Tawney and Cindy Rank. Defendant filed a Response in opposition, ECF No. 61, and Plaintiffs filed a Reply, ECF No. 65. Additionally, Defendant has moved for summary judgment on the grounds that 1) Plaintiffs have failed to establish standing, 2) Defendant is protected from liability based on the CWA's permit shield,[2] 3) treating West Virginia's water quality standards

---

[1] The Complaint also alleges that Defendant violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia. However, the parties subsequently filed a joint motion to dismiss the claims relating to selenium, ECF No. 72, which this Court granted, ECF No. 75. Therefore, Plaintiffs' selenium claims need not be discussed.

[2] Under the permit shield defense, a permit holder cannot be held liable for CWA violations if the permit holder is in compliance with the terms of its permit. *See* 33 U.S.C. § 1342(k).

as effluent limits in the manner Plaintiffs advocate is an impermissible permitting "shortcut," 4) Plaintiffs fail to sufficiently demonstrate any violation of West Virginia's narrative water quality standards in that they rely solely on West Virginia Stream Condition Index ("WVSCI") scores, and 5) Plaintiffs' SMCRA claims are barred because their CWA claims are barred. Plaintiffs filed a Response, ECF No. 64,[3] and Defendant filed a Reply, ECF No. 66.

Defendant acknowledges that its second, third, and fourth arguments were raised by defendants Elk Run Coal Company, Inc., and Alex Energy, Inc., and rejected by this Court in *OVEC v. Elk Run Coal Company, Inc., et al.*, No. 3:12-cv-00785, 2014 WL 2526569 (June 4, 2014). Therefore, there is no need for the Court to discuss those previously rejected arguments in this Memorandum Opinion and Order. Additionally, because the Court finds that Plaintiffs' CWA claims are not barred for the reasons explained below, it is unnecessary to address Defendant's fifth argument.

Both Motions are ripe for resolution. In Section II, the Court discusses the legal standard applicable to motions for summary judgment. In Section III, the Court examines the parties' arguments concerning standing. In Section IV, the Court briefly explores Plaintiffs' notice of intent to sue.

## II. Legal Standard for Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[3] The day after filing their Response, ECF No. 63, Plaintiffs filed a "corrected" Response, ECF No. 64, which made a minor edit to the previously filed version. The Court will consider the "corrected" Response instead of the initial filing.

249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Having discussed the standard for review of motions for summary judgment, the Court now turns to the parties' arguments concerning standing.

### III. Plaintiffs' Standing

#### A. Legal Standard for Standing

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*

7

("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

### B. Application

#### 1. Injury in Fact

Plaintiffs assert standing through Cindy Rank and James Tawney. *See* James Tawney Decl., ECF No. 55-2; Cindy Rank Decl., ECF No. 55-3; James Tawney Dep., ECF No. 57-9; Cindy Rank Dep., ECF No. 57-12. Cindy Rank is a member of all three plaintiff organizations. Rank Decl. ¶¶ 1, 5, 7. She first visited Twentymile Creek around 1994 as part of a state-sponsored interagency mine tour, and in 1997 she compiled a map of surface mining permitting in the area. *Id.* ¶¶ 11, 12. In July 2010 Ms. Rank visited the creek as part of a citizen inspection, and in September 2010 she visiting again with James Tawney to become more familiar with the area. *Id.* ¶¶ 16, 17. During the latter visit, Ms. Rank "enjoyed the sights and sounds of the stream

but was very concerned about the damage to aquatic life from pollution coming from the mines upstream, including Fola's Surface Mine No. 3." *Id.* ¶ 19. She stops and visits the creek when driving through the area for meetings, enjoying views of the wildlife and the water, and she "would be upset if the number and variety of birds, wildlife, fish or insects have been or will be reduced as a result of mining activities upstream." *Id.* ¶¶ 20-22. Ms. Rank has visited the creek fairly consistently over the past few years, including visits in 2013. *See* Rank Dep. 22-27 (discussing her two visits to Twentymile Creek in August 2013 to view the scenery and stating that she has visited once or twice a year for the past five years).

Ms. Rank asserts that she "see[s] red when [she] think[s] about the harm that is being done to the environment and to communities downstream," Rank Decl. ¶ 13, and that her "enjoyment of Twentymile Creek would greatly improve if mining companies[,] including Fola[,] were forced to clean up the pollution and comply with their permits," *id.* ¶ 14. *See also* Rank Dep. 42 (noting that she wishes conductivity and sulfate levels would improve). Ms. Rank also explains her knowledge of studies showing the negative effects of ionic stress in Twentymile Creek. *Id.* at 40-41. She notes that she has not personally witnessed any degradation or damage within the areas at issue in this case caused by mining, other than road work. *Id.* at 36-38. However, she "understand[s] that upstream mining and the discharge of pollutants such as . . . conductivity has diminished stream life and harmed the ecosystem of Twentymile." Rank Decl. ¶ 22. Ms. Rank's knowledge of the degradation caused by mining "puts a damper on [her] visits in many ways." Rank Dep. 36; *see also id.* at 39 ("[K]nowing that streams are covered and knowing what is on the paper in terms of the permits, I know that there is damage being done from some of the discharges, and that upsets me."). Lastly, she asserts that she will visit Twentymile Creek in the future. Rank Decl. ¶ 26.

James Tawney is also a member of all three plaintiff organizations. Tawney Decl. ¶¶ 2, 4-5. Mr. Tawney first visited Twentymile Creek as a child, swimming and fishing in the area, and made up to fifty visits by the time he was around twenty years old. *Id.* ¶¶ 9-10. Thereafter, he visited once or twice a year to hike, hunt, and gather ginseng. *Id.* ¶ 12. He would see fewer fish as time went by and noticed that deep fishing holes were becoming filled with sediment; he also stopped eating any fish he caught because he was afraid to eat them due to pollution. *Id.* ¶¶ 14, 15. He believes that mining pollution—including conductivity—is hurting the fish population. *Id.* ¶ 20. He says that he "would enjoy the creek more if [he] knew the mines were not polluting the stream" and would also visit more frequently. *Id.* ¶ 15. He is afraid to swim in the creek because of pollution. *Id.* ¶ 22. He has visited Twentymile Creek more than once a year for the past several years. *Id.* ¶ 16. For example, he visited Blue Hole—located approximately a few miles downstream from Stillhouse Branch's confluence with Twentymile Creek—last year to go fishing. Tawney Dep. 43-45. He intends to visit Twentymile Creek "many times in the future." Tawney Decl. ¶ 28; *see also* Tawney Dep. 50.

Mr. Tawney acknowledges that he has not seen any personal evidence of harm caused by conductivity in the area but that he bases his belief that damage is occurring on scientific evidence. Tawney Dep. 48-49. For example, he states that the WVDEP classified Twentymile Creek and Stillhouse Branch as biologically impaired. Tawney Decl. ¶ 19; *see also* Tawney Dep. 31 (noting that high conductivity, which he believes is caused by mining, is one parameter that concerns him), 39-41 (noting his concern and belief that high levels of sulfate and conductivity can kill insects and fish), 59 (stating that he believes Stillhouse Branch is listed as an impaired stream based on its ionic content and that Twentymile also is impaired), 60-61 (noting his concerns about the effects of conductivity on insects and the larger "chain of life").

Defendant points out that neither Ms. Rank nor Mr. Tawney can describe any evidence of degradation that they have personally observed regarding the pollutants at issue in this case, which, Defendant argues, makes these declarants unable to show an injury to themselves as is required for standing. The Court acknowledges that in many other cases the declarants involved could see the harmful effects of the activities for which they sought redress. *See, e.g., Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) (finding that the declarant showed an injury in fact concerning the circus's treatment of elephants where he could attend that circus and "observe either direct physical manifestations of the alleged mistreatment of the elephants . . . or detect negative effects on the animals' behavior"); *Piney Run*, 268 F.3d at 263 (finding that the declarant showed an injury in fact where the increase in green algae in a stream interfered with her use and enjoyment of the stream by making rocks slippery and reducing the water's clarity); *Animal Lovers Volunteer Ass'n Inc., (A.L.V.A.) v. Weinberger*, 765 F.2d 937, 938-39 (9th Cir. 1985) (for injury in fact to occur, there must be a "direct sensory impact" upon the declarants (citation omitted) (internal quotation marks omitted)). However, Plaintiffs have sufficiently alleged standing here even without direct sensory observations by Ms. Rank and Mr. Tawney.

Although it is true that Ms. Rank and Mr. Tawney have not personally observed any obvious injury to the physical environment, they have nonetheless sufficiently alleged an injury based on their frequent use of the affected area and their beliefs—based on scientific evidence and information from individuals they trust—that high conductivity and sulfate levels are causing harm to that area. Even though they may not be able to see this alleged harm, this does not mean that harm is not occurring, and the Court believes that their interactions with the environment while having this knowledge about the effects of mining are sufficient to allege

injury in fact. That the alleged pollution has not reached the point where its impact could be readily observed does not preclude declarants from experiencing an injury at this point.

Defendant also argues that the concerns raised by Mr. Tawney—such as the fish being toxic or the water being unsafe for swimming—are unrelated to the actual effects of high levels of ionic salts, as reflected by high conductivity and sulfate levels. However, both Ms. Rank and Mr. Tawney have demonstrated a long-standing persistent interest in the possible harm that high conductivity and sulfate levels can have on the area affected by Defendant's discharges. They have demonstrated concern about the effects of high conductivity and sulfate levels and have gained information about the possible effects of pollutants on the affected area. The fact that some of their concerns may be unrelated to high conductivity and sulfate levels does not eliminate their claims of injury arising from such levels. Defendant also argues that Ms. Rank has been unable to identify specific ways in which mining has diminished the enjoyment of her trips. The Court disagrees with the Defendant's characterization and finds that Ms. Rank and Mr. Tawney have alleged specific ways in which Defendant's mining—and the resulting levels of conductivity and sulfates specifically—harm their enjoyment of the affected area. Additionally, based on their history of connection and visits to the area, the Court finds that Ms. Rank and Mr. Tawney have sufficiently alleged their intent to visit in the future.

Defendant points to several supposed weaknesses in Mr. Tawney's declaration and testimony. For example, Defendant seems to fault Mr. Tawney for not having visited the area near Stillhouse Branch other than an October 2010 visit and a second visit with an expert witness. However, Stillhouse Branch is not the exclusively affected area in this case; rather, Twentymile Creek, to some point downstream of its confluence with Stillhouse Branch— certainly within the area visited by the declarants—is an affected area as well. Defendant also

makes much of the point that while Mr. Tawney's declaration states that he traveled up the public road along Twentymile Creek many times in 2013, in his deposition he said that he only did so once. Defendant also suggests that Mr. Tawney misspoke in another case about his future intentions to visit a certain affected area. The Court does not believe that Mr. Tawney has misled the Court or that the nature of his testimony is such that it should be discounted. Even setting aside his alleged misstatement concerning recent drives along the creek, Mr. Tawney clearly made at least one visit to the affected area in 2013 for recreational purposes, namely, fishing at Blue Hole. He has therefore sufficiently demonstrated a direct nexus to the affected area.

In summary, Ms. Rank and Mr. Tawney have demonstrated a concrete and actual harm to their aesthetic and recreational interests as a result of ionic pollution in Twentymile Creek.

### 2. Traceability

Plaintiffs' injuries are fairly traceable to Defendant's discharges of ionic pollution in alleged violation of its WV/NPDES Permit because the declarants claim that their injuries resulted from elevated pollution in the same waterway into which Defendant discharges pollutants. *OVEC v. Marfork Coal Co., Inc.*, No. 5:12-cv-1464, 2013 WL 4509601, at *5 (S.D. W. Va. Aug. 23, 2013). Defendant does not argue that the areas used by Plaintiffs' declarants in Twentymile Creek are not affected by its mining and discharges. Therefore, traceability has been shown.

### 3. Redressability

The Court finds that Plaintiffs also satisfy the final standing element, redressability. Plaintiffs seek injunctive relief requiring Defendant to reduce its discharge of ionic pollution to comply with the terms of its permit. This relief would provide redress for Plaintiffs' injuries by reducing the amount of ionic pollution in Stillhouse Branch and Twentymile Creek.

4. **Organizational Standing**

The Court finds that Plaintiffs have constitutional standing. Declarants are members of all of the plaintiff organizations. They have demonstrated: (1) injuries in fact which are (2) fairly traceable to Defendant's alleged violations and which (3) are able to be redressed by a favorable decision in this case. These two declarants support Plaintiffs' organizational standing because, A) as individual members, they would have standing to sue in their own right, B) the interests Plaintiffs seek to protect are germane to Plaintiffs' overall purpose to conserve and preserve the environment and natural resources, and C) neither the claims asserted nor the relief requested requires the participation of individual members.

## IV. Sixty Days' Notice

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the state in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). On December 7, 2012, Plaintiffs sent a letter to the appropriate recipients which appears to provide the necessary details for valid notice of suit. *See* Notice Intent, ECF No. 55-4. This lawsuit was commenced over sixty days later, on March 13, 2013. Plaintiffs specifically address the sufficiency of their Notice of Intent to Sue in their Memorandum in Support of their Motion for Partial Summary Judgment. Defendant does not challenge the sufficiency of the Notice in its Response or in its pleadings regarding its own Motion for Summary Judgment. However, in the Proposed Integrated Pretrial Order, Defendant argues for the first time that the Notice of Intent "failed to identify sufficiently the pollutants that Plaintiffs contend are violating an effluent standard or limitation," without further elaboration. ECF No. 79 at 10. The Court is

not inclined to now consider Defendant's argument on this point given that it failed to respond to this issue earlier. However, even were this argument considered on the merits, the Court would find that the Notice is sufficient in that it properly puts Defendant on notice of Plaintiffs' concerns about conductivity and sulfate levels caused by discharges from Outfall 029. Plaintiffs' Notice of Intent to Sue meets applicable statutory requirements.

### V.     Conclusion

For the reasons explained above, Plaintiffs' Motion for Partial Summary Judgment on Jurisdictional Issues is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**. Specifically, the Court **GRANTS** summary judgment in favor of Plaintiffs on the issue of jurisdiction.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:     July 30, 2014

_____
ROBERT C. CHAMBERS, CHIEF JUDGE