IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC., and
SIERRA CLUB,

                Plaintiffs,

v.                           CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,

                Defendant.       Huntington, West Virginia
                                     August 19, 2014


TRANSCRIPT OF BENCH TRIAL - DAY 1
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          J. MICHAEL BECHER, ESQ.
                              JOSEPH M. LOVETT, ESQ.
                              APPALACHIAN MOUNTAIN ADVOCATES
                              P. O. Box 507
                              Lewisburg, WV  24901

                              JAMES M. HECKER, ESQ.
                              PUBLIC JUSTICE
                              1825 K Street, N.W.
                              Washington, DC  20006

```
For the Defendant:          ROBERT G. MCLUSKY, ESQ.
                            M. SHANE HARVEY, ESQ.
                            MATTHEW S. TYREE, ESQ.
                            JACKSON KELLY
                            1600 Laidley Tower
                            P. O. Box 553
                            Charleston, WV  25322

Court Reporter:             Teresa M. Ruffner, RPR
                            Sidney Christie Federal Building
                            845 5th Avenue, Room 101
                            Huntington, WV  25701
                            (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    <u>Tuesday, August 19, 2014, at 9:10 a.m. in open court</u>

2          THE COURT:  All right.  Are the parties ready to

3    proceed?

4          MR. BECHER:  Yes, Your Honor, plaintiffs are.

5          THE COURT:  Before we get started with opening

6    statements, on yesterday at a final conference, plaintiffs

7    submitted two notebooks of joint exhibits.

8       My understanding is that the parties agree and stipulate

9    that each of those exhibits is admissible and that the parties

10   need not question witnesses to authenticate or otherwise have

11   them introduced into evidence.  Is that true?

12         MR. BECHER:  That's our understanding.  I would like

13   to point out, I guess, one clarification, that I don't think

14   we've agreed to the truth of all the matters in those

15   documents.  We can still argue about how valid they are.  As

16   far as admissibility, there should be no --

17         MR. MCLUSKY:  That's right, Your Honor.  So to the

18   extent someone offers one in evidence, we may call them to ask

19   for what purpose it's being offered.

20         THE COURT:  All right.  We're just stipulating their

21   admissibility, then.

22      All right.  Is there anything else we need to address

23   before the opening?

24         MR. BECHER:  Following up on that, Your Honor, we

25   had reached a stipulation that was filed with the Court on the

1    materials prepared by Chris Swan, and these are contained in

2    Joint Exhibits 11 through 16.  Just to avoid the need to offer

3    and separately admit those, we would like to, as a group, ask

4    for those to be admitted at this point.

5              THE COURT:  11 through 17 in plaintiffs' exhibits?

6              MR. BECHER:  Through 16 in the joint exhibits, Your

7    Honor; 11 through 16 in the joint exhibits.

8              MR. MCLUSKY:  No objection.

9              THE COURT:  No objection?  All right.  They're each

10   admitted.

11             MR. BECHER:  One moment, Your Honor.

12             THE COURT:  Go ahead.

13             MR. BECHER:  And, Your Honor, we would like to do

14   the same thing for the Hansen exhibits, Joint Exhibits 3

15   through 10.

16             THE COURT:  All right.  Any objection to those?

17             MR. MCLUSKY:  No, Your Honor.

18             THE COURT:  They're admitted.

19        All right.  Are we ready for openings?

20        Go ahead.

21             MR. BECHER:  Thank you, Your Honor.  Through

22   briefing the previous case, this Court is now well aware of

23   the applicable law in this case.  Fola's permit contains

24   conditions prohibiting discharge that cause a violation of

25   water quality standards.  Plaintiffs will show that Fola has

1   violated narrative water quality standards in Stillhouse

2   Branch of Twentymile Creek by discharging materials in

3   concentrations that are harmful, hazardous, or caustic to man,

4   animal, and aquatic life in violation of the water quality

5   criteria contained in 47-2 -- or 47 of the West Virginia

6   C.S.R. 2-3.2e.

7        Also, defendants are causing a violation of water quality

8   standards by creating a condition which adversely altered the

9   integrity of waters of the state and by creating adverse

10  impacts to the chemical, physical, hydrologic, or biological

11  components of the aquatic ecosystem in violation of 47 West

12  Virginia C.S.R. 2-3.2i.

13       To prove that Fola has violated these standards and its

14  permit, plaintiffs will rely on scientific literature written

15  by EPA scientists and independent researchers demonstrating

16  the effects of high conductivity mine drainage on aquatic

17  organisms in Appalachian streams.

18       The findings in this literature are uncontroverted.

19  There are no published articles that disagree or refute these

20  conclusions.

21       Plaintiffs will further rely on the EPA conductivity

22  benchmark and peer-reviewed articles published after the

23  publication of the benchmark to support the conclusions of

24  those documents.  These papers subject the relationship

25  between high conductivity and biological degradation have

1    heightened scrutinies for a formal causation analysis.

2          THE REPORTER:  I'm sorry.  Can you go slower?

3          MR. BECHER:  Sure.  The authors, principally Suter

4    and Cormier, found not only that the relationship between

5    conductivity and biological impairment was causal, but that it

6    was not confounded by any of 12 different variable being

7    analyzed, including habitat, organic enrichment, nutrients,

8    sediment, pH, selenium, temperature, headwaters, lack of

9    headwaters, catchment area, settling ponds, dissolved oxygen,

10   and metals.  Again, nothing in the benchmark or the subsequent

11   published papers has been refuted or contradicted in the

12   published literature.

13        The levels of conductivity in Stillhouse Branch are far

14   in excess of those found to cause biological degradation in

15   this literature.  While the benchmark and the independent

16   research establish a threshold level of 300 microsiemens per

17   centimeter, levels in Stillhouse Branch are consistently well

18   above 3000 microsiemens per centimeter.

19        Discharge monitoring reports confirm the level of

20   conductivity correspond to concentrations discharged by Fola.

21        Now, the stream at issue in this case, Stillhouse Branch

22   of Twentymile Creek, is composed entirely of flow from Outlet

23   29 of Fola's Surface Mine No. 3.  The mine is the only source

24   of pollution in the watershed.  It's the only major

25   disturbance in the area.

1          Stillhouse Branch is classified by the West Virginia

2     Department of Environmental Protection as a stream impaired

3     for not meeting biologic criteria; so is the next order

4     stream, Twentymile Creek.   There can be no doubt that

5     Stillhouse Branch is impaired as a result of Fola's mining.

6          Plaintiffs will present direct testimony from two expert

7     witnesses showing that this impairment is the result of

8     conductivity.   These experts are Dr. Palmer and Dr. Ryan King.

9     Dr. Margaret Palmer has testified before this Court several

10    times as an expert in stream restoration and aquatic ecology.

11    She will provide the Court with an overview of the literature

12    establishing that conductivity does indeed cause biological

13    impairment.

14         She will explain how the level of review given to this

15    relationship has been one of the most rigorous she has seen in

16    her field.   Dr. Palmer will then go on to explain the

17    conditions of Stillhouse Branch as she observed them on her

18    visit to the site.   She will explain why evidence from the

19    site leads to only one logical conclusion, that biological

20    impairment at Stillhouse Branch was caused or contributed to

21    by ionic pollution from Fola's surface mine.

22         Plaintiffs' next witness is Dr. Ryan King.   Like

23    Dr. Palmer, he's testified several times before this Court,

24    and he has been qualified as an expert in ecology, entomology,

25    and ecologic data analysis.

1          Dr. King will explain how EPA scientists such as Suter

2     and Cormier have examined the evidence and determined through

3     weight of evidence and statistical methods that conductivity

4     does indeed cause biological degradation.

5          Dr. King will explain how his own work, how it validates

6     EPA scientists.  Dr. King will also address the site-specific

7     evidence at Stillhouse Branch itself.  He will describe how

8     the stream has gone from a larger ecosystem to one dominated

9     by organisms that are highly tolerant to ionic pollution.

10         Plaintiffs anticipate the defendant will call two

11    witnesses of their own, Carrie Kuehn and Dr. Charles Menzie.

12    Carrie Kuehn has no experience in the ecological methods -- in

13    ecological methods, and it's admitted that she has not

14    analyzed any of the data at issue in this case.  Nonetheless,

15    she will attempt to undermine the credibility of plaintiffs'

16    experts and also the entire body of work demonstrating this

17    causal link between conductivity and biological impairment in

18    Appalachian streams.  She'll do this primarily by pointing out

19    that they did not follow a rigid approach favored by

20    epidemiologists.

21         Defendant's next witness will be Dr. Charles Menzie.

22    Like Carrie Kuehn, Dr. Menzie attempts to show not only the

23    plaintiffs' experts but dozens of scientists who have been

24    involved in the literature examining the link between

25    conductivity and biological impairment, just a very basic fact

1     that calls into doubt the body of work.

2          It's worth noting Dr. Menzie did not have any problem

3     with this work even though he served as one of the reviewers

4     of the EPA benchmark until he was hired for this litigation.

5          Throughout this testimony, the Court should keep in mind

6     the burden the plaintiffs bear in this case.  This case must

7     be decided on the preponderance of evidence, 51 percent

8     likelihood that plaintiffs are correct.  While Fola's experts

9     struggle to find weaknesses in the literature and the work by

10    plaintiffs' experts, by their own admission they have not gone

11    through the necessary steps to determine any alternate cause

12    of impairment for this stream.

13         Plaintiffs also need not show that conductivity is the

14    sole cause of impairment.  It is enough to violate the water

15    quality standards when a discharge causes or contributes to

16    the biological degradation of the stream.

17         The evidence in this case points in one direction only,

18    that conductivity is the principal cause or at least a strong

19    contributor to the degradation of Stillhouse Branch.  Thank

20    you.

21              THE COURT:  Thank you.  All right.  For the

22    defendant?

23              MR. HARVEY:  Good morning, Your Honor.  In addition

24    to the counsel who've made an appearance in this case, we also

25    have with us today Dr. Menzie, whom you know.  Sitting beside

1    Dr. Menzie is Carrie Kuehn, the epidemiologist you've heard so

2    much about already, and also with us today in the back is Mike

3    Sweeney, in-house counsel for Fola Coal Company.

4         Your Honor, to prevail in this case, plaintiffs must show

5    that Fola discharged a pollutant that caused a violation of

6    West Virginia's narrative water quality standards.  This

7    raises two key questions:  Is conductivity a pollutant that

8    causes impairment, and did conductivity cause impairment at

9    Stillhouse Branch?  General causation and specific causation.

10        Plaintiffs answer the general causation question by

11   relying heavily on the EPA benchmark for conductivity.  As we

12   discussed a couple of weeks ago, the benchmark marked a

13   significant departure for the EPA.  The Clean Water Act is

14   over 40 years old; and throughout its history, EPA has always

15   used laboratory data to set water quality standards.  It takes

16   test organisms, it exposes them to pollutants in a lab, it

17   studies the results under very careful conditions, and it sets

18   the standard after public notice and comment.

19        The benchmark was different.  For the first time ever,

20   the agency used observational data to set a standard.  They

21   took data that had been gathered by the West Virginia DEP and

22   others and applied principles of epidemiology to study that

23   data and reach conclusions on causation.  This was a first for

24   the agency.

25        And there's nothing wrong with using epidemiology to

1    answer questions about general causation.  That is what

2    epidemiologists do.  They take observational date, they run

3    very complicated statistics on that data, and they can infer a

4    causation from it if the data is good data.

5        The link between smoking and lung cancer was established

6    by epidemiologists.  However, if you do not know what you are

7    doing, if you're only dabbling in epidemiology, you can make

8    mistakes.  Relationships that seem appealing to the untrained

9    eye can be misleading.  Correlation is not causation.  EPA and

10   the plaintiffs' experts we believe have made mistakes in that

11   regard.

12       In this case, you will hear that EPA made mistakes in

13   their maiden voyage into the field of epidemiology.  You will

14   hear that plaintiffs made mistakes.

15       The second question imposed in the case is whether

16   conductivity caused impairment at Stillhouse.  I'd like to

17   show you a picture of Stillhouse, if I could, Mr. Tyree, just

18   to orient the Court.

19       Your Honor, Stillhouse Branch has been largely filled --

20   its headwaters have largely been filled by a valley fill that

21   is not in the picture, but you will see that the water runs

22   through the valley fill and into a series of sediment ponds.

23   The Court has seen sites like this before and is familiar with

24   them.  There's a series of three to four ponds at the top of

25   that picture.

1        From there, the water runs down a steep concrete flume

2   into a short open stream channel.  At the end of that flume,

3   at the beginning of that channel is where the plaintiffs

4   conducted their WVSCI sampling and their habitat sampling.

5   The water then runs through a series of pipes and ditches

6   until it finally dumps into Twentymile Creek.

7        Your Honor, many of the physical conditions shown in this

8   photograph are known to cause stream impairment.  In fact,

9   plaintiffs' experts have testified on many occasions,

10  including before this Court, that the conditions seen in this

11  photograph will cause impairment without regard to the

12  chemical quality of the water.  Plaintiffs, however, have not

13  taken these site conditions into account in their site-

14  specific analysis.

15       Your Honor, we realize that this case appears similar in

16  many ways to the case you heard last December, the *Elk Run*

17  case.  We ask that you remember that the benchmark is still

18  relatively new science.  The papers that supported the

19  benchmark by Suter and Cormier were published just last year.

20       In the last trial, we did not seek to attack the

21  underpinnings of the benchmark, but we plan to do so in this

22  case.  Science evolves only because we continue to ask

23  questions, continue to probe, continue to have an open mind;

24  and we ask that the Court have an open mind in this case.

25  Thank you.

1          THE COURT:  Thank you.

2       All right.  Plaintiffs ready to call their first witness?

3          MR. LOVETT:  We are, Your Honor.  We call Dr.

4    Margaret Palmer, please.

5          MR. MCLUSKY:  Your Honor, before we start, we've had

6    discussions with plaintiffs' counsel.  You may recall in the

7    last case, we moved to sequester the plaintiffs' other experts

8    during the cross-examination of Expert A; that is, Expert B

9    would be sequestered during the cross-examination.  We intend

10   to do the same, and they intend to make the same motion with

11   respect to our experts, as I understand it.

12          THE COURT:  All right.

13          MR. LOVETT:  That's my understanding as well, Your

14   Honor.

15          THE COURT:  All right.

16          MR. MCLUSKY:  Then Dr. King would have to step out

17   when Dr. Palmer is cross-examined.

18          THE COURT:  All right.  Then the Court will instruct

19   the parties to follow that rule accordingly.  So each side's

20   experts may not sit in on the cross-examination of their

21   client's other expert.

22          MARGARET PALMER, PLAINTIFFS' WITNESS, SWORN

23                       DIRECT EXAMINATION

24   BY MR. LOVETT:

25   Q.   Good morning, Dr. Palmer.

Palmer - Direct

1    A.   Good morning.

2    Q.   So we're going to be working with a series of notebooks,

3    and I think there are three notebooks that you'll need to have

4    in front of you for the examination.   They are two joint

5    exhibit notebooks and plaintiffs' exhibit notebooks.

6         Does the clerk have a copy of those that the witness can

7    use?

8              THE COURT:   Do you want the witness to use the

9    original?   I think we had requested a copy for me, a copy for

10   my law clerk, and the original, or a copy that was given to

11   the clerk would suffice as the original.

12             MR. LOVETT:   Let me see if we have another copy,

13   Your Honor.

14             THE COURT:   All right.

15             MR. LOVETT:   We do not.   The witness would have to

16   use one of those three, whichever the Court --

17             MR. BECHER:   Your Honor, if I may, we submitted four

18   copies to the Court yesterday.   So there should be a copy for

19   you yourself, Your Honor, each of your two law clerks, and

20   then a set of originals as well.   So four copies in total.

21             THE COURT:   Okay.   Do we need to use, then, a copy

22   that was provided to one of my law clerks for the witness to

23   use?

24             THE CLERK:   They're not marked.   I'm just going to

25   mark them later anyway.

Palmer - Direct

1    THE COURT:  All right.

2    MR. LOVETT:  Thank you.

3    THE WITNESS:  This is the first one we'll use?

4    BY MR. LOVETT:

5    Q.   Dr. Palmer, would you turn to Joint Exhibits 1 to 58,

6    Exhibit 17.

7    A.   Yes.

8    Q.   Do you see that?

9    A.   Yes.

10   Q.   Is that your CV?

11   A.   It is.

12   Q.   Did you prepare the CV yourself?

13   A.   Yes.

14   Q.   Is it an accurate representation of your experience?

15   A.   It is.

16   Q.   Have you testified before this Court before?

17   A.   Yes, I have.

18   Q.   Several times; is that right?

19   A.   That's correct.

20   Q.   And you've been admitted as an aquatic ecologist and

21   stream restoration expert in the past; is that correct?

22   A.   Correct.

23   Q.   Are you still a professor at the University of Maryland?

24   A.   I am.

25   Q.   And do you conduct research at the University of

Palmer - Direct

1    Maryland?

2    A.    Yes.  I have a laboratory and graduate students and so

3    forth.

4    Q.    And are you in charge of the laboratory?

5    A.    I am.

6    Q.    And what is the focus of that laboratory?

7    A.    Stream ecology, including studies related to insects, as

8    well as biogeochemistry.

9    Q.    Okay.  Is the work that you carry out in your research

10   relevant to your testimony here?

11   A.    Oh, yes.

12   Q.    Okay.  And do you supervise graduate students as part of

13   your work?

14   A.    I do.

15   Q.    How many graduate students are you currently supervising?

16   A.    Right now I have five graduate students.

17   Q.    Can you give me an idea of about how many publications

18   you've authored in peer-reviewed journals in the field of

19   aquatic ecology?

20   A.    Somewhere around 153 to 155.

21   Q.    All in peer-reviewed journals?

22   A.    Yes.

23   Q.    And in addition to your research duties at the lab we

24   discussed, do you also run something called the Socio-Economic

25   Synthesis Center?

                         Palmer - Direct

1    A.    Socio-Environmental Synthesis Center.

2    Q.    I'm sorry.

3    A.    That's okay.

4    Q.    And how is that funded?

5    A.    It's funded by the National Science Foundation, a grant

6    to me.

7    Q.    How large is the grant?

8    A.    Well, for the first five years, it was -- this is

9    terrible.  I'm having trouble remembering.  I think 27 and a

10   half million dollars.

11   Q.    And how many people do you supervise at that research

12   center?

13   A.    Well, we have 16 staff members.  I also supervise 10

14   post-docs there, and then we have approximately 500 visiting

15   scholars a year that work at the center.

16   Q.    And is that center's work related to stream ecology?

17   A.    No --

18   Q.    Just --

19   A.    -- it's a whole variety of issues related to the

20   environment.

21   Q.    Okay.  Is stream ecology among those?

22   A.    I'm -- I'm sure -- yes, I am sure there are a few studies

23   that include a focus on streams or rivers.

24   Q.    What is the purpose generally of the center?

25   A.    Well, the purpose of the center really is to gain a

Palmer - Direct

1  better understanding of the relationship between people and

2  social drivers and environmental factors, particularly issues

3  that may have some policy relevance.

4  Q.   Okay.  So you now have feet in two worlds in a sense.

5  You're still doing your aquatic research, correct?

6  A.   Correct.

7  Q.   You're also working on how science is related to policy

8  issues at the center.

9  A.   That's correct.

10  Q.   Now, have you written papers on the effects of ionic

11  stress on impaired streams?

12  A.   Yes, I have.

13  Q.   How many?

14  A.   Well, the primary paper was the one that was focused

15  on -- it came out in 2010, but there's at least one other one.

16  Q.   What's the other one?

17  A.   It's one that was just accepted for publication, and it

18  looks at the outcome from all of the mitigation projects in

19  the coal mining regions of the Appalachians based on data --

20  the database we put together from the reports submitted by

21  coal companies to the Army Corps of Engineers.

22  Q.   When was that published?

23  A.   It was accepted for publication yesterday, and it's

24  already online.

25  Q.   Okay.  In what journal?

Palmer - Direct

1   A.   *Environmental Science and Technology.*

2   Q.   A peer-reviewed journal?

3   A.   Yes.

4   Q.   It's a journal we've heard a lot about in this courtroom

5   over the years, isn't it?

6   A.   That's correct, because it's a journal that deals

7   particularly with issues related to the environment and

8   chemical factors.

9   Q.   Okay.  Have you delivered talks about the impacts of

10  ionic pollution or ionic stress on Appalachian streams?

11  A.   Yes.  I've delivered a number of talks related to that.

12  Q.   Have you kept up with the literature related to ionic

13  stress in Appalachian streams?

14  A.   Yes.  It's something I follow very carefully,

15  particularly since I publish in that area.

16  Q.   Do you consider yourself an expert in that area?

17  A.   I think so, yes.

18  Q.   In the course of your work, have you visited Appalachian

19  streams?

20  A.   I have.

21  Q.   And how many times in your life do you think you've been

22  in the streams of Appalachia?

23  A.   Well, probably hundreds of times because I grew up in

24  that area.

25  Q.   Okay.  And would you say that you have a familiarity with

Palmer - Direct

1   the physical and other characteristics of Appalachian streams?

2   A.    Absolutely.

3   Q.    Can you generally tell, do you think, when a stream is

4   healthy and when it's not?

5   A.    I mean, generally speaking, if it's a physical cause,

6   it's pretty obvious.  If it's chemical, you have to do some

7   sampling and look at the bugs in the stream and so forth

8   unless you do water chemistry.

9   Q.    And have you sampled benthic macroinvertebrates in

10  Appalachian headwater streams?

11  A.    I have.

12  Q.    Would you say that you have a familiarity, a working

13  familiarity with the types of aquatic insects that live in

14  Appalachian streams?

15  A.    Yes, I would.

16              MR. LOVETT:  At this point I move to qualify

17  Dr. Palmer as an expert in aquatic ecology, particularly as it

18  relates to ionic stress in headwater streams, as well as --

19  well, that's all.

20              THE COURT:  All right.  I'm satisfied.  Go ahead.

21  The defense can cross-examine as to her qualifications.

22              MR. LOVETT:  Thank you.

23  BY MR. LOVETT:

24  Q.    Have you reviewed the data that will be used in this case

25  regarding Stillhouse Branch?

Palmer - Direct

1    A.    Yes, I have.

2    Q.    And what conclusion has that data led you to?

3    A.    The data clearly show that the stream is biologically

4    impaired and that there are very high levels of conductivity

5    and sulfate and in some cases selenium.

6    Q.    And do you believe that those high levels of conductivity

7    and sulfates are causing the impairment in Stillhouse Branch?

8    A.    Yes, I do.

9    Q.    Okay.  Let me ask you how you define "impairment."

10   A.    Well, impairment is based on water quality criteria, and

11   all states develop their own water quality criteria for

12   submitting information to EPA for the 303(d) listing; and in

13   West Virginia, that the West Virginia Stream Condition Index

14   is used.

15   Q.    Also known as the WVSCI, right?

16   A.    That's correct.

17   Q.    Okay.  And so does EPA use the WVSCI method, or does it

18   recommend use of the WVSCI method?

19   A.    Well, EPA actually recommends use of something that is

20   much more accurate, and that would be the GLIMPSS method,

21   which was developed by Greg Pond at EPA.

22   Q.    And what is the difference between WVSCI and GLIMPSS?

23   A.    The WVSCI index is based on family-level criteria for the

24   insects, whereas the GLIMPSS is based on genus-level criteria.

25   And so for that reason, the genus-level one provides a much

Palmer - Direct

1    better indicator of whether or not a stream is stressed.

2    Q.    Would the GLIMPSS method be more sensitive about picking

3    up harm to aquatic life than the WVSCI would be?

4    A.    Yes, that's correct, because within a single family of

5    insects, you can have both tolerant and sensitive genera.  And

6    so it's important to look primarily at those sensitive

7    organisms if you want to protect the stream from impairment.

8    Q.    Okay.  And what is the measure of impairment, if you

9    know, in the WVSCI index?

10   A.    You mean the numeric value?

11   Q.    Yes.

12   A.    68.

13   Q.    Anything --

14   A.    Below that would be impaired.

15   Q.    Okay.  Would you explain generally how the indices, both

16   the GLIMPSS and the WVSCI, work?

17   A.    Well, they're both essentially multi-metric indices.  So

18   a number of different subindices are used to develop those,

19   and they include things like the number of EPT taxa, the

20   percent of EPT taxa, the percent of organisms in the samples

21   that are dipterans, typically midges.  So a variety of

22   different elements go into them.

23           THE COURT:  Are all these subindices based upon or

24   related to some type of aquatic life, specific organism of

25   some type?

Palmer - Direct

1          THE WITNESS:  That's correct.

2   BY MR. LOVETT:

3   Q.    Okay.  So if a stream is impaired, you have different

4   groupings of insects than you would find in an unimpaired

5   stream.

6   A.    That's correct, yes.

7   Q.    Okay.  And how does the change in population affect the

8   overall ecology of the aquatic environment?

9   A.    Well, whenever you change the population, for example, as

10  significantly as in Stillhouse Branch, you can be missing

11  whole categories of species or genera that perform different

12  functions in the system.  And so it could influence things

13  like decomposition rate, metabolism, primary production if the

14  organisms that are lost are consuming a fair amount of algae.

15  So there are a lot of different ways.  Certainly it can

16  influence availability of prey for higher trophic levels.

17  Q.    Now, in this case we're concerned with ionic pollution

18  from alkaline mine drainage; is that right?

19  A.    Yes, that's correct.

20  Q.    And what is alkaline mine drainage?

21  A.    It simply refers to the fact that the water is alkaline

22  itself, the pH is typically above 7, and that's characteristic

23  of this particular region in the Appalachians.

24  Q.    And does the alkaline mine drainage that exists at

25  Stillhouse, is that somehow related to ionic pollution?

Palmer - Direct

1   A.   It is.  So the elevated conductivity is essentially a

2   measure of the ions that are in solution.  It does that by

3   measuring electrical conductivity.

4   Q.   So when we talk about conductivity, you're talking

5   about -- tell me what conductivity is.

6   A.   Well, it's a measure of -- actually, technically it's a

7   measure of current flowing through the water, but that's

8   related to the ions that are dissolved in the water.  And so

9   as conductivity goes up in these streams, it's because you

10  have elevated levels of things like iron, sulfate, calcium,

11  magnesium, etcetera.

12  Q.   So is it fair to say that we know from the conductivity

13  levels in Stillhouse that sulfates are being discharged at

14  high levels from the outfall?

15  A.   That's correct.  The sulfate levels were very elevated.

16  Q.   Okay.  Could you describe the relationship the best you

17  can between sulfates and high conductivity?

18  A.   In this part of the Appalachians because of the geology

19  of the region and so forth, the sulfates pretty much mirror

20  conductivities.  So, in fact, West Virginia DEP had been using

21  sulfate concentrations as a proxy for mining previously when

22  you get above about 50 milligrams per liter.

23  Q.   Okay.  So what is actually -- if you can answer this,

24  what's actually causing the impairment?  Is it the sulfates,

25  the conductivity, the mixture of them?

Palmer - Direct

1   A.   It's believed to be the mixture of them, and it's when

2   you get -- you can think of it almost like salinity.  Say you

3   get significant ions in the water and it causes ionic -- some

4   kind of ionic stress on the organisms.

5   Q.   How is this -- how are these sulfates and high

6   conductivity created by the surface mine?

7   A.   So when the material is brought up from great depths to

8   do the mining, the -- and the valley fills are created, you're

9   exposing rock material that hasn't been really exposed to

10  water and oxygen and so forth on the surface in a very, very,

11  very long time.

12       And so when it rains, water flows through that overburden

13  material in the valley fill.  It forms acidic conditions

14  initially, hydrogen -- hydrochloric -- hydro -- sulfuric acid.

15  Excuse me.  And -- but that's really quickly neutralized

16  because there's significant calcium ions and so forth,

17  bicarbonate, that forms that can neutralize that.

18  Q.   Okay.  And this whole soup creates the alkaline mine

19  drainage that you mentioned earlier, right?

20  A.   That's correct.

21  Q.   Okay.  And are there aquatic insects that are

22  particularly sensitive to this kind of pollution?

23  A.   Mayflies are the most sensitive.  They're sensitive in

24  general, but in the case of the elevated conductivity in these

25  streams, numerous studies have shown that they decline or

Palmer - Direct

1    completely disappear as conductivity increases.

2    Q.   Okay.  And has the relationship between surface mining

3    and alkaline mine drainage or ionic stress been clearly

4    established in the literature?

5    A.   Oh, absolutely.  Many, many studies have established that

6    relationship.

7    Q.   Okay.  And have many studies also been published that

8    show the effects of alkaline mine drainage, particularly the

9    sulfates and conductivity, on aquatic organisms?

10   A.   Yes, there have been a number of studies that looked at

11   the relationship between taxonomic composition, in some cases

12   the WVSCI scores or the GLIMPSS, and conductivity.

13             THE COURT:  Let me ask a question before we get too

14   far.  What stream functions are lost or diminished as a result

15   of injury to sensitive species or insects?

16             THE WITNESS:  Well, there's a variety of ones.  The

17   most obvious one would be availability of prey to higher

18   trophic levels.

19        So, for example, bats feed on emerging insects from these

20   streams.  Birds feed on emerging insects.

21             MR. MCLUSKY:  Your Honor, I hate to object to the

22   Court's question, but this is outside the scope of her report.

23   She's offered no report or opinion on impacts beyond those to

24   the insects themselves.

25             THE COURT:  Well, I haven't seen her report.  Is

Palmer - Direct

1  that a fair statement?

2          MR. LOVETT:  I'm thinking about the report, Your

3  Honor.  I need one second, if you don't mind.

4          THE COURT:  All right.

5          THE WITNESS:  But I can also talk about impacts that

6  are just --

7          MR. LOVETT:  Let's wait until --

8          THE COURT:  Hold on.

9          MR. LOVETT:  Your Honor, Dr. Palmer's report does

10  not address issues of function beyond the loss of the insects

11  themselves.

12          THE COURT:  Well, in what regard does it address

13  function affected by the loss of insects?

14          MR. LOVETT:  Only I think and to this extent, that

15  she testified earlier that certain functions of the insects

16  themselves that are lost, shredding and the other kind of

17  activities that the insects carry on in the water itself is

18  lost, not the effect on higher trophic levels.

19          THE COURT:  All right.  Go ahead.  Resume your

20  questioning you started before I interrupted you.

21          THE WITNESS:  I don't know if I can correct you, but

22  higher trophic levels are affected within the stream.

23          MR. LOVETT:  I understand, but --

24          THE WITNESS:  I don't mean --

25          MR. LOVETT:  You don't need to testify about that --

Palmer - Direct

1         THE WITNESS:  Okay.

2         MR. LOVETT:  -- given the Court's ruling.

3         MR. MCLUSKY:  Your Honor, I move to strike the

4    comment.

5         THE COURT:  Well, I'll disregard it.

6    BY MR. LOVETT:

7    Q.   Do the insects in the streams vary over insensitivity?

8    A.   Yes, they do.

9    Q.   And the presence and absence of those insects, then,

10   allows stream ecologists to determine whether a stream is

11   healthy or not; is that correct?

12   A.   That's correct.

13   Q.   Now, I was asking you, I think, about the publications in

14   the area.

15   A.   Yes.

16   Q.   And particularly about the effects of sulfates and

17   conductivity on aquatic life.

18   A.   Yes.

19   Q.   Do you know approximately how many publications,

20   peer-reviewed publications there have been that address that

21   relationship?

22   A.   I want to say on the order of perhaps 20.

23   Q.   Are you confident that that number is close?

24   A.   Yes.

25   Q.   Did you just look at that this morning?

Palmer - Direct

1  A.   I did look at it, but I don't remember the exact number.

2  I actually counted the authors.

3  Q.   And how many authors were there of those approximately 20

4  papers?

5  A.   Over 50.

6  Q.   So over 50 authors have published approximately 20 papers

7  in peer-reviewed journals addressing the relationship between

8  conductivity, sulfates, and aquatic impairment; is that right?

9  A.   That's correct.  So those are the papers that are just

10  linking conductivity and impairment.  It doesn't include

11  papers linking valley fills to conductivity alone.

12  Q.   And there are many more of those papers, right?

13  A.   That's correct.

14  Q.   Now, and do each of those papers determine that there is

15  a link -- strike that.

16      Do each of those papers determine that conductivity --

17  that high conductivity causes aquatic impairment?

18  A.   They all show a strong relationship between conductivity

19  and impairment.

20  Q.   And are there any papers, published papers, to the

21  contrary?

22  A.   No, no papers to the contrary.

23  Q.   Okay.  And at what levels do those papers determine -- at

24  what levels of conductivity do those papers determine that

25  aquatic impairment occurs?

Palmer - Direct

1          MR. MCLUSKY:  Your Honor, I'm going to object.  I'm

2     looking at her report.  She's got 11 documents listed here as

3     reference materials on page 9 and 10 of her report, and we've

4     just talked about some 20 articles that haven't been

5     identified and are not identified presumably in this list of

6     11 reference materials.

7          MR. LOVETT:  Well, she's not testifying specifically

8     about each of them.  I think there's also a list on the

9     rebuttal report.  I agree that perhaps each of the 20 isn't

10     something she's going to testify any more about.  Mr. McLusky

11     can ask her, if he likes, to name each of the 20 articles and

12     to see if -- you know, test her knowledge of them.

13          THE COURT:  Well, I assume what you're telling me is

14     that for purposes of forming her opinions, she's relied upon

15     the articles that were listed specifically that totaled about

16     11.

17          MR. LOVETT:  Eleven in her opening report and then

18     the additional articles in her rebuttal report.

19          THE COURT:  All right.  You don't intend to ask her

20     about any articles other than those listed, apart from asking

21     her how many articles she's aware of have been published in

22     the area?

23          MR. LOVETT:  That's correct, Your Honor.

24          THE COURT:  All right.  Then I deny the objection.

25     Proceed.

Palmer - Direct

1    BY MR. LOVETT:

2    Q.   The Court has heard this before, and I'll move through it

3    as quickly as I can, but I think we should go through a bit of

4    the history of the publication of papers showing the

5    relationship between conductivity and stream impairment.

6         So are you aware of a Greg Pond paper that was published

7    in 2008?

8    A.   Yes.

9    Q.   Can you explain the significance of that paper to me?

10   A.   Well, he and co-authors basically showed that below

11   valley fill sites -- so they compared mined and unmined sites

12   and showed that conductivity was much higher in the mine below

13   the mine sites and also that there was a loss of organisms.

14   Q.   Okay.  If you could turn to Plaintiffs' Exhibits 1 to 26

15   notebook.

16        May I approach, Your Honor?

17             THE COURT:  You may.

18             MR. MCLUSKY:  I'm sorry, Joe.  Which number was it?

19             MR. LOVETT:  It's plaintiffs' notebook, Exhibits 1

20   through 26.

21   BY MR. LOVETT:

22   Q.   Let's start with Exhibit 1.  Are you familiar with this

23   paper?

24   A.   Yes, I am.

25   Q.   And would you tell us what this paper is.

Palmer - Direct

1   A.   This is a paper that Dr. Bernhardt and I wrote

2   summarizing all the impacts of mountaintop mining valley fill

3   operations, including what happens to other water chemistry

4   and to the biota.

5   Q.   And when was it published?

6   A.   When or where?

7   Q.   When.

8   A.   It was published in 2011.

9   Q.   And where was it published?

10  A.   It was published in the New York Academy of Science's

11  journal.

12  Q.   Could you turn to -- we'll use these PE numbers at the

13  bottom.   It's PE 24.   Or, excuse me.   PE 14.   Do you see the

14  numbers I'm referring to?

15  A.   Okay.

16  Q.   And do you see in the conclusions there?

17  A.   I do.

18  Q.   Could you read into the record at the conclusion from the

19  sentence about, you know, a couple inches down beginning

20  "Whether or not."

21  A.   "Whether or not individual component ions within mining-

22  derived runoff reach streamwater concentrations" --

23            THE REPORTER:   I'm sorry.

24            THE COURT:   Slow down.

25            THE WITNESS:   I'm sorry.   "Whether or not individual

Palmer - Direct

1    component ions within mining-derived runoff reach streamwater

2    concentrations of multiple contaminants is clearly associated

3    with a substantial reduction in water quality and biological

4    integrity in streams and rivers below mine sites."

5    BY MR. LOVETT:

6    Q.   And the next sentence as well, please.

7             MR. MCLUSKY:  What page are we on?

8             MR. LOVETT:  PE 14.

9             MR. MCLUSKY:  Which column?

10            MR. LOVETT:  At the conclusions.  We're now in the

11    last sentence on the page.

12            MR. MCLUSKY:  Thank you.

13            THE WITNESS:  "All research to date indicates that

14    conductivity is a robust measure of the cumulative or additive

15    impacts of the elevated concentrations of multiple chemical

16    stressors from mine sites that lead to biological impairment

17    of streams."

18    BY MR. LOVETT:

19    Q.   And you believe that statement was accurate as of the

20    publication in 2011?

21    A.   Yes, I do.

22    Q.   Do you still believe that to be an accurate statement?

23    A.   Absolutely.

24    Q.   Is that a peer-reviewed journal?

25    A.   Yes, it is.

Palmer - Direct

1    Q.    Okay.  Could you turn to Exhibit 3, please.

2    A.    Okay.

3    Q.    Have you seen this paper before?

4    A.    I have.

5    Q.    And who were the authors of the paper?

6    A.    Susan Cormier, Glenn Suter, and Lei Zheng.

7    Q.    And where was it published?

8    A.    It was published in *Environmental Toxicology and*

9    *Chemistry*.

10   Q.    And what year was it published?

11   A.    2012.

12   Q.    Is that a reputable peer-reviewed journal?

13   A.    Absolutely.

14   Q.    Okay.  Can I turn your attention to the abstract, please.

15   A.    Yes.

16   Q.    Could you read from the sentence "The authors developed

17   an aquatic life benchmark."  Do you see that?

18   A.    Yes.

19   Q.    Could you read --

20   A.    "The authors developed an aquatic life benchmark for

21   specific conductance as a measure of ionic strength that is

22   expected to prevent the local extirpation of 95 percent of

23   species from neutral to alkaline waters containing a mixture

24   of dissolved ions in which the mass of sulfate, bicarbonate,

25   and chloride."

Palmer - Direct

1    Q.   Would you continue, please.

2    A.   "Extirpation concentrations of specific conductance were

3    estimated from the presence and absence of benthic

4    invertebrate genera from 2,210 stream samples in West

5    Virginia."

6    Q.   Continue.

7    A.   "The extirpation concentration is the 95th percentile of

8    the distribution of the probability of occurrence of a genus

9    with respect to specific conductance."

10   Q.   And one more sentence.

11   A.   "In a region with a background of 116 microsiemens per

12   centimeter, the 5th percentile of the species sensitivity

13   distribution of extirpation concentrations for 163 genera is

14   300 microsiemens per centimeter."

15   Q.   Okay.  Do you agree with that conclusion?

16   A.   Yes, I do.

17   Q.   Does all of the published literature that you're aware of

18   agree with that conclusion?

19   A.   Yes, it does.  They do.

20           MR. MCLUSKY:  Your Honor, I object to this only

21   because it refers to genera, and I think her own testimony was

22   that the measure of impairment in West Virginia is tied to

23   taxa, not genera.

24           THE COURT:  Well, you can cross-examine her about

25   that.

Palmer - Direct

 1   BY MR. LOVETT:

 2   Q.   Would you turn to Exhibit 11, please.

 3   A.   Okay.

 4   Q.   What is Exhibit 11?

 5   A.   This is a paper by a group of people, Ty Lindberg, Emily

 6   Bernhardt, and others looking at the cumulative impacts of

 7   mining in a watershed.

 8   Q.   And when was that paper published?

 9   A.   This was published in, I think, 2011.

10   Q.   I think it says -- does it say received for review

11   July --

12   A.   So it could be it could have come out in final form in

13   2012.  I'm not sure when the final form came out.

14   Q.   Okay.  Where was this published?

15   A.   This was published in *Proceedings of the National Academy*

16   *of Science*.

17   Q.   Is that a prestigious journal?

18   A.   One of the most prestigious.

19   Q.   Okay.  And could I turn your attention to the abstract on

20   the first page there.

21   A.   Yes.

22   Q.   And about halfway down, the sentence beginning "However,

23   as eight separate mining."  Do you see that?

24   A.   "However, as eight separate mining-impacted tributaries

25   contributed their flow, conductivity and the concentrations of

Palmer - Direct

1   selenium, sulfate, magnesium, and other inorganic solutes

2   increased at a rate directly proportional to the upstream

3   areal extent of mining."

4   Q.   Okay.  And then skip a sentence and read the sentence, if

5   you would, beginning "All tributaries."

6   A.   "All tributaries draining mountaintop-mining-impacted

7   catchments were characterized by high conductivity and

8   increased sulfate concentration, while concentrations of some

9   solutes such as selenium, strontium, and nitrogen were lower

10   in the two tributaries draining reclaimed mines."

11   Q.   Okay.  Now, you've examined the data from Stillhouse

12   Branch, correct?

13   A.   Correct.

14   Q.   And we'll go through that in a minute, but do the data

15   from Stillhouse Branch comport with the conclusion here that

16   tributaries draining mountaintop-mining-impacted catchments

17   were characterized by high conductivity and increased

18   sulfates?

19   A.   Yes, that's correct.

20   Q.   And do you agree with the conclusions of Drs. Lindberg

21   et al. here?

22   A.   Yes, I do.

23   Q.   I turn your attention to Exhibit 13, please.

24   A.   Okay.

25   Q.   Do you recognize that?

Palmer - Direct

1   A.   I do.

2   Q.   And what is it?

3   A.   It's a paper that I was the lead author on, published in

4   *Science* in 2010, looking at the consequences of mountaintop

5   mining.

6   Q.   Okay.  And is *Nature* a prestigious journal?

7   A.   Is the *Science*?

8   Q.   I'm sorry.  *Science*.

9   A.   Yes.

10  Q.   Is that a prestigious journal?

11  A.   It's a very prestigious journal.

12  Q.   And this is peer-reviewed, correct?

13  A.   Yes.

14  Q.   Turning your attention to page PE 177, which is the next

15  page --

16  A.   Okay.

17  Q.   -- and the first section there is "Mining effects on

18  stream chemistry and biota."  Do you see that?  I think it's

19  explaining the figures above.

20  A.   I'm sorry.  What column are you --

21  Q.   It's the first -- it's the very first thing, describing

22  the figures.

23  A.   Oh, it's the figure legend.  Okay.  "Mining effects on

24  stream chemistry and biota.  Sulfate concentrations reflect

25  amount of mining in watershed."  That's the top panel.

Palmer - Direct

1    Q.    Right.

2    A.    Average concentrations of manganese, iron, aluminum, and

3    selenium is the bottom panel.

4         "Stream invertebrate metrics in relation to sulfate

5    concentrations for 1058 West Virginia streams (methods in

6    table S2).  Regressions all statistically significant (table

7    S3)."

8    Q.    What do those panels tell you?

9    A.    Well, this -- that shows that -- this was before the

10   benchmark was established.

11   Q.    Yes.

12   A.    And we looked at the relationship between increasing

13   sulfate and other ions, as well as the stream condition index.

14   The ions we looked at all increased, and the stream condition

15   index declined, as did the number of insect genera, the number

16   of intolerant genera, and the number of mayfly genera.

17   Q.    And in 2014 do those conclusions hold true still?

18   A.    Yes, they do.

19   Q.    Okay.  I turn your attention to tab 15, please.

20   A.    Yes.

21   Q.    What is that?

22   A.    This is the paper by Greg Pond that we talked about

23   earlier in my testimony.

24   Q.    The 2008 paper?

25   A.    Correct.

Palmer - Direct

1   Q.   Okay.  And let's look at the abstract there and start

2   with the second sentence "We characterized."

3   A.   "We characterized macroinvertebrate communities from

4   riffles in 37 small West Virginia streams (10 were unmined and

5   27 mined sites with valley fills) sampled in the spring index

6   period (March through May)" --

7   Q.   May I interrupt you there?

8   A.   Yes.

9   Q.   So this is different -- is this different from the other

10  papers that you've testified about in that it's focusing on

11  particular streams?

12  A.   That's correct.

13  Q.   Okay.  And I forgot to ask you, was this published in a

14  peer-reviewed journal?

15  A.   Yes.  It's in the *Journal of the North American*

16  *Benthological Society*.

17  Q.   Another reputable journal?

18  A.   Yes.  It is the top stream ecology journal.

19  Q.   Okay.  And could you read one more sentence.  If you skip

20  a sentence, then it's the sentence beginning "Four lines of

21  evidence."

22  A.   "Four lines of evidence indicate that mining activities

23  impair biological condition of streams: shift in species

24  assemblages, loss of Ephemeroptera taxa, changes in individual

25  metrics and indices, and differences in water chemistry."

Palmer - Direct

1    Q.    Okay.  Now, this publication is from 2008.  Do those

2    conclusions hold true today?

3    A.    They do.

4    Q.    And they're supported by all subsequent published

5    literature; is that correct?

6    A.    That's correct.

7    Q.    Does it matter -- is it relevant that this focuses on

8    particular streams instead of a large dataset from DEP?

9    A.    Well, it reaches the same conclusion.  It just has groups

10   of streams as opposed to, say, a continuum.

11   Q.    It uses different methods to reach the same conclusion

12   that the DEP dataset led other researchers.

13   A.    That's correct.

14   Q.    Could you turn to Exhibit -- or tab 16, please.

15   A.    Okay.

16   Q.    Well, before we do that -- I'm sorry.  Back in that

17   article, would you look at PE 212.  PE 213.  I'm sorry.

18   A.    Okay.

19   Q.    Do you see table 5 there?

20   A.    Yes.

21   Q.    What does table 5 show us?

22   A.    This shows you correlation coefficients for both the

23   GLIMPSS --

24   Q.    Okay.

25   A.    -- index and the WVSCI index and the significance of

Palmer - Direct

1   those various factors related to that.

2   Q.   And does it address temperature?

3   A.   Yes, it does.

4   Q.   Does it find temperature to be significant?

5   A.   Not to significantly affect.

6   Q.   What does it find?  Let's look at the WVSCI rather than

7   the GLIMPSS.  Do you see the WVSCI column?

8   A.   Yes.

9   Q.   What effect does -- how much of the effect of impairment

10  does the temperature contribute to?

11  A.   .02.

12  Q.   That's a very small amount, correct?

13  A.   Very small.

14  Q.   And --

15  A.   Conductivity, eight -- .80.

16  Q.   And does it also address embeddedness?

17  A.   Yes.  That's .22.

18  Q.   So it finds -- this study finds that at those mined

19  sites, conductivity is a much, much more significant cause

20  than either embeddedness or temperature.

21  A.   That's correct.

22  Q.   Does that mean that this 2008 paper did not find that

23  either temperature or embeddedness were confounding factors

24  for the causation of the impairment by conductivity?

25              MR. MCLUSKY:  I object.  There's no foundation for a

Palmer - Direct

1    statement about a confounding factors analysis.

2           THE COURT:  Rephrase your question.

3    BY MR. LOVETT:

4    Q.   What's a confounding factor?

5    A.   A confounding factor is a factor that essentially

6    interferes with the relationship between two other variables

7    you're trying to look at.

8    Q.   And is that a statistical concept that you use in your

9    work all the time?

10   A.   Yes.

11   Q.   Okay.  And based on these tables, does it appear that

12   either temperature or embeddedness confounds the causal

13   mechanism of conductivity for impairment?

14          MR. MCLUSKY:  I object to the form of that question.

15   The testimony earlier was there's a high degree of correlation

16   between conductivity and impacts to insects, not causation.

17          MR. LOVETT:  That's not my question.  I am not

18   asking about the relation -- I'm asking if she thinks this

19   shows cause or not.

20          THE COURT:  Overruled.  You can cross-examine.

21          THE WITNESS:  I'm sorry.  What was the question?

22   BY MR. LOVETT:

23   Q.   I'm sorry.  Let me try to think of it again.  Does this

24   show -- does this table show that conductivity is the cause of

25   the impairment rather than temperature or embeddedness?

Palmer - Direct

1   A.   It does.  It shows it's the primary leading factor.

2   Q.   Let's see.  Turn to 16 now, please.  What is tab 16?

3   A.   Yes.

4   Q.   What is that?

5   A.   This is another study by Greg Pond, as sole author this

6   time, looking at what happens to mayflies, Ephemeroptera, in

7   headwater streams, patterns of taxa loss.

8   Q.   Okay.  And where was this published?

9   A.   It was published in *Hydrobiologia*.

10  Q.   Do you know when it was published?

11  A.   I want to say 2012.  I'm looking to see if it's on here.

12  This is the proof instead of the final article that was

13  published, but it's essentially the same.

14  Q.   Okay.  Could you --

15  A.   Oh, it may have been 2010.  I'm sorry.

16  Q.   Why do you say that?  Why are you changing your mind?

17  A.   Well, because what I'm looking at was the final version

18  was accepted December 2009.  So it certainly had a 2010 date

19  on it.

20  Q.   Okay.  Now, in the abstract there, at the end of the

21  abstract, at the end of the first column on page 223, there's

22  a sentence that begins "Mean mayfly richness."  Do you see

23  that?

24  A.   Yes.

25  Q.   Would you read that, please?

Palmer - Direct

1   A.   "Mean mayfly richness and relative abundance were

2   significantly higher at reference sites compared to all other

3   categories; mined sites had significantly lower metric values

4   compared to residential and mined and residential sites."

5   Q.   Okay.  So what conclusion is Pond drawing here?

6   A.   Well, he's basically concluding that the abundance of

7   mayflies declines dramatically in mined streams even in

8   comparison to watersheds that have a little bit of mining and

9   residential development in them.

10  Q.   Okay.  And do you agree with the conclusion of the paper?

11  A.   I do.

12  Q.   Has any subsequent publication invalidated that paper?

13  A.   No, they have not.

14  Q.   Number 17, please.

15  A.   Yes.

16  Q.   What is that?

17  A.   This is a similar paper by Greg Pond, but in this case he

18  looked at the effect of mining on stoneflies and caddisflies.

19  Q.   Okay.  Can I turn your attention to the abstract and the

20  very bottom of the first column with the sentence beginning

21  "Core caddisfly genera."  Do you see that?

22  A.   Yes.

23  Q.   Could you read that sentence?  Read that sentence and the

24  following, please.

25  A.   "Core caddisfly genera" -- do you want me to read all

Palmer - Direct

1    those?

2    Q.    No.

3    A.    -- "were extirpated from most disturbed sites.  Species

4    richness was significantly higher at reference sites and

5    reference site mean tolerance value was lowest compared to all

6    other categories; relative abundance of both orders was

7    variable between disturbance groups."

8    Q.    Okay.  What does that tell us, that abstract?

9    A.    Well, basically it's similar, that when you get

10   disturbance in a watershed, you can get a reduction in

11   stoneflies and caddisflies, but the greatest reduction is in

12   the mined sites.

13   Q.    Okay.  And so that is looking at a particular mine site

14   or a large dataset?

15   A.    I believe this was looking at particular mine sites, but

16   I'd have to go back.  They looked at 94 headwater streams, and

17   they were groups of sites.

18   Q.    And is this in Kentucky?  Are these data from Kentucky?

19   A.    That's correct.

20   Q.    And was -- where was it published?

21   A.    This was also published in *Hydrobiologia*.

22   Q.    Do you agree with the conclusions reached in that paper?

23   A.    Yes, I do.

24   Q.    Have all subsequent publications also been in harmony

25   with that paper?

Palmer - Direct

1   A.   Yes, they have.

2   Q.   Okay.  I turn your attention to tab 18, please.

3   A.   Okay.

4   Q.   What is that?

5   A.   This is a very -- oh, this is a paper by Greg Pond, Jeff

6   Bailey, Ben Lowman, and Michael Whitman that describes how the

7   GLIMPSS index was developed, calibrated, and validated.

8   Q.   Okay.  Would you read the sentence in the abstract, in

9   the second column, beginning "A comparison of GLIMPSS with

10  WVSCI."

11  A.   "A comparison of GLIMPSS with WVSCI exhibited marked

12  improvements where GLIMPSS detected greater stream impacts."

13  Q.   What does that mean?

14       MR. MCLUSKY:  Your Honor, before we go any further,

15  I've looked at both her first report and then the rebuttal

16  report.  I don't think this paper is listed as a reference in

17  either report.

18       MR. LOVETT:  If it's not, I apologize and we'll move

19  on.

20       THE COURT:  Well, why don't you move on --

21       MR. LOVETT:  I'll look to make sure.

22  BY MR. LOVETT:

23  Q.   Okay.  Can I turn your attention to PE 287, which is tab

24  19, please.

25  A.   Yes.

Palmer - Direct

1   Q.   Now, this isn't mentioned in your report, is it?

2              MR. HECKER:   It is.

3              MR. LOVETT:   Oh.   Well, Mr. Hecker informs me --

4   strike that.   Let's move back to the previous thing.   Mr.

5   Hecker informed me on page 10 of her report from January 16,

6   2014, it is listed as the -- I guess it's the first --

7              MR. MCLUSKY:   Okay.   It's there, Your Honor.

8              THE COURT:   All right.   Go ahead, then.

9   BY MR. LOVETT:

10  Q.   Okay.   Well, let's go back and try to finish that.   What

11  does -- what's the conclusion of this calibration and

12  validation paper that begins on PE 261?

13  A.   Well, it basically is just demonstrating, showing, how

14  they developed it and that it is better at detecting

15  impairment in streams, loss of taxa, and so forth than is the

16  WVSCI score.

17  Q.   All right.   So let's move on to the next one, which is

18  PE 287.   Do you see that?

19  A.   Yes.

20  Q.   And that's not listed in either of your reports, is it?

21  A.   This came out right -- very recently.

22  Q.   Okay.

23  A.   And so I wanted to submit it as something I had read.

24  Q.   When was it published?

25  A.   2014.

Palmer - Direct

1    Q.   June 2014?

2    A.   That sounds about right.

3    Q.   This says accepted June 2014.  So very recently.

4    A.   Yes.

5    Q.   And who are the authors?

6    A.   Greg Pond and colleagues from other -- from EPA.

7    Q.   Okay.

8    A.   And actually from the Office of Surface Mining.

9    Q.   From EPA and the Office of Surface Mining?

10   A.   That's correct.

11   Q.   Where was it published?

12   A.   In *Environmental Management*.

13   Q.   Is that a peer-reviewed journal?

14   A.   Absolutely.

15   Q.   And what does the paper conclude?

16   A.   There's a number of different conclusions.  I think that

17   among the most significant is that they looked at streams

18   below valley fill sites where the sites had been reclaimed,

19   and it was between, like, 11 and 33 years previously; and

20   those streams, the majority, the vast majority were still

21   impaired.

22   Q.   Eleven to thirty-three years after the completion of

23   reclamation, a majority of the streams were still impaired; is

24   that right?

25   A.   That's correct.

Palmer - Direct

1   Q.   Impaired by what?

2   A.   Conductivity, ionic problems, water quality.

3   Q.   And would you read from the abstract at the end of the

4   first column where it says, "Although valley fills -- although

5   VF sites."  Do you see that?

6   A.   "Although valley fill sites had good instream habitat,

7   nearly 90 percent of these streams exhibited biological

8   impairment.  Valley fill sites with higher index scores were

9   co-located near unaffected tributaries; we suggest that these

10   tributaries were sources of sensitive taxa as drifting

11   colonists."

12   Q.   What does that mean?

13   A.   So what they did in this study was they selected sites

14   that had comparable temperature and habitat regimes to the

15   reference sites, and the majority of the mined sites were

16   impaired and had water quality problems.  There were a few

17   that were below the impairment threshold.  And so they went

18   back into the field to sample tributaries that were

19   contributing to the stream they sampled, and those tributaries

20   were unmined, and measured drifting organisms.

21        And what they found was, not surprisingly, from those

22   unmined tributaries, organisms were drifting in to the main

23   stem -- I guess it was the main stem that they were sampling

24   below the valley fill.  And so basically what they showed is

25   that the exceptions to the -- what I would call a rule, that

Palmer - Direct

1    when conductivity reaches a certain point you get impairment,

2    were due to drifting organisms coming in.

3    Q.    Okay.  And let's look at the last sentence of the

4    abstract, "Although these VFs," valley fills.  Do you see

5    that?

6    A.    "Although these valley fills were constructed pursuant to

7    permits and regulatory programs that have as their stated

8    goals that (1) mined land be reclaimed and restored to its

9    original use or a use of higher value, and (2) mining does not

10   cause or contribute to violations of water quality standards,

11   we found sustained ecological damage in headwater streams

12   draining valley fills long after reclamation was completed."

13   Q.    Okay.  I turn your attention to PE 289.

14   A.    Yes.

15   Q.    And I guess it's a sentence that begins, really, on 288,

16   but it's a very long sentence.  So -- no.  Strike that.  It's

17   not.

18        Do you see the first sentence, beginning "Local reference

19   streams"?

20   A.    Yes.

21   Q.    Would you read that sentence, please.

22   A.    "Local reference streams were sighted in close proximity

23   (range .75 to 10.5 kilometers) to paired valley fills and had

24   similar catchment areas, forest types, and base geology."

25   Q.    Okay.  And why is that relevant?  Why is that important

Palmer - Direct

1    to the study?

2    A.    Well, my interpretation is that they were trying to

3    actually get the field data in which they eliminated

4    confounding -- potential confounding factors.

5    Q.    What confounding factors are they trying to eliminate?

6    A.    Well, things like the area forested.  So all of the

7    stream reaches they sampled in were forested along the

8    riparian corridor.  They selected streams that had similar

9    temperatures as well as similar habitat scores.  So basically

10   the kinds of things that the benchmark had tested for as

11   confounding variables.

12   Q.    And then it goes on to say, "These reference streams."

13   Read the next sentence too.

14   A.    "These reference streams were not pristine, as their

15   catchments frequently had poorly maintained roads and

16   culverts, utility right-of-ways, gas wells, or underground

17   mining that did not discharge to the watershed."

18   Q.    Okay.  Why is that important that that's noted here?

19   A.    Well, it shows that other forms of impacts to the water-

20   shed are not causing the kind of impairment you see below

21   valley fills.

22   Q.    Okay.  And turn to page 291, if you would, please, the

23   section labeled "Results."

24   A.    Yes.

25   Q.    Could you read the first sentence there?

Palmer - Direct

1   A.   "Between valley fill and reference groups, stream

2   characteristics (catchment area, channel width, riffle

3   substrate composition, discharge) were all similar."

4   Q.   Continue.

5   A.   "However, percent forest was significantly higher at

6   reference sites."

7   Q.   Why is it important that the percent forest was

8   significantly higher at reference sites?

9   A.   Well, those are unmined watersheds, and so those are

10  the -- all the streams had forest along the riparian corridor,

11  but the mined ones had lost their -- obviously much of the

12  forest in the upper areas where the mining had occurred.

13  Q.   Okay.  And let me ask you, so this paper isn't based on

14  DEP data either, is it?

15  A.   No.  This was -- this is what you would call a natural

16  experiment when you actually select sites specifically to test

17  a hypothesis.

18  Q.   Okay.  And then let's turn to the next page at table 1.

19  A.   Yes.

20  Q.   And we see -- well, what is table 1?

21  A.   It's just a list of comparing the environmental variables

22  that were measured at the reference --

23  Q.   Uh-huh.

24  A.   -- versus valley fill sites.  And it shows the mean as

25  well as the minimum and maximum values measured.

Palmer - Direct

1   Q.   And did it look at the embeddedness score?

2   A.   Yes, it did.   The mean for the reference was 17.3 and for

3   the valley fill was 14.3.

4   Q.   And why does it -- is it typical to use mean rather than

5   median when you express data like this in a paper?

6   A.   Usually when you have a table like this, it is.

7   Q.   Okay.   And temperature as well?   Does it assess

8   temperature effects?

9   A.   I'm sure it does.   Let me just --

10   Q.   Towards the bottom of the chart.

11   A.   Yes, it does.   Temperature at the reference site, the

12   mean was 13.8, and the mean at the valley fill site was 14.4.

13   And they had almost identical maximum values at the mined and

14   valley fill sites.

15   Q.   Okay.   Turn to page 294, the first column.

16   A.   Yes.

17   Q.   "We found that known sensitive taxa such as the

18   mayflies" -- do you see that? -- "*Ephemerella* and" --

19   A.   "We found that known sensitive taxa such as the mayflies

20   *Ephemerella* and *Epeorus* and the caddisfly *Neophylax* were found

21   at 100 percent of the reference sites but were absent from 12

22   of 15, or 80 percent, of the valley fill sites."

23   Q.   What does that tell us?

24   A.   Well, it tells you that most of those sites below valley

25   fills, you know, had lost sensitive mayflies.

Palmer - Direct

1   Q.   Okay.  And on page 296.

2   A.   Yes.

3   Q.   Second column, about halfway down.  "VF age was not

4   significantly correlated."  Do you see that?

5   A.   Not yet.

6        THE COURT:  Which column?

7        MR. LOVETT:  Second column, halfway down, page 296.

8   "VF age."

9        THE WITNESS:  296.  I was on the wrong page.

10      "VF age alone was not related to biological condition.

11  VF age was not significantly correlated to any biological

12  indicators or water chemistry."

13  BY MR. LOVETT:

14  Q.   And then in the discussion at the very bottom of the

15  page, "The idea of VF age."  Do you see that?

16  A.   Yes.  "The idea of VF 'age' as a predictor of downstream

17  recovery is plausible, but we found no relationship between

18  valley fill age and any of the biological or chemical measures

19  and thus it was impossible to predict recovery time with our

20  dataset."

21  Q.   And remind me, the older valley fills were -- had some

22  forest cover, correct?

23  A.   That's correct.

24  Q.   Okay.  On page 298 --

25  A.   Yes.

Palmer - Direct

1   Q.    -- the first column, just a couple of inches down, the

2   clause, not a sentence, beginning "our data indicated."

3            MR. MCLUSKY:   Which column?

4            MR. LOVETT:   First column, near the top.

5            THE WITNESS:   This is page 298?

6            MR. LOVETT:   298.   It's the sentence beginning

7   "Despite federal and state mining" --

8            THE WITNESS:   Yes.   "Despite federal and state

9   mining and water quality regulations intended to safeguard

10  aquatic resources during and after mining, our data indicated

11  that highly evaluated ionic concentrations may persist for

12  over 30 years post-reclamation and that these chemical

13  signatures result in damaged aquatic communities."

14  BY MR. LOVETT:

15  Q.    Would you read the next sentence, please.

16  A.    "Habitat can be a limiting factor, but by design, we

17  removed significant habitat degradation factors by selecting

18  sample reaches with relatively good habitat and intact

19  riparian vegetation at reference and valley fill sites."

20  Q.    Okay.   So these were selected sites, again, not from the

21  big DEP dataset.

22  A.    That's correct.

23  Q.    This is another way, then, of controlling for those

24  variables that's different from the way the other publication

25  did it by using the DEP dataset.

Palmer - Direct

1   A.   They took exactly the approach you would take in trying

2   to control for variables that you weren't interested in

3   measuring necessarily or that you weren't interested in

4   testing.

5   Q.   Okay.  Let's turn to the next tab, please, which is 20.

6        You testified earlier I think that the level of

7   impairment under the WVSCI is 68; is that right?

8   A.   That's correct.

9   Q.   Okay.  Have you seen this letter before?

10  A.   I have.

11  Q.   Okay.  Would you read the sentence beginning -- I guess

12  it's the third sentence in the letter.  It says, "For the

13  reasons discussed."

14  A.   "For the reasons discussed in the enclosures, EPA

15  partially approves and partially disapproves West Virginia's

16  Section 2012 303(d) list consistent with the requirements of

17  the Clean Water Act Section 303(d) and 40" -- and I forget

18  what C.F.R. stands for.

19  Q.   Code of Federal Regulations.

20  A.   Okay.  Code of Federal Regulations.

21  Q.   And then the next sentence.

22  A.   "The basis of EPA's partial disapproval is West Virginia

23  DEP's decision not to evaluate existing and readily available

24  data regarding whether certain waters are achieving West

25  Virginia's narrative water quality criteria as applied to the

Palmer - Direct

1    aquatic life uses."

2    Q.    Then would you turn to page 319, please, the last -- the

3    second to the last page of that document.

4    A.    Okay.

5    Q.    And the sentence in the second -- or the first full

6    paragraph on the page, the second to the last sentence, "West

7    Virginia's use of the 'gray zone.'"  Can you read that?

8    A.    Uh-huh.  "West Virginia's use of the 'gray zone' is

9    statistically unsupported."

10   Q.    Okay.  That's enough.  What's the gray zone, if you

11   remember?

12   A.    I think it was between 62 and 68, but I forget exactly.

13   Q.    Would you turn to Exhibit -- or tab 21.

14   A.    Okay.

15   Q.    And is that another letter from EPA to Mr. Huffman at

16   DEP?

17   A.    Yes, it is.

18   Q.    And would you turn to page 358.

19   A.    Okay.

20   Q.    And it says -- the last full paragraph on that page --

21   "WVDEP's use of a precision."  Do you see that?

22   A.    Yes.

23   Q.    Could you read that sentence, please.

24   A.    "West Virginia DEP's use of a precision estimate to

25   establish the 'gray zone' is not statistically supportable

Palmer - Direct

1    because the potential variability for which the gray zone is

2    purported to account already is accounted for by variability

3    in the reference sites."

4    Q.    Okay.  So you don't remember the numbers for the gray

5    zone, but the gray zone, as you recall, is between 60 and 68

6    I think.

7    A.    Yeah, in that region.

8    Q.    And was DEP trying to use that gray zone to mark

9    impairment rather than 68?

10   A.    That's what these letters would imply.

11   Q.    Do you know if DEP was doing that, or do you not know?

12   A.    I don't know.

13   Q.    Okay.  But in any event, this letter says that it would

14   be inappropriate, not statistically supportable, to use such a

15   gray zone; is that right?

16   A.    That's correct.

17   Q.    And then let's turn to the tab 25.

18   A.    Okay.

19   Q.    And that should be another letter from EPA.  And would

20   you turn to page PE 383 of that, please.

21   A.    I'm sorry.  383?

22   Q.    Uh-huh.

23   A.    Yes.

24   Q.    And it says -- would you read the confounding factors --

25   strike that.  We'll get to this.  Let me strike that.

Palmer - Direct

1    THE COURT:  Would this be a good time to take a

2    break?

3    MR. LOVETT:  Yes, Your Honor.

4    THE COURT:  All right.  We'll take a ten-minute

5    recess.

6        You may step down, but don't discuss your testimony.

7        (Recess from 10:34 a.m. to 10:52 a.m.)

8    THE COURT:  All right.  You may resume.

9    BY MR. LOVETT:

10   Q.   Dr. Palmer, would you grab the joint exhibits again, 1 to

11   58.

12       May I approach, Your Honor?

13   THE COURT:  Yes, you may.

14   BY MR. LOVETT:

15   Q.   I think it's the one you had previously.

16   A.   Are we going to go back to this?

17   Q.   We'll use that again later.  We're almost finished.

18       In the joint exhibits, would you turn to tab 58, which is

19   the benchmark.

20   A.   Okay.

21   Q.   Okay.  Now, based on the research that you just testified

22   about and its own scientists, EPA published a benchmark in

23   2011, March of 2011; is that right?

24   A.   That's correct.

25   Q.   What is this document?  What is the benchmark?

Palmer - Direct

1    A.    The benchmark is describing work they did to establish a

2    relationship between extirpation of organisms and

3    conductivity.

4    Q.    And would you turn to page JE 396.  Can you tell me who

5    the authors of the benchmark were and, if you know any of

6    them, if they're good scientists?

7    A.    So you want me to identify the ones I know?

8    Q.    Well, yes, if you know a scientist here that you think is

9    particularly eminent in the field of stream ecology.

10        First of all, were there a lot of reviewers of the

11    benchmark and contributors?

12    A.    There were.

13    Q.    Four principal authors, correct?

14    A.    That's correct.

15    Q.    And Cormier and Suter whose papers you testified about,

16    right?

17    A.    That's correct.

18    Q.    And then there are other contributors as well, correct?

19    A.    That's correct.

20    Q.    One, two, three, four, five, six, seven, eight of those.

21    Do you know any of those?

22    A.    Yes, I do.

23    Q.    Which -- who do you know here?

24    A.    So Gerritsen I met at one point.  Michael Griffith.

25    Q.    Only if you know their work well.  You don't have to just

Palmer - Direct

1   have passing --

2   A.    Greg Pond.  I've read his work.  I've never met him.

3   Q.    Okay.  And then there were one, two, three, four, five,

4   six, seven, eight, nine reviewers, correct?

5   A.    It looks to be the case.

6   Q.    Was Dr. Menzie one of those?

7   A.    Yes, he is listed as one of those.

8   Q.    Okay.  And also Pond and Passmore; is that right?

9   A.    Yes.

10  Q.    They are people who have published in this area, correct?

11  A.    Correct.

12  Q.    Okay.  And then the Science Advisory Board Panel on

13  Ecological Impacts of Mountaintop Mining and Valley Fills,

14  there are one, two, three, four, five, six, seven, eight,

15  nine, ten, eleven, twelve, thirteen, fourteen, fifteen --

16  fifteen of those reviewers, correct?

17  A.    Correct.

18  Q.    Okay.  Almost all of them have Ph.D.s, don't they?

19  A.    They do, and I know a number of them.

20  Q.    Any of them particularly stand out to you?

21  A.    Well, I know Beth Boyer at Penn State, who's an

22  exceptional stream and river ecologist; Will Clements, who's

23  an expert on toxicology in streams and rivers.

24  Q.    Are these mostly faculty members at universities?

25  A.    That's correct.  He's at Colorado State.  Beth Boyer is

Palmer - Direct

1    at Penn State.  Helderbrand is one of my colleagues at the

2    University of Maryland.  Lucinda Johnson I met from Minnesota.

3    Alex Huryn.

4        There's, oh, yeah, a number of them.  I've read Todd

5    Petty's work.  Sam Luoma used to head up CALFED in the State

6    of California.  I know him.

7    Q.    Do you consider it an eminent list of reviewers and

8    authors?

9    A.    Yes.

10   Q.    And then after this benchmark was written, was it

11   reviewed by another body?

12   A.    That's correct.  I think that the -- these reviewers

13   provided a report to the Scientific Advisory Board for EPA.

14   Q.    Okay.  Well, we'll get to that.  Let's look at the

15   benchmark briefly, though.  We won't spend a lot of time on

16   it.  If you'd turn to page JE 464.

17   A.    Okay.

18   Q.    Do you see figure A-9 there?

19   A.    Yes.

20   Q.    And do you see the sentence above that figure?

21   A.    I do.

22   Q.    Would you read that, please.

23   A.    "At the benchmark of 300 microsiemens, the corresponding

24   WVSCI score is 64, which is impaired based on West Virginia's

25   biocriteria.  Using logistic regression, the probability of

Palmer - Direct

1    impairment at 500 microcentimeters -- 500 microsiemens per

2    centimeter is .72 and at 300 is .59."

3    Q.   Okay.  So this benchmark, then, determined that 300

4    microsiemens per centimeter generally has a corresponding

5    WVSCI score of 64; is that right?

6    A.   Correct.

7    Q.   And that's an impaired score, based on your previous

8    testimony, right?

9    A.   Correct.

10   Q.   Okay.  And would you explain the logistic regression data

11   there to us, what they mean?

12   A.   Well, basically they're just referring to the

13   relationship between conductivity and WVSCI score and the

14   probability that you're going to, if you sample a bunch of

15   streams, how many of those are going to be impaired at a

16   certain level of conductivity.

17   Q.   So 500 microsiemens per centimeter --

18   A.   72 percent will be impaired.

19   Q.   And at 300, which is the benchmark --

20   A.   About 59 percent typically impaired.

21   Q.   Okay.  So EPA sets that as the 300 microsiemens per

22   centimeter as the point at which water quality standards will

23   be violated based on the loss of 59 percent, right?

24   A.   That's correct.

25   Q.   Or 59 percent occurrence --

Palmer - Direct

1    A.    Yes.

2    Q.    -- of loss.  Okay.  And does the figure A-9 support that?

3    A.    It does.

4    Q.    Okay.  Let's now -- did EPA in the benchmark consider --

5    did it use the weight of evidence test or method?

6    A.    It did.  There were a number of steps involved in the

7    causal analysis, and that was certainly one of the most

8    important steps.

9    Q.    And JE 472, this analysis -- or appendix B, it is an

10   analysis of potential confounders.  Do you see that?

11   A.    I do.

12   Q.    Could you tell us what it means to be a confounder.

13   A.    Well, as I referred to before, you know, it basically

14   means that there may be another variable that's leading to the

15   relationship that you're interested in that is basically

16   causing a false relationship or is at least confusing the

17   relationship.

18   Q.    Okay.  So EPA determined that at 300 microsiemens per

19   centimeter, there's going to be impairment in 59 percent of

20   the cases, right?

21   A.    That's correct, occurrences, yes.

22   Q.    And then it looked after that to see if there were any

23   other factors that might be causing that relationship.

24   A.    That's correct.

25   Q.    Okay.  And that's what it did in appendix B, correct?

Palmer - Direct

1   A.   I think that's right.   I forget what appendix number it

2   was, but --

3   Q.   Well, it's at JE 472.

4   A.   Okay.   Yes.

5   Q.   Okay.   And this is -- among the authors of this are

6   Cormier and Suter, right?

7   A.   Correct.

8   Q.   And they're the people that we heard last trial came up

9   with the CADDIS method, right?

10  A.   Yes.

11  Q.   And that's a weight of evidence test to determine when

12  you can eliminate a confounding factor.   Is that your

13  understanding?

14  A.   Yeah.   It's related to causal analysis.

15  Q.   Okay.   So let's look at a couple of the factors,

16  confounding factors, that were considered by the benchmark.

17       And first turn to JE 486, if you would, please.

18  A.   Okay.

19  Q.   And do you see B.4.4 there at the top of the page?

20  A.   Yes.

21  Q.   Okay.   And that's deposited sediment, right?

22  A.   That's correct.

23  Q.   So the purpose of this exercise is to eliminate -- well,

24  strike that.

25       The purpose of this is to determine whether embeddedness

Palmer - Direct

1   or deposited sediment is a confounding factor.  Is that true?

2   A.   That's correct.

3   Q.   Okay.  And what data did, if you know, did EPA use to do

4   this analysis?

5   A.   They used data from the West Virginia DEP database.

6   Q.   All right.  And was that a large dataset?

7   A.   It's extremely large; over many, many years.

8   Q.   Okay.  So did a statistical assessment to eliminate these

9   confounding factors, right?

10   A.   Well, yes, it used a variety of lines of evidence.

11   That's correct.

12   Q.   All right.  And did it eliminate embeddedness as a

13   confounding factor here?

14   A.   Yes, it did.

15   Q.   And how -- explain it just briefly.  I think there will

16   be more testimony by Dr. King, but I just want to briefly

17   introduce how it did that.

18   A.   Well, basically they just showed that, you know, when

19   conductivity is low, even if embeddedness is high, you can

20   have impairment, and vice versa.  You know, at high

21   conductivities, you know, even when there's no embeddedness,

22   you can get impairment.

23   Q.   So it found, for instance, in the table B-13, that there

24   were 44 sites that it looked at, right?

25   A.   Uh-huh.

Palmer - Direct

1   Q.   And the number of the sites that had conductivity of --

2   this is less than 200.  So 44 out of -- well, what does that

3   tell you?

4   A.   Well, it tells me that 95 percent of the sites with

5   embeddedness scores less than 7 --

6   Q.   Uh-huh.

7   A.   -- and conductivity less than 200 had mayflies; and that

8   when you looked at even a higher embeddedness score,

9   99 percent of the sites they looked at had mayflies.

10  Q.   So that tells us that embeddedness, at least at those

11  scores, is not significantly impacting mayflies, right?

12  A.   That's correct.

13  Q.   And what does conductivity tell us?

14  A.   Well, it tells you that, you know, when you don't have a

15  conductivity problem, embeddedness is not really causing a

16  confounding factor; but when embeddedness is lower and you get

17  up to, you know, high levels of conductivity, you definitely

18  get, you know, the impairment.

19  Q.   Why do you think there were so fewer sites considered

20  with conductivities greater than 1500?

21  A.   Well, probably just there were fewer sites that had that,

22  because those are mined sites.

23  Q.   All right.  And then let's turn to JE 492.  Did EPA also

24  consider temperature as a confounding factor?

25  A.   Yes.

Palmer - Direct

1   Q.   And did it similarly eliminate conduct -- temperature as

2   a confounding factor?

3   A.   Yes, it did.   It showed that so long as conductivity is

4   low, even when temperature is greater than 22 degrees

5   Centigrade, you found mayflies at 100 percent of the sites.

6   Q.   Okay.   And what about when conductivity was over 1500?

7   A.   Well, the number of --

8         MR. MCLUSKY:   Your Honor, at this point none of this

9   is in any of her reports, any discussion about the confounding

10   factors analysis.   I don't really have an objection to going

11   forward as long as we understand that they can't have

12   cumulative testimony if Dr. King --

13         MR. LOVETT:   Well, I'm just introducing the concept

14   here that the benchmark contains a confounding factors

15   analysis, and I really wasn't intending --

16         THE COURT:   Well, you're going beyond that when

17   you're asking her specific questions about the benchmark's

18   analysis of these confounding factors.

19         MR. LOVETT:   Okay.   I'll stop, Your Honor.   It is

20   Dr. King who will mainly focus on this, and I don't want to

21   have duplicative testimony.

22         THE COURT:   Good.

23   BY MR. LOVETT:

24   Q.   Now, the only -- the last question in this line is, these

25   confounding factors assessments, as you testified, rely on the

Palmer - Direct

1  DEP database, right?

2  A.   That's correct.

3  Q.   But you testified earlier particularly about a 2014 Pond

4  paper that reached the same conclusions based not on the DEP

5  database, correct?

6  A.   They went to sites and sampled, yes.

7  Q.   So by looking at -- the two methods confirm each other,

8  right?

9  A.   That's correct.  They found the same result.

10  Q.   Even though they used different sets of data to reach it.

11  A.   Yes.

12  Q.   Okay.  Now, after the benchmark was developed and

13  reviewed, it was sent to the Scientific Advisory Board; is

14  that right?

15  A.   That's EPA's procedure, yes.

16  Q.   Okay.  Will you turn back to Plaintiffs' Exhibits 1 to 26

17  and turn to -- do you have it there?

18  A.   Is that the prior notebook we had?

19  Q.   Yes, the one we just used.

20            THE COURT:  Which exhibit?

21            MR. LOVETT:  It is tab 25.

22            THE WITNESS:  Okay.

23  BY MR. LOVETT:

24  Q.   Do you see tab 25?

25  A.   Yes.

Palmer - Direct

1   Q.   Okay.  And is this the Scientific Advisory Board's review

2   of the benchmark?

3   A.   Yes, it is.

4   Q.   Okay.  How does that process work?  Who's on the

5   Scientific Advisory Board?

6   A.   Well, it's a large number of people that are experts in a

7   variety of fields that EPA has to deal with in their work.

8   Q.   Very eminent scientists on there --

9   A.   Oh, yes.

10   Q.   -- right?  And in this case, that Scientific Advisory

11   Board appointed a committee to come up to review the

12   benchmark; is that right?

13   A.   That's right.  They try and appoint a committee that is

14   expertise, all of the people on the committee, to the topic at

15   hand.

16   Q.   Okay.  And that committee is listed on page 374, right?

17   A.   Right.  I believe we went through that before.  Oh, you

18   mean the SAB?

19   Q.   Yeah, this is the SAB, not the -- what we had before was

20   the benchmark itself.  Now we're looking at the SAB.

21   A.   Right.  So page 376, then?

22   Q.   I was looking at 374.

23   A.   Oh, I'm sorry.  Okay.  Yes.  No, that's the panel on

24   ecological impacts.  That's not the SAB.

25   Q.   I understand.  Is this the group, though, that actually

Palmer - Direct

1    reviewed, as you understand it --

2    A.    Yes, it is.

3    Q.    -- that actually reviewed the benchmark?

4    A.    Correct.

5    Q.    Okay.  And, again, an eminent group of scientists in your

6    view?

7    A.    Oh, yes.

8    Q.    Do you know some of them, some of their work?

9    A.    Yes, I know many of them.

10   Q.    Okay.  And then once the SAB committee reviews the

11   benchmark, does it pass it on to the full SAB?

12   A.    That's my understanding.  The report goes to the full

13   SAB.

14   Q.    And the SAB has -- well, let's look quickly.  I would say

15   on the review committee, there are, you know, are more than 12

16   reviewers, aren't there?

17   A.    Yes.

18   Q.    And most of those are professors at research

19   institutions, correct?

20   A.    Correct.

21   Q.    Maybe all of them.  And then on the Scientific Advisory

22   Board itself, there are -- I'm just going to eyeball it and

23   say 40 or so members, right?

24   A.    That looks about right, yes.

25   Q.    And those too reviewed the work of the -- they reviewed

Palmer - Direct

1   the work of the committee.

2   A.   That's correct.

3   Q.   Okay.  So the benchmark itself you testified earlier went

4   through significant review and authorship, right, before it

5   got to the SAB?

6   A.   That's correct, and, of course, there was probably time

7   for public comment.  So many other scientists may have

8   provided input.

9   Q.   Okay.  Now, the SAB determines -- let's look at page 383.

10  A.   Yes.

11  Q.   It concludes -- would you read the sentence in Causality

12  between Extirpation and Conductivity that begins -- well, why

13  don't you read that section.

14  A.   "Building a strong case for causality between

15  conductivity and loss of genera requires that two linkages be

16  demonstrated: (1) a strong relationship between stream

17  conductivity and the amount of mountaintop mining valley fill

18  in the upstream catchment, and (2) a strong relationship

19  between elevated stream conductivity and loss of benthic

20  macroinvertebrate taxa.  The EPA document presents a

21  convincing case for both linkages."

22  Q.   That's enough.  So the Scientific Advisory Board agrees

23  that EPA has presented a convincing case for those links,

24  right?

25  A.   Yes.

Palmer - Direct

1    Q.    And that goes with all the other research that you

2    testified about earlier today.

3    A.    That's correct.

4    Q.    Is there any research that you're aware of that

5    contradicts that?

6    A.    I know of no research that contradicts it.

7    Q.    Okay.  It also says Confounding Factors.  Would you read

8    the first sentence there.

9    A.    "The report has done a credible job in isolating the

10   major, potential confounding factors and providing a basis for

11   their assessment relative to the potential effect of

12   conductivity."

13   Q.    Read the next sentence.

14   A.    "However, the report would be strengthened by further

15   attention to potential confounding factors such as selenium

16   and other trace metals, dissolved organic carbon, and

17   hydrologic flows."

18   Q.    Okay.  It does not mention there that it's necessary to

19   do any further analysis on temperature, does it?

20   A.    It does not.

21   Q.    Nor on embeddedness.

22   A.    It does not.

23   Q.    Nor any other habitat issue.

24   A.    No.

25   Q.    That's been resolved, hasn't it?

Palmer - Direct

1   A.   Yes.

2   Q.   You've read the benchmark?

3   A.   I have.

4   Q.   Do you agree with it?

5   A.   I do.

6   Q.   Do you think it's good science?

7   A.   I think it's excellent science.

8   Q.   Have you read it carefully?

9   A.   I have.  I read it very carefully when it first came out,

10  and I periodically look at different sections of it again.

11  Q.   Let's talk about Stillhouse Branch specifically.  Did you

12  visit Stillhouse?

13  A.   Yes, I did.

14  Q.   And when did you visit it?

15  A.   It was in January.

16  Q.   Okay.  Why did you visit it?

17  A.   To observe the site so that I had a better understanding

18  of what was going on there and to take some of my own

19  measurements.

20  Q.   Okay.  Now, if you'd turn to Plaintiffs' 23, please, it

21  should be a picture, an aerial --

22  A.   Yes.

23  Q.   -- depiction of the site.  Now, this is Stillhouse where

24  you visited, correct?

25  A.   Yes, it is.

Palmer - Direct

1    Q.    Okay.  This is at PE 363.  Would you describe -- first of

2    all, I think this is very similar, if not the same photo that

3    Mr. Harvey put on the screen earlier.

4    A.    Yes.

5    Q.    Is that your understanding?

6    A.    It looks like it.

7    Q.    And I think he said you had testified many times before

8    that an arrangement like this causes impairment.  Did you hear

9    him say that?  You didn't testify -- he made that statement in

10   his opening statement.

11   A.    I heard him say that, and it surprised me.  I have not

12   testified to that.

13   Q.    Okay.  You've never testified to that, have you?

14   A.    No, I have not.

15   Q.    At least not in terms of habitat, right?

16   A.    No, I haven't.  I mean, no.

17   Q.    Okay.  Would you describe to us what is in this picture

18   and what you saw when you were on the ground.

19   A.    So we drove up to the site.  From Nicholas Road you go

20   around a curve and you cross a culvert.  We drove further

21   upstream and parked pretty much where that white line crosses

22   the road and then walked to the stream at the end of the arrow

23   there.  After I sampled, I also walked all the way up to the

24   top where the pond is and looked around.

25   Q.    Okay.  And where is the outfall?

Palmer - Direct

1    A.   The outfall is just above the point of that arrow where

2    it says Open Channel 94.

3    Q.   Okay.  And was that a sampling point?

4    A.   I sampled below the outfall, that's correct, but above

5    the road crossing and culvert and so forth.

6    Q.   Okay.  Let me strike the question.  Have there been

7    samples, not that you took them, that you've reviewed that

8    come from the outfall itself?

9    A.   Oh, chemistry data, yes, correct.

10   Q.   Okay.  And those data would come from that point you just

11   described where the outfall is.

12   A.   That's right.

13   Q.   And are there also data that you both took and reviewed

14   that come from the stream segment just below the outfall?

15   A.   That's correct.

16   Q.   And you're saying that you gathered samples or took --

17   A.   I took measurements as well as gathered some rock

18   samples.

19   Q.   And that was between the road and the outfall.

20   A.   Correct.

21   Q.   Okay.  Why did you pick that site?

22   A.   Well, I wanted to make sure I sampled above the road

23   because we know that that can have impacts, and we were trying

24   to look at the impact of the mine.  And I wanted to sample

25   below the outfall so that I was in the stream and not in part

Palmer - Direct

1   of the constructed region associated with the mine and the

2   outfall.

3   Q.   Now, is there any contribution of water to Stillhouse

4   Branch other than from Outfall 29?

5   A.   No.

6   Q.   Well, is that outfall -- is that called Outfall 29?

7   A.   It is called 29.

8   Q.   So is there any -- there's no other contribution to

9   Stillhouse except from that outfall; is that right?

10  A.   That's correct.  My recollection is that the mining

11  covered over 90 percent of the watershed draining to that --

12  Q.   Are there any impacts --

13  A.   -- stream.

14  Q.   Are there any impacts upstream of where you sampled,

15  except for the mine?

16  A.   No.

17  Q.   Are there some other impacts downstream?

18  A.   Sure.  There's the culvert piping, road crossing.

19  Q.   Okay.  But your sample was above all that, above the

20  influence of that, right?

21  A.   Correct.

22  Q.   Now, did you walk down into Stillhouse and look at the

23  stream?

24  A.   Yes.  I walked in the stream.

25  Q.   Can you tell me your impressions of the -- your visual

Palmer - Direct

1   impressions or other impressions of the stream?

2   A.   Well, the stream, you know, was in pretty good shape.

3   There was a little discoloration in the water immediately

4   below the outfall.  Otherwise, it was clear-looking.  The

5   bottom had heterogeneous substrates, but some of the

6   substrates, a fair number, were covered with deposits.

7   Precipitates of some sort was what I suspected.  And there

8   were some small areas associated with those precipitates where

9   it appeared to be embedded so that if you kicked the bottom,

10  it sort of stayed there.  But the majority of the stream area

11  wasn't embedded.

12  Q.   Well, there aren't trees over the stream, are there?

13  A.   In -- yeah, in most parts, not completely covered, not at

14  all.

15  Q.   Okay.  So would you consider the streambed that you

16  examined partly embedded and partly not embedded, or how would

17  you describe it?

18  A.   It was partially embedded, but only less -- certainly

19  well less than 50 percent.

20  Q.   And how large a segment did you look at when you were

21  there?

22  A.   I don't know.  I didn't measure it.  Twenty-five, thirty

23  meters at least probably.

24  Q.   All right.  Would you turn to tab 45 in Joint, please.

25  I'm wrong.  I meant page -- I'm confused.  Tab 13.

Palmer - Direct

1   A.   In the Joint?

2   Q.   Yes, in the Joint.

3   A.   Okay.

4   Q.   Okay.  Do you recognize that?

5   A.   I do.

6   Q.   It says table 1, summary of metrics.  Is that it?

7   A.   Yes.

8   Q.   Okay.  What is that?

9   A.   Well, it's the WVSCI scores and the GLIMPSS scores from

10  the samples that were collected by Chris Swan in --

11  Q.   Who is Chris Swan?

12  A.   Dr. Chris Swan is a professor, an ecologist, stream

13  ecologist, who his expertise is in stream invertebrates, their

14  dynamics, communities.

15  Q.   He was engaged by plaintiffs to do this analysis,

16  right?

17  A.   That's correct.

18  Q.   Okay.  And what did Dr. Swan find on September 30th?

19  A.   Well, he found that, using both the WVSCI criteria and

20  the GLIMPSS criteria, the stream was impaired significantly.

21  Q.   Okay.  Do you know what the GLIMPSS number for impairment

22  is?

23  A.   I think it's 53 for impairment, and this was 27.7.

24         MR. MCLUSKY:  Object, Your Honor.  West Virginia

25  doesn't use the GLIMPSS and as far as I know doesn't have an

Palmer - Direct

1    impairment threshold.

2              THE COURT:  What's the relevance of the GLIMPSS?

3              MR. LOVETT:  Just to help the Court understand how

4    bad the aquatic life is.  There may not be a legal standard in

5    West Virginia, but it certainly informs the Court about the

6    state of the stream itself.

7              THE COURT:  All right.  Overruled.

8    BY MR. LOVETT:

9    Q.    The WVSCI score here is 58, right?

10   A.    That's correct.

11   Q.    68 is the level of impairment, correct?

12   A.    Correct.

13   Q.    Okay.  And Dr. Swan visited the site himself to take the

14   samples that that's based on, correct?

15   A.    Yes.  He sampled in the same area that I did.

16   Q.    Okay.  Would you turn to the next tab.

17   A.    Yes.

18   Q.    And is this Dr. Swan's data too?

19   A.    It is the -- the taxonomic identifications were done by

20   Pennington & Associates.  He sent them the samples after he

21   had picked the bugs out of them is my understanding.

22   Q.    Okay.  And this is a -- these are family data,

23   family-level data?

24   A.    That's correct.

25   Q.    And --

Palmer - Direct

1    A.    Order and family.

2    Q.    And WVSCI is a family-based metric, correct?

3    A.    Yes.

4    Q.    Okay.  What does this -- what do these data tell you?

5    A.    Well, it tells me that, first of all, there's no

6    Ephemeroptera, there's no mayflies, and that within the

7    sensitive group where we look at typically the mayflies,

8    stoneflies, and caddisflies, you have a fair number of

9    caddisflies, 78 and 31, in two different families.  And those

10   are relatively tolerant.  They have genera in them that are

11   tolerant.  And there was only one family of stoneflies found.

12   Q.    What does it means that there was only one family of

13   stoneflies?  How does that --

14   A.    Well, they're just very sensitive, and so most of those

15   presumably had been extirpated from the site.

16   Q.    So what you see are taxa that are not sensitive to high

17   conductivity, and what you see missing are those that are,

18   correct?

19   A.    That's correct.

20   Q.    Could that be caused in this case at this site by the

21   embeddedness of the stream?

22   A.    No.  You wouldn't have lost all of your mayflies when the

23   majority of the stream isn't embedded.

24   Q.    And have you seen the temperature data for this stream?

25   A.    Yes.

Palmer - Direct

1   Q.   And could those losses be caused by the high

2   temperatures?

3               MR. MCLUSKY:   Let me object, Your Honor.   There's no

4   statement to that effect in her report, either report.

5               MR. LOVETT:   There is a statement that -- where have

6   you seen the temperature data for Stillhouse?

7               THE WITNESS:   The temperature data for Stillhouse I

8   saw in Menzie's report that I wrote a report in response to

9   and discussed temperature.

10              THE COURT:   All right.   Overrule the objection.

11  BY MR. LOVETT:

12  Q.   And what were the high temperatures in that report, if

13  you remember?

14  A.   Well, I think, as I recall, he had the Stillhouse

15  temperature, a maximum temperature, I think 23 or 24 degrees

16  Centigrade.

17  Q.   And at a temperature of 24 degrees, would you expect to

18  see extirpation of mayflies?

19  A.   No, not without any other problem in the stream.

20  Q.   And how do you know that?

21  A.   Well, it's largely just based on the fact that I've been

22  working in streams with insects and mayflies for a long time,

23  and we even find mayflies in some of our streams that are as

24  high as 30 degrees C.

25  Q.   Let's turn to the next page.   And this is a species-level

Palmer - Direct

1   depiction of the same gathering of data, right, of insects?

2   A.   Yes.

3   Q.   Are there any mayflies there?

4   A.   No mayflies.

5   Q.   Do you see the same pattern there, the tolerant -- the

6   species that are tolerant to high conductivity there but not

7   those that are sensitive?

8   A.   Yeah.  And it just confirms what I said, that there are

9   genera within those families that are very sensitive.  So

10  *Hydropsyche*, there were 51 of those.  Those are the kind of

11  caddisflies I find in very degraded urban streams too.  So

12  they're very tolerant.

13  Q.   Okay.

14  A.   And also the simulids are tolerant.

15  Q.   Okay.  Could you turn to tab number 4, please.

16  A.   Okay.

17  Q.   Now, have you seen this before?

18  A.   Yes, I have.

19  Q.   Are these sampling data taken from Evan Hansen at

20  Downstream Strategies?

21  A.   Yes.  So I saw Mr. Hansen's report, and this table was in

22  it.

23  Q.   Is he also engaged by plaintiffs to gather this

24  information, if you know?

25  A.   Yes.

Palmer - Direct

1    Q.    Okay.  And on the -- he sampled, as I see it, at Outfall

2    029, which would be the outfall at Stillhouse that you

3    described on page 263, right?

4    A.    Yes.

5    Q.    And he also sampled, it looks like, in the stream below

6    that.

7    A.    Yes.

8    Q.    Do you know where he sampled in the stream below that?

9    A.    I only know it was below the outfall and I think in the

10   general same area Chris Swan sampled.

11   Q.    Okay.  And do you see the conductivity levels that he

12   found there?

13   A.    I do.

14   Q.    How many microsiemens per centimeter did he find?

15   A.    In the Outfall, 2826; and in the stream, 2825.

16   Q.    Okay.  What about the total suspended solids at the very

17   bottom, 3.0?  Is that high?

18   A.    Not particularly high.

19   Q.    And he had one non-detect I see, right?

20   A.    Yes, in the stream.

21   Q.    And did you sample -- did you take a conductivity sample

22   when you were there?

23   A.    I did.

24   Q.    What number did you hit?

25   A.    I think it was almost 1800.  I'd have to look back at the

Palmer - Direct

1   data.

2   Q.   Let's look at 26.  I think this describes Mr. Hansen's

3   sampling sites, the question I asked you earlier.

4   A.   Wait.  Tab 26?

5   Q.   No.  I'm sorry.  Page 26, tab 5, the next tab.  Sorry.  I

6   may have confused you.

7   A.   Tab 5?

8   Q.   Yes, the page right after the one we were discussing.

9   A.   Yes.

10  Q.   Can you see where his sampling sites are now?

11  A.   I do see those.  So it looks like he had three of them in

12  the spillway, bottom of the spillway, and then downstream.

13  Q.   Very similar to your sampling sites, aren't they?

14  A.   The downstream, yes.

15  Q.   Where did you take your conductivity measurement,

16  approximately, based on JE 26 here?

17  A.   Approximately the same place he did, his downstream site.

18  Q.   Downstream from 029?

19  A.   Correct.

20  Q.   Would you turn to tab 9.

21  A.   Yes.

22  Q.   It's a picture taken by Mr. Hansen.  Did you see that

23  site?  I'm sorry.  It was taken by Miss Betcher, who works for

24  Mr. Hansen.

25  A.   Yes.  I was at the very same site.

Palmer - Direct

1    Q.    What does that picture tell you about the site?

2    A.    Well, it looks as if he saw the same sort of cloudy water

3    immediately below the spill, and then -- spillway, and then it

4    clears up and you see the bottom of the stream.

5    Q.    Okay.  And what about in the next picture, tab 10?

6    A.    It shows, you know, nice flow.  I can't tell if there's

7    trees overhead.  They're not right on the edge of the stream.

8    But good flow.  I see large rocks.

9    Q.    Okay.  Get the other joint exhibit notebook, which is

10   joint exhibits starting with 58.

11        I draw your attention to tab 59 there.

12   A.    Yes.

13   Q.    Is that the West Virginia 303(d) list, if you know?

14   A.    It's their assessment report to EPA in 2012, yes.

15   Q.    2012.  Would you turn to page J 693.

16   A.    Yes.

17   Q.    And do you see Stillhouse Branch listed in that report

18   about halfway down the page?

19   A.    Yes, I do.  There's two Stillhouse Branch, I guess,

20   sampling sites.

21   Q.    And do you see that it is listed as CNA, impaired for

22   biological purposes?

23   A.    Yes, that's what it says.

24   Q.    And the impaired size of the -- is 1.9 stream miles or

25   the entire length?

Palmer - Direct

1   A.   That's correct.

2   Q.   Would you turn to Joint Exhibit 43.   I'm sorry to go from

3   notebook to notebook.   We should've put the notebook together

4   in order for the testimony.   And turn to tab 43, please.

5   A.   Yes.

6   Q.   This is a stipulation of the parties about historical

7   data --

8   A.   Yes --

9   Q.   -- correct?

10   A.   -- it appears to be.

11   Q.   Have you seen these before?

12   A.   Yes, I have.

13   Q.   Can you -- so on the JE 126, do you see pre-mining

14   conductivity numbers?

15   A.   Yes, I do.

16   Q.   And those numbers are fairly low, aren't they?

17   A.   Yes.   The highest one is 104.   The lowest one is 47.

18   Q.   Well below the benchmark, correct?

19   A.   Well below, yeah.

20   Q.   And then on the next page, though, we have historical

21   numbers after the beginning of mining at JE 127.   Do you see

22   that?

23   A.   I do.

24   Q.   And those conductivity numbers, on the other hand, are

25   significantly elevated, well over two and three thousand for

Palmer - Direct

1  the most part, right?

2  A.   That's well over 2000, almost 3000, yes.

3  Q.   And the sulfate numbers likewise are significantly

4  elevated from background, aren't they?

5  A.   I'm sorry.  I was looking at sulfate.  Those are really

6  high numbers for sulfate.  Conductivity, yes, goes well over

7  3000, and sulfate goes very, very high.

8  Q.   And those are related to each other, as you've testified,

9  right?

10  A.   In this region, yes.

11  Q.   Sulfates is a marker for --

12  A.   It's a marker for coal in this region.

13  Q.   So that shows that there are high sulfates being

14  discharged from this mine, right?

15  A.   Correct.

16  Q.   And it shows that those sulfates and other constituent

17  ions have raised conductivity to levels many times the

18  benchmark, correct?

19  A.   That's correct.

20  Q.   Now, those measures were measured by DEP; is that right?

21  That's what it says in 11?

22  A.   That's correct.

23  Q.   Okay.  Then at later dates on page JE 129 --

24  A.   Yes.

25  Q.   -- from the outlet itself, again we only have

Palmer - Direct

 1   conductivity numbers here and not sulfates, but still in most

 2   instances more than 10 times the benchmark, correct?

 3   A.   That's correct.

 4   Q.   Are those extremely high conductivity numbers in your

 5   experience?

 6   A.   Yeah.  Other than in the mining area, I've never noted

 7   them that high before in any other streams.

 8   Q.   Now, comparing those conductivity numbers -- those

 9   conductivity and sulfate levels with what you saw with

10   embeddedness and what you understand the temperature to be at

11   this site, is there any question about what's causing the

12   impairment?

13   A.   Absolutely no question.  It's the elevated conductivity.

14   Q.   And the sulfates?

15   A.   And sulfates.  Well, that's part of it, yes.

16   Q.   Would you explain a little more about how you reached

17   that conclusion, why you eliminated the other two and picked

18   this one?

19   A.   Well, there's a variety of lines of evidence, but at this

20   particular site --

21   Q.   At this site.

22   A.   Right.  Only a small fraction of the bed appeared to have

23   embedded spots in it.  The temperature was well within a

24   range.  The oxygen levels were fine.  Habitat heterogeneity

25   was high.  Flow status was excellent.

Palmer - Direct

1    Q.    Okay.  And those historical data are consistent with the

2    data that both you and Mr. Hansen gathered, correct?

3    A.    That's correct.  Elevated conductivity we all found.

4    Q.    Would you turn to Joint Exhibit tab 18, please.

5    A.    Yes.

6    Q.    Well, let's skip 18.  Well, let me ask you, is that the

7    site that -- is that the Stillhouse site, as far as you can

8    tell?

9    A.    Yes, it is.

10   Q.    And I think you've testified -- let's turn to the next

11   tab, 19.

12   A.    Those are the data that I collected when I went out and

13   sampled, showing elevated conductivity, a temperature of 7.4

14   degrees and 100 percent oxygen saturation.

15   Q.    What does that mean?  Why is the oxygen saturation there,

16   and why did you put that there?

17   A.    It's one of the things you always want to rule out, that

18   you don't -- you aren't in a region where you've got anoxia

19   and the organisms can't survive.  And obviously that's not a

20   problem here.

21   Q.    And on tab 20, let me -- these are tables from your

22   expert report, right?

23   A.    Yes.

24   Q.    Okay.  On tab 20, you have pre-mining data in Stillhouse.

25   Do you know where those came from?

Palmer - Direct

1   A.   Those came from the SMCRA permit, I believe, section.

2   Q.   Okay.  All, again, well below the benchmark, right?

3   A.   Yes.

4   Q.   And the next tab, did you plot -- this is tab 21.  Did

5   you plot those --

6   A.   Yes, I plotted the data.

7   Q.   Explain to me -- well, explain to the Court -- let's

8   start with the top one.  What does figure 2a show?

9   A.   Well, basically provides just a nice pictorial of what

10  we've just described; that is, pre-mining back in the early

11  '90s.  Conductivity was well below levels of concern.  And by,

12  you know, 2004, the numbers were really high.

13       Here, numbers -- many of these collected by the coal

14  mining company itself or their consultants -- were at levels

15  reaching sometimes almost exceeding 4000 microsiemens.

16  Sulfate was much higher than I had ever seen, up to almost

17  3000 post-mining when, as I said earlier, DEP had identified

18  50 as the threshold for indication of mining impacts.

19  Q.   Okay.  And on tab 22 --

20  A.   Yes.

21  Q.   -- these are data from Outfall 29, right?

22  A.   This is the outfall that is feeding into the stream, the

23  outfall directly from the valley fill and the pond.

24  Q.   And these are all the data points that you had?

25  A.   These are data points that come from monitoring reports

Palmer - Direct

1   that the coal company submitted to DEP, yes.

2   Q.   Again, this is a pictorial representation of the kind of

3   thing --

4   A.   That's right.

5   Q.   -- you've talked about before.  Turn to tab 23.

6   A.   Yes.

7   Q.   Is this something you prepared too?

8   A.   It is.  I collected rocks from the bottom of the stream,

9   and I had taken with me reverse osmosis water, which is very

10   low conductivity.  I think it started out with conductivity

11   about 15 microsiemens.  I had replicate containers without --

12   Q.   Let me slow you down.  You mean the water you took had 15

13   microsiemens?

14   A.   That's correct.

15   Q.   Okay.  And then you took a rock from the stream?

16   A.   I took multiple rocks from the stream, and in each one of

17   the containers I put a single rock, and I had the conductivity

18   probe in the container, and I watched how conductivity, along

19   with the consultants that had come from -- I believe the

20   defendants had sent them.  We watched the conductivity

21   increase over time in the water that had previously had low

22   conductivity until we put the rock in.

23   Q.   How high did the conductivity go in the water?

24   A.   Well, I stopped, you know, after almost 15 minutes, and

25   the conductivity went up to 50 microsiemens per second.

Palmer - Direct

1    Q.    What did it start at again?

2    A.    17.

3    Q.    Okay.  And why did you do that?

4    A.    Well, because in my prior testimony in a previous trial,

5    there seemed to be concerns raised that potentially material

6    on the rocks was silt, and I had been certain it was deposits

7    of precipitates.  And so I thought, well, if it's deposits and

8    the streams below mine sites are often super saturated in the

9    minerals that caused the deposits, then if you put it in water

10   that's clearly undersaturated, some of it will go into

11   solution.

12   Q.    And that, in fact, happened, right?

13   A.    That, in fact, happened.

14   Q.    What did that tell you about the sediment on the bed of

15   the stream?

16   A.    Well, it wasn't sediment.  It was precipitates.  But I

17   had the -- I chose to have it analyzed chemically by a

18   geochemist also.

19   Q.    Okay.  And that geochemist may testify here, right?

20   A.    Yes, I believe she's going to.

21   Q.    Okay.  So based on that, do you conclude that the

22   precipitate on the bottom of the stream is caused by high

23   conductivity and associated ions?

24   A.    That's correct.

25   Q.    So if there is an embeddedness problem there, it would be

Palmer - Direct

1    caused by the conductivity and associated ions.

2    A.   It would be caused by the heavy precipitates on some of

3    the rocks, yes.

4    Q.   But, again, you don't believe that embeddedness is the

5    cause of the impairment here, do you?

6    A.   No.   There was not enough embeddedness throughout the

7    stream to have caused the level of impairment we see.

8             MR. LOVETT:  One minute, Your Honor.  I'm almost

9    finished.

10            THE COURT:  Okay.

11   BY MR. LOVETT:

12   Q.   Would you turn to the Joint Exhibits 1 to 58 notebook.

13   A.   58?

14   Q.   It's the notebook that says 1 to 58.  I need you to turn

15   to tab 12 in that notebook.

16   A.   Yes.

17   Q.   And that's -- this is the report by Christopher Swan, who

18   you testified about earlier, right?

19   A.   Correct.

20   Q.   Would you turn to page JE 47.

21   A.   Yes.

22   Q.   And he did a rapid bioassessment protocol also on his

23   visit, didn't he?

24   A.   Yes, he did.

25   Q.   Can you explain to me what he found with the rapid

Palmer - Direct

1   bioassessment protocol?

2   A.   Well, he looked -- you know, did the entire RBP, but he

3   really focused on the sub-scores that had been identified when

4   the rapid assessment method was developed.

5   Q.   May I just interrupt you for a second?  You can look at

6   his lab sheets if you'll turn to tab 26 in the other notebook,

7   in the plaintiffs' notebook.

8   A.   Okay.

9   Q.   Okay.  So can you just, you know, explain to the Court

10   what Dr. Swan did when he took the rapid bioassessment

11   protocol and what he found?

12   A.   Well, he followed the standard procedures of the EPA

13   rapid bioassessment that was developed by Michael Barbour and

14   others sometime ago and, you know, walked the section of the

15   stream and then scored each of the categories that make up the

16   RBP.  And in the report, he focuses on five of those.

17   Q.   Do you know which section of the stream he walked?

18   A.   The same one I did.

19   Q.   Okay.  And let's look at each of these in turn.  At PE

20   418 in Plaintiffs', there are --

21   A.   Yes.

22   Q.   -- one, two, three -- there are four pages there.

23   A.   Yes.

24   Q.   Okay.  So what did -- you say he looked at how many

25   factors?

Palmer - Direct

1   A.   Well, just in his report, he emphasized five factors, the

2   ones that are typically used to try and assess impairment

3   based on habitat.

4   Q.   Okay.  So the data sheets are what he found particularly.

5   Let's look at embeddedness, for instance, at PE 420.

6   A.   Yes.

7   Q.   And there he scored embeddedness as a 14, right?

8   A.   Yes.  That would be a suboptimal, which is just below

9   optimal.

10  Q.   Right.  So I think that's like a grade of a B.  Is that

11  fair?

12  A.   I guess pretty much.

13  Q.   Okay.  And, you know, I know you didn't perform it on the

14  same day, but would you agree based on your observation --

15  strike that.

16       Have you performed a rapid bioassessment protocol

17  yourself?

18  A.   I have, many times, but I did not on Stillhouse.

19  Q.   All right.  Does that seem reasonable to you, the 14,

20  based on your observation there?

21  A.   Yes.  You know, the issue here, though, is oftentimes

22  embeddedness is discussed not in terms of chemical

23  precipitates pulling -- you know, locking things together,

24  just silt and sediments and so forth.  But, yeah, that would

25  be consistent.

Palmer - Direct

1    Q.    Okay.  And the same is true of sediment deposition,

2    suboptimal, correct?

3    A.    Yes.  And that would be in some of the locations on the

4    stream, correct.

5    Q.    Okay.  Any other habitat parameters that strike you as

6    particularly important for the assessment at issue here?

7    A.    Well, in terms of impairment for biologically, no.  I

8    mean bank stability was poor.  So there was some eroded banks.

9    And as I said before, the entire thing was not fully forested.

10   So the riparian score at least on one of the banks, the right

11   bank, was marginal; whereas on the left bank, it was optimal.

12   So -- but none of those would be a problem in terms of causing

13   the impairment.  They're not anything at that level.

14   Q.    And did he come up with a final tally?

15   A.    I think his tally was 130, if I recall.  Yes, it was.  It

16   says right here.

17   Q.    And that is suboptimal, right?

18   A.    Correct.

19   Q.    Would you expect to see a suboptimal rapid bioassessment

20   protocol result in a situation in which there are no mayflies?

21   A.    No, not habitat; no.

22   Q.    So do you believe that the habitat is not -- that this

23   rapid bioassessment protocol helps show that the habitat is

24   not responsible for the impairment at Stillhouse?

25   A.    That's correct.

Palmer - Direct

1  Q.   Do you hold the opinions -- all the opinions you've

2  expressed here today to a reasonable degree of scientific

3  certainty?

4  A.   More than a reasonable degree; a highly certain degree.

5        MR. LOVETT:  Okay.  That's all I have except to move

6  the admission of the exhibits.

7        THE COURT:  All right.  Do you want to do that at

8  this time?

9        MR. LOVETT:  It might be better, Your Honor, while

10  Mr. McLusky -- or at lunch, I can go through and make sure

11  that I catch every one that --

12        THE COURT:  All right.  We'll take a lunch break

13  until 1:00.

14      You can start cross then.

15      Be ready to deal with your exhibits when we start back.

16        MR. LOVETT:  Thank you, Your Honor.

17        THE COURT:  You may step down.  Don't discuss your

18  testimony.  We stand in recess until one.

19      (Lunch recess from 11:53 a.m. to 1:10 p.m.)

20                    AFTERNOON SESSION

21        THE COURT:  All right.  Ready to proceed?

22        MR. MCLUSKY:  We are, Your Honor.

23        THE COURT:  All right.  Cross-examination of

24  Dr. Palmer.  Will you take the stand.

25      Have you resolved what you want to do about the exhibits?

1          MR. LOVETT:  I'm afraid that it's not resolved, Your

2     Honor.  I mean I don't think we have a big dispute, but I can

3     move the admission of exhibits, and I think Mr. McLusky will

4     probably object to some of them.

5          THE COURT:  Well, at some point we need to do that.

6     Are you satisfied to do it now or --

7          MR. MCLUSKY:  We can do it now or we can do it at

8     the end of Dr. Palmer's --

9          THE COURT:  I don't mind waiting until the end of

10    her testimony.

11         All right.  You may proceed with your cross.

12                         CROSS EXAMINATION

13    BY MR. MCLUSKY:

14    Q.   Dr. Palmer, do you have the notebooks up there?

15    A.   Yes, I do.

16    Q.   Could you turn to Plaintiffs' 15, which I believe is the

17    Pond 2008 paper.  If it's not, please let me know.

18    A.   Okay.

19    Q.   Mr. Lovett had you look at the abstract, which is on page

20    PE 202, I believe.  Do you recall reading parts of that?

21    A.   I do.

22    Q.   Can you point to me any statement in this abstract that

23    conductivity or sulfate cause any particular effect in any

24    stream anywhere?

25    A.   They don't specifically mention conductivity and

Palmer - Cross

 1   associate that with impairment in the abstract; you're

 2   correct.

 3   Q.   You were an advisor or at least reviewed this paper for

 4   Mr. Pond, didn't you, back in 2008?

 5   A.   Yes.   I provided an informal review before he submitted

 6   it to the journal.

 7   Q.   Presumably if he believed that conductivity was causing

 8   any of these things, he would have said so in this abstract

 9   because it would have been pretty important, right?

10   A.   I don't know if he -- I mean he was primarily looking at

11   the amount of mining.   So I can't answer what he would have

12   done.

13   Q.   Well, in fact, he used conductivity simply as a surrogate

14   for mining, did he not?

15   A.   I believe so.

16   Q.   Dr. Palmer, would you turn to page PE 211, which is page

17   726 of the Pond 2008 article, Plaintiffs' 15.

18   A.   Okay.   I'm there.

19   Q.   Do you see that table 4?

20   A.   Yes, I do.

21   Q.   Do you see that's a table of correlation coefficients for

22   various potential or potential insults to the environment?

23   A.   Yes, I do.

24   Q.   What is the correlation coefficient between RBP habitat

25   score and the WVSCI scores on table 4?

Palmer - Cross

1    A.    It's .74.

2    Q.    That's considered high, is it not?

3    A.    It is relatively high, yes.

4    Q.    And for the embeddedness score, it's .57; is that

5    correct?

6    A.    That's correct.

7    Q.    And that's also relatively high, isn't it?

8    A.    Relatively so, yes.

9    Q.    The .74 is by benchmark standards considered moderately

10   or strongly correlated, is it not?

11   A.    Yes.

12   Q.    If you'd turn to page PE 215 of the same article, which

13   is page 730 of the article.

14   A.    Okay.

15   Q.    Okay.  In the second column --

16   A.    Yes.

17   Q.    -- about midway through that first full paragraph, you'll

18   see a sentence that starts with "Howard."

19   A.    Yes.

20   Q.    Could you read that sentence for me, please?

21   A.    Sure.  "Howard et al. (2001) and Pond (2004) reported

22   that habitat indicators (chiefly sedimentation and

23   embeddedness) were strongly correlated with MMIs and

24   particular metrics in Kentucky headwater streams."

25   Q.    And an MMI is a multi-metric --

Palmer - Cross

1    A.    Indices.

2    Q.    -- indices?

3    A.    Uh-huh.

4    Q.    And that's things like the WVSCI; is that correct?

5    A.    That's correct.

6    Q.    And then if you'd turn to the next page, it's PE 216.

7    A.    Yes.

8    Q.    And he has a series of -- he has six paragraphs here.

9    I'm not sure what they are.  But look at paragraph 6, if you

10   would.

11   A.    Okay.

12   Q.    And it talks about both ionic stress and landscape

13   disturbances are correlated with downstream impairment in

14   empirical studies.

15        Does it not say that?

16   A.    Yes, it does.

17   Q.    Pardon my fumbling.  We have a couple of different

18   numbering systems here.

19        Would you turn to page PE 211 of the same article.

20   A.    Okay.

21   Q.    And in the second column, towards the end -- it may even

22   be the last sentence --

23   A.    Yes.

24   Q.    -- it begins with the word "Our."  Do you see the words

25   "Our bioassessment"?

Palmer - Cross

1    A.   I do.

2    Q.   Could you read that for me?

3    A.   "Our bioassessment indicators were not strongly

4    correlated with dissolved or total metals concentrations in

5    the water column, but these results do not rule out possible

6    exposure to metals via dietary uptake or microhabitat

7    smothering by metal hydroxide precipitation."

8    Q.   Thank you.  Turn to Plaintiffs' Exhibit 16, which is Pond

9    2010, if you would, please.

10   A.   Okay.

11   Q.   Now, this page 223 also has an abstract, does it not?

12   A.   It does.

13   Q.   And is it fair to say that nowhere in this abstract is

14   there any statement that either conductivity or sulfate have

15   or can cause any particular effect to benthic macro-

16   invertebrates?

17   A.   It does not.  It refers to mining disturbance and

18   residential development.

19   Q.   And if I turn again in the same article to PE 233 in the

20   second column -- let me know when you're there.

21   A.   Okay.

22   Q.   This actually has line numbers I think on the right-hand

23   column.

24   A.   Yes.

25   Q.   If you look at line 593 --

Palmer - Cross

1   A.   Okay.

2   Q.   -- does this not also say that although Pond et al. 2008

3   did not find strong correlations of mayfly abundance and

4   richness with mining-related trace metals in the water column,

5   except selenium, they state that possible exposure to metals

6   through dietary uptake or potential microhabitat smothering by

7   metal hydroxide precipitate or iron bacteria blooms could not

8   be ruled out?

9   A.   Yes, it does say that.

10   Q.   Then flip ahead, if you would, to Plaintiffs' 17, which

11   is Pond 2011.

12   A.   Okay.

13        MR. LOVETT:  What page, Bob?

14        MR. MCLUSKY:  It's tab -- it's Plaintiffs' 17, page

15   PE 240, which is the first page of -- I call this Pond 2011.

16   I think that's how we referred to it.

17   BY MR. MCLUSKY:

18   Q.   Is it fair to say again, Dr. Palmer, that this abstract,

19   which I think you may have read from, likewise does not state

20   that conductivity or sulfate can or have caused any particular

21   impacts to any stream biota anywhere?

22   A.   It says there's a high correlation with conductivity.

23   Q.   But the question I asked you was, does it state --

24   A.   It doesn't say --

25   Q.   -- a causal connection.

Palmer - Cross

1    A.    No, it does not say cause.

2    Q.    It also says, does it not, in the second column of the

3    abstract, that the O/E index was highly correlated with

4    individual habitat?

5    A.    It does.

6    Q.    And "O/E" means?

7    A.    The observed versus expected.

8    Q.    That's a ratio of number of bugs you expect -- what you

9    find and what you would expect to find?

10   A.    Well, or the composition, yes.

11   Q.    So at least in the abstract, they find a high correlation

12   between the index they chose to use here and individual

13   habitat, right?

14   A.    They did.

15   Q.    Plaintiffs' Exhibit 19.  If we turn to that next, which I

16   think starts at PE 287.  And this is Pond 2014.

17   A.    Okay.

18   Q.    I'll ask you the same question.  Isn't it true that

19   there's nothing in this abstract that you read from that says

20   that conductivity or sulfate have or can cause any particular

21   effects to macroinvertebrates anywhere?

22   A.    That's correct, it does not say that.

23   Q.    All right.  Would you turn, then, to page 292 of the same

24   exhibit.

25   A.    Okay.

Palmer - Cross

1  Q.   And this is a table 1.  Do you see this?

2  A.   I do.

3  Q.   And you testified earlier that Pond had looked at

4  temperature, is that correct, in this article?

5  A.   I don't remember if it was this one or another one.

6  Q.   If you look --

7  A.   Yes.  It's there, yes.

8  Q.   Yes, there's temperature listed here.  But if you look at

9  the -- over in the left, there's a legend, whatever it is,

10  says concentrations are in milligrams per liter.  Do you see

11  that?

12  A.   Yes, I do.

13  Q.   Is it fair to say that the data on this table appear to

14  have all been collected in April?

15  A.   That's correct, which is when I think they sampled.

16  Q.   Right.  So the temperature data here would be from April,

17  then; is that correct?

18  A.   Yes.

19  Q.   Now, as I understand Plaintiffs' Exhibit 19, the Pond

20  article, they did not use a WVSCI test here.  They used some

21  type of GLIMPSS.  Is that correct?

22  A.   That's correct.

23       MR. MCLUSKY:  Pardon me just a minute.

24       Pardon me a moment, Your Honor.  The pages in the

25  original article are not numbered.  They were numbered only in

Palmer - Cross

1    the exhibit, which I didn't have when I prepared it.

2              THE COURT:  All right.  Take your time.

3    BY MR. MCLUSKY:

4    Q.    Dr. Palmer, if you'd turn to page 295.

5    A.    Okay.

6    Q.    Second column, first full paragraph.  Does that not say,

7    "As expected, percent forest had moderate to strong negative

8    correlations with biological indicators"?

9    A.    That's correct.

10   Q.    So when they compared -- and it's fair to say with review

11   of this report, you would find that there's a higher percent

12   forest at the unmined sites than there was at the mined sites;

13   isn't that correct?

14   A.    Right.  The mining removes trees, yes.

15   Q.    So there was a higher degree of correlation between the

16   percent of forest cover and impacts to macroinvertebrates

17   here.

18   A.    That's correct.

19   Q.    Okay.  What they did, they found little correlation in

20   percent of valley fill area within the valley fill community

21   in this report, but they -- but as between the unmined and the

22   mined sites, percent forest cover did matter, did it not?

23   A.    I don't -- the first part of what you said, I don't know.

24   I'd have to go back and read the paper.  But the second part,

25   they did find a relationship between amount of forest in the

Palmer - Cross

1   watershed and the biological indicators.

2   Q.   I think we confirmed they found a moderate to strong

3   correlation, didn't they?

4   A.   Yes.

5   Q.   Now, let's go back to some basic credentials here.  Is it

6   fair to say that you don't consider yourself an epidemiologist

7   at all?

8   A.   That's fair.

9   Q.   In fact, you really haven't taken any classes in that

10  discipline.

11  A.   I have not had a class in epidemiology.

12  Q.   And while you may have used statistics, you don't hold

13  yourself out as a statistician.  Is that a fair statement?

14  A.   That's correct.  I'm not a statistician.

15  Q.   And I think you told us before you haven't independently

16  reviewed any of the statistics used by either the benchmark or

17  the Suter and Cormier papers, have you?

18  A.   In the deposition I said that I had not replicated their

19  analysis and run it myself.

20  Q.   Okay.

21  A.   That's correct.

22  Q.   Fair enough.  I believe you told us before you're not a

23  chemist.

24  A.   I'm not a chemist, no.

25  Q.   Okay.

Palmer - Cross

1    A.    I do a lot of biochemistry, but I'm not a chemist.

2    Q.    You've also testified before you're not a toxicologist.

3    A.    That's correct.

4    Q.    And I think you said you're not a biogeochemist like

5    Dr. Bernhardt when she testified here.

6    A.    It's not my sole, primary area.

7    Q.    In fact, I think when I asked you back in 2012 about the

8    differences between your expertise and Dr. Bernhardt's, you

9    said, "I'm a restoration expert.  My background and Ph.D. is

10   actually in oceanography.  I work at the interface of fluid

11   mechanics and dispersal of small marine organisms."

12          Is that a fair characterization?

13   A.    The characterization reflects what I did for my Ph.D.,

14   but it's not a characterization of my career.

15   Q.    And I think you then told me that it's the biogeochemist,

16   which was Dr. Bernhardt, I believe, who spends more time

17   looking at the mechanics of which mine effluent might affect

18   benthic macroinvertebrates.

19   A.    She looks at the geochemistry much more than I do, that's

20   correct.

21   Q.    In fact, your earlier testimony before this Court was

22   primarily about the potential of mitigation projects to

23   restore function, wasn't it?

24   A.    You can't look at restoration without looking at

25   biogeochemistry, and you can't look at function without

Palmer - Cross

1  biogeochemistry.

2  Q.   Have you done any original lab work on the effects of any

3  mine drainage on aquatic insects at all?

4  A.   No laboratory work, no.

5  Q.   Have you done any field work?

6  A.   No, except a small amount of sampling I've done for the

7  trials.  That's correct.

8  Q.   All right.  There was testimony earlier about the SAB

9  review of the EPA benchmark; is that correct?

10 A.   That's correct.

11 Q.   And I think that's Plaintiffs' Exhibit 25, if I'm not

12 mistaken.

13      Now, I think Mr. Lovett established earlier that the

14 benchmark itself is dated March of 2011; is that correct?

15 A.   I don't remember the dates exactly.  If he stated that,

16 then I agree with you.

17 Q.   I'll skip it.  At any rate, Plaintiffs' Exhibit 25 is the

18 SAB report, letter and report to EPA; is that correct?

19 A.   That's correct.

20 Q.   And it's dated March 25th of 2011, right?

21 A.   It is.

22 Q.   Okay.  Doesn't this report -- and I'll direct you to

23 page -- do you guys have page numbers on here?  Can you get me

24 Dr. Palmer's --

25      (Mr. McLusky and Mr. Lovett conferred privately off the

Palmer - Cross

 1    record.)

 2              THE WITNESS:  Okay.

 3              MR. MCLUSKY:  Mr. Tyree, could you turn to tab 18,

 4    which should be the SAB report of 3/25/11.

 5              THE WITNESS:  I'm sorry.  What page?

 6              MR. MCLUSKY:  Page 20 of the report itself.

 7              THE WITNESS:  Okay.

 8              MR. LOVETT:  Your Honor, Bob, we don't have these

 9    pages.  We need to be able to follow.

10              THE COURT:  Can you identify where this is,

11    Mr. McLusky, in the report?

12              MR. MCLUSKY:  My problem, Your Honor, is that the

13    report had internal page numbers.  Those page numbers have not

14    been reproduced in the plaintiffs' exhibit.  They have a

15    separate paging system.  So I have a hard time correlating the

16    two.  I don't necessarily intend to introduce this document.

17              THE COURT:  I understand.  Just some guidance on

18    where to find this page within the document.

19              MR. LOVETT:  I believe it's page 400, PE 400.

20              THE COURT:  All right.

21              MR. MCLUSKY:  Mr. Tyree, would you show the language

22    so I can read it.  Blow it up a little bit.

23    BY MR. MCLUSKY:

24    Q.   Is it fair to say, Dr. Palmer, that on page 20 of the

25    report, or page PE 400 of the Plaintiff's Exhibit 25, the SAB

Palmer - Cross

1   says that conductivity itself is not a pollutant but is a

2   surrogate measure for the major constituent ions in the

3   mixture?

4   A.    Correct.

5   Q.    That's an accurate statement, isn't it?

6   A.    That's correct.

7   Q.    And then two sentences later, the SAB says, "Furthermore,

8   if there are unaccounted factors -- if there are unaccounted

9   for factors that may be confounding the causal relationship

10  between stress from specific ions and taxa loss (e.g., dietary

11  selenium exposure or slight reductions in habitat quality),

12  conductivity may still be interpreted as a signal for the

13  presence of the combination of factors resulting from the

14  presence of upstream valley fill."

15        Is that correct?

16  A.    It does say that, yes.

17  Q.    And if I turn back to what should be PE page 371 or --

18  which is also -- I think you can leave that notebook.  Just

19  turn back to the tab 18 in your notebook.

20  A.    Okay.

21  Q.    Page 2.

22  A.    Okay.

23  Q.    Mr. Tyree has it up on the board, I believe.

24        Didn't the SAB panel also say that the scientific

25  credibility of the benchmark would be strengthened by analysis

Palmer - Cross

1   relating the constituent ions to observed biological community

2   changes?

3   A.   Yes, it says that.

4   Q.   Now, if we could jump to the final -- actually, the

5   benchmark, Joint Exhibit 58.

6   A.   Okay.

7   Q.   And I need to find -- well, am I wrong?

8        (Mr. McLusky, Mr. Tyree, and Mr. Becher conferred

9   privately off the record.)

10  BY MR. MCLUSKY:

11  Q.   If I turn to page 26 of the report itself, which I

12  believe is JE 408 --

13  A.   All right.  I'm there.

14  Q.   Mr. Tyree, could you show it up on the board too?

15       Is it fair to say that EPA in the final benchmark under

16  the heading Treatment of Mixtures says, "However, conductivity

17  per se is not the cause of toxic effects"?

18  A.   That's correct, it says that.

19  Q.   Okay.  And then if you turn to page A-40 of the report --

20  and I'm going to struggle to find the PE page number here.

21  A.   I've got it.

22  Q.   I'm looking for a PE page number.

23            THE COURT:  Doctor, do you think you found it in the

24  exhibit, JE exhibit?

25            THE WITNESS:  Yes.

Palmer - Cross

1          THE COURT:  Which page?

2          THE WITNESS:  JE 468.

3          MR. MCLUSKY:  Oh, great.  Thank you.

4    BY MR. MCLUSKY:

5    Q.   Is it fair to say that in the last paragraph, under the

6    Conclusion section there, that it says, "This causal

7    assessment does not attempt to identify the constituents of

8    the mixture that account for the effects"?

9    A.   It does say that.

10   Q.   So this report says in one place that conductivity per se

11   is not the cause and then later on says it doesn't attempt to

12   identify what the particular constituents are that do account

13   for the effect.  Fair statement?

14   A.   That's a fair statement.

15   Q.   Didn't Suter and Cormier say the same thing in some of

16   their papers?

17   A.   I don't know.  I mean the focus of this and their papers

18   is on the ionic strength of the water which conductivity

19   directly measures as a cause.

20   Q.   Let's go to Plaintiffs' Exhibit 3, if we could.

21        Are you there?

22   A.   Not quite.  Okay.  I'm there.

23   Q.   If you'd turn to page 269, column two.

24        Mr. Tyree, could you put that up on the board for us?

25        This is PE page 77.

Palmer - Cross

1   A.   Yes, I'm there.

2   Q.   Is it fair to say here that in the Suter and Cormier

3   paper I think you testified about earlier, they say

4   conductivity per se is not the cause of toxic effects, that

5   waters with different mixtures of ions but the same

6   conductivity may have different toxicities?

7   A.   That's correct, it says that.

8   Q.   And then if I turn to -- I think it's Plaintiffs'

9   Exhibit 5, which is the Suter and Cormier paper "Assessing

10  Causation."

11  A.   Yes.

12  Q.   And turn to page 285 of that paper, which I believe is

13  PE 93.

14  A.   All right.

15  Q.   Does it not say, "The causal assessment does not attempt

16  to identify constituents of the mixture that account for the

17  effects"?

18  A.   It says that.

19  Q.   It says the same thing the benchmark does.

20  A.   I can't remember the exact words, but I will take your

21  word for it that it does.

22  Q.   Okay.  So if conductivity per se is not the cause, some

23  constituent thereof is the cause?  Is that what you're saying?

24  But these reports don't identify what these constituents or

25  attempt to identify a causal link.

Palmer - Cross

1   A.   I'm sorry.  Could you tell me what the question is again?

2   Q.   I'll come back to it.

3        You've testified I think in a couple of other hearings

4   that conductivity per se is not the cause of lowered WVSCI

5   scores, haven't you?

6   A.   No, but that's correct.  It's the ionic strength, and

7   conductivity is a direct measure of that.

8   Q.   And what are the -- the benchmark talks about an ionic

9   fingerprint that is typical of the mine drainage they're

10  looking at?

11  A.   Yes.

12  Q.   They mention four primary ions; is that correct?

13  A.   Correct.

14  Q.   Do you remember what they are?

15  A.   Bicarbonate, sulfate, calcium, and magnesium.

16  Q.   Was there a certain proportion they identified as

17  indicative of the mine drainage they were developing the

18  benchmark for?

19  A.   I'd have to re-read the paper.  I don't recall.

20  Q.   Do you know what the relative proportions of those four

21  ions are at Stillhouse?

22  A.   I do not.

23  Q.   Are you aware that Dr. King testified in the *Elk Run* case

24  that he believed, when asked which constituents of

25  conductivity was primarily responsible, he believed it was

Palmer - Cross

1  bicarbonate?

2  A.   I don't recall that.

3  Q.   Have you ever talked to him about that?

4  A.   No, I have not.

5  Q.   Is it fair to say that EPA's confounding factors analysis

6  that you talked about earlier did not individually evaluate

7  either the effects or the confounding -- potential confounding

8  effect of sulfate, bicarbonate, magnesium, or calcium?

9  A.   I don't think they thought that they were confounding.

10 So I don't -- I think you're correct.   I don't think they did.

11 Q.   Nor did they separately analyze whether they were

12 potential causes themselves, did they?

13 A.   I can't say they did not.   I do not know.

14 Q.   Well, you can't point to anything in those reports that

15 says that sulfate causes impairment in the benchmark, can you?

16 A.   I don't know.   I'd have to read the benchmark.   I don't

17 recall if it says that anywhere.

18        MR. MCLUSKY:   Mr. Tyree, Defendant's 8.   Could you

19 pull that up, which is, I believe, the -- does Dr. Palmer have

20 a notebook of Defendant's 8?   She should.

21        THE WITNESS:   Is it the joint or the cross?

22        MR. MCLUSKY:   This is Defendant's.

23        THE WITNESS:   I don't think I have it.

24        THE COURT:   I have a set of the Defendant's here.

25 Which one are you referring to?

Palmer - Cross

1            MR. MCLUSKY:  Defendant's 8, which is the Gauley

2    TMDL.

3            THE COURT:  Do you know which volume that's in,

4    Mr. McLusky?

5            MR. MCLUSKY:  I do not.

6            THE WITNESS:  I don't know.  It says Palmer Cross-

7    Examination Document.

8            MR. MCLUSKY:  No.

9            THE COURT:  Did you say the total maximum daily load

10   document?

11           MR. MCLUSKY:  Yeah.

12           THE COURT:  I think those notebooks are down below

13   you to the right.

14           THE WITNESS:  Which volume?

15           THE COURT:  Volume 1, tab 8.

16           THE WITNESS:  Okay.

17   BY MR. MCLUSKY:

18   Q.   Turn to page 15 of that exhibit.  And Mr. Tyree will

19   highlight it for us.

20   A.   Okay.

21   Q.   Can you blow that up?

22        Is it fair to say that while DEP listed the stream as

23   biologically impaired for ionic toxicity, that because it

24   could not identify the causative ions, it was deferring TMDL

25   development for Stillhouse?

Palmer - Cross

1   A.   I have no idea.

2          MR. LOVETT:   Objection, Your Honor, to the extent

3   he's asking for legal conclusions about what DEP did.   It's

4   beyond the scope.

5          THE COURT:   Well, sustained.   Rephrase your

6   question.

7   BY MR. MCLUSKY:

8   Q.   Dr. Palmer, Defendant's 8, does it not end with the

9   statement, "Therefore, DEP is deferring TMDL development and

10  retaining those waters on the Section 303(d) list"?

11  A.   It does say that, yes.

12  Q.   And prior to that, it says that the information available

13  regarding the causative pollutants and their associated

14  impairment thresholds is insufficient for TMDL development at

15  this time, does it not?

16  A.   Yes, it does say that.

17  Q.   Is it fair to say you haven't done any toxicological

18  experiments on insects at Stillhouse?

19  A.   Not at Stillhouse, no.

20  Q.   Okay.   Have you conducted any type of statistical

21  analysis yourself to determine the cause of the WVSCI scores

22  at Stillhouse?

23  A.   I'm trying to think if we did them on Stillhouse.   If I

24  could look at my notes, I could tell you.

25  Q.   Well --

Palmer - Cross

1    A.    We did do statistical analysis.

2    Q.    Do you know what the WVSCI scores were in the Stillhouse

3    watershed prior to mining?

4    A.    I don't know.  I don't know if those data are available.

5    Q.    I'm unaware of any.  Is it fair to say the best you know,

6    there are no WVSCI data available prior to mining?

7    A.    It's fair to say I don't know of any.

8    Q.    Have you done any investigation into the impacts of

9    upstream timbering or of the pond that was built in Stillhouse

10   on downstream temperatures or food supplies?

11   A.    I've not done any at Stillhouse.  I've only read in the

12   literature about the effect of timbering.

13   Q.    Have you done any investigation into the effects of

14   mining in the Stillhouse watershed on the flow regime or flow

15   patterns in Stillhouse?

16   A.    No.  As far as I know, there's no long-term data.  If

17   there are, I have not seen it.

18   Q.    And I think you testified earlier that some 90-plus

19   percent of the Stillhouse watershed has been mined or filled?

20   A.    My recollection was that 90 percent of it had been

21   impacted by mining.

22   Q.    Put up Plaintiffs' Exhibit 23, if you could, Mr. Tyree.

23         That's not what I wanted.

24   A.    Okay.

25   Q.    As I understand it, you were -- the place you visited on

Palmer - Cross

1   Exhibit 23 was -- let's get oriented.  We've got ponds up in

2   the upper right.  The water is flowing from those ponds into

3   Stillhouse, and then it meets Twentymile Creek to the south.

4        Is that a fair statement?

5   A.   That's correct.

6   Q.   Okay.  And the place you went was all to the north of

7   what appears to be a railroad track or a road to the middle of

8   that?

9   A.   That's correct.

10  Q.   And you did not go to the lower reaches of Twentymile

11  Creek at all.

12  A.   I did not because of the impacts of -- the potential

13  impacts of the road and railroad tracks; I did not.

14  Q.   Well, what potential impacts are the road and railroad

15  track going to have?

16  A.   Well, I only know that the protocol typically for looking

17  at impact work is to stay closest to the impact you're

18  studying and not go below additional ones.

19  Q.   But according to your testimony, a little road and the

20  road crossing aren't going to have an effect on the WVSCI

21  score, are they?

22  A.   Oh, they could affect the WVSCI score; they're not going

23  to lead to impairment.

24  Q.   Oh, okay.  So you didn't go in the stream at all, didn't

25  even see it below the railroad tracks.

Palmer - Cross

1   A.   No.  I've seen Boardtree just upstream but not there.

2   I've looked at Boardtree where it went into Twentymile.

3   Q.   All right.  Let's look upstream a little bit from here.

4        If you could, show Defendant's Exhibit Number 7,

5   Mr. Tyree.

6        I assume you've seen this picture before.  I believe your

7   lawyers may have provided it.  Have you seen this before?

8   A.   I suspect I have.

9   Q.   Okay.  Mr. Tyree, could you zoom in on the Defendant's

10  Exhibit 7 on the Stillhouse watershed?

11  A.   Is it in -- is it in one of these documents?

12  Q.   It is.  It's Defendant's Exhibit 7.

13  A.   Okay.

14  Q.   Mr. Tyree, could you point to us the toe of the valley

15  fill?

16       Dr. Palmer, do you see where Stillhouse is noted on this

17  exhibit?

18  A.   I do.

19  Q.   Okay.  Now, Stillhouse itself -- almost all of Stillhouse

20  has been filled, hasn't it?

21  A.   It certainly appears that way.

22  Q.   How much is left?  Two to three hundred yards below the

23  ponds?

24  A.   Oh, you meant the stream itself?

25  Q.   Right.

Palmer - Cross

1    A.   I don't know how far up it went.  So I wouldn't want to

2    estimate the distance.  Oh, you mean that's left?

3    Q.   Right.

4    A.   Oh, yeah, probably; you're correct.

5              MR. MCLUSKY:  Just a moment, Your Honor.

6         This was an exhibit I believe that the plaintiffs showed

7    earlier.  I don't remember the number.

8              THE WITNESS:  I recall it.

9              THE COURT:  Can we identify it for the record?

10             MR. MCLUSKY:  It should be Joint Exhibit 18.

11             THE WITNESS:  Yes.

12   BY MR. MCLUSKY:

13   Q.   Okay.  Now, if you look at Joint Exhibit 18, you can see

14   where the original stream channel used to be, can't you?

15   A.   Yes, you can.

16   Q.   Now, is it fair to say the vast majority of Stillhouse

17   was buried by the valley fill?

18   A.   That's correct.

19   Q.   Is it fair to assume based on the photograph we saw a

20   moment ago, Exhibit 23, that the entire watershed has been

21   timbered?

22   A.   Yes, but I do have to ask a question.  Normally I think

23   of the valley fill as where there's those cross lines.

24   Q.   Right.

25   A.   But above that, they don't show those.  So I didn't know

Palmer - Cross

1    if that was just cleared flat area or if that was part of the

2    valley fill.

3    Q.   Well, I think this is out of your report, and it says the

4    yellow is the valley fill.

5    A.   Oh, well, I'm referring to the yellow where there's those

6    cross lines.

7    Q.   Don't you believe the stream has been filled above the

8    cross lines?  Isn't that just the face of the fill?

9    A.   I honestly don't know because I don't read these

10   regularly.

11   Q.   Are you aware of any remaining portions of Stillhouse

12   that exist above the valley fill that you've seen?

13   A.   Only -- no.  That I've seen, no, just a very small amount

14   that's not impacted.

15   Q.   But the amount you saw is below the valley fill, not

16   above it, right?

17   A.   Perhaps.  I just read that over 90 percent had been

18   impacted by mining.  I didn't do the spatial analysis myself.

19   Q.   Are you aware of any stream segment in the Stillhouse

20   watershed that exists upstream of the valley fill?

21   A.   I know of none.

22   Q.   And you've driven over there, and that whole area has

23   been cleared, timbered, and mined, hasn't it?

24   A.   I haven't driven above the ponds.

25   Q.   There was mined -- the timber was stripped off, wasn't

Palmer - Cross

1    it?

2    A.   Yes, it was.

3    Q.   All right.  Is it fair to say manganese and selenium are

4    not among the four ions that EPA identified that is

5    constituting the fingerprint of mine drainage for the

6    benchmark?

7    A.   I think that's fair.

8    Q.   Okay.  But EPA did find that there was a moderation

9    correlation between manganese and extirpation of sensitive

10   macroinvertebrates, didn't it?

11   A.   I'll take your word for it.  I'd have to re-read this

12   document.

13   Q.   Have you suggested that particular pollutants such as

14   selenium and manganese can themselves cause stress to aquatic

15   organisms by getting in the food web?

16   A.   Certainly I know selenium can.

17   Q.   Haven't you said that several of the more toxic ions,

18   especially selenium and manganese, are known to accumulate at

19   high concentrations in stream biofilm where they may enter

20   stream food webs?

21   A.   I know that to be the case.  I can't remember if I said

22   that in this report or an earlier one.

23   Q.   But that's a fair statement.

24   A.   Yes, I think so.

25   Q.   Okay.  Did you do any site-specific work here to see if

Palmer - Cross

1   manganese or selenium have accumulated in Stillhouse in high

2   ionic concentrations to enter the food web?

3   A.   I did not do food web work.

4   Q.   Didn't the Sierra Club originally claim in this case that

5   Fola was violating the water quality standards for selenium?

6   A.   I don't recall.

7   Q.   You don't recall your report addressing selenium either?

8   A.   It's in this report.  Oh, yeah, I know selenium was in

9   there.  I don't recall that I said the Sierra Club reported

10  that.

11  Q.   Well, you're working on behalf of the Sierra Club here,

12  correct?

13  A.   I believe that they pay the bills to Mr. Lovett.  I don't

14  ever encounter the Sierra Club --

15  Q.   Well, you understand this lawsuit originally included a

16  claim that there was a violation of water quality standards

17  for selenium; is that correct?

18  A.   Yes.

19  Q.   You understand that's been dropped, right?

20  A.   I do not know that.

21  Q.   Okay.  Is it your belief that selenium could be

22  contributing, then, to stress to aquatic organisms in

23  Stillhouse?

24  A.   I think it probably could.  I don't know.

25  Q.   Temperature.  You've referred to temperature and other

Palmer - Cross

1    things, a couple of others, as master variables before.

2    A.   I usually think of flow as the master variable, but

3    certainly temperature is very important.

4    Q.   Okay.  And what does the term "master variable" mean?

5    A.   It's like, you know, you have to get the flow, so -- I

6    just finished giving a talk a few weeks ago where I describe

7    that there's a hierarchy of factors you look for when you're

8    getting ready to restore a stream which tells you what the

9    underlying problem was; and flow is one of those, which is

10   below water quality problems.

11      So water quality would trump anything.  Then you want to

12   look at flow because it controls the sediments, food, all

13   sorts of things.

14   Q.   Okay.  Did you do any investigation as to the impact, the

15   hydrologic -- the flow impacts of the mining in the Stillhouse

16   watershed on the flows below the pond in Stillhouse?

17   A.   Only looked at the flow the day I was sampling, but I did

18   not do a thorough investigation.

19   Q.   And that flow comes across a concrete flume, doesn't it?

20   A.   It does.

21   Q.   And that flume is there to retard incision and erosion,

22   isn't it?

23   A.   I don't know why the flume is there; no idea.

24   Q.   That's what they're typically there for, aren't they?

25   A.   I don't know.

Palmer - Cross

1  Q.   The role of multi-metric indices, is it fair to say that

2  generally studies have not been able to link the scores of

3  multi -- of the application of those indices like the WVSCI to

4  specific stressors?

5  A.   I don't know the answer to that.

6  Q.   Weren't you the co-author of a paper for the National

7  Fish and Wildlife Foundation in 2011 entitled "Promoting

8  Successful Restoration through Effective Monitoring in the

9  Chesapeake Bay Watershed"?

10  A.   I was.

11  Q.   Didn't you say in that paper, in general, studies have

12  not been able to link index scores to specific stressors,

13  making it difficult to interpret metrics because communities

14  can show impairment due to a stress, such as hydrologic

15  regime, that is different from the stress that is being

16  evaluated, such as water quality?

17  A.   And the point is that it depends on what is in the multi-

18  metric index, that that whole study was done to establish a

19  relationship between functional change and stressors and what

20  the scientific evidence was relating those two.  And so we

21  were basically telling NFWF that we do not advise using

22  multi-metric indices as an indicator of reduced function in

23  the streams they wanted to restore.

24  Q.   Well, didn't you go on in that same report to say that

25  macroinvertebrate indices generally cannot be used to diagnose

Palmer - Cross

1   a specific problem such as metal contaminants or high nutrient

2   levels because these pollutants are almost always --

3            THE REPORTER:  Excuse me.

4            THE COURT:  Slow down.

5            THE REPORTER:  Start over and slow down.

6   BY MR. MCLUSKY:

7   Q.   Let's put up -- Mr. Tyree, this is tab 17 of your Palmer

8   notebook, if you would.

9   A.   That looks -- which notebook?

10  Q.   Should be Palmer Cross-Examination.

11  A.   Which volume?  Which volume?

12  Q.   I don't know.  It's tab 17.  I don't have it in front of

13  me.  I'm awash in volumes right now.  I'm going to trip over

14  them.

15  A.   Yes, I'm there.

16  Q.   If you'll turn to page A-8, paragraph 1.

17       Mr. Tyree, could you blow that up?

18  A.   What page are you on?  I'm sorry.

19  Q.   A-8.  "A" as in "apple," dash 8.

20  A.   Okay.  I'm there.

21  Q.   And here is it fair to say you're talking about macro-

22  invertebrate indices?

23  A.   Yes, it looks like we are.

24  Q.   Okay.  And don't you say here that they generally cannot

25  be used to diagnose specific problems such as metal

Palmer - Cross

1    contaminants or high nutrient levels because these pollutants

2    are almost always associated with multiple confounding

3    effects?

4    A.   That's correct, which is why you have to do a confounding

5    effect analysis, to eliminate those.

6    Q.   Right.  And --

7    A.   Which is what EPA did.

8    Q.   -- you haven't done that here, though, have you, on

9    anything?

10   A.   For Stillhouse?

11   Q.   Have you done it for -- have you done it independently of

12   anything in the benchmark?

13   A.   I'm sorry.  Do you mean in any stream in West Virginia?

14   Q.   I mean in a general -- let's go back and --

15   A.   I've definitely done it on the West Virginia database.

16   Q.   We will come back to that later, then.

17        Dr. Palmer, isn't it fair to say that the removal of

18   trees from the entire watershed, such as occurs during mining,

19   fundamentally changes the form in which the remaining stream

20   receives carbon from a particulate carbon to a dissolved form?

21   A.   Yes, it can.

22   Q.   And haven't you previously told us that that shift in the

23   carbon form caused by tree removal results in the loss of some

24   of the shredder insects?

25   A.   I'm sure I would have said that loss of the particulate

Palmer - Cross

1   organic matter would result in loss of shredders but not the

2   dissolved component.

3   Q.   Okay.  I'm confused.  Loss of the particulate portion

4   would result in a loss of shredders.  Is that a fair

5   statement?

6   A.   Correct.

7   Q.   And cutting trees --

8   A.   Some shredders, not all of them.

9   Q.   Well, in fact, I think you said you'd lose a lot of the

10  sensitive shredders, right?

11  A.   Where are you reading from?  I'm sorry.

12  Q.   Well, I can pull up -- you said this in 2012.

13       Let's pull up the tab 1 of the cross-examination

14  notebook, which should be your deposition from the *Highland*

15  case.

16       Mr. Tyree has it up on the board.

17  A.   Yeah, I mean I don't dispute that when you lose the leaf

18  litter, you're -- entirely lose the leaf litter, you're going

19  to lose some shredders.  Stillhouse had plenty of leaf litter.

20  Q.   You said the sensitive ones are lost, though, right?

21  A.   Well, if all the leaf litter is lost.

22  Q.   You're saying there's leaf litter because there were some

23  trees below the pond?

24  A.   There were definitely trees below the pond.

25  Q.   So you don't believe the food source in the pond had been

Palmer - Cross

1   converted from a particulate source to a dissolved carbon

2   source?

3   A.   There was plenty of particulate organic carbon in

4   Stillhouse.

5   Q.   Did you do any measures to look at the relative abundance

6   of a particulate versus the dissolved organic carbon?

7   A.   I did not.  As part of the biochemistry work, I did not

8   measure DOC directly, but I often do.

9   Q.   Haven't you told us before that when you take away leaves

10  and wood, the shredders' food supply is gone and you can

11  change the composition of an aquatic insect community in a way

12  that can cause impairment?

13  A.   If all the material is gone.  But as I stated several

14  times, there's plenty of leaf litter and even some wood in

15  Stillhouse.

16  Q.   Did you say in your deposition that you thought there was

17  a good chance that nutrient processing has been affected

18  downstream of the pond in Stillhouse?

19  A.   I wouldn't be surprised if it had been.

20  Q.   Did you also say you didn't know what the effects of that

21  nutrient -- changes in nutrient processing would be to the

22  area where Dr. Swan did his sampling?

23  A.   I said I did not know.

24  Q.   Right.

25  A.   Yes.

Palmer - Cross

1    Q.   Is it fair to say that if you put aside the nutrient

2    dissolved -- particulate versus dissolved carbon, that if I

3    just cut the trees, I will tend to warm the pond and the

4    streams in an environment like this?

5    A.   If there's no trees over the stream and you have warm

6    water from the pond, sure, you could increase the temperature.

7    Q.   In fact, you'd expect that to be the case here, wouldn't

8    you?

9    A.   Yes, you would.

10   Q.   That also generally causes a higher rate of what's called

11   primary production in the pond, doesn't it?

12   A.   Metabolism in general goes up, including the rate of

13   primary production.

14   Q.   And that would typically shift the types of bugs you have

15   from a -- or from a food source to an algae-based system,

16   would it not?

17   A.   Well, I should clarify.  It would -- primary production

18   would go up if you have sufficient nutrients.  Just because

19   light goes up doesn't mean you're going to get an increase in

20   primary production or temperature unless you have sufficient

21   nutrients.  Primary production requires nitrogen, phosphorous,

22   sufficient light.

23   Q.   Would you expect there to be greater source of algae in

24   Stillhouse now than there was prior to mining as a result

25   of --

Palmer - Cross

1    A.    Probably some difference in benthic algae.

2    Q.    I think you've also told us before that based on those

3    increased -- increased primary production, you can expect to

4    see a decline in diversity as well too, can't you?

5    A.    I don't know if I said that.  Certainly if I did -- you

6    can't say that as a general rule.

7    Q.    But it can occur.

8    A.    Only at excessive levels of primary production which then

9    when the algae die create anoxic conditions.  Then you could

10   see reduced diversity.  But oxygen was 100 percent saturation

11   in that system.

12   Q.    You have testified about high light environments in

13   mitigation stream channels in the past here, have you not,

14   those where people were trying to create a stream by a

15   hillside?

16   A.    I suspect I did.  I don't recall, but I believe you, it

17   would happen.

18   Q.    All right.  Do you remember saying that with abundant

19   light and open canopy, algae production rather than leaf

20   litter can fuel the ecosystem?

21   A.    Yes, it can.

22   Q.    And the temperatures may rise in the summer to levels to

23   which native fauna cannot acclimate.

24   A.    Depends on what the temperature levels are.  Absolutely.

25   If it exceeds their thermal tolerance, organisms will start

Palmer - Cross

1  drifting.

2  Q.   Well, you've also said, I think, that you don't know,

3  short of lethal temperature increases, whether temperature

4  increases would affect a WVSCI score, right?

5  A.   I don't know at what point, you're correct, short of

6  thermal tolerances it would.

7  Q.   Okay.  Do you recall the *Aracoma* case back in 2006?

8  A.   Vaguely.

9  Q.   That was probably the first time you testified here.

10  A.   It was.

11  Q.   Do you recall there reacting to a statement either by the

12  Corps or a company representative -- I don't recall which --

13  which said that no substantial effects from ponds will be

14  anticipated to occur on downstream aquatic communities?

15  A.   I don't remember my reaction, but I would expect there to

16  be impacts from ponds.

17  Q.   And those impacts would be on the biodiversity and the

18  types of bugs that exist downstream, wouldn't it?

19  A.   The biggest impact you usually have is that you get

20  pelagic or planktonic drifting organisms from the pond going

21  into the stream.

22  Q.   And that changes the makeup of the insects as well?

23  A.   Well, it's hard to say because most of the planktonic

24  organisms are not what's included in the multi-metric index

25  because they're not native to streams.  They're common in

Palmer - Cross

1   ponds.

2   Q.   So the multi-metric index wouldn't pick up those changes?

3   I'm not sure I follow.

4   A.   So the multi-metric index does not take -- it does not

5   assess organisms like daphnids or other pelagic organisms that

6   might accidentally drift in, correct.

7   Q.   Dr. Palmer, you said flow is a master variable, right?

8   A.   Yes, that's correct.

9   Q.   Haven't you said before -- well, let's see.  And the most

10  important aspect of flow for the purposes of impairment would

11  be peak flows?

12  A.   Well, it's actually peak flow and the lowest flow.

13  Q.   Okay.  And then presumably changing the velocities of the

14  flows in smaller areas could affect microhabitats as well?

15  A.   Yeah, it could.  It doesn't have nearly the effect of the

16  high -- if the historically high velocities are exceeded

17  consistently or the lowest flows are -- occur below those

18  historical levels, then, yeah, it can have a big impact.

19  Q.   So if I do something to increase my peak flows on a

20  routine basis, it can have a significant impact downstream.

21  A.   Only if they're outside the historical range of natural

22  variability.

23  Q.   Right.  Now, you've written before, I believe, that peak

24  flows increase linearly with the percent of watershed mined

25  even if the land has been reclaimed, haven't you?

Palmer - Cross

1    A.   I don't recall that.  It may be that that's work that

2    Eshleman did sometime ago, but I haven't looked at that in a

3    long time.

4    Q.   Well, let's look at -- I think it's Plaintiffs' Exhibit

5    Number 1.

6    A.   Okay.

7    Q.   And if I turn to page 45 of the report, which is PE 7,

8    second column -- Mr. Tyree can probably show that to us

9    quicker than I can.

10       Is it fair to say that in this article you say that peak

11   flows increase linearly with the percent of the watershed

12   mined?

13   A.   I'm sorry.  What page are you on?

14   Q.   I'm on page 45 of the article.

15   A.   Right column?

16   Q.   The right column, I think.

17   A.   Top?

18   Q.   It's under "Altered hydrology," lower right paragraph.

19   Do you see that?

20   A.   Oh, okay.  Yes, I do see that.

21   Q.   If you read down there, I think you'll see it.

22       Can you confirm or read for me the sentence that starts

23   with "Peak flows"?

24   A.   I can confirm that recent works of the study that we cite

25   found peak flows increasing linearly with the percent of the

139

Palmer - Cross

1   watershed mined.

2   Q.   I think you testified before that some 90 percent of the

3   watershed had been mined here, right?

4   A.   That's correct.

5   Q.   So -- or at least 90 percent.  You couldn't get much more

6   in terms of your increase on the peak flows, right, in a

7   watershed?

8   A.   Well, actually that's not the case.  First of all, you'd

9   have to look at the peak flows historically; and second, you

10   don't have the vertical gradient that you had before the

11   mining was done.  And so there's a very good chance that the

12   peak flows the stream experiences now are not higher than the

13   historical range of peak flow during storms.

14   Q.   What does the article say?  The article doesn't say that.

15   It says peak flows increase linearly with the percent of the

16   watershed mined, even if the land has been reclaimed, doesn't

17   it?

18   A.   I said that that's what that study showed.  I'm simply

19   giving you an analysis of what I've seen at Stillhouse, which

20   is it's a very gentle slope.  It's not the steep headwater

21   slopes.

22   Q.   Where are we talking -- you didn't get above the valley

23   fill, the face of the fill you said.  So what did you look at?

24   A.   Correct.  I'm talking about what the stream slope was

25   where I --

Palmer - Cross

1   Q.   Oh, the stream slope.  Okay.  Okay.

2   A.   So a couple things.  One, water comes down that chute.

3   Q.   Right.  I'm not -- I understand.

4   A.   And drop --

5   Q.   I understand.  I just wanted you to --

6   A.   Drop reduces velocity.

7            THE COURT:  One at a time.  Hold on.

8   BY MR. MCLUSKY:

9   Q.   I just wanted you to confirm what was said in this

10  report.

11  A.   And I did, but I said that it dealt specifically with

12  that one particular study.

13  Q.   This paper -- turn to page 1, Exhibit 1.  Tell me what

14  the title of this paper is.

15  A.   It is "The environmental cost of mountaintop mining

16  valley fill operations for aquatic ecosystems of the Central

17  Appalachians."

18  Q.   This doesn't represent that it's the study of one site.

19  It represents that it's the cost of mountaintop mining

20  generally, doesn't it?

21  A.   That is not what the sentence says.  If you read the

22  sentence, it's very clear that it is referring to a specific

23  study.

24  Q.   I understand that.

25  A.   It says recent work, and it cites one article.

Palmer - Cross

1  Q.   The sentence before that says mining also leads to

2  significant changes in watershed hydrographs, doesn't it?

3  A.   That's correct.

4  Q.   Then without qualification, it makes the statement that

5  peak flows increase linearly with the percent of the watershed

6  mined, even if it's been reclaimed, doesn't it?

7  A.   I have not denied that mining will alter hydrology.  I

8  simply said in Stillhouse, because of the gentle slope and the

9  drop -- step pools are used to reduce flow in urban streams

10 when peak flows go way up.  And essentially the chute has

11 created a step pool where the energy drops down very, very

12 quickly before it goes into the stream.

13 Q.   Have you done any measure at all -- you're not an

14 engineer.

15 A.   Actually I've worked on boundary layer flows and

16 hydrodynamics for my Ph.D.

17 Q.   And there's all kinds of modeling that people use in

18 order to evaluate what impact in the peak flows is going to

19 be, aren't there?

20 A.   Absolutely.

21 Q.   Did you apply any of those at this site?

22 A.   I did not, but I did look at flow in the stream, and I

23 looked at slope.

24 Q.   You looked at the slope in the stream, though.

25 A.   Well, that's where the relevant point is here that we're

Palmer - Cross

1   talking about.

2   Q.   But the peak flows are coming from the mined areas to the

3   stream, are they not?

4   A.   Yeah, and there's a drop.   Physics tells us when you have

5   a drop and the area widens, the conservation of momentum is

6   such that flow is going to drop significantly, velocity is.

7   Q.   Can't repeated increases in peak flows cause impairment?

8   A.   If they're outside the historical range of flow

9   variability for the site.

10  Q.   Haven't you also said in the past that many sensitive

11  indicator taxa used in multi-metric indices are so sensitive

12  to degradation that their return typically requires almost

13  full restoration of ecological processes such as flow,

14  sediment regime, and food base?

15  A.   As I said before -- and I've talked about this

16  extensively and published -- you have to use a hierarchical

17  approach and look at the most limiting factors.

18  Q.   Well --

19  A.   Can I finish my sentence?

20         MR. LOVETT:   Your Honor, Mr. McLusky has interrupted

21  her repeatedly.

22         THE COURT:   Let her finish her answer.

23         THE WITNESS:   If the water is too polluted for

24  organisms to live, it doesn't matter what the flow levels are

25  or the habitat.   They can't live there.   And numerous studies

Palmer - Cross

1   have manipulated in restoration projects the flow using

2   structures and increasing habitat and you still don't get the

3   organisms back because the water is polluted.

4   BY MR. MCLUSKY:

5   Q.   Now, my question to you, though, in order to restore a

6   WVSCI score as measured by the multi -- as measured by the

7   WVSCI test, isn't it fair to say that you would require full

8   restoration of ecological processes such as the flow, the

9   sediment, the temperature regime, and the food base?

10  A.   To get full ecological restoration of all processes,

11  biogeochemical, etcetera, you would have to restore all of

12  those.

13  Q.   Did you not tell Congress in 2009 that there are now a

14  number of peer-reviewed scientific studies documenting the

15  fact that hydrologic regime -- that is, the source, timing,

16  and amount of water flow below mined sites -- is fundamentally

17  altered?

18  A.   Yes, and I have not denied today that I'm sure there's

19  some alteration to the hydrologic regime.  There's no evidence

20  it's outside of the historic range of variability at the site

21  that we're discussing.

22  Q.   Except for the fact that you published a paper that says

23  that peak flows increase linearly with percent of mining,

24  right?

25  A.   No, I didn't publish that paper.  I quoted someone else

Palmer - Cross

1   who measured that at one site.  Just because there's a linear

2   relationship at one site doesn't mean it's at all sites.

3   Q.   Dr. Palmer, that paper, Exhibit 1, Dr. Bernhardt and

4   Dr. Palmer are the only authors of this paper.

5   A.   That's correct.

6   Q.   And you're saying this quote was not intended to

7   characterize mining generally but when you're talking about a

8   single site?

9   A.   There may be many more sites that respond linearly.  I

10  don't know that those sites have step pools.  I'd have to go

11  back and look at this.  If this is the work in Western

12  Maryland streams, they don't look anything like the sites

13  we're talking about at Stillhouse.

14  Q.   But there aren't any mountaintop mining sites with valley

15  fills in Maryland, are there?

16  A.   I don't know.

17  Q.   Well, you represented in this article that this was

18  indicative of mountaintop mining valley fills in Central

19  Appalachia, didn't you?

20  A.   No.

21  Q.   You didn't?

22  A.   I said recent work.  That means a paper I'm citing

23  analyzing hydrologic change as a function of the amount of

24  watershed, etcetera, etcetera.  I did not say all mine sites

25  increase linearly.  We don't have the data to show that.

Palmer - Cross

1  Q.   You don't even identify the particular mine site here, do

2  you?

3  A.   I site Ferrari et al.

4  Q.   Okay.   What do their papers say?

5  A.   I haven't read it in many years.   If you want to get it

6  for me, I'll be glad to read it.

7  Q.   Mr. Tyree -- do you remember you provided some testimony

8  to Congress back in 2009 to the Senate Environment and Public

9  Works Committee?   Do you remember that?

10 A.   I do.

11 Q.   It's at tab 2 I think of your Palmer Cross-Examination

12 notebook.   You can turn to page 3 of that.   Mr. Tyree has it

13 up.

14 A.   Sorry.   I'm having a hard time finding it.   What volume

15 is it?

16 Q.   It's tab 2, so it's probably volume 1.   Mr. Tyree can

17 show you the first page if you'd like.

18 A.   It must still be in the box.   Let me look.   Volume 2.   Is

19 it the one that said Defendant on it?

20 Q.   No.   It should say Palmer Cross-Examination.

21 A.   I don't think I have that.   Maybe someone from your team

22 can look and --

23          MR. MCLUSKY:   May I approach, Your Honor?

24          THE COURT:   Yes, you may.

25          THE WITNESS:   Okay.   Tab 2.

Palmer - Cross

1      MR. MCLUSKY:  Yes.

2  BY MR. MCLUSKY:

3  Q.   Dr. Palmer, can you confirm that you've provided

4  testimony to a subcommittee on water and wildlife, the

5  Committee of the EPW or Environment and Public Works Committee

6  that --

7  A.   I did, yes.

8  Q.   And turning to page 3 of that testimony, could you

9  confirm that you said since the flow regime is one of the key

10  variables in determining what types of insects and other

11  aquatic organisms can live in a stream, even if the water

12  coming out of valley fills could be purified before entering

13  the streams, the biological community will never be the same?

14  A.   It may not have exactly the same constituents.  That's

15  absolutely true.  It doesn't mean it will be impaired, though.

16  Q.   But that's not what you told Congress.  You said it will

17  never be the same.  You weren't saying except it will meet the

18  WVSCI score, were you?

19  A.   I was instructed to keep this extremely short.  In fact,

20  I was asked to cut it and cut it and cut it by the committee,

21  I guess, staff members.  So, no, I didn't put a lot of those

22  details in.

23  Q.   Well, what you meant by this was even if you purified the

24  water, the landscape style effects upstream are going to cause

25  fundamental changes in the biology downstream, didn't you?

Palmer - Cross

1   A.   I've said many times hydrology influences the organisms.

2   I have no doubt you may see a shift in species composition,

3   but I absolutely don't have any reason to know if you would

4   have impairment.  It would depend on how much the hydrology

5   changed compared to what the organisms evolved in response to;

6   that is, their historic range of variability.  And these

7   streams, these deep streams have very high, deep flows during

8   rain storms.

9   Q.   Mr. Tyree, could you show us Defendant's Exhibit 5B?

10      I just want to walk a little bit -- it's probably easier

11  to look.  This one is easier to look at on the screen I think.

12  A.   Oh, yes.  This is from the site.

13  Q.   Is this a view of the pond or one of the ponds at the

14  headwaters of Stillhouse?

15  A.   It is.

16  Q.   Okay.  And then I'm just going to kind of walk you

17  downstream to see if it's consistent with your memory of being

18  there.

19      If you go to Joint Exhibit 8, I think we should have a

20  picture of something called the flume.  Do you remember this

21  downstream of the pond?

22  A.   I do.  It looks pretty different because there was snow,

23  but yes.

24  Q.   Okay.  So the pond here, I believe this is actually off

25  of -- either from Meghan Betcher or Mr. Hansen's pictures.

Palmer - Cross

1   The pond is in the foreground, as I understand it, even though

2   it's kind of an optical illusion to me.  But as I understand

3   it, this water is moving from the right foreground into the

4   left background.

5   A.   Oh, is that right?  I thought it was coming down.  It's

6   hard to tell, but I trust you.  I don't know.

7   Q.   In any event, is there a date on this photograph?  Okay.

8   This is -- I think this is taken by Miss Betcher, who works

9   for the plaintiffs here, September of 2013.

10  A.   Uh-huh.

11  Q.   Mr. Tyree, could you zoom back out for a moment?

12       This is a pretty healthy volume of water coming off

13  there, isn't it?

14  A.   Uh-huh.  Yes, it is.

15  Q.   Might be the reason there's a concrete flume, right?

16  A.   Could be, and the reason there's a drop and a plunge pool

17  at the base of it.

18  Q.   Is there some kind of a road crossing between the pond

19  and the flume?  Do you remember a road actually crossing?

20  A.   Yes.  It looks like when the pond fills, it goes I

21  believe right over the road into -- you know, it's gravel.

22  Q.   Okay.  Mr. Tyree, could you show us Joint Exhibit 6?

23       I think what you're seeing here, if I'm not mistaken, is

24  a road crossing a -- a horizontal line with the pond

25  discharges before it enters the flume.  Is that consistent --

Palmer - Cross

1   A.   I think that's correct, yes.

2   Q.   Then in the remaining reach, as I understand it, below

3   the flume, you go through an open channel and then a series of

4   culverts that cross under roads, railroad, maybe another road,

5   and then ultimately into Twentymile; is that correct?

6   A.   That would be -- yes, below the area I sampled.   Correct.

7   Q.   Let's look at the Defendant's Exhibit 37, Mr. Tyree,

8   which I think is part of Joint Exhibit 81.

9   A.   Is that probably my --

10           THE COURT:   Which are you asking her to look for?

11           MR. MCLUSKY:   I'm looking for Defendant's 37.

12           THE WITNESS:   Which volume was that?

13           THE COURT:   Which volume?

14           THE WITNESS:   Volume 4, maybe?

15           MR. MCLUSKY:   It's on tab 27 of the cross.   I don't

16   know if Mr. Tyree put it in the notebook.

17           THE WITNESS:   Yes, I found it.   I have it.   Okay.

18   BY MR. MCLUSKY:

19   Q.   Have you seen this document before?

20   A.   You know, I suspect I have, but I don't recall for sure.

21   Q.   Okay.   Look across the top and see if you can't agree

22   with me that this is a watershed assessment form issued by the

23   West Virginia DEP as a result of a site inspection in May of

24   2012.

25   A.   That's what it looks like.

Palmer - Cross

1   Q.   Okay.  You've seen sheets like this before?

2   A.   Yes, I have.

3              MR. LOVETT:  Bob --

4              MR. MCLUSKY:  Yeah?

5              MR. LOVETT:  -- I'm sorry.  What page is it?

6              MR. MCLUSKY:  It's the first page of --

7         (Counsel conferred privately off the record.)

8   BY MR. MCLUSKY:

9   Q.   So I'm looking on Defendant's 37.  It says Stillhouse

10  page 1064 in the lower right.  Do you see that?  There's a

11  paging --

12  A.   Yes, I do see that.

13  Q.   Now, this appears to be a drawing of the lower end at

14  least of Stillhouse, doesn't it?

15  A.   It does.

16  Q.   Okay.  And if I look at this drawing to get oriented, I

17  think when I've looked at this, the ponds would be off to the

18  right, perhaps off of the drawing altogether, and Stillhouse

19  would be to the left --

20  A.   Yes.

21  Q.   -- off of the drawing altogether; is that correct?

22  A.   Yes.

23  Q.   And then we have railroad tracks going up the center,

24  correct?

25  A.   Correct.

Palmer - Cross

1   Q.   And my understanding is you did not go downstream of

2   those railroad tracks at all.

3   A.   That's correct.

4   Q.   Okay.  Now, so this form is dated -- can you confirm up

5   in the top line -- May 9 of 2012?

6   A.   That's correct.  It looks like -- well, it's hard to say.

7   It looks like "9" might have gotten erased and corrected --

8   Q.   Okay.

9   A.   -- but it looks like 5/9/12.

10  Q.   All right.  And then if I want to walk from the

11  downstream end of Stillhouse to the upstream end using this

12  drawing in Exhibit 37, is it fair to say the first thing I see

13  is a dirt road on the left that the stream goes under?

14  A.   Yes, I guess that's what it says.  Did you mean road

15  ditch or --

16  Q.   No, it says --

17  A.   Dirt road.

18  Q.   -- dirt road.

19  A.   Yes.

20  Q.   There's a road ditch as well, you're right.  Then I see

21  "culvert."

22  A.   Yes.

23  Q.   And then I see "old stump" and then the word "erosion"

24  next to that.

25  A.   Yes.

Palmer - Cross

1   Q.   And then to the south of that, I see "steep eroding

2   bank."

3   A.   Yes.

4   Q.   And then further upstream, but before the railroad

5   tracks, I see "undercut bank."

6   A.   Yes.

7   Q.   Okay.  And then I cross the railroad tracks, apparently

8   cross power lines as well.

9   A.   Yeah.

10   Q.   Okay.  Did you get down to the power lines?

11   A.   I think we passed them driving in.  I didn't walk there.

12   Q.   If I could turn two pages -- several pages ahead to page

13   1067.

14   A.   Yes.

15   Q.   Mr. Tyree, could you zip ahead?  Go ahead and show us

16   first, if you would, the General Comments section.

17        Do you see that, Dr. Palmer?

18   A.   I'm sorry.  What?

19   Q.   The General Comments section.

20   A.   Yes.  Yes, I do.  Yes.

21   Q.   Can you confirm that near the end, the statement "Lower

22   40 meters has erosion undercutting in sharp bends.  Poor

23   buffer"?

24   A.   I'm sorry.  I don't know why -- I don't see where you're

25   looking.  You're on 67?

Palmer - Cross

1   Q.   I'm on 1067 under the General Comments section.

2   A.   Right.

3   Q.   You'll see the last sentence is, "RDP almost identical to

4   the LDB."  About two lines above.

5   A.   Yes, I do see that.

6   Q.   Okay.

7   A.   And then two sets of railroad tracks, some herbs and

8   shrubs around 80 to 100 meters before stream flows into

9   culvert.

10  Q.   We're going to come back to this in a minute or two, but

11  your trip in January 2014, you saw some staining I think you

12  said earlier?

13  A.   Yes.

14  Q.   I think you said earlier those were orange precipitates

15  on the stream?

16  A.   Well, they were more blackish-green.  Some were orange.

17  Q.   I thought you said in your deposition you thought it was

18  iron hydroxide.

19  A.   It probably was iron hydroxide, but the color varied.

20  Some of it to me looked like manganese, but that's the reason

21  I had it geochemically analyzed, because I wasn't positive.

22  Q.   As I understand it, the -- was it the precipitates that

23  were causing some embeddedness, patchy embeddedness you said

24  earlier?

25  A.   That was my guess, yes.

Palmer - Cross

1  Q.    Okay.   In your deposition, Mr. Harvey asked you whether

2  this stream would receive a WVSCI score of 68 if you had

3  treated the conductivity to 300 or below.

4      Do you recall that?

5  A.    I don't recall, but I will believe you.

6  Q.    And do you recall that your answer was that it may pass,

7  and then you said, "I think it would"?

8  A.    And I still do.

9  Q.    But you don't know, do you?

10 A.    I don't know of any studies that have actually cleaned up

11 the water so that we've had a chance to measure it on mine

12 sites, but I do know from acid mine drainage, if you deal with

13 the acid and clean up the water, you definitely recover from

14 impairment.

15     So there's a lot of other studies where there's water

16 quality problems that have been cleaned up.

17 Q.    Well, Mr. Harvey asked you what you would do to restore

18 the stream.   I think you said first that you would plant trees

19 over the entire watershed, right?

20 A.    No, the first thing I would do is take care of the water

21 quality.   It would have to be filtered.   And then as you

22 actually start restoring the stream, not just cleaning up the

23 water that flows into it, yeah, I would plant trees.

24 Q.    And the reason you said, that would slowly over time

25 restore the hydrology, right?

Palmer - Cross

1  A.   It would.

2  Q.   Which means the hydrology needs to be restored, right?

3  A.   That's -- well, sure.  I've never said that hydrology

4  doesn't matter and that it wouldn't affect WVSCI.  I simply

5  said I don't think it would affect it enough to cause

6  impairment, which it was only the hydrology and it wasn't

7  outside the historic range of variability.

8  Q.   Can you point me to any studies, either the Exhibit 1 we

9  talked about that you and Dr. Bernhardt published, that says

10  that the changes in flows that you expect in a mine won't

11  cause impairment?

12  A.   I don't know of any such studies, no.

13  Q.   I think you said also that planting trees would correct

14  any changes to nutrient cycling or water chemistry caused by

15  deforestation?

16  A.   It would -- it could improve it.

17  Q.   That would take decades, though, right?

18  A.   Yes, it would.

19  Q.   Many, many decades, correct?

20  A.   Well, actually there's a large study done by Orzay

21  (phonetic) where even restoring the riparian zone within about

22  20 -- 15 to 20 years, you start seeing dramatic improvement in

23  the biota.

24  Q.   That's still a decade and a half-plus, right?

25  A.   Yes.  Yes.  It's very severely impacted by mining.

Palmer - Cross

1   Q.   You said also you'd get rid of the pond because it

2   probably has different types of organic matter coming out of

3   it than does a reference stream?

4   A.   Yes, I believe I said --

5   Q.   And you understand that you can't get rid of that pond if

6   you're still treating water?

7   A.   No, I don't.  No, anything really about the actual

8   engineering process by which the water is purified, I only

9   know it needs to be done.

10  Q.   Have you ever seen a reverse osmosis plant at all?

11  A.   A plant?

12  Q.   Yeah.

13          MR. LOVETT:  Objection, Your Honor.  This is well

14  beyond the scope of direct and something that she's not

15  qualified to testify about, hasn't testified about, and it's

16  not in the report or --

17          MR. MCLUSKY:  Well, I believe in her report she

18  actually opined that the site would return to a passing WVSCI

19  score if the conductivity was reduced.

20          THE COURT:  Well, overruled.

21          THE WITNESS:  Can I respond?

22          MR. MCLUSKY:  No.  I don't think there's a question

23  outstanding right now.

24          THE COURT:  Did you answer his question?  I think he

25  just asked you if you'd seen a reverse osmosis plant.

Palmer - Cross

1      THE WITNESS:  No, I've never seen a plant.

2  BY MR. MCLUSKY:

3  Q.   Have you ever seen any type of water treatment plant that

4  has to normalize or equalize flows?

5  A.   A plant?  Well, certainly I've been involved in

6  restoration projects where structures are used to restore the

7  hydrologic flow regime.  Yes, I have seen --

8  Q.   I'm talking about water treatment, treatment for

9  conductivity, for example.

10  A.   I don't know that they usually combine dealing with the

11  hydrology with the water treatment.  They're usually done

12  separately.  And the hydrology is usually controlled by a

13  vertical structure because, as I said before, when you have

14  the drop, you can alter the momentum, which changes the

15  velocity.

16  Q.   Don't you have to have -- well, let's go back to

17  Defendant's Exhibit 37, which is the DEP assessment sheet.

18      THE COURT:  Volume 4.

19      THE WITNESS:  Thank you.

20      THE COURT:  At the very back.

21      THE WITNESS:  So what was the tab?

22      THE COURT:  37.

23      MR. MCLUSKY:  37, I believe.

24      THE WITNESS:  Okay.

25  BY MR. MCLUSKY:

Palmer - Cross

1   Q.   All right.  And if you'd turn to page 1066 of that

2   exhibit.

3   A.   Yes.

4   Q.   Is it fair to say here DEP notes, under Sediment Notes

5   and Comments, thick cementing of substrate in many places by

6   some type of manganese or Mn hydroxide?

7   A.   I do see that, yes.

8   Q.   Have you ever seen this before?

9   A.   And that would be consistent with him saying, "I saw a

10  greenish-black material in some areas."

11  Q.   Right.  But they say "many places."  You talk about

12  patchiness.  This says thick cementing of substrate in many

13  places, does it not?

14  A.   I don't know the difference between "many places" and

15  "some places."

16  Q.   Well, let's look above because we have a rating system

17  here.  Do you see it says Rate Sediment Deposits?

18  A.   Uh-huh.

19  Q.   And it has a score from zero to 4, with 4 being extreme.

20  A.   I'm sorry.  You're looking at sediment deposits?

21  Q.   I'm looking right above the sediment notes.

22       Mr. Tyree could probably point it out.

23  A.   So where it says Silt and Fine Gravel?  Is that where

24  you're looking or just looking at the manganese?

25            MR. MCLUSKY:  Back.

Palmer - Cross

1   BY MR. MCLUSKY:

2   Q.   Do you see where it says Rate Sediment Deposit?

3   A.   Okay.  Now I do see that, yes.

4   Q.   You're asked to rate the sediment deposits.  There's a

5   scoring system from zero to 4?

6   A.   Yes.  Yes.

7   Q.   Now, if I look over to the right, I see Manganese (Black

8   Hydroxide) with a 4, don't I?

9   A.   Yes.  And I don't know where they did this exactly in the

10  stream.

11  Q.   They rated it extreme, didn't they?

12  A.   They did.

13  Q.   All right.  They have long/lats on the first page of this

14  document.  Did you happen to plot this at all on a map?

15  A.   I didn't.  So I don't know if this is above or if it's

16  immediately below.  I have no idea where it is.

17  Q.   Okay.  If I turn, then, to page 1068, if you would.

18  A.   Okay.

19  Q.   Can you confirm this appears to be an RBP form?

20  A.   It's parts of an RBP, yes.  It's the beginning of one.

21  Q.   How many -- if you'd go to the next page, is that --

22  A.   Yes, it's clearly an RBP.

23  Q.   Okay.  Let's look at the score for epifaunal substrate,

24  the first score.  They give it a poor, a 3, don't they?

25  A.   They do.

Palmer - Cross

1    Q.    All right.  And then under Embeddedness, they give it a

2    poor with a 2, correct?

3    A.    Let me just look at it for a second, please.

4    Q.    Sure.

5    A.    Right.  And so I had a chance to look and see where it

6    was, and they indicated a lot of disturbance related to the

7    mining and the railroad and the culvert and the dirt roads.

8    Q.    Right, but my question is -- let's go back to number 2

9    under Embeddedness.  They give it a rating of 2, don't they?

10   A.    They do.

11   Q.    Now, presumably it's downstream of the railroad would you

12   say?

13   A.    That's what it appears to be.  I was trying to see if

14   they marked it on the map, but I don't see that.

15   Q.    But the notation for embeddedness also says metal

16   hydroxides, doesn't it?

17   A.    It sure does.

18   Q.    Let's turn to page 1070, if we could.

19   A.    Okay.

20   Q.    Now, at the top you'll see it says Benthic and Fish

21   Habitat, Aesthetic, and Remoteness Ratings.  Do you see it at

22   the very top?

23   A.    Oh, benthic habitat, invertebrate substrate?  Is that

24   what you're looking at?

25   Q.    I'm talking about the very top.

Palmer - Cross

1    A.   Yes, I do.

2    Q.   Okay.  This appears to me to be a supplemental part of

3    the DEP form that is not part of the standard RBP, isn't it?

4    A.   That does, yes.

5    Q.   Okay.  In fact, if I go back one page to page 1069 -- do

6    you see that?

7    A.   Yes.

8    Q.   The prior page.  You'll see there's a total score for the

9    RBP in the lower left-hand corner --

10   A.   Yes.

11   Q.   -- of 94.

12   A.   Yes.

13   Q.   Okay.  And that comes out as marginal, doesn't it?

14   A.   That sounds about right.

15   Q.   Well, don't take my word for it.

16   A.   No, no.  I mean I've forgotten what the cumulative

17   score is, but I believe you.  Yeah, it's a bad -- it's not a

18   great score.  It's not poor, but it's certainly not

19   suboptimal.

20   Q.   If I look over two blocks, three blocks to the right, you

21   have optimal, suboptimal, marginal.  Do you see the scoring

22   system there?

23   A.   Yes, I do.

24   Q.   Okay.

25   A.   Yes, absolutely.  I'm sorry.

Palmer - Cross

1  Q.   All right.  Now, let's go, then, to page 1070 where we

2  have this kind of supplemental form that DEP has.

3  A.   Yes.

4  Q.   Can you confirm for me there that DEP actually has its

5  own category for benthic macroinvertebrate substrate, doesn't

6  it?

7  A.   They do, and they rated it poor.

8  Q.   With a 2, right?

9  A.   That's correct.

10  Q.   2 out of 20.  Now, if I go to page 1072 --

11  A.   Yes.

12  Q.   -- and you'll see -- Mr. Tyree, if you want to pull that

13  up.

14       There's a description section, second to the bottom.  I'm

15  pointing to it.  Do you see where it says "CB in some areas"?

16  A.   Yes, I do.

17  Q.   Okay.  Can you confirm for me that they also say here,

18  "All larger substrate coated in some sort of precipitate or

19  flocoulant, basically binding it together.  I could only move

20  and scrub three to four pieces of substrate"?

21  A.   I see that.  It's certainly not what I observed, but I do

22  see it.

23  Q.   Right.  But they were further downstream than you,

24  perhaps.

25  A.   I guess, yeah.  I don't know.

Palmer - Cross

1   Q.   Well, overall very poor is what they say, right?

2   A.   It's what they said, yes.

3        MR. MCLUSKY:  Your Honor, if I might, I'm trying to

4   find some photographs.

5        THE COURT:  All right.  Take your time.

6    (The Court and court reporter conferred privately off the

7   record.)

8        THE COURT:  Excuse me.  We'll go ahead and take a

9   brief recess at this time, about a ten-minute recess.

10       MR. MCLUSKY:  Sure.  I'm almost finished.

11   (Recess from 2:50 p.m. to 3:06 p.m.)

12       MR. BECHER:  Your Honor, before we begin, if I

13  may -- and I discussed this with defense counsel -- Dr. Palmer

14  had shoulder surgery earlier this year and is having some pain

15  picking up notebooks.  They have no objection if I approach

16  and help her handle them.

17       THE COURT:  Certainly.

18       MR. BECHER:  Thank you, Your Honor.

19  BY MR. MCLUSKY:

20  Q.   Dr. Palmer -- and I think I don't need any more

21  notebooks, but Defendant's 37, which was the stream assessment

22  sheet you were testifying about a minute ago --

23  A.   Yes.

24  Q.   -- to the extent that talks about heavy manganese,

25  hydroxides, and sedimentation in the stream, that's different

Palmer - Cross/Redirect

1   conditions than you saw on your site visit.  Is that a fair
2   statement?
3   A.   Yes, it is.
4   Q.   Okay.  And to the extent there were metal hydroxides
5   downstream of where you were, they wouldn't be the result of
6   the railroad or the road, would they?
7   A.   They shouldn't be.  They might be exacerbated if there's
8   a lot of silt.
9           MR. MCLUSKY:  I think that's all I have, Your Honor.
10          THE COURT:  All right.
11          THE WITNESS:  Would you --
12          THE COURT:  Redirect?
13          THE WITNESS:  Oh, yeah.
14          MR. LOVETT:  I need somebody to help me with the
15   books too.
16                  REDIRECT EXAMINATION
17   BY MR. LOVETT:
18   Q.   Let's stay on the same exhibit just to -- do you still
19   have the sheets before you?
20          THE COURT:  Plaintiffs' 37?
21          MR. LOVETT:  37.
22          THE COURT:  I mean Defendant's 37.
23   BY MR. LOVETT:
24   Q.   Defendant's 37.  Page Stillhouse 1064.
25   A.   Thank you.  Yes.  Okay.

Palmer - Redirect

1   Q.   Okay.  Also Plaintiffs' Exhibit page 363, which is the

2   map that Mr. McLusky was just using as well.

3          THE COURT:  Plaintiffs' Exhibit which?

4          MR. LOVETT:  Page 363.

5          MR. BECHER:  Which tab is that, Joe?

6          MR. LOVETT:  It is tab 23.  I'm sure it's somewhere

7   else too, but that's where I know it to be.

8          THE WITNESS:  I can hold it.

9   BY MR. LOVETT:

10  Q.   Okay.  Do you see that map?

11  A.   Yes.

12  Q.   Okay.  So let's try to understand where the DEP was doing

13  its work here.  Do you see at the very top on page 1064 it

14  says site verification, stream location, Stillhouse; and then

15  it says near mouth?  Do you see that at the very top of the

16  page?

17  A.   Yes, I do.

18  Q.   So this was taken -- these were taken near the mouth of

19  Stillhouse --

20  A.   They were.

21  Q.   -- correct?

22  A.   Yes.

23  Q.   Okay.  And if you look at the drawing, it says "US" on

24  the right-hand side of the page, again on 1064.  That's

25  upstream, right?

Palmer - Redirect

1   A.   That's correct.

2   Q.   So the stream is flowing downstream from there into the

3   tracks, and they're sampling on the other side of the railroad

4   tracks, correct?

5   A.   Oh, yes, I see now.  I get the orientation.  Yeah.

6   Q.   Is that your understanding of that?

7   A.   So the pond is to the left, is that correct, of the page?

8   Q.   Okay.

9   A.   I don't know.

10  Q.   I -- okay.  But where is the mouth of this stream?

11  A.   Well, it's going to be at the confluence of Twentymile.

12  Q.   Okay.  So it's down towards Twentymile.

13  A.   It's way downstream, yeah.

14  Q.   And then if you look at page 1066, two pages on --

15  A.   Yes.

16  Q.   -- it says reach location, and it starts zero meters and

17  goes to 40 meters.  Do you see that at the bottom --

18  A.   I do, yes.  Yes.

19  Q.   So does that indicate to you that the samples were taken

20  from the mouth 40 meters upstream?

21  A.   Well, that's what it suggests.

22  Q.   Okay.  So that's in a much different location.  That's

23  significantly downstream from where you took your samples,

24  right?

25  A.   Yes, very much so.

Palmer - Redirect

1   Q.   And it's below the railroad tracks and below those

2   other --

3   A.   Yes, it is.

4   Q.   -- disturbances, right?  Now, where you were -- and let

5   me ask you one other question.  Can you look at page 1066 of

6   that same document, and the top boxes, one says sediment

7   deposits.  Do you see that box?

8   A.   Yes, I do.

9   Q.   Do you see the very bottom?  It says probable source.

10  A.   Mining.

11  Q.   Mining?

12  A.   Yes.

13  Q.   Is there any other mine there except for this mine that

14  you're testifying about?

15  A.   No, there's not.

16  Q.   About the manganese deposits, do you know what a

17  manganese deposit looks like?

18  A.   It's a greenish color, greenish-black.

19  Q.   Did you see that in the stream?

20  A.   Oh, absolutely.

21  Q.   Okay.  And do you think that at the part of this stream

22  where you and where Dr. Swan -- where you sampled and where

23  Dr. Swan took his samples, was that material there?

24  A.   It was there, yes.

25  Q.   Was there a lot of it?

Palmer - Redirect

1    A.    There was a lot of deposits.  All areas weren't embedded.

2    So there were patches of embedded areas, as I said earlier,

3    but --

4    Q.    Are those deposits related to the ions associated with

5    conductivity?

6    A.    Yes, they are.

7    Q.    Let's look at plaintiffs' exhibits and then start with

8    15.  It's the Pond 2008 paper that Mr. McLusky was asking you

9    about.

10   A.    Yes.  Okay.

11   Q.    And if I recall, Mr. McLusky was questioning you about

12   whether this paper associated ionic pollution with impairment

13   or not.

14         Do you recall that line of questions?

15   A.    Yes, I do.

16   Q.    Would you please turn to PE 210, page 210 of that

17   document.

18   A.    Okay.

19         MR. LOVETT:  Your Honor, let me just -- we've tried

20   to reach an agreement with defendants about not having to read

21   all this into the record and admitting these exhibits, but we

22   haven't been able to reach an agreement.  So, unfortunately, I

23   think there's going to be some reading into the record from

24   these articles.

25         THE COURT:  That's fine.

Palmer - Redirect

1          MR. LOVETT:  Okay.  I apologize in advance for that.

2     BY MR. LOVETT:

3     Q.   At page PE 210, the very first paragraph, "Our results,"

4     could you read that, please?

5     A.   "Our results confirm that mountaintop mining impact to

6     aquatic life is strongly correlated with ionic strength in the

7     Central Appalachians, but habitat quality did explain some

8     variance in MMIs and other metrics."

9     Q.   Okay.  So this is in 2008, right?

10    A.   Yes.

11    Q.   And back in 2008, Pond was already associating the

12    impairment with ironic stress, correct?

13    A.   He was.

14    Q.   Okay.  Also, Mr. McLusky pointed you to the bottom of

15    page 211, PE 211.

16    A.   Yes.

17    Q.   It says, "Our bioassessment indicators were not strongly

18    correlated with dissolved or total metals concentrations."

19         Do you see that?

20    A.   I do.

21    Q.   Sulfates is not a metal, is it?

22    A.   No.  Well --

23    Q.   So that's not addressing sulfates and the ions associated

24    with conductivity, is it?

25    A.   That's correct.

Palmer - Redirect

1   Q.   Now, he also had you look down at table 4, and the

2   embeddedness score under the WVSCI was fifth, I guess, .57.

3   Does that mean -- what does that mean?

4   A.   Well, it means there is, you know, an influence or a

5   relationship between embeddedness and WVSCI.

6   Q.   Okay.  And but what about with specific conductance?

7   A.   It's just a much stronger relationship.  The value of

8   those numbers represent the steepness of the slope relating

9   the two variables.

10  Q.   And is this paper, if you remember, based on the DEP

11  database or on samples of particular mined watersheds?

12  A.   No, this is based on field sampling of specific

13  watersheds.

14  Q.   Okay.  So in this specific case, you found the sediment

15  deposition score and the embeddedness score, but that's only

16  at these sites, right?

17  A.   That's correct.

18  Q.   Okay.  Do you see page 215, the first paragraph?

19  A.   Yes.

20  Q.   Would you read the first sentence of that, please?

21  A.   "Water quality structured benthic communities more than

22  habitat quality."

23  Q.   And do you know what he's talking about when he's talking

24  about water quality there based on the rest of the article?

25  A.   Yes.  He's talking about the ionic composition of the

Palmer - Redirect

1   water.

2   Q.   Okay.  So if -- and then the next sentence, please.

3   A.   "Our study and others" -- and he cites a series of

4   studies -- "suggest that specific conductance is the best

5   predictor of the gradient of conditions found downstream of

6   alkaline mine drainage and valley fill sites in the Central

7   Appalachians."

8   Q.   Okay.  Did you see alkaline mine drainage at Stillhouse?

9   A.   Absolutely.

10  Q.   Okay.  And then it's not true, is it, that this article

11  does not draw a relationship between ionic stress and

12  impairment?

13  A.   This article definitely draws a relationship between

14  ionic stress and impairment.

15  Q.   Can I turn your attention to the next article that

16  Mr. McLusky asked you about, which is tab 16, a Pond paper in

17  *Hydrobiologia*.  And if you would look at page 233.

18  Mr. McLusky pointed you to line 593.  Do you remember that?

19  A.   Yes.

20  Q.   And it says -- and I think he had you read this

21  statement, "Although Pond et al. did not find strong

22  correlations of mayfly abundance and enrichment with mining-

23  related trace metals in the water column, they state that

24  possible exposure to metals through dietary uptake or

25  potential microbial -- potential microhabitat smothering by

Palmer - Redirect

1   metal hydroxide precipitate or iron bacteria blooms could not

2   be ruled out."

3        Do you see that?

4   A.   I do.

5   Q.   Okay.  What do you think of that statement based on the

6   rest of your testimony here?

7   A.   Well, first of all, I do think that there is a

8   relationship, a strong relationship between metals in the

9   water column and the mayfly abundance.  You know, this is just

10  one subset --

11  Q.   But the --

12  A.   It's the other factors also.

13  Q.   Sulfates aren't metals, are they?

14  A.   You know, I need to look that up.  I don't think so.

15  Q.   If they're not, this sentence doesn't really affect that,

16  right?

17  A.   Well, I guess that's true.

18  Q.   Has a lot of research been done since the Pond 2008 study

19  as well to support the opinions that you've expressed here?

20  A.   A tremendous amount of work has been done.

21  Q.   Would you read the next sentence too, please?

22  A.   "Analyses from West Virginia mining areas" -- and he

23  cites Hartman, Merricks, and Pond -- "indicated that the

24  decline of mayflies from mountaintop mining correlates most

25  strongly to specific conductance."

Palmer - Redirect

1    Q.    Again, that supports your testimony here today, doesn't

2    it?

3    A.    It does.

4    Q.    Now, Mr. McLusky also turned your attention to tab 17,

5    PE 240.  Do you see that?

6    A.    Yes.

7    Q.    Particularly the sentence beginning at the bottom of the

8    first column and continuing on to the second column, beginning

9    "Species richness."  Would you read that sentence, please?

10   A.    Beginning "Core caddisfly genera"?

11   Q.    I was talking about the next sentence, but "Species

12   richness."  Is that a new sentence?

13   A.    Yes.  "Species richness was significantly higher at

14   reference sites and reference site mean tolerance value was

15   lowest compared to all other categories."

16   Q.    That doesn't surprise you, does it?

17   A.    No.

18   Q.    You'd expect -- you would expect species richness to be

19   higher at reference sites.

20   A.    Yes, particularly because you have mayflies there.

21   Q.    On page 250 of the same article, the sentence beginning

22   at the end of the second column, at the end of the page there,

23   beginning "Spearman."

24   A.    Yes.

25   Q.    Would you read that passage?

Palmer - Redirect

1   A.   "Spearman correlations revealed that habitat factors

2   related to the quality and quantity of substratum (i.e.,

3   epifaunal substrate quality and degree of embeddedness) and

4   streamside forests (riparian zone width and bank vegetative

5   quality) were strong and significant drivers of richness."

6   Q.   You agree with that, don't you, generally?

7   A.   Yes.  Habitat is important generally.

8   Q.   Okay.  Would you continue?

9   A.   "However, no habitat factors were significantly

10  correlated with relative abundance metrics.  Additionally,

11  major ion concentrations (measured as specific conductance)

12  were also highly correlated with Plecoptera and Trichoptera

13  richness but not abundance."

14  Q.   Again, is that consistent with your testimony on direct?

15  A.   Yes, it is.

16  Q.   Okay.  And Mr. McLusky asked you a series of questions

17  about tab 19.  Would you turn to tab 19, please?

18  A.   Okay.

19  Q.   And that's the 2014 Pond et al. document that you

20  testified about on direct; is that correct?

21  A.   That's correct.

22  Q.   And on page 298 of that document, or PE 298 --

23  A.   Yes.

24  Q.   -- would you read the paragraph -- the last paragraph of

25  the -- Mr. McLusky was asking you questions about this.  The

Palmer - Redirect

1   last paragraph of the page.

2   A.   Beginning "Overall"?

3   Q.   Yes.

4   A.   "Overall, biological variation was strongly correlated

5   with water chemistry and less by reach-scale habitat and

6   landscape conditions.  Since ion concentrations explained the

7   greatest amount of biological impacts and were the most

8   altered (compared to reference), this suggests that recovery

9   is potentially hindered by ions, even in forested reaches long

10   after reclamation."

11   Q.   And then turn the page, if you would, to page 299.

12   A.   Okay.

13   Q.   And the paragraph -- the next paragraph beginning "Simple

14   land use change."

15   A.   "Simple land use change (i.e., percent forest loss) was

16   certainly tied to the environmental degradation we observed,

17   but exclusive to our 15 valley fill sites, biological

18   variation was not significantly correlated to land use

19   features."

20   Q.   Would you continue?

21   A.   "This latter observation adds uncertainty in applying

22   land use thresholds for managing aquatic resources when

23   streams are already compromised by varying water quality

24   problems, like elevated specific conductance."

25   Q.   Okay.  Continue, please.

Palmer - Redirect

1    A.    "Specific conductance is often used as a simple but

2    robust measure of mine pollution (e.g., Rikard and Kunkle

3    1990) and biological effects from mine pollution in this

4    ecoregion (e.g., Pond et al. 2008; U. S. EPA 2011b).  Cormier

5    et al. (2013b) and Suter and Cormier, 2013, provided strong

6    causal evidence that Appalachian macroinvertebrate extirpation

7    is linked to increasing ions (as specific conductance), a

8    finding supported by our study."

9    Q.    Do you agree with that statement?

10   A.    I do agree.

11   Q.    I mean you agree that mine -- that specific conductance

12   is a problem for -- strike that.

13         You agree that macroinvertebrate extirpation is linked to

14   increasing specific conductance, right?

15   A.    I think there's no question about that.

16   Q.    Now, let's turn to the last two sentences of the article.

17   Mr. McLusky was asking you about how long it would take to

18   reforest sites.

19         Do you recall those questions?

20   A.    Yes.  Yes, I do.

21   Q.    Would you read the sentence beginning with the words

22   "Ultimately, a longer time span."  Do you see that?

23   A.    "Ultimately, a longer time span and subsequent monitoring

24   will be required to determine if and when conditions improve

25   and whether newer surface mining methods and required

                          Palmer - Redirect

1    compensatory mitigation will minimize adverse ecological

2    effect and speed recovery in streams draining mountaintop

3    mining/valley fill in the Central Appalachians.  However, if

4    dissolved ion concentrations are not mitigated with these

5    newer mining practices, recovery of macroinvertebrate

6    assemblages is doubtful."

7    Q.   Do you agree with that conclusion?

8    A.   Absolutely.

9    Q.   So as I understand it -- well, strike that.

10        Do Suter and -- well, I guess this is Pond.  Pond does

11   find that there's a relationship between forests and the

12   macroinvertebrate makeup, right?

13   A.   I'm sorry.  I was --

14   Q.   This paper, Pond finds that there is a relationship

15   between forested streams and the macroinvertebrate --

16   A.   Yes.

17   Q.   -- composition, right?

18   A.   Yes.

19   Q.   But there's no indication, is there, here or anywhere

20   else that the loss of those forests are the cause of the

21   impairment?

22   A.   That's correct.

23   Q.   I think next Mr. McLusky turned you to the SAB review,

24   which is at tab 25.

25            MR. MCLUSKY:  Is that Joint?

Palmer - Redirect

1          MR. LOVETT:  It's PE.  Well, let's see.  PE 400 is

2     the page number.

3          THE WITNESS:  Okay.

4          THE COURT:  I think that's Plaintiffs' Exhibit 25.

5          MR. LOVETT:  Plaintiffs' Exhibit 25.

6     BY MR. LOVETT:

7     Q.   And he asked you -- he pointed you to the passage, the

8     first bullet point, "Conductivity itself is not a pollutant,

9     but is a surrogate measure for the major constituent ions in

10    the mixture."

11         Do you remember --

12    A.   Yes.

13    Q.   -- testifying about that?  And I think you agreed with

14    that sentence when he asked you questions about it, correct?

15    A.   I did.

16    Q.   Were you intending to express a legal conclusion about

17    what a pollutant is?

18    A.   No.

19    Q.   Okay.  You don't know the law about what a pollutant is,

20    do you?

21    A.   No, I don't know the legal definition.

22    Q.   And that the conductivity is a measure of constituent

23    ions, correct?

24    A.   Yes, it is.

25    Q.   And among those ions are sulfates, right?

Palmer - Redirect

1    A.    Yes.

2    Q.    And we saw your testimony earlier that sulfates were very

3    high at Stillhouse, right?

4    A.    Extremely high, in the thousands.

5    Q.    Now, let's turn to Joint Exhibit page 371, which is tab

6    58.  I don't know why -- it took us to 371 because it has the

7    table of contents.

8          Anyway, is this exhibit the benchmark?

9    A.    Yes, it is.

10   Q.    Okay.  On page JE 408, part of the benchmark, Mr. McLusky

11   asked you a question in a section that's 5.3, Treatment of

12   Mixtures.  Do you see that section?

13   A.    I do.

14   Q.    "However, conductivity per se is not the cause of toxic

15   effects" --

16   A.    Yes.

17   Q.    -- "and waters with different mixtures of salts but the

18   same conductivity may have different toxicities."

19         Do you see that?

20   A.    Yes, I do.

21   Q.    It says, "In this case, the benchmark was calculated for

22   a relatively uniform mixture of ions in those streams that

23   exhibit elevated conductivity in the Appalachian Region."

24         Do you see that?

25   A.    Yes.

Palmer - Redirect

1   Q.   Okay.  So what does the benchmark mean when it says that

2   conductivity per se is not the cause of toxic effects?  What

3   does "per se" add to that?

4   A.   It means that while conductivity is a measure of ionic

5   strength, it's actually the ionic concentration that causes

6   the problem.

7   Q.   So it would be the sulfates that cause the problem; is

8   that correct?

9   A.   That's correct.

10   Q.   And when you see high conductivity levels, you know -- in

11   the Appalachian region, you know that there's going to be

12   impairment because of the ions contained or marked by that

13   conductivity, right?

14   A.   That's correct.

15   Q.   Okay.  At PE -- at plaintiffs' exhibit in tab 3 in

16   plaintiffs' notebook, which is a Cormier and Suter paper from

17   2012 that Mr. McLusky asked about, he turned your attention to

18   PE 93.

19   A.   Okay.

20   Q.   He said -- he had focused your attention on this very

21   last paragraph, the first sentence, "This causal assessment

22   does not attempt to identify constituents of the mixture that

23   account for the effects."

24        Do you see that?

25   A.   Yes.

Palmer - Redirect

1   Q.   Would you read after that, please?

2   A.   "Instead, it shows that the mixture in streams with

3   elevated conductivity and neutral or somewhat alkaline waters

4   in Appalachia can cause and is causing the extirpation of

5   sensitive genera of macroinvertebrates.   Laboratory-based

6   physiological evidence suggests that the relative amounts of

7   ions as well as the concentrations of individual ions

8   determine the toxic mechanisms.   Failure of bicarbonate

9   media -- mediated regulation of multiple ions in cells,

10  particularly hydrogen, sodium, and chloride, is one potential

11  mode of action."

12  Q.   Thank you.

13      Sorry to keep changing notebooks on you, Mike.   I'm just

14  following the order.

15      In defendant's notebook, volume 1 of 4, tab 8,

16  Mr. McLusky turned your attention to page 15.

17  A.   Okay.

18  Q.   Bottom paragraph.

19  A.   Yes.

20  Q.   And I think you read this into record already.   The first

21  sentence says that in certain waters of the Gauley River,

22  including Stillhouse Branch, the stressor identification

23  process determined ionic toxicity as the primary stressor.

24      Do you see that?

25  A.   I do.

Palmer - Redirect

1   Q.   So this is a DEP document, right?

2   A.   Yes.

3   Q.   So DEP determined, didn't it, that toxicity is the

4   primary stressor in Stillhouse Branch?

5   A.   That ionic toxicity is, yes, they did.

6   Q.   All right.  It goes on to say that it's not going to

7   write a TMDL for that, doesn't it?

8   A.   It does.

9   Q.   You don't know why it declined to write that TMDL, do

10  you?

11  A.   I have no idea why.

12  Q.   Okay.  But there's no doubt that DEP also agrees with

13  Pond, EPA, and you, is there, based on the first sentence?

14  A.   Based on this, no, there's no doubt.

15  Q.   Now, Mr. McLusky asked you how long the reach of

16  Stillhouse that remains after mining is.  Do you recall that?

17  A.   I recall.

18  Q.   And I think he suggested, and you didn't disagree, that

19  it was two or three hundred yards.  Is that your recollection?

20  A.   I think we said two or three hundred meters likely, but I

21  wasn't sure.

22  Q.   Now, Twentymile is -- Stillhouse runs into Twentymile

23  Creek, right?

24  A.   Correct.

25  Q.   Twentymile Creek is probably -- the confluence of Twenty-

Palmer - Redirect

1   mile Creek and Stillhouse is probably where the DEP inspector

2   was looking when he started their examination, right?

3   A.   Well, based on the sample --

4   Q.   Okay.

5   A.   -- form, it looks like that.

6   Q.   And there's a stipulation at JE page 129.  Could you turn

7   to that stipulation and look at number 15?

8   A.   Okay.

9   Q.   And that says, doesn't it, that both Stillhouse Branch

10  and Twentymile Creek downstream from that branch are listed on

11  the DEP 303(d) --

12       MR. MCLUSKY:  Your Honor, I object.  There was no

13  testimony on my cross-examination about Stillhouse -- or about

14  Twentymile Creek at all.

15       MR. LOVETT:  He was making the point, I believe,

16  that there's a very small segment of impaired water in

17  Stillhouse, and my only point is to show that the impairment

18  continues down into --

19       THE COURT:  Well, I think that is beyond his cross-

20  examination.

21  BY MR. LOVETT:

22  Q.   Mr. McLusky asked you about a series of variables in

23  water that could affect the macroinvertebrate makeup, such as

24  differences in benthic algae and changes in primary production

25  and ponds and so forth.  Let me ask you about each of those.

Palmer - Redirect

1    A.    Okay.

2    Q.    Let's talk about the differences in benthic algae that

3    come both generally with valley fills and at this particular

4    site.  So let's start generally.

5          Do you believe that generally the differences in the

6    benthic algae that results from mountaintop removal mining or

7    other large-scale surface mining could account for the

8    complete extirpation of mayflies below sites?

9    A.    Absolutely not.

10   Q.    Okay.  Do you think that at this site that happened?

11   A.    No, I don't.

12   Q.    Okay.  Is there a complete extirpation of mayflies at

13   this site?

14   A.    There is a complete extirpation.

15   Q.    So though differences in algae can certainly, as you

16   testified, affect the benthic macroinvertebrate makeup, that's

17   different from extirpating all mayflies, correct?

18   A.    Yes.  Food is important, but it wouldn't lead to the loss

19   of an entire order of organisms.

20   Q.    What would lead to that loss?

21   A.    Typically it's pollution that's the problem.

22   Q.    What about changes in primary production?  Is that also

23   something that occurs below large-scale surface mining?

24   A.    Well --

25   Q.    Typically?

Palmer - Redirect

1   A.   It may.  I mean I'm trying to think who studied it.  I

2   believe Fritz and others may have.  It certainly could change

3   below mine sites.

4   Q.   Well, the kinds of changes to primary production that

5   could occur below valley fills, would that cause the complete

6   extirpation of mayflies?

7   A.   No.

8   Q.   Okay.  What about ponds?  You testified that the ponds in

9   the streams affect the macroinvertebrate makeup.  Could they

10  be responsible for the complete extirpation of mayflies?

11  A.   No.  And, again, I think I noted that the effects of

12  ponds on streams when they flow into them usually are

13  associated with adding some pelagic organisms, organisms that

14  live up in the water column, not extirpation of taxa.

15  Q.   And the flow issue as well, I think that you testified

16  that the flow is slowed by the flume.  But even if the flow

17  were increased significantly and reduced the macroinvertebrate

18  community, could that account for the complete extirpation of

19  mayflies?

20  A.   You wouldn't see the complete extirpation unless -- you

21  would have seen -- if the flow was high enough to really lead

22  to loss, you would have seen massive erosion in the channel.

23  Q.   Okay.  And he asked you also -- and did you see massive

24  erosion in the channel?

25  A.   No, not at all, and I have seen that in streams.

Palmer - Redirect

1   Q.   All right.   And then the last thing he asked you about

2   was temperature, and I think you testified earlier -- and I

3   just want to make sure, based on his cross-examination, do you

4   believe that the temperature at that site could cause the

5   complete extirpation of mayflies?

6   A.   No.   There's no indication based on annual variation in

7   temperature seasonally that it exceeds the tolerance levels.

8           MR. LOVETT:   I'm almost finished, Your Honor.   One

9   second.

10          THE COURT:   All right.

11  BY MR. LOVETT:

12  Q.   You have the joint exhibits in front of you.   I can't

13  remember where we were last.

14  A.   Okay.   Yes, I do.

15  Q.   Now, would you turn to tab 9, page 30.

16  A.   Yes.

17  Q.   Do you recognize that picture?

18  A.   I do.

19  Q.   And is that pool up there the kind of -- well, describe

20  that in terms of the flow attenuation that you described

21  earlier at that site to Mr. McLusky, please.

22  A.   Right.   So when flow is a problem in streams, the way

23  it's typically controlled is to have a plunge pool, what are

24  called step pools.   And that's a natural one, probably due to

25  flow that's fairly high coming down that during storms.   And

Palmer - Redirect

1    so what that does is dramatically reduces the flow, and it

2    more slowly moves out of that pool down to the riffle and the

3    stream below.

4    Q.    Okay.  So that's the picture of the plunge pool you were

5    talking about.

6    A.    That's right.

7    Q.    Okay.  And then, lastly, would you turn to tab 4, JE 25.

8    A.    Okay.

9    Q.    Mr. McLusky asked you if you knew the constituents of the

10   ionic -- the ionic composition of the water at Stillhouse.

11        Does this table tell you anything about that?

12   A.    Well, sure.  It describes the concentration of many of

13   the constituents, but not all of them.

14   Q.    Right.  So calcium, is that one of them that I recall?

15   A.    Yes.  And that is 207 micrograms per liter in the stream.

16   Q.    And sulfates?

17   A.    Sulfate is 2100 milligrams per liter.

18   Q.    Is that 2100 or 2000?  Are we looking at the same thing?

19   A.    Yes, the result.  For sulfate?

20   Q.    Are you at JE 25?

21   A.    Yes.

22   Q.    Sulfate?

23   A.    You're looking at the outfall.  I'm sorry.  Did you want

24   me to look at the outfall?

25   Q.    Oh, let's look at the -- you're right.  I'm looking at

Palmer - Redirect

1    the outfall, and you're looking at --

2    A.   I looked at the stream.

3    Q.   Okay.  So, though, at both of those sites, the sulfates

4    are extremely elevated, aren't they?

5    A.   Very elevated.

6    Q.   Any other information here about the ionic composition of

7    the water?

8    A.   Well, it shows the manganese dissolved in total as well

9    as nitrates, and both of those are typically elevated below

10   valley fill sites.

11   Q.   Is the sulfates the thing that most stands out here to

12   you?

13   A.   Well, the sulfate and, of course, the conductivity up

14   above --

15   Q.   Right.

16   A.   -- which is a measure of all the ions.

17   Q.   Which is 2800.

18   A.   That's right.

19            MR. LOVETT:  Okay.  Thank you.  That's all I have.

20            THE COURT:  All right.  Recross?

21            MR. MCLUSKY:  No, Your Honor.

22            THE COURT:  All right.  Dr. Palmer, you may step

23   down.

24            THE WITNESS:  Thanks, Mike.

25            THE COURT:  Is Dr. King going to be your next

1   witness?

2            MR. LOVETT:  Yes.

3            THE COURT:  Someone go and get him.

4       Let me make one request.  You've each had witnesses -- or

5   the witness read from various exhibits.  I assume that some of

6   those, counsel are going to seek to be admitted.  I'm not sure

7   that that's true with all of them.

8       For the benefit of my court reporter, I'm going to

9   require that you provide at least the page that you've had the

10  witness read from to make sure that she can double check her

11  work, all right?

12           MR. LOVETT:  Your Honor, we have also failed to

13  address the issue of the exhibits.

14           THE COURT:  Do you want to do that now?

15           MR. LOVETT:  It's up to the Court.

16           THE COURT:  Let's do it now.

17           MR. LOVETT:  Okay.  So --

18           THE COURT:  Use your microphone there.  I can barely

19  hear you.

20           MR. LOVETT:  I move to admit Plaintiffs' 1,

21  Plaintiffs' 3, Plaintiffs' 11, Plaintiffs' 13, 15, 16, 17, 18,

22  19, 20, 21, 25, 26, and, out of order, 23.

23       And it's my understanding that we -- I want to make sure

24  I'm right about this, that it's unnecessary to move the

25  admission of joint exhibits because they're already all

1   admitted.

2           THE COURT:  Well --

3           MR. LOVETT:  Is that the state of the joint

4   exhibits?

5           THE COURT:  First, let's hear the defendant's

6   response to the plaintiffs moving the plaintiff exhibit

7   numbers he just noted into evidence.

8           MR. MCLUSKY:  I think Mr. Harvey is going to

9   respond.

10          THE COURT:  That's fine.

11          MR. HARVEY:  Your Honor, we don't mind if the court

12  reporter has a page of the learned treatises that the

13  plaintiffs have introduced.  Under the Rules of Evidence,

14  they're supposed to be read in the record.  An exhibit does

15  not come in.  But if the court reporter wants to have a page

16  for purposes of typing, we're fine with that, but otherwise we

17  object to the admittance of those exhibits.

18          MR. LOVETT:  I think it's a fair objection, and

19  that's why we read all that into the -- all the testimony into

20  the record.  So --

21          THE COURT:  Well, I agree.  First, generally learned

22  treatises aren't admitted as exhibits into evidence.  Here,

23  obviously the parties have had the witness read or refer to

24  specific pages.  I've tried to keep notes of those pages as my

25  court reporter, I'm sure, has gotten them better than I have

1   to make sure that we know.  As far as I'm concerned, I'm going

2   to admit the exhibits insofar as they contain the specific

3   paragraphs or sentences about which the witness was

4   questioned.

5       I don't believe it's appropriate for the parties or the

6   Court to rely upon anything other than that in any of these

7   exhibits.  However, it would be virtually impossible for us to

8   have, I think, a clear record and certainly for the Court to

9   have fair access to these documents to make sure that the

10  Court can accurately recall exactly what the witness referred

11  to.

12      So to that extent, I overrule the objection.  The Court

13  will allow these documents the plaintiff noted to be admitted

14  into evidence but restrict their use to only those portions

15  specifically referred to in the questioning of the witness.

16      The next question I think was --

17          THE CLERK:  I have two they identified but didn't

18  move.

19          THE COURT:  There are two plaintiffs' exhibits that

20  you haven't identified -- or haven't moved, rather.

21          THE CLERK:  7 and 14.

22          THE COURT:  7 and 14 appear to be the exhibit

23  numbers that we referred to.

24          MR. LOVETT:  Let me look at them, Your Honor.  I'd

25  also note, though, that 20 and 21 that we moved are not

1    learned treatises but were letters from EPA.

2            MR. HARVEY:  No objection to 20 and 21.

3            THE COURT:  21 then are admitted fully.

4            THE CLERK:  20 and 21.

5            MR. LOVETT:  So did you say Plaintiffs' 7?

6            THE CLERK:  And 14.

7            THE COURT:  My clerk tells me that you referred to

8    and identified in the course of questioning Exhibit 7.

9            MR. LOVETT:  Yes.  Did we use that?  I don't know if

10   she did.

11       Okay.  The same.  We would move Plaintiffs' 7 in the same

12   way that we moved the other ones and subject to the same

13   ruling.

14       And what was the other one?  14 we did not have any

15   testimony about.

16           THE COURT:  Well, I'm looking through 7.  I tried to

17   put brackets around any parts of these articles that the

18   witness read into evidence or that counsel specifically

19   referred to.

20       I don't see that I made any such markings on Exhibit 7.

21   So I don't know the extent to which she relied upon it in her

22   questioning.

23           MR. LOVETT:  I agree with you, Your Honor.  I have

24   none either.  I'm relying on co-counsel --

25           THE COURT:  All right.  At this point I'm not

1  admitting anything from Exhibit 7.  If you find that somehow

2  we've missed something, we can deal with it later.

3        MR. LOVETT:  Okay.

4        THE COURT:  What about 14?

5        MR. LOVETT:  Nothing in 14, Your Honor.

6        THE COURT:  All right.  Then with regard to 7 and

7  14, neither of those are being moved at this time.

8     Now, I assume, then, that the parties agree that with

9  respect to the joint exhibits, which you've stipulated as

10  authentic, that the same limitation on their admissibility

11  applies if they are a learned treatise, if they're one of

12  these published articles.  So that it's only that portion

13  quoted from or directly referred to in the questioning that is

14  actually admitted into evidence.

15        MR. LOVETT:  Your Honor, I also would like to raise

16  another thing.  I think that 25, which is the Science Advisory

17  Board's letter and the comments, are government documents and

18  should be admitted, not only under the --

19        THE COURT:  I think 25 also falls out of the

20  category of simply a learned treatise, and it is a government

21  document, and the Court will admit it.

22        THE CLERK:  Plaintiffs'?

23        THE COURT:  Plaintiffs' Exhibit 25.

24        MR. MCLUSKY:  The benchmark as well?

25        MR. BECHER:  The benchmark is in our joint exhibit

1    list.

2         (The Court and Clerk conferred privately off the record.)

3         THE COURT:  As I understand it, with the joint

4    exhibits, even those which you have yet to refer to in any of

5    your questioning, you've stipulated that those are authentic

6    documents.

7       To the extent that they're a learned treatise, you've

8    agreed that they should be admitted only insofar as a witness

9    is specifically questioned or reads from the treatise.

10   Otherwise, I assume they're admitted for any purpose.

11        MR. HARVEY:  Your Honor, maybe I can clarify.  I'm

12   looking at the list of joint exhibits.  I don't think any are

13   learned treatises.

14        THE COURT:  Okay.

15        MR. HARVEY:  So I don't think we have an issue

16   there.

17        THE COURT:  All right.  So all of the joint exhibits

18   are admitted into evidence for all purposes?

19        MR. LOVETT:  (Nods head up and down)

20        MR. HARVEY:  The ones they've moved, we have no

21   issue with, Your Honor.

22        THE COURT:  Well, they just moved them all.  That's

23   sort of the point of bringing it up.

24        MR. HARVEY:  Whether testified to or not?

25        MR. LOVETT:  It was my understanding, Shane, that

1    that was our agreement, that all of these documents were

2    admissible in full so that we wouldn't have to do that.  I can

3    move individual ones if you'd like.

4            MR. MCLUSKY:  There was an agreement they were all

5    admissible, but they would not be admitted unless someone

6    actually relied on them, Your Honor, is what I understood the

7    agreement.

8            MR. HARVEY:  There are figures here from

9    Dr. Prestegaard, who's not testified.

10           THE COURT:  Well, all right.  Let's just stop in our

11   tracks.  With regard to the joint exhibits thus far, we'll

12   take those up at a later time.  Let's get started with

13   Dr. King.

14           MR. MCLUSKY:  Your Honor, I did have -- move three

15   exhibits that we referred to.

16           THE COURT:  All right.  Go ahead.

17           MR. MCLUSKY:  That is 5B and 7, both of which I

18   think were photographs.  One was -- actually got from the

19   plaintiffs.  And then Defendant's 37, which was the DEP site

20   inspection form.

21           THE COURT:  All right.  Any objection to those being

22   introduced into evidence?

23           MR. MCLUSKY:  I think that's part of a joint

24   exhibit.

25           MR. LOVETT:  I don't have any -- you said the DEP

1    was a joint exhibit?

2           MR. MCLUSKY:  The original has more pages.  I made a

3    shorter exhibit just for this witness.

4           MR. LOVETT:  I have no objection to anything in the

5    joint exhibit book if it's in there, and I think Mr. McLusky

6    is representing that that DEP document is in the joint exhibit

7    book.  I have no objection.

8           MR. MCLUSKY:  It is.

9           THE COURT:  All right.  But you're saying that it's

10   not all of --

11          MR. MCLUSKY:  Correct.

12          THE COURT:  -- what is contained in the joint

13   exhibit?

14          MR. MCLUSKY:  Right.  It's a shorter exhibit.

15          THE COURT:  All right.  So Defendant's 5B, 7, and 37

16   are admitted into evidence.

17      You also referred to Defendant's Exhibit Number 8.

18          MR. MCLUSKY:  I'm not --

19          THE COURT:  Not moving that?

20          MR. MCLUSKY:  (Shakes head from side to side)

21          THE COURT:  Just make sure -- I don't know which one

22   that is.  If that's one in which you've questioned a witness

23   about a particular statement within the exhibit, make sure you

24   provide a copy of that to my court reporter.

25          MR. MCLUSKY:  Will do.

```
 1              THE COURT:  All right.  All right.  Ready for
 2   Dr. King?
 3              MR. BECHER:  Yes, Your Honor.  Plaintiffs would next
 4   call Dr. Ryan King.
 5              THE COURT:  We'll go until about five and then we'll
 6   stop wherever we are and come back tomorrow.
 7              MR. BECHER:  We can at least get Dr. King qualified
 8   by then.
 9              THE COURT:  Doctor, if you'll step up here, my clerk
10   will administer the oath.
11              RYAN KING, PLAINTIFFS' WITNESS, SWORN
12                      DIRECT EXAMINATION
13   BY MR. BECHER:
14   Q.   Good afternoon, Dr. King.  If you could, there's a series
15   of notebooks to your left.  If you'd open the Joint Exhibits 1
16   through 58 to tab 24, please.
17   A.   What was the tab?
18   Q.   24.  Do you recognize this document?
19   A.   Yes.
20   Q.   What is it?
21   A.   It's my CV.
22   Q.   Did you prepare that CV?
23   A.   I did.
24   Q.   Is it an accurate representation of your experience to
25   date?  You can go through it if you'd like.
```

King - Direct

1    A.    Yes, although I think it's probably a couple of months

2    out of date, but otherwise, yes.

3    Q.    Okay.  Was this the CV you submitted with your expert

4    report?

5    A.    Yes.

6    Q.    Now, have you previously testified in front of this

7    Court?

8    A.    Yes, I have.

9    Q.    And I believe you've been accepted as an expert in

10   aquatic ecology, entomology, and ecological data analysis; is

11   that correct?

12   A.    That is correct.

13   Q.    And as I recall, you prefer to refer to yourself as an

14   expert in ecological data analysis rather than statistics.  At

15   least that was the case last time.  Is that still the case?

16   A.    Yes, that's correct.

17   Q.    Can you explain the difference between ecological data

18   analysis and statistics?

19   A.    Well, the distinction is that the field of statistics is

20   huge.  There are many specializations within the field of

21   statistics; and to claim that I'm an expert in all areas of

22   statistics would be like, you know, claiming I'm an expert in

23   all areas of medicine or something along those lines.

24         So ecological data analysis deals specifically with the

25   unique idiosyncratic properties of ecological data, which

King - Direct

1    makes them generally not amenable to traditional or

2    conventional statistical procedures, particularly when you're

3    talking about species assemblages and multiple predictors.

4    And so that's kind of an area that I have a particular

5    expertise.  And while I have a strong foundation in

6    conventional statistics, that's my area of expertise.

7    Q.    Thank you.  Now, where are you a professor at?

8    A.    Baylor University in Waco, Texas.

9    Q.    Are you tenured there?

10   A.    Yes.

11   Q.    When did you receive tenure?

12   A.    It was in 2009, and then I was just promoted to a full

13   professor this year, which is one of the things that's a

14   little bit outdated on the CV there.

15   Q.    Sure.  At Baylor do you teach any courses related to

16   aquatic ecology or entomology?

17   A.    Yes, I do.  I teach stream ecology, aquatic biology.  I

18   taught a seminar in the taxonomy of aquatic insects, just to

19   name a few.

20   Q.    Have you published in those areas?

21   A.    Yes.

22   Q.    About how many papers have you published in those areas,

23   if you know?

24   A.    The majority of my papers.  I mean I've published I guess

25   somewhere in the 50 range of publications, and virtually all

King - Direct

 1   of them deal with, you know, aquatic ecology, entomology,

 2   and/or ecological statistics in some way.

 3   Q.   Do you run a lab at Baylor?

 4   A.   I do.  My lab is called the Aquatic Ecology Lab, and I

 5   have five graduate students and currently have three full-time

 6   technicians and several undergraduate researchers in my lab.

 7   So it keeps me busy.

 8   Q.   Can you tell us a little bit about the work, some of the

 9   research projects your lab is doing currently that might

10   relate to aquatic ecology or entomology?

11   A.   Sure.  I mean I have several funded research projects

12   ranging from an NSF project on environmental implications of

13   nanomaterials in aquatic ecosystems.  I'm completing a project

14   on atrazine, which was funded directly in response to the EPA

15   Scientific Advisory Panel recommendation for a specific study

16   dealing with pulsed additions of atrazine, and so I was

17   basically contacted as the person to do that.  And the results

18   of that study are actually going to play a significant role in

19   the atrazine standard, which is up for renewal in 2015.

20   Q.   Is that like the development of a water quality criteria

21   for atrazine?

22   A.   Absolutely.  It's basically they're re-reviewing it.

23   There's been numerous papers that have been published since

24   ten years ago, and now they're trying to determine whether

25   they need to adjust that numerical criterion for non-point

King - Direct

1    source waters.

2    Q.    Are you currently involved in any other work like that,

3    determining numeric or other criteria for waters?

4    A.    I am.   I was just selected -- and arguably this is

5    probably the most important study that I will have conducted

6    to date; been selected by a joint committee composed of

7    governor-appointed scientists from the States of Oklahoma and

8    Arkansas.

9         I was selected to run an independent stressor response

10   study related to phosphorus as it relates to rivers and

11   streams in Northeastern Oklahoma and Northwest Arkansas.   And

12   this study is the culmination of many years of litigation

13   between Oklahoma and Arkansas, which came -- really fully came

14   to a head in 1992 as a Supreme Court case in which it was

15   ruled that an upstream state cannot violate the water quality

16   standards of a downstream state.

17        And so this particular study is a two-and-a-half-year

18   gradient study.   It's all based on field observations, and --

19   but it is considered a causal analysis.   And you're using

20   principles of causal analysis and confounding factors to

21   identify a critical level of phosphorus.

22        And at the end of the study, the report that will be

23   written by me and agreed upon by the committee will bind the

24   States of Oklahoma and Arkansas to the numeric value that is

25   determined by our study.   And that will theoretically end

King - Direct

1    30-plus years of litigation between the two states.

2    Q.    Now, when you say bind the parties, is this a study

3    you're doing for one particular group, either plaintiffs or

4    defendants?

5    A.    No.  The two states have come together in agreement.  In

6    fact, they required that it was someone who was outside the

7    States of Oklahoma and Arkansas to run the study

8    independently.  They asked for -- requested statements of

9    qualifications; and I had to give a proposal, along with

10   several others, and I was selected to run the study.

11   Q.    Thank you.  Now, you mentioned you have submitted -- I

12   think you estimated 50 or so papers or published 50 or so

13   papers in your career.  I assume those are to various

14   ecological journals.

15   A.    That's right.  I mean primarily to journals that are

16   specific to aquatic ecology or more generally to the broader

17   field of ecology and environmental science.

18   Q.    Do you currently serve as a reviewer yourself on any

19   ecological journals?

20   A.    Well, I get requests frequently to review for journals as

21   an ad hoc reviewer, but I'm a subject matter editor for a

22   journal called *Ecological Applications*, which is one of the

23   flagship journals for the Ecological Society of America.

24        I previously served as an editor, a subject matter editor

25   on a journal *Freshwater Science* before that.  So between

King - Direct

1    ad hoc reviews and serving as an editor, I review a lot of

2    papers.

3    Q.    Do these papers often deal with ecological statistics or

4    ecological data analysis?

5    A.    Yeah, frequently.  I mean that's one of the reasons why I

6    was added to the editorial boards of those journals.

7    Q.    Before coming to Baylor as a professor, where did you

8    work?

9    A.    I worked at the Smithsonian Environmental Research Center

10   in Edgewater, Maryland.

11   Q.    And what was your focus there?

12   A.    Well, it was based on linking land use in coastal areas

13   to stream and estuarine biological conditions.  So I did work

14   on small streams, much like the ones that we're discussing

15   now, looking -- using -- used a large chronological monitoring

16   dataset for the State of Maryland and published several papers

17   from that, one of which was a highly cited paper, dealt

18   specifically with potential confounding factors and steps to

19   go about avoiding pitfalls when relating land use to

20   ecological response variables in streams.

21        I also did some papers in the estuaries related to

22   anything from blue crabs to PCBs and some estuarine fishes and

23   how those related to land use.

24   Q.    Was a lot of this work done with aquatic insects and

25   macroinvertebrates?

King - Direct

1   A.   The stream work absolutely was, yes.  It was completely

2   based on aquatic macroinvertebrates.

3   Q.   How many macroinvertebrate assessments do you think

4   you've done in your career?

5   A.   I don't know.

6   Q.   Is it on the order of hundreds?

7   A.   Yes, sure.

8   Q.   Have you published or developed any materials specific to

9   ecological data analysis?

10  A.   I have.  I've co-authored papers earlier in my career on

11  changepoint analysis, but most recently I have published

12  several papers about a technique called Threshold Indicator

13  Taxa Analysis, or TITAN.  And we've published not only the

14  method but some applications of the method and some

15  clarifications and guidance on how to use the method.

16  Q.   And is that technique now used more broadly in the field

17  than just yourself and your co-developers?

18  A.   Yes, absolutely.  I think since we published it in 2010,

19  it's been used in about 60 papers; and we get requests

20  frequently for help on, you know, guidance on how to use the

21  method.  And it's even being employed by, for example,

22  Connecticut and Massachusetts in some of their biological

23  condition work, and even USGS in the Northeast has been using

24  it.  So I'm aware of others as well, but those are some

25  examples of groups that are applying the technique.

King - Direct

1    Q.    Now, this case involves questions about relationships

2    between ionic pollution below mines and the degradation of

3    streams.  Is that your understanding?

4    A.    Yes.

5    Q.    Have you done any work or published any material

6    specifically in this area?

7    A.    Yes.

8    Q.    Okay.  Can you describe that?

9    A.    Well, that was a paper in which I was the co-author with

10   Emily Bernhardt, Brian Lutz, and some others where we looked

11   at a subset of sites that were screened pretty thoroughly to

12   identify a gradient of reference conditions up to very heavily

13   mined areas that were relatively independent of other

14   confounding factors and tried to identify levels of

15   conductivity and mining that resulted in impairment to

16   West Virginia streams.  And that was based on the West

17   Virginia database.

18         That paper is frequently referred to as the "How Many

19   Mountains" paper published in *Environmental Science and*

20   *Technology*.

21   Q.    Have you kept up to date with further research as it's

22   developed?

23   A.    I have, yes.

24   Q.    Okay.  In doing so, have you had pretty thorough exposure

25   to the types of insects that would commonly occur in

King - Direct

1  Appalachian streams?

2  A.   Yes, absolutely.

3  Q.   Would you say that by looking at a taxa list that you

4  would be able to determine whether those would be common

5  insects to an Appalachian stream?

6  A.   Yes.

7  Q.   Okay.  And that would be based, I assume, in your work on

8  the database and your own publication.

9  A.   Yes, absolutely, and in reviewing the increasingly large

10  body of literature that other investigators have published

11  related to this same topic in which they've looked at, you

12  know, various similar but various facets of the relationship

13  between mining and macroinvertebrates.

14       MR. BECHER:  Okay.  At this point, I'd move to

15  qualify Dr. King as an expert in aquatic ecology, entomology,

16  and ecological data analysis.

17       THE COURT:  All right.  I'm satisfied.  You can

18  proceed, and can cross-examine him as to his qualification.

19  BY MR. BECHER:

20  Q.   Now, you were sequestered during the cross-examination of

21  Dr. Palmer, but you heard her testimony on direct; is that

22  correct?

23  A.   Yes, I did.

24  Q.   Do you believe her testimony is accurate?

25  A.   Yes.

King - Direct

1   Q.   Is there anything you disagree with that she told the

2   Court earlier?

3   A.   No.

4   Q.   I want to go through -- Dr. Palmer testified as to some

5   of the literature that's developed around this subject of

6   ionic pollution and biological degradation, but there were a

7   couple of papers that you cited in your report that I don't

8   believe she's testified about yet.

9        If you could, bring open plaintiffs' exhibit binder,

10  which is a different binder than the one you have in front of

11  you.

12       If you could, please open to Plaintiffs' Exhibit 12.

13  A.   Okay.   I'm there.

14  Q.   Do you recognize this paper?

15  A.   Yes.

16  Q.   Can you tell me the main points, in your own words, of

17  what this paper finds?

18  A.   Well, this study examined the relationship between both

19  mining and residential and commercial development on

20  biological condition of streams, and they found that streams

21  that had both relatively high levels of development and mining

22  had lower biological condition than streams that had just

23  development or just mining.   Hence, there was an additive

24  effect between the two.   But they found a very strong

25  relationship regardless of just mining and just development

King - Direct

1   independently.

2   Q.    Reading in the abstract or looking at the abstract,

3   there's a sentence that begins "Correlation analysis and

4   partial Mantel tests."

5        Can you read that sentence for me?

6   A.    Sure.  "Correlation analysis and partial Mantel tests

7   indicated that mining (percent of total of subwatershed area)

8   caused acute changes in water chemistry (with correlations

9   between .55 and .91), whereas residential development

10  (expressed as parcel density) strongly affected both physical

11  habitat (with correlations between .59 and .81) and

12  macroinvertebrate community structure (with correlations

13  between .059 and .093)."

14  Q.    Thank you.  If you could turn to page PE 166.  It's the

15  same study.

16  A.    Okay.

17  Q.    Would you read in the second column the sentence that

18  begins "On average."  It's the second sentence in the first

19  full paragraph in that column.

20  A.    PE 166 you said?

21  Q.    Correct.

22  A.    And it's the second sentence in the first paragraph?

23  Q.    The first full paragraph.  There's a partial paragraph on

24  top.

25           THE COURT:  The paragraph starting "Along the mining

1   gradient."

2   BY MR. BECHER:

3   Q.   "Along the mining gradient."  I'd like you to read the

4   second sentence, "On average."

5   A.   Sorry.  Excuse me.  "On average, a mining intensity of

6   25.8 percent produced conductivities of 257 microsiemens per

7   centimeter, suggesting a high degree of agreement between

8   mining and specific conductance for the observed biological

9   impairment."

10   Q.   And actually going back to the sentence that begins at

11   the bottom of the first column, can you read that for me?

12   A.   Starting with "Given that"?

13   Q.   Exactly.

14   A.   "Given that specific conductance was the major stressor

15   associated with mining, we repeated this process using the

16   linear relationship between specific conductance and WVSCI,

17   (an R-square of 0.36)."

18   Q.   Okay.  I'd like to turn the page to 167 where the

19   discussion section begins.

20   A.   Okay.

21   Q.   And I apologize for the time it may take, but can you

22   read the first two paragraphs in the discussion section?

23   A.   Okay.  "We found significant effects of mining on

24   in-stream conditions.  Increased levels of mining resulted in

25   poorer water quality, primarily through increases in specific

King - Direct

1   conductance and associated dissolved chemical constituents
2   (that is, sulfate, calcium, magnesium, sodium, and nitrate).
3   Selenium concentrations exceeded US EPA water-quality
4   standards in several mined sites.  However, no relationship
5   was observed between selenium and total percent mining.
6   Mining also resulted in significant alterations to
7   macroinvertebrate community structure through decreases in
8   sensitive taxa (that is, EPT richness, E richness, and percent
9   E), and Ephemeroptera consistently showed the greatest
10  decline.  These alterations led to significant decreases in
11  WVSCI score.  Mining had no measurable effect on habitat
12  complexity or quality."
13      Continuing on to the second paragraph, "Our results are
14  similar to those of recent studies that have identified
15  changes in water quality to be the dominant stressor in mined
16  systems.  Increased specific conductance is consistently the
17  dominant stressor in streams affected by mountaintop removal
18  mining in southern West Virginia.  Hartman et al. (2005)
19  observed conductivities in mined sites that were 2 to 21 times
20  higher than those observed in reference sites.  Furthermore,
21  increased specific conductance is a consistently important
22  predictor of ecological condition in these systems.  Pond
23  et al. (2008) used specific conductance as an indirect measure
24  of mining intensity and noted a significant response in 17 of
25  19 community metrics.  Our results corroborate those of

King - Direct

1   numerous studies in which Ephemeroptera was identified as one

2   of the most sensitive taxa to increases in ionic strength

3   associated with large-scale surface mining in the central

4   Appalachian region."

5   Q.   So what are they suggesting is the mechanism by which

6   mining is causing changes to these ecological systems?

7   A.   Well, they're suggesting that the mixture of ions is --

8   that constitute specific conductance or conductivity, as we

9   usually refer to it in some of these other papers, is having a

10  direct effect on aquatic macroinvertebrates, particularly

11  mayflies, and that it's independent of many of these other

12  factors that you might normally associate with degradation and

13  biological impairment.

14  Q.   Thank you.  Actually I want you to read one more part of

15  this paper, the bottom of PE 168, the very last sentence on

16  that page.

17  A.   "The threshold changes from mining observed in our study

18  were highly consistent with observed threshold changes along

19  the specific conductance gradient."

20  Q.   Okay.  And keep going on to -- excuse me.  In 169 are a

21  number of graphs.  But if you could, please, go on to 170.

22  A.   "Consequently, conductance may be a reliable single

23  indicator of coal-mining influence on aquatic ecosystems.  Our

24  results are similar to those of Pond et al. (2008) who

25  observed a high frequency of impairment when conductance was

King - Direct

1   greater than 500.  Values greater than 500 in our study

2   corresponded to the 95 percent impairment thresholds for total

3   mining and specific conductance.  Conversely, Pond et al.

4   (2008) observed no impairment in WVSCI when conductance was

5   less than 500.  We observed biological impairment when

6   conductance reached 250 microsiemens per centimeter,

7   suggesting that impairment may occur at lower conductance in

8   Pigeon Creek than previously reported."

9   Q.   And as I believe you said before -- correct me, but this

10  is suggesting that the ions associated with conductivity in

11  these -- from these mines is what's causing biological

12  impairment?

13  A.   That's my -- yeah, absolutely.

14  Q.   Do you agree with that?

15  A.   I do.

16  Q.   If you know -- or if you don't, turn to the first page of

17  the study.  Where is this published?

18  A.   It's the *Journal of the North American Benthological*

19  *Society*, which is now called *Freshwater Science*.

20  Q.   Is that the journal that you formerly were serving on as

21  a reviewer?

22  A.   Yes.

23  Q.   Okay.  And is that a reputable journal?

24  A.   Yes.  It's considered probably the best journal for

25  stream ecology.

King - Direct

1   Q.   Okay.  If you could now please turn to Plaintiffs'

2   Exhibit 14.

3        I apologize, Your Honor.  Let me get my bearings here for

4   a moment.

5             THE COURT:  That's all right.

6             MR. BECHER:  If I could have one second, Your Honor.

7             THE COURT:  Go ahead.

8   BY MR. BECHER:

9   Q.   I might skip this study.  I will have you turn -- I want

10  to clarify something that was brought up earlier.  If you

11  could turn to the Pond 2008 study, which is the next tab,

12  Plaintiffs' Exhibit --

13  A.   Okay.  I'm there.

14  Q.   Okay.  Can you read on the bottom of page 211, PE 211,

15  the sentence that begins with "Our bioassessment indicators."

16  It's about two-thirds of the way down the last paragraph on

17  page PE 211.

18  A.   "Our bioassessment indicators were not strongly

19  correlated with dissolved or total metals concentrations in

20  the water column, but these results do not rule out possible

21  exposure to metals via dietary uptake or microhabitat

22  smothering by metal hydroxide precipitate."

23  Q.   Thank you.  And are you familiar -- I should have asked

24  this first.  Are you familiar with this Pond 2008 paper?

25  A.   I am.

King - Direct

1  Q.   There was a lot of testimony about this paper from

2  Dr. Palmer.  I don't want you to re-read Dr. Palmer's

3  sections, but are you familiar with the main findings of this

4  paper?

5  A.   Yeah.  I mean the gist of it is that they set up a study

6  that was basically a gradient study but done in groupings

7  based on conductivity where they selected a series of unmined

8  and then mined sites with valley fills where they sampled

9  below the valley fills and examined a variety of different

10  biological metrics, including some multivariate approaches but

11  also multi-metric indices such as WVSCI and GLIMPSS.

12       And what they found was a very strong relationship

13  between conductivity associated with alkaline mine drainage

14  and both WVSCI and the GLIMPSS scores.  And this is an example

15  of a dataset where the conductivity data was collected for --

16  I believe it was monthly for about a year, maybe 13

17  collections.  And so there was more certainty in the

18  conductivity data versus, for example, the DEP dataset where

19  we have just one measurement, and we know that conductivity

20  kind of bounces around.

21       And, you know, so to the point that the relationship

22  between conductivity and WVSCI and the DEP dataset is weaker,

23  one of the things that this study shows is it's attributed

24  probably a lot to the fact that conductivity varies over time.

25  When we have better conductivity estimates, you end up

King - Direct

1   explaining a lot more variance in the WVSCI scores and in the

2   GLIMPSS scores.  I believe it was up to 80 percent of the

3   variance was explained.

4   Q.   Okay.  Thank you.  And so this was looking at the, again,

5   the relationship between conductivity and biological

6   degradation --

7            MR. HARVEY:  Your Honor, I hate to object at this

8   late hour especially, but this is cumulative.  We covered all

9   this with Dr. Palmer.

10            MR. BECHER:  I just want to make one point here.

11   BY MR. BECHER:

12   Q.   Are you familiar --

13            THE COURT:  Overruled.  Go ahead.

14   BY MR. BECHER:

15   Q.   Are you familiar with the main constituents of

16   conductivity in alkaline mine drainage in West Virginia or in

17   the Appalachian streams?

18   A.   Yes.  Bicarbonate, sulfate, calcium, magnesium.

19   Q.   Are most of those metals?

20   A.   Metals?

21   Q.   Yes.

22   A.   No.

23   Q.   Which ones are not metals?

24   A.   Well, bicarbonate and sulfate and calcium.

25   Q.   Okay.  And so when Pond is saying, as you read, "Our

King - Direct

1    bioassessment indicators were not strongly correlated with

2    dissolved or total metals concentrations," that's not saying

3    anything about the relationship with sulfates, bicarbonates,

4    or calcium; is that correct?

5    A.   No, I don't read it that way.

6    Q.   Okay.  Well, how do you read that?  Let's be clear.

7    A.   My understanding is he's referring specifically to metals

8    that were -- represented much smaller, lower concentration of

9    the total -- that represented virtually no signal in the

10   conductivity signal.  They may be part of this.

11   Q.   So this is a separate finding from his conductivity

12   finding?

13   A.   Yes.

14   Q.   Thank you.  Okay.  And I just want to ask generally --

15   this is the Pond 2008 paper that you've testified about and

16   Dr. Palmer testified about.  Are you familiar with other work

17   by Greg Pond?

18   A.   Yeah, absolutely.  He's published a series of papers, you

19   know, recently, particularly focused on mayflies.  And then he

20   has a really important paper that just came out in 2014 in

21   *Environmental Management* that has several findings that have

22   major implications to sort of rule out some of the loose ends

23   that have been presented as confounding issues in this

24   relationship between conductivity and biological condition.

25   Q.   And, again, avoiding cumulative testimony -- I think

King - Direct

1    we'll get in some new things in the 2014 paper in just a

2    second -- but is there any outcome from Pond's or others'

3    works that you can say is indicative of mines degraded by

4    conductivity?

5    A.   Is there any -- his specific findings were relative --

6    Q.   Yes, is there any -- so he does a lot of work, say, in

7    his 2008 paper looking at biological indices versus -- well,

8    looking at biological indices and their effects by conduc-

9    tivity.  He does other work which furthers that research.

10   Does he find any kind of marker for streams that are degraded

11   that shows that this is a signature effect of conductivity?

12   A.   Well, what he finds is essentially what is continuing to

13   be this almost a mountain of literature now that repeatedly

14   shows a series of taxa, mostly mayflies, that are highly

15   sensitive to conductivity associated with surface mines.

16        He specifically goes into examining a list of sensitive

17   taxa, some of which we published as sensitive taxa in our "How

18   Many Mountains" paper.  In fact, he cites our paper and refers

19   to it directly and basically says his results are highly

20   congruent with what we found in that paper and also what the

21   EPA found in their benchmark.

22        And what's important in his study is that it's another

23   example of a -- rather than using the existing dataset for

24   biomonitoring at the state level, they did a very carefully

25   defined gradient study by going out to valley fills that were,

King - Direct

1   in fact, between 11 and 33 years old.

2        One of the questions was, do these older valley fills

3   start to show a sign of diminished conductivities and then

4   relates that to -- or compares that to sites that are unmined.

5   So, in essence, the key findings were that there was no

6   evidence that --

7             MR. HARVEY:  Your Honor, if I may, this is hearsay.

8   If he wants to read parts of Mr. Pond's study that he's

9   relying on, he may, but to simply spout out what he thinks it

10  says is hearsay.

11            THE COURT:  Well, I disagree.  I think what he's

12  trying to establish is the basis for his conclusion where he

13  agrees with these findings.

14        Go ahead.

15            THE WITNESS:  Yeah.  I'm simply summarizing the fact

16  that here's a dataset that was collected independently of

17  previous datasets, and they found essentially the same thing,

18  that they analyzed the data in a different way, yet repeatedly

19  come to the same conclusion.  And one of those conclusions are

20  that habitat was not an important component of this

21  relationship and that distance from the valley fill was not

22  important, which gets to the issue of, like, well, headwaters,

23  how close to the valley fill we are.  In the specific

24  causation in this case, they found no relationship with

25  distance in that particular study.

King - Direct

1  BY MR. BECHER:

2  Q.   Let's go ahead and turn to Pond's 2014 study at tab 19.

3  If you could, I'd like you to turn to PE 294.

4  A.   Okay.

5  Q.   Can you tell me what this chart on -- I believe it's

6  labeled table 3 -- represents?

7  A.   All right.  Well, it's the frequency of occurrence of the

8  top 10 taxa depicted as responding negatively or positively

9  based on differences between the reference and valley fill

10  groups.

11       So the group on the left are ones that are sensitive, and

12  the ones on the right are ones that are really tolerant or

13  increasers.  And the list of names here look very familiar.

14  Q.   Can you read for me the names of the taxa that he's

15  identified as sensitive to conductivity?

16  A.   Yeah.  *Ephemerella*, which is a mayfly; *Epeorus*, which is

17  a mayfly; *Neophylax*, which is a caddisfly; *Paraleptophlebia*,

18  which is a mayfly; *Cambarus*, which is a crayfish;

19  *Stempellinella*, which is a chironomid and ordered dipteran;

20  *Maccaffertium*, which is a mayfly; *Oulimnius*, which is an elmid

21  beetle; *Polypedilum*, which is a chironomid.  *Yugus*.  I'm

22  blanking out on that one.  *Haploperla*, which is a stonefly.

23  *Drunella*, which is a mayfly.  *Pteronarcys*, stonefly.  *Sweltsa*,

24  stonefly.

25  Q.   And those are the ones, again, that are sensitive to

King - Direct

1    conductivity or they can be expected to decline in high

2    conductivity waters.

3        Can you read the other column and tell me what those

4    represent.

5    A.   Okay.  *Hydropsyche*, which is very commonly associated

6    with mine sites.  That's a caddisfly.  *Eukiefferiella*, which

7    is a chironomid.  *Cricotopus*, chironomid.  *Hemerodromia*, which

8    I believe to be a tipulid.  *Diamesa*, chironomid.  *Neoplasta*.

9    That's probably a name change I don't recognize.  *Chimarra*,

10   which is a very tolerant caddisfly.  *Lumbricidae*, which is an

11   aquatic worm.  *Paratrichocladius*, which is also a chironomid.

12   *Thienmanniella*, chironomid.  *Tvetenia*, chironomid.  *Chrysops*,

13   which is a tabanid, a deer fly.  Those are really nasty,

14   biting deer flies.  And *Cheumatopsyche* is also a very tolerant

15   caddisfly.

16   Q.   Thank you.  And you said this list looked familiar.  Why

17   is that?

18   A.   Well, the names on both sides, while they don't line up

19   perfectly with what we found previously in the "How Many

20   Mountains" paper or the list of the most sensitive that came

21   out in the benchmark document, the majority of these names are

22   ones that we see over and over again as either sensitive or

23   tolerant, respectively, particularly noting that there's a lot

24   of mayflies in the group on the left.  And on the right,

25   there's some tough caddisflies.  And then there are a lot of

King - Direct

1   really tolerant midges, chironomids, dipterans.

2   Q.   And let's go ahead and turn to your "How Many Mountains"

3   paper.  It's tab 2 in the joint exhibits.

4       You actually may be able to find this more quickly than

5   I, but I'm looking for your -- well, first of all, did you do

6   a similar list of taxa that would be affected by conductivity,

7   either --

8   A.   Yes, and they're presented in a graph that's the output

9   from the TITAN analysis, which essentially is on page PE 24,

10  figure 3.  Unfortunately, the journal was rather chintzy with

11  the figure sizes and so the font is rather small.

12          MR. MCLUSKY:  Your Honor, I'm not objecting, but I

13  think this is Plaintiffs' 2, not Joint Exhibit 2, for those

14  trying to follow.

15          MR. BECHER:  I'm sorry, Your Honor.

16          THE COURT:  I think you're right.  It is Plaintiffs'

17  Exhibit Number 2.

18  BY MR. BECHER:

19  Q.   I understand you have -- what I'm going to try to do here

20  is have you read through a similar list.  I'd like to save

21  your eyes and try to keep from you having to read that.

22      Does that appear anywhere in your supplemental materials

23  in a more legible form?

24  A.   I honestly don't recall.  Probably, but --

25  Q.   You can take a quick look.  Your supplemental materials

King - Direct

1   are immediately after the --

2          THE COURT:  Well, if you have something you want to

3   refresh his recollection about his supplemental materials, go

4   ahead.

5          THE WITNESS:  Yeah, we do produce -- we did produce

6   scatterplots of each taxa, which was done so that people could

7   actually see the relationship of taxa response to conductivity

8   one at a time.  And so that does start on, I believe, PE 48.

9   BY MR. BECHER:

10  Q.   These are PE 48.  Read the heading on that for me.

11  A.   "Abundance patterns for individual data determined by

12  TITAN to respond negatively to the stream" -- oh, "sulfate

13  concentration gradient."  My apologies.

14  Q.   Can you go ahead and tell me which --

15  A.   So I believe the taxa --

16  Q.   -- responds negatively to sulfates based on your work

17  "How Many Mountains."

18  A.   I'm sorry, Mike?

19  Q.   Can you read for me the taxa that you found to respond

20  negatively to sulfate in your "How Many Mountains" work?

21  A.   Okay.  *Acroneuria*, which is a stonefly.  *Ameletus*, which

22  is a mayfly.  *Amphinemura*, which is a stonefly.  *Baetis*, which

23  is a mayfly.  *Bezzia*, which is a dipteran.  *Chrysops*, which is

24  a dipteran.  *Cinygmula*, which is a mayfly.  *Demicrypto-*

25  *chironomus*, which is a chironomid, a dipteran.  *Dicranota*,

King - Direct

1    which is a tipulid dipteran. *Diploperla*, which is a

2    stonefly. *Drunella*, which is a mayfly. *Epeorus*, which is a

3    mayfly.

4        So already several of these names are the same as what we

5    were just reading.

6        *Ephemera*, mayfly. *Ephemerella*, mayfly.  That was on the

7    previous. *Eurylophella*, mayfly. *Haploperla*, stonefly.

8    *Heptagenia*, mayfly. *Heptageniidae*, which is a group of

9    species, mayfly. *Hexatoma*, which is a stonefly. *Lanthus*,

10   which is an odonate, a dragonfly. *Leptophlebiidae*, which is a

11   mayfly. *Limnophila*, which is a dipteran. *Maccaffertium*,

12   which is a mayfly.

13       *Micropsectra*, which is a chironomid. *Microtendipes*,

14   chironomid. *Neophylax*, also on that previous list, is a

15   caddisfly. *Paraleptophlebia* is a mayfly. *Periodidae* is a

16   stonefly. *Platysmittia* is a chironomid, dipteran.

17   *Polypedilum* is a chironomid, dipteran. *Remenus* is -- I'm

18   blanking out on that taxon. *Stenacron* is a mayfly.

19   *Stenonema*, mayfly. *Sweltsa*, stonefly.  And *Yugus*, again, is

20   the other that I had just blanked out on.

21       So a lot of names that were -- and quite a few more here.

22   Q.   You have more than 10.

23   A.   Yeah.  He just picked the 10 most, and just to simplify

24   it, rather than list them all.

25   Q.   And he was looking at taxa that would decline as a result

King - Direct

1   of ionic pollution from mining, right?

2   A.   Yes, he was.

3   Q.   And you were looking at the taxa that would decline

4   directly related to sulfate concentrations.

5   A.   Yes.  So we looked at -- compared how the ones -- if we

6   looked at -- just looked at sulfate, which is, you know, one

7   of the primary constituents of alkaline mine drainage, and

8   whether or not those taxa were the same as the ones we saw

9   associated with conductivity, and the correspondence was very

10  high.

11  Q.   Were many of the taxa that you found responding

12  negatively to sulfate the same taxa that Pond found responding

13  negatively to ionic stress or ionic pollution in general?

14  A.   Yes.

15       MR. HARVEY:  Your Honor, again, Dr. King's report

16  does not say that sulfate is the cause of impairment.  He says

17  it's conductivity.  I'm not sure where this is going, but it

18  seems well outside the scope of his report.

19       MR. BECHER:  I think he said that sulfate is one of

20  the main constituents of conductivity.

21       THE COURT:  He did.  Overruled.

22  BY MR. BECHER:

23  Q.   And this will be much quicker, thankfully, if you could

24  turn to PE 52.  And can you read for me the taxa that you

25  found actually respond positively to stream sulfate.

King - Direct

1    A.    Yeah.   *Cardiocladius* is a very tolerant chironomid,

2    midge.   *Cheumatopsyche*.   We've heard that name a lot.   That's

3    a caddisfly.   *Hydropsyche* is a caddisfly.   And then some

4    ambiguous taxa that were grouped as *Hydropsychidae* also

5    increased with sulfate.

6    Q.    And, again, does your finding with regard to sulfate

7    correspond to any of the same taxa that Pond found increased

8    with ionic pollution?

9    A.    Yeah.   These are -- these were all, I believe, listed in

10   his group.   And then when we looked at this with respect to

11   specific conductance, we have a longer list and more overlap

12   with his list.

13   Q.    Why do you think there's this correlation between

14   sulfates and the group that Pond looked at with ionic --

15   A.    Well, it's -- I mean it is just a predictive chemical

16   component, part of the mixture of the ions that are associated

17   with alkaline mine drainage.   So, you know, conductivity is

18   measuring sulfate as well as bicarbonate, calcium, and so

19   forth.   And sulfate is just very highly correlated to it

20   because it's part of it.   So this is one -- one ion that's a

21   subset of it.

22   Q.    Briefly -- and I won't have you read this, but if you

23   could turn to Joint Exhibit tab 58.   Turn to a couple of the

24   very last pages, starting with JE 525.

25   A.    JE 525?   You say JE 525?

King - Direct

1   Q.   Correct.

2   A.   So 58 is split between two --

3   Q.   Those are the last few pages of the first ones of the

4   joint exhibits.

5   A.   Okay.  I'm there.

6   Q.   Are you familiar with this table?

7   A.   Yes.  I've looked it over.

8   Q.   And what is this?

9   A.   These are the extirpation concentrations that were

10  derived by EPA as part of the field-based benchmark for the

11  different genera in ecoregion 69 and 70 of West Virginia.

12  Q.   And what does the column XC95 indicate?

13  A.   That is -- XC95 means extirpation concentration and where

14  95 percent of the occurrences of the taxon fall at or below

15  that value.  So above that value is -- it's essentially the

16  taxon is no longer present.

17  Q.   Okay.  And I won't go through all of these ad nauseam,

18  but I just want to pick a few that Pond recognized as

19  responding particularly negatively to conductivity.

20       Let's look at *Ephemerella*.  And I'll tell you, these are

21  in alphabetical order by genus.

22  A.   Okay.

23  Q.   What is the extirpation for this?

24  A.   299.

25  Q.   Is that relatively low compared to other numbers in this

King - Direct

1    table?

2    A.    Well, I mean it varies.   I mean there are several that

3    are right around that, and then there are some that are much

4    higher.

5    Q.    Okay.

6    A.    But, yeah, it's in the lower 20 percent of the numbers on

7    that table.

8    Q.    How about *Epeorus* or E-p-e-o-r-u-s?

9    A.    *Epeorus* is 307.

10   Q.    Okay.   It's around the same level as --

11   A.    Uh-huh.

12   Q.    And to contrast those, let's look at some of the species

13   that -- or, excuse me -- genera that Pond found would respond

14   positively.   How about *Hydropsyche*?

15   A.    Yeah.   *Hydropsyche* is given a value of -- a conductivity

16   value of greater than 7010 microsiemens per centimeter.   So

17   essentially what that means is, it sort of -- they didn't have

18   any more values to look at, and it's at least that much.   It

19   could be higher.

20   Q.    And let's go ahead and look at -- I think it's the third

21   one, the Diptera species, *Cricotopus*.

22   A.    Yeah.   So *Cricotopus* is greater than 11,227 microsiemens

23   per centimeter.   Again, they didn't have any more values.   So

24   that's the minimum.   It could be much higher, its extirpation

25   concentration.

King - Direct

1   Q.   So the same taxa that Pond found responding negatively

2   are many of the same that you found responding -- let me

3   strike that.

4       The same taxa that Pond found responding negatively to

5   conductivity and you found responding negatively to sulfates,

6   EPA here is finding are very sensitive or relatively sensitive

7   to conductivity while the ones that responded positively are

8   very tolerant?

9   A.   Yeah, that's right.

10  Q.   Were these investigations done with the same datasets?

11  A.   The Pond data, it was done with -- the Pond study was

12  done with an entirely different dataset that his group

13  collected, though the "How Many Mountains" paper is a subset

14  of the West Virginia DEP dataset, a much smaller subset,

15  but -- and it was screened differently than the dataset here.

16  And then the EPA benchmark document included all of West

17  Virginia's database that was in ecoregion 69 and 70, as well

18  as EPA Region 3 data, which was a relatively small dataset.

19  Q.   Despite these different datasets, are these results

20  consistent?

21  A.   Yeah, remarkably so.

22          MR. BECHER:  Your Honor, it's just about 5:00.  This

23  is a good stopping point.

24          THE COURT:  All right.  Dr. King, you may step down.

25  Don't discuss your testimony with anyone.  We'll recess until

1   9:00 tomorrow.

2        Is there anything we need to address before we depart?

3             MR. HARVEY:  Not from defendants, Your Honor.

4             THE COURT:  If not, see you back here at 9:00 in the

5   morning.

6        (Proceedings adjourned at 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2                                                            Page

 3     Opening Statement by Mr. Becher                          4

 4     Opening Statement by Mr. Harvey                          9

 5     Plaintiffs' Witnesses        Direct   Cross   Redirect   Recross

 6     MARGARET PALMER                13      100      164        --

 7     RYAN KING                      197

 8     Joint Exhibits                                        Admitted

 9     No. 3   Evan Hansen CV                                    4

10     No. 4   Hansen expert report, Table 2                     4

11     No. 5   Hansen expert report, Figure 1                    4

12     No. 6   Hansen expert report, Figure 2                    4

13     No. 7   Hansen expert report, Figure 3                    4

14     No. 8   Hansen expert report, Figure 4                    4

15     No. 9   Hansen expert reporter, Figure 5                  4

16     No. 10 Hansen expert report, Figure 6                     4

17     No. 11 Christopher Swan CV                                4

18     No. 12 Christopher Swan expert report                     4

19     No. 13 Swan expert report, Table 1                        4

20     No. 14 Swan expert report, Table 2                        4

21     No. 15 Swan expert report, Table 3                        4

22     No. 16 Swan expert report, Figure 1                       4

23     Plaintiffs' Exhibits

24     No. 1   Bernhardt, et al. "The environmental costs of"... 191

25     No. 3   Cormier, et al. "Derivation of a benchmark for"... 191
```

1   No. 11 Lindberg, et al. "Cumulative impacts of"...          191

2   No. 13 Palmer, et al. "Mountaintop Mining Consequences"   191

3   No. 15 Pond, et al. "Downstream effects of mountaintop"...191

4   No. 16 Pond "Patterns of Ephemeroptera taxa loss in"...   191

5   No. 17 Pond "Biodiversity loss in Appalachian headwater"..191

6   No. 18 Pond, et al. "Calibration and validation of a"...  191

7   No. 19 Pond, et al. "Long-term impacts on"...             191

8   No. 20 March 25, 2013 letter                             191

9   No. 21 September 30, 2013 letter                         191

10  No. 23 aerial photo                                      191

11  No. 25 March 25, 2011 letter                             191

12  No. 26 Swan RBP field data sheet                         191

13  Defendant's Exhibits

14  No. 5B photos and videos from Menzie's on-site visit     196

15  No. 7  Stillhouse fact summary                           196

16  No. 37 WVDEP WAB Forms                                   196

17

18

19

20

21      I, Teresa M. Ruffner, certify that the foregoing is a

22  correct transcript from the record of proceedings in the

23  above-entitled matter.

24

25          /s/Teresa M. Ruffner              September 15, 2014