IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC., and
SIERRA CLUB,

              Plaintiffs,

v.                              CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,

              Defendant.        Huntington, West Virginia
                                    August 20, 2014


TRANSCRIPT OF BENCH TRIAL - DAY 2
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:           J. MICHAEL BECHER, ESQ.
                             JOSEPH M. LOVETT, ESQ.
                             APPALACHIAN MOUNTAIN ADVOCATES
                             P. O. Box 507
                             Lewisburg, WV  24901

                             JAMES M. HECKER, ESQ.
                             PUBLIC JUSTICE
                             1825 K Street, N.W.
                             Washington, DC  20006

```
For the Defendant:          ROBERT G. MCLUSKY, ESQ.
                            M. SHANE HARVEY, ESQ.
                            MATTHEW S. TYREE, ESQ.
                            JACKSON KELLY
                            1600 Laidley Tower
                            P. O. Box 553
                            Charleston, WV  25322

Court Reporter:             Teresa M. Ruffner, RPR
                            Sidney Christie Federal Building
                            845 5th Avenue, Room 101
                            Huntington, WV  25701
                            (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1    <u>Wednesday, August 20, 2014, at 9:06 a.m. in open court</u>

2                THE COURT:  All right.  Ready to resume with the

3    examination of Dr. King?

4                MR. LOVETT:  A couple of quick housekeeping matters,

5    if that's okay, Your Honor.

6                THE COURT:  Okay.  Use the microphone so we can hear

7    you.

8                MR. LOVETT:  Sorry.

9                THE COURT:  Is that on?

10               MR. LOVETT:  Yeah, it is.  It's about the exhibits.

11   We've agreed that in terms of joint exhibits to wait until the

12   end of testimony.  I think that we all agree that all the

13   joint exhibits are admitted and admissible except for the ones

14   that we do not use during the trial.

15        So in terms of --

16               THE COURT:  Well, all right.  I'll let him continue

17   to refer to them.  I understand you're going to move at the

18   end of the trial to admit those that have been referred to.

19               MR. LOVETT:  Thank you.  And one other thing.

20   Yesterday I failed and would like to now move the admission of

21   Defendant's 8.

22               THE COURT:  Defendant's 8?

23               MR. LOVETT:  Yes, which is the total maximum daily

24   loads for streams in the Gauley River --

25               THE COURT:  All right.  Any objection to that?

King - Direct

1          MR. HARVEY:  No objection.

2          THE COURT:  All right.  It's admitted.

3          MR. LOVETT:  Thank you.

4          THE COURT:  All right.  Are you ready to resume with

5   Dr. King?

6          MR. BECHER:  Yes, Your Honor.

7          THE COURT:  Dr. King, if you'll take the stand

8   again.

9   BY MR. BECHER:

10  Q.   Good morning, Dr. King.

11  A.   Good morning.

12  Q.   I believe where we left off yesterday, we were talking

13  about different taxa of macroinvertebrates, bugs, that were

14  sensitive to conductivity.  Is that your recollection?

15  A.   Yes.

16  Q.   Can you explain to me why viewing macroinvertebrates in

17  this way or in the multi-metric index, like the WVSCI or

18  GLIMPSS that has been referred to, is useful for ecologists?

19  A.   Well, you know, looking at the individual taxa that --

20         THE COURT:  Hold on just a minute.  I'm sorry to

21  interrupt you.  I want to make sure your microphone -- it

22  looks like it's on.

23      (The Court and Clerk conferred privately off the record.)

24         THE COURT:  We're going to turn it off and turn it

25  back on again.  There we go.  All right.  Sorry for the

King - Direct

1   interruption.

2   THE WITNESS:  No problem.  So as I was saying,

3   individual taxa have different sensitivities.  So looking at

4   the taxa that comprise the community at an individual site

5   provides an additional level of information about specificity,

6   you know, where you consistently see taxa that you know to be

7   sensitive and they're there when conductivity is low versus

8   taxa you know to be tolerant and those are the only ones you

9   find when you see conductivity when it's high, for example.

10  BY MR. BECHER:

11  Q.   Now, are these bugs that we see declining with

12  conductivity, are they particularly sensitive or weak bugs

13  overall?

14  A.   It varies.  Not necessarily.  You know, there are

15  certainly some that have much greater tolerance to

16  degradation; for example, mayflies.  If we were to just look

17  at mayflies as a group and the number of mayflies you'd expect

18  to find with increasing, say, habitat degradation, some of

19  them don't change much at all, at least in the way we measure

20  habitat in terms of, you know, quality in a stream.

21       So, no, it's not -- they're often very specific to

22  particular stressors.

23  Q.   And why are we looking at bugs at all rather than just

24  looking at, say, the chemistry data from these sites or

25  physical measurements?

King - Direct

1    A.   Well, I mean that's a pretty deep question in many ways,

2    but I mean in terms of, you know, legally, we're to protect

3    the biological integrity based on the Clean Water Act.  And so

4    understanding how chemistry is affecting aquatic life in a

5    stream is fundamental to, you know, maintaining clean water in

6    this country.  And these organisms are long-term integrators

7    of the condition.

8         So as the conductivity goes up and down, we may go to a

9    site and measure a value that isn't indicative of the

10   long-term condition, whereas the organisms that are there will

11   tell you a lot more about that, because it's more like a

12   snapshot versus, like, a movie reel.  A community of organisms

13   in a stream has often been kind of a -- the analogy is that

14   they are sort of like a long-term, you know, movie of what's

15   happened.

16   Q.   Thank you.  I want to -- we started going through the

17   literature yesterday.  I want to continue a little bit.

18        If you would turn to Plaintiffs' Exhibit 2, it's your

19   "How Many Mountains" paper that we talked about a little bit

20   yesterday.

21   A.   Okay.

22   Q.   First, can you -- well, strike that.  First, can you tell

23   us generally what you're trying to do in this paper, what your

24   main point of focus was?

25   A.   Well, at the time when we started writing it, the

King - Direct

1    objectives were to formally link or address the area -- the

2    spatial extent of mining in a catchment or a watershed and how

3    that related to chemical changes in a stream.  So, is there a

4    relationship between how large a mine is relative to the total

5    watershed?

6         At the time we were working on it, that was new.

7    However, you know, there had been, for example, the Merriam

8    paper looked at that a little bit and some others that came

9    out before ours did and essentially found the same thing we

10   did.  That was one aspect of it.

11        And then another was to look more -- once we made that

12   association, was to look at conductivity and then also

13   sulfate, which was a very strong correlate or component of

14   that ionic mixture, and how it corresponded to biological

15   measures of stream integrity and including two that are used

16   to assess impairment.  Well, in West Virginia, technically

17   only one, WVSCI, but GLIMPSS is also a genus-level index.  And

18   then finally to assess how individual taxa responses, using an

19   entirely different method, that being the TITAN method,

20   corresponded to results derived by the EPA benchmark using

21   individual taxa or genera.  So we had several objectives.

22   Q.   And were you aware of the benchmark when you worked on

23   this paper?

24   A.   Sure.  It was a draft document in 2010; and, you know, we

25   were very aware of it.  Again, the goal wasn't to necessarily

King - Direct

1   validate it.  It was simply to look at this data in a

2   different way.  We screened the data in a very different way;

3   and it was simply to see, well, how do our results compare.

4   Q.   I want to turn to the same exhibit, page PE 23.  There's

5   a table 1 there.

6   A.   Yes.

7   Q.   And there's a response variable column.  Can you tell me

8   the response variables that you were looking at in these

9   analyses?

10  A.   Sure.  In these three cases, we were looking at, first of

11  all, the responses were the cumulative individual taxa

12  responses which was analyzed with TITAN, and then we were

13  looking at WVSCI, particularly where the WVSCI score reached

14  its failing point, and the GLIMPSS score, where it reached its

15  failing point.

16  Q.   So you were using three different response variables

17  here.

18  A.   Correct.

19  Q.   Okay.  And how does that differ in the response variables

20  that EPA looked at?

21  A.   Well, I mean EPA did somewhat, you know, address the

22  WVSCI.  There is a figure where they estimate the percentage

23  of sites that are predicted to be impaired with WVSCI; and at

24  300, it was 59 percent, I think.

25       And the main difference here was the cumulative

King - Direct

1   individual taxa responses was analyzed a very different way

2   than the species sensitivity distribution approach that EPA

3   used.   In our case, we used the occurrence and the abundance

4   of particular taxa.  And the TITAN method tries -- attempts to

5   identify the point where there is a sharp non-linear decline

6   in the occurrence and/or abundance of a taxon.  It's not

7   attributed to a particular level of extirpation, for example.

8        So in EPA's case, they focused entirely on whether it

9   occurred or not and then at what point was it basically going

10  almost extinct.  So ours was looking more at where individual

11  taxa were really starting to be affected and is there a point

12  where a lot of taxa simultaneously are affected.  If there

13  were, we would have this response that was really strong in a

14  specific zone.

15       That's what TITAN does.  It aggregates the responses of

16  those taxa to identify a community-level threshold.  So that's

17  how it is very different from what EPA did.

18  Q.   So you used analyses based on WVSCI, GLIMPSS, and TITAN.

19  A.   Yes.

20  Q.   And they used primarily WVSCI and species sensitivity

21  distribution.

22  A.   Yeah.  And the benchmark really is entirely based on the

23  species sensitivity, and then they had some additional

24  analysis where they looked at WVSCI, but it was not a huge

25  component of their work.

King - Direct

1    Q.    Despite using these different types of evidence, were

2    your results consistent with those of EPA?

3    A.    They were remarkably consistent, yes.  So, you know, in

4    our case, we were looking at what level did WVSCI, with

5    conductivity, for example, where did it hit the point where --

6    where did the model say that it, you know, on average, a site

7    would be impaired.  And we found that it would be at 308

8    microsiemens per centimeter.  And our model actually accounted

9    for habitat as well.

10         So getting rid of any potential confounding effect of

11   habitat, in addition to all the other variables we screened,

12   308 was the number.

13   Q.    And that's what you got, it looks like, for WVSCI and

14   GLIMPSS as a threshold estimate.

15   A.    Correct.

16   Q.    What did you get for the TITAN analysis?

17   A.    283, with a confidence interval of 178 to 289.  So, you

18   know, basically just below 300.

19   Q.    And remind us, what was the benchmark threshold?

20   A.    297.

21   Q.    And so these are very consistent with that level.

22   A.    Yes, and, you know, again, entirely different methods,

23   completely -- I mean there would be a great potential for the

24   results to be very different.

25   Q.    I also want to talk a little bit about the datasets that

King - Direct

1    were used in "How Many Mountains."  Can you tell us a little

2    bit about -- you mentioned eliminating confounding factors --

3    how you arrived at the datasets for these analyses?

4    A.    How we screened our data?

5    Q.    Sure.

6    A.    Yeah.  Well, so in our case --

7    Q.    Let me back up, actually.  I hate to interrupt you.

8    Which -- where was your data from?

9    A.    Okay.  Our data was a subset of data from the West

10   Virginia DEP.  And the reason why it was a subset and not the

11   full dataset is we had a region of South West Virginia where

12   we had mapped the aerial extent of mining, and hence that area

13   is where we defined our study area.

14        So that eliminated a large part of the state, but -- and

15   then from there, we obtained data mostly collected between

16   2000 -- well, up to 2007 is I think the dataset.  And we

17   screened those data for numerous potential confounding

18   factors, such as the amount of urban development in the

19   catchment, which has been shown in a variety of places,

20   including one of the papers we talked about yesterday, as

21   something that is certainly a confounding factor.  It would

22   very likely lead to degradation in the stream independent of

23   mining.

24        So we got rid of sites that had more than 4.3 percent per

25   recovered.

King - Direct

1   Q.   So you used a small subset of the West Virginia database.

2   What database did the EPA use in deriving their benchmark?

3   A.   They used the West Virginia DEP database that was not for

4   the entire state; most of the state.   Ecoregions 69 and 70.

5   And they also used a dataset from region -- EPA Region 3,

6   which was a smaller dataset, but they went ahead and included

7   that because it overlapped with that area.

8   Q.   And so they had a larger dataset --

9   A.   They had a much larger -- yeah, 2200 data points,

10   compared to our dataset after it had been screened was 223

11   data points.

12   Q.   Did they look at any data outside of West Virginia?

13   A.   They did.   After they had done all of their analyses, one

14   of the steps that they did to validate what they had found was

15   to look at -- essentially develop an entirely new species

16   sensitivity distribution using data from the State of

17   Kentucky.   And I think that's something that is -- it's in an

18   appendix.   So a lot of times people aren't aware that they had

19   actually done this.   But they reproduced the entire thing for

20   a dataset from a different state.

21   Q.   Let's just very briefly point to that appendices,

22   appendix G, which is the -- I apologize, Your Honor --

23   appendix G, which is the first exhibit in the joint exhibits

24   notebook, 58, appendix --

25          THE REPORTER:   I'm sorry.   Say that again, slower.

King - Direct

1    MR. BECHER:  This is part of Joint Exhibit 81 -- or,

2    excuse me -- Joint Exhibit 58.  Joint 58 is actually split in

3    the middle because it's such a large document.  And this part

4    of that exhibit is the second joint exhibit notebook.

5    THE COURT:  And it's appendix G?

6    MR. BECHER:  G.

7    THE COURT:  Do you know what page that starts on?

8    MR. BECHER:  JE 589.

9    BY MR. BECHER:

10   Q.   And can you just look at that briefly and tell me if this

11   is the analysis that you're talking about --

12   A.   Yeah, it is.

13   Q.   So you've already said that the analyses you did using

14   the highly screened portion of the West Virginia database

15   consistent with the EPA's derivation in their main work was

16   consistent with the dataset they found in Kentucky?

17   A.   Yeah.  Yes.

18   Q.   Do you know of anybody else that did these kind of

19   analyses with different datasets or different methods?

20   A.   Well, we already discussed several different papers, you

21   know, for example, the Pond work.

22   Q.   So Pond used an even different dataset than was used in

23   either your work or --

24   A.   Yeah, it was entirely -- yeah.  They generated their own

25   dataset.  And that was a focused study.  Rather than using

King - Direct

1    Pond monitoring data, they went out and actually collected

2    data more intensely.  And that was the only reason why we

3    saw -- they saw relationships in those data that were quite a

4    bit stronger than what we see from the snapshot data from the

5    biomonitoring approach.

6    Q.   And all these datasets and all of these different

7    methods, are they coming to similar conclusions?

8    A.   Yeah.  I mean, in fact it's remarkably similar.  So it

9    seems to be, regardless of where the sampling was done, how it

10   was sampled, when it was sampled, and other sorts of variables

11   included, the results are the same.

12        So I mean it's really getting to the point where we have

13   a substantial literature that is arriving at this conclusion

14   that conductivity associated with alkaline mine drainage is

15   very strongly linked to biological degradation; and it seems

16   to happen at levels around 300 is where it starts, and it

17   continues to get worse as conductivity increases.

18        So there's this very clear dose response --

19   Q.   I'll ask you some questions about that work in a moment.

20   I want to have you read from some of the literature, and I

21   want to start with the "How Many Mountains" paper.

22        If you could, turn to -- this is, again, Plaintiffs'

23   Exhibit 2, page PE 25.

24   A.   Okay.

25   Q.   And you have a Stressor Gradient 2, Conductivity heading.

King - Direct

1    Can you read me the paragraph that falls immediately after

2    that heading?

3    A.    "As with the mining gradient, the diversity of intolerant

4    macroinvertebrate taxa declined rapidly with increases in

5    stream conductivity, with the conductivity model capturing

6    more variation in the number of sensitive taxa" --

7              THE COURT:  Slow down some.

8              THE WITNESS:  I'm sorry.  "With the conductivity

9    model capturing more variation in the number of sensitive taxa

10   than percent mining."  And this was the GAM result, with an

11   R-square of 0.45.

12       Mike, how far do you want me to read?

13   BY MR. BECHER:

14   Q.    To the end of the paragraph.

15   A.    Okay.  "Based on the GAM models" -- GAM refers to

16   generalized additive models -- "once stream conductivity

17   increases above 121 or 308 microsiemens per centimeter,

18   GLIMPSS and WVSCI scores will typically fall below their

19   respective impairment thresholds.  TITAN revealed significant

20   declines in abundance for 50 of the 157-recorded taxa in

21   response to rising conductivity, with the greatest cumulative

22   community diversity loss observed at 283 microsiemens per

23   centimeter.  Ten species of tolerant caddisflies and fly

24   larvae responded positively to increasing conductivity.  The

25   estimates we derive from all three analyses are very close to

King - Direct

1   the benchmark value of 300 microsiemens per centimeter that

2   was recently set by the U. S. EPA to be protective of Central

3   Appalachian stream biota.   Identical analyses were conducted

4   for the sulfate gradient, with results appearing in Table 1

5   and data and models presented in an appendix."

6   Q.   Very quickly, that mentions sulfates.  Can you turn back

7   to page PE 23.  Tell me the sulfate threshold that you arrived

8   at.

9   A.   Yeah.  So in table 1, we report a TITAN threshold of

10  50 milligrams per liter, with a confidence interval of 27 to

11  57.  WVSCI also resulted in a threshold estimate of

12  50 milligrams per liter, with a confidence interval of 48 to

13  58.  So that's where WVSCI on average would fail.

14      And then the GLIMPSS score resulted in a threshold of

15  52 milligrams per liter.  So very consistent, three different

16  indicators.

17  Q.   Thank you.  Now, you mentioned a minute ago that EPA had

18  done some analysis based on WVSCI in their benchmark.  Did

19  they actually do any predictions of the probability of failing

20  streams at different WVSCI scores?

21  A.   Yes, they did.  They, in fact, used the same dataset and

22  looked at WVSCI scores in those different bins of conductivity

23  and fit a regression model and then used that to predict the

24  probability that a site would fail.

25      And at 300, their -- their estimated probability was

King - Direct

1    59 percent of the sites would fail at 300.  And then at, I

2    believe, at 500, they predicted that 72 percent of the sites

3    would fail, something like that.

4    Q.    And I just want to direct you to one that is in the

5    benchmark itself.  You can turn again to Joint Exhibit 58, the

6    benchmark.  This is in actually the first joint exhibit

7    notebook.

8         Can you turn to page JE 464.

9    A.    Okay.  Excuse me.  Yes, I have it.

10   Q.    Is that the analysis you were referring to?

11   A.    Yes.

12   Q.    And they looked at it up to a level, it looks like, 500

13   microsiemens per centimeter.

14        Did you do a similar type of analysis on the probability

15   of failing WVSCI scores based on conductivity in your work for

16   this case?

17   A.    Yes.  So I did a kind of a simple -- I basically looked

18   at percentages of sites that failed in different -- at

19   different levels of conductivity.  It wasn't a formal, like a

20   regression analysis.  It was simply just tabulating the number

21   of sites that failed in different categories of conductivity.

22        One of the main differences is that in my report, I had

23   filtered the data heavily to remove sites that had, you know,

24   for example, poor or marginal habitat, low pH, urbanization, a

25   long list of variables that you can propose as confounding

King - Direct

1  factors.  I essentially just removed those data.

2      And that is very consistent with what the defendants are

3  saying needed to be done to be an epidemiological type of

4  analysis.  And in that simple summary, I'm trying -- I can't

5  remember the exact number.  I believe it was 53 percent of the

6  sites --

7  Q.   Let's look at it.  If you could turn to Joint Exhibit 25.

8  A.   Okay.

9  Q.   Is that the table reflecting the analysis you --

10 A.   Yeah, exactly.

11 Q.   Okay.  I think you were about to tell us some of the

12 figures from there.

13 A.   Exactly, yes.  So once -- in the group of 301 to 400

14 microsiemens, after removing many of the sites that had all of

15 these other things that might cause a failing WVSCI score, the

16 percent failure was 53 percent.  So, again, very consistent.

17 As we get around 300 and slightly above, we see on average the

18 majority of sites failing.

19 Q.   Okay.  And what happens when you get above 1500

20 conductivity?

21 A.   Above 1500, there were 69 sites, and 67 of them failed, 2

22 of them passed.  It was a 97 percent failure rate.

23 Q.   Okay.  We've talked a lot about your work, the work of

24 independent researchers and EPA.  Are you aware of any work by

25 the West Virginia Department of Environmental Protection that

King - Direct

1   looked at responses to macroinvertebrates and conductivity?

2   A.   Well, I mean they have some guidelines about, you know,

3   probable stressors as it relates to conductivity.  So I'm not

4   aware of, like, formal analyses necessarily, but they

5   certainly have some specific numerical criteria that relate to

6   how they might go about interpreting impairment or causal

7   results based on, for example, a conductivity value at a site

8   if indeed their WVSCI failed.  Is that what you're referring

9   to?

10  Q.   Well, I was asking you if you're aware of things.  That

11  is what I had in mind.

12       If you could, turn to Joint Exhibit 61.  Sorry to be

13  switching joint exhibit notebooks.  This is in the second one.

14  A.   That's okay.  All right.

15  Q.   Can you just read the title of that document?

16  A.   The title is Permitting Guidance for Surface Coal Mining

17  Operations to Protect West Virginia's Narrative Water Quality

18  Standards.

19  Q.   Okay.  And if you would turn back one tab to Joint

20  Exhibit 60.

21  A.   Okay.

22  Q.   And can you read the title of this document?

23  A.   Justification and Background for Permitting Guidance for

24  Surface Coal Mining Operations to Protect West Virginia's

25  Narrative Water Quality Standards.

King - Direct

1    Q.    Are these two documents related?

2    A.    Yeah.   I mean I believe they are, yes.

3    Q.    Based on the title, it appears that one was justification

4    for the other?

5    A.    Sure.

6    Q.    If you would turn to Joint Exhibit page 700.

7    A.    Okay.

8    Q.    There is a table there looking at cause -- which is

9    listed candidate cause of ionic strength.  If you go over in

10   the conductivity column, can you tell me where DEP recognizes

11   that conductivity is going to be a definite stressor?

12   A.    They indicate that above 1533 microsiemens per

13   centimeter, conductivity is a definite stressor, meaning if

14   it's that high, it is, in fact, recognized by the state as not

15   probable but completely definitely a stressor.

16   Q.    Okay.  And let's just look at the category below that.

17   Can you tell what they found, you know, below where --

18   A.    Yeah.  So from 1075 up to that number, they call it a

19   likely stressor.  Then they go down a little bit more, from

20   700 up to a little over a thousand, and they say it's a

21   probable stressor, and then on down the line.

22   Q.    Now, do you agree with DEP that you need to reach a level

23   of 1075 to be a likely stressor of conductivity?

24   A.    I mean I think that 1075 is more than -- more than a

25   likely stressor at that point.  So these are very conservative

King - Direct

1    numbers.

2    Q.    But would you agree at the top level, I'll assume, that

3    above 1500 --

4    A.    I mean, yeah, the fact that they recognize it, if you're

5    above 1500, the site is definitely stressed by conductivity.

6    I definitely agree with that.

7    Q.    Now, both you and Dr. Palmer have testified about many

8    journals or articles in the peer-reviewed literature that were

9    authored by yourselves and other independent researchers such

10   as Pond.

11         In your mind is the research in those journals enough to

12   establish a likelihood of causation?  And what I mean by that

13   is that a likelihood that conductivity is causing biological

14   impairment.

15   A.    Yes.  I mean there has not been a study that has

16   generated results that lead to anything that would lead to any

17   other conclusion other than conductivity being a very

18   consistent, predictable causal factor in the impairment of

19   Appalachian streams.

20         And, you know, I think one of the things that's been lost

21   in this discussion to some degree is that the scientific

22   method is, in fact, based on consensus in the literature.  You

23   know, so causation, I mean there's many things that we

24   consider to be facts of science, you know, evolution,

25   whatever, that are based on our inability to refute a

King - Direct

1   particular idea or question.  And there has been nothing to

2   refute this as a stressor.

3        And so the body of evidence is what we would consider to

4   be there's very strong inference from all of these papers that

5   lead it to be considered to be there's a consensus in the

6   literature.  And when you have a consensus, that's where we

7   get to the point where we say this is a fact of science.  Are

8   facts of science occasionally overturned?  Very rarely once

9   there's a consensus.

10  Q.   Is it necessary in the field of ecology particularly to

11  run one of these facts of science through a formal causation

12  analysis?

13  A.   I mean when you have this level of evidence and this many

14  studies, that's why, for example, the Scientific Advisory

15  Panel reviewed that benchmark document and all came to the

16  same conclusion, that it was very sound science because of all

17  the steps they had gone through.

18       You take that and add all the literature that we have on

19  top of it, it's a remarkably strong predictive relationship.

20  So for field data to have this kind of relationship that we

21  see over and over and over again, no matter how we throw our,

22  you know, analyses at it or how people collect the data in

23  different ways, we end up with the same conclusion.

24       Yeah, it's just a compelling, you know, very clear

25  response that conductivity associated with mine drainage

King - Direct

1   causes biological impairment.

2   Q.   Let me be clear.  Would that be your opinion without

3   looking at any kind of formal causation analysis on

4   conductivity and biological degradation?  By "formal causation

5   analysis," I mean the type of thing that might be used by an

6   epidemiologist to confirm a cause of disease.

7   A.   Well, that was done with the benchmark.

8   Q.   But did that need to be done for you to accept this as a

9   scientific fact?

10  A.   No, I think given all the other literature that we have

11  now.  But the fact that that was done already in that document

12  just adds -- you know, takes it to the next level.  But in

13  general, that's not done in most scientific -- when we're

14  dealing with questions in science.

15      Science continues to build on issues, and eventually it

16  becomes -- once people study it further and we reach a

17  consensus on what happens, and that rarely is done through a

18  formal causal analysis.  It's done by, you know, posing

19  hypotheses, testing them.  And when we continue to have an

20  inability to refute a particular hypothesis or a known

21  hypothesis, then we eventually accept something as a fact of

22  science.

23  Q.   And, again, let me be clear.  Without a formal causation

24  analysis --

25  A.   Yes.

King - Direct

1    Q.    -- would you accept the causal nature of conductivity to

2    biological impairment as a scientific fact?

3    A.    Yes.  So without the benchmark, with all the other

4    literature that is out there now, the consensus is, yes, that

5    this is causing impairment.

6    Q.    Thank you.  But as you mentioned, a more formal causal

7    analysis was done.

8    A.    It was done.

9    Q.    And this was done -- was it done in the benchmark?

10   A.    It was done in the benchmark.

11   Q.    If you could, let's just turn to, again, Joint Exhibit

12   58.

13              THE COURT:  Which one?

14              THE WITNESS:  Yeah.

15              MR. BECHER:  I'm going to go to appendix A, which is

16   in the first joint exhibit notebook.  Thank you, Your Honor.

17   BY MR. BECHER:

18   Q.    Could you just read the heading of --

19              THE COURT:  What page?

20              MR. BECHER:  Oh, excuse me.  Joint Exhibit 429.

21   It's the beginning of appendix A.

22              THE WITNESS:  Okay.  And you'd like me to read what?

23   BY MR. BECHER:

24   Q.    Just the heading of appendix A, the title of the section.

25   A.    Okay.  Causal Assessment.

King - Direct

1   Q.   Have you read through this section?

2   A.   Yes.

3   Q.   In your mind does this show that through the -- is the

4   method they used in your opinion a valid method?

5   A.   Yes, it is.  I mean it's based on the causal analysis

6   decision framework, or CADDIS, that EPA developed 15 years

7   ago.  It's based -- which is also further based on Hill's

8   work, Hill's considerations for demonstrating causation.  In

9   his case, he was dealing mostly with human health issues, but

10  basically it was adapted and followed it identically.

11  Q.   Do you agree with the conclusions they reached?

12  A.   Yes, absolutely.

13  Q.   Was this causal assessment published anywhere besides the

14  benchmark?

15  A.   It was.  So after the benchmark document was published,

16  each of the components -- most of these appendices were

17  published as separate papers in a series of papers in the

18  *Journal of Environmental Toxicology and Chemistry*.  And so I

19  believe there's about six different papers, but three or four

20  of them are really key to this demonstrating not only how the

21  method works, but then they go through the formal causal

22  assessment or causal analysis and confounding factor analysis

23  and report the results.

24  Q.   And Dr. Palmer read a bit from one of those papers

25  yesterday.  I'm not going to bring you back through that

King - Direct

1   paper, but can you turn to, again in the plaintiffs' exhibit

2   notebook, Plaintiffs' Exhibit 5.

3   A.   Okay.

4   Q.   I apologize.  I'm going to have you do a lot of reading

5   here.

6   A.   That's fine.

7   Q.   Can you tell me what this document is?

8   A.   It's called Assessment Causation of the Extirpation of

9   Stream Macroinvertebrates by a Mixture of Ions.

10  Q.   Is this where the causal analysis for the benchmark was

11  published in peer-reviewed literature?

12  A.   Yes.

13  Q.   Okay.  What journal is this published in?

14  A.   It's *Environmental Toxicology and Chemistry*, which is the

15  flagship journal of the Society of Environmental Toxicology

16  and Chemistry, or SETAC.

17  Q.   If you could look at the abstract and the sentence that

18  starts with "Through this assessment."  Can you read that

19  sentence and the next two?

20  A.   "Through this assessment, the authors found that a

21  mixture containing the ions calcium, magnesium, bicarbonate,

22  and sulfate, as measured by conductivity, is a common cause of

23  extirpation of aquatic macroinvertebrates in Appalachia where

24  surface coal mining is prevalent.  The mixture of ions is

25  implicated as the cause rather than any individual constituent

King - Direct

1   of the mixture."

2   Q.   Actually, keep going to the next sentence, please.

3   A.   "The authors also expect that ionic concentrations

4   sufficient to cause extirpations would occur with a similar

5   salt mixture containing predominantly bicarbonate, sulfate,

6   calcium, and magnesium in other regions with naturally low

7   conductivity.  This case demonstrates the utility of the

8   method for determining whether relationships identified in the

9   field are causal."

10  Q.   And if you could, I want to read the authors' sort of

11  description of what they're doing here.  Can you read for me

12  the last sentence on page PE 85?

13  A.   "The evidence is organized by six characteristics of

14  causation: co-occurrence, preceding causation, interaction,

15  alteration, sufficiency, and time order."

16  Q.   Okay.  I would like to go through the evidence they

17  looked at in each of these categories as well as how that was

18  weighed.

19       If you'd turn to page PE 86, the first category they

20  mention is co-occurrence.  Can you tell me what they meant by

21  co-occurrence?

22  A.   Well, that --

23  Q.   You can -- actually, they describe immediately below that

24  heading what they're referring to, if that helps you.

25  A.   So I mean do you want -- you're asking me to read it,

King - Direct

1  then?

2  Q.   Sure, read that.

3  A.   "Because causation requires that causal agents interact

4  with unaffected entities, they must co-occur in space and

5  time."

6  Q.   Okay.  And within the category of co-occurrence, they

7  looked at a couple of different subcategories of evidence.

8  The first one appears below that.

9      Can you tell me what they first looked at with

10  co-occurrence?

11  A.   Co-occurrence between conductivity and extirpation of

12  genera.

13  Q.   Okay.  And within that, they tell how they score this

14  evidence in a paragraph beginning "Scoring."  Can you read

15  from that paragraph?

16  A.   "This evidence supports the causal relationship;

17  extirpation of 40 genera in West Virginia and 46 in Kentucky

18  in streams with conductivity greater than 1500 microsiemens

19  per centimeter is a strong effect.  The two independent data

20  sets and analyses corroborated one another.  The total score

21  is assigned plus, plus, plus," which is the highest score that

22  it can receive for being a causal factor.

23  Q.   And can you tell me why -- what the meaning of "plus" is

24  here?

25  A.   "Plus" relates to -- I mean they had multiple lines of

King - Direct

1   evidence that they looked at in scoring this, and each one

2   received a very strong score, meaning the relationship was

3   very strong in terms of co-occurrence, and cumulatively that

4   results in the highest score.

5   Q.   Could they alternatively have a minus for a category?

6   A.   Absolutely, or none and no weight.  No weight means it's

7   equivocal or it didn't apply.

8   Q.   And in addition, they could have, you know, two minuses

9   or three minuses as they're having two or three pluses?

10   A.   That's right.  So if you have a -- basically if you have

11   a minus, it almost immediately rules out something as a causal

12   factor.

13   Q.   Okay.

14   A.   So, for example, in Kentucky there was, you know, like

15   one genera that was extirpated with conductivity.  They would

16   probably score it as, like, a minus or very equivocal effect,

17   which would almost rule it out.  But since they had found the

18   identical thing there, it got to be a very high score.

19   Q.   So here again we have three pluses for this type of

20   co-occurrence with extirpation of genera.

21   A.   That's correct.

22   Q.   What about the co-occurrence of cause and Ephemeroptera?

23   That's the next category.  The score actually appears on page

24   PE 87.  Can you read for me that paragraph?

25   A.   Yes.  "This evidence supports the causal relationship

King - Direct

1    between conductivity and extirpation of genera.  Where

2    conductivity is high, individuals of the order Ephemeroptera

3    are less likely to occur.  A change of 50 percent or more is

4    large.  The evidence is corroborated in three independent data

5    sets collected from different streams at different times by

6    different researchers using different sampling protocols.  The

7    total score assigned is plus plus plus."

8    Q.    Okay.  And what is the next subcategory they looked at?

9    A.    Co-occurrence in nearby catchments.

10   Q.    And their score for that appears on PE 88.  Can you read

11   that score, the text that goes along with that score?

12   A.    Sure.  And I think it's worth noting that the

13   co-occurrence in nearby catchments, the catchments that they

14   examined were Boardtree and Stillhouse Branch and Ash Fork in

15   the Twentymile Creek watershed.  So they specifically were

16   looking at the site in question here and the scoring.

17        "This evidence supports the causal relationship; the

18   number of genera is two to three times greater at the low-

19   conductivity sites for most metrics; few or no Ephemeroptera

20   were observed at three-fourths of the sites.  The results are

21   consistent and independently corroborated.  Total score

22   assigned is plus plus plus."

23   Q.    And next we've got an entirely new category, Preceding

24   Causation.  Can you tell me what preceding causation is either

25   in your own words or by reading what they wrote?

King - Direct

1    A.    Well, I think in this case they're referring to, like, a

2    source; for example, alkaline mining.  You know, the mine

3    itself leads to a specific mixture of ions.  And then they

4    look at it in contrast to other sources and types of ions to

5    make sure that there are not other sources that could lead to

6    the same mixture of ions.

7         It's more like a pathway; is there a causal pathway from

8    something to the stressor and the causal agent?  And that's my

9    understanding of what they mean there.

10   Q.    Thank you.  And the first subcategory is complete source-

11   to-cause pathway from the literature.  Can you read for me the

12   scoring for that?

13   A.    "This evidence from the literature indicates that there

14   are sources of the mixture of dissolved ions that are

15   widespread in region and can be differentiated from sources of

16   other mixtures.  Multiple studies are consistent in the

17   description of the ion types associated with different

18   sources."  Strength is not scored here.  The total score is

19   plus plus.

20   Q.    So we don't get three pluses there, but we get two.

21   A.    Yeah.

22   Q.    All right.  The next is the co-occurrence of sources and

23   conductivity from the region.  Can you read me the scoring for

24   that?

25   A.    "This evidence supports the causal relationship.  The

King - Direct

1  conductivity at mined sites is 10 to 50 times greater than at

2  unmined sites.  The source of increased conductivity is

3  independently corroborated and consistent.  Total score is

4  plus plus plus."

5  Q.  Okay.  And the next subcategory appears after that,

6  characteristic composition of identified sources.  Can you

7  tell me the scoring for this subcategory?

8  A.  "The evidence supports the causal relationship by showing

9  that there are sources of high conductivity with a consistent

10 matrix of ions.  Both mined and unmined sites have similar

11 proportions of calcium, magnesium, bicarbonate, and sulfate

12 but very different concentrations.  The difference between the

13 ionic composition of mined watersheds and watersheds with

14 other sources of ions such as brines," sea salt, "is very

15 large.  The evidence from the West Virginia database and two

16 other Appalachian studies consistently supported the ionic

17 makeup associated with land disturbance, especially surface

18 mining.  The data from mined and unmined watersheds are from a

19 peer-reviewed publication, and the brine values are from

20 reports from extraction permittees in West Virginia.  Although

21 the brine analyses are not peer reviewed, the findings are

22 qualitatively similar to other non-peer-reviewed reports of

23 the makeup of such brines.  Total score is plus plus plus."

24 Q.  And the next subcategory we have is correlation of

25 conductivity with sources.  Can you read me the score for

King - Direct

1    that?

2    A.    "This evidence supports the causal relationship.  The

3    correlations for percentage area in mountaintop mining with

4    valley fill, all mining minus valley fill and abandoned mine

5    lands, and forestry are moderately strong based on our

6    a priori scoring system.  The present study has not been

7    independently corroborated, although it is consistent with the

8    findings of Pond et al. and Lindberg at al.  The association

9    seems to be specific for extensive geologic disturbances,

10   which in these regions are from mining and valley fills.  The

11   total score is plus."

12   Q.    Okay.  We get next to a new category, interaction and

13   physiological mechanisms.  Can you tell me what is interaction

14   and physiological mechanisms referring to?  Again, they

15   describe it, if it helps you to read there.

16   A.    Yeah.  I'll just say, "Causal agents alter affected

17   entities by interacting with them through a physical

18   mechanism.  Evidence that a mechanism of interaction exists

19   for a proposed causal relationship strengthens the argument

20   for that relationship."

21   Q.    The first category under that is evidence of mechanism of

22   exposure.  Can you read me the score?

23   A.    "Evidence of a mechanism of exposure is from

24   knowledgeable -- is from knowledge that the ions are present

25   in streams and from general knowledge of animal physiology and

King - Direct

1    the anatomy of insects and other aquatic invertebrates.

2    Because the exposure is by the same mechanism that provides

3    respiration (that is, the maintenance of water flow over

4    permeable membranes), it is strong.  Many studies support this

5    inference.  The total score is plus plus plus."

6    Q.    Okay.  The next subcategory, biochemical mechanisms of

7    effect, can you read me the scoring?

8    A.    "This mechanism supports the causal relationship by

9    providing evidence that the bicarbonate ion matrix in the

10   region can create ionic gradients that interfere with proper

11   homeostasis.  However, direct observations of the ionic

12   regulatory processes or membrane potential measurements are

13   not described in the literature for affected or tolerant

14   species studied in Appalachia.  Evidence from the literature

15   about mitochondrion-rich chloride cells in epithelia of

16   insects, (particularly in mayflies), amphibians, and fish,

17   logically leads to disruption of ionic regulation in organisms

18   highly dependent on passive ionic regulation by a bicarbonate

19   chloride antiport anion exchange.  Other ion transport systems

20   are also affected by increases in the concentration of the ion

21   mixture, which is measured as increased conductivity in the

22   region of concern.  A large body of peer-reviewed

23   physiological studies supports this inference.  The total

24   score is plus plus."

25   Q.    Okay.  And the scoring for physiological mechanism of

King - Direct

1   effect?

2   A.   "This evidence supports the causal relationship by

3   demonstrating that the loss of ionic regulation can affect an

4   animal's physiology leading to severe effects.  Studies of the

5   physiology of affected species and intolerant species from

6   Appalachia are not available.  The effects of ionic disruption

7   are supported by a large body of peer-reviewed physiological

8   studies, some of which are presented above.  The total score

9   is plus plus."

10  Q.   Okay.  Next we have a new category, alteration.  Can you

11  read the first sentence describing what alteration means?

12  A.   Yes.  "A cause alters or changes a susceptible entity.

13  In this case, the alteration is failure to maintain viable

14  populations of sensitive species."

15  Q.   Okay.  And the first alteration we looked -- the type of

16  alteration, the first subcategory is the change in genera.

17  Can you read the scoring?

18  A.   "This evidence supports the causal relationship by

19  demonstrating that conductivity greater than background levels

20  causes a consistent set of sensitive genera to be extirpated.

21  The number of genera with similar extirpation concentration

22  values (less than 10 percent difference) in Kentucky and West

23  Virginia with extirpation concentration values less than 500

24  microsiemens per centimeter is 71.4 percent and for those with

25  a similar pattern of decline, it is 81.5 percent.  Multiple

King - Direct

1    studies and data sets confirm this evidence.  The total score

2    is plus plus plus."

3    Q.    Next, we have as alteration models, change of genera.

4    Again, can you read me the score?

5    A.    "This evidence supports the causal relationship by

6    demonstrating that conductivity greater than background levels

7    causes a consistent set of sensitive animals to be extirpated.

8    The prediction was statistically strong.  The effect is

9    specific enough to clearly separate groups by nonparametric

10   statistical methods into two different data sets.  Independent

11   data sets and investigators confirmed that different

12   assemblages of invertebrates occur with different stressors,

13   including neutral-to-alkaline waters with increased

14   concentration of ions.  The total score is plus plus plus."

15   Q.    Okay.  We get to a new category of sufficiency.  Can you

16   read the first two sentences where they describe what they are

17   talking about when they're referring to sufficiency.

18   A.    Well, "Because many agents are natural components of the

19   environment (for example, ions), a causal relationship must

20   show that there are thresholds or patterns of the effect to

21   the susceptible entities (for example, mayflies) associated

22   with the changing magnitude of exposure (for example,

23   conductivity).  In this section, we describe evidence that can

24   be credibly used to evaluate whether the level of ionic

25   concentration is sufficient to cause extirpation."

King - Direct

1   Q.   Now, read for me the title of that first category under

2   Sufficiency.

3   A.   "Laboratory tests of reconstituted mine discharges."

4   Q.   Okay.  Was the benchmark largely derived using laboratory

5   data?

6   A.   No.

7   Q.   Okay.  So if you could, read for me, so we get a clear

8   idea of how they're using laboratory data, read for me not

9   only the scoring but that whole section.

10  A.   All right.

11  Q.   It's a short one.

12  A.   Starting with "Kennedy" there?

13  Q.   Yes.

14  A.   "Kennedy et al. tested simulated coal mine discharge

15  waters in Ohio with the ephemeropteran *Isonychia bicolor*.  The

16  ionic matrix was dominated by sulfate, bicarbonate, and

17  sodium.  In 7-day lethality tests, the lowest observed effect

18  concentrations for survival of *Isonychia*" -- and these were

19  mid-to-late instars -- "at 20 degrees Centigrade occurred at

20  1,562, 966, and 987 microsiemens per centimeter in three

21  tests.  These values bracket the field-derived extirpation

22  concentration for *Isonychia* of 1,180 microsiemens per

23  centimeter."

24  Q.   Thank you.  And can you read for me the scoring under

25  that section.

King - Direct

1   A.    "The laboratory tests by Kennedy et al. establish that

2   the effect for one insensitive ephemeropteran species,

3   *Isonychia bicolor*, in the laboratory, occurred at a similar

4   conductivity level to that in the field.  A total score of

5   plus was assigned."

6   Q.    Okay.  Before I miss it, there was one sentence there at

7   the end that you did not read that refers to a difference in

8   temperature.  Can you read that for me?

9   A.    "However, when the assay was conducted at 12 degrees, the

10  lowest observed effect concentration was 4,973, suggesting

11  that longer exposures are needed before effects occur at cold

12  temperatures."

13  Q.    Okay.  Now, are they -- they're reviewing another

14  author's work, Kennedy; is that correct?

15  A.    Yes.

16  Q.    Are they interpreting Kennedy to say that temperature is

17  causing the impairment here?

18  A.    No.

19  Q.    Okay.

20  A.    I mean they're simply saying that at a cold temperature

21  of 12, physiologically the organism is -- basically its

22  metabolism is much slower and the effect would probably take

23  longer to be realized.  The organism is developing slower.

24  Everything is slower.  So it's sort of like the movie reel is

25  moving slower.  That's all.

King - Direct

1    Q.    The next category we'll look at is field exposure-

2    response relationships of composite metrics.

3        The scoring for that appears on PE 92.  Can you read that

4    for me?

5    A.    "The field observations show that as conductivity

6    increases, the number of Ephemeroptera and total number of

7    genera decrease and, thus, the concentration of ions in

8    streams is sufficient to cause effects.  The correlation is

9    strong to moderately strong depending on the data set.  The

10   effect was specific for the ionic mixture.  The correlations

11   were corroborated with independent data sets from different

12   streams sampled by different investigators.  A total score of

13   plus plus was assigned."

14   Q.    Okay.  The next is field exposure relationships of

15   composite indices.

16       Can you tell me which indices this is referring to and

17   then read the scoring?

18   A.    Yes.  They're referring to the WVSCI score here, and the

19   scoring, "This set of evidence indicates that, in multiple

20   data sets and by a variety of biological responses and

21   analytical methods, as conductivity levels observed in the

22   region increase, stream condition decreases, and the

23   assemblage of macroinvertebrates is different from best

24   available reference sites in the region.  This is supporting

25   evidence of sufficient ionic concentrations in the streams to

King - Direct

1   cause widespread effects.  The correlations are strong.  The

2   correlations were corroborated with different methods in four

3   independent studies.  A total score of plus plus plus was

4   assigned."

5   Q.   Okay.  And the last in this category is field exposure-

6   response relationships: susceptible genera.  Can you read the

7   scoring there?

8   A.   "The observed effects logically support the causal

9   relationship between increased conductivity and declining

10  occurrence of susceptible genera and indicate that effects

11  occur at relatively low conductivity levels.  The effect is

12  strong, with complete extirpation of many genera.  The results

13  were corroborated with independent data sets from Kentucky and

14  Virginia.  The total score is plus plus plus."

15  Q.   Okay.  The last major category they have is time order.

16  Can you read for me what they mean by time order?

17  A.   Well, "Logically, a causal event occurs before an effect

18  is observed.  Evidence of time order could be provided by

19  changes in the invertebrate assemblages after the introduction

20  of a source that increased conductivity.

21       "We could not obtain conductivity and biological survey

22  data collected before and after construction of a valley fill

23  or release of ion-rich effluents from other sources.  Hence,

24  this characteristic of causation is scored as no evidence,"

25  because they didn't have any.

King - Direct

1    Q.    Okay.   So they didn't have any pre-mining data?

2    A.    Apparently not.

3    Q.    Now, this analysis you now read very carefully, are they

4    just using the -- just looking at their own work and the

5    benchmark to do this causal analysis?

6    A.    I mean, very clearly, no.

7    Q.    And was there any evidence that they found that pointed

8    to a non-causal effect?

9    A.    No.

10   Q.    What would you say was the most common score given here?

11   A.    The highest, you know, the plus plus plus.   Basically

12   that's unequivocally strong causal evidence.

13   Q.    Okay.   Would you agree with this analysis?

14   A.    Yeah.   Yes, I would.   They outline -- they're very

15   thorough and they have multiple lines of evidence, and

16   absolutely.

17   Q.    Thank you.   Now, as part of their causal analysis, did

18   they also look at confounding factors?

19   A.    Absolutely.

20   Q.    Was that done in a separate paper?   Do you know?

21   A.    Yes, it was.

22   Q.    I'd like you, if you could, turn to Plaintiffs'

23   Exhibit 8.   And can you read for me the title of Plaintiffs'

24   Exhibit 8?

25   A.    "A Method For Assessing The Potential For Confounding

King - Direct

1    Applied" -- let me start over.  "A Method For Assessing The

2    Potential For Confounding Applied To Ionic Strength In Central

3    Appalachian Streams."

4    Q.    Was this work from another -- I believe you said earlier

5    that these publications were largely taken from work done in

6    the appendices of the benchmark.

7          Is this true of this paper as well?

8    A.    Yes.

9    Q.    Okay.  I want to actually refer to the work in the

10   benchmark in a little more detail.  Before we get there, can

11   you read in the published document, in the abstract, the

12   sentence that begins "Twelve potential confounders."

13   A.    "Twelve potential confounders were evaluated: habitat,

14   organic enrichment, nutrients, deposited sediments, pH,

15   selenium, temperature, lack of headwaters, catchment area,

16   settling ponds, dissolved oxygen, and metals."

17   Q.    And that describes, if you need a moment to look, the

18   analysis done in this paper and in the benchmark to your

19   knowledge?

20   A.    Yes.

21   Q.    I want to very quickly read the general approach they

22   took under the methods.  If you could, it's on the same page.

23   The first two sentences under General Approach.

24   A.    "We developed a weight-of-evidence approach for

25   evaluating potential confounders.  Both logical arguments and

King - Direct

1   statistical analyses are used to indicate whether an

2   environmental factor affects or does not affect our ability to

3   model the causal relationship.  If the body of evidence

4   indicates that the factor was not a potential confounder, no

5   action was taken."

6   Q.   Why don't you go on to read to the end of that paragraph.

7   A.   "If the body of evidence indicates that environmental

8   factor was a likely confounder, then the data set was

9   truncated to reduce the effect of the confounder."  That is,

10   they threw out data that might confound.  "Truncation removes

11   the observations for which the confounder was beyond its

12   threshold for effects.  Although it was not necessary in this

13   case, other methods might be used to adjust for any discovered

14   confounding of the causal relationship."

15   Q.   Is that similar to the approach you took in filtering

16   data in your "How Many Mountains" paper?

17   A.   Exactly.

18   Q.   Now, they provided a little more detail in this paper and

19   the benchmark.  So I want to refer, if I could, to benchmark

20   appendix B, which is the first joint exhibit notebook.  Again,

21   it's Joint Exhibit 58.

22   A.   Okay.

23   Q.   And actually first go to the first page of that

24   appendices or the appendix, Joint Exhibit 472, page 472.

25   A.   Yeah, I'm there.

King - Direct

1    Q.   Okay.  This shows this appendix is, as you said, the

2    analysis of potential confounders?

3    A.   Yes.

4    Q.   Okay.  I don't want to go through each one.  As we said,

5    there are 12.  But generally is the method they used to look

6    at confounding similar to the weight of evidence approach they

7    used for causation?

8    A.   It's similar, yes.

9    Q.   I want to look at how they analyzed two of the specific

10   potential confounders.  If you could, turn to page JE 493.

11   A.   Okay.

12   Q.   And we see a table with, this time, minuses.  The last

13   time we were looking at pluses, which I believe you said

14   indicated causation.  What do these minuses mean?

15   A.   Well, minuses mean that this is not likely to be a

16   confounder.  So if they had a plus, then it basically is

17   indicating evidence they may be confounding.

18   Q.   Okay.  And they looked at -- well, how many different

19   categories did they look at to determine whether temperature

20   was a confounding factor?  And that's -- it's all listed on

21   table B-20 on that page, 493.

22   A.   Here we go.  It's labeled 1, 2, 3, 5, 6, 7.  So there's

23   actually six, unless one of them has -- I don't know how that

24   numbering works.

25   Q.   I hadn't noticed that before.  Can you read through those

King - Direct

1    six --

2    A.    Sure.

3    Q.    -- types of evidence they used?

4    A.    So first is correlation of cause and confounder, and it

5    received a score of zero.  Temperature was moderately

6    correlated with conductivity year-round in the West Virginia

7    dataset, with an R of .39, but was weakly correlated in the

8    EPA dataset.  So that one received a score of zero.

9         So number 2, correlation of effect and confounder.  So in

10   this case, they're looking at the response of mayflies to

11   temperature.

12        Temperature was weakly correlated with Ephemeroptera

13   year-round in the West Virginia dataset and uncorrelated in

14   the EPA dataset.

15        Number 3, contingency -- and that received a score of

16   minus.

17        Contingency of high level -- of high level of cause and

18   confounder.  Okay.  So Ephemeroptera were present at 99 to

19   100 percent of sites that had low conductivity at both high

20   and low temperature.  In the high conductivity categories,

21   Ephemeroptera occurred in more sites with elevated

22   temperatures, which is contrary to expectations if temperature

23   were contributing to the impairment.

24        I believe it was like 56 percent of the sites at high

25   temperatures versus 33 percent, or something like that, at

King - Direct

1    low.  So that received a score of minus minus minus.

2         So the next one, 5, levels of confounders known to cause

3    effects.  Temperature limits are highly taxon specific, but

4    temperatures rarely exceeded the West Virginia limits for

5    reference sites, which is 30.6 degrees Centigrade May through

6    November and less than 22.8 degrees Centigrade December

7    through April.

8    Q.   I want to stop you there for a moment.  What does that

9    West Virginia limits for reference sites of 30.6 mean?

10   A.   It means that a site cannot be classified as a reference

11   site if temperature exceeds 30.6.  So the state recognizes

12   30.6 as a threshold where you're likely to see, for example,

13   effects on mayflies.

14   Q.   Thank you.

15   A.   And so they scored this a minus.

16        The next point, removal of confounders shows it is

17   important.  When high temperatures were deleted, the

18   correlation of conductivity and Ephemeroptera was unchanged,

19   with a negative .61 correlation.  Minus minus.

20        Then lastly, multivariate statistics.  Habitat quality,

21   temperature, and fecal coliform together had essentially no

22   effect on the slope in multiple regression.

23        So when they added in other factors on top of

24   temperature, they didn't see a change.  So that's minus minus.

25        And so the weight of evidence received a total score of

King - Direct

1    minus minus, almost the highest score it can receive,

2    moderately confident, none positive, some strongly negative.

3    No treatment for confounding.

4    Q.    Okay.  And you yourself in preparation for this case had

5    done some looking at potential response of temperature and

6    mayflies as they did here, did you not?

7    A.    I did.

8    Q.    If you could, we're going to go to the -- actually, it's

9    the same notebook.  Joint Exhibit 32.

10         And what is this graph?

11   A.    Okay.

12   Q.    First of all, where did it come from?

13   A.    Well, these are data that represent a subset of data from

14   the "How Many Mountains" paper, which was 223 sites that had

15   already been filtered for several variables.

16         What I did is I further screened that dataset to remove

17   samples that occurred during the spring, because to include an

18   analysis of temperature versus mayflies over the course of,

19   you know, March through August, temperature is going to be

20   changing rapidly in the spring.

21         In the summer, it tends to level off.  And even you can

22   see in Dr. Menzie's work where he looks at temperature.  You

23   see relatively similar temperatures, at least a range of

24   temperatures that's fairly flat.

25         So the goal here was to say, okay, here's the summer.

King - Direct

1   This is when things are going to be the warmest, and this is

2   where temperature is most likely to be a confounding factor.

3       So I looked at the number of mayfly taxa that occurred at

4   these sites; and it was roughly, I think, 133 sites that came

5   out of the 223.  And the relationship shows, even though I've

6   drawn a regression line through this just to show -- it's

7   really just a trend line.  I wouldn't want to try to say that

8   this is some sort of valid statistical relationship, because

9   it's not.

10      What I'm showing here is that as you go from low

11  temperatures -- so we've got some as low as around 12

12  degrees -- all the way up to levels around 28 degrees

13  Centigrade, you find a similar range of mayflies, okay?

14      So mayflies are, as Dr. Menzie has said in the past, the

15  group that mostly drives the WVSCI response.  And here we have

16  mayflies occurring at similar levels across all temperatures

17  that are measured in this dataset.

18      So as I've said in the past, I don't think temperature --

19  snapshot temperature data from this kind of dataset are very

20  reliable in the sense that they're telling us that, you know,

21  you just see a value of -- for example, I see a value of 18.

22  I don't have a lot of certainty that that represents the

23  thermal regime at that site.  But when I see a value of 28,

24  that means that that's a site that likely consistently gets

25  pretty warm, okay?  You can't have a high value and -- I mean

King - Direct

 1   it wouldn't just blip up like that and never come back to that

 2   level.

 3         So high value, you've got high value, yet we still see up

 4   to 10 mayfly taxa at a site near 28 degrees C.  So seeing this

 5   result alone tells me that in addition to all the other stuff

 6   the EPA has done, to say that temperature is really -- might

 7   be the confounding behind-the-scenes like leading to all these

 8   changes, is ridiculous.

 9   Q.   I want to ask you one thing here I want to clarify.  Will

10   you look at the labels you have for the axes?  Are those

11   correct?

12   A.   No.  I don't know how that happened.

13   Q.   Can you tell us what they're supposed to be?

14   A.   Yeah.  The X axis is supposed to be temperature, and the

15   Y axis is the number of mayfly taxa.  So --

16   Q.   X would be horizontal?

17   A.   What's that?

18   Q.   X would be horizontal?

19   A.   Yes.  The horizonal axis is temperature in degrees

20   Centigrade, and the X axis is the number of mayfly taxa.  I

21   don't know how that happened, but thank you for pointing that

22   out.

23   Q.   Let's move back a tab to Joint Exhibit 31.

24   A.   Okay.

25   Q.   And what does this graph represent?

King - Direct

1   A.    So this is the same 133 sample points just from summer.

2   So they also have just a snapshot of conductivity.  And it is

3   the relationship -- again, this case, it says specific

4   conductivity, and the Y axis's number should say number of

5   mayfly taxa.  And the relationship that you see is basically a

6   very sharp, non-linear decline in the number of mayfly taxa as

7   conductivity increases.  The relationship is strong.

8        Again, I fit a trend line here just to give you an idea

9   of how strong it is.  But the bottom line is, if you contrast

10  this graph with the preceding graph, the one we just looked

11  at, it's fairly clear that even though this is snapshot data,

12  a one-time measurement of conductivity, when you have a high

13  conductivity value, that's indicative of a site that probably

14  is affected by alkaline mine drainage, and we don't find

15  mayflies there.

16       We have a high-temperature site, which is a site that

17  likely is affected to some degree by high temperatures.  We're

18  just as likely to have lots of mayflies there as we are at a

19  low-temperature site.

20       So I guess if I saw this graph, but it was -- the

21  relationship was like this for temperature, I would be willing

22  to say, yeah, I think temperature is a confounding factor,

23  but --

24  Q.    It's clearly not.

25  A.    It's clearly not like that at all.  So I mean I would be,

King - Direct

1   like, there's clearly something going on here and at a

2   minimum we need to consider temperature as a confounding

3   factor if it looked like this.  But it doesn't look anything

4   like this.

5   Q.   All right.  Thank you.

6        MR. HARVEY:  Your Honor, whenever there's a good

7   breaking point, counsel could use a comfort break.

8        MR. BECHER:  I'm going to transition to a new topic.

9   So this is --

10       THE COURT:  All right.  We'll take a ten-minute

11  recess.

12       You may step down.  Don't discuss your testimony.

13       (Recess from 10:28 a.m. to 10:45 a.m.)

14       THE COURT:  All right.  You may resume.

15       MR. BECHER:  Thank you, Your Honor.

16  BY MR. BECHER:

17  Q.   I believe when we left off, we'd gone through the

18  benchmark analysis of the confounding factor of temperature.

19  I want to go through next the treatment for deposited

20  sediment.  If you could, turn to Joint Exhibit 486.

21  A.   Joint Exhibit page?

22  Q.   JE 486.

23  A.   Okay.

24  Q.   Can you look at table B-14 for me?

25  A.   Okay.

King - Direct

1   Q.   Is that the weight of evidence analysis they did for the

2   confounding factor -- potential confounding factor of

3   deposited sediment?

4   A.   Yes.

5   Q.   Can you read through that table for me?

6   A.   Okay.  Number 1, correlation of cause and confounders.

7   So this would be conductivity versus embeddedness, which was

8   the metric of deposited sediment.

9        The West Virginia embeddedness score was weakly

10  correlated with conductivity.  So it received a score of

11  minus.

12       Okay.  Correlation of the effect; that is, the number of

13  mayflies.  And the confounder; that is, embeddedness.  The

14  embeddedness score is weakly correlated with Ephemeroptera.

15  It received a score of minus.

16       Contingency of high level of cause and confounder.  In a

17  contingency table, see table B-13, high embeddedness scores,

18  that is, greater than 15, which is in this case a good frame

19  they score it.  So meaning 15 is low.  And actually it doesn't

20  have that high of embeddedness.

21  Q.   Thank you.

22  A.   "Has little effect at either high or low conductivity."

23  Q.   Okay.  And the last?

24  A.   Removal of confounder.  "When samples within an

25  embeddedness score less than 13 are removed from the analysis,

King - Direct

1   the correlation of conductivity with the number of

2   Ephemeroptera was virtually unchanged."

3       So they removed scores that were less than 13, which is,

4   actually -- you know, 10 to 13 is still considered to be in

5   the suboptimal, which isn't necessarily bad; removed all the

6   samples that had embeddedness scores from zero to 13, and it

7   had no effect on the relationship between conductivity and

8   mayflies.

9   Q.   So what was their overall score for this weight of

10  evidence approach?

11  A.   Three minuses.  They were very confident, all negative,

12  some strongly.  No treatment for confounding.

13  Q.   Okay.  And do you think this is a -- do you agree with

14  this method for analyzing the confounding factor, the

15  potential confounding factor of deposited sediment?

16  A.   Yes, I do.  I mean I think they looked at it in multiple

17  ways, and it's pretty clear that the relationship between

18  conductivity and mayflies is not -- it's not being modulated

19  or influenced by embeddedness, nor is it being caused by

20  embeddedness.

21  Q.   Thank you.  Now, you have read, I believe, a reference in

22  Cormier and Suter's paper, did the one on causation to a

23  laboratory study.  Do you remember that?

24  A.   I do.

25  Q.   Were there any other laboratory studies besides the

King - Direct

1   Kennedy paper reference there that you know of?

2   A.   There's a paper by Kunz et al., Kunz, where they --

3   Q.   If you could, let's turn to Plaintiffs' Exhibit 10 in the

4   plaintiffs' exhibit notebook, not the joint exhibit.

5   A.   Okay.

6   Q.   Is that the Kunz paper you were referring to?

7   A.   Yes, it is.

8   Q.   And in the abstract, there is a sentence that begins with

9   "Two of the reconstituted waters."  Can you read that sentence

10  for me?

11  A.   "Two of the reconstituted waters had ionic compositions

12  representative of alkaline mine drainage associated with

13  mountaintop removal and valley fill-impacted streams."  And

14  there it names Winding Shoals and Boardtree.  They had

15  elevated magnesium, calcium, potassium, sulfate, and

16  bicarbonate, and a third reconstituted water had an ionic

17  composition representative of neutralized mine drainage, that

18  is, Upper Dempsey, with elevated sodium, potassium, sulfate,

19  and bicarbonate.

20  Q.   Are you familiar with the location of Boardtree Branch?

21  A.   Yes.  It's just to the west of Stillhouse Branch.

22  Q.   About how far?

23  A.   I mean it's immediately -- it's the next watershed over.

24  I mean the watersheds come in contact with each other.

25  Q.   If you could, turn to later in that article, page PE 144.

King - Direct

1  A.   Yes.

2  Q.   If you look at table 2, can you tell me what table 2

3  represents?

4  A.   Sure.   In table 2, they outline the three different sites

5  and -- you know, in rows.   And within those three sites, they

6  have the different types of water that they analyzed, whether

7  it was the full-strength reconstituted water or diluted water,

8  for example, 10 percent or 50 percent strength.

9       And then the data in the table represent the survival and

10 either, like, the number of offspring or the growth of the

11 organisms exposed to these different types of waters.   And

12 there are four different types of organisms, the cladoceran,

13 which is a standard *Ceriodaphnia*.   Then they use a freshwater

14 mussel, unionid mussel, which is really a neat application

15 because it's not a standard, but it is a stream-dwelling

16 organism.

17      They also used an amphipod *Hyalella azteca*, which is a

18 standard ecotox model organism, and then also used a mayfly.

19 And this is also -- this is the non-standard ecotox model

20 organism.   It's one that this particular lab has been using.

21 It's called *Centroptilum*, and it turns out as one that occurs

22 frequently in streams in Appalachia.

23 Q.   What is -- if you could, I know that they've got

24 amphipod, and then they give the scientific species name.   Can

25 you tell us in layman's terms what an amphipod is?

King - Direct

1   A.   An amphipod is a -- oh, a layman's name would be a scud

2   or a sideswimmer.   It's a little crustacean, a shrimp-like

3   organism that's probably no bigger than your fingernail on

4   your pinky.

5   Q.   And let me back up for a second to be clear.   Were these

6   tests done in the field or in a laboratory?

7   A.   These are laboratory tests.

8   Q.   Okay.   I want you to focus in on the results for the

9   mayfly.

10  A.   Okay.

11  Q.   Can you just briefly first tell me what they found with

12  the mayfly, and then read for me the results as they appear in

13  the chart.

14  A.   Okay.   Well, they measured survival in terms of the

15  percentage of individuals and the biomass of the mayfly.   And

16  this was a 35-day test.   So it was the entire lifespan of the

17  immature.   So from right when they hatched, they took the

18  early instars and subjected them to the different mine waters

19  and controls.   And they grew them for 35 days, all the way

20  until emergence when the mayfly actually becomes an adult

21  winged organism and flies.

22      And what they found was at Winding Shoals and Boardtree,

23  the controls have 84 and 80 percent survival.   And the biomass

24  had -- was 8.5 and 8.9, on average, milligrams per individual.

25  So that's control water.   So it's basically reconstituted

King - Direct

1    water that lacks these ions or at least very low

2    concentrations.

3         Then they looked at the mine water, and they had -- at

4    Winding Shoals, they had --

5    Q.   Well, let's just focus on Boardtree.

6    A.   Okay.  Well, they took Boardtree and they looked at

7    full-strength water and 50 percent diluted water.  And at

8    full-strength water, no mayflies survived.  And at 50 percent

9    diluted water, 37 percent survived.  And the ones that did

10   survive only weighed 3.7 milligrams.  So they were less than

11   half the mass or size of the ones that were in the control

12   water.

13   Q.   Thank you.  If you could, turn in the same exhibit to

14   page PE 148.

15        Now, if you could, read for me the sentence that appears

16   in the middle paragraph in the first column and begins with

17   "The Winding Shoals and Boardtree reconstituted waters."

18   A.   Okay.

19   Q.   It's most of the way down the paragraph.

20   A.   All right.  "The Winding Shoals and Boardtree

21   reconstituted waters were toxic to *L. siliquoidea*, *H. azteca*,

22   or *C. dubia* at conductivities ranging from about 500 to 2400

23   microsiemens per centimeter.  The Upper Dempsey reconstituted

24   water" --

25   Q.   Okay.  Excuse me.  I actually want you to go in the

King - Direct

1    paragraph before that.  Sorry for not directing you well.

2    It's actually the sentence towards the end of that paragraph

3    that's talking about the *triangulifer*.

4    A.    Yeah.   There's another sentence that starts exactly the

5    same.  My apologies.  So at this point you're referring me

6    back just a few sentences up in that paragraph, correct?

7    Q.    Right.

8    A.    "The Winding Shoals and Boardtree reconstituted waters

9    were toxic to *C. triangulifer*," which is *Centroptilum*, the

10   mayfly, "at a conductivity of about 800 to 1300 microsiemens

11   per centimeter with elevated concentrations of magnesium,

12   calcium, sodium, potassium, sulfate, or bicarbonate.  It is

13   interesting to note that the regional 95 extirpation

14   concentration based on conductivity for the *Centroptilum* in

15   the benthic community field surveys was determined to be

16   1092."

17        And in this case, they're referring directly to the

18   benchmark document and those papers.

19        "However, the genus *Centroptilum* was not among the more

20   sensitive taxa used to derive the regional benchmark."  That

21   is, 56 of the native taxa had extirpation concentration values

22   that were less than that of *Centroptilum*."

23   Q.    So are they saying here that the results they found in

24   the lab were similar to the results that were measured by

25   field data?

King - Direct

1  A.    Yeah.  Basically the field value fell right in the middle

2  of the range that they found in the lab for *Centroptilum*, yes.

3  And it's also noted that it's, you know, one of the more

4  tolerant species, and they end up with a value that is pretty

5  high, but, again, it was high in the field as well.

6  Q.    And next, if I could switch over to the next column, the

7  last paragraph there where it's talking about the ionic

8  composition of Winding Shoals and Boardtree reconstituted

9  waters.  Can you read that sentence?  It's about two-thirds of

10  the way through that last paragraph.

11  A.    "The ionic composition of the Winding Shoals and

12  Boardtree reconstituted waters are characteristic of

13  mountaintop-mining-impacted streams, and *C. triangulifer* is

14  representative of native Appalachian taxa, albeit more

15  tolerant to elevated conductivity based on benthic community

16  survey data.  Future studies should focus on identifying

17  the" --

18  Q.    That's fine.

19  A.    Okay.

20  Q.    Thank you.  I want to move on to some of the

21  site-specific evidence we have in the case.  Let's first talk

22  about biological impairment.

23       I believe that Dr. Palmer testified yesterday that

24  Stillhouse Branch was recognized by the West Virginia DEP as

25  biologically impaired.  Do you recall that?

King - Direct

1   A.   Yes, I do.

2   Q.   Do you know if this impairment extends down to the next

3   order stream, Twentymile Creek?

4   A.   Twentymile Creek I believe is impaired, yes.

5   Q.   Okay.  If you could, turn to Joint Exhibit 53.  Can you

6   tell me what this document is?

7   A.   It's called Total Maximum Daily Loads for Selected

8   Streams in the Gauley River Watershed, West Virginia.

9   Q.   And are you familiar with total maximum daily load?

10  A.   Yes.

11  Q.   Can you just briefly and generally describe what TMDL,

12  the total maximum daily load, is?

13  A.   Well, it's basically a watershed-specific like a

14  management plan for a specific type of like a sediment or a

15  nutrient or something along those lines.  It's essentially how

16  much can go into that system.

17  Q.   Why do they do it?

18  A.   They do it to limit impairments because there's usually

19  an impairment of some type in a water body; and they

20  basically start restricting something so that they can restore

21  it or at least get it so that it is not classified as being

22  impaired.

23  Q.   If you turn to, in that exhibit, JE 235, please.  This is

24  table 3-3.  What is this table?  Just read the heading there.

25  A.   "Water bodies and impairments for which TMDLs have been

King - Direct

1    developed."

2    Q.    Okay.  Can you move over two pages to JE 237, please?

3    A.    Okay.

4    Q.    Can you tell me the recognized impairment for Twentymile

5    Creek itself?

6                MR. HARVEY:  Your Honor, same objection as

7    yesterday.  There's no claim here against Twentymile.

8                THE COURT:  Was there no reference in the reports to

9    Twentymile Creek or conditions there?

10               MR. BECHER:  One minute, Your Honor.

11        Your Honor, I believe the objection yesterday was

12   different.  The objection yesterday was it was outside the

13   scope of cross.

14        This is direct, and I think Mr. -- or, excuse me -- Dr.

15   King has testified about the extent and the type of biological

16   degradation downstream from valley fills.  We just want to

17   show how far this one is extending.

18               THE COURT:  Well, I disagree.  I took yesterday's

19   objection to be both that it wasn't -- it was beyond the

20   scope, meaning that you all didn't -- the defense didn't do

21   anything to elicit testimony about Twentymile Creek and that

22   the expert hadn't indicated opinions or findings relative to

23   Twentymile Creek as part of their report.  And that's the way

24   I take this objection.

25        So if it's not somewhere in his report or in the findings

King - Direct

1   that the expert has referred to, then I don't think you can

2   get into Twentymile Creek.  I know that Stillhouse feeds into

3   it.  Obviously you can have him testify about how Stillhouse

4   Branch is characterized under the 303(d) list, but not beyond

5   that.

6           MR. BECHER:  Your Honor, I would point out, if you

7   turn to the stipulation, the facts that we had agreed upon and

8   filed with this Court, we do have a stipulation --

9           THE COURT:  Where is that?

10          MR. BECHER:  It's Joint Exhibit 43.  That not only

11  Stillhouse Branch but Twentymile Creek is impaired.

12          THE COURT:  What paragraph?

13          MR. BECHER:  It's page JE 129.15.

14          THE COURT:  Did you say which paragraph?

15          MR. BECHER:  15.  "Both Stillhouse Branch and

16  Twentymile Creek downstream of that branch" --

17          THE COURT:  All right.  Well, it's clear that

18  Twentymile Creek is listed as impaired.  The stipulation goes

19  no further than that.  I'm not going to let you get into

20  testimony or opinions about whether the impairment of

21  Twentymile Creek is related to or caused by Stillhouse.  It

22  doesn't seem to me that it would matter either way.

23          MR. BECHER:  That's the only point I wanted to make,

24  Your Honor.  Thank you.

25          THE COURT:  Fair enough.

King - Direct

1   BY MR. BECHER:

2   Q.   I'm making this difficult on myself.  Have you looked at

3   the chemical data for Stillhouse Branch in this case?

4   A.   Yes.

5   Q.   Will you turn actually to the same exhibit I was speaking

6   with the judge about, Joint Exhibit 43.

7   A.   Okay.

8   Q.   At point 9 -- it's on the second page of the

9   stipulation -- there's a chart of conductivity and sulfate.

10  Can you tell me what that chart represents?

11  A.   This is baseline data prior to the mine.  So this is in

12  the mining permit application.  And at the mouth of Stillhouse

13  Branch, they have six conductivity and sulfate measurements,

14  as they did it six times over -- these are monthly samples.

15  Q.   I don't need you to read all of them, but can you tell me

16  generally --

17  A.   Yeah.  Well, the range is 47 to 104 microsiemens per

18  centimeter conductivity, and 4 to 22 milligrams per liter

19  sulfate.

20  Q.   In your opinion -- you said this was baseline data.  Is

21  this the kind of pre-mining data that Cormier and Suter were

22  missing in their causation analysis?

23  A.   It is.  I mean, it is.

24  Q.   Let's see what happens.  Can you turn to the chart under

25  point 11.

King - Direct

1    A.    Okay.

2    Q.    And what does this data represent?

3    A.    These are samples that begin in July 1998 following

4    construction of the mine, and that's also conductivity and

5    sulfate data that's taken it looks to be almost weekly.  Well,

6    they have one value in 1998, and there's mostly weekly data

7    starting in 2003.

8    Q.    Okay.  And what has happened to the conductivity and

9    sulfate levels here?

10   A.    Well, I mean 1998, right after the mine was constructed,

11   it had jumped up to 511.  And then by 2003, the values were,

12   for example, 3794.  Most of them are two to three thousand

13   here.  Yeah, pretty consistently in the two to three thousand

14   range, with sulfate levels in the one to two thousand

15   milligrams per liter range.

16   Q.    How does that compare with the pre-mining data?

17   A.    It's -- you know, in order of magnitude increase, it's

18   very different.  So pre-mining data at this site looked like

19   an unimpaired reference stream in terms of the -- at least for

20   those two.

21   Q.    Actually, in most cases it's two orders of magnitude; is

22   that --

23   A.    Yeah.  Yeah.  Sulfate for sure.

24   Q.    Also if you turn to JE 129.16, there's another chart.

25   A.    Okay.

King - Direct

1    Q.    And what does this data represent?

2    A.    This is more discharge data from the mine.

3    Q.    I want to be clear.  This is -- clearly it says discharge

4    data from Outlet 29.  The previous chart we looked at, was

5    that discharge data or in-stream data?

6    A.    I thought it was actually at the outlet of the stream.

7    At the mouth of Stillhouse Branch, yes.

8    Q.    So 11 was at the mouth of Stillhouse Branch, and 16 is

9    from the outfall --

10   A.    That's right.

11   Q.    -- from the mine.  And are those numbers fairly

12   consistent?

13   A.    Yes, they are.  They're all -- most of them are in the

14   two to three thousand range.  There's one value of 763.

15   Interestingly, one had dropped all the way to 307.  That's

16   illustrating how occasionally during rain events you can have

17   massive dilution; and if you take a snapshot into the

18   conductivity value, that's a source of some of the noise in

19   our analysis.

20   Q.    And so this again is showing in sort of a time order

21   sequence that conductivity as a result of mining is

22   drastically increased in Stillhouse Branch.

23   A.    Yeah.  Yes.

24   Q.    Let's look at biological data next.  If you could, it's

25   in the second joint exhibit notebook.  Turn to Joint Exhibit

King - Direct

1    62.

2            MR. HARVEY:  Objection, Your Honor.  It was pretty

3    clear in the deposition that Dr. King had not reviewed this

4    data.  I asked him if he had any -- reviewed any pre-mining

5    data.  He said no.

6       Mr. Lovett placed the data in front of him and said, "Do

7    you remember this data now, Dr. King?"  And he said, "Oh,

8    yes."  He reviewed it during his deposition and then commented

9    on it.  It was not part of his expert report in any way.

10           MR. BECHER:  This was -- he was deposed on this

11   document, and he did in his expert report refer to

12   conductivity tolerances with individual taxa, which is exactly

13   what I want to go over with him here.

14           THE COURT:  Well --

15           MR. HARVEY:  What document are you looking at, Mike,

16   just to be clear?

17           MR. BECHER:  The Bethlehem Mine.

18           MR. HARVEY:  Okay.  It's not --

19           THE COURT:  I couldn't hear you.  What did you say?

20   Which document?

21           MR. BECHER:  The Joint Exhibit 62, the Bethlehem

22   Mine Corporation.

23           THE COURT:  And what is this?

24           MR. BECHER:  This is baseline environmental data

25   that was taken by a mining company in this watershed prior to

King - Direct

 1    mining.

 2            THE COURT:  All right.  Prior to mining.  And you're

 3    saying that it wasn't provided to or relied upon by Mr. King

 4    in forming his report.

 5            MR. BECHER:  It was not mentioned in his report, but

 6    he was given this document in deposition and deposed about it.

 7            MR. HARVEY:  He was given the document by Mr.

 8    Lovett, Your Honor.  And I have the section of the transcript

 9    right here.

10            THE COURT:  Is that accurate?  He didn't have the

11    report prior to the deposition?

12            MR. BECHER:  I believe it was Mr. Harvey that gave

13    him this document.

14            MR. HARVEY:  No, it was not, Your Honor.  If it

15    would help, we can put the transcript on the screen.

16        Not until he asks.

17            MR. BECHER:  If I'm -- if I may, Your Honor,

18    Mr. Lovett has just refreshed my memory and is telling me that

19    even if he's the one that physically handed over this

20    document, we obtained this information from the defendants.

21            THE COURT:  Well, here's my problem:  And I'm not

22    questioning the authenticity of the document or those things.

23    The problem is this:  If the expert is expected to be

24    providing opinions based upon his review of the document, then

25    it sounds like he didn't have the document until he'd already

King - Direct

1   formed his opinions until he was being deposed.

2          MR. HARVEY:  Your Honor, would it help if I showed

3   the transcript from deposition?

4          MR. BECHER:  Your Honor, we didn't have this

5   document until deposition.  I mean this is a document that the

6   defendants had in their possession that we didn't get until

7   deposition and then had a chance to depose him about it.

8          MR. HARVEY:  I can also --

9          THE COURT:  Well, all right.  We're going to get too

10  far afield.  Is there another subject or area you could switch

11  to at this point and they we'll come back to this?

12         MR. BECHER:  This is actually my last topic, Your

13  Honor.

14         THE COURT:  All right.  Well, so was there anything

15  in the doctor's report where he discussed pre-mining

16  conditions or reports of sampling or testing pre-mining other

17  than the ones you've already gone through that are part of the

18  stipulation?

19         MR. BECHER:  He did not specifically discuss

20  pre-mining data, but he did discuss the conductivity

21  sensitivity of the species that we were able to have from our

22  information that we now know are there and testified about

23  this topic that it is the less tolerant, less sensitive

24  species that we're now finding at Stillhouse Branch.

25         THE COURT:  Well, you've confused me.  So you want

King - Direct

1    to ask him questions about this nature of the species, the

2    characteristics of the species that are found there now.

3            MR. BECHER:  I want to ask -- I want to compare the

4    species there now versus the species that were there in this

5    baseline data.

6        Mr. -- or, excuse me -- Dr. King clearly notes in his

7    report that he would be talking about this subject, species

8    tolerance, genera tolerance to conductivity, using the

9    available data that we have, current data.  And at the

10   deposition, we were provided this document.  And the

11   defendants had the opportunity to depose him on this document

12   as well, which contains similar information for pre-mining

13   conditions.

14           THE COURT:  All right.  Mr. Harvey?

15           MR. HARVEY:  Mr. Tyree I think can put the

16   transcript up on the screen from the deposition.  I can clear

17   this up.

18           THE COURT:  Go ahead.

19           MR. HARVEY:  This is Mr. Lovett's examination of

20   Dr. King after I deposed him.

21       Question:  Mr. Harvey asked if you looked at any

22   pre-mining benthic data at Stillhouse in his questioning.  Do

23   you recall that?

24       Answer:  Yes, I did.

25       I think you said you don't recall any; is that right?

King - Direct

 1        Answer:  I did say that.

 2        Do you remember, though, the 1977-78 Bethlemen Steel

 3   study that was discussed at the *Muttley* trial?

 4        I think he meant the *Elk Run* trial.

 5        Yeah.

 6        Here, I'm going to hand it to you now and see if that

 7   refreshes your recollection and if there are any data that

 8   you've seen before about the pre-mining.

 9        Your Honor, this wasn't something we provided them at the

10   deposition.  This was something from the *Elk Run* trial they

11   brought and tried to present Dr. King with.  It wasn't part of

12   his report in any way.

13              THE COURT:  Well, wait a minute.  That just said

14   that you're the one that handed him this exhibit.

15              MR. HARVEY:  That's Mr. Lovett.

16              THE COURT:  Oh, I'm sorry.  Go through it again.

17              MR. HARVEY:  Mr. Lovett is saying, "I think you said

18   you don't recall any; is that right?"

19              THE COURT:  Oh, I understand now.

20              MR. HARVEY:  Then Mr. --

21              THE COURT:  So your assessment of this is that the

22   witness acknowledges having seen this but for the purposes of

23   some other case, in another trial.

24              MR. HARVEY:  And Mr. Lovett puts it in front of him

25   and asks him if that refreshes his recollection.  There was

King - Direct

```
 1    nothing that he --
 2              MR. BECHER:  Well, we'll just talk about the current
 3    data.
 4              THE COURT:  Yes.  I mean it seems to me if this
 5    document was presented to the witness at his deposition, it
 6    seems clear that he didn't have it before and he didn't form
 7    opinions based upon it, and so I don't think that he can add
 8    that at a deposition, especially when it's presented in this
 9    fashion, and use that as a basis for testimony at trial.  I
10    sustain the objection.
11    BY MR. BECHER:
12    Q.   Okay.  If I could, first let me bring up a figure in your
13    report.  Please turn to Joint Exhibit 33.  And this was a
14    chart that appeared in your rebuttal report; is that correct?
15    A.   Yes.
16    Q.   Can you tell me about this chart?
17    A.   This is the list of taxa that were found in the Fall of
18    2013, I believe, by Chris Swan.
19    Q.   And are those the Swan data that Dr. Palmer testified
20    about yesterday?
21    A.   Yes, I believe they are.
22    Q.   And what did you find in reviewing these data?
23    A.   Well, that the taxa that were present represented a list
24    of only highly conductivity-tolerant taxa.  So -- and, in
25    fact, several of these on this list are the same ones that we
```

King - Direct

1   found when we -- in the "How Many Mountains" paper that were

2   predictable increasers, that is, what we tend to find at high

3   conductivity sites.

4        So the conductivity thresholds for these taxa, the lowest

5   one is *Leuctra*, which is that stonefly that we tended to only

6   find one of every time at these sites, but we do tend to find

7   it there, and it happens to be a very conductivity-tolerant

8   stonefly and --

9   Q.   How tolerant?

10  A.   Well, it's basically set at greater than 2087.  So

11  basically it kind of increases, and, you know, it could be

12  even higher.  Its extirpation could be even greater than 2087

13  is what they're saying, but it's at least 2000.

14  Q.   These are all highly tolerant for conductivity in your

15  opinion?

16  A.   Yeah.  Some of them are set at 11,000.  So I mean it's --

17  they're all very highly tolerant.

18  Q.   And let's actually turn back to the Swan family data.  I

19  believe that is Joint Exhibit 50.  Excuse me.  This is the

20  genus-level data that I wanted to go to, but I said

21  family-level data.  But it's Joint Exhibit 15, page JE 50.

22  A.   Okay.

23  Q.   Again, this is the list of genera that Chris Swan found

24  at Stillhouse Branch; is that correct?  Is that your

25  understanding?

King - Direct

1   A.   Well, it says from Pennington & Associates, but, yeah, I

2   believe that's right.   Yes.

3   Q.   Okay.   Do you see any mayflies?

4   A.   No.

5   Q.   And I think you'd said previously that that was one of

6   the indicators of high conductivity, the absence of mayflies?

7   A.   Yeah.   I mean, again, sites that have low conductivity,

8   less than 200 in the West Virginia database, have mayflies

9   basically a hundred percent of the time, at least one mayfly

10  genera, genus; and there's none, none here.

11  Q.   Can you tell me if any of the species that you see --

12  excuse me -- any of the genera you see here are of the kind

13  that you or Pond or others found to be sensitive to

14  conductivity?

15  A.   No.

16           THE COURT:   You're looking now at --

17           MR. BECHER:   Still on the same chart, page JE 50.

18           THE WITNESS:   No, I mean these are not -- these are

19  not sensitive taxa.   I mean these are the toughest of the

20  bunch.

21  BY MR. BECHER:

22  Q.   When it comes to conductivity?

23  A.   Exactly.

24  Q.   Do you see any that were on the list of taxa expected to

25  increase or do well in high conductivity waters?

King - Direct

1    A.    Yes, several of these.

2    Q.    Can you point just a few of those out?

3    A.    Yes.  *Ceratopsyche*, *Cheumatopsyche*, *Hydropsyche*,

4    *Hydroptila*, *Cricotopus*.  I mean, yeah, there's several here

5    that are predictably, you know, good indicators of high

6    conductivity sites.

7    Q.    Okay.  So would you say this fits within the pattern

8    established in the literature of species you would find in a

9    stream that's degraded by conductivity?

10   A.    Yes.  And I also note that most of these are -- you'd

11   categorize as clingers.  That would be taxa that you'd find

12   with good -- a good high-flowing stream, with minimal

13   sedimentation, and lots of interstitial spaces between the

14   rocks for habitat.

15        Clingers are usually ones that are impacted greatly by

16   habitat degradation related to, for example, sedimentation.

17        And, again, this leutrid we know from our Maryland work

18   that Matt Baker and I published is remarkably sensitive to

19   urbanization gradients where you have high embeddedness,

20   flashy flow, habitat degradation.  It disappears at very low

21   levels of urbanization, and yet it's one of the most tolerant

22   to conductivity.

23        So it's a good way of -- you know, multiple lines of

24   evidence sort of showing that some of the things here aren't

25   necessarily just tolerant of everything.  They're specifically

King - Direct

1   tolerant to this mixture of ions.

2   Q.   And I don't want to go back through it, but did you also

3   review the chemical data that was taken by Mr. Evan Hansen and

4   the physical habitat assessment that was done by Dr. Chris

5   Swan --

6   A.   Yes.

7   Q.   -- in forming your opinions here?

8   A.   Yes.

9   Q.   Based on your review of this data and all of those data,

10  do you have any doubt that it is conductivity that's causing

11  the impairment in the stream?

12  A.   I mean the bottom line is conductivities at this level

13  will unequivocally impair a stream.  So the habitat that was

14  measured at this site scored a 130, which is in the

15  suboptimal, but, you know, it's a fairly average value for

16  streams.  It's not considered bad.

17       All the other data that was measured, you know, dissolved

18  oxygen, things of that nature, were well within range.  And,

19  again, the temperature data at this site suggests it gets up

20  to 23, 24 degrees C.  That is in no -- no way result in this

21  level of impairment.  It just simply would not.

22       And I mean I think the graph that I showed earlier

23  showing streams with, you know, 28 degrees and, you know, 10

24  mayfly taxa alone completely blows that argument out of the

25  water.  I mean it just -- that alone just completely

King - Direct

1   demonstrates that temperature is not confounding this.

2          MR. BECHER:  Thank you.  If I may have a moment,

3   Your Honor.

4          THE COURT:  You may.

5   BY MR. BECHER:

6   Q.   Is there anything else that you'd like to explain to the

7   Court to sort of clarify about your opinion?

8   A.   I mean I guess my opinion is based on just multiple lines

9   of evidence ranging from what's become a very large body of

10  literature, my own data analysis, my own review of the data at

11  this site, looking at the specific list of taxa that are

12  present at this site, my awareness of the taxa that were there

13  before.

14        Collectively I believe there is a consensus in the

15  scientific community not only of general causation that

16  conductivity is, in fact, the principal cause of biological

17  degradation below alkaline mine drainage -- with alkaline mine

18  drainage, and in this particular site there's specific

19  causation that is, to me, unequivocally the principal cause is

20  conductivity associated with the mine, and that if you were to

21  reduce the conductivity to a level of, say, 200, that you

22  would see a dramatic increase in the number of sensitive taxa.

23        You know, it might require restoration efforts in terms

24  of bringing taxa to actually see that area, but I think you

25  would see increases and potentially the site would no longer

King - Direct

1    be impaired.

2         However, if you were to, for example, lower the

3    temperature by two or three degrees consistently, my opinion

4    is that it would have absolutely no effect on this stream.  It

5    would not restore the stream.  It would still be biologically

6    impaired.  I'm absolutely convinced that is the case.

7    Q.   Do you hold the opinions you've expressed today to a

8    reasonable degree of scientific certainty?

9    A.   Yes.

10        MR. BECHER:  Nothing further.

11        THE COURT:  All right.  We'll go ahead and take an

12   early lunch break at this time.  It's 11:30.  Let's take a

13   break until 12:30.

14        You may step down.  Don't discuss your testimony with

15   anyone.

16        We'll stand in recess until 12:30.

17        (Lunch recess from 11:30 a.m. to 12:35 p.m.)

18                      AFTERNOON SESSION

19        THE COURT:  All right.  Are we ready?

20        MR. HARVEY:  Yes, Your Honor.

21        THE COURT:  All right.  Dr. King, if you'll resume

22   the stand.

23        MR. MCLUSKY:  Your Honor, I think that the agreement

24   is Dr. Palmer cannot be present during this.

25        THE COURT:  That's my understanding.  The parties

King - Cross

1    agreed that experts would not be present during the cross-

2    examination of their fellow experts.

3         All right.  Mr. Harvey, go ahead.

4                      CROSS EXAMINATION

5    BY MR. HARVEY:

6    Q.   Good afternoon, Dr. King.

7    A.   Hello.

8    Q.   We discussed at your deposition the West Virginia Stream

9    Condition Index is based on conditions in West Virginia

10   reference streams, correct?

11   A.   Correct.

12   Q.   And I think you told me that WVSCI scores essentially

13   measured departures from those reference stream conditions,

14   correct?

15   A.   WVSCI scores measure the biological condition of the

16   stream, and the scoring of it is relative to a set of sites

17   that were considered to be reference sites, yes.

18   Q.   Okay.  And you did not conduct a site visit in this case,

19   correct?

20   A.   No, I didn't conduct a site visit, but --

21   Q.   Dr. King, I just want to know, yes or no, did you conduct

22   a site visit?

23   A.   No, I didn't.

24   Q.   Okay.  But you have seen photographs of the site,

25   correct?

King - Cross

1    A.    I have.

2    Q.    And do you recall our discussion of the ways in which

3    Stillhouse is different from a West Virginia reference stream?

4    A.    I recall our discussion about that, yes.

5    Q.    You told me that one of the differences is that

6    Stillhouse has a valley fill, whereas a reference stream did

7    not, correct?

8    A.    That is true.

9    Q.    And Stillhouse has sediment ponds, correct?

10    A.    Stillhouse has sediment ponds, that's correct.

11    Q.    And unlike a reference stream, Stillhouse has a steep

12    concrete flume, correct?

13    A.    Yes.   That's part of the site, yes.

14    Q.    And further downstream there are culverts which you would

15    not typically find in a reference stream, correct?

16    A.    Not typically, no.

17    Q.    Okay.   Streams are often impaired even where conductivity

18    scores are low, correct?

19    A.    Sure, that can happen.

20    Q.    I'd like to show you a graph prepared by the West

21    Virginia Department of Environmental Protection.   It's part of

22    Joint Exhibit 60, which you and Mr. Becher discussed earlier.

23    It could be found on page 699 under tab JE 60.

24          Mr. Tyree is going to put that on the screen as well.

25    A.    Yes, I believe we've looked at this one before.

King - Cross

1    Q.    And you would agree with me that there are numerous sites

2    below a conductivity level of 300 that are also having WVSCI

3    scores below 68.

4    A.    Yes, there are.

5    Q.    Okay.  And do you recall our conversation at your

6    deposition about things other than conductivity that can lead

7    to stream impairment?

8    A.    Generally, I do.

9    Q.    Okay.  For instance, you told me in-stream habitat

10   conditions can cause WVSCI scores to decline, correct?

11   A.    Yes, that is correct.

12   Q.    And you told me that flow alterations can lead to failing

13   WVSCI scores; is that correct?

14   A.    Yes, although I don't know if we put this much data to

15   that effect.

16   Q.    But you told me they can, correct?

17   A.    Yeah.  If there's no flow in the stream, it can lead to a

18   failing WVSCI score, yes.

19   Q.    And you told me that the availability of food sources can

20   cause WVSCI scores to decline, correct?

21   A.    I mean, yeah.  If there was essentially no leaf litter or

22   periphyton growing on rocks, that could lead to that, but

23   that's not the case at Stillhouse.

24   Q.    I didn't ask you that.  I asked you did you not tell me

25   that differences in flow -- I'm sorry -- in food availability

King - Cross

1    can cause WVSCI scores to decline.

2    A.   I mean, I answered.

3    Q.   Yes, correct?

4    A.   Yeah.  If that were the case, it could cause that.

5    Q.   Okay.  And you told me -- and I want to get your quote

6    exact here -- that, quote, completely burying part of the

7    upstream area could have some influence on the stream below,

8    closed quote.  Do you recall telling me that?

9    A.   Vaguely, and I said it could have some influence, yes.

10   Q.   We also discussed drifting organisms at your deposition.

11   Do you remember that?

12   A.   I do.

13   Q.   What are drifting organisms?

14   A.   Well, stream organisms will drift when their populations

15   reach a size where there's -- particularly when there's a

16   recruiting group of the same mayflies.  They'll initially get

17   hatched where there's potentially thousands of small ones; and

18   as they grow, there's not enough food necessarily, and so many

19   of them will drift downstream to a different patch.

20       It could be drifting from one rock to the next or

21   drifting for, you know, until they essentially find a patch

22   where there's suitable habitat and food resources.  They also

23   drift to avoid predators.

24   Q.   Okay.  And do you recall our discussion in your

25   deposition of the effects that a sediment pond and concrete

King - Cross

1   flume --

2            THE REPORTER:  I'm sorry.  Can you talk louder --

3            MR. HARVEY:  Yes.

4            THE REPORTER:  -- or get closer?

5   BY MR. HARVEY:

6   Q.   And do you recall our discussion at your deposition of

7   the effects that a sediment pond and concrete flume may have

8   on the number of drifting organisms at a site?

9   A.   Again, I vaguely remember we discussed it, but, yeah.

10  Yes.

11  Q.   Do you recall telling me that you do not know whether the

12  pond and flume would reduce the abundance of drifting

13  organisms at this site?

14  A.   I think that's correct.  I don't necessarily know -- I

15  don't necessarily think that there's strong evidence that it

16  would.

17  Q.   But you do not know.

18  A.   My opinion is, is that it probably would not, but I don't

19  know.

20  Q.   Mayflies, correct?  Is that correct?

21  A.   It can, yes.

22  Q.   Okay.  Have you performed any studies examining the

23  effect of flow alterations at this site?

24  A.   Have I performed studies on flow alteration at this site?

25  I'm not aware of any studies on flow alteration at this site.

King - Cross

1    Q.    So Dr. Palmer didn't perform any either?

2    A.    I mean she performed -- when you say studies, I mean she

3    performed an assessment of it, sure.

4    Q.    Did she gather any data?

5    A.    Yes.

6    Q.    What data did she gather about flow?

7    A.    Well, she measured velocity.  She measured dissolved

8    oxygen in the stream.  She measured, you know, discharge;

9    yeah, and so there were data gathered on it, sure.

10   Q.    Did she do any analyses comparing that to reference

11   sites?

12   A.    You know, my understanding is that it was within the

13   range that you typically would see at a reference site, sure.

14   Q.    Did she do any analyses?

15   A.    I don't think she did any analyses, but I'm aware that --

16   Q.    Please, pay attention to my question, and I'll try to

17   make this as civil as possible.

18        Have you performed any studies examining whether the food

19   sources are adequate at this site?

20   A.    I have reviewed the data that Dr. Palmer collected and

21   her personal opinions about food sources at the site, and my

22   opinion is, is that the food sources were present and

23   adequate.

24   Q.    Did you perform any studies?

25   A.    I did not, no.

King - Cross

1    Q.    Thank you.  Did you perform any habitat studies beyond

2    looking at what Dr. Swan had calculated in the way of RBP

3    scores?

4    A.    I examined the existing data with respect to habitat at

5    this site in question, yes, but I didn't personally measure --

6    go out and measure the habitat at the site, no.

7    Q.    I think you told me that RBP scores are performed in a

8    100-meter reach of stream; is that correct?

9    A.    It varies, depending on the -- 75 meters, 100 meters.  It

10   depends on the site.  There's exceptions, depending on

11   availability of, you know, landowners, things of that nature.

12   But typically 75 meters, 100 meters, something like that.

13   Q.    Okay.  And Dr. Swan performed his RBP analysis downstream

14   of the concrete flume we've discussed, correct?

15   A.    That's my understanding.

16   Q.    And do you recall telling me at your deposition that RBP

17   scores will not necessarily tell you everything about the

18   stream reaching up to the headwaters above?

19   A.    I mean, that's -- yeah, that's true.  I mean it wouldn't

20   necessarily tell you everything about the stream.

21   Q.    And do you recall telling me that you do not know whether

22   RBP scores will reflect changes in food sources for bugs?

23   A.    I did say that I can't be certain, but if you have an RBP

24   score that is in the optimal/suboptimal range, it's usually

25   indicative of conditions that are favorable for food

King - Cross

1    resources.  So, again, I don't know, but my opinion is, is

2    that food sources will probably be adequate.

3    Q.   But you don't know.

4    A.   I can't be certain.

5    Q.   I'd like to discuss table B-19 with you, Dr. King.  It's

6    a table that I believe you and Mr. Becher discussed.  It's in

7    Joint Exhibit 58 and can be found on page JE 492.

8         We talked about this table -- tell me when you get to it,

9    Dr. King.  I'm sorry.

10   A.   Okay.  I'm there.

11   Q.   And we talked about this table at your deposition.  Do

12   you recall that?

13   A.   I think so, yes.

14   Q.   And this table shows where the mayflies are present at

15   certain temperature and conductivity levels, correct?

16   A.   Yes, that's correct.

17   Q.   It doesn't tell us whether WVSCI scores are passing at

18   these temperature and conductivity levels, does it?

19   A.   I mean it's specifically about mayflies, which are the

20   sensitive group and which tend to drive WVSCI scores, as your

21   expert has said in the past.

22   Q.   It doesn't tell us whether the WVSCI scores are passing

23   or failing, does it?

24   A.   No, but it's a component metric of the WVSCI.

25   Q.   And I think you told me at your deposition that at 200

King - Cross

1   conductivity, there could be a mayfly present, but the WVSCI

2   scores could be failing, correct?

3   A.   Yeah, that's possible.

4   Q.   And at your deposition, you told me that you did not know

5   whether the habitats are the same for the 200 conductivity

6   bins as the 1500 conductivity bins; is that correct?

7   A.   Well, yes.  If you take this table in isolation of all

8   the other contingency tables, that would be true, but there's

9   several other contingency tables where they examined that.

10  So --

11  Q.   I understand, but in this table, you did not know whether

12  the habitat is the same in the 200 --

13          THE REPORTER:  I'm sorry.  Is your microphone on?

14          MR. HARVEY:  I'm leaning back.  I've got a bad back.

15  I'm sorry.  I'll try to stand closer to the mic.  I apologize.

16          THE WITNESS:  Well, again, to fully answer your

17  question, it's important to recognize that as part of both the

18  causal analysis and confounding analysis, they examined

19  whether or not habitat was a confounding factor and was it

20  correlated strongly with conductivity, and it was ruled out as

21  the correlate.  And so I can assume that the habitats on both

22  of those sides are not markedly different.

23  BY MR. HARVEY:

24  Q.   Do you know?

25  A.   I'm fairly confident that they're not markedly different.

King - Cross

1    Q.   Do you recall your deposition in June of this year?

2    A.   I mean, like I said, I'm not a hundred percent certain,

3    but I'm confident that they're not markedly different because

4    I've reviewed -- I mean, is it unreasonable for me to have

5    reviewed things since my deposition?

6    Q.   Do you recall your deposition?

7    A.   I recall my deposition.

8    Q.   And you took an oath at that deposition to tell the

9    truth, correct?

10   A.   Yes, I did.

11   Q.   I'm not suggesting that you did not, but -- Mr. Tyree,

12   can you put up page 111 of Dr. King's deposition.

13       Question -- Dr. King, it's on the screen to your left.

14   On page 111 of your deposition was, "Do you know if the

15   habitats were the same between these two groupings?"  And your

16   answer was, "I don't."

17   A.   And then I finished the sentence by saying, "But they've

18   done a comparable analysis," and I elaborated, basically

19   saying the exact same thing I just said.

20   Q.   I understand, but I just want to make it clear that you

21   do not know if the habitat conditions were the same.

22   A.   Okay.  If we're going to say "the same" means identical,

23   you're right, I do not know.

24   Q.   This table was compiled from snapshot temperature data;

25   is that correct?  Can you put the table back on the screen,

King - Cross

1   Mr. Tyree?   Thank you.

2   A.   The table was compiled from the West Virginia database

3   which -- in which all of the data regarding water chemistry

4   and habitat is a snapshot; it's a single site visit.   So, yes.

5   Q.   And then in the *Elk Run* trial last December, you

6   testified that snapshot temperature data is almost useless.

7   Do you recall that?

8   A.   I recall saying that in the specific context of referring

9   to Dr. Menzie's use of a single measurement at a reference

10   site and a single measurement at the mine site.   He was using

11   that as a means to compare.   And it was obvious that the

12   measurements were taken on different days and different air

13   temperatures.

14       And so in that context, I said snapshot data comparing

15   two sites like that is almost useless.   So context is very

16   important.

17           MR. HARVEY:   Mr. Tyree, can you pull up Dr. King's

18   testimony in the *Elk Run* case?   Page 238.

19       Your Honor, can I approach?

20           THE COURT:   You may.

21   BY MR. HARVEY:

22   Q.   Dr. King, the question in the *Elk Run* case was from

23   Mr. Lovett.   And read with me here, if you would.

24       The question is, "Okay.   What does that tell you, if

25   anything, or does it tell you anything?"

King - Cross

1          "Well, it doesn't tell me anything.  For one thing, none

2     of these temperatures are sufficient to cause biological

3     impairment like we've seen at these sites.  I also have no

4     idea when they were collected.  A snapshot measurement of

5     stream temperature is almost -- almost useless."

6          Is that your testimony at the time?

7     A.   It was; and, again --

8     Q.   Dr. King, I'm just asking you if that was your testimony

9     at the time.

10    A.   It was, in the context of comparing the two measurements

11    that Dr. Menzie had taken on different days, at different

12    times, just comparing those two sites.  So that was the

13    context.

14    Q.   Do you recall telling me in this deposition in this case

15    that stream temperature can go from 10 degrees in the morning

16    to 25 degrees in the afternoon?

17    A.   Yes, it can.

18    Q.   And do you recall telling me in this case, not talking

19    about Dr. Menzie, that snapshot temperatures can't be very

20    representative of the long-term condition of a stream?

21    A.   I did say that, and I think one of the things to keep in

22    mind --

23    Q.   Dr. King, I don't mean to cut you off, but I just want

24    to --

25              THE COURT:  Just answer his question.

King - Cross

1          THE WITNESS:  Okay.

2          THE COURT:  Go ahead.

3    BY MR. HARVEY:

4    Q.   Dr. King, these temperature measurements that we see in

5    table B-19 might have been taken in the morning but reached

6    higher levels in the afternoon, correct?

7    A.   Well, there's thousands of collections, and so they're

8    almost certainly all taken -- in fact, they're taken across

9    seasons and across different times of the day.  So essentially

10   what we have is a large number --

11   Q.   Dr. King, I'm sorry.  It was a simple question.  The

12   temperatures shown in this table may have been taken in the

13   morning and had reached higher temperature levels in the

14   afternoon, correct?

15   A.   There is almost certainly an equal number of observations

16   from morning, midday, afternoon, and the evening because

17   that's the way the biological surveys work.  So, no, that's

18   not correct.

19        I mean it's correct that the temperatures can change

20   during the day, but what you're implying is that some of the

21   temperatures were all taken in the morning, which is

22   incorrect.

23   Q.   I didn't say that.  I said is it possible that some of

24   these temperatures may have been taken in the morning --

25   A.   It's not only possible, it's a fact that some of them

King - Cross

1   were taken in the morning and some were taken in the

2   afternoon.

3   Q.   Because they're snapshot temperature.

4   A.   Because they visit the site, they collect the data, and

5   they measure the temperature.  But because of that, then we

6   have a large number of sites and we have a large number of

7   temperatures.  So, for example, if you have a high

8   temperature --

9   Q.   Dr. King, please.  The question was, were some taken in

10  the morning possibly higher in the afternoon.  The answer was

11  yes, correct?

12  A.   Okay.

13  Q.   And some of these measurements may have been taken in the

14  spring but have reached higher levels in the summer, correct?

15  A.   Correct.

16  Q.   And you believe this table is fairly inconclusive, right?

17  A.   That this table is fairly inconclusive?

18  Q.   Yes.

19  A.   No, I don't.

20       MR. HARVEY:  Mr. Tyree, can you pull up page 124 and

21  125 of Dr. King's deposition testimony.

22  BY MR. HARVEY:

23  Q.   Dr. King, I'm going to read to you -- and it's on the

24  screen to your left if you want to follow along -- part of

25  your deposition testimony.

King - Cross

1    I asked you the following questions:

2    Now, we know it's cooler when that measurement was taken.

3    We don't know anything else about the site throughout the

4    year, correct?

5    Answer:  Presumably that's true.  I mean it is a

6    snapshot, you know.  A warm temperature probably tells us more

7    because it's pretty warm.  It could get warmer, but, you know,

8    it could -- but the fact that it's warm could tell us that

9    it's hitting a thermal maximum.  Again, in this particular

10   case, we see high conductivities.  In the warmer temperatures,

11   we actually see more mayflies than we do with the lower

12   temperatures.

13   Question:  Right.  But, again, we have no knowledge.

14   Answer:  Yeah, I would say in comparing these two bins,

15   it probably is fairly inconclusive.

16   Is that your testimony?

17   A.   It is my testimony.  I'm not sure what --

18   Q.   Dr. King, is that your testimony?

19   A.   That was my testimony, but I'm not sure what I'm

20   responding to in --

21   Q.   I read you the questions, Dr. King.

22   A.   Yeah.

23   Q.   Now, the cause of the limitations in EPA's table here,

24   you used a different method than EPA to eliminate temperature

25   as a confounder; is that correct?

King - Cross

1   A.   I addressed temperature as a confounder in a different

2   way, yes.

3   Q.   Because EPA's analysis was not complete, correct?

4   A.   No, it was -- I looked at it in a different way, so not

5   because it was incomplete.

6   Q.   Mr. Tyree, can you go to page 130 of Dr. King's

7   deposition?

8        And we're talking about this table, I'll represent to

9   you, Dr. King.  And it's to your left on the screen if you

10  want to review it.

11       And the questions and answers are as follows:

12       Question by me:  Do you stand by your earlier conclusion

13  that the snapshot data of temperature is almost useless?

14       Answer:  Well, it's almost.  It has some use.

15       Question:  Okay.

16       Answer:  If you don't have it, it's better than not

17  having any.

18       Question:  Okay.  If you were helping EPA and trying to

19  eliminate temperature as a confounder, is this what you would

20  do, or would you do something different?

21       Answer:  Using the existing data?  I think I would do

22  what I did, which was look at the relationship between

23  temperature and conductivity, temperature and mining,

24  temperature and WVSCI, temperature and mayflies, and that

25  alone to me was enough to show that temperature wasn't a

King - Cross

1    confounding factor.  This -- this little matrix is

2    interesting, but I just -- I think just examining the

3    relationship among these variables is an even more direct way

4    from a statistical perspective because it -- I think you meant

5    to say "does not" confound that relationship.  It cannot be

6    the hidden variable that really is explaining the pattern if

7    it's not related to the other variables.

8         Is that your testimony at the time?

9    A.   Yes.

10   Q.   So you looked at the relationships between various

11   variables, and you and Mr. Becher discussed those during your

12   direct examination, correct?

13   A.   That's correct.

14   Q.   For instance, you looked at the relationship between

15   conductivity and temperature, correct?

16   A.   I did, yes.

17   Q.   And I'm going to show you that graph that you and

18   Mr. Becher discussed.  It's Joint Exhibit 29.  If you want to

19   look at the one in your notebook, I'll give you time to look

20   at that.

21   A.   Yes.

22   Q.   Do you have it, Dr. King?

23   A.   I do.

24   Q.   Okay.  And this graph is based on snapshot data, correct?

25   A.   It is.

King - Cross

1   Q.   And based on the low R-squared number in this graph, you

2   concluded that temperature and conductivity were weakly

3   correlated; is that right?

4   A.   Yeah, I mean and by visualizing the data as well, the

5   pattern shows that there's a weak correlation; and, in fact,

6   as conductivity, you know, increases, temperature is

7   essentially very -- very flat.  So there's not -- there's not

8   a relationship here that would be confounding.  And EPA

9   actually did do a correlation analysis with the confounding

10  factors.  So they did --

11  Q.   We're going to talk about that.  So that will be next.

12       You say it was flat.  You conducted this analysis only on

13  summer data, correct?

14  A.   Well, and for good reason, yes.

15  Q.   Is that correct?

16  A.   It is correct.

17  Q.   Okay.  And in the summer, the data flattens out, doesn't

18  it?  You said that earlier to Mr. Becher.

19  A.   The summer, the data is -- yeah, in summer we have a

20  pattern where generally the -- the pattern from June, July to

21  August among streams is -- at least the range of temperatures

22  is similar.

23       Now, there's some early June samples, there's a trend --

24  in retrospectively analyzing the data, there's a trend where

25  early June tends to be a little cooler.  And so I probably

King - Cross

1    should've restricted this analysis truly to summer, which

2    would be June 21st through the end of August.

3    Q.    And as you said before, that flat data will give you a

4    lower R-squared number, correct?

5    A.    No.  I'm referring to a trend across time in the summer.

6    Q.    Okay.

7    A.    So not that -- the relatively low change in temperature

8    across that time span would allow us -- well, if you have a

9    temperature that's changing, for example, in the spring, like

10   Dr. Menzie included all that data across all that time, that

11   analysis is confounded by seasonable variation in temperature

12   because you have a mix of some of the low temperatures are

13   going to be low because it's spring.

14       The purpose of binning the data in the summer was to

15   eliminate the changing temperature in the spring.  So these

16   temperatures should at least represent more approximately, you

17   know, a constant, you know, across sites over time, so without

18   seeing a seasonable change as much.

19   Q.    You have an R-squared number of .05, correct?

20   A.    Yes.

21   Q.    And as you said, EPA also did a correlation between

22   temperature and conductivity; is that right?

23   A.    Yes, and --

24   Q.    That wasn't mentioned in your expert report, was it?

25   A.    I don't think it was, but it's in the benchmark.  I

King - Cross

1   mentioned the benchmark pretty thoroughly, so --

2   Q.   Did you realize that EPA did a correlation after your

3   deposition?

4   A.   I realized through the confounding factoring also said

5   that they had done that, yes.

6   Q.   Did they do a correlation on the entire West Virginia

7   dataset, not just summer?  Correct?

8   A.   That's true.  That's true.

9   Q.   And they come up with a number that's very different than

10  yours; isn't that correct?

11  A.   Can we --

12  Q.   Sure.

13  A.   -- look at the --

14  Q.   Let's look at figure 13e from the benchmark.  But in the

15  notebooks, I believe that will be Joint Exhibit 58, Your

16  Honor, page 414.

17       Have you seen that table before, Dr. King?

18  A.   This scatterplot matrix?

19  Q.   Yes.

20  A.   I have.  These I'm not sure --

21  Q.   I just asked you had you seen it.

22  A.   So, yeah.  I have, yes.  And you said the values were

23  different, but that's a correlation coefficient.  So it's .4.

24  So the square of it would be -- the variance explained would

25  be 16 percent.

King - Cross

1    Q.    Okay.

2    A.    So it would be R-square .16.  So --

3              MR. HARVEY:  Okay.  May I approach, Your Honor?

4              THE COURT:  You may.

5    BY MR. HARVEY:

6    Q.    And just so everybody understands how to read this table,

7    Dr. King, confirm what I am saying is correct.

8          If you're looking for correlations in matrix, say,

9    between temperature and conductivity, you would go straight up

10   from the joinder of those two, and this shows a correlation

11   between conductivity and temperature; is that correct?

12   A.    Yes, that's right.

13   Q.    And it's .4?

14   A.    Yes.

15   Q.    And this graph I'm pointing to, which is the second graph

16   of data down on the left-most column, is the graph of the

17   relationship between conductivity and temperature.  Do you see

18   that?

19   A.    I do.

20   Q.    Okay.  Is that a weak correlation, Dr. King, .4?

21   A.    That's pretty weak.  I mean, again, it's not -- it's

22   certainly not strong.  Actually, the number in their table

23   B-20 that they -- they said temperature was moderately

24   correlated with conductivity year-round in the West Virginia

25   dataset May --

King - Cross

1        THE REPORTER:  I'm sorry.  You're going too fast.

2        THE WITNESS:  Okay.  And they report a correlation

3   of .39.

4   BY MR. HARVEY:

5   Q.   Okay.  Let's talk about how they get there.  And

6   that's -- their weighting system is found in appendix B,

7   correct?  Do you recall that?

8   A.   Exactly.  So JE 493 would be the page.

9   Q.   Actually, I want to take you to JE page 476 in Joint

10  Exhibit 58.

11       Have you found that page, Dr. King?

12  A.   Yes.

13  Q.   And do you see table B-2 in that page?

14  A.   I do.

15       MR. HARVEY:  May I approach again, Your Honor?

16       THE COURT:  You may.

17  BY MR. HARVEY:

18  Q.   Dr. King, table B-2 in EPA's benchmark takes different

19  correlations and assigns them various strengths.  Do you see

20  that?

21  A.   Yes.

22  Q.   And a correlation between .25 and .75 is described as

23  moderate.  Do you see that?

24  A.   That's right.

25  Q.   Okay.  And it's given a plus score.  Do you see that?

King - Cross

1    A.    Yes.

2    Q.    What does that mean?

3    A.    That means that there's moderate evidence that that --

4    for that particular relationship could be a confounder.

5    Q.    Moderate evidence of confounding, correct?

6    A.    Yes.  But they also found in the EPA dataset the

7    correlation was .17.  The EPA dataset was part of it.  So they

8    scored that as zero because one of them was weak and one of

9    them was moderate.

10   Q.    I didn't ask you about the EPA dataset.  But since you

11   added that, how many sites were in the EPA dataset?

12   A.    I don't remember.

13   Q.    It's in the table you were looking at just now, table

14   B-20, I think.

15   A.    B-20 did you say?

16   Q.    B-20, I believe.

17   A.    Yeah.  There were 46.

18   Q.    Forty-six observations.  And how many in the entire

19   dataset that we're talking about?

20   A.    2,216.

21   Q.    Okay.  Thank you.  Dr. King, you also looked at the

22   relationship between mayflies and temperature, correct?

23   A.    I did.

24   Q.    And you produced a graph that you and Mr. Becher

25   discussed earlier; is that correct?

King - Cross

1    A.    Yes, I did.

2    Q.    Mr. Tyree, can you pull up Joint Exhibit 32 and put that

3    on the screen?

4          There were some problems with this graph, right,

5    Dr. King?

6    A.    The axis labels were incorrect, yes.

7    Q.    Okay.  And I think you said something about it not being

8    a valid statistical relationship; is that correct?

9    A.    Well, the relationship is very weak, yeah.  So it's just

10   a trend line.

11   Q.    Okay.  This is snapshot data, correct?

12   A.    It is, yes, and so we have a wide range of temperatures.

13   Q.    Okay.  And you ran a linear regression on this data; is

14   that correct?

15   A.    It's really just a trend line, yeah.  I mean I don't

16   provide any other diagnostic statistics with it, yes.  It's a

17   scatterplot.

18   Q.    That's a linear regression on a scatterplot, correct?

19   A.    Sure.

20   Q.    Okay.  And this is count data, correct?

21   A.    It is count data, correct.

22   Q.    Okay.  It counts number of mayflies, one, two, three,

23   four, correct?

24   A.    Number of mayfly taxa, yes.

25   Q.    Okay.  Is it appropriate to run a linear regression on

King - Cross

1    count data?

2    A.   It depends on the distribution of the residuals from the

3    regression.  There's some instances when it can be all right.

4    Otherwise, you use a regression with a different underlying

5    distribution.

6    Q.   What kind of regression?

7    A.   Well, it varies.  For example, you can use generalized

8    additive model which has different assumptions about the

9    residuals.  You can use a negative binomial regression which

10   is -- still can be a linear regression, but all you're doing

11   is using a different distribution to assess the significance

12   of the relationship.  And that's why what I'm telling you here

13   is I'm not presenting any sort of p-values related to this

14   analysis.  This is simply a scatterplot with a trend line.

15   Q.   Do you know what a Poisson regression is?

16   A.   I do.

17   Q.   What is that?

18   A.   Poisson is also for count data, but it actually tends not

19   to perform as well as the negative binomial.  Most count data

20   in ecological studies are distributed with a negative

21   binomial.  So usually we don't use Poisson.

22   Q.   I'm not sure if you agree with me on this or not.  Was it

23   inappropriate to run a linear regression on this count data?

24   A.   It's not inappropriate if the distribution of the

25   residuals meets the assumptions of the analysis.  The point

King - Cross

1    here, this is --

2    Q.   Well, let me ask you, do they?

3    A.   The residuals in this case are probably not normally

4    distributed, no; and, in fact, the relationship, regardless of

5    the technique -- and, again, I did not present p-values or

6    other diagnostic statistics with this.  It is simply a trend

7    line.

8         And what it shows is -- you can look at the data; you can

9    look at the scatterplot.  The relationship is virtually

10   non-existent.  And the point of the graph is that there are

11   very high values for numbers of mayflies at all temperatures

12   observed in the dataset.  There are temperatures that are up

13   to 28 degrees with 10 mayfly taxa occurring there, okay?

14        So snapshot data or not, if you have a temperature of 28

15   degrees, you have a temperature of 28 degrees.  And if there

16   are that many mayflies there, it strongly refutes the idea

17   that temperature is a confounding factor with respect to

18   conductivity.

19   Q.   The point of this graph was that the R-squared number was

20   low, wasn't it?

21   A.   No.

22   Q.   Isn't that what you said in your deposition?

23   A.   Look -- why would I put a box around the upper part of

24   the data and annotate it if the point of the graph was the

25   regression?

King - Cross

1       The point of the graph was to show, visualize, that there

2   is essentially no pattern with respect to temperature and that

3   indeed you find mayflies, large numbers of them, different

4   genera, at all temperatures during the summer, even though

5   it's a snapshot.

6   Q.   You were trying to show there was a low correlation

7   between mayflies and temperature, correct?

8   A.   I was showing not just that there was a low correlation;

9   I was emphasizing the values of numbers of mayflies that occur

10  at high temperatures.

11          MR. HARVEY:   Mr. Tyree, can you pull up Dr. King's

12  expert rebuttal report?   It's not paginated, Mr. Tyree, but

13  can you go over to the second page of that report?

14       May I approach, Your Honor?

15          THE COURT:   You may.

16  BY MR. HARVEY:

17  Q.   Dr. King, I'm going to read to you from your expert

18  rebuttal report.

19       Does this look like your expert rebuttal report?

20  A.   It looks like it.

21  Q.   Okay.   Paragraph two, "In determining whether a variable

22  confounds a causal relationship, one issue is whether the

23  variables are closely correlated.   If they are not, we can use

24  statistical analyses to look at the way the variables

25  influence the observed outcome.   I have used statistical

King - Cross

1    analyses to support the conclusions by EPA that temperature

2    does not confound the effects of conductivity.  I also

3    demonstrate, through statistical techniques, that Menzie's

4    criticisms of EPA for using individual temperature

5    measurements rather than measurements over time is not well-

6    founded."

7        Here's the important part.  "First, I have run analyses

8    confirming that temperature is not well-correlated to

9    conductivity or to the extent of mining in a watershed.  This

10   is likely true even if we use only data from summer months

11   when maximum temperatures are likely to occur and lack of

12   canopy is likely to have the most profound effects."

13       Mr. Tyree, can you scroll down?

14       There's a series of graphs here, and then you've got a

15   sentence that says, "Further, the conductivity is much more

16   strongly correlated with numbers of mayflies, the key driver

17   of biological impairment, than high temperatures."

18       Do you see that?

19   A.   Yeah.

20   Q.   And then we've got a graph, correct?

21   A.   Sure.  And would you scroll down and read the rest of it?

22       Then I drive home the point that the distribution of

23   numbers of mayflies across the temperatures that were observed

24   in these dataset demonstrate that it is virtually impossible

25   for temperature to be confounding the effect of conductivity

King - Cross

1   on biological conditions if, in fact, we have numbers of

2   mayflies that are essentially unaffected across the full range

3   of temperatures, and the mayflies being the most sensitive

4   group to conductivity.

5        I mean this graph refutes conclusively, regardless of the

6   linear regression and the assumptions.  I mean you could run

7   any statistical method on this regardless and come to the same

8   conclusion.  This relationship is extraordinarily weak, and

9   there is an obvious pattern that higher temperatures have no

10  effect on the ability to get large numbers of mayflies.

11  Q.   Dr. King, let's try this in a different way.  In the *Elk*

12  *Run* trial, do you recall telling Mr. Lovett that the

13  correlation between smoking and lung cancer was very low?

14  A.   Vaguely.

15  Q.   Mr. Tyree, can you pull that up so we can show that to

16  Dr. King?  It's from the *Elk Run* transcript, page 316.

17       May I approach, Your Honor?

18            THE COURT:  Yes, you may.

19  BY MR. HARVEY:

20  Q.   Dr. King, this is a question from Mr. Lovett in the last

21  trial.  The question was as follows:

22       "So how much variance, if you know, is typically

23  explained in statistical models for things like smoking and

24  lung cancer, for instance?"

25       And would you read your answer for me, please?

King - Cross

1   A.   Sure.

2        "Well, so, for example, there's studies that -- like

3   numbers based on how many cigarettes somebody smokes and the

4   probability of getting lung cancer, and I think the variance

5   is -- explained is only like some 8 percent, 12 percent,

6   15 percent.  But obviously we all agree that's a -- that's a

7   very, you know, very -- it's highly significant and it's

8   predictive, but the variance of your" -- some of this doesn't

9   read well.

10  Q.   We run on all the time too.  You can skip the word

11  "like."

12  A.   "You're probably -- there's so many other factors that

13  contribute to whether an individual gets cancer or not."

14  Q.   Now, Dr. King, if you were studying whether asbestos, for

15  instance, caused lung cancer, would you rule out smoking as a

16  potential confounder because it has that low correlation?

17  A.   I think we're talking about something that's very

18  different.  I think the issue, the question, is whether or not

19  the relationship of conductivity is confounded by temperature,

20  okay?

21       And the relationship of conductivity is not confounded by

22  temperature.  It doesn't necessarily mean that temperature has

23  no effect.  It might.  But it's not a confounder.  It's not

24  altering the relationship.  It's not driving the relationship.

25  Q.   Dr. King, I'd like you to answer my question.  If you

King - Cross

1    were studying whether asbestos caused lung cancer, would you

2    rule out smoking as a potential confounder based on the low

3    correlation between smoking and lung cancer?

4    A.    In that instance, no, I wouldn't.

5    Q.    Because smoking is a risk factor for lung cancer,

6    correct?

7    A.    That's correct.

8    Q.    Dr. King, this is the *Reference Manual on Scientific*

9    *Evidence*.  It's something that judges use to educate

10   themselves on scientific topics.

11         Would you agree with me that's probably a reliable source

12   for scientific information?

13   A.    I would suppose so.  I don't know.

14   Q.    I'd like to take you to page 591 of that book.  Mr. Tyree

15   is going to put it on the screen.

16         May I approach, Your Honor?

17              THE COURT:  Yes, you may.

18   BY MR. HARVEY:

19   Q.    This is a section under the epidemiology chapter,

20   Dr. King, with the title Could a Confounding Factor Be

21   Responsible for the Study Results.

22         Do you see that?

23   A.    Yes, I see that.

24   Q.    And there's a sentence here one, two, three, four, five

25   lines down that says, quote, "One instance of a confounding --

340

King - Cross

1    one instance of confounding is when a confounder is both a

2    risk factor for the disease and a factor associated with the

3    exposure of interest."

4         Do you see that?

5    A.   I do.

6    Q.   Okay.  Do you disagree with that?

7    A.   Do I disagree with that sentence?  No.

8    Q.   Okay.  Do you believe it is good practice to use

9    correlation coefficients to identify a confounding?

10   A.   I think it's one -- one method of several to evaluate

11   confounding.

12   Q.   I understand it's one method.  Is it a good practice is

13   the question.

14   A.   It's a standard practice.

15   Q.   In what field?

16   A.   A standard practice I believe in epidemiology, in eco-

17   epidemiology, ecology, medical science, several fields.

18   Q.   Okay.  I'd like to show you an article published in the

19   *American Journal of Epidemiology*.

20        Mr. Tyree, can you pull that up?

21        Dr. King, have you -- go back to the top, Mr. Tyree.

22        Dr. King, the title of this article is The Fallacy of

23   Employing Standardized Regression Coefficients and

24   Correlations as Measures of Effect.

25        Do you see that?

King - Cross

1    A.    Sure.

2    Q.    Have you heard of the *American Journal of Epidemiology*?

3    A.    I've heard of it.

4    Q.    You'll see, if you look to your left, the journal was

5    published by Johns Hopkins University.  I assume you've heard

6    of Johns Hopkins University.

7    A.    I have, a very good university.

8    Q.    Do you believe that Johns Hopkins University is a

9    reliable source of information?

10   A.    Yes, I do.

11   Q.    Mr. Tyree, can you go to page 206 of this article?

12         Would you mind reading the paragraph that starts with the

13   word "Blalock."

14   A.    "Blalock notes yet another problem with the use of

15   partial correlations as measures of effect.  The magnitude of

16   such correlations can in general be expected to change upon

17   control of additional variables, even if these additional

18   variables lack one of the two associations necessary to be a

19   confounder.  That is, association with the exposure variable

20   and association with the outcome variable."

21         Continue reading?

22   Q.    Yes, please.

23   A.    "This occurs because control of an additional variable,

24   even a non-cofounder, will reduce the residual variance of any

25   correlated variable, and residual variances are key elements

King - Cross

1    in determining the partial correlation.  Thus, evaluation of

2    confounding using correlation or path coefficients can be

3    particularly misleading."

4    Q.    Dr. King, you don't hold yourself out as an expert in

5    statistics, correct?

6    A.    Not in all areas of statistics, no.

7    Q.    Which areas are you not an expert in?

8    A.    I'm an expert in areas that deal with ecological and

9    environmental statistics and data analysis.

10   Q.    Which areas are you not an expert in?

11   A.    Well, that would be I'm not an expert in areas that fall

12   outside of that.

13   Q.    I think you told me at your deposition you've had four

14   classes in statistics; is that correct?

15   A.    I think I've had more than that, but -- I don't think I

16   said four, did I?

17   Q.    I believe you did.  Actually, you said five.  There was

18   one you didn't count.  So I thought of it as just four.  As we

19   went through your deposition, which we can review if you want,

20   but I believe you told me five.

21   A.    Okay.

22   Q.    But you told me you do keep statistics textbooks on your

23   shelf.

24   A.    Yes.

25   Q.    Okay.  And you told me you developed a software program

King - Cross

1   to analyze ecological data, correct?

2   A.   Yeah, co-authored with a colleague, Matt Baker.

3   Q.   That is the one you and Mr. Becher discussed called

4   TITAN?

5   A.   That's correct.

6   Q.   TITAN was publicly criticized in a peer-reviewed paper by

7   a professor at Duke named Song Qian; is that correct?

8   A.   He's a professor at the University of Toledo, assistant

9   professor.

10  Q.   He was a professor at Duke at the time he criticized you;

11  is that correct?

12  A.   No.  He was a soft money researcher, not a professor.

13  Q.   What was his specialty?

14  A.   He has a degree in environmental science from -- in the

15  same program in which I received my degree.

16  Q.   I thought you told me at your deposition that he was a

17  specialist in Bayesian statistics.

18  A.   Well --

19         THE REPORTER:  I'm sorry.  A specialist --

20         MR. HARVEY:  Bayesian.

21         THE WITNESS:  He --

22         MR. HARVEY:  Dr. King, we're talking over each

23  other.  B-a-y-e-s-i-a-n.  Bayesian.

24         THE WITNESS:  Yes.  He applies Bayesian statistics

25  and methods primarily for water quality modeling is what his

King - Cross

1    training is.

2    BY MR. HARVEY:

3    Q.   You have no training in epidemiology, correct?

4    A.   That's true.  I've never taken a course in epidemiology.

5    Q.   The benchmark was reviewed by a panel established by the

6    Scientific Advisory Board, correct?

7    A.   That's correct.

8    Q.   Science Advisory Board.  My mistake.

9         Do you know were there any experts in statistics or

10   epidemiology who reviewed the benchmark?

11   A.   Well, I'd have to look at the list of names again.  May I

12   do that?

13   Q.   Sure.  Mr. Tyree just happens to have those.

14        If it would be easier, Dr. King, this is in Plaintiffs'

15   Exhibit 25, page 374.

16   A.   So Dr. Will Clements is an ecotoxicologist who does have

17   expertise in epidemiology and statistics.

18   Q.   Dr. Will Clements.  What do you mean by "he has

19   expertise"?

20   A.   He's published a book called *Ecotoxicology* with some

21   statistical methods in that textbook.  He's the author of the

22   text.  So I consider that expertise.

23   Q.   I'm asking you if anyone was an expert in statistics or

24   in --

25   A.   He's an expert in statistical methods that apply to the

King - Cross

1    type of data in the benchmark, yes.

2    Q.   Who else?

3            MR. BECHER:  Can I just ask that the witness be

4    allowed to look at the plaintiffs' exhibit that's written in

5    the notebook?

6            THE COURT:  He can look at the list.  It's

7    plaintiffs' exhibit in the notebook?

8            MR. HARVEY:  It's Plaintiffs' Exhibit 25, page 374.

9            THE WITNESS:  Tom La Point also -- an

10   ecotoxicologist at the University of North Texas -- has very

11   strong expertise in statistics that relate to stressor

12   response and toxicology.

13   BY MR. HARVEY:

14   Q.   What about epidemiology?  Is he an expert in

15   epidemiology?

16   A.   I mean his field is very closely aligned to it, yes.  So

17   I wouldn't -- he would have to tell you whether he would

18   consider himself an expert in epidemiology.

19   Q.   Okay.  Who else?

20   A.   Almost all of these people have a very -- have a very

21   distinguished record in ecology and environmental science

22   which they employ --

23   Q.   Well, I don't doubt that, Dr. King.

24   A.   So --

25   Q.   My question --

King - Cross

1    A.    There's something that needs to be clarified.  May I

2    continue?

3              THE COURT:  No.  Let him ask his question.

4    BY MR. HARVEY:

5    Q.    My question is, is there anyone else other than the two

6    persons you named who you believe to be an expert in

7    statistics or epidemiology?

8    A.    In looking at most of these names, what I was going to

9    say is that most of these people have significant expertise in

10   statistics because in ecology, environmental science, that is

11   an implicit part of your training.  Ecology may be one of the

12   most statistically-oriented fields in which we as ecologists

13   or environmental scientists are trained to employ our own

14   statistics.

15         So I would say that there are many people on this list

16   that would be experts in statistical methods that are

17   appropriate for the type of data that occurs in the benchmark

18   document.

19   Q.    Do they have backgrounds like yourself?

20   A.    I'm sure several of them do, yes.

21   Q.    And you don't hold yourself out as an expert in

22   statistics.

23   A.    I hold myself as an expert in the type of statistics and

24   data analysis that apply to this type of data in this

25   benchmark.  So I think that is -- that's the point.

King - Cross

1    Q.    Do you know whether the review panel criticized the draft

2    benchmark for failing to use proper statistical techniques?

3    A.    I believe that there were maybe -- it doesn't specify

4    who, because someone -- someone, at least one person,

5    suggested there should have been more use of multivariate

6    statistical approaches.

7    Q.    Right.

8    A.    And -- but --

9    Q.    Dr. King, let's look at that, okay?

10   A.    Okay.

11   Q.    It's Plaintiffs' Exhibit 25, page 402.

12          THE COURT:   Which exhibit?

13          MR. HARVEY:   Your Honor, I believe it's Plaintiffs'

14   Exhibit 25, page 402.

15   BY MR. HARVEY:

16   Q.    Have you found that page, Dr. King?

17   A.    Yes.

18          MR. HARVEY:   Have you found it, Your Honor?

19          THE COURT:   Yes.   Go ahead.

20   BY MR. HARVEY:

21   Q.    Dr. King, there's a paragraph that starts with the word

22   "Consider further use."   Do you see that?

23   A.    I do, yes.

24   Q.    Can you read that paragraph into the record, please?

25   A.    Sure.   "Consider further use of quantitative statistical

King - Cross

1   analyses for understanding causality and the potential role of

2   confounding factors.  Because parametric procedures have been

3   used successfully elsewhere to evaluate multivariate

4   environmental data sets and can provide a relatively

5   objective, quantitative framework for data analysis, a more

6   rigorous statistical analysis should be contained in the

7   document.  Further, it would be helpful for the authors to

8   clarify whether nonparametric multivariate methods, such as

9   non-metric multidimensional scaling, were considered.  At a

10  minimum, the EPA document should discuss the pros and cons of

11  multivariate statistical methods (such as multiple linear

12  regressions, principal components analysis, and canonical

13  correlations, factor analyses, and partial correlations) and

14  explain why these approaches were not applied."

15  Q.   Dr. King, do you know whether EPA addressed that concern?

16  A.   I do believe it is addressed in the confounding factors

17  discussion, yes.

18  Q.   Can you point me to where that is?

19  A.   Take a minute to find it.  Do you know where it is or are

20  you just asking me to find it or do you really not know where

21  it is?

22  Q.   I know where it is.  I'd like to know if you know where

23  it is.

24  A.   Okay.  JE 475.

25        MR. HARVEY:  Can you pull up page JE 475?  One

King - Cross

1  moment, Dr. King.  We had that pagination issue again.

2  BY MR. HARVEY:

3  Q.   I'm going to have Mr. Tyree highlight a paragraph on that

4  page, and you tell me if we're talking about the same part of

5  the document.

6       Dr. King, I've had Mr. Tyree highlight page 475, PE 475.

7  Is that the same reference you're making?

8  A.   Yes.

9  Q.   Could you read that paragraph into the record?

10 A.   Sure.  "Some commenters recommended using multivariate

11 statistics in place of weight-of-evidence analysis as the sole

12 means to address potential confounders.  However, because of

13 the goals of the analysis and the nature of the data, it is

14 not appropriate to use multivariate statistics alone to try to

15 model the relationship between conductivity and extirpation or

16 to eliminate the effects of confounders or estimate the

17 magnitude of their effects.  First, no statistical test can

18 demonstrate that an association is causal.  Second, violation

19 of assumptions prevents reliable estimation of the influence

20 of one potentially causal variable on another.  Multiple

21 regression depends on the assumptions of independence,

22 additivity, and normality that are not met.  In sum,

23 multivariate statistical associations are just associations,

24 and association is not causation.  However, they can be used

25 as evidence in the weight-of-evidence analysis along with

King - Cross

1    other incomplete or imperfect pieces of evidence to help reach

2    the best-supported conclusion."

3    Q.   Did EPA do anything beyond that paragraph to respond to

4    the SAB's concerns?

5    A.   I think the SAB's concerns were largely addressed via the

6    fact that they did include statistical associations as part of

7    the confounding factors analysis.  You know, I mean -- so, to

8    me, part of the comments that were made, just because SAB made

9    that comment sounds like they didn't fully understand what

10   they did in the confounding factors analysis, because they did

11   do statistical associations as part of it and then used it as

12   one of several different tools to address confounding factors.

13        So I think part of it is EPA did do a lot of what the

14   people were asking for, but what they're saying here is it's

15   actually not appropriate to try to use a multivariate approach

16   to parse out a bunch of variance -- variables that each have

17   potentially different distributions and are going to violate

18   the assumptions, which is, in fact, the major underlying

19   problem with using parametric techniques on ecological data,

20   is that most of the time those assumptions that get violated

21   and that's what EPA is saying here.

22        Lester Yuan, who is one of the authors of the benchmark

23   document, is --

24   Q.   Dr. King, that's well outside of what I asked you.

25   A.   He's an expert in statistics, okay?

King - Cross

1   Q.   Dr. King, did EPA do anything else besides adding this

2   paragraph telling the SAB they didn't understand?  Did they

3   add anything else to their analysis?

4   A.   As far as I know, other than what I just said.

5   Q.   Okay.  Dr. King, I'd like to turn next to Joint Exhibit

6   25, which is a table that you prepared and talked about with

7   Mr. Becher.

8        I think in your discussion with Mr. Becher, you called

9   this a very simple analysis; is that right?

10  A.   Well, yes.  It's simply meaning -- it's like an expanded

11  contingency table, basically.

12  Q.   Is this the type of analysis a trained statistician would

13  use?

14  A.   It's actually very simple.  It's a tabular form of

15  analysis, sure.  This is supplementary to all the other things

16  that I've done on top of it to basically show that even doing

17  this, you come up with the same sort of conclusion.

18  Q.   Is this analysis something a trained statistician would

19  use?

20  A.   Sure.

21  Q.   Okay.  You ran this analysis after removing sites with

22  potential confounding factors, correct?

23  A.   I did.  I screened the data using the criteria outlined

24  in the Bernhardt, et al. paper, the same criteria, and I used

25  it -- applied it to the dataset.

King - Cross

1    Q.   You removed sites that had high urban development,

2    correct?

3    A.   Well, not necessarily just high, even pretty low levels

4    of urban development; basically only allowed sites that had

5    minimal urban development.

6    Q.   Low pH?  You removed those as well, below 6, correct?

7    A.   That's correct.

8    Q.   High chlorides?  You removed those sites, correct?

9    A.   That's right.  That's a different form -- a different

10   mixture of ions.

11   Q.   And sites with low RBP scores, correct?

12   A.   Yeah, poor or marginal.  So only suboptimal or optimal

13   habitat.

14   Q.   And you did not remove any sites based on temperature,

15   correct?

16   A.   Not in this analysis, I did not.

17   Q.   Okay.  Were availability of food, that wasn't factored

18   in?

19   A.   No data on availability of food, but the habitat index is

20   a proxy for that.

21   Q.   Okay.  Or presence of valley fills, sites with valley

22   fills weren't ruled in or ruled out?

23   A.   Sites with or without valley fills?  It's specifically

24   looking at the conductivity that would be associated with

25   alkaline mine drainage.  We would -- I removed sites that had

King - Cross

1    high chloride.  So that's pretty much the only other major

2    source of high conductivity in West Virginia streams.  So

3    these would be sites that are associated with mines as

4    conductivity increases.

5    Q.   Did you analyze or deal with confounding relating to the

6    presence of sediment ponds in this analysis?

7    A.   Presence of sediment ponds, I didn't have -- there's no

8    data that's associated with these sites about presence of

9    sediment ponds, but both -- I think both EPA and the recent

10   Pond paper demonstrated that that was not --

11   Q.   You didn't do anything, did you, in this analysis?

12   A.   Well, because, one, there's no data available; and two,

13   others have already shown that that's not a confounding

14   factor.

15   Q.   You testified earlier about EPA's use of logistic

16   regression.  Do you recall that?

17   A.   I believe, yes, I did.

18   Q.   Okay.  That was the testimony about conductivity at

19   levels of 300 would have a 59 percent chance of failing.  At

20   500 conductivity, I think your number was 72 percent.  Is that

21   correct?

22   A.   Yes.

23   Q.   You don't have access to the logistic regression model

24   that EPA used, do you?

25   A.   I don't.

King - Cross

1   Q.    Okay.  And you told me at your deposition that you don't

2   have a lot of experience with logistic regression; is that

3   correct?

4   A.    I haven't used it much, no.

5   Q.    Okay.  Dr. King, you also testified about the paper that

6   you co-authored with Dr. Bernhardt, "How Many Mountains,"

7   correct?

8   A.    Yes.

9   Q.    The Sierra Club funded that paper, correct?

10  A.    I'm not sure where all the funding came from.  I received

11  no funding for it.

12          MR. HARVEY:  Mr. Tyree, can you pull up Plaintiffs'

13  Exhibit 2?  And go to page PE 26.

14  BY MR. HARVEY:

15  Q.    Dr. King, do you see the acknowledgment section?  Can you

16  read the highlighted section into the record, please?

17  A.    Sure.  "This research was supported by unrestricted gifts

18  in support of research provided by the Foundation for the

19  Carolinas and the Sierra Club to ESB."  That would be Emily

20  Bernhardt.

21  Q.    Okay.  Dr. King, I wasn't asking you about you or

22  suggesting anything inappropriate.  I just wanted to

23  understand was this paper funded by the Sierra Club.

24  A.    Well, I think in part.  I mean, again, I put in a lot of

25  hours on it and didn't receive any compensation.  So some of

King - Cross

1   it was funded -- I guess should have acknowledged Baylor

2   University because they were paying for my time.

3   Q.   I'll leave that between you and Baylor, but was part of

4   this paper funded by the Sierra Club?

5   A.   Yeah, I guess part of it was.

6         MR. HARVEY:  Okay.  Mr. Tyree, can you go to the

7   first page of "How Many Mountains"?

8   BY MR. HARVEY:

9   Q.   There's a section highlighted there, Dr. King.

10        May I approach, Your Honor?

11        THE COURT:  Yes, you may.

12  BY MR. HARVEY:

13  Q.   Dr. King, I've highlighted a part of this, but if you

14  would, read the part of the paper starting with the word

15  "Pyrite."

16  A.   "Pyrite minerals in coal residues release sulfuric acid,

17  and the production of this strong acid within a matrix of

18  carbonate bedrock neutralizes the acidity generated by pyrite

19  dissolution and releases high concentrations of coal-derived

20  sulfate ions accompanied by elevated concentrations of

21  calcium, magnesium, and bicarbonate ions."

22  Q.   Those are the same ions that EPA noted in the benchmark,

23  correct?

24  A.   Correct.

25  Q.   Sulfate, calcium, magnesium, and bicarbonate, correct?

King - Cross

1   A.   Yes.

2   Q.   And I think in the *Elk Run* trial, you told us that

3   bicarbonate was particularly important.  Do you recall that?

4   A.   I do.  I believe that there's some evidence that

5   bicarbonate is one of the factors that influences mayflies in

6   particular, interferes with their ability to regulate sodium

7   and chloride through their transport pumps.

8   Q.   Okay.  You also discussed the Kunz paper.  Do you know

9   how to pronounce that?  Is it "Koons"?

10  A.   I guess it's "Koonz."  I don't know him personally.

11  Q.   It's Plaintiffs' Exhibit 10.  Do you still have that with

12  you?

13  A.   Okay.

14  Q.   Now, I'd like to focus your attention to the very last

15  paragraph -- scroll up, Mr. Tyree, if you would -- in this

16  paper.

17       You and Mr. Becher talked about part of this paragraph,

18  but I want to make sure we cover all of it.  Can you read the

19  first highlighted section, please?

20  A.   "In the present study, 2 central ideas in the assessment

21  of toxicity associated with major ions were reinforced:

22  specific ion composition of the water is critical, and

23  selection of laboratory test species is also critical for

24  relating major ion toxicity to field data.  For example,

25  survival of *C. triangulifer* and *L. siliquoidea* was reduced in

King - Cross

1  all dilutions of Boardtree and Winding Shoals reconstituted

2  waters in this case (with elevated magnesium, calcium,

3  potassium, sulfate, and bicarbonate), yet *Centroptilum*

4  *triangulifer* did not exhibit adverse effects with exposure to

5  Upper Dempsey reconstituted water (with elevated sodium,

6  potassium, sulfate, and bicarbonate)," which was neutralized

7  water, by the way, "at conductivity comparable to the toxic

8  dilutions of Boardtree and Winding Shoals reconstituted

9  waters."

10 Q.    So what this is telling us, in simpler terms, is that

11 some high conductivity water kills mayflies; other high

12 conductivity water did not kill mayflies in the study,

13 correct?

14 A.    Correct.  So when it was not representative of alkaline

15 mine drainage, it didn't have the effect.  When it was, it

16 did.

17 Q.    And the water that killed mayflies contained high levels

18 of magnesium, correct?  It's there in the paper.

19 A.    Yeah.  I mean it contained levels of all of those same --

20 the four big ions that occur in alkaline mine drainage.

21 Q.    Magnesium is mentioned in the paper there, correct?

22 A.    Magnesium, sulfate, bicarbonate, and calcium.

23 Q.    Okay.  What analysis have you done to determine if

24 Stillhouse has elevated levels of bicarbonate?

25 A.    Whether it has elevated levels of bicarbonate?  The data

King - Cross

1   from Evan Hansen I believe showed that it had elevated levels

2   of bicarbonate, yes.

3   Q.   Let's look at that.

4        Mr. Tyree, can you pull up table 2 from Mr. Hansen's

5   paper?

6   A.   I mean --

7   Q.   Let's --

8   A.   Okay.

9   Q.   -- get to the table.  It's Joint Exhibit 4.

10       Is this the table that you and Mr. Becher discussed

11  earlier, Dr. King?

12  A.   I don't think we discussed this table.

13  Q.   It's been admitted into evidence.  Is this sampling that

14  was conducted at Stillhouse from Evan Hansen?

15  A.   Yes.

16  Q.   Is bicarbonate analyzed in this sample?

17  A.   It's not, but --

18  Q.   Is it analyzed in this sample?

19  A.   It isn't because --

20  Q.   Dr. King, is magnesium analyzed in this sample?

21  A.   It is not.

22  Q.   Thank you.

23       Mr. Tyree, can you pull up Joint Exhibit 60?

24       This is the document that you and Mr. Becher discussed

25  earlier, Dr. King.  Do you recall that?

King - Cross

1    A.   I do.

2    Q.   And you and Mr. Becher discussed a table at the very end

3    of that document -- do you recall that? -- showing

4    conductivity as a definite or a likely stressor?

5    A.   Yes.  Yeah, at above 1533 the state deems it as

6    essentially definite.

7              MR. HARVEY:  Mr. Tyree, can you go to that last

8    page?

9         May I approach again, Your Honor?

10             THE COURT:  Yes, you may.

11   BY MR. HARVEY:

12   Q.   Can you read -- do you have this in front of you,

13   Dr. King?  This may be hard to read.

14   A.   I can read it.

15   Q.   You can read it?  Okay.  Can you read the section -- the

16   sentence that starts -- part of the table that talks about

17   whether conductivity is a definite stressor.  It starts with

18   the word "Consider."  Do you see that?

19   A.   Okay.  "Consider as independent stressor in non-acidic,

20   non-alkaline, non-acid-mining-drainage streams, when

21   conductivity values met threshold ranges and sulfates and

22   chloride violate conditions listed as follows."

23   Q.   Okay.  So the table is qualified by this condition, when

24   conductivity levels are as high as in this table and sulfates

25   and chloride violate the conditions listed below.  So all

King - Cross

1    three have to occur, correct?

2    A.    I don't believe that's what they mean because --

3    Q.    Well, what does it say?

4    A.    It doesn't make sense if sulfates and chlorides would

5    violate the condition because they're usually in two different

6    mixtures, so --

7    Q.    But it says when all three of these conditions are

8    present, correct?

9    A.    I think it's a typo.  I mean honestly I'm 99 percent sure

10   that's not what they mean.

11   Q.    Your testimony is this is a typo?

12   A.    My testimony is that that makes no sense that they would

13   say that.  So if sulfates are above that level and

14   conductivity is above that level, that makes sense.   If

15   chloride is above that level and conductivity is above that

16   level, that makes sense, but not all three.

17   Q.    Are there any other typos in the table?

18   A.    I don't know, but I'm just telling you I'm confident that

19   that's not what they mean.  That's not how they employed it.

20   Otherwise, it makes no sense.

21            MR. HARVEY:  Mr. Tyree, can you go to Plaintiffs'

22   Exhibit 8, the Suter and Cormier paper?

23        You may not have that, Mr. Tyree.

24            MR. TYREE:  What's the title?

25            MR. HARVEY:  I think it's Suter and Cormier on

King - Cross

1    causation.

2              THE WITNESS:  What's the exhibit number?

3              MR. HARVEY:  It's Plaintiffs' Exhibit 8, Dr. King.

4         I have it here.  Do you have it now, Dr. King?

5              THE WITNESS:  I do.

6    BY MR. HARVEY:

7    Q.   Mr. Becher had you read parts of this paper.  Do you

8    recall that?

9    A.   Yes.

10   Q.   In the first column on the first page, which is

11   designated as PE 112 --

12   A.   Yes.

13   Q.   -- there's a paragraph that starts with the word "The

14   method."  Do you see that?

15   A.   Yes.

16   Q.   Would you mind reading that paragraph into the record as

17   well?

18   A.   "The method is applied to potential confounders of the

19   relationship between stream invertebrate presence and the

20   salts that leach from crushed rock in central Appalachia.  The

21   goal of the present analysis was to determine which

22   environmental variables must be treated as confounders in the

23   development of the benchmark value."  Keep reading?

24   Q.   No.  Well, hold on.  I think we've got it all.

25        No, sir.  Continue with "It was not."

King - Cross

1          MR. BECHER:  Where are we?

2          MR. HARVEY:  PE 112.

3          THE WITNESS:  Continue with "It was not"?

4    BY MR. HARVEY:

5    Q.   Yes, sir.

6    A.   "It was not to eliminate confounding variables.  Most of

7    them are natural variables, such as temperature and habitat

8    structure, that cannot be literally eliminated, like

9    eliminating women or smokers in an epidemiological study.  Nor

10   was the goal to equate the levels of confounders to an ideal

11   or pristine level.  Furthermore, the goal was not to

12   demonstrate that these variables never cause effects.  It is

13   known that these factors all cause some effects in some

14   circumstances.  The goal was to support estimation of the

15   ionic strength, measured as specific conductance, that

16   protects against unacceptable effects on the invertebrate

17   communities in those streams without significant influence by

18   confounding variables."

19          MR. HARVEY:  Thank you, Dr. King.

20      Your Honor, if I may have one moment, I think I can wrap

21   up.

22          THE COURT:  You may.

23   BY MR. HARVEY:

24   Q.   Dr. King, one last bit of housekeeping, and I appreciate

25   your patience with all the reading.  It's a rule of

                              King - Cross

1    evidence --

2    A.    Sure.

3    Q.    -- and why I do it this way.

4          If we can go back to the Kunz paper, which is Plaintiffs'

5    Exhibit 148 -- I'm sorry -- Plaintiffs' Exhibit 10, page 148.

6    It's on the screen.  It might be the easier way to do this.

7    I'm going to have you read one highlighted part.

8          Can you read the last highlighted part from where you're

9    sitting, Dr. King?

10   A.    "Future studies should focus on identifying the primary

11   toxic ions or, conversely, determine whether a characteristic

12   ionic matrix is necessary to produce toxicity."

13              MR. HARVEY:  Thank you, Dr. King.  No more

14   questions.

15              THE COURT:  All right.  We'll take a brief recess

16   before we do any redirect.  We'll stand in recess about ten

17   minutes.  You may step down.

18        (Recess from 2:04 p.m. to 2:17 p.m.)

19              THE COURT:  Dr. King, if you'll resume the stand.

20        Mr. Harvey, you've finished your cross-examination.

21              MR. HARVEY:  Yes, I have, Your Honor.

22              THE COURT:  Redirect?

23              MR. BECHER:  Thank you, Your Honor.

24                          REDIRECT EXAMINATION

25   BY MR. BECHER:

King - Redirect

1    Q.   Hello again, Dr. King.  I want to start with a fairly

2    general matter.  There were a lot of questions by Mr. Harvey

3    about the influence of factors like the availability of

4    nutrients, like flow, temperature.

5         Is it your opinion that those can never cause biological

6    degradation in a stream?

7    A.   No, that's definitely not my opinion.  Of course they

8    can.

9    Q.   Okay.  What happens when those factors are present along

10   with very high conductivity?

11   A.   You're saying if those factors are poor?

12   Q.   Well, scratch that question.  Would you expect any of

13   those factors alone to lead to the complete extirpation of

14   mayflies in Appalachian streams?

15   A.   Well, for example, flow, if the stream channel is dry,

16   I'd say yes, that's going to be a complete extirpation.  But,

17   you know, even a moderate change in flow status would

18   certainly not lead to the extirpation of mayflies.

19        You know, food availability is kind of an odd question.

20   I mean it's -- you know, the streams sort of are driven

21   primarily by what are called lichenous inputs, you know,

22   essentially leaves, material falling into the stream by

23   vegetation along the stream.  And so we know there's

24   vegetation along the stream, including trees, and we know that

25   leaves get in there.  And hence, you know, I was asked whether

King - Redirect

1    I could -- whether I knew anything about that or whatever.  I

2    think it's clear that, you know, that alone is not driving the

3    response there, no.

4         So -- but, no, I think none of those factors, unless --

5    what was the third factor that you discussed?

6    Q.   I think I said flow, nutrients, and temperature.

7    A.   Yeah, temperature.  Well, temperatures at the levels that

8    we've see obviously I don't think have any real marked effect

9    on the community.

10        If the temperature were 40 degrees Centigrade, yes, it

11   would cause a complete extirpation.  So it's a matter of the

12   magnitude of the variable that we're talking about.

13   Q.   Mr. Harvey also had a line of questions about the

14   different toxicities of different suites of ions.

15        To respond to that, can you turn to Exhibit 58, the

16   benchmark, the front of the benchmark.  So it will be in the

17   first joint exhibit notebook.

18   A.   Okay.

19   Q.   And I want to look at the executive summary, which is on

20   JE 381.

21   A.   Okay.

22   Q.   I believe -- well, can you read that first sentence for

23   me?

24   A.   "This report uses field data to derive an aquatic life

25   benchmark for conductivity that can be applied to waters in

King - Redirect

1    the Appalachian Region that are dominated by salts of calcium,

2    magnesium, sulfate, and bicarbonate at circum-neutral to

3    mildly alkaline pH.  The benchmark is intended to protect the

4    aquatic life in the region."

5    Q.   You can stop there.  My question is, so this benchmark is

6    talking about conductivity with those specific suites of ions;

7    is that correct?

8    A.   Yes.

9    Q.   And in reviewing the benchmark and reviewing the data

10   that you've worked on for "How Many Mountains" and this case,

11   is that constituent suite of ions fairly consistent in

12   alkaline mine drainage?

13   A.   Oh, very.  And so, for example, in Evan Hansen's table of

14   data, the bicarbonate wasn't, in fact, in there, but calcium

15   was.  And calcium, it's calcium carbonate.  It's the

16   dissolution of those.  So when you have a certain

17   concentration of calcium, you necessarily have a certain

18   concentration of bicarbonate.  So it's implied.  So he didn't

19   measure it because he measured the calcium.  So we know how

20   much bicarbonate was there.

21   Q.   Is that because of the source of the calcium and

22   bicarbonate?

23   A.   Exactly, and it's the dissociation, the dissolution of

24   calcium carbonate into those component ions.  They're

25   balanced.  There's an equilibrium there.  So if you know how

King - Redirect

1   many bicarbonates we have, we know how many calciums we have.

2   And there is a lot of calcium.

3   Q.   Thank you.  While we're on this, let's go back to the

4   Kunz paper, which is in the plaintiffs' exhibit folder.  I

5   believe it's Exhibit 10 of plaintiffs' exhibits.

6       And Mr. Harvey took you through this last paragraph where

7   it talked about these species responding to Boardtree and

8   Winding Shoals and I believe not responding as significantly

9   to water from Upper Dempsey.  Do you recall that?

10  A.   Yes.

11  Q.   Will you remind the Court again where Boardtree is?

12  A.   Boardtree is immediately adjacent to Stillhouse Branch.

13  The watersheds actually are just, you know, separated by a

14  divide.  They touch each other.

15  Q.   Would you expect the water in Stillhouse Branch would be

16  more like this water in Boardtree or more like the water in

17  Upper Dempsey?

18           MR. HARVEY:  Objection; foundation.

19           THE COURT:  Well, lay more of a foundation.

20           MR. BECHER:  Okay.

21  BY MR. BECHER:

22  Q.   Based on where you know -- what you know about the

23  locations of these two streams, Boardtree and Stillhouse,

24  would you expect their water chemistry to be similar?

25  A.   Yeah.  I mean it definitely would be similar.  I mean

King - Redirect

1   they're coming from the same rock, same parent material.

2   Q.    Thank you.   There were several questions about your use

3   of snapshot temperature data and criticism, I think, of your

4   referring to that as almost useless in the last trial.

5        Can you, for the Court -- I want to give you a chance to

6   explain this more fully.  When do you think that this kind of

7   snapshot data is indeed useless and when may it be useful in

8   an analysis?

9   A.    Well, I -- for example, I wouldn't go to the table and

10  look at a site, an individual site, and see a temperature of,

11  say, 15 degrees C and just without knowing when it was

12  collected and time of day -- even if I knew that, I wouldn't

13  assume that I know the thermal regime at that site.   And I

14  wouldn't use that to try to compare it to, say, another site

15  and say, well, this site that has a temperature of 15 versus

16  this site that has a temperature of 12, I wouldn't go -- I

17  wouldn't be willing to say that the two necessarily are

18  different.

19       However, it's useful to know, for example, when -- if you

20  have a high temperature, just like when we have a very high

21  conductivity reading, we know that sometimes conductivity

22  readings can be low because of dilution.  But when it's very

23  high, you know, you've got -- I mean very rarely do you have

24  very high conductivity just once and then the rest of the time

25  it's low.

King - Redirect

1        So in the case of temperature, when you have high

2    temperature values at a stream, it's indicative of a stream

3    that probably has higher than average conductivities.  So

4    there's an example where that would be useful information.

5        It's also useful when you have a very large dataset and

6    you have many, many, many observations, and so you have

7    co-occurrence of temperature data and conductivity data.  So

8    you have lots of sites that have high conductivities but that

9    some of them might have low temperatures and some of them

10   might have high temperatures.  In the cases where you have the

11   high temperatures and high conductivity versus low, that's

12   where it allows you to assess whether or not potentially those

13   high temperatures are having a confounding effect.  And given

14   that we simply don't see relationships with high temperature

15   and mayflies, for example, it really calls into question -- I

16   think completely refutes the idea that temperature is, you

17   know, driving this relationship.

18       Again, we're talking about principal cause here.  And it

19   is to me unequivocal that conductivity is the principal cause.

20   And I think it's so weak, the relationship between temperature

21   and the biological data and the very weak correlation between

22   temperature and conductivity.  To think that that temperature

23   is the principal cause is -- there just is no evidence to

24   suggest that it is.

25   Q.   Is that what you were making a point in your graph on the

King - Redirect

1    figure from your expert report, which is Joint Exhibit 32?

2    A.    Precisely.

3    Q.    I want to -- may I approach?

4          Do you recognize this document, Dr. King?

5    A.    I do.

6    Q.    Is it your expert report?

7    A.    Yes.

8    Q.    Mr. Harvey walked you through your expert report where

9    you talked about the correlation coefficients in the exhibit

10   we were just talking about.

11   A.    He did, yes.

12   Q.    You said you drove home the point later on, and I don't

13   think you were allowed to refer to that during cross.

14         Were you referring to this sentence below the chart,

15   starts with "Based on the West Virginia dataset"?

16   A.    Yes.  May I read it?

17   Q.    Absolutely.

18   A.    "Based on the West Virginia dataset, at the temperatures

19   recorded by Dr. Menzie, I would expect there to be at least

20   five to ten genera of mayflies at a site like Stillhouse

21   Branch.  The complete absence of mayflies and abundance of

22   conductivity-tolerant taxa informs my conclusion that it is

23   conductivity and not temperature leading to biological

24   impairment."

25         And I don't believe I'm referring to correlation

King - Redirect

1    coefficients there in making that conclusion.

2    Q.    So you're not relying on correlation coefficients alone

3    for your opinion?

4    A.    No, I mean absolutely not.

5    Q.    If I could again refer to Joint Exhibit 32, I believe

6    again you started to talk about why you limited that to summer

7    data.

8         Is there anything else you want to offer as an

9    explanation of why the limitation of these data to summer only

10   data is appropriate?

11   A.    Well, one of the factors as well is that there's seasonal

12   patterns in the emergence of certain taxa, and whereas, you

13   know, the WVSCI apparently, you know, accounts for seasonable

14   differences in the way they calculate their metrics and score

15   them, individual taxa, for example, are -- like a lot of the

16   mayflies, often are very abundant in the spring and then more

17   or less disappear in the summer.

18        And so it sort of confounds the analysis to mix spring

19   and summer data together in looking at, for example, taxa

20   responses or things of that nature.  So confining it to summer

21   data, it's just a way of removing that potential confounding

22   effect.

23   Q.    Okay.  Now, I want you now to compare the plots in Joint

24   Exhibit 31 with 32.  I believe you said that the, you know,

25   the trend line in Exhibit 32 wasn't a key or wasn't the

King - Redirect

1    principal component of what you tried to express with this

2    graph.

3         The significance in this, I mean is that obvious just by

4    looking at the scatter distribution between these two graphs?

5    A.   So, again, referring to page JE 113?

6    Q.   Uh-huh.

7    A.   Yes.  So the scatterplot alone, visualizing the data,

8    it's very clear that the relationship is very weak.  And this

9    is just a trend line that was fitted there.  And, yes, there

10   is an equation with variance explained associated with it, but

11   other techniques would -- you know, again, I did not include

12   other diagnostic statisticals such as p-values.

13        You know, had I gone that far, then there would've been

14   some violations of assumptions on doing the trend line here.

15   But the graph itself is -- and the point I'm making with this

16   graph is just simply look at the data.  You don't need a

17   correlation to say -- to point at a dot that says 10 taxa at a

18   temperature of roughly 28 degrees, and in many, many, many

19   cases of above 24 degrees, 25 degrees, where we have, you

20   know, five, six, seven, eight genera.  That's the main point

21   of this graph.  Whereas, the other graph, which also has a

22   trend line fitted to it -- and it's a non-linear one, a

23   polynomial because the relationship is very non-linear, does

24   show a high variance explained.  But, again, you could simply

25   just look at it.  You don't need the trend line to see that

King - Redirect

1    basically as conductivity increases, there's a dramatic

2    collapse in the number of mayfly taxa.

3        So I mean I could show this to my 11-year-old son and ask

4    him, "What do you see," and he would undoubtedly see, well, it

5    looks like there's low numbers on this side and there's high

6    numbers on that side.  I mean they're markedly different.

7    It's the same data.

8    Q.   Now, along with the criticism of the correlation

9    coefficients, I think there was some criticism of the

10   benchmark's use of correlation coefficients.

11       Can you -- we discussed this earlier, but in light of the

12   questioning, would you return to table B-20.  That's the

13   benchmark again, Joint Exhibit 58.  I'm looking at page JE

14   493.

15              MR. HARVEY:  I'm sorry, Mike.  Which exhibit?

16              MR. BECHER:  It's in the benchmark.  JE 493 is the

17   page number.

18              THE WITNESS:  Okay.

19   BY MR. BECHER:

20   Q.   Are correlation coefficients based on the explanation

21   here by the EPA the only factors that are used to rule out

22   confounding?

23   A.   No.

24   Q.   Okay.

25   A.   They use several.

King - Redirect

1   Q.   There was a question to you regarding the SAB comments

2   about multivariate statistics.  Do you recall that?

3   A.   Yes.

4   Q.   Did they use multivariate statistics to help rule out

5   confounding here?

6   A.   They did.

7   Q.   Okay.

8   A.   They included multiple predictors in a model and assessed

9   how much it changed the model by including those variables,

10  and it had a negligible effect on the relationship.

11  Q.   While we're on the topic of the SAB -- I believe that was

12  Plaintiffs' Exhibit 25.  Can you return -- it's 27.  Let me

13  make sure I get this right.  Yeah, Plaintiffs' Exhibit 25.

14  A.   Okay.

15  Q.   If you could turn to page PE 374.

16  A.   Okay.

17  Q.   You recognize that some of the people on this I believe

18  that you said you thought have a pretty good foundation or

19  perhaps even be experts in statistics; is that right?

20  A.   In the statistics that are relevant to the analysis in

21  the report, absolutely.  Almost all of them do.

22  Q.   Do you know everyone on this list?

23  A.   No, I don't know all of them.

24  Q.   Can you turn to PE 376.  I think PE 374 where Mr. Harvey

25  had you look at was the panel that reviewed the benchmark.  I

King - Redirect

1    believe PE 376 is the Scientific Advisory Board itself.

2        Do you know everyone on this list?

3    A.   I know about half of them.

4    Q.   Okay.  Would you consider them to be good scientists?

5    A.   Yeah.

6    Q.   Is there anyone that you could point out as an example

7    that would have good knowledge, perhaps be expert in

8    statistics?

9    A.   Yes.  I mean I think, for example, David Dzombak.  He was

10   actually the editor of the "How Many Mountains" paper.  And,

11   yes, again, he's very familiar with mining issues, and he's in

12   environmental engineering, which is a very quantitative field.

13   And he had -- you know, obviously he didn't have much problem

14   with our use of statistics in that paper.

15   Q.   I believe you were going to say something about a

16   Dr. Yuan.

17   A.   Oh, Lester, Dr. Lester Yuan.  He was one of the main

18   contributing authors of the benchmark document, and he is a --

19   his degree is in statistics.  He is a statistician.  He's more

20   of a frequentist, I believe, but he is definitely an expert in

21   statistics.  In fact, all of his publications deal

22   specifically with applications of statistics in ecological and

23   environmental science.

24   Q.   Now, there were also some questions about your background

25   in statistics.  You're an ecologist, correct?

King - Redirect

1    A.   Yes.

2    Q.   And what's your department?

3    A.   Biology.

4    Q.   Okay.  Do you do any work with -- well, let me ask first,

5    is there a Department of Statistics at Baylor?

6    A.   Yes.

7    Q.   Do you do any work with the Department of Statistics?

8    A.   Yes.  In fact, I even had a statistician sit in on my R

9    course because he was interested in learning some of the ways

10   that we're using R in graphical analysis of data.  And I've

11   sat on two committees in the Department of Statistics as well.

12   Q.   So you're certainly conversant in basic statistics?

13   A.   Oh, certainly.

14   Q.   But you have a particular expertise, again, in ecological

15   statistics?

16   A.   Yes, exactly.

17   Q.   Okay.  There was also brief mention of Sue Qian.  And

18   this also came up in deposition.  Could you give us a brief

19   overview of the situation with Dr. Sue Qian and the TITAN

20   analysis in the "How Many Mountains" paper?

21   A.   Yeah.  Song Qian.

22   Q.   Sorry.

23   A.   That's all right.  Well, very briefly, Song has a

24   different approach to collegiality, I guess you could say, and

25   is -- instead of -- I don't know, you know.  His critique of

King - Redirect

1   our analysis, our TITAN analysis, was based almost entirely on

2   the fact that he was employed by the U. S. Geological Survey,

3   by, I believe, a regional program leader named Tom Cuffney.

4   And I, along with Matt Baker, had written a paper that we --

5   where we critiqued a publication that was led by Tom Cuffney.

6   And we simply pointed out that you could come up with a

7   different conclusion in their analysis by looking at the data

8   in a different way.

9       And one of the ways we looked at it was with TITAN, but

10  not just that.  We also looked at the data by some other

11  techniques.

12      So apparently that caused more of a problem for Tom,

13  whether it be him -- his ego or whether it actually was a

14  problem, you know, in his job.  I don't know.  But he was very

15  upset.  And Song was not an author on the paper that we

16  critiqued, but they in turn turned around and Tom basically

17  paid Song to tear apart TITAN.

18  Q.   What was the end result of that?  Was there any

19  resolution in the literature?

20  A.   There was.  The resolution was that our -- our paper was

21  a response to their critique, and our paper unequivocally

22  addressed every one of their points and completely dismantled

23  them.  And that's not just my words.  That's the words of the

24  editor of the journal --

25          MR. HARVEY:  Objection; hearsay.

King - Redirect

1          THE COURT:  Sustained.

2          MR. BECHER:  Certainly.

3          THE WITNESS:  And I guess the proof is TITAN has,

4    you know -- we say let it play out in the literature.  Well,

5    it's played out in the literature, and TITAN is being used

6    more than it ever has.

7    BY MR. BECHER:

8    Q.    Thank you.  I want to ask you to turn to Defendant's

9    Exhibit 8.  And that is the Total Maximum Daily Loads for

10   Streams in the Gauley Watershed, West Virginia, the final

11   approved technical report.

12   A.    Defendant's Exhibit 8?

13   Q.    Yes.

14          THE COURT:  It's in volume 1 of Defendant's --

15          THE WITNESS:  Excuse me.  Sorry about that.

16   BY MR. BECHER:

17   Q.    If you could turn to page 12 of that exhibit.

18   A.    I'm not sure I'm looking at the right thing here.  This

19   is a causation paper?

20   Q.    I can put it on the document viewer.

21          MR. HARVEY:  Mike, we're lost too.  Which page are

22   you on?

23          MR. BECHER:  Defendant's Exhibit 8, the Gauley TMDL

24   technical report.

25          THE WITNESS:  I think I've found it now.  There's a

King - Redirect

1   lot of notebooks.  Okay.

2   BY MR. BECHER:

3   Q.   If you recall, there was some question as to the

4   interpretation of language by the DEP about what is necessary

5   to be an ionic stressor; is that right?

6   A.   Yes.

7   Q.   Will you read on page 12 the point 4, the last row, the

8   first column under Ionic Strength.

9   A.   So --

10  Q.   "Consider as independent stressor in non-acidic,

11  non-AMD" --

12  A.   Yeah.  "Conductivity.  Consider as independent stressor

13  in non-acidic, non-acid-mine-drainage streams, when

14  conductivity values exceed elimination thresholds and sulfates

15  and chloride violate conditions listed as follows."

16  Q.   Is that the same language as in the other document that

17  you were having interpretation questions with?

18  A.   I think so.

19  Q.   Okay.  If we need to, we can refer back to that.

20       Well, the record will show whether that's the same

21  language or not.  But you had said that you did not think that

22  chloride had to exceed a certain amount because that would not

23  make sense.

24  A.   Well, it didn't make sense to me that both would have to

25  be, because of the mixture of ions.  I mean you're usually

King - Redirect

1   dealing with -- high chloride is usually associated with

2   Marcellus shale brines, and then -- or road salts.  And so

3   you're not going to have the high sulfates in that situation.

4   And then, of course, in an alkaline mine drainage case, we

5   don't have high chlorides.  On a case you'd have to have both,

6   and there's very few situations you'd ever have both of those

7   together.

8   Q.   Do you recall if we had high chlorides in Stillhouse

9   Branch?

10  A.   I don't think there are high chlorides there, no.

11  Q.   Can you now turn to page 15 of this document?

12  A.   Okay.

13  Q.   Can you read the first sentence of the last paragraph?

14  A.   "In certain waters of the Gauley River, (Scrabble Creek,

15  Left Fork/Scrabble Creek, Boardtree Branch, Sugarcamp Branch,

16  Stillhouse Branch, and Robinson Fork), the stressor

17  identification process determined ionic toxicity as the

18  primary stressor."

19  Q.   So this -- does this support your interpretation that

20  it's --

21  A.   Yes.

22  Q.   -- that DEP has identified --

23  A.   Yes.  That's why I was saying it had to have been -- one

24  of those two had to be high.  It made no sense otherwise.

25         MR. BECHER:  One moment, Your Honor.  Nothing

King - Recross

1    further, Your Honor.

2              THE COURT:  All right.  Recross?

3                    RECROSS EXAMINATION

4    BY MR. HARVEY:

5    Q.   Dr. King, I believe you told Mr. Becher that you would

6    expect the water to be the same in Boardtree as in Stillhouse,

7    correct?

8    A.   I'd expect the relative mixture of ions to be similar.  I

9    didn't say exactly the same.

10   Q.   Do you know what coal seams were mined in the Stillhouse

11   Branch watershed?

12   A.   Which specific coal seams?

13   Q.   Yes, sir.

14   A.   No, I don't.

15   Q.   How about at Boardtree?  Do you know what seams were

16   mined resulting --

17   A.   I don't recall.  I think I did at one point, but --

18   Q.   Mr. Becher showed you some individuals who were not on

19   the SAB panel but on the entire full SAB that included

20   epidemiologists and statisticians.

21        Do you recall that?

22   A.   Yes.

23   Q.   Do you know whether the entire SAB reviewed the

24   benchmark, or did the panel simply review the benchmark?

25   A.   I don't know for sure whether or not the entire SAB,

King - Recross

1   Science Advisory Board, reviewed it.  I don't recall.

2   Q.   Okay.  I'm going to point you to Plaintiffs' Exhibit 25,

3   page PE 385.

4        Mr. Tyree, can you pull that up?

5        We'll make do, Dr. King, without the screen.  On page 385

6   there's a paragraph that describes the process.  Do you see

7   that?  It says the panel met on July 20th through 22nd.  Do

8   you see that?

9   A.   I do.

10  Q.   Okay.  And midway through the paragraph, it says the

11  panel held a follow-up public teleconference on October 20th,

12  2010, and the SAB conducted a quality review of the panel

13  report on January 19th, 2011.  Do you see that?

14  A.   Yes.

15  Q.   Is it possible that the panel reviewed the benchmark and

16  then the SAB reviewed the panel's report?

17  A.   I mean it's clear that the panel reviewed the benchmark

18  in detail and that the board reviewed their assessment of it.

19  But earlier it says that the two technical documents mentioned

20  above were sent to the Scientific Advisory Board for review.

21  Q.   Right.  And then the panel reviewed them, correct?

22  A.   Well, it says it was sent to the SAB for review.  So it

23  may be that they reviewed it and then sent it out to the panel

24  for their comments and then they reviewed their comments.

25  It's really ambiguous to me in reading this.

King - Recross

```
 1    Q.    Okay.  You talked about the fact that at certain high
 2    temperatures, you found some mayflies in the data; is that
 3    correct?
 4    A.    Yeah.  You saw the graph that showed that that was the
 5    case.
 6    Q.    Right.  I'm going to ask you to turn to Joint Exhibit 43,
 7    which is a stipulation of the parties.  I can put it on the
 8    Elmo, I think.
 9          Do you have Joint Exhibit 43, Dr. King?
10    A.    I do.
11    Q.    And it describes a dataset taken from "How Many Mountains
12    Can We Mine?"  Do you see that, in paragraph 17?  I'm sorry.
13    A.    Paragraph 17?
14    Q.    Yes, sir.
15    A.    Yes.
16    Q.    Okay.  And it mentions that --
17                MR. BECHER:  Judge, I'm going to object.  I think
18    this is beyond the scope of redirect.  This is a new document.
19                THE COURT:  I can't see what you're starting to ask
20    about in the stipulation.  So I can't tell.
21                MR. HARVEY:  I don't know if we can get it on the
22    screen or not.  We were having trouble pulling it up a second
23    ago.
24          Your Honor, it is Joint Exhibit 43.
25                THE COURT:  Which paragraph?
```

King - Recross

 1          MR. HARVEY:  Paragraph 17, Your Honor.

 2          THE COURT:  Okay.  Explain to me how your

 3   questioning about this relates to the redirect.

 4          MR. HARVEY:  Your Honor, it is simple.  He found

 5   mayflies at high temperatures, and he considers that

 6   important.  This exhibit shows that there are passing WVSCI

 7   scores at high conductivity, very similar.  There are some

 8   examples of every piece of evidence --

 9          THE COURT:  All right.  I'm going to allow it since

10   it's cross-examination.

11   BY MR. HARVEY:

12   Q.   Paragraph 7 is ordered by habitat.  Do you see that,

13   Dr. King?

14   A.   I do.

15   Q.   It starts with marginal and it worked its way --

16   A.   Yes.

17   Q.   -- to optimal.  Do you see that?

18   A.   I do.  And, interestingly, all these -- looking through

19   marginal habitat here, all of them have mayflies.

20   Q.   I'd like to talk to you about some of the optimal

21   habitats towards the end.  This is on page 13 of the

22   stipulation.

23   A.   All right.

24   Q.   My apologies.  It's not showing up very well on the Elmo.

25          Do you see the one towards the bottom named Spruce Fork,

King - Recross

1    third from the bottom?

2    A.    Yes.

3    Q.    It has an optimal habitat, correct?

4    A.    It says optimal, yes.

5    Q.    And it has a conductivity of 608.  Do you see that?

6    A.    Yes.

7    Q.    And it has a passing WVSCI score.  Do you see that?

8    A.    Of 69.33, yeah.  That's pretty close.

9    Q.    Can you turn the page?  Maybe the one, two, three, four,

10   sixth line down, there's a site for the unnamed tributary of

11   Laurel Creek.  Do you see that?

12   A.    Yes.

13   Q.    And this site has an optimal habitat, correct?

14   A.    Yes.

15   Q.    And WVSCI at 363.  Do you see that?

16   A.    The conductivity was 363.

17   Q.    I'm sorry.  Conductivity.  WVSCI is 71.73.  Do you see

18   that?

19   A.    Yes.  Right near the edge.

20   Q.    How about Buckles Branch?

21   A.    Buckles Branch has 81.3, with very high conductivity of

22   1650.

23   Q.    Most of these sites with optimal habitat have passing

24   WVSCI scores, correct?

25   A.    Yeah.  Some do not, but --

King - Recross

1   Q.   How many?  I count two.

2   A.   Well, there aren't very many that have optimal habitat

3   either.

4   Q.   Okay.  Well, if we were going to use your pass/fail type

5   of chart, roughly how many optimal habitats do you think we'd

6   have here?

7   A.   Maybe 20.

8   Q.   Okay.  And how many fail at optimal habitat?

9   A.   Yeah, there's like two or three.

10  Q.   Okay.

11  A.   But there aren't very many that have elevated

12  conductivity.  There's only one, two -- there's really only

13  three that I would consider -- I mean there's one that has

14  363, you know, but that's kind of on the margin, and so

15  there's only three that have elevated conductivity in that

16  group.  So I'm not sure what your point is.

17  Q.   And they pass?

18  A.   Those barely pass.

19  Q.   81 is barely passing?

20  A.   Well, two of them barely passed, yeah.

21  Q.   Okay.  I understand that you feel that you won the battle

22  with Song Qian in the papers that went back and forth, but

23  Dr. Song Qian's papers were peer-reviewed; is that correct?

24  A.   Sure.

25            MR. HARVEY:  One moment, Your Honor.

King - Further Redirect

1              THE COURT:  All right.

2              MR. HARVEY:  Thank you, Dr. King.  No further

3    questions.

4              THE COURT:  All right.  Any redirect?

5              MR. BECHER:  I'll be very brief, Your Honor.

6                   FURTHER REDIRECT EXAMINATION

7    BY MR. BECHER:

8    Q.   I just want to make one clarification point about the SAB

9    panel and full SAB review.  I think you said it was ambiguous

10   whether the SAB reviewed the entire benchmark or not.

11             Is there any doubt that they reviewed the panel's report?

12   A.   No.  It's --

13   Q.   So --

14             THE REPORTER:  I'm sorry.

15             THE COURT:  One at a time.

16   BY MR. BECHER:

17   Q.   Sorry.  Go ahead.

18   A.   It's clear that they reviewed the panel's comments, their

19   report, and it is implied that initially the board reviewed

20   the benchmark document.

21   Q.   Okay.  Thank you.  Mr. Harvey was bringing you through

22   some of the data from, I believe, your "How Many Mountains"

23   paper.

24             Did any of the data he pointed out change your mind?

25   A.   No.  And, you know, I think a very critical point has

388

King - Further Redirect

1   been -- I don't think I have yet discussed it, but from the

2   2014 Pond et al. paper, there are cases with some of these

3   points where you have a high conductivity and a passing WVSCI

4   score.  They examined that.  They actually had a few cases

5   where they had high conductivities and good bug data.  But

6   they identified the reason.  And the reason was, in every case

7   they examined, there was an unmined tributary that was

8   contributing drifting organisms.  Sometimes 4,000 organisms

9   would drift into the mine channel per day.  And so the unmined

10  tributary had very good biological condition.

11       And so it illustrates that there is a mechanism that

12  explains this.  And so you have a source, these tributaries,

13  and then the mined site becomes a temporary place for these

14  organisms.  They -- you know, as I suggested in the past, I

15  think that it's mostly a chronic stressor.  It doesn't kill

16  them immediately.  And so when they go and they collect, they

17  get these organisms that are actually from a different place.

18  And without those tributaries, you don't see those scores.

19  And that's a major conclusion of the Pond 2014 paper.

20            MR. BECHER:  Thank you.

21            THE COURT:  All right.  Any other questions?

22            MR. HARVEY:  One, Your Honor.

23                      FURTHER RECROSS EXAMINATION

24  BY MR. HARVEY:

25  Q.   This data in paragraph 17 is from your paper, correct,

King - Further Recross

1    "How Many Mountains Can We Mine?"

2    A.    It says so, yes.

3    Q.    Do you know whether these sites we talked about had

4    tributaries feeding clean water into these streams?

5    A.    I don't know.

6              MR. HARVEY:  No further questions.

7              THE COURT:  All right.  Any other questions for

8    Dr. King?

9              MR. BECHER:  (Shakes head from side to side)

10             THE COURT:  Thank you, Doctor.  You may step down.

11        All right.  Mr. Becher?

12             MR. BECHER:  Plaintiffs rest.

13             THE COURT:  All right.  The plaintiffs have rested.

14             MR. BECHER:  Oh, excuse me.  I neglected to move

15   plaintiffs' exhibits.  If we could, may I suggest we can move

16   on and I can gather together the folders of exhibits and I'll

17   introduce them before we leave today?

18             THE COURT:  That's fine with me.

19             MR. BECHER:  May we also un-sequester our witnesses,

20   Dr. Palmer and Dr. Prestegaard?

21             THE COURT:  You may.

22        All right.  Mr. Harvey, are you ready?

23             MR. HARVEY:  Your Honor, at this time actually we

24   would like to move for a directed verdict.

25             THE COURT:  All right.  Go ahead.

1          MR. HARVEY:  Conductivity is not a pollutant.  It's

2     a surrogate.  It is a condition like humidity.  It is a

3     measure of ions which you have heard throughout these first

4     two days of testimony are harmful, according to the evidence

5     put on by the plaintiffs.  Those ions include calcium,

6     magnesium, sulfate, and bicarbonate.

7          The plaintiffs have introduced all of their chemical

8     data.  It does not include bicarbonate.  It does not include

9     magnesium.  Two of the four fingerprint ions that are

10    important to the EPA benchmark, to the paper that Dr. King

11    did, we do not think they can make their case without that

12    evidence.

13         Under the law they have to show that a pollutant is

14    causing a violation of West Virginia's narrative standards.

15    They have left out two of the primary pollutants that they

16    claim is part of some mixture that is harmful.

17         THE COURT:  All right.  Response?

18         MR. LOVETT:  Your Honor, we know from the evidence

19    at Stillhouse itself that sulfates are extremely elevated,

20    over 2000, and I think the testimony showed that 50 is the

21    level of concern.  We have levels -- we saw data showing --

22    data sheets showing sulfates elevated well over 2000.

23         Dr. King just testified that calcium was also very high

24    in Mr. Hansen's list of constituents of the water and that

25    that of the breakdown.  That bicarbonate shows that

1    bicarbonates are high.  The calcium number itself shows that

2    calcium is high.  And we also know that conductivity is

3    extremely elevated.  All of the samples I think were over

4    sixteen or seventeen hundred, and many over two or three

5    thousand.

6        I also think it's a question about whether conductivity

7    itself is a pollutant.  I think that's a legal question that

8    hasn't been briefed here.  We believe it is a pollutant.

9    Mr. Harvey has done nothing to show that it's not a pollutant.

10   It's a material, the concentration at which this case causes

11   harm to aquatic life, impairment.

12       And, similarly, pH has been deemed to be a pollutant, and

13   it similarly is an indicator of other problems with -- it's an

14   indicator, just like conductivity, yet it is certainly a

15   pollutant.

16       So we know that the WVSCI scores are failing, that the

17   water is impaired here.  We know that at this site, sulfates

18   are high, calcium is high, bicarbonates are going to be high.

19   So we know that the conductivity is high, and, of course, we

20   have much evidence showing that when conductivities, sulfates,

21   bicarbonates, and calcium are high, that that is a cause of

22   the impairment that we see here.

23       We see no mayflies at this site, and that can only be

24   explained by the conductivity and its associated ions.

25            THE COURT:  All right.  Mr. Harvey, do you want to

1    reply?

2            MR. HARVEY:  Your Honor, I believe they said

3    themselves, as did EPA, that conductivity per se is not a

4    pollutant.  The important thing is the mixture of the ions.

5        They have failed -- and I don't think they deny -- to

6    introduce any evidence about two of them, bicarbonate and

7    particularly magnesium.

8        I understand that Dr. King said there's some relationship

9    between calcium and bicarbonate.  I'm not sure they've proved

10   it up.  There's been nothing whatsoever introduced in the way

11   of magnesium, which is a difference-maker.  It is one of the

12   four principal ions listed in every study they've put into

13   evidence, Your Honor.

14           THE COURT:  All right.  I'm going to take this under

15   advisement.  I want to consider your arguments.  While we're

16   here, let's go ahead and start with the defense case.

17           MR. HARVEY:  Your Honor, defendants call Carrie

18   Kuehn.

19           THE COURT:  All right.

20           MR. HARVEY:  Your Honor, can Mr. Tyree set up a --

21           THE COURT:  Yes, he may.

22       If you'll step up here, my clerk will swear you in.

23         CARRIE KUEHN, DEFENDANT'S WITNESS, SWORN

24           MR. HARVEY:  Obviously we need someone who's not a

25   lawyer to set this up.  We'll do the best we can.

 1           MR. LOVETT:  Also, Your Honor -- excuse me, Shane.

 2    Sorry.  I don't know what that's going to be used for, but we

 3    can't see it.

 4           THE COURT:  Are you going to use it?  Do you want

 5    your witness to use this to write things?

 6           MR. HARVEY:  There will be a couple of occasions

 7    where she will do that, Your Honor.  I don't know of a good

 8    location where the Court can see it and the plaintiffs can see

 9    it.

10           THE COURT:  Well, I'm not sure either.  I'm

11    concerned about our ability to hear the witness without the

12    microphone if she moves from the witness stand.  I don't know

13    if there's a way of setting that up up here.  I can't tell

14    from the base of it whether there's room.  I don't know how

15    much you're going to use it.  So I don't have an easy

16    solution.

17           THE WITNESS:  It might fit, but we could try back

18    here.

19           MR. HARVEY:  Your Honor, what we will do is during

20    the trial, we'll be holding it for Ms. Kuehn.

21           THE COURT:  We could have Mr. McLusky lift it up

22    over here.  He's not doing anything.

23           MR. HARVEY:  He may not be tall enough, Your Honor.

24           THE WITNESS:  I could draw on it and then hold it

25    up.

Kuehn - Direct

1        MR. HARVEY:  Let's do that.

2        THE WITNESS:  Okay.

3        MR. HARVEY:  If we happen to have a break, Your

4   Honor, we'll fix that.

5        THE COURT:  That's fine.

6        MR. HARVEY:  My apologies.  During all that, I

7   didn't see if Miss Kuehn was sworn in.  I'm sorry.

8        THE WITNESS:  I was.

9        THE COURT:  She was.

10                    DIRECT EXAMINATION

11  BY MR. HARVEY:

12  Q.   Miss Kuehn, can you state your name for the record,

13  please.

14  A.   Carrie Kuehn.

15  Q.   And where are you employed?

16  A.   I'm employed at Exponent, Incorporated.

17  Q.   And what do you do at Exponent?

18  A.   I am a senior managing scientist in our biomedical

19  engineering practice.

20  Q.   And how long have you been so employed?

21  A.   It will be six years this October.

22  Q.   And what does a senior scientist at Exponent do in your

23  field?

24  A.   Senior managing scientist.

25  Q.   Managing scientist.

Kuehn - Direct

1   A.    I consult with clients.  I work with -- I direct --

2   supervise, direct reports.  I help manage the practice.  And I

3   do consulting work with a variety of different clients.

4   Q.    Are you an epidemiologist?

5   A.    Yes, I am.

6   Q.    What is epidemiology?

7   A.    Epidemiology is the study of the effect of the exposures

8   on outcomes.  We primarily use statistics as our main tool for

9   conducting epidemiologic research.

10  Q.    You said "we."  Do you use statistics in your day-to-day

11  work?

12  A.    Yes, I do.

13  Q.    Are you a trained statistician?

14  A.    Yes, I am.

15  Q.    Do you frequently examine observational data to reach

16  conclusions of general causation or inferences about general

17  causation one way or the other?

18  A.    Yes.  I've used many different types of observational

19  data and conducted statistical analyses on them to examine the

20  causal effect of an exposure on an outcome.  We don't always

21  infer causation based on just one analyses, but we look at the

22  effect of the exposure on the outcome.  So, yeah, I do that a

23  lot.

24          MR. HARVEY:  May I approach, Your Honor?

25          THE COURT:  You may.

Kuehn - Direct

1   BY MR. HARVEY:

2   Q.   Miss Kuehn, I've handed you what's been marked as Joint

3   Exhibit 67.  Is that your resume?

4   A.   Yes, it is.

5   Q.   Does it appear to be an up-to-date copy of your resume?

6   A.   Yes.  It looks relatively recent, yeah.

7   Q.   Okay.  On page 3 there's a section entitled Academic

8   Credentials and Professional Honors.  Do you see that?

9   A.   Yes, I do.

10  Q.   I see that you have a bachelor of arts degree in

11  anthropology from the University of Washington.

12  A.   That's correct.

13  Q.   Now, tell me about that degree.

14  A.   I primarily studied human biology.  So it was a focus on

15  physical anthropology, which is the study of humans.  I did

16  extensive undergraduate coursework in basic science,

17  chemistry, biology, anatomy, physiology, statistics, and

18  anthropology.

19  Q.   Lawyers often take or major in political science in

20  undergrad before becoming lawyers.  Do epidemiologists

21  frequently major in anthropology on their way to becoming

22  epidemiologists?

23  A.   Yes.  I know a number of epidemiologists who began their

24  college careers in anthropology.

25  Q.   I see you also have a masters in biocultural

Kuehn - Direct

1    anthropology; is that correct?

2    A.   That's correct.

3    Q.   Did you tell me you were pursuing that at the same time

4    you received your masters in public health and epidemiology?

5    A.   That's correct.  I studied -- I did both degrees

6    concurrently over a three-year time period.

7    Q.   And I believe I read online that the University of

8    Washington is one of the top epidemiologic schools in the

9    nation; is that correct?

10   A.   That's correct.  It's a world-class institution for

11   epidemiology.

12   Q.   And I see here from your resume that you have authored or

13   co-authored several articles in the field of epidemiology; is

14   that correct?

15   A.   That's correct.

16   Q.   Do these articles involve reaching conclusions from

17   observational datasets?

18   A.   Yes, they do.

19   Q.   Do they involve the use of statistics?

20   A.   All of them do, yes.

21   Q.   Were these articles peer-reviewed?

22   A.   Yes, they were.

23   Q.   How many statistics classes did you take on the way to

24   getting your anthropology and epidemiology degrees?

25   A.   At least ten, the majority of which were graduate-level,

Kuehn - Direct

1   high-level statistics or biostatistics courses.

2   Q.    Biostatistics?

3   A.    That's correct.

4   Q.    Can you give us examples of some of the courses you took?

5   A.    I took applied ecologic methods, which is essentially the

6   application of statistics to an epidemiologic question.   I

7   took fundamental epidemiology methods, which involved

8   statistics throughout the training.   I took advanced courses

9   in logistic regression as well as survival analysis, just to

10  name a few examples.

11  Q.    And it appears here that you frequently -- I'm looking at

12  pages 5 and 6 and 7 of your resume, and 8.   You frequently

13  present on topics involving epidemiology?

14  A.    That's correct.

15  Q.    Are you a member of any epidemiological societies?

16  A.    Yes, I am.

17  Q.    Tell the Court what those are, please.

18  A.    I am a member of the International Society for Pharmaco-

19  epidemiology.   I'm also a member of the Society for

20  Epidemiologic Research.

21  Q.    Prior to being employed at Exponent, where were you

22  employed?

23  A.    I was employed in the pharmacoepidemiology group at

24  Amgen, which is a biotech company.

25  Q.    How many years in total do you have in the practice of

Kuehn - Direct

1   epidemiology?

2   A.    More than 12 years.

3           MR. HARVEY:  Your Honor, at this time I would move

4   to admit Carrie Kuehn as an expert in epidemiology.

5           THE COURT:  I'm satisfied.  Do you want to --

6           MR. LOVETT:  Well, Your Honor, we're not satisfied,

7   but --

8           THE COURT:  I'll let you cross-examine her about her

9   qualification.

10          MR. LOVETT:  Now or --

11          THE COURT:  No, after we go through it.

12          MR. LOVETT:  Okay.  Thank you.

13  BY MR. HARVEY:

14  Q.    Miss Kuehn, is epidemiology used to examine issues of

15  general causation?

16  A.    Yes, it is.

17  Q.    How?

18  A.    We use observational data to examine associations between

19  exposures and outcomes.  We cannot typically observe the cause

20  and effect relationships that we're interested in.  So we use

21  a variety of statistical techniques to analyze observational

22  data to evaluate the exposure and outcome relationships of

23  interest.

24  Q.    Does epidemiology examine associations between variables

25  such as the association between smoking and lung cancer?

Kuehn - Direct

1    A.   Yes, it does.

2    Q.   How are associations measured?

3    A.   Associations can be measured using a variety of

4    statistical techniques.  Some statistics are best for

5    exploring data to try and get a sense for what your data looks

6    like.

7         Others are designed to examine the -- or measure the

8    effect of a variable, like an exposure, on another variable,

9    like an outcome.

10   Q.   Can associations be measured with correlation

11   coefficients?

12   A.   Yes, but in a very limited way.

13   Q.   What is a correlation coefficient?  I know we heard

14   Dr. King talk about those.  Explain to the Court what a

15   correlation coefficient is.

16   A.   A correlation coefficient tells you if the values for two

17   variables move in the same direction or in opposite

18   directions.  The value of the correlation coefficient tells

19   you how close those two variables or the values for those two

20   variables are to a straight line.  That's all that value tells

21   you.  It's usually denoted by a small letter "r," and that's

22   about it.  That's about all I can tell you.

23   Q.   And according --

24             MR. LOVETT:  Your Honor, this is beyond the scope of

25   her report.  There's nothing in her report about background or

Kuehn - Direct

1  coefficient correlation or -- we're outside the scope of her

2  expert report.

3         THE COURT:  As I recall her report -- I don't have

4  it in front of me, but she provided her opinion criticizing

5  reliance upon the correlation coefficients that are cited in

6  these studies.  I think she can certainly explain what these

7  evaluations mean.  Overruled.

8  BY MR. HARVEY:

9  Q.   And "r" is usually measured somewhere between zero and 1;

10  is that correct?

11  A.   That's correct.

12  Q.   And a correlation coefficient of zero would be a

13  scatterplot of data with no relationship to the line drawn

14  through it?

15  A.   Yeah.  I can draw a picture if you'd like.  But, yeah.

16  So a correlation of zero would essentially be a graph with a

17  bunch of dots that seemingly have no relationship to each

18  other.

19  Q.   And a correlation of 1 would be tightly clustered around

20  a line, correct?

21  A.   That's correct.

22  Q.   Okay.  Do correlation coefficients have limitations in

23  terms of what they can tell you?

24  A.   Yes.  Correlation coefficients are limited in that they

25  can only tell you, again, how close the values of those two

Kuehn - Direct

1    variables are to a straight line.

2        So if your variables are related to each other in

3    anything but a linear fashion -- that's what we mean by a

4    straight line -- a correlation coefficient cannot tell you

5    anything about them.

6        They are also highly susceptible to distortion by

7    outliers.  And this is best I think illustrated if I can draw

8    a picture.  Would that be all right?

9    Q.   Absolutely.  Okay.

10   A.   Okay.  Can everybody see that?  So as I was saying, in

11   the top graph we can see that our X and our Y axis, they're

12   clearly related to each other.  They're a curved linear

13   relationship.  Naturally we see relationships like this, for

14   example, in medication use where we see an improvement, but

15   then we see a deterioration because you're giving more

16   medication to sick people.  It's an example of that.

17               MR. LOVETT:  Your Honor, may I approach and stand --

18               THE COURT:  Go ahead.  Certainly get where you need

19   to.

20               THE WITNESS:  So you can see it.  You can see that

21   the correlation is zero when, in fact, we have a very distinct

22   relationship between the variables.  So the correlation

23   coefficient just can't tell you about that.

24        The second graph shows what is clearly a linear

25   relationship, but we have one small point down on the bottom

Kuehn - Direct

1   right here, and that outlier throws off the correlation.   And

2   so it tells us we have no correlation when, in fact, most of

3   our data actually say we do.   We have a nice straight line

4   there.

5        The bottom is another example where most of our data is

6   down in the bottom corner.   There's not necessarily a good

7   relationship, but we have one point that is all the way up in

8   the top right-hand corner.   And because of that, it detects

9   that as being a straight line.   And so our correlation is

10  actually inflated.   It's .99, close to 1, when, in fact, we

11  don't have a relationship.

12       So correlation coefficients can be very misleading in

13  terms of their ability to tell us about our data.

14  BY MR. HARVEY:

15  Q.   Is that true for ecological data as well as medical data?

16  A.   It's true for any data.

17  Q.   Okay.   Is correlation the same thing as causation?

18  A.   No, it is not.

19  Q.   Give me an example to help me understand.

20  A.   So, for example, we might find that gray hair is highly

21  correlated with dying.   We might find that the correlation is,

22  you know, 80, 90 percent, but that doesn't mean that having

23  gray hair causes you to die.   And it illustrates the point

24  that correlations are symmetric.   There's no indication of

25  directionality.   You can't use them to establish causation;

Kuehn - Direct

1    and, in fact, there's a number of textbooks and articles that

2    have -- that warn against using correlation coefficients to

3    establish causation for that very reason.

4    Q.   In fact, that's a principle explained in most

5    epidemiology and statistics textbooks, correct?

6    A.   That's correct.

7    Q.   Correlation does not equal causation.

8    A.   That's correct.

9    Q.   Is Rothman's book on *Modern Epidemiology* a reliable

10   treatise on the subject?

11   A.   It is an authoritative textbook on the subject of

12   epidemiology and the application of statistics in

13   epidemiology.

14   Q.   I'm going to show you a passage from page 185 from that

15   treatise.

16   A.   Yes.

17   Q.   Mr. Tyree is going to put it on the screen.

18            MR. LOVETT:  Your Honor --

19            THE COURT:  Hold on.

20            MR. LOVETT:  Is this in your --

21            MR. HARVEY:  This is Defendant's Exhibit 21.

22            MR. LOVETT:  Well --

23            THE COURT:  Is this something she relies on in her

24   report?

25            MR. HARVEY:  Yes.  Yes.  It's listed in her report.

Kuehn - Direct

1    MR. LOVETT:  It's *Modern Epidemiology*?

2    MR. HARVEY:  Yes, by Rothman.

3    THE COURT:  Are you going to have her read this?

4    MR. HARVEY:  I'm going to try to avoid as much of it

5    as we've seen, Your Honor.

6    BY MR. HARVEY:

7    Q.   Miss Kuehn, does this text from Rothman help explain the

8    principles of causation and association?

9    A.   Yes, it does.

10   Q.   Can you read only so much of it as might inform the Court

11   about that commonly understood principle?

12   A.   Sure, you bet.  So Rothman's book talks first about the

13   fact that causation and association are qualitatively

14   different concepts, that they are not the same thing.

15       He goes on to say, similar to what I was just noting,

16   that causal relations are directed.  Associations are

17   undirected.  They are symmetric.  There's no sense of

18   directionality.

19       And as I mentioned, he also states that sample

20   associations are directly observable, but causation is not.

21   And when we talk about samples, we're talking about data

22   gathered from the entirety of the population.  We have to

23   sample that data.  That's the dataset that we use.  So we

24   observe associations in samples because we cannot observe

25   causation as it occurs.

Kuehn - Direct

1        So he goes on to say that -- and I'll quote.  Our

2   intuition tells us that associations are the result of causal

3   forces.  Most obviously, if X, which would be our exposure,

4   causes Y, which is our outcome, this will generally result in

5   an association between X and Y.

6        He goes on to state, though, that the catch, of course,

7   is that even if we observe X and Y without error -- so if all

8   of our measurements are absolutely perfect -- many other

9   forces, such as confounding and selection, may also affect the

10   distribution of Y -- in other words, the outcome that we are

11   interested in -- and thus induced an association between X and

12   Y that's actually not due to X causing Y.

13        So he's talking about confounding here, which has been

14   something we've talked about quite a bit.

15   Q.   Let me ask you, what is confounding?

16   A.   What is confounding?  Confounding is a distortion of

17   the -- is the distortion of an observed association.  So it's

18   the distortion of an effect of an exposure on an outcome that

19   we might observe in our observational data.

20        It can also be called a mixing of effects, but

21   essentially confounding is when you observe an association

22   between an exposure and an outcome but that observation is

23   actually distorted by another factor.

24   Q.   I think you've prepared an exhibit, Defendant's Exhibit

25   1.  Mr. Tyree, can you put that on the screen, please?

Kuehn - Direct

1          MR. LOVETT:  I'm sorry to interrupt, but could you

2   tell us the page number?  We can't find that in --

3          MR. HARVEY:  It's under tab 1.  It's only one page.

4          THE COURT:  Tab 1, volume 1 of Defendant's?

5          MR. HARVEY:  Yes, Your Honor.

6          MR. LOVETT:  I need the page that she just read

7   from, the page, the Rothman page.

8          MR. HARVEY:  Oh, the Rothman?

9          MR. LOVETT:  It was a very long book that you gave

10  us.  I don't know the page on which to find that.

11         MR. HARVEY:  Page 185.

12         THE COURT:  All right.  Let's say this into the

13  record.  Mr. Harvey, will you provide us with the page number

14  from the quote from the book that she read?

15         MR. HARVEY:  Yes, Your Honor.  It is on page 185 of

16  *Rothman on Modern Epidemiology*.

17         THE COURT:  And that's one of the defense exhibits?

18         MR. HARVEY:  It is, Your Honor.  It's Defendant's

19  Exhibit --

20         MR. LOVETT:  We found it.  Thank you.

21         MR. HARVEY:  -- 21.

22         THE COURT:  All right.

23  BY MR. HARVEY:

24  Q.  Miss Kuehn, do you recognize Defendant's Exhibit 1 shown

25  on the screen?

Kuehn - Direct

1   A.    Yes, I do.

2   Q.    Can you use that exhibit to explain the concept of

3   confounding to the Court?

4   A.    Yes, I can.  So what we see here is E, which is our

5   exposure of interest, is -- has an effect on Y.  Y is our

6   outcome.  So, for example, in the issue at hand here, E would

7   be conductivity.  Y would be impairment.  And so we're

8   interested in the effect of the exposure on the outcome.

9         What the diagram shows, however, is that C, which is your

10  confounder in this case -- this could be temperature, habitat,

11  any of the other confounders that have been identified or

12  potential confounders -- is a risk factor for the outcome and

13  also is associated with the exposure.  And so this diagram

14  simplifies the concept of confounding.  Instead of just being

15  able to observe the effect of the exposure on the outcome, we

16  have to take into account the confounding effects of the

17  confounder.

18  Q.    Do you recall the discussion between Dr. King and me

19  about asbestos and lung cancer and smoking being a potential

20  confounder?

21  A.    Yes.

22  Q.    Were you present for that?

23  A.    Yes, I was.

24  Q.    Is that a good example of the concept of confounding?

25  A.    That's an excellent example of confounding.

Kuehn - Direct

1    Q.    Because asbestos may be associated with smoking, correct?

2    A.    Absolutely.  It could be related to the fact that the

3    workers can have an increased frequency of smoking or what

4    have you, and smoking is clearly a risk factor for lung

5    cancer.  So, sure.

6    Q.    Do most textbooks and treatises in statistics and

7    epidemiology address the issue of confounding?

8    A.    Confounding is an important -- I can't emphasize enough,

9    a very important topic in epidemiology and statistics,

10   particularly as it concerns the analysis of observational

11   data, because we have no control over the occurrence of that

12   data.  It's not an experiment.  It's uncontrolled.  That's why

13   we call it observational.

14        We have to take into account confounding.  And the

15   textbooks on this topic will include chapters on confounding,

16   and nearly every chapter in every textbook I've ever looked at

17   talks about confounding.  It's a very big deal, particularly

18   with observational data.

19   Q.    Is it something that can affect ecological data?

20   A.    It can affect any data where we're looking at an exposure

21   on an outcome and the data that we are examining or analyzing

22   is observational, which is exactly what this dataset is.  So,

23   absolutely.

24   Q.    I'd like to return to *Rothman on Modern Epidemiology*,

25   particularly page 129 from Defendant's Exhibit 21.  And

Kuehn - Direct

1    Mr. Tyree has put a section of that book on the screen.

2         Does this help explain the concept of confounding?

3    A.   Yes.  So as I stated, a simple way to describe

4    confounding is stated there.  It says, "On the simplest level,

5    confounding may be considered a confusion of effects."  They

6    go on to state that the apparent effect of the exposure of

7    interest is distorted because the effect of extraneous

8    factors, potential confounders, is mistaken for, or mixed

9    with, the actual exposure effect, which may actually be null,

10   which means it may actually have no effect.

11        The distortion introduced by a confounding factor can be

12   large, and it can lead to overestimation or underestimation of

13   an effect.  And, again, this depends on the direction of the

14   confounding and the direction of the effect of the exposure on

15   the outcome.  So it can have a very large effect on the

16   results of any analysis.

17   Q.   And confounding can be hard to identify, correct?

18   A.   It can.  Confounding can be subtle.  Understanding the

19   potential confounding effects of extraneous factors is a major

20   source of anxiety for most epidemiology students.  It's not a

21   simple concept to necessarily understand or apply.

22        You can have very subtle effects of confounding that end

23   up having a large impact on the estimate of the effect of the

24   exposure of interest, on the outcome of interest, and so it's

25   very important that it be addressed thoroughly and correctly

Kuehn - Direct

1    in the analysis.

2    Q.    Can confounding lead to spurious conclusions if not

3    properly addressed?

4    A.    Absolutely.  So, again, if we have confounding, that

5    means that the exposure and outcome relationship that we're

6    observing in our analysis is not correct.  It's distorted by

7    something we have not controlled for or adjusted for.

8         So if we fail to take it into account, then what we

9    observe is actually not the true association between that

10   exposure and the outcome.  So it's incredibly important.  So

11   without good identification of confounding, appropriate

12   adjustment for a confounding in the analyses, the results that

13   you get can be completely meaningless.

14   Q.    Well, how do we identify confounders?  Can you use

15   statistics to identify confounding?

16   A.    Absolutely.  So you can use statistics.  You can use

17   a priori information or knowledge that you have about

18   potential confounders.  There are a number of ways that we go

19   about identifying confounding and then determining whether

20   potential confounders actually have an effect on the

21   relationship of interest.

22   Q.    Can you use regression to identify confounders?

23   A.    We can use regression to determine if a potential

24   confounder has an effect on the relationship of interest.  In

25   other words, we can use regression to determine does that

Kuehn - Direct

1    extraneous factor distort the effect that we are observing.

2    Q.    Now, I think the SAB -- and Dr. King and I talked about

3    this.  The SAB panel recommended that EPA use regression.

4    A.    Yes.

5    Q.    Can you tell the Court what regression is?

6    A.    Regression is a statistical technique that we can use to

7    model, is what we call it, to model our data such that we can

8    examine the actual effect of the exposure on the outcome.

9         This is very different than what we were talking about

10   before which can't tell us how one variable affects another.

11   Regression allows us to examine that.  And we use regression

12   to estimate for what are called parameters.  So these are the

13   beta coefficients.  And I can draw another picture if that's

14   helpful, but they provide us with estimates of how much the

15   outcome changes with a change of exposure.  And then we use

16   statistical tests to tell us whether that change is

17   statistically significant.  And so we can use the regression

18   to do that.

19        The other thing we can do with regression is adjust for

20   confounders.  And so we can include those in our model in such

21   a way that we remove that distorting effect on the observed

22   associations.

23   Q.    Are there different kinds of regression?

24   A.    Yes, there are a number of different kinds of regression.

25   Q.    Do they depend on the type of data you're analyzing?

Kuehn - Direct

1   A.   Yes, they do.  This might be a good opportunity for a

2   picture, if that's all right.  Okay.

3           MR. LOVETT:  Your Honor, again, I object to this.  I

4   don't see anything about a regression analysis or explanations

5   about that in her report.

6           THE COURT:  Well, I'll let you respond to that when

7   she finishes her drawing.

8           MR. LOVETT:  Okay.

9           THE COURT:  All right.  Mr. Harvey, can you respond

10  to the objection?

11          MR. HARVEY:  Yes, Your Honor.  The report from

12  Miss Kuehn, which you've already read, talks about the failure

13  of both EPA and Dr. King to use proper statistical techniques.

14      One of the techniques that should be used -- and this was

15  stated by the SAB -- was regression.  And Miss Kuehn would

16  like to talk about the failure of both Dr. King and EPA to use

17  regression, why is it important, and it's a simple background

18  on regression.  And I think she does specifically reference

19  regression in her report, if you'd give me one moment, Your

20  Honor.

21      If I may, Your Honor, this is -- I'd like to read from

22  Miss Kuehn's report.

23          THE COURT:  Go ahead.

24          MR. HARVEY:  "Correlations such as those

25  described" --

Kuehn - Direct

1  THE COURT:  Well, tell us where you are first.

2  MR. HARVEY:  It's on page 9.  We can put it on the

3  screen as well, Your Honor.

4  THE COURT:  I've got it.

5  MR. HARVEY:  Okay.  It says, in the highlighted

6  part, Your Honor, "Correlations such as those described in

7  Dr. King's report are not considered to be measures of effect,

8  and thus should not be used to establish causation.

9  Multivariate modeling, including regression that controls for

10  confounders, would be a more appropriate means by which to

11  evaluate the relationship between exposure and outcome in this

12  situation."

13  MR. LOVETT:  Your Honor, that is the only mention of

14  the word "regression" in the entire report, and it's very

15  theoretical on a very general level.  So I mean --

16  THE COURT:  Well, I'm going to overrule your

17  objection.

18  MR. LOVETT:  Okay.

19  BY MR. HARVEY:

20  Q.  Are you finished with your --

21  A.  I am finished drawing.  If someone wants to hold it up, I

22  can --

23  Q.  Okay.

24  A.  I can explain.  All right.  So I believe the question was

25  related to different types of regression.  So there are

Kuehn - Direct

1   different kinds of regression to -- meant to handle different

2   kinds of data.  And so the most familiar regression is what we

3   call linear regression.  All of these can be multi, so multi-

4   linear or multi-logistic.  Basically "multi" just means they

5   have more than one variable predicting the outcome.

6            THE COURT:  I'm sorry to interrupt.  Shane, why

7   don't you stand over in the jury box and put that on the rail.

8   It would be easier for me to see.

9            THE WITNESS:  Okay.

10            THE COURT:  Back up a row.  If you'd go to that next

11   row back.  Is there anything there?

12            MR. HARVEY:  There is, but I'll navigate.

13            THE COURT:  All right.  That's much better for me.

14   Can you see it okay there?

15            MR. LOVETT:  Yes.  Thank you, Your Honor.

16            THE WITNESS:  So what I've done here is I've given

17   you a little cheat sheet on regression.  Okay.  So we have the

18   type of regression, the type of data that that regression is

19   designed to handle, an example from this case of the type of

20   data and the estimate.

21        I want to emphasize that the data type is the type of

22   data that is your outcome.  Okay.  So when we look at linear

23   regression, we're modeling a continuous outcome measure.  You

24   can have all different kinds of predictors, but your outcome

25   measure is what determines which model that you use.  Okay.

Kuehn - Direct

1        So in this example, we might use linear regression on
2   WVSCI score.  It's a relatively continuous variable.  And what
3   that would give us is an estimate in the form of a
4   coefficient.  And that coefficient would tell us to what
5   extent the outcome, WVSCI score, changes with a change in our
6   exposure, and we would get a p-value that tells us if that
7   change is significant.  And then we could also include
8   variables in the model for potential confounders, and we can
9   evaluate whether or not they have an effect on that estimate
10  and so forth.  So that's the first one.
11       The second one is logistic regression.  And logistic
12  regression is specifically designed to model a binary outcome.
13  This is a yes or no, cancer or no cancer.  In this case, we
14  might use it to model WVSCI above the 68 threshold or WVSCI
15  below.  And, again, we would put a number of predictors in the
16  model, conductivity being the exposure of interest.  And what
17  that model would estimate for us is called an odds ratio.
18       That odds ratio would tell us whether or not there is an
19  increased or a decreased risk for WVSCI scores of above 68,
20  depending on how you code it, with an increase in
21  conductivity.  And you can flip that around.
22       So let's say we wanted to know what the increased risk
23  was for an impaired score, and we could model our data such
24  that we could find the relative increased risk in an impaired
25  score based on a change in level of conductivity, and we could

Kuehn - Direct

1   control for potential confounders, etcetera.  So that's how

2   you would use logistic regression.  And, again, we would get

3   p-values to tell us if those odds ratios were significantly

4   significant.

5        Finally, we have Poisson or a negative binomial

6   regression.  I think we talked a little bit about this

7   earlier.  This is appropriate for using with count data when

8   your data is of the type.  In this case, number of bugs or

9   number of genera is a good example.  And what that estimates

10  for us is called a rate ratio, and it tells us the risk of an

11  increased rate or, in this case, an increased count or a

12  decreased count with a change in our exposure variable.  And,

13  again, we can control for potential confounders in that model.

14  So it would give us a p-value to let us know whether that

15  change was significant.

16       MR. LOVETT:  Your Honor, I didn't interrupt, but

17  none of this is in her report.  The word "Poisson" does not

18  appear in her report.  I understand the word "regression"

19  appears.  This is an exhibit really that was not given to us.

20  It's being created here because it wasn't in the report.

21       THE COURT:  Well, as I understand it, in her report

22  she made clear that she objected to or criticized the

23  statistical methodology used for the benchmark and by the

24  experts for the plaintiff, as well as a number of these

25  studies.

Kuehn - Direct

1          MR. LOVETT:  Yes.

2          THE COURT:  I think she's entitled to testify about

3   her criticism of the use of these statistics and these models.

4   And now, as I understand it, she's explaining the model or the

5   statistical method that she thinks should have been employed

6   which she made reference to in her report.

7          MR. LOVETT:  I understand, Your Honor.  Dr. King has

8   never had the opportunity to review this document.  He can't

9   see it.  She didn't say anything in her report about it,

10  and --

11         THE COURT:  What document are you talking about?

12  The drawing?

13         MR. LOVETT:  The document just created with the --

14         THE COURT:  I view this as nothing more than an

15  expert giving background explanation about the principles that

16  she is going to employ in her testimony.  I don't see it as a

17  problem.

18  BY MR. HARVEY:

19  Q.   Miss Kuehn, is data quality important in the field of

20  statistics and epidemiology?

21  A.   Yes, data quality is very important.  We want to make

22  sure that the data we are using to measure exposure, measure

23  confounders, measure our outcome are as accurate and precise

24  as possible.

25         When we have a lack of data quality, this can introduce

Kuehn - Direct

1    things like bias in our results and actually can severely

2    limit our ability to infer or make conclusions about the

3    results of our analysis.

4    Q.   We'll talk about this more later, but did you hear

5    Dr. King talk about snapshot data being almost useless I think

6    was his quote?

7    A.   Yes, I did hear him talk about that.

8    Q.   Is there a danger in using snapshot data in a study such

9    as this?

10   A.   In a study such as this where you have factors that

11   change repeatedly over time, using snapshot data can be

12   particularly problematic because you don't have an opportunity

13   to take into account that variation.

14       We have two things that, if I understand correctly,

15   change quite a bit.  One is temperature, which changes on an

16   hourly basis in addition to on a monthly and seasonal basis.

17   So based on what I read in the benchmark, nearly all of these

18   sites had only one set of measurements.  So we only have one

19   temperature for any particular site.  And the problem you run

20   into is whether or not that temperature is actually a good

21   reflection of the overall temperature profile of that site.

22       So it is problematic, and it limits our ability to

23   understand the effect of temperature on the outcome, the

24   effect of temperature as a confounder.

25       Similarly --

Kuehn - Direct

1          MR. LOVETT:  Your Honor, I apologize.  In her

2    deposition when asked if she had an opinion of data quality,

3    she said, quote -- this is on page 94 -- I have not evaluated

4    this data for its quality.  So I believe the opinion in my

5    report was to the extent that there are problems with the

6    data, which I have not analyzed, that it could lead to

7    problems with the results.

8         For her to now testify about data quality, you know,

9    there's nothing in her report about it, and she disavows it in

10   her deposition.

11         MR. HARVEY:  Your Honor, we'll look at that.  I

12   don't know.  We'll move on for now.

13         THE COURT:  All right.  Let's move on.  I'll reserve

14   the objection.

15         MR. HARVEY:  Okay.

16   BY MR. HARVEY:

17   Q.   Did EPA claim to use epidemiology in creating the

18   benchmark?

19   A.   Yes, they did.

20   Q.   I'd like to turn your attention to Joint Exhibit 58, page

21   386.

22        Mr. Tyree, if you can put that on the screen, Miss Kuehn,

23   you won't have to look for it.

24        May I approach, Your Honor?

25         THE COURT:  Yes, you may.

                        Kuehn - Direct

1   BY MR. HARVEY:

2   Q.   Here, Miss Kuehn, EPA says -- and I quote -- "The

3   evidence for and against salts as a cause of biological

4   impairment is weighed using causal criteria adapted from

5   epidemiology."

6        Do you see that?

7   A.   Yes, I do.

8   Q.   Mr. Tyree, can you turn to page 429 in the same exhibit,

9   Joint Exhibit 58.

10       And, Miss Kuehn, does this page similarly say, "The

11  inferential approach is to weigh the body of evidence, as is

12  done in epidemiology"?

13  A.   Yes, that's what it says.

14  Q.   And I think this page is under appendix A, which they

15  refer to as a causal assessment; is that correct?

16  A.   Yes.

17  Q.   And further down under section A1, EPA says, "To assure

18  the association of conductivity with the extirpation of

19  aquatic taxa reflects a causal relationship, we use

20  epidemiological arguments."

21       Do you see that?

22  A.   Yes, I do.

23  Q.   And there are other examples throughout the benchmark

24  where EPA purports to use epidemiology, correct?

25  A.   Correct.

Kuehn - Direct

1    Q.    And in the papers of Suter and Cormier.

2    A.    Correct.

3    Q.    Do you think it was appropriate for EPA to apply

4    epidemiology to this issue?

5    A.    Absolutely.  I mean this is the type of dataset that we

6    use in epidemiologic research.  It's an observational dataset

7    with measures of exposure and measures of outcome, and the

8    statistical techniques and methods used in epidemiology are

9    entirely appropriate.

10   Q.    I know you have some issues with the data quality, but

11   beyond that, the approach is something you're familiar with

12   and you think is acceptable.

13   A.    Absolutely.  We use limited data all the time, and the

14   key is to take into account those limitations when making

15   inferences based on our analyses.

16   Q.    Now, let me ask you this.  Did EPA properly apply

17   epidemiologic methods in their study of conductivity?

18   A.    No, they did not.

19   Q.    Did you see the discussion between Dr. King and myself on

20   some of the concerns raised by the Science -- Scientific

21   Advisory Board?

22   A.    Yes, I did.

23   Q.    Mr. Tyree, can you put those on the screen?  Those are

24   found in defense -- my writing might be -- maybe it's

25   Plaintiffs' Exhibit 25.  I'm sorry.  Plaintiffs' Exhibit 25,

Kuehn - Direct

1    page 402.

2         And Dr. King earlier read this statement, Miss Kuehn.

3    It's on the screen behind you.  I don't know if you have it in

4    front of you now.

5    A.    No.  I can see it on the screen.

6    Q.    You're familiar with it, though?

7    A.    Yes, I am.

8    Q.    Without reading it again into the record, what

9    essentially is the SAB telling the EPA in this paragraph?

10   A.    The SAB is recommending that EPA employ some additional

11   multivariate statistical methods to evaluate confounders in

12   particular.  They also are asking for clarification on why

13   other multivariate methods were not used to evaluate the

14   exposure and outcome relationship of interest.

15   Q.    Do you have similar concerns about the benchmark?

16   A.    Yes, I do.

17   Q.    I'd like to show you next Joint Exhibit 58, page 475.

18   This is something else that Dr. King and I discussed.

19        Here, EPA responds to the SAB's concerns, correct?

20   A.    Correct.

21   Q.    And they explain why they did not use multivariate

22   statistics, correct?

23   A.    Correct.

24   Q.    Tell me what you think about their explanation.

25   A.    It's nonsensical, to be blunt.  Firstly, they confuse the

Kuehn - Direct

1   recommendation to use multivariate statistics as a request

2   that they use that instead of their weight of evidence

3   technique; and they seemingly fail to recognize that what the

4   SAB was asking them to do, and what my criticism is, is that

5   they needed to apply multivariate statistics to examine the

6   relationship between conductivity and impairment and evaluate

7   confounding.

8       The results from those analyses would feed into a weight

9   of evidence for causation.  They're two separate things, and

10  EPA seems to conflate those.

11      The other thing that really doesn't make sense is they

12  actually state that it would not be appropriate to use

13  multivariate statistics on these data, which is, again, just

14  nonsense.  This is exactly the kind of data that these

15  statistical tools are designed to be used for.  So it simply

16  doesn't make any sense to me.

17  Q.   If you were to pick up any textbook on statistics or

18  epidemiology, there would be discussions about using these

19  tools on this type of data, wouldn't there?

20  A.   Absolutely.

21  Q.   Even though EPA expressed the reservations that they had

22  in this paragraph, did they ultimately perform a multiple

23  regression analysis?

24  A.   They appeared to have performed some multi-linear

25  regression, yes.

Kuehn - Direct

1    Q.    Okay.  I don't know that Dr. King pointed us to that in

2    his testimony today, but I'd like to clarify that for the

3    Court.  If we could turn to Joint Exhibit 58, page 482.

4         What is this, Miss Kuehn?

5    A.    This appears to be output from two linear regression

6    models.  The first model is described in those top few rows

7    where it says Univariate Model.  "Univariate" means they had

8    one variable in the model.  And then there's a multivariate

9    model below that.

10   Q.    And it looks like they're trying to analyze certain

11   confounders in the benchmark?

12   A.    Yes.  So the univariate model includes conductivity, and

13   the multivariate model includes conductivity, RBP slope,

14   temperature, and fecal coliform slope.

15   Q.    Is this a proper regression analysis?

16   A.    Well, the outcome that they were examining was predicting

17   the bug genera as far as we can -- I can tell from their

18   description, whether or not the bugs are present or counts of

19   genera.

20        So as I explained before, when we have count data, we

21   want to use the appropriate model for that data.  And here,

22   they used linear regression --

23             MR. LOVETT:  Objection, Your Honor.  She is not --

24   she has testified in her deposition that she is not an aquatic

25   ecologist.  She has no knowledge of what appropriate data are.

Kuehn - Direct

1    She may be able to determine if data have been analyzed in a

2    particular way, but to determine which data are analyzed is

3    beyond her -- not only the scope of her expertise but the

4    scope of what she said in her deposition.

5            THE COURT:  Overruled.  I'm going to permit her to

6    testify.  She's testifying as an epidemiologist to the

7    appropriate use of these regression analyses.  I don't think

8    at this point that she's required also to demonstrate that she

9    has this ecology background.

10    She's testified that from her knowledge of this, this is

11    an example of the type of data that requires a particular

12    model to be used to determine if they used properly a

13    regression analysis.

14            THE WITNESS:  So, again, they used linear regression

15    on what appear to be count data.  If it was present or absent,

16    we would want to use logistic regression.  So they are

17    applying the wrong model to the data.

18    The other problem here is we can't tell anything about

19    their output.  They have neglected to provide us with any of

20    the statistical tests' information that we need to know.  So

21    you can see here where it says conductivity slope, minus 0.93,

22    and it provides us with a standard error, what I need to then

23    see is, was that statistically significant?  Did conductivity

24    statistically predict the outcome?

25    Now, this is the wrong model, but if it was the correct

Kuehn - Direct

1    model, we still don't have the information we need.  So while

2    they've provided us with some output here, it's

3    uninterpretable given what they've got in that table.

4    BY MR. HARVEY:

5    Q.   Are you familiar with a textbook by Koepsell and Weiss on

6    epidemiologic methods?

7    A.   Yes.  Actually, Drs. Koepsell and Weiss were graduate

8    school professors of mine, and my cohort actually helped them

9    edit that book.

10   Q.   I'd like to show you Defendant's Exhibit 22, page 263,

11   from that treatise.

12         MR. LOVETT:  I'm sorry, Your Honor, but is this

13   cited?  I don't see it, Koepsell and Weiss.

14         MR. HARVEY:  Koepsell and Weiss, yes, it is.

15         MR. LOVETT:  Okay.  Oh, there it is.  Sorry.

16         THE COURT:  What volume are you in?

17         MR. HARVEY:  Defendant's Exhibit 22.  I don't know

18   that -- volume 2, Your Honor.  Volume 2.  My mistake, Your

19   Honor.

20   BY MR. HARVEY:

21   Q.   What does this table or output on page 263 show,

22   Miss Kuehn?

23   A.   So this is what we would typically desire to see in a

24   regression output.  This happens to be from a logistic

25   regression, so, again, a binary outcome.

Kuehn - Direct

1        What they show us is the first model, which has our

2   exposure, which here happens to be oral contraceptive use --

3   this is a study looking at cardiovascular disease in women who

4   have taken oral contraceptives.

5        So they provided us with the point estimate in the first

6   model.  Then the second model, they are examining the effect

7   of -- looks like something having to do with physical activity

8   I think is what that stands for.

9        So you can see the left side of the table is similar to

10  what EPA provided us.  There's the point estimate and standard

11  error, but now we have the rest of it.  We have the p-values.

12  And that tells us whether or not the exposure of interest is a

13  significant predictor of our outcome.

14       We also have the odds ratio, which is what the logistic

15  regression calculates for us, and that's actually calculated

16  from the point estimate, and then we have a confidence

17  interval.

18       So we can see in this model whether or not we have

19  statistical significance in the parameters being estimated by

20  the model.  And that's what we need to see in order to

21  interpret regression output.

22  Q.   Other than this flawed regression analysis that EPA

23  performed and the paragraph saying, "We disagree with you,

24  SAB," did EPA do anything else to address the SAB's comments

25  as far as you're concerned?

Kuehn - Direct

1   A.   Not as far as I can tell, no.

2   Q.   So if EPA didn't run proper statistical models, how did

3   they address confounders?

4   A.   Based on what I read in the benchmark, EPA applied their

5   own criteria and what appears to be a weight of evidence

6   technique that we would normally use for causation.  I think

7   it's loosely based on Bradford Hill, which is a set of

8   criteria -- and I say that loosely -- that we use to evaluate

9   causation.

10       Bradford Hill is -- it's very rare that -- we don't -- we

11   don't look at it as a checklist.  It's sort of a guideline for

12   establishing causation.  But, anyway, EPA used these weight of

13   evidence criteria, and the criteria they listed in appendix B,

14   and came up with an assessment of confounding that is nothing

15   like any established techniques for identifying, controlling,

16   or adjusting for confounding.  I've never seen anything like

17   it.

18   Q.   Is that the plus plus plus, plus plus, minus minus

19   information --

20   A.   Yeah.

21   Q.   -- that Dr. King read into the record today?

22   A.   Yes, it is.

23   Q.   Are the amounts of pluses and minuses entirely subjective

24   in your view?

25   A.   As far as I can tell, yes.

Kuehn - Direct

1   Q.   Does it relate in any way to what Sir Bradford Hill did

2   as an epidemiologist?

3   A.   If we're talking about causation, one could argue that

4   the weight of evidence technique has some linkage, if you

5   will, in Bradford Hill, but that's establishing causation.

6   And what again happens here is EPA appears to conflate the

7   assessment of confounding with establishing causation.   And

8   they really are two separate things.

9        When we look at confounding, we're looking at the effect

10  of these potential confounders on the observed relationships

11  that we are calculating using our models.   We look at

12  confounders.   Do they affect the relationships of interest?

13  Do we have a prior knowledge that would tell us that this

14  factor could potentially distort this relationship?   That's an

15  assessment of confounding.

16       The weight of evidence technique, the causal philosophy,

17  if you will, is a completely separate issue; and the results

18  of our analyses feed into that and can be used in that weight

19  of evidence, but weight of evidence itself is not a means by

20  which we assess confounding.

21  Q.   Okay.   Let's look at an example.

22  A.   Okay.

23  Q.   This is an example that Dr. King and Mr. Becher

24  discussed.   It's found in Joint Exhibit 58, in the benchmark,

25  page 493.   Has everyone got to their proper place in the

Kuehn - Direct

1    notebook?

2         Miss Kuehn, this is a table that EPA prepared that looks

3    at temperature, correct?

4    A.    Correct.

5    Q.    And analyzes whether or not it's a confounder, correct?

6    A.    Correct.

7    Q.    And Dr. King and Mr. Becher talked about this table

8    today, correct?

9    A.    Yes, I believe so.

10   Q.    Okay.  Let's walk through some of these steps.  Let's

11   look at the first one.  What is EPA doing in step one?

12   A.    So in step one, they are evaluating the correlation

13   between temperature and conductivity, so the relationship

14   between temperature and the exposure.  And they used a

15   correlation coefficient which tells them that the two

16   variables are correlated.  R equals .39.  So they're

17   moderately correlated.  And they're trying to meet one of

18   their criteria for a confounder, which is a relationship with

19   the exposure.

20   Q.    Okay.  Dr. King and I talked about this some, but I'd

21   like to look at the background for that .39 in this table, and

22   that's found in figure 13e of the benchmark, which is Joint

23   Exhibit 58, page 414.

24         Do you recall this matrix, Miss Kuehn?

25   A.    Yes, I do.

432

Kuehn - Direct

1    Q.   What does this tell us about the correlation between

2    temperature and conductivity?

3    A.   That it is 0.4.

4    Q.   And do you see the graph, the second graph down the

5    left-hand side?

6         Mr. Tyree, can you blow that up?

7         What does that graph tell us about the relationship

8    between temperature and conductivity?

9    A.   Basically it tells us that as temperature goes up,

10   conductivity goes up.  And you can see with the red line, it

11   kind of slopes gently upward.  That's about all that tells us.

12   Q.   And I'm not sure what Dr. King ultimately concluded on

13   this point, but would you describe this relationship as a weak

14   relationship?

15   A.   I would say they're moderately correlated, but I would

16   also use other evidence for the relationship between

17   conductivity and temperature besides just this correlation to

18   establish the relationship between the two.

19   Q.   And EPA found this correlation to be moderate, didn't

20   they?

21   A.   Yes, they did.

22   Q.   Would you rule out temperature as a confounder based on

23   this correlation of .4?

24   A.   No, not at all.

25   Q.   Why not?

433

Kuehn - Direct

1   A.   Well, we have other information that tells us that

2   conductivity and temperature are related.  There's clearly

3   over the seasons as temperature goes up, conductivity goes up.

4   When temperature goes down, conductivity goes down.  So

5   they're moving together in a seasonal way.

6        We can see that graphically.  I would look at it

7   graphically.  And even Dr. King himself has stated that

8   temperature and conductivity tend to move together.

9        So there's ample evidence that temperature and

10  conductivity are somehow related.  So they certainly meet that

11  particular criteria for -- or criterion, rather, for a

12  potential confounder.

13  Q.   Dr. King -- if you could go back to table B-20,

14  Mr. Tyree -- he noted that EPA did find a moderate correlation

15  for conductivity and temperature in the entire dataset, but

16  then he pointed out there was a second dataset, EPA dataset,

17  with 46 observations where they came up with a lower

18  correlation and pointed out that EPA therefore reduced the

19  score, overall score, to zero.

20       Do you think that was appropriate?

21  A.   I'm not sure why you would do that.  So, again, the

22  correlation is just one piece of information.  And why you

23  would reduce your dataset to 46 when you have 2,200

24  observations that tell you that conductivity and temperature

25  move together, they're related to each other, why you then

Kuehn - Direct

1    rely on a much smaller set of data is baffling to me.

2         Again, you have ample information that says that

3    temperature and conductivity are related.  It's very simple.

4    And so it meets that criterion for being a confounder.

5         There's no explanation here for why they would reduce

6    their data in that way and then rely on that correlation

7    coefficient.

8    Q.   All right.  EPA next in step two looks at the correlation

9    between mayflies and temperature; is that correct?

10   A.   That's correct.

11   Q.   And they gave this score a -- they gave the score one

12   minus.  Do you see that?

13   A.   I do see that, yes.

14   Q.   Based on the fact that there was a low correlation

15   between temperature and Ephemeroptera.  Do you see that?

16   A.   I do.

17   Q.   Do you agree with that analysis?

18   A.   No.

19   Q.   Why not?

20   A.   Well, there's a couple of reasons.  One is, again, if

21   we're looking at count, count data is not going to be linearly

22   related with conductivity -- or, I'm sorry -- with

23   temperature.  And so using a correlation coefficient to

24   compare those two doesn't work.  It's not a linear

25   relationship.

Kuehn - Direct

1      The second reason is we -- EPA is clearly ignoring

2  a priori knowledge that temperature is a potential risk factor

3  for the viability of organisms in these streams.  There's --

4           MR. LOVETT:  Objection, Your Honor.  She's

5  testifying way beyond her area of expertise and beyond her

6  report and everything else.

7           THE COURT:  You haven't laid a foundation for her to

8  testify about this.

9  BY MR. HARVEY:

10  Q.    Have you been present for Dr. King's testimony?

11  A.    Yes, I have.

12  Q.    Were you present at his deposition?

13  A.    Yes, I was.

14  Q.    Did he describe temperature as a risk factor for

15  mayflies?

16  A.    I believe he did, yes.

17  Q.    Something that could affect the WVSCI score?

18  A.    That's correct.

19  Q.    And EPA does the same in the benchmark, correct?

20  A.    That's correct.  They identified it as a potential risk

21  factor.

22  Q.    That's the reason they're looking at temperature, right?

23  A.    That's exactly right.  And they apparently ignore their

24  own information and rely on these correlation coefficients.

25  Again, when we look at potential confounders, relying on a

Kuehn - Direct

1   statistic like this is not appropriate.  You need to take in

2   all of the information you have about that potential

3   confounder, and they simply failed to do that.

4   Q.   When Dr. King and I discussed, again, smoking and lung

5   cancer --

6   A.   Uh-huh.

7   Q.   -- he conceded, did he not, that he would not rule out

8   smoking as a potential confounder for lung cancer in a study,

9   because it's a risk factor; right?

10  A.   That's correct, and we have ample a priori information to

11  tell us that that's the case.  It is absolutely valid to

12  address or assess the effect of a potential confounder simply

13  based on your a priori knowledge about that confounder as a

14  risk factor for your outcome and as it being related to

15  exposure.

16  Q.   Well, what about the fact that the relationship between

17  smoking and lung cancer only explains 8 percent of the

18  variance?  It has a very low correlation.

19  A.   That 8 percent is irrelevant in terms of smoking's

20  confounding effect on the relationship.  You can have a very

21  weak correlation or variance accounting between your potential

22  confounder and your outcome and your potential confounder and

23  your risk factor and it can have a very strong confounding

24  effect.

25       It's a mathematical relationship.  It is a -- it is not

Kuehn - Direct

1    something that you can simply ignore because you have a

2    correlation coefficient that's very small.

3         You have to take into account all of the information.

4    And if you're still not sure, you can do iterative modeling

5    with the regression analyses that I described and see if it

6    has an effect on your outcome, and if -- or, I'm sorry -- an

7    effect on your risk estimate or whatever parameter you're

8    estimating.  And if at that point it does not appear to be

9    altering the relationship, then you can probably not adjust

10   for it.  But until you've done all of that, you have to take

11   it into account and adjust for it in your models.

12   Q.   Let's talk about EPA's third step, which involved the use

13   of a contingency table that Dr. King and I discussed today,

14   table B-19, which is in Joint Exhibit 58, page 492.

15        I know this is one of your favorites, Miss Kuehn.  Tell

16   me what this table shows.

17   A.   This table gives us the frequency of the presence of

18   these bugs for streams that have conductivity levels less than

19   200 microsiemens per centimeter and conductivity greater than

20   1500 and for temperature below 17 and above 22 degrees.  And

21   that's about it.  It provides us with frequencies.

22   Q.   Well, I mean you heard Dr. King.  As long as conductivity

23   is low, we find mayflies 99 percent of the time at low

24   temperature and a hundred percent of the time at high

25   temperature.  Why is that not compelling?

Kuehn - Direct

1   A.   Frequency tables are useful for illustrating our data,

2   summarizing our data, but they have to be interpreted very

3   carefully because the frequencies that you observe there can

4   be misleading.

5        First of all, we're missing an enormous amount of data

6   here.  There are categories of conductivity and temperature

7   that are not included in this table, and we know nothing about

8   that data.  It is impossible to interpret what this means

9   without the entirety of the data.

10       They simply picked the lowest and the highest, and that's

11  all we know.  So that's a serious problem.  We simply would

12  not do that in epidemiology or biostatistics.

13       The other problem is, you can't infer any type of effect

14  or causation from this because, again, we haven't taken into

15  account habitat, we haven't taken into account any of the

16  other potential confounders.  And since those have not been

17  evaluated appropriately, we don't know if they could somehow

18  change the way these frequencies are distributed across these

19  cells.  So --

20  Q.   Not to cut you off, but did you hear Dr. King tell me

21  that he has no idea whether the habitat is the same for the

22  1500 conductivity bin as the 200 conductivity bin?

23  A.   That's correct.  You can't tell that from this table, and

24  that's incredibly important.

25  Q.   You can't compare apples to apples without knowing what

Kuehn - Direct

1  the habitat is, right?

2  A.   You cannot.  There's a lot of information missing from

3  this table that renders its value very low.

4  Q.   Is this snapshot data?

5  A.   Again, all of this data is snapshot data.  As I described

6  earlier with temperature, we don't know if that is

7  representative of that stream in general.

8  Q.   Well, you mentioned something to me before also about

9  switching the outcome of interest.  What did you mean by that?

10  A.   Yeah.  So my understanding of the benchmark is that EPA

11  set out to evaluate the effect of conductivity on impairment.

12  Okay.  What we see throughout appendix B where they do this

13  confounding analysis is an evaluation of bugs as the outcome,

14  whether it's count or presence or absence.

15      While I understand that the presence or absence of those

16  bugs or the number of -- types of bugs is important for -- as

17  being part of the overall impairment of the stream, when we're

18  evaluating confounding, we must stick to the exposure of

19  interest and the outcome of interest and the effect of

20  confounding on that relationship.

21      If we start evaluating confounding for a different

22  outcome, we've completely changed the question.  So looking at

23  here the presence or absence of these bugs tells us nothing

24  about the effects of temperature and conductivity on

25  impairment.  This is not representative of that particular

Kuehn - Direct

1  relationship, which is supposed to be the relationship of

2  interest.

3  Q.   This just tells us whether mayflies are present or

4  absent, right?

5  A.   Correct.

6           MR. HARVEY:   And may I approach, Your Honor?

7           THE COURT:   Yes.

8  BY MR. HARVEY:

9  Q.   In this box here were high temperature and low

10  conductivity.   We've got a hundred percent.

11  A.   Uh-huh.

12  Q.   But that only tells us that we may -- that we have at

13  least one mayfly present in this group, right?

14  A.   That's my understanding.   It's based on presence or

15  absence.   So, yes.

16  Q.   It doesn't tell us the rate of passage for WVSCI scores,

17  does it, at these temperatures?

18  A.   No, it does not.

19           THE COURT:   Hold on just a moment.

20       All right.   We're going to take a recess for the day.

21  We'll recess until 9:00 a.m. tomorrow.

22       Miss Kuehn or Dr. Kuehn -- is it Miss Kuehn?

23           THE WITNESS:   Miss Kuehn.   Thank you.

24           THE COURT:   You may step down.   Please don't discuss

25  your testimony with anyone.   Other than that, is there

```
 1   anything else we need to address?

 2             MR. LOVETT:  No, Your Honor.

 3             MR. HARVEY:  No, Your Honor.

 4             THE COURT:  All right.  We'll stand in recess until

 5   9:00 a.m. tomorrow.

 6        (Proceedings adjourned at 4:30 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

442

```
1                          I N D E X

2                                                        Page

3    Motion at the Conclusion of Plaintiffs' Evidence    389

4

5    Plaintiffs' Witness        Direct   Cross   Redirect   Recross

6    RYAN KING (resumed)         235      309    363/387    381/388

7

8    Defendant's Witness

9    CARRIE KUEHN                392

10

11   Defendant's Exhibit                                 Admitted

12   No. 8  2008 Gauley TMDL report                         235

13

14

15

16

17

18

19

20

21       I, Teresa M. Ruffner, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24

25       /s/Teresa M. Ruffner              September 15, 2014
```