IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC., and
SIERRA CLUB,

          Plaintiffs,

v.                        CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,

          Defendant.       Huntington, West Virginia
                              August 21, 2014


TRANSCRIPT OF BENCH TRIAL - DAY 3
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        J. MICHAEL BECHER, ESQ.
                            JOSEPH M. LOVETT, ESQ.
                            APPALACHIAN MOUNTAIN ADVOCATES
                            P. O. Box 507
                            Lewisburg, WV  24901

                            JAMES M. HECKER, ESQ.
                            PUBLIC JUSTICE
                            1825 K Street, N.W.
                            Washington, DC  20006

```
For the Defendant:              ROBERT G. MCLUSKY, ESQ.
                                M. SHANE HARVEY, ESQ.
                                MATTHEW S. TYREE, ESQ.
                                JACKSON KELLY
                                1600 Laidley Tower
                                P. O. Box 553
                                Charleston, WV  25322

Court Reporter:                 Teresa M. Ruffner, RPR
                                Sidney Christie Federal Building
                                845 5th Avenue, Room 101
                                Huntington, WV  25701
                                (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

Kuehn - Direct

1  Thursday, August 21, 2014, at 9:05 a.m. in open court

2         THE COURT:  All right.  Are we ready to resume with

3  the examination of the witness?

4         MR. HARVEY:  Yes, Your Honor.

5         THE COURT:  Miss Kuehn, if you'll take the stand

6  again.

7  BY MR. HARVEY:

8  Q.   Good morning, Miss Kuehn.

9  A.   Good morning.

10  Q.   Sleep well?

11  A.   I did.  I slept very well.  Thank you.

12  Q.   You're under oath now.

13  A.   I did sleep well.  I slept a long time last night.

14  Q.   All right.  Yesterday you and I began to talk about data

15  quality, which drew an objection from Mr. Lovett.  Do you

16  recall that?

17  A.   Yes, I do.

18  Q.   And I just want to clarify.  You are not saying or

19  testifying today that the data that EPA or DEP gathered is

20  inaccurate in some way in terms of measurement, are you?

21  A.   No, I'm not.

22  Q.   So that you're not saying the temperature measurements

23  are wrong, for instance.

24  A.   Correct, that's not what I'm saying at all.

25  Q.   You're just saying that the data is coarse.  It has

Kuehn - Direct

1   limitations, correct?

2   A.   That's correct.  So limitations in the data will

3   translate into limitations --

4           MR. LOVETT:  Objection, Your Honor.  This calls --

5   even to know whether the data are coarse or not calls for

6   ecological knowledge that this witness does not have.

7           THE COURT:  Well, you can cross-examine her about

8   this.  I'm going to deny the objection.  I went back and

9   looked at her report actually yesterday during her testimony.

10  The first opinion she offers is that temperature may confound

11  the statistical association between conductivity and the

12  benthic community based on data from the DEP.  The report goes

13  on to elaborate about that.

14     I think clearly she identified temperature as a

15  confounding factor based on statistical analyses that an

16  epidemiologist can perform.  So I'm going to let her testify

17  about that.

18          MR. LOVETT:  I don't disagree, Your Honor, that that

19  is in her report.  I don't think she's competent to testify

20  about it, and in her deposition she said that she was not

21  going to testify about it.

22          THE COURT:  Well, I don't know that she's testified

23  beyond what I've just described.  Do you think --

24          MR. BECHER:  Your Honor, if I may, the problem with

25  her report is that when we asked her about those sections, she

Kuehn - Direct

1    said that she was not able to answer questions about those

2    sections of her report, those figures in her report, and we

3    should direct those questions to Dr. Menzie.

4              MR. HARVEY:  Your Honor, if you look at her

5    deposition -- we can put parts of it on the screen if we need

6    to.  She testified that she would not talk about the quality

7    of the data in terms of its accuracy.  She said there are

8    limitations in the data throughout the deposition with

9    Mr. Becher or Mr. Lovett, that it's seasonal and it has

10   different variabilities, it should -- there should be time-

11   sensitive analysis on the data.  She talked about that at

12   length throughout the deposition.

13             THE COURT:  Well, I deny the objection.  At this

14   point I'm satisfied it's within her report.

15   BY MR. HARVEY:

16   Q.   Before we resume our discussion of table -- I think it

17   was B-20 in the EPA benchmark -- I wanted to clear up one

18   thing.

19        Yesterday we talked about a relationship between

20   temperature and conductivity.  Do you recall that?

21   A.   Yes, I do.

22   Q.   You were not saying that one causes the other, correct,

23   that temperature causes conductivity to go up or conductivity

24   causes temperature to go up?

25             THE COURT:  I think this is where you need to be

Kuehn - Direct

1    careful because this sounds like you're asking for an opinion

2    that could be an aquatic ecologist's opinion rather than an

3    epidemiologist's.  So if you'll rephrase your question and

4    focus on her opinions based upon the statistical analyses that

5    an epidemiologist would perform, I'm satisfied that's within

6    her expertise.

7                MR. HARVEY:  I'm actually trying to limit her

8    testimony to make it clear she was not talking about that,

9    Your Honor.

10                THE COURT:  Okay.

11                THE WITNESS:  Yeah, that's correct.  I was not

12   implying that at all.

13   BY MR. HARVEY:

14   Q.   Okay.  And you weren't saying that temperature changes

15   daily and conductivity tracks it on a daily basis, for

16   instance?

17   A.   I'm not saying the two are causally related in any way.

18   I'm saying that there is evidence that they are related in

19   some way based on the graphical analysis that I've looked at

20   that would lead me to be concerned that temperature is a

21   potential confounder of the relationship between conductivity

22   and impairment and thus it needs to be evaluated as such in

23   the analyses.

24   Q.   Understood.  Mr. Tyree, could we go back to table B-19?

25   B-19, Mr. Tyree.  And for the record, this is Joint Exhibit

Kuehn - Direct

1    58, page 492.

2         Miss Kuehn, we were talking about this table when we left

3    yesterday.  Do you recall that?

4    A.   I do.

5    Q.   And we talked about certain limitations in this table.

6    Do you recall that?

7    A.   Yes, I do.

8    Q.   And I don't want to cover them all again, but just to get

9    everyone back up to speed, you talked about this table being

10   based on snapshot data.  Do you recall that?

11   A.   That's correct.

12   Q.   And that's a limitation, correct?

13   A.   Yes, absolutely.

14   Q.   And you talked about the fact that the -- we do not know

15   whether the habitats are the same between these two

16   conductivity bins?

17   A.   That's correct.

18   Q.   So we don't know if we're comparing apples to apples,

19   correct?

20   A.   That is correct.

21   Q.   And you talked about the fact that there are only two

22   discrete groups in the table, very low conductivity and very

23   high conductivity, correct?

24   A.   That's correct.  We're missing a lot of information in

25   this table.

Kuehn - Direct

1   Q.   And I can't recall if we talked about this in depth, but

2   you also had a concern -- I believe you mentioned that EPA

3   switched the outcome of interest.  Do you recall that?

4   A.   That's correct.  It's important that when you're doing an

5   analysis and you're assessing confounding, that you're very

6   clear what your exposure is and what your outcome of interest

7   is.  And all of your assessments, all of your analyses that

8   you do need to be based on that same outcome.

9        So switching between presence and absence of bugs, to the

10  number of taxa you see, to an assessment of impairment such as

11  WVSCI, those are three completely different outcomes.

12       Now, you can evaluate those relationships with

13  conductivity with each of those outcomes, but if you're

14  evaluating confounding, you need to do it for each of those

15  relationships within its own analysis.  You can't switch.

16       So if we identify a potential confounder of conductivity

17  and presence or absence of bugs, that may not have the same

18  confounding effect on the relationship between conductivity

19  and impairment as measured by WVSCI.  It needs to be specific

20  to the relationship of interest.

21       So EPA kind of flips back and forth with the outcomes

22  that they present in this appendix.

23  Q.   In fact, this table only tells us at each site or for

24  each bin, if you will, whether one mayfly was present or

25  absent, correct?

Kuehn - Direct

1   A.   That's correct.

2   Q.   It doesn't tell us anything about whether the WVSCI

3   scores were passing, correct?

4   A.   That's correct.

5   Q.   Or anything about the species sensitivity distribution

6   that EPA talks about in the benchmark, correct?

7   A.   That's correct.

8   Q.   I'd like to go back to table B-20, which is EPA's

9   confounding factor analysis for temperature.  It's on the next

10  page of the benchmark, I believe.

11       There is a step 7 to table B-20.  Do you recall that?

12  A.   Yes, I do.

13  Q.   Miss Kuehn, what is EPA doing in step 7?

14  A.   They're reporting on what appears to me a multivariate

15  model where they included habitat quality, temperature, and

16  fecal coliform in what they describe as a multiple regression.

17  Q.   And do they refer to table B-7?  Is that correct?

18  A.   That's correct.

19  Q.   Mr. Tyree, would you put table B-7 on the screen?

20       For the record, that is Joint Exhibit 58, page 482.

21       This is the same multiple regression that we talked about

22  earlier, isn't it, Miss Kuehn?

23  A.   That's correct.

24  Q.   This is the multiple regression that EPA put in the

25  benchmark to respond to the SAB's concerns, correct?

Kuehn - Direct

1  A.   I don't know if it was to respond to SAB, but it is

2  included in the benchmark, yes.

3  Q.   And we talked about the flaws in that multiple regression

4  analysis earlier, correct?

5  A.   That's correct.

6  Q.   I don't want to cover those again, but let me ask you

7  this.  Would you use this multiple regression analysis with

8  all its flaws to discount temperature as a confounding factor?

9  A.   No, I would not.

10  Q.   I'd like to next turn to Joint Exhibit 58, page 483,

11  which is table B-9 -- which contains table B-9.  And this is a

12  similar analysis of confounding performed by EPA in the

13  benchmark, correct, except this one is for habitat?  Correct?

14  A.   That's correct.

15  Q.   Okay.  And there are similar -- similar to the

16  temperature confounding analysis, there are various steps that

17  EPA walks through; is that correct?

18  A.   That's correct.

19  Q.   Okay.  What are they doing in the first step?

20  A.   Again, they are evaluating the correlation between RBP

21  scores, the measure of habitat, and conductivity.

22  Q.   And they found a positive relationship?

23  A.   Yes, they did.  Well, they scored it as a plus.  They

24  found a negative correlation coefficient of 0.25.

25  Q.   And the second step, they gave a positive score, correct?

Kuehn - Direct

1    A.    That's correct.

2    Q.    Based on a moderate correlation between RBP and number of

3    mayfly?

4    A.    That's correct.  But I would note again that the count

5    data for the number of flies would not have a linear

6    relationship with RBP.  So doing a correlation there is

7    somewhat misleading.  But that's what they did.

8    Q.    And then in step 3, they use a contingency table much

9    like the one we talked about for temperature?

10   A.    That's correct.

11   Q.    Did it contain similar flaws?

12   A.    Yes.  All of the confounding analyses that EPA did are

13   similar to what we see in this table, as well as the one for

14   temperature, and they repeat the same mistakes.

15   Q.    And they rely in step 7 on the same multiple regression

16   analysis that is flawed, correct?

17   A.    That's correct.

18   Q.    And we've already talked about those flaws, correct?

19   A.    Yes, sir.

20   Q.    And at the very bottom, there's a weight of evidence

21   statement.  Do you see that?

22   A.    Yes, I do.

23   Q.    And the last sentence says, "Therefore, we did not

24   correct for habitat, but more detailed habitat studies could

25   be worthwhile."

Kuehn - Direct

1   A.   Yes, I see that.

2   Q.   Does this make any sense to you?

3   A.   It's somewhat baffling.  They disregard the evidence they

4   have in front of them that habitat could be not just a

5   confounder but what we would call an effect modifier, which is

6   something that is not adjusted at all in the EPA report.  But

7   they note that they should do more work looking at habitat.

8   So it's somewhat contradictory.

9   Q.   Would a competent epidemiologist eliminate habitat as a

10  confounder under these circumstances?

11  A.   No.  I would have done much more evaluation of habitat as

12  a confounder and a potential effect modifier of the

13  relationship of interest.

14  Q.   Would a competent epidemiologist eliminate temperature as

15  a confounder based on the analysis we discussed earlier?

16  A.   Not at all, no.

17  Q.   And the analysis for all of the confounding factors in

18  the benchmark under appendix B are done similarly, correct?

19  A.   Yes.  They are all done using the similar weight of

20  evidence technique that EPA seems to have developed on their

21  own.  None of the methods that they used to look at

22  confounding would have successfully identified confounders,

23  certainly would not have eliminated confounding, nor would it

24  have appropriately controlled for confounding of the

25  relationship between conductivity and impairment.

Kuehn - Direct

1    Q.   What would be the proper way to address confounding in a

2    situation like this?

3    A.   We would start with the whole dataset.  We would use

4    a priori knowledge.  EPA provides some good a priori knowledge

5    in --

6    Q.   Let me stop you there.

7    A.   Sorry.

8    Q.   What is a priori knowledge?

9    A.   Sorry.  A priori knowledge is knowledge you have about

10   the factors of interest before you go into your analysis.  So

11   EPA came up with a nice list of potential confounders.  That's

12   what we in epidemiology would do.  What are the factors we

13   think could have an effect on the relationship that we are

14   interested in?

15        We might graph those data, use tables to look at their

16   frequency, and then apply statistical analyses to those

17   tables.  Unlike what EPA did in their contingency tables, we

18   would examine all of the data and analyze it.  And then if we

19   have some evidence of potential confounding or we're concerned

20   that a factor might be a potential confounder, we would do

21   iterative regression modeling based on the type of data we

22   have, whether it's logistic regression or negative binomial or

23   multi-regression, whatever is appropriate, and examine how the

24   confounders affect our risk estimates.

25        We use what we call post-regression diagnostics.  We have

Kuehn - Direct

1   tests to see if our models are good.  And we can test and

2   compare different models to each other, even something called

3   a likelihood ratio test.  And that can tell us if a confounder

4   is having a significant impact on the model.

5        So I would have done an extensive amount of analyses on

6   these data before eliminating these factors as confounders.

7   Q.   And, for instance, with habitat, you would not say

8   there's something that needs to be looked at later but for now

9   we're going to rule it out as a confounder.

10  A.   If, for example, we had very limited data on habitat,

11  let's say we have extensive missing data, which is not the

12  case in the EPA dataset, we might say we couldn't control

13  for it and we're going to examine that later with additional

14  data collection and analysis.  But we would not eliminate it

15  as a confounder until we had done all of the analyses

16  necessary to show it wasn't having an effect on our outcome.

17  And then, you know, there's always room to do additional

18  research, but I certainly would not have done what EPA did

19  here.

20  Q.   I'd like to turn your attention next to Joint Exhibit 58,

21  page 464.  It is page A-36 in the benchmark.

22       Mr. Tyree, can you put that on the screen?

23       This relates to the logistic regression that Dr. King and

24  Mr. Becher talked about.  Do you recall that?

25  A.   I do recall that, yes.

Kuehn - Direct

1   Q.   You talked about this somewhat earlier, but can you

2   remind us what logistic regression is?

3   A.   Sure.  A logistic regression is used -- again, we have a

4   binary outcome.  So, for example, you could use it for

5   examining predictors of the presence or absence of mayflies,

6   for example, or a WVSCI score below 68 or above 68; so a

7   binary outcome.  And it can be multivariate.  So you can

8   include multiple variables in the model.

9   Q.   Now, right below this highlighted statement about the

10  conductivity levels of 300 and the chance of impairment,

11  you're familiar with that statement?  Dr. King talked about it

12  before.

13  A.   Yes.

14  Q.   There's a graph.  Do you see that?

15  A.   Yes, I do.

16  Q.   Does that graph have anything to do with logistic

17  regression?

18  A.   No.  It actually has nothing to do with logistic

19  regression.

20  Q.   What is that?

21  A.   If you look further up in the paragraph, so it's actually

22  the first -- or, sorry -- the second complete sentence on the

23  page, it starts with "Mean WVSCI scores," that sentence

24  states, "Mean WVSCI scores from 60 bins were regressed with

25  conductivity (see Figure A-9)."

Kuehn - Direct

1     So this figure is actually a plot of the mean WVSCI score

2   for each of the bins of conductivity that they calculated.

3   It's really nothing more than a visual representation of the

4   mean WVSCI score across conductivity bins, but it has nothing

5   to do with logistic regression.

6   Q.    Does that graph have any predictive value?

7   A.    No.

8   Q.    Okay.  Let's look at the highlighted statement.

9   Mr. King -- Dr. King and Mr. Becher talked about that.  It

10  says, "Using logistic regression, the probability of

11  impairment at 500 microsiemens is .72 and at 300 microsiemens

12  is .59."  Do you see that?

13  A.    I do see that.

14  Q.    How did they get these numbers?

15  A.    I have no idea.  They provide no information in any --

16  anywhere in the benchmark about what model they used for their

17  logistic regression, what outcome, what method they used or

18  variables in the model.

19     Quite frankly, when we use logistic regression, what

20  we're interested in is, as I described yesterday, the beta

21  coefficients in the model.  Logistic regression provides us

22  with an odds ratio, and that tells us -- it's a relative

23  measure that tells us what the relative increase in risk for

24  our outcome is compared to a lower value of our predictor.

25     So we can tell if conductivity goes up, what's the

Kuehn - Direct

1    relative increase in our probability of an impaired WVSCI

2    score, for example, relative to lower conductivity.  That's

3    the -- that's what we use logistic regression for.

4        I don't know how you could use logistic regression to

5    calculate these probabilities.  If you look at a logit model,

6    which is what that is, a logistic regression model, it may be

7    possible to plug in some values and solve for the algebraic,

8    but we would never use logistic regression in that fashion.

9    Q.   Did you hear Dr. King testify yesterday during

10   cross-examination that he did not have access to the model

11   that EPA used to compute these numbers?

12   A.   That's correct.  I haven't seen any evidence that they

13   provide details of what this model was.

14   Q.   In any event, does this logistic regression statement

15   tell us anything about the likelihood of impairment?

16   A.   No, it certainly does not.

17   Q.   Does it address confounding factors?

18   A.   No.  There's no information at all about their model,

19   whether they controlled for confounding factors or how they

20   calculated these probabilities using their logistic model.  As

21   far as I'm concerned, this sentence is completely meaningless.

22   This provides us no information at all.

23   Q.   Let's talk next about how Dr. King addresses confounding

24   factors.  You were present at his deposition, correct?

25   A.   Yes, I was.

Kuehn - Direct

1    Q.   And you were present during his testimony, correct?

2    A.   Yes, I was.

3    Q.   And you've read his expert reports, correct?

4    A.   Yes, I have.

5    Q.   He relies heavily on the analysis performed by EPA,

6    doesn't he?

7    A.   Yes, he does.

8    Q.   But he also does his own analysis, correct?

9    A.   That's correct.

10   Q.   He did that after conceding in his deposition that there

11   were some limitations in EPA's analysis, correct?

12   A.   I believe that's correct, yes.

13   Q.   Now, as I understand it, Dr. King did this -- and you

14   tell me if I've misrepresented your exhibits, but he did this

15   by exploring the link between conductivity --

16   A.   Uh-huh.

17   Q.   -- and temperature, correct?

18   A.   That's correct.

19   Q.   And he found a low correlation, correct?

20   A.   I believe that's correct, yes.

21   Q.   Okay.  I think the correlation was -- the temperature and

22   conductivity in the summer was .058.  Does that sound right?

23   A.   I think it was an R-squared, which is the square of the

24   correlation that --

25   Q.   Right.  You're right.

Kuehn - Direct

1    A.    But they're closely related.  You just take the square

2    root of that, and you would get the correlation coefficient, I

3    believe.

4    Q.    Okay.  And then he also had that odd graph in Joint

5    Exhibit 32 where he ran an R-squared analysis on mayfly taxa

6    and temperature and came up with an R-squared value of .048,

7    correct?

8    A.    That's correct.  So that would be a capital "R."

9    Q.    My apologies.

10   A.    That's okay.

11   Q.    Okay.  And that .048 as we discussed was similar to the

12   .08 for smoking and lung cancer, for instance.  So just for

13   comparison purposes, I'm going to put that up beside, just to

14   remind ourselves that those two are similar, correct?

15   A.    Sure.  Uh-huh.

16   Q.    So he found low correlations between conductivity and

17   temperature, and between temperature and impairment, and said

18   this shows that temperature is not a confounder, essentially,

19   correct?

20   A.    Essentially that's what he did.

21   Q.    You don't agree with that analysis, do you?

22   A.    I do not agree with that analysis, no.

23   Q.    Mr. Tyree, can we put up on the screen Joint Exhibit 29?

24         I pressed Laptop, Terry, and it didn't turn on.

25         (Mr. Harvey and the Clerk conferred privately off the

Kuehn - Direct

1    record.)

2    BY MR. HARVEY:

3    Q.    And Joint Exhibit 29, is this the graph that Dr. King

4    used to discuss the relationship between temperature and

5    conductivity?

6    A.    Yes, it is.

7    Q.    What's wrong with that analysis?

8    A.    Well, there are a number of things wrong with the

9    analysis.  First off, he limits his analysis to summer data

10   only.  It's not clear to me why he chose to do that.  I think

11   he believes that by truncating your data, whether it's by

12   season or temperature, you're somehow removing confounding.

13   This is absolutely not the case.  So we have only part of the

14   whole dataset here.

15        The other problem is that the data are not -- I'm sorry.

16   I'm getting myself tied up in knots here.

17        The R-squared of his model actually indicates that the

18   model he used, which is just a simple regression, does not

19   actually fit this data very well at all.

20        He also ignores all of the evidence from the EPA's

21   analyses that temperature and conductivity are related to each

22   other.

23   Q.    Let's talk about that briefly, and we've seen it before,

24   but just so we're all on the same page, Joint Exhibit 58, page

25   414, contains the analysis that EPA did on the entire dataset,

Kuehn - Direct

1    correct?

2    A.   That's correct.

3    Q.   Okay.  And what correlation did they find between

4    temperature data and conductivity?

5    A.   It was 0.4 based on this matrix here.

6    Q.   Okay.  And as we discussed earlier, there's a graph of

7    that relationship, correct?

8    A.   That's correct, yes.

9    Q.   Okay.  If you ran a regression not on the entire dataset

10   but only on the summer data, would that tend to give you a

11   lower R-squared number?

12   A.   It's going to limit your ability to interpret your data.

13   Based on the graphs that I have seen, temperature and

14   conductivity both rise in the summertime by whatever mechanism

15   that happens.  And so they tend to flatten out, and so you may

16   see less of this slope, if you will.  But whenever you

17   truncate your data, you're missing important information about

18   the relationships between the variables in your data.

19       So the biggest problem we have here is that he feels that

20   truncating his data -- when I say "truncate," it means

21   eliminating data that's lower than a certain level or higher

22   than a certain level.

23       That doesn't eliminate confounding of your relationship,

24   and it can distort the relationship that you observe.  So it's

25   not good practice to do that unless you have a really good

Kuehn - Direct

1   methodological reason, and I don't see any reason to do that

2   here at all.

3   Q.   Would a competent statistician or epidemiologist

4   eliminate temperature as confounding -- as a confounder based

5   on the analysis that Dr. King performed with that graph?

6   A.   No.

7   Q.   Okay.  We've talked about the relationship that Dr. King

8   found between temperature and conductivity.  R-squared .058,

9   right?

10  A.   Correct.

11  Q.   And you found that that tells us nothing about whether

12  temperature is a confounder, correct?

13  A.   That's correct.

14  Q.   He also analyzed the relationship between temperature and

15  impairment, correct?

16  A.   That's correct.

17  Q.   Okay.  And he did that in Joint Exhibit 32, I believe.

18       Mr. Tyree, can you put that on the screen?

19       What is Dr. King attempting to show in this graph?

20  A.   I think he's attempting to show that temperature is not

21  related to the number of taxa that were counted at these

22  sites.

23  Q.   Do you agree that he had the X and the Y axes mixed up?

24  Do you accept that?

25  A.   I thought it looked a little funny, yeah.

Kuehn - Direct

1   Q.   Does this graph prove that temperature is not a

2   confounder?

3   A.   No.  Again, he's truncated the data.  So we're missing an

4   enormous amount of data here, and that limits our ability to

5   interpret it.

6        The other thing to remember is, we're interested in

7   whether temperature is a risk factor for the outcome.  And so

8   we know, at least based on, again, a priori knowledge and

9   scientific knowledge, that temperature is a risk factor for

10  viability is how I would describe it, and so it meets that

11  criteria.

12       This tells us almost nothing, not to mention the fact

13  that he used the wrong kind of regression to calculate his

14  R-squared if that's what he was doing.

15  Q.   He should have used some form of regression that takes

16  into account the fact that this is count data, correct?

17  A.   That's correct.

18  Q.   Something like Poisson regression that you discussed

19  earlier?

20  A.   Poisson regression or negative binomial regression,

21  that's correct.

22  Q.   But he testified he used a simple linear regression,

23  correct?

24  A.   That's correct.

25  Q.   Is that partly why this graph is sort of a mess and --

Kuehn - Direct

1   A.   Well, the line doesn't make much sense, and it -- yeah.

2   The regression itself is pretty meaningless here.

3   Q.   So when you talk about risk factors, it's like the

4   discussion I had with Dr. King about smoking.   The correlation

5   for smoking and lung cancer is low by his testimony, somewhere

6   around .08, correct?

7   A.   Right.   He describes the R-squared or the variance

8   explained in -- by smoking as being .08.

9   Q.   Okay.   But even he admitted that he would not rule out

10   smoking as a confounder because it's a risk factor, right?

11   A.   That's correct.

12   Q.   And the same is true of temperature, correct?

13   A.   I think there is ample evidence that temperature is a

14   potential confounder and should have been evaluated in the

15   modeling process of the exposure here, conductivity, and the

16   outcome of interest, which was impairment, yes.

17   Q.   I'd like to turn again to *Rothman on Modern Epidemiology*,

18   which is Defense Exhibit 21.   And this is from page 132 of

19   Defendant's Exhibit 21.   And Rothman talks about criteria for

20   a confounding factor.   Do you see that?

21   A.   That's correct.

22   Q.   Tell the Court, if you would, what's important about this

23   discussion in *Rothman*?

24   A.   So what Rothman is doing here is he's providing details

25   about the criteria necessary for a factor to be a confounder.

Kuehn - Direct

1    And in this particular highlighted paragraph, he's talking

2    about the fact that a confounder must be an extraneous risk

3    factor for the disease.  And by "extraneous," we mean not in

4    the path of causation of the exposure.

5        So what he said is, well, A, that it needs to be a risk

6    factor for the disease.  That's one of the criteria.  But he

7    also states that the data may serve as a guide to the relation

8    between the potential confounder and the disease, but it is

9    the actual relation between the potentially confounding factor

10   and disease, not the apparent relation observed in the data,

11   that determines whether it's confounding.

12       And this is a cautionary statement because if we have,

13   again, a priori knowledge or concern that a factor may meet

14   the criteria for confounding, we don't eliminate it simply

15   because of something -- a statistic we might see in our data.

16   We're going to evaluate it as a potential confounder in our

17   modeling to make sure it is not having an effect on the

18   relationship that we are analyzing.

19   Q.   And you were present yesterday when Dr. King and I talked

20   about that passage in the *American Journal of Epidemiology*

21   from Johns Hopkins?  Do you recall that?

22   A.   That's correct, yes.

23   Q.   And talked about R-squared coefficients or coefficients

24   correlation being possibly misleading in terms of identifying

25   confounding?

Kuehn - Direct

1   A.   Absolutely.  So, remember, correlation coefficients only

2   tell us whether two variables move in the same or opposite

3   directions and how close they are to a straight line.  They

4   just don't tell us anything about effect.  It's not --

5   mathematically that's not what they're meant to do.  And

6   that's why you can find funny correlations like the rate of

7   crime and the sale of popsicles in the summer.  They are

8   highly correlated, but they have nothing to do with each

9   other.

10       So correlations can be spurious and they can be

11  misleading, which is why we do not rely on them for causation

12  and we do not rely on them to accept or eliminate or evaluate

13  potential confounding.

14  Q.   Would any competent epidemiologist or statistician

15  eliminate a risk factor based on a low R-squared number?

16  A.   No.

17  Q.   Mr. Tyree, could you turn to Joint Exhibit 32, which is

18  Dr. King's graph?

19       Did Dr. King in this graph also change the outcome of

20  interest?

21  A.   Well, again, my understanding from the EPA benchmark is

22  they were interested in exposure to conductivity and

23  impairment.  And as I've described, if that is the

24  relationship of interest, then that is the relationship for

25  which we need to be evaluating potential confounders.  To

Kuehn - Direct

1  evaluate confounding of that exposure on a completely

2  different outcome, whether it's the number of taxa or the

3  presence or absence of mayflies, is a completely separate

4  analysis.

5      So this does not inform us as to whether or not there's

6  confounding of the relationship between the exposure of

7  conductivity and the outcome of impairment.

8  Q.   Were the graphs prepared by Dr. King based on snapshot

9  data?

10 A.   Yes.  All of EPA's -- or, sorry -- DEP's data is cross-

11 sectional or snapshot data.  They are individual measurements

12 from a site at a particular time.

13 Q.   And so Dr. King's graphs suffer from the limitations that

14 he's identified with using snapshot data.

15 A.   Absolutely.  When we have cross-sectional data, we are

16 limited in our analyses, particularly if we have snapshot data

17 of measures that vary over time.  Ideally you would want to

18 have multiple measurements of those measures, and then we

19 would use techniques to account for time series data, is what

20 we would call that.

21     We don't have that here.  So we have to recognize those

22 limitations in the data and interpret our results accordingly.

23 Q.   So that might give you even less confidence in using a

24 figure or a statistic like R-squared.

25 A.   Yeah.  We just wouldn't use R-squared to tell us much of

Kuehn - Direct

1   anything.  It doesn't tell us about statistical significance.

2   It doesn't tell us about how the predictor impacts the

3   outcome.  We just don't use R-squared like that at all.

4   Q.   I'd like to next turn to Joint Exhibit 25, which is

5   another table that Dr. King prepared.

6        This is a table that Dr. King testified about on direct

7   examination with Mr. Becher.  Do you recall that?

8   A.   I do.

9   Q.   And he used this table to establish causation.  Do you

10  recall that?

11  A.   Yes, I do.

12  Q.   Do you think that you can use this table to establish

13  causation between conductivity and failing WVSCI scores?  That

14  is, can this table be used to show that conductivity causes

15  WVSCI scores to pass or fail?

16  A.   No, you can't use a contingency table alone to establish

17  causation.  Contingency tables, which is what we would call

18  this, are useful for visualizing the data, for getting a sense

19  of the distribution of your data.

20       He's got bins of conductivity and pass/fail scores, and

21  that can be very helpful for visualizing the data, but

22  contingency tables can be misleading.  There are statistics

23  you can use to evaluate what you're seeing in a contingency

24  table.  There are many available, and -- but he doesn't do any

25  of those.

Kuehn - Direct

1        We don't have a sense for whether these differences in

2   pass/fail across conductivity scores are statistically

3   significant, and there's no ability here to control for

4   confounding.

5        You can stratify tables on a potential confounder.  At

6   some point, though, that becomes arduous, and so we would put

7   this into a regression model; and, as we've discussed, with a

8   binary outcome, we would use logistic regression.

9   Q.   But you heard Dr. King say that he dropped out sites

10  with, you know, marginal or poor habitat and low pH.  He did

11  some of that.  Why doesn't that make this table accurate?

12  A.   Again, simply removing certain values of a confounder

13  does not control for confounding.  All you are doing is

14  possibly looking at the relationship for one strata of that

15  confounder, so for one range of that confounder, but it

16  doesn't control for confounding.

17       My concern would be that the confounder would vary across

18  your exposure categories here, which would by definition

19  render it uncontrolled confounding.  And so that's not a

20  method for doing that.  It simply won't work.  And, in fact,

21  by eliminating additional data, you limit your ability to even

22  assess the confounding effects of that potential confounder.

23  So that does not help.

24            MR. HARVEY:  And may I approach, Your Honor?

25            THE COURT:  You may.

Kuehn - Direct

1   BY MR. HARVEY:

2   Q.   And as we discussed yesterday with Dr. King, this table

3   doesn't account at all, or even attempt to, for some

4   confounders like temperature, correct?

5   A.   That's correct.

6   Q.   He didn't address that in any way, did he?

7   A.   There's no what we would call stratification on

8   confound -- excuse me -- on temperature, on habitat, or any of

9   the other potential confounders.  That's correct.

10  Q.   So, for instance, in his table, he's got conductivity

11  levels of 1001 to 1500.  Do you see that?

12  A.   I do.

13  Q.   And he finds that you failed a WVSCI test 85 percent of

14  the time, correct?

15  A.   That is correct.

16  Q.   Do we know what the temperature levels are in the fail

17  column?

18  A.   No.

19  Q.   Do we know what they are in the pass column?

20  A.   No.

21  Q.   Is that important?

22  A.   Yes, as is additional other information about those

23  sites.

24  Q.   Did you hear Dr. King talk about a paper by Greg Pond

25  published in 2014?

Kuehn - Direct

1   A.   Yes, I did.

2   Q.   Mr. Tyree, can you pull up Plaintiffs' Exhibit 19?

3        Oh, you already have it.  Go to page PE 296.

4        Can you see that okay, Miss Kuehn?

5   A.   Yes, I can, depending on what we're looking at.

6            MR. HARVEY:  May I approach, Your Honor?

7            THE COURT:  Yes, you may.

8            THE WITNESS:  Thank you.

9   BY MR. HARVEY:

10  Q.   Greg Pond in this analysis found a high correlation

11  between GLIMPSS, for instance, and conductivity, correct, .73?

12  A.   Yes.

13  Q.   But there are also other high correlations in this table,

14  correct?

15  A.   Yes, there are.

16  Q.   For instance, percent forest land cover is .67, correct?

17  A.   That's correct.

18  Q.   Now, somehow Greg Pond was able to determine that even

19  though we have these varying high correlations, that

20  conductivity was the most important.

21       Did you get a chance to look at his paper?

22  A.   I did look at this paper.

23  Q.   How did he do that?

24  A.   They used a method called principal components analysis

25  to examine chemical factors and habitat factors, which is a

Kuehn - Direct

1  perfectly fine way to analyze these data.  I think that was

2  actually one of the recommendations from EPA.  Interestingly,

3  though, they only examined them separately.  They did separate

4  principal component analyses on chemical factors and on

5  habitat, but they never put them together in the same model,

6  at least as far as I could tell from reading the article.

7      Normally we would expect to at least see all of the

8  factors analyzed together, and it may be appropriate to

9  separate them out, but I saw no evidence that they tried to

10  evaluate how those factors fell out, if you will, into their

11  different components when analyzed together.

12      They then identified three different principal components

13  in the paper.  I believe they call these axes -- axis 1, 2,

14  and 3, all of which had very high eigenvalues, which is how

15  you determine whether your component is relevant I guess to

16  your further analysis is how I would describe it.

17      But then they go on, and what you're supposed to do is

18  take the parts of each component that are most relevant to

19  that component, and the way -- it's a little hard to describe,

20  but the way it works is certain things will sort of clump

21  together is how I would describe it based on correlations and

22  collinearity and some other statistical facts.

23      You then take those components and you use what we would

24  call a super variable or a variable that represents that

25  component, and you would put it into a model, and you would

Kuehn - Direct

1    use that as a predictor of your outcome.  You would use it as

2    a proxy for your exposure.

3         And what that allows you to do is it allows you to

4    include a whole lot of factors in your regression model

5    without running into problems of oversaturation.  So many of

6    these variables are related to each other, and you might run

7    into a problem of what we call collinearity where they just

8    are predicting the same thing, and that can really mess up

9    your regression.  So we use this as a way to kind of condense

10   them down into one bundled exposure, if you will.

11        They then ran a couple of models using regression, but

12   they only focused on the first component.  They completely

13   ignored principal components two and three for both habitat

14   and chemical exposure.  There doesn't appear to be any

15   rationale for that, even though their eigenvalues were very

16   high.  And they never, as far as I can tell from the paper,

17   ran a model that included both the principal components from

18   the chemical components and the habitat.

19        So while their paper is interesting, they ultimately go

20   back and simply say, "Well, conductivity was the most

21   important thing, and therefore that's a predictor of our

22   outcome."

23        They never, as far as I can tell, looked at the beta

24   coefficients in their model and their statistical

25   significance.  They, again, rely on R-squares.  And so while

Kuehn - Direct/Cross

1    it appears they attempted to do some sophisticated modeling

2    and there's a lot of good potential there to learn something,

3    they completely missed the boat on telling us what we wanted

4    to know about that relationship.

5    Q.   Can you use this paper to show that conductivity is a

6    cause of impairment?

7    A.   No.

8              MR. HARVEY:  One moment, Your Honor.

9              THE COURT:  Certainly.

10             MR. HARVEY:  No further questions.

11        Thank you, Miss Kuehn.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  Cross-examination?

14                      CROSS EXAMINATION

15   BY MR. LOVETT:

16   Q.   Good morning, Miss Kuehn.

17   A.   Good morning.

18   Q.   Boy, given your opinion of the 2014 Pond paper that you

19   just read, are you surprised the journal editors accepted it?

20   A.   Yeah.

21   Q.   There's pretty basic errors there that you're describing,

22   right?

23   A.   There are some pretty significant errors, yes.

24   Q.   Have you ever heard of the journal that that appeared in?

25   A.   I need to recall what journal it was.

Kuehn - Cross

1   Q.   Why don't you go look and tell me if you've heard of it

2   before.

3   A.   I need a copy of the exhibit, if you don't mind.

4   Q.   Okay.  It's a journal called *Environmental Management*.

5   Do you know that journal?

6   A.   I'm not particularly familiar with it, but I've heard it

7   mentioned here at trial.

8   Q.   Okay.  Now, do you have your CV before you?

9   A.   Yes, I do.

10  Q.   It says here you've testified before in a case, right?

11  A.   I have.

12  Q.   And is that the only case you've testified in?

13  A.   That's correct.

14  Q.   And when was that?

15  A.   That was in January of this year.

16  Q.   Okay.  And what was the subject of your testimony?

17  A.   I testified about the quality system regulations.

18  Q.   And is that within your -- what was the gist of your

19  testimony?

20  A.   I was testifying about compliance with the quality system

21  regulations with regard to an in vitro device medical device

22  company.

23  Q.   So it was a medical device case, and you were an expert.

24  A.   Roughly, yes.

25  Q.   And were you an expert for plaintiff or defendant?

Kuehn - Cross

1    A.   I was an expert for plaintiff.

2    Q.   And who was the plaintiff?

3    A.   Sekisui Corporation.

4    Q.   And what was the nature of the claim, if you know?

5    A.   It was a breach of contract case.

6    Q.   Okay.  And why were you asked to testify?

7    A.   I was asked to testify about the compliance of the

8    defendants with regard to federal regulations.

9    Q.   Okay.  And what expertise did you bring to that

10   testimony?

11   A.   For the last few years I have been working extensively in

12   medical device regulatory affairs.

13        MR. LOVETT:  May I approach, Your Honor?

14        THE COURT:  Yes, you may.

15   BY MR. LOVETT:

16   Q.   Now, is this -- have you seen this before?

17   A.   Yes.

18   Q.   Is this the order issued by the judge in that case?

19   A.   Yes, it is.

20   Q.   It was a federal judge in the Southern District of

21   New York, I believe.

22   A.   Yes.  Judge Scheindlin.

23   Q.   And how long did you testify in that case?  How long were

24   you on the witness stand?

25   A.   A few hours.  I don't recall how long.  It spanned a

Kuehn - Cross

1    couple of days.

2    Q.    Could I turn your attention to page 16 of that order,

3    please.

4    A.    Okay.

5    Q.    Do you see section 5?

6    A.    Yes, I do.

7    Q.    Have you read that before?

8    A.    I believe I read it when the order came out, sure.

9    Q.    Would you read what the judge said about your testimony

10   in section 5, please, from page -- starting on page 16?

11   A.    Sure.   "Sekisui's regulatory affairs expert, Carrie

12   Kuehn, testified that ADI was not in compliance with the QSRs

13   during the relevant period.   At the outset, I note that Kuehn

14   has never conducted or even witnessed an FDA inspection or an

15   ISO audit.   Her training is limited to attending regulatory

16   conferences and reading relevant guidance materials."

17         Did you want me to keep going?

18   Q.    Yes, please.

19   A.    "Nonetheless, Kuehn repeatedly testified that ADI's

20   documents differed from what she would expect to see in an

21   FDA-compliant company.   The FDA expects each company to

22   implement a QMS tailored to its size and risk-level.   The QSRs

23   provide a 'framework' for companies to develop their own

24   internal procedures.   While Kuehn might have implemented the

25   QSRs differently than ADI, her opinion does not render ADI

Kuehn - Cross

1    non-compliant."

2    Q.    Continue, please.

3    A.    "Moreover, Kuehn's methodology is flawed.  Her

4    conclusions are based on a review of documents, at least one

5    of which she misread.  The documents were provided by

6    Sekisui's counsel at least four years after the relevant time

7    period.  Although she interviewed four ADI employees, she

8    failed to speak with key compliance managers, such as Leigh

9    Ayers.  Thus, I cannot credit Kuehn's opinions over the

10   contemporaneous conclusions of the FDA inspectors, ISO

11   auditors, and customer auditors that visited ADI, interviewed

12   management, and reviewed key documentation."

13   Q.    Thank you.  You've not testified in a case since, until

14   today, correct?

15   A.    That's correct.

16   Q.    Now, let's turn to your CV here.  Starting with your

17   education, you have a masters in public health and

18   specialization in epidemiology; is that right?

19   A.    That's correct.

20   Q.    And that's from 2003?

21   A.    That's correct.

22   Q.    Now, would you tell me what epidemiology is, please?

23   A.    Again, epidemiology is the study of the effect of

24   exposures on outcomes in populations.  We use statistics to

25   conduct epidemiologic research.

Kuehn - Cross

1   Q.   On human populations, right?

2   A.   It can be used on human populations, non-human

3   populations.

4   Q.   Well, the University of Washington, that's where you went

5   to school to get your masters, right?

6   A.   That's correct.

7   Q.   On its website it defines epidemiology as the study of

8   the frequency, distribution, and deterrence of diseases in

9   human populations.

10       Isn't that really the definition of epidemiology?

11  A.   That's another way to state it, yes.

12  Q.   And the Wikipedia, which I know isn't a legal reference,

13  but it defines "epistemology" as the science that studies the

14  patterns, causes, and effects of health and disease conditions

15  in defined populations.

16       So is that another definition?

17  A.   It would be "epidemiology," and --

18  Q.   Yes.

19  A.   -- there are many ways to state it, but sure.

20  Q.   Well, epidemiology really deals with human populations,

21  doesn't it?

22  A.   Again, epidemiologic methods and statistics have been

23  applied on many different kinds of data, including non-human

24  data and other types of observational data.

25  Q.   Yeah, but epidemiology itself is the study of human

Kuehn - Cross

1   populations.  It may be applied elsewhere, but your masters is

2   in the study of human populations, correct?

3   A.   Yes.

4   Q.   Okay.  You don't have any training at all in the study of

5   ecological conditions, do you?

6   A.   No, I do not.

7   Q.   Now, have you ever been asked to analyze any ecological

8   statistical data?

9   A.   I'm sorry.  I'm not sure what you mean by "ecological

10  statistical data."

11  Q.   Ecological data.

12  A.   So you're speaking of measurements of ecology matters

13  such as the DEP data that we've been discussing?

14  Q.   Any at all.

15  A.   No, I have not.

16  Q.   You've never performed any ecological data analysis, have

17  you?

18  A.   On the types of data that we're referring to in the DEP,

19  no, I have not.

20  Q.   On any kind.

21  A.   I used environmental data for my thesis.  So that is why

22  I'm qualifying it to the type of data that we're discussing in

23  the DEP.

24  Q.   What kind of ecological data did you use in your thesis?

25  A.   I used hazardous waste data from the Department of

Kuehn - Cross

 1   Environmental Health in the State of Washington for exposure

 2   data for my thesis.

 3       I've also looked at nitrate and nitrate water data for a

 4   childhood cancer study.  And I think those are the two main

 5   ones.  That's why.

 6   Q.   You were using those data to understand the impact on

 7   human populations, right?

 8   A.   That's correct.

 9   Q.   Now, you say you have some published papers, correct?

10   A.   That's correct.

11   Q.   How many are there?

12   A.   I haven't counted them.

13   Q.   I think we counted them in your deposition and came up

14   with four.  Do you remember that?

15   A.   I think that was limited to a specific time period.  So I

16   have much more than four.

17   Q.   Okay.  Tell me -- let's go through your peer -- I'd like

18   to know about your peer-reviewed publications.

19   A.   Okay.

20   Q.   Okay.  Let's start --

21   A.   Do you want me to count them real quick?

22   Q.   Let's go through each of them.  I'd like to understand

23   what they're about.

24   A.   Okay.  The most recent -- so I'll go most recent.

25   Q.   Yeah.

Kuehn - Cross

1    A.   Does that sound good?

2    Q.   Let's do that.

3    A.   The most recent is a review article on the burden of

4    Influenza B.  We did a structured literature review and

5    published that in the *American Journal of Public Health.*

6    Q.   What is a structured literature review?

7    A.   A structured literature review is a review where we had

8    specific criteria for the types of data we were interested in

9    in the published literature.  We then evaluated that

10   information, synthesized it, and published our findings.

11   Q.   And you are the third author on that.  What was your role

12   in that paper?  What did you do?

13   A.   I did quite a bit of the review of the literature that we

14   looked at --

15   Q.   Okay.

16   A.   -- and did quite a bit of the writing, as well as the

17   analysis and synthesis.  We worked as a team.

18   Q.   Did you do statistical analysis for that?

19   A.   Not on this particular paper, no.

20   Q.   What's the next published paper?

21   A.   "Water quality monitoring records for estimating tap

22   water arsenic and nitrate: a validation study."

23   Q.   Okay.  And that was published in 2010?

24   A.   Correct.

25   Q.   You are the third author on that article.  What was your

Kuehn - Cross

1   role in that article?

2   A.   So for this study, I was the study manager.  So I did all

3   of the data collection, data organization, and analyses.

4        This particular paper was more of a methods paper, if I

5   recall.  It's been a while since I looked at it, but

6   essentially we were using tap water measurements and

7   validating their utility compared to publicly available water

8   data with regard to arsenic and nitrate levels.  So we were

9   publishing the methods in this particular paper.

10  Q.   Did you perform any statistical operations for that

11  paper?

12  A.   I think Susan did most of the statistics for this

13  particular paper.

14  Q.   Okay.  Thank you.  What's the next one?

15  A.   The next one is "An evaluation of semi-quantitative test

16  strips for the measurement of nitrate in drinking water in

17  epidemiologic studies."

18  Q.   I'm sorry.  Where's that on the -- who's the first author

19  on that one?

20  A.   That's Searles Nielsen S.  That's the third one down.

21  Q.   Okay.

22  A.   And similar to the one above it, we -- it's publishing

23  about the nitrate water study.

24  Q.   And that was in 2008.

25  A.   That's correct.

Kuehn - Cross

1   Q.   And, again, you performed no data analysis for that

2   paper, correct?

3   A.   You know what, it's been a while.  I honestly don't

4   recall on this particular paper what we -- who did what.

5   Q.   Okay.  And what was the other -- what are the other

6   published -- peer-reviewed published papers that you have?

7   A.   The next one is "Measuring participation in multiple

8   sclerosis: A comparison of the domains of frequency,

9   importance, and self-efficacy."

10  Q.   Again, that's 2008?

11  A.   That's correct.

12  Q.   And what was that paper about?

13  A.   This was work that I did as part of the Multiple

14  Sclerosis Rehabilitation, Research, and Training Center at

15  U-dub.  And so we had done an extensive observational survey

16  study of patients with multiple sclerosis.

17      This paper was looking at patient-reported outcomes,

18  essentially, is the point.

19  Q.   Did you perform data analysis for that paper?

20  A.   Yes, I did.  I was one of the statisticians at the

21  MSRRTC.

22  Q.   Tell me what method you employed.

23  A.   I would need to look at my notes.  I honestly don't

24  remember.

25  Q.   Okay.  And that was published in what journal?

Kuehn - Cross

1   A.   That was published in -- I think that's *Disability and*
2   *Rehabilitation*.
3   Q.   And that's a peer-reviewed journal?
4   A.   Yes.
5   Q.   Okay.  And what other published articles, peer-reviewed
6   published articles do you have?
7   A.   "Antidepressant use in multiple sclerosis:  Epidemi-
8   ologic study of a large community sample."
9   Q.   Okay.  And that's in which journal?
10  A.   *Multiple Sclerosis*.
11  Q.   And that's peer-reviewed in 2007, correct?
12  A.   That's correct.
13  Q.   And you're the third author on that paper, right?
14  A.   That's correct.
15  Q.   And what was your role?
16  A.   I'm the fourth author on that paper.  Sorry.
17  Q.   Oh, I'm sorry.
18  A.   That's all right.
19  Q.   And what is your role in that paper?
20  A.   Again, I was one of the statisticians with the MSRRTC.
21  So I handled a lot of data.  I did some of the writing, some
22  of the analyses.
23  Q.   Do you remember any of the statistical methods you used
24  in that paper?
25  A.   Like I said, it's been a while.  I would need to go back

Kuehn - Cross

1   and use -- I would've used any of the statistical methods that

2   I've discussed here today and am familiar with.

3   Q.   But as you sit here, you don't remember which ones they

4   were.

5   A.   I would need to look at my notes.

6   Q.   Okay.  Any other published, peer-reviewed articles?

7   A.   Yes.

8   Q.   Okay.

9   A.   The next one is "Symptom burden in persons with spinal

10  cord injury."

11  Q.   Okay.  And that was published in 2007?

12  A.   Correct.

13  Q.   And you're the second author on that article?

14  A.   That's correct.

15  Q.   And that dealt with human subjects, I guess?

16  A.   Yeah.  Again, this is all coming out of the rehab

17  medicine group that I worked with.

18  Q.   And what was your role in that paper?

19  A.   Again, I was a statistician.

20  Q.   Okay.  And what other published articles do you have?

21  A.   "Assistive technology use among adolescents and young

22  adults with spina bifida."

23  Q.   Uh-huh.

24  A.   The *American Journal of Public Health*.

25  Q.   2007?

Kuehn - Cross

1    A.    That's correct.

2    Q.    What was your role in that paper?

3    A.    Similar to the others.  I was a statistician in the

4    MSRRTC.

5    Q.    Okay.  And other published articles?

6    A.    The next one is "Risk of malformations associated with

7    residential proximity to hazardous waste sites in Washington

8    State."

9    Q.    And that's published in where?

10   A.    *Environmental Research*.

11   Q.    A peer-reviewed journal?

12   A.    Yes.

13   Q.    Okay.  What was your role in that paper?

14   A.    I was the lead author, statistician, and study design.

15   This was my thesis work.

16   Q.    This is your thesis work?

17   A.    That's correct.

18   Q.    Any other peer-reviewed publications?

19   A.    Yes.

20   Q.    And these would've all been while you were in graduate

21   school or before then if that was your thesis work?  Is that a

22   fair assessment or not?

23   A.    Well, they were published after I graduated, but -- and

24   some of that analyses and work continued after graduation --

25   Q.    Okay.

Kuehn - Cross

1    A.   -- but some of this work was done while I was a graduate

2    student.

3    Q.   Well, how many other peer-reviewed -- I don't want to

4    spend all day here, so --

5    A.   Three, four, five, six, seven, eight.  I have another

6    eight peer-reviewed published articles.

7    Q.   Okay.  And they all deal with human subjects, right?

8    A.   I think that's an accurate statement.

9    Q.   Okay.  Now, that section of your CV that's labeled

10   Academic Credentials and Professional Honors, now you don't

11   have any honors listed there, but I think you mentioned to

12   Mr. Harvey yesterday a couple of honors.  Is that true?

13   A.   No.  What I mentioned were professional affiliations,

14   which can be found on the second to last page of my CV.

15   Q.   Do you have any professional honors?

16   A.   I'm not sure.  So I think what that would mean is like an

17   honorary degree or something like that.  And, no, I do not.

18   Q.   Any award, any recognition that you've had for your

19   professional activities?

20   A.   Oh, yes.  I've had a number of awards.

21   Q.   Okay.

22   A.   I don't think that they are included on here, but, yes,

23   I've had awards.

24   Q.   Tell us your --

25   A.   I received an award for my work on my thesis when it was

Kuehn - Cross

1   presented.

2   Q.    And when was that award --

3   A.    I need to look.  I would need to look back.  I honestly

4   don't recall.

5   Q.    Anything more recent than that?

6   A.    No.

7   Q.    Now, in your testimony with Mr. Harvey, I believe you

8   said you had taken 10 classes in statistics; is that right?

9   A.    At least.

10  Q.    But in your deposition, I think you only listed four

11  classes in statistics.  Does that sound familiar to you?

12  A.    It may have been in relation to the question that was

13  asked, but I can verify with my university transcripts that I

14  took a lot more than four.

15  Q.    Okay.  Well, let's figure that out, because in your

16  deposition you said you took Statistics 101, right?

17  A.    As an undergraduate.

18  Q.    As an undergraduate.

19  A.    Uh-huh.

20  Q.    And then you took biostatistics for three quarters.  Is

21  that as an undergraduate as well?

22  A.    No.  Those were graduate-level biostatistics classes.

23  Q.    Did you take any other undergraduate statistics courses

24  besides Statistics 101?

25  A.    Undergraduate?

Kuehn - Cross

1    Q.    Yes.

2    A.    No.

3    Q.    Okay.  And then you went to graduate school.

4    A.    That's correct.

5    Q.    And you took biostatistics.

6    A.    I took three quarters of the required biostatistics that

7    is necessary for the degrees that I achieved.  I took three --

8    Q.    Let me ask you, do you know what grade you got in that

9    class?

10   A.    Well, my graduating GPA was a 3.72.  So I did pretty

11   well.

12   Q.    I mean do you remember that class in particular and how

13   well --

14   A.    I don't know what grade I got in that particular class.

15   Q.    I wouldn't either.

16   A.    I had two degrees.  I worked two jobs through school,

17   so --

18   Q.    I wouldn't remember either.  I just asked on the

19   offhand --

20   A.    Yeah.  I have no idea.

21   Q.    Okay.  What other statistics classes did you take during

22   your graduate work?

23   A.    I took three epidemiology methods classes, which are

24   all -- involve statistics.  I also took an applied

25   epidemiology course that required the application of the

Kuehn - Cross

1    statistical methods that we were being trained in in a 10-week

2    course on a large observational dataset.  And then I took two

3    advanced biostatistics courses in logistic regression and

4    survival analysis.  And those are the ones I remember.

5    Q.   Okay.  Have you -- were those statistics classes related

6    to epidemiology?

7    A.   They were related to the statistical methods.  So they

8    were in the biostatistics department, but they were for my

9    epidemiology degree.

10   Q.   Statistical methods that epidemiologists use, right?

11   A.   Biostatistics are used by many more fields than

12   epidemiology.

13   Q.   I understand your biostatistics course, but the later

14   ones, the ones you mentioned after the biostatistics, the

15   applied --

16   A.   The four epidemiology courses I took were -- and they

17   included statistics, were epidemiology-specific.

18   Q.   Okay.

19   A.   They included the basic of the methods I then went on to

20   take advanced biostatistics classes in.  And those are methods

21   that are applied in epidemiology and across other fields of

22   study.

23   Q.   Have you ever taught a statistics class?

24   A.   I was a TA for one of the applied epidemiology classes,

25   and I taught or counseled students on the appropriate

Kuehn - Cross

1   programming and use of statistics for their projects.

2   Q.   Okay.  So you taught -- you were a TA when you were a

3   graduate student.

4   A.   Yeah.

5   Q.   Okay.  How many semesters were you a TA?  Was it

6   epidemiological statistics you were a TA --

7   A.   It was the applied methods class, and I believe I TA'd

8   that class one quarter.

9   Q.   Have you ever taken a course on ecology?

10  A.   I don't think specifically, no.

11  Q.   Okay.

12  A.   I'm trying to think back to my undergraduate, and I don't

13  recall.

14  Q.   And you've never taken a course on ecological data

15  analysis, have you?

16  A.   I've taken -- well, I'm not sure that there are courses

17  offered in that, but I've taken courses on environmental

18  epidemiology, which is -- my thesis was related to

19  environmental exposures.  So to that extent, I have taken

20  coursework in environmental exposure.

21  Q.   Those are exposures by human beings, right?

22  A.   Exposures to human beings.

23  Q.   To human beings.  Okay.

24       You have no training in epidemiology outside the human

25  context, do you?

Kuehn - Cross

1    A.   In terms of the outcomes that I've been examining as an

2    epidemiologist?

3    Q.   In terms of data analysis.

4    A.   As I mentioned, I have worked with environmental data.

5    Q.   Related to human subjects.

6    A.   As related to human outcomes, yes.

7    Q.   And you don't claim to be an expert on ecology or biology

8    or chemistry, do you?

9    A.   No.

10   Q.   Okay.  Have you ever visited a stream in Appalachia?

11   A.   No, I haven't.

12   Q.   And you don't really know what the WVSCI method is, do

13   you?

14   A.   My understanding is that it is an index measure of

15   ecological health of these streams.

16   Q.   Do you know any more about it than that?

17   A.   No.

18   Q.   Okay.  In your deposition you weren't sure, I think,

19   whether it dealt with habitat or whether habitat was included

20   within the WVSCI or GLIMPSS.

21        Do you know today whether habitat is part of the WVSCI or

22   GLIMPSS method?

23   A.   I am not very familiar with all of the components of it.

24   What I understand is that WVSCI is a measure of health in that

25   particular ecological system and that it is made up of a

Kuehn - Cross

1   number of components.  It's an index.

2   Q.   Okay.  How long have you worked for Exponent?

3   A.   It will be six years in October.

4   Q.   And how many times have you been used as an expert in

5   litigation?

6   A.   As a testifying expert, this is my second time.

7   Q.   Never testified in a deposition before except for the

8   medical device case that we talked about earlier?

9   A.   I was deposed in a personal matter back in --

10   Q.   Oh, no.  I don't care about that.

11   A.   Yeah.  But, no.  Other than that, no.

12   Q.   Okay.  And were you hired as an expert in other

13   litigation that you ended up -- you didn't end up testifying

14   in?

15   A.   Not as a testifying expert.

16   Q.   Okay.  Okay.  As an expert in any other capacity?

17   A.   My work on any other litigation is strictly confidential.

18   I'm not going to testify about that.

19   Q.   I'm not asking you to tell me which cases you've worked

20   on, just if you have and about how many of them.

21           THE WITNESS:  Your Honor --

22           THE COURT:  You can answer that.

23           THE WITNESS:  Okay.  I just want to make sure I'm

24   not -- okay.

25   BY MR. LOVETT:

Kuehn - Cross

1   Q.   I'm not going to ask you which companies.

2   A.   Okay.   I have been hired as a consulting expert.

3   Q.   More than five times?

4   A.   Sure.   Yes.

5   Q.   Okay.   Now, I think you said early on in your testimony

6   that you believe that it is appropriate -- and you do it all

7   the time, I think -- to use observational data to show

8   causation; is that right?

9   A.   It is appropriate to use observational data in studies of

10  the effect of an exposure on an outcome which can be -- the

11  results of which can be used along with other evidence to

12  establish causation.

13  Q.   Well, okay.   Let me ask you, do you think that the use of

14  observational data alone is sufficient to establish causation?

15  A.   It completely depends on the exposure and the outcome of

16  interest.

17  Q.   So is that sometimes?

18  A.   Potentially.

19  Q.   Well, do you know -- can you name -- can you tell me a

20  case where you think it is appropriate to use observational

21  data to establish causation?

22  A.   Not off the top of my head, no.

23  Q.   Not one?

24  A.   No.   I mean there's an infinite number of potential

25  exposures and outcomes that we could discuss here, and I'm not

Kuehn - Cross

1  going to speculate as to which of them could be established

2  solely with the use of observational data.

3  Q.   I'd just like you to give me an example --

4  A.   I don't have one.

5  Q.   -- of cause --

6  A.   I don't have one.

7  Q.   Okay.  In your deposition, on page 76 Mr. Becher asked

8  you, "So you said that observation, you would not place too

9  much weight on it.  Do you think an appropriate analysis of

10  causation and elimination of confounding factors can be solely

11  done with observational data, or is that" -- and you said,

12  "No, I would not."

13       Mr. Becher says, "Okay."  You say, "I would not say

14  that."

15       Mr. Becher says, "You would not say that?"  And you say,

16  "I would not say that you can establish causation solely with

17  observational data."

18  A.   That's correct.

19  Q.   Do you agree with that statement still?

20  A.   I still agree with that statement.

21  Q.   Didn't you just tell me that in some cases, it was

22  appropriate and in others not?

23  A.   I told you that there's the potential that there could be

24  something out there, but I can't possibly -- I can't give you

25  an example.  I don't think that contradicts my prior

Kuehn - Cross

 1   statement.

 2   Q.   Okay.  So theoretically you haven't ruled it out as

 3   logically impossible, but you can't think of any cases where

 4   it would be appropriate; and in your deposition, you said it

 5   was not appropriate.

 6        Is that a fair assessment of your view?

 7   A.   I believe that's a fair statement, yes.

 8   Q.   Now, observational data are usually, I think, juxtapose

 9   with experimental or lab data.  Is that a fair assessment or

10   not?

11   A.   I think that's right.  There's different sources of

12   evidence.

13   Q.   And I think you said in your deposition that you'd like

14   to see lab data on this, right?

15   A.   If that was feasible, sure.

16             MR. LOVETT:  May I approach?

17             THE COURT:  You may.

18   BY MR. LOVETT:

19   Q.   Have you seen this before?

20   A.   No, I have not.

21   Q.   Okay.  Let me sort of take you through it.

22   A.   Okay.

23   Q.   This is a response the plaintiffs received from

24   defendants, from your client here.

25   A.   Okay.

Kuehn - Cross

1   Q.   And we asked Fola for any lab data that it had.

2   A.   Okay.

3   Q.   And it responds to us -- you see our request?  Documents

4   related to any monitoring, measurement, sampling, analysis, or

5   whole effluent toxicity testing.

6        Do you know what whole effluent toxicity testing is?

7   A.   No, I don't.

8   Q.   Okay.  And then if you'd turn to page 3 --

9   A.   Okay.

10  Q.   -- you see we got a privilege log from them.

11  A.   I'm sorry?  We get what?

12  Q.   A privilege log.  It says Supplemental Privilege Log at

13  the top.

14  A.   Oh, I see it, yes.

15  Q.   Do you see that?

16  A.   Uh-huh.

17  Q.   And the document that it's withholding is an analytical

18  report, and it's called the whole effluent toxicity tests.

19  A.   Okay.

20  Q.   So do you know -- have you been told by anyone at Fola,

21  your lawyers or anyone else, whether or not there is a whole

22  effluent toxicity test or any kind of lab test taken in this

23  case?

24  A.   I have no idea.

25  Q.   Never been mentioned to you?

Kuehn - Cross

1    A.    No.

2    Q.    Would you like to know if there is a lab test showing

3    that the water was not toxic in a lab?

4    A.    I don't know that it would have a whole lot of meaning

5    for me, given I'm not qualified to interpret those kinds of

6    information.   So --

7    Q.    Well, if somebody who were qualified told you that the

8    toxicity tests came out positive and it didn't kill the

9    organism, wouldn't that be the kind of thing that you would

10   like to know to form an opinion about whether or not the water

11   at issue is toxic?

12   A.    I'm not forming opinions about whether or not the water

13   was toxic.   I'm forming opinions about the methods used to

14   analyze observational data.

15   Q.    Okay.   Now, your criticism in this case, as I recall from

16   your testimony, was limited to criticism of the benchmark and

17   of the 2014 Pond paper; is that right?

18   A.    I believe I was also providing criticism of Dr. King's

19   work.

20   Q.    Dr. King's testimony.

21   A.    Correct, his expert report.   That's correct.

22   Q.    Right.   But in terms of the literature, that was your

23   testimony, right?

24   A.    I believe that's all I've testified to with regard to the

25   published literature, yes.

Kuehn - Cross

1   Q.   Okay.  So at tab 1 -- if you'd like our notebook,

2   I'll --

3   A.   I just need to know which --

4   Q.   Plaintiffs' exhibits.

5        May I approach, Your Honor?

6            THE COURT:  Yes, you may.

7            THE WITNESS:  Okay.

8            THE COURT:  Help her find the right notebook.

9            THE WITNESS:  This one?  Okay.  I'm sorry.  Which

10  tab?

11  BY MR. LOVETT:

12  Q.   1.

13  A.   Okay.

14  Q.   Okay.  So that is a paper by Bernhardt and Palmer.

15  A.   I see that.

16  Q.   You have no opinion about that paper, correct?

17  A.   I would need to look it over.  Did you want me to offer

18  an opinion?

19  Q.   No.  You haven't offered any testimony or opinion about

20  that paper, have you?

21  A.   I haven't today.  No, I have not.

22  Q.   Okay.  Tab 2, "How Many Mountains."

23  A.   Yes.

24  Q.   You've offered no opinion or testimony about that,

25  correct?

Kuehn - Cross

1   A.   I have not today, no.

2   Q.   Okay.  Tab 3, "Derivation of a benchmark for freshwater

3   ionic strength."  No opinion, correct?

4   A.   To the extent that this is related to the benchmark work,

5   I think my opinions may extend, but I have not testified about

6   this particular article today.

7   Q.   Okay.  Same is true for tab 4, "A method for assessing

8   causal field exposure response relationships," right?

9   A.   Similar to the answer I just gave.  To the extent that

10   this report is similar methodology as the benchmark, my

11   criticisms would extend to that.

12   Q.   For instance, with "How Many Mountains," you don't have

13   any statistical -- you haven't provided any criticism of the

14   statistical methods adopted in that, have you?

15   A.   I have not been asked to today.

16   Q.   Okay.  I won't take you through all the tabs, but it's

17   fair to say that's going to be true of the other tabs here,

18   right?

19   A.   I have not answered any questions regarding these other

20   articles.  I'd be happy to if you would like to ask me some.

21   Q.   No.  Thank you.

22   A.   All right.

23   Q.   Now, statistics are pretty confusing to laypeople like

24   me.  So I apologize for my lack of familiarity with the

25   terminology.  I'm sure I will get it wrong.

Kuehn - Cross

1   A.   Okay.

2   Q.   So bear with me, please.  Let me just start, this is a

3   complicated statistical question, isn't it?  A lot of work has

4   been done here.

5   A.   The question of the exposure and outcome that is being

6   evaluated here?

7   Q.   Yes.

8   A.   It is a complex question.

9   Q.   And there are over 20 published papers on this issue,

10  right?

11  A.   I don't know that personally.

12  Q.   Well, you sat through it and heard -- you sat through

13  both Dr. Palmer's testimony and Dr. King's, didn't you?

14  A.   My understanding is that there were about 20 papers that

15  she had relied on or that contained information.  So to the

16  extent that that's true, then yes.

17  Q.   So -- and then you testify basically in polar opposition

18  to Dr. King, right?

19  A.   I would say that's accurate.

20  Q.   You disagree with almost everything he's done.

21  A.   With regard to this data, yes.

22  Q.   And the same is true of EPA and the benchmark.  You

23  disagree with almost everything that they did and the EPA did.

24  A.   I disagree with the epidemiologic and statistical methods

25  they applied to these data; yes, I do.

Kuehn - Cross

1    Q.    And that's the heart of the benchmark, isn't it?

2    A.    I believe -- well, yeah, I believe that's true.

3    Q.    So how do we decide who to believe?  I mean on the one

4    hand, we've got you saying everything that Dr. King, the

5    benchmark, have done is wrong; and you have a bunch of reasons

6    and they have a bunch of reasons.  How do we decide who to

7    believe?

8    A.    I can give you a stack of textbooks that will contradict

9    everything that they did and support everything that I've

10   testified to.

11   Q.    Well, there's another way, isn't there?  It's called

12   peer-review.  Have any of the opinions you expressed here

13   today been peer-reviewed or published in any journal?

14   A.    Not yet.

15   Q.    Okay.  Do you know who the lead author -- who the

16   statistician on the benchmark was?

17   A.    I don't know.

18   Q.    Do you know what his qualifications were?

19   A.    If it's the gentleman that Dr. King talked about

20   yesterday, it sounds like he's an expert in environmental

21   toxicology.

22   Q.    I think his name is Yuan; is that right?

23   A.    If that's his name, sure.

24   Q.    You're not familiar with him at all, are you?

25   A.    I am not.

Kuehn - Cross

1   Q.   You don't -- can you name any environmental data analyst

2   except for Dr. King?

3   A.   I'm sorry.  Say that again.

4   Q.   Can you name a single environmental data analyst except

5   for Dr. King?

6   A.   No.  He's the only person I know that claims to be an

7   ecological data analyst.

8   Q.   Did you ask any other epidemiologist to review the

9   materials that you testified about here today?

10  A.   Yes, I did.

11  Q.   Okay.  Who was that?

12  A.   Some colleagues of mine, epidemiologist who works with me

13  at Exponent.

14  Q.   Okay.  Did somebody help you with forming your opinions,

15  then?

16  A.   No.  She -- she helped me with organizing materials and

17  whatnot.  I formed my own opinions.

18  Q.   And what was her training?

19  A.   She has a Ph.D. in epidemiology.

20  Q.   Okay.  And what's her name?

21  A.   Vanessa Perez.

22  Q.   Now, those 20 papers have all been peer-reviewed, is that

23  your understanding, approximately?

24  A.   Well, they were reviewed by peers in the same field.

25  Q.   Yes, they were.  Right.  And you heard testimony I think

Kuehn - Cross

1   that there were statisticians.  Many of them were authored by

2   statisticians and reviewed by statisticians.  Is that true?

3   A.   I don't recall hearing that testimony, no.

4   Q.   Okay.  Let me turn to the benchmark, which is Joint

5   Exhibit 58, and that's one of the books -- it should say Joint

6   Exhibit Book 1, I think.

7   A.   I hope this is the right one.

8   Q.   It says 1 to 58.

9   A.   This says 58 Appendix E-81.

10   Q.   It should have tabs on it.

11   A.   Not that one.  Hang on.

12        MR. LOVETT:  May I approach, Your Honor?

13        THE COURT:  Yes.  Help locate the right notebook.

14   BY MR. LOVETT:

15   Q.   This is it.

16   A.   Okay.  I just want to make sure I'm looking at the right

17   thing.  Okay.  I'm sorry.  Which one am I looking for?

18   Q.   The last tab.  It's the benchmark.

19   A.   Okay.

20   Q.   Now, you testified extensively about that here today,

21   didn't you?

22   A.   Yes, I did.

23   Q.   Okay.  Do you know the procedure for how this benchmark

24   gets approved?

25   A.   No, I don't.

Kuehn - Cross

1    Q.    Okay.  Let's look at the authors of the benchmark.

2    That's on JE 376.

3    A.    Okay.

4    Q.    There are a lot of Ph.D.'s on there, right?

5    A.    Yes.

6    Q.    Do you know any of them?

7    A.    Personally, no.

8    Q.    Have you ever heard of any of them?

9    A.    I've heard of Cormier and Suter.

10   Q.    Okay.  And you've heard of them because they --

11   A.    And Pond.

12   Q.    Okay.  Because of the testimony in this case, right?

13   A.    The articles I've reviewed for the case, etcetera, sure.

14   Q.    Anybody else?

15   A.    No.

16   Q.    Do you know if any of them are statisticians?

17   A.    I don't.

18   Q.    And then you testified about the -- well, do you

19   understand that EPA has a Scientific Advisory Board that

20   reviews the benchmark to see if it passes scientific muster?

21   A.    So this is my understanding, is that the authors authored

22   the benchmark.  It went to a review panel of some kind.  They

23   received comments.  The EPA received comments.  And they

24   responded to those comments in the final benchmark.

25         As far as I can tell, it did not go through another round

Kuehn - Cross

1   of review to see if those comments had been adequately

2   addressed.

3   Q.   Okay.  But the testimony is that there is a -- and I

4   think the -- the benchmark is submitted to the SAB.

5   A.   Okay.

6   Q.   The SAB appoints a committee that reviews the benchmark,

7   right?

8   A.   Uh-huh.

9   Q.   That's the report that we have.

10  A.   Okay.

11  Q.   And then that either -- we're not sure about this, but

12  either that report or that report and the benchmark go to the

13  full SAB for review, right?

14  A.   My understanding was it was the report, not the full

15  benchmark.  But, again, it sounds like there's some question

16  there.  So I don't know the answer any better than you do.

17  Q.   Okay.  But in any event, at least the full SAB looked at

18  the report about the benchmark.

19  A.   Yes, I believe that's true.

20  Q.   And you testified in your deposition that there were no

21  epidemiologists on the SAB.  Do you remember that?

22  A.   I did not identify any epidemiologists.

23  Q.   Did you look at the SAB report before you gave that

24  answer?  Excuse me.  The SAB report.

25  A.   The comments?

                              Kuehn - Cross

 1   Q.   Yes.

 2   A.   No, I did not.

 3   Q.   Let's do that.

 4   A.   Actually -- I'm sorry.  May I correct that statement?  I

 5   believe that the benchmark lists the reviewers --

 6   Q.   Uh-huh.

 7   A.   -- of the report and the SAB.  So I did look for

 8   information on all of those people.  So, yes.

 9   Q.   Let's do an easy thing and turn to page 376.

10   A.   Okay.

11   Q.   PE 376.  This is the Scientific Advisory Board.

12   A.   376 looks like it's the authors and the contributors.  Am

13   I not looking at the right thing?

14   Q.   I think it says U. S. EPA Science Advisory Board.  Do you

15   see that?  PE 376.  Page 376.

16   A.   PE?  I'm sorry.  I'm looking at JE.

17   Q.   I'm sorry.

18   A.   That's okay.  I'm confused.

19        I'm sorry, Your Honor, but I need a break here.

20             THE COURT:  All right.  Why don't we take a

21   ten-minute recess.

22             THE WITNESS:  Thank you.

23             THE COURT:  You can step down.  Don't discuss your

24   testimony.

25             THE WITNESS:  Yeah.

Kuehn - Cross

1            (Recess from 10:43 a.m. to 10:53 a.m.)

2      BY MR. LOVETT:

3      Q.    So that is a list of the Scientific Advisory Board

4      I think.  Do you agree with that?

5      A.    Yes, this is the list.

6      Q.    Science Advisory Board.  I've been calling it the wrong

7      thing.

8            And do you see that one of the reviewers is named

9      Dr. Patricia Buffler?

10     A.    Patricia Buffler, yes.

11     Q.    Have you heard of her?

12     A.    Yes, I have.

13     Q.    Is she an eminent epidemiologist?

14     A.    Yes.  She's a well-known epidemiologist.

15     Q.    And she was dean of the department of epidemiology at the

16     University of California-Berkeley, right?

17     A.    She was the dean emeritus, yes.

18     Q.    So she reviewed at least the committee report, didn't

19     she?

20     A.    Well, she would have at least reviewed the --

21                MR. HARVEY:  Objection; lack of foundation.

22                THE WITNESS:  I don't know what she reviewed, but

23     assuming she reviewed at least the committee report, she would

24     have been aware of the criticisms that we've discussed

25     regarding the use of statistics.

Kuehn - Cross

1   BY MR. LOVETT:

2   Q.    Okay.  Let's turn to page 402 where I think you've

3   testified about a bullet point that's towards the top of that

4   page.

5   A.    Yes.

6   Q.    So this is from the Scientific Advisory Board and a

7   recommendation to the authors of the benchmark, correct?

8   A.    That's correct.

9   Q.    And it says, "Consider further use of quantitative

10  statistical analysis for understanding causality and the

11  potential role of confounding factors."

12  A.    Yes.

13  Q.    That's right what you pointed to, isn't it?

14  A.    That's correct.

15  Q.    It says -- and the reason it says is because parametric

16  procedures have been used successfully elsewhere to evaluate

17  multivariate environmental datasets and can provide a

18  relatively objective quantitative framework for data analysis.

19  A more rigorous statistical analysis should be contained in

20  the document, right?

21  A.    Right.  So they're stating that because these methods

22  have been used elsewhere to evaluate this type of data, that

23  the EPA should apply a more rigorous statistical approach.

24  Q.    And, "Further, it would be helpful for the authors to

25  clarify whether nonparametric multivariate methods, such as

Kuehn - Cross

1  non-metric multidimensional scaling were considered."

2  A.   That's correct.

3  Q.   "And at a minimum, the EPA document should discuss the

4  pros and cons of multivariate statistical methods and explain

5  why these approaches were not applied," right?

6  A.   That's right.

7  Q.   So EPA did do that, didn't it?

8  A.   No, they did not.  They provided a nonsensical response

9  to the comments, and they did not discuss at all the rationale

10  for why other approaches had not been applied to these data.

11  Q.   I understand you think it's nonsensical, but you don't

12  think it tried to explain why what it did in response to this

13  comment?

14  A.   I'm not saying they didn't try to explain it.  I'm saying

15  their explanation made no sense.

16  Q.   You disagree with their explanation because you don't

17  understand it, right?

18  A.   No.  I disagree with their explanation because it's

19  nonsensical and it doesn't answer the questions.

20  Q.   Okay.  What is -- let me ask you, what is non-metric

21  multidimensional scaling?

22  A.   It's going to be a nonparametric method of evaluating the

23  data.  It is not a statistical method that I have used.

24  Q.   Do you know what it is?  Can you give a good explanation

25  of how it works?

Kuehn - Cross

1   A.   No.  I would need to look it up.  That's not a method I'm

2   particularly familiar with.

3   Q.   So maybe that's why you think -- strike that.

4        Is that maybe why you don't understand EPA's response to

5   this comment, because you don't understand the comment itself?

6   A.   I understand EPA's response to the comment, and nowhere

7   in the benchmark do they mention at all the application of any

8   nonparametric multivariate methods, including non-metric

9   multidimensional scaling.

10  Q.   What data do you think EPA should have had -- used for

11  the multi -- for the non-metric multidimensional scaling?

12  A.   The data they had available to them.

13  Q.   Which -- which were what?

14  A.   Say again?

15  Q.   Which -- okay.  What should've used those data for?

16  A.   They had a large observational dataset, and the advisory

17  board is recommending that they apply various statistical

18  methods to analyzing that data.  So I'm not sure your question

19  makes sense.

20  Q.   Okay.  I'll try to ask it as clearly as I can.  Exactly

21  what data should EPA have used to perform this analysis?

22  A.   I just told you I am not familiar with this particular

23  nonparametric analysis; but at a minimum, they would have

24  needed to have examined their exposure and their outcome of

25  interest and whenever their data were appropriate for

Kuehn - Cross

1   completing that model.

2   Q.   And you can't tell me how EPA should have performed that

3   analysis, correct?

4   A.   This particular statistical method --

5   Q.   Uh-huh.

6   A.   -- no.

7   Q.   Okay.

8   A.   I would need to look it up.

9   Q.   Thank you.  And you haven't looked it up.

10  A.   Not this particular one, no.  There's a number of other

11  ones that were suggested.

12  Q.   Okay.  Now, let's turn to page 383, if you would, too,

13  please.

14  A.   I'm sorry.  Which page?

15  Q.   383.  PE 383.  Are you there?

16  A.   I have seen that.  Yes.

17  Q.   Do you see the section that says Causality between

18  Extirpation and Conductivity?

19  A.   I do.

20  Q.   In the benchmark, the SAB, which includes Professor

21  Buffler, I believe, says, doesn't it, that the EPA document

22  presents -- let me start before that.

23       "Building a strong case for causality between

24  conductivity and loss of genera requires that two linkages be

25  demonstrated: a strong relationship between stream

Kuehn - Cross

 1  conductivity and the amount of MTM-VF in the upstream

 2  catchment, and a strong relationship between elevated stream

 3  conductivity and the loss of benthic macroinvertebrate taxa.

 4  The EPA document presents a convincing case for both

 5  linkages."

 6       Do you see that?

 7  A.   I do see that.

 8  Q.   And that's why the Scientific Advisory Board approved the

 9  benchmark, isn't it?

10  A.   I don't know that they actually approved the benchmark.

11  My understanding is they provided comments to EPA about the

12  benchmark.  EPA made some revisions to the benchmark.  And I

13  don't believe the SAB ever saw it again prior to its

14  publication.

15  Q.   Okay.  That's your understanding of the process?

16  A.   That's my understanding.  If I'm incorrect, I'll --

17  Q.   Okay.  Now, let's look at these members of the SAB.  Do

18  you recognize any of them except for Professor Buffler?

19  A.   I'm sorry.  Please remind me what page that's on.

20  Q.   I believe it was 376.

21  A.   So as I said, I recognize Dr. Buffler.  Elaine Faustman

22  looks familiar, but --

23  Q.   Okay.

24  A.   -- I couldn't tell you.  I may have come across her work

25  in the literature.  That's it.

Kuehn - Cross

1    Q.    Okay.  So you don't know any of the authors of the

2    benchmark, right?

3    A.    That's correct.

4    Q.    You're not familiar with their work.

5    A.    Not inasmuch as it is outside the realm of what we've

6    been talking about here, no.

7    Q.    What about the Panel on Ecological Impacts -- it's on

8    page 374 -- who reviewed the benchmark and provided the

9    comments?  Do you recognize any of them?

10   A.    No.

11   Q.    I think every one of them has "Doctor" before his or her

12   name, right?

13   A.    Yes.

14   Q.    I think the same is true of the SAB.

15   A.    That's possible.

16   Q.    And I'm sure the same is true of everybody that reviewed

17   every one of those journal articles, right?

18   A.    Not necessarily.  I've reviewed a number of journal

19   articles and I don't have a "Doctor" in front of my name.

20   Q.    Is it your understanding that the benchmark was derived

21   to show the level at which conductivity causes impairment as

22   measured by the WVSCI or the GLIMPSS?

23   A.    Can you repeat that?  I want to make sure I heard you

24   correctly.

25   Q.    Is it your understanding that the benchmark was derived

Kuehn - Cross

1    to show the level at which conductivity causes impairment as

2    measured by an index like GLIMPSS or WVSCI?

3    A.   I believe that that's the case.  I'd need to look at the

4    front half of the benchmark to make sure the wording that

5    you're using is correct.

6    Q.   It's not in the benchmark.  That's my --

7    A.   Okay.  So you mentioned -- what I'm having trouble with

8    is the fact that you mentioned a specific level.

9    Q.   Okay.  Let me --

10   A.   So that's why I'm not following you.

11   Q.   Let me ask you a more open-ended question.

12   A.   Okay.

13   Q.   Can you tell me why the benchmark was derived?

14   A.   My understanding is that they were examining the effect

15   of conductivity on stream impairment as measured by the WVSCI

16   and whatnot.

17   Q.   Okay.  And it's with that understanding that you apply

18   your tools to the benchmark, right?

19   A.   That's correct.

20   Q.   Did you apply any statistical methods to any of the data

21   available in this case?

22   A.   I have not had an opportunity to analyze the data.

23   Q.   When were you hired as an expert in this case?

24   A.   I believe it was May of this year.

25   Q.   May?

Kuehn - Cross

1   A.   May or April.  I don't recall precisely.  I'm sorry.

2   Q.   Well, your deposition was on June 11th.

3   A.   Okay.

4   Q.   Would that tell me about how long before your deposition

5   you were hired?

6   A.   Well, I had an expert report that was due prior to that.

7   So I believe I was hired in April.  The report was due in May.

8   And I was deposed in June.  I think that's the approximate

9   time line.

10  Q.   Would you know how to analyze the environmental data that

11  we have in this case to determine if conductivity and its

12  associated ions cause impairment?

13  A.   Using the observational data that is available from the

14  DEP, yes, I do.

15  Q.   Do you know how to do that?

16  A.   I can do that, yes.

17  Q.   Tell me the steps, every one of them, that you would use

18  to do that.

19  A.   Every single one of them?

20  Q.   I want to know how you do it.

21  A.   I would get the data from the DEP.

22  Q.   Okay.

23  A.   I would -- well, let me back up.  Prior to that, I would

24  assemble a team to work on the analysis.  This is not a simple

25  thing.  This is a complex analysis, and it would take a lot of

Kuehn - Cross

1    time.

2    Q.    Who would you put on the team?

3    A.    I would have an ecologist --

4    Q.    Okay.

5    A.    -- with expertise in the measurements that were being

6    taken and the outcomes of interest to make sure that we were

7    evaluating the appropriate exposure and the appropriate

8    outcome and that we had identified all of the factors that we

9    should evaluate for confounding and effect modification.  I

10   would do it the same way I would do any other epidemiologic

11   study.

12   Q.    Okay.  So you say you would have an ecologist.  Who else

13   would you have?

14   A.    Maybe another epidemiologist to assist.

15   Q.    Another epidemiologist?

16   A.    Yeah.

17   Q.    Okay.  So you need two epidemiologists and one ecologist.

18   What else?

19   A.    That would be the basics of it.

20   Q.    Okay.  So a three-person team.  Then what would you do --

21   let's see -- then request the data from whom?

22   A.    Request the data from wherever it's located.  I believe

23   the Washington -- or, sorry -- the West Virginia DEP --

24   Q.    Okay.

25   A.    -- would provide the data.

Kuehn - Cross

1  Q.   So you would gather the dataset.  And how -- what tools

2  would you apply to that dataset?

3  A.   From my initial look at the data, I would simply open it

4  up in Excel and take a look at it for a while, look at the

5  values, look at how it's organized, look at the variables that

6  were provided, and then I would convert that.  When I'm ready

7  to start exploring the data further, I would convert it into a

8  STATA file, which STATA is assistance statistical software.

9  Q.   Okay.  STATA, is that a readily available statistical

10  software program?

11  A.   You can purchase it, yes.  It's readily available for

12  purchase.

13  Q.   Right.  It's, like, sort of Microsoft Word for your kind

14  of statistics, right?

15  A.   That's oversimplifying it, but, yeah, it's a statistical

16  program that you can conduct any number of analyses.

17  Q.   You don't know how to write statistical code, do you?

18  A.   I write commands for STATA to perform the analyses.  I'm

19  not sure what you mean about writing statistical code, though.

20  Q.   You don't know what that means?

21  A.   Are you talking about writing actual code?

22  Q.   Yes, writing actual code.  Do you know how to do that?

23  A.   So let's be clear.  There is the code or the programs you

24  have to write to run the analyses in the software.  So STATA

25  uses a particular set of commands, and you write those in a

Kuehn - Cross

 1    do-file.  STATA requires a specific set of commands, and you

 2    write that in a SAS file.  So do I know how to do that?  Yes.

 3    Am I a software programmer?  No.

 4    Q.    I'm not asking if you're a software programmer.  It's not

 5    the intent anyway.  I want to know if you know how to use

 6    STATA -- and what was the other one?

 7    A.    SAS.

 8    Q.    STAT?

 9    A.    SAS.  S-A-S.

10    Q.    S-A-S?

11    A.    Yes.

12    Q.    And that's another off-the-shelf statistical software

13    program, right?

14    A.    Yes.  Yes, it is.

15    Q.    By the way, have you heard of TITAN before this?

16    A.    Not before this, no.

17    Q.    Did you examine the TITAN -- do you have the expertise to

18    look at TITAN to understand whether or not it is a useful

19    statistical tool?

20    A.    TITAN does something that I'm not familiar with.  So, no,

21    that would not be my specific area of expertise.

22    Q.    Okay.  And also we've heard something about GAM models.

23    Do you remember that?

24    A.    Yes.

25    Q.    What's a GAM model?

Kuehn - Cross

1    A.    It's a generalized additive model.  It's a type of

2    regression.

3    Q.    And do you know how to write a GAM model?

4    A.    I could code for a GAM model, sure.

5    Q.    You could?

6    A.    Yes, I could.

7    Q.    Tell me basically how you would do that, please.

8    A.    You want me to tell you the STATA code for a GAM model?

9    Q.    Yeah, I do.

10   A.    I would need to look up the command, and then I can tell

11   you what it is.  So STATA has 12 volumes of command books, and

12   I would need to look up the specific command, but it would

13   include putting in the GAM command and specifying the

14   exposure, the independent variables, the outcome, as well as

15   any other special options for the model, the type of

16   smoothing, the type of post-estimation that I wanted, and I

17   would write that into a do-file and run it through my code.

18   Q.    Basically you're telling me you would get out the

19   instructions or the operating manual and read them and follow

20   the instructions, correct?

21   A.    No.  There's a difference.  So writing statistical code

22   is not an exercise in memorization.  You have to know what

23   you're doing, and it is complex.  There are many different

24   options.  So to make sure that your code works properly and

25   provides you with the information that you need, there are

Kuehn - Cross

1   reference manuals, and every statistician that I know has to

2   use them from time to time.  So, yeah.

3   Q.   Sure.   And that's not my question.  But you don't know

4   how to do anything beyond using those already prepared

5   programs, do you?

6   A.   I'm not sure what you're talking about, beyond that.

7   Beyond that is actual programming, writing computer code.

8   Q.   And are undergraduates, advanced undergraduates in

9   statistics now often taught to write their own code to develop

10  programs to suit their particular purposes?

11  A.   I don't know if that's true.

12  Q.   All right.  But in any event, your expertise, as I

13  understand it, is limited to using STATA and SAS and applying

14  those pre-prepared programs to data that come before you,

15  right?

16  A.   Yes, I would say that's true, me and thousands of other

17  epidemiologists and statisticians who use those programs.

18  Q.   Okay.  So you get the data.  You plug it into STATA and

19  SAS.  Which one would you use?  STATA or SAS?

20  A.   I would probably use STATA.

21  Q.   Okay.  STATA.  Okay.

22  A.   Uh-huh.

23  Q.   And, you know, that's like "Appa-la-cha" or

24  "Appa-lay-cha," I guess.

25  A.   Right.

Kuehn - Cross

1    Q.   What would you do in STATA with -- let me strike that.

2    Let me start with a more basic level.   Which of the data are

3    you going to plug into STATA?   What kind of data?

4    A.   So let's be clear.   A dataset is a series of rows and

5    columns.   It's essentially a giant spreadsheet, if you will,

6    okay?   You have records and you have variables.   And so I

7    would bring the entire dataset into STATA, and I would have

8    access to all the variables, all of the records, which I

9    believe there's over 2,000.   I've worked in STATA where there

10   were over 300,000 records before.   So you can input -- you can

11   bring in extremely large volumes of data, okay?

12        And then I have access to all of the variables that I

13   might want to explore.   One of the first things I do when I

14   have a new dataset and I'm going to analyze a new question is

15   I simply get a description of each variable, what does it look

16   like, how is it coded, what are the minimum and maximum

17   values.   I'll look at the bottom few values and the top few

18   values to see do I have anything that looks extreme or

19   inappropriate; maybe there was a data entry error.

20        So I would look at basically the quality of the data,

21   because my analysis from that point on will lack validity if

22   my data has got problems.   I'll look for missing data.   What

23   variables do I have extensive amounts of missing data in?

24   Those I may not be able to use in my analysis as well, or it

25   may require sub-analyses on just the portion for which I have

Kuehn - Cross

1   all the data.

2        So I would do extensive exploration basically getting to

3   know my data.

4   Q.   So can you tell me which data you would use, or is that

5   something you would have to discover when you start working

6   with it?

7   A.   I would need to look at it.  My understanding based on

8   the benchmark is they've got a table with some of the

9   variables that I --

10  Q.   Since you haven't looked at the data, how do you know

11  that you could use those data to show that conductivity either

12  is or isn't causing impairment?

13  A.   I don't know until I look at it.

14  Q.   I thought you told me a minute ago that, sure, you could.

15  A.   I said I could evaluate it for that cause, but I don't

16  know if it can tell me -- give me good answers.  It completely

17  depends on what the data says, and I have not looked at it

18  yet.

19  Q.   So you don't know if the data is sufficient to reach the

20  conclusion that EPA tried to reach or that -- strike that.

21       You don't know if the data is sufficient to answer the

22  question that EPA asked, do you?

23  A.   I have not looked at the data itself.  Based on what I've

24  seen and how it was described in the benchmark, I think it

25  would be helpful for that purpose.  I would certainly make an

Kuehn - Cross

1  attempt to examine it to see if I could conduct that analysis.

2  And if I could, I would; and I would acknowledge the

3  limitations, if there were any, in doing that analysis.

4  Q.   One thing you certainly couldn't do is use nonparametric

5  multivariate methods like non-multidimensional scaling, right?

6  A.   I'm not saying I couldn't use it.  I would need to look

7  at what it is, how it should be used, what its limitations

8  are, and if it's appropriate for the question at hand.

9  Q.   I want to make sure I understand your testimony.  You're

10  not testifying, are you, that temperature or habitat are

11  confounding factors?  You're only testifying that Dr. King,

12  the benchmark, and the 2014 Pond study did not eliminate those

13  as confounding factors.

14  A.   That is correct.

15  Q.   You don't have any opinion about what's actually causing

16  impairment, do you?

17  A.   No, I do not.

18  Q.   You testified about "a priore" knowledge.

19  A.   "A priori."

20  Q.   Okay.  You say "to-may-to" and I say "to-mot-to."

21  A.   It's Latin.  I'm sorry.

22  Q.   That's fine.  Nobody knows how to pronounce Latin.

23  They're all dead.  That's the only thing I remember from Latin

24  class.

25  A.   That's all right.

Kuehn - Cross

1    Q.    Anyway, "a priori," "a priore," whatever it is --

2    A.    Okay.

3    Q.    -- what is that in terms of statistical analysis?

4    A.    When I say a priori, it just refers to our previous

5    knowledge, knowledge we have that we bring to the analysis,

6    knowledge that we are familiar with prior to conducting the

7    study that we're doing.

8    Q.    And for ecological data analysis, it's important to bring

9    a priori knowledge in ecology, isn't it?

10   A.    I would certainly say so, yes.

11   Q.    And you heard Dr. Palmer's and Dr. King's testimony.  Do

12   you believe they have sufficient a priori knowledge in those

13   fields to assess ecological problems?

14   A.    Yes.

15   Q.    What do you think of Dr. King's testimony generally,

16   about him as a statistician?  Is he just, like, incompetent?

17   I mean I'm curious, because you have so fundamentally

18   criticized him.  Either he's incompetent or dishonest or

19   uninformed, something.

20        What is it that you think is going on here?

21   A.    I think he believes that what he is doing is correct.  I

22   think he has had some statistical training.  I think it's

23   limited.  I think that he is applying methods he's not

24   entirely familiar with and failing to recognize the

25   limitations of those methods in how to appropriately evaluate

Kuehn - Cross

1    statistically the relationships that are of interest here.

2        So I just think there's -- he's missing some context and

3    some training there.

4    Q.   Do you think that Dr. King is not familiar with TITAN?

5    A.   I don't -- he wrote TITAN.  So I'm assuming he's familiar

6    with it.

7    Q.   I thought you said he wasn't familiar with the methods he

8    was using.

9    A.   The methods -- let me clarify, then.  The methods with

10   regard to the evaluation of conductivity as an exposure on the

11   outcome of interest as we are discussing here as it relates to

12   causation.

13   Q.   Now, studying human beings is different from studying the

14   natural world, isn't it?

15   A.   Human beings are part of the natural world.  They're

16   dynamic systems.  They have incredible variability, same as

17   the natural world.  I mean there's many similarities with

18   regard to how we would examine these questions regardless of

19   whether we're studying humans or cows or bugs or fish in a

20   stream.  They're dynamic systems.  They can get sick.  They

21   can be affected by exposures.  They can be affected by

22   environment.  So it's not much different.

23   Q.   But you can't put natural environment into a lab very

24   easily, can you?

25   A.   No, you can't.

Kuehn - Cross

1   Q.   That's the huge -- that's the big difference, right?

2   A.   Well, depending on the question that you're asking, I

3   believe that when you're dealing with, for example, non-human

4   species, it is much more straightforward to design experiments

5   such that you can evaluate those things.  But, yeah, you can't

6   put a stream in a lab.

7   Q.   That's right.  You can't put a stream in a lab.  In

8   epidemiology -- as an epidemiologist, you're used to dealing

9   with things you can put in a lab, right?

10  A.   No.  Actually we're used to dealing with things you can't

11  put in a lab.  That's why we use observational data.

12  Q.   You just -- you told me earlier that you couldn't use --

13  you couldn't think of a single example where you could use

14  observational data to establish causation.

15  A.   So you misunderstood my testimony about that.

16  Q.   Okay.  I'm sorry.

17  A.   So we use observational data as one element for

18  establishing a causal relationship, okay?  There are other

19  scientific disciplines involved with this.  So, for example,

20  if we look at smoking and cancer -- okay? -- there are

21  geneticists who will evaluate the effect of nicotine on genes.

22  As an epidemiologist, I'm not going to do that work.  My work

23  is in the realm of the observational data and the study

24  methods that we use.

25       So when we're talking about using that and combining it

Kuehn - Cross

1    with other data for causation, I'm talking about evidence from

2    other fields of study where they have done laboratory

3    analyses, where they have broken down the contents of nicotine

4    to show it has arsenic in it, etcetera.  Epidemiologists are

5    not going to necessarily do that type of work.  There are some

6    epidemiologists who work in labs; I'm not one of them.

7    Q.   Okay.  I understand that you don't work in a lab, but I

8    asked you earlier if you could tell me a single example where

9    causation had been established by observational data alone,

10   and as I recall --

11   A.   And as I said, I cannot think of a single one.

12   Q.   Well, I don't understand your testimony.  I'm not trying

13   to be difficult.  I just don't understand how that statement

14   can be squared with the idea that you can use -- that you do

15   it all the time, use observational data to establish

16   causation.

17   A.   I think you misunderstand that particular statement.

18   Q.   Okay.

19   A.   Epidemiologists rarely will establish causation based on

20   observational research.  Typically what you will find is that

21   we will examine increased risks, we will look for

22   associations, we will infer a relationship between an exposure

23   and an outcome, but it requires a lot more than one or even

24   two observational research studies to establish causation.

25   Q.   Okay.  So do you take action in the epidemiological world

Kuehn - Cross

1    to control drugs or devices where causation has not been

2    established?

3    A.   Again, I need you to clarify that question because I

4    think you've completely shifted gears on me.   So --

5    Q.   Fine.

6    A.   Okay.

7    Q.   I'm not trying to.   So I'm just trying to understand the

8    world you're coming from, and I admit I don't understand it

9    very well.

10       So you look at -- epidemiologists look at devices and

11   drugs and public health issues, things like that, right, to

12   decide how humans are impacted by those kinds of things?

13   A.   I think that's a fair statement.

14   Q.   Okay.   And sometimes epidemiologists may recommend, for

15   instance, to the FDA that it withdraw a drug or that it

16   withdraw a medical device.

17   A.   I --

18   Q.   Is that wrong?

19   A.   I think that that's a completely different situation.   So

20   let's start with the drug comment, okay?

21   Q.   Okay.

22   A.   So the whole field of pharmacoepidemiology is designed to

23   examine drug exposure and health outcomes, whether they be

24   positive or negative, okay?   Excuse me.   Whether or not the

25   results from those studies provide recommendations to FDA,

Kuehn - Cross

1   that's entirely possible if it's found -- it may change the

2   practice of medicine, but that's done in a consensus-based

3   way.  They may make recommendations, sure, if that's what

4   you're talking about.

5       If you're talking about adverse events, then you're

6   talking about something completely different.

7   Q.   All I'm trying to establish is the level of confidence

8   that one needs to take action to withdraw a drug, control a

9   pollutant, all of those kinds of things.

10      In your field what level of confidence do you have to

11  have before -- do you have to be sure that X causes Y before

12  you make a recommendation to take action based on the

13  relationship between the two?

14  A.   So FDA has internal policies about whether or not a

15  recall is necessary for a device or a drug, and that is not

16  necessarily dependent on epidemiologic research, which is what

17  I'm here talking about.  They will look at trending.  They

18  will look at all kinds of different things.

19      I think you're misstating how epidemiology interacts with

20  FDA.  I don't see how that's relevant here either.

21  Q.   Okay.  You say you can establish causation through

22  observational data, right?

23  A.   I think I said the exact opposite of that.  I said that

24  it would require -- I think you've asked me multiple times to

25  give you an example where observational research can establish

Kuehn - Cross

1   causation, and I told you I cannot give you one, of one piece

2   of evidence that can be used to establish causation among a

3   preponderance of additional evidence.

4   Q.   Okay.   In this case, the case we're trying in this room,

5   whether conductivity is leading to impairment --

6   A.   Yes.

7   Q.   -- can that be determined, that causal relationship be

8   determined by observational data alone?

9   A.   I don't believe so, no.

10   Q.   Okay.   So you could not use EPA's database, if you had

11   it --

12   A.   I --

13   Q.   -- to determine that cause, could you?

14   A.   I could use EPA's database to determine whether or not

15   conductivity -- increased levels of conductivity lead to an

16   increased risk of impairment.   I could use the data to look at

17   that association and that relationship, and it would be

18   limited to the extent that there are limitations in the data.

19   Q.   Okay.   And you're testifying that EPA and all these other

20   papers have not established that causation, right?

21   A.   The methods that EPA used were not appropriate for

22   analyzing the relationship that they were starting out to

23   examine, that's correct.

24   Q.   In fact, you think it couldn't have established causation

25   based on the data it had because all it has is observational

Kuehn - Cross

1   data, right?

2   A.   I'm sorry.   I'm going to ask you to repeat that to make

3   sure I understood the question correctly.

4   Q.   Okay.   You think that EPA would be unable to use the data

5   that it has to establish causation because it has nothing more

6   than observational data, correct?

7   A.   I think, yes, I do not believe they could establish

8   causation based alone on the observational data available to

9   them in the DEP.

10  Q.   So neither could you, right?

11  A.   That's correct.   I don't believe I claimed that that's

12  possible.

13  Q.   And it requires something further, like lab results, an

14  experiment, right?

15  A.   Or repeatability of the findings in the observational

16  research or any additional information that --

17  Q.   Okay.   So repeatability.   If you could -- and that's

18  observational data, right?

19  A.   Sure.

20  Q.   So if things had been repeated in different ways based on

21  the same data and different data, that may be sufficient to

22  establish causation based only on observational data, right?

23  A.   It would depend on the limits of the data, it would

24  depend on the methods employed, and it would depend on the

25  strength of the relationship that had been identified in that

Kuehn - Cross

1   data.

2   Q.   But multiple lines of evidence is an important element in

3   establishing causation, right?

4   A.   Yes.

5   Q.   Have you ever used a data program called R?

6   A.   No, I have not.

7   Q.   Do you know what it is?

8   A.   Yes.

9   Q.   What is it?

10  A.   It is an open source statistical program that is, my

11  understanding, is it's available for free.

12  Q.   But you're not a user of it.

13  A.   I don't use R, no.

14  Q.   I'm sorry.  I'm going through my notes and crossing out

15  all the things I've covered.

16  A.   Okay.

17  Q.   The good thing is I'm crossing most of them off.

18       Let's turn to Joint Exhibit -- I think it's, again, the

19  benchmark page, Joint Exhibit page 482.

20  A.   You said 482?

21  Q.   Joint Exhibit tab 58, page 482.

22  A.   Okay.

23  Q.   You testified about that yesterday, right?

24  A.   Yesterday and today, I believe.  This is the linear

25  regression in B-7?

Kuehn - Cross

1  Q.    Yes.

2  A.    Yes.

3  Q.    I think you said yesterday that there's missing

4  information there, right?

5  A.    That's correct.

6  Q.    And what information is missing?

7  A.    I'd like to see the p-values for the variables, the

8  independent variables used in the model at a minimum.

9  Q.    What are the p-values?

10  A.    The p-values represent the statistical tests that the

11  regression does to inform the statistician whether or not the

12  predicted variables are statistically significant predictors

13  of the outcome.

14  Q.    So is it your testimony that one could not reasonably

15  determine whether this relationship is statistically

16  significant based on the information on the page?

17  A.    You could calculate with the estimate, the beta parameter

18  estimate and the standard error, I believe you could probably

19  calculate the information necessary to evaluate whether or not

20  it was statistically significant, but it's not straight-

21  forward.

22       The regression provides that for you, and it would just

23  be very simple if they included that here.

24  Q.    But it can be calculated by someone who knows what he's

25  doing pretty easily, can't it?

Kuehn - Cross

1  A.   You probably could calculate it if you really wanted to.

2  Q.   I couldn't, but Dr. King could, couldn't he?

3  A.   If he has the correct formula.  But I would remind you

4  that they used the wrong type of regression on this model.  So

5  the significance of these estimates are not particularly

6  relevant here.

7  Q.   But the missing information you've complained about

8  yesterday, someone -- you may not be able to understand it,

9  but someone with Dr. King's training can, right?

10  A.   I could do it as well, but I would rather not go to the

11  trouble.  It would be nice if they simply provided the

12  information, but I could calculate it just the same as he

13  could.

14  Q.   Okay.  So that table shows a slope of regression between

15  conductivity and -- or the relationship between mayfly

16  conductivity and mayfly genera; is that right?

17  A.   I believe so, yes.

18  Q.   Ephemeroptera are mayflies; is that right?

19  A.   Correct.

20  Q.   Okay.  Now, isn't -- isn't there a -- doesn't that show a

21  strong decline in slope and therefore a strong relationship?

22  A.   I don't know how strong it is.  I don't have any measures

23  of statistical significance here.  I also can't tell how

24  conductivity was entered into the model.  Did they enter it as

25  a continuous variable?  Did they bin it and put it in as

Kuehn - Cross

1    categorical?  I have no information about that.  So

2    interpreting that estimate is nearly impossible with this

3    information.

4    Q.    That's your testimony, that it's nearly impossible for

5    you based on what you know about this information, right?

6    A.    Based on the information they provide about the model

7    that they did, the information in this table is insufficient

8    for me to make any inferences about the results.

9    Q.    Okay.  Turn to Joint Exhibit 29, which I believe you

10   testified about this morning.

11   A.    So is that tab 29?

12   Q.    Yes, it is tab 29.

13   A.    Okay.

14   Q.    Page Joint JE 110.

15   A.    Okay.  Yeah.

16   Q.    I think you testified this morning that the data had been

17   truncated, right?

18   A.    He limits the analysis he does here to summer data only.

19   Q.    And why would he do that?

20   A.    He -- as far as I know, I think he testified that it was

21   to minimize the effect of confounding by temperature.

22   Q.    Do you think it was to clarify the analysis?

23   A.    I don't know that that's why he did it.

24   Q.    All right.  Is that something that one might rely on,

25   one's "a priori" or "a priore" knowledge to do?

Kuehn - Cross

1   A.    If all we were interested in is the effects of the

2   exposure and the outcome in the summertime only, then you

3   might have some justification for only examining data in the

4   summer.   However, my understanding, based on the benchmark, is

5   that they used data from all 12 months, all seasons, to do

6   their analysis.   So it is unclear to me what the rationale

7   would be for examining this only in the summer.

8        Similarly, if we were interested in examining the effects

9   of the exposure on the outcome across seasons -- let's say we

10  suspected that season modified the effect of the exposure on

11  the outcome.   That's what we talked about, effect

12  modification.   We might look at the data from winter, spring,

13  summer, fall, but he only presents the summer data here.

14  Q.    Do you know why this was prepared?

15  A.    Do I know why this was prepared?

16  Q.    Yeah.

17  A.    This was part of his rebuttal report.

18  Q.    The rebuttal report to Dr. Menzie and to you, right?

19  A.    I believe so.

20  Q.    And is the claim that high temperatures are causing a

21  problem with mayflies from Dr. Menzie?

22  A.    I don't know that that's his claim.

23  Q.    If that were the claim, would it make sense to look at

24  the hottest months, the summer months, if you were writing a

25  rebuttal report?

Kuehn - Cross

1   A.   What he was doing here was eliminating temperature as a

2   confounder, and I don't see that that has anything to do with

3   temperature causing problems with mayflies in terms of

4   eliminating it as a confounder.  You're not going to do that

5   just in the summer.  That doesn't eliminate the effect of

6   temperature as a confounder.

7   Q.   Well, Dr. King believes that that's been eliminated a

8   long time ago overall by all the published work, the

9   benchmark, his published work.  And those did consider winter

10  temperatures, didn't they, all-year temperatures?

11  A.   I disagree with his belief in that.

12  Q.   I understand you disagree with his belief.  I'm just

13  trying to get to the bottom of why he may have used only

14  summer months here.

15  A.   You'll need to ask him.

16  Q.   You don't understand it.

17  A.   No, I don't believe it was a valid way to examine this

18  data.

19  Q.   Okay.  Let's turn to 32, which you also testified about

20  this morning.  Again, does this rely only on summer data?

21  A.   Yes, apparently it does.

22  Q.   And that's one of your criticisms of it?

23  A.   My criticism is that he was using these to eliminate

24  temperature as a confounder, and doing so by only examining

25  summer months was an inappropriate method to use to eliminate

Kuehn - Cross

1   temperature as a confounder.

2   Q.   This was part of his rebuttal report too, right?

3   A.   That's correct.

4   Q.   Okay.  Now, let turn to tab 25, Joint Exhibit 25, page

5   104, JE 104.  You testified about that this morning too I

6   think.

7   A.   Yes, I did.

8   Q.   And I think you said for this, that he couldn't rely only

9   on this table -- is that what you said? -- to form a

10  conclusion?

11  A.   That's correct.

12  Q.   But it's useful for a statistician, isn't it?

13  A.   Oh, sure.

14  Q.   Did you hear Dr. King say he could rely only on this

15  table or that it was the kind of thing a statistician would

16  use as part of his tool?

17  A.   I believe my concerns were related to the comments he had

18  in his report in which this table appeared, but I don't

19  disagree that it's a useful way to visualize your data.

20  Q.   Did you hear Dr. King say anything more than that?

21  A.   I honestly don't recall.  I don't recall what he stated.

22  Q.   Does he say more than that in his report?

23  A.   I would need to look at his report.

24  Q.   Now, you've relied in your report on the data presented

25  to you by Dr. Menzie, right?  You used it, let's say.

Kuehn - Cross

1   A.   Well, he generated some graphs that I relied on in my

2   report.

3   Q.   And all of that is observational data too, isn't it?

4   A.   Absolutely.

5   Q.   So those data couldn't be used to show what is causing,

6   in your opinion, show what is causing extirpation of mayflies,

7   could they?

8   A.   Again, if we are examining the relationship between a

9   particular exposure and an outcome using observational data,

10  it would be difficult to establish causation using those data.

11  Q.   Now, did you hear the testimony yesterday about the Kunz

12  and Kennedy papers?

13  A.   I remember there being discussion about it, yes.

14  Q.   You haven't read those, have you?

15  A.   I have not.  At least I don't believe I have.

16  Q.   Can you name an author of any published paper on this

17  subject area that agrees with your assessment here today?

18  A.   I would need to review the literature, and I have not

19  done that exercise yet.

20  Q.   You've not reviewed the literature in this area before

21  you testified here as an expert?

22  A.   As I said, my testimony was limited to the methods that

23  were used in the EPA benchmark and by Dr. King.  I have not

24  done a full critique of the body of literature on this

25  particular topic.

Kuehn - Cross

1           MR. LOVETT:  May I approach?

2           THE COURT:  Yes, you may.

3    BY MR. LOVETT:

4    Q.    Have you seen this before?

5    A.    Yes.  This is Dr. -- or Sir Bradford Hill's paper from

6    1965.

7    Q.    And this is the Sir Bradford Hill that you testified

8    about as sort of the father of the method that you apply and

9    epidemiologists apply, correct?

10   A.    The method -- well, Dr. -- Sir Hill developed a set of

11   criteria, if you will, that can be used to evaluate causation.

12   Q.    And you laid it out fully in your report I think --

13   A.    Yeah.

14   Q.    -- didn't you?

15   A.    Yeah.

16   Q.    You listed this methodology in your report, right?

17   A.    I did.

18   Q.    And you testified about it yesterday.

19   A.    I don't think I testified about it yesterday.  If I did,

20   I --

21   Q.    We did.

22   A.    -- didn't get enough sleep.  Sorry.

23   Q.    In any event, this is a seminal paper in your field,

24   right -- or not paper, but talk.

25   A.    It's seminal in the fact that people refer to it when

Kuehn - Cross

1   evaluating evidence for causation.  So, yes, I would say

2   that's true.  It is one philosophy of causation.

3   Q.   Okay.  It's fair to say that Mr. Hill believes that -- I

4   don't know if he's a doctor or not -- believes that you can

5   establish causation through observational data, isn't it?

6   A.   Actually, Sir Bradford Hill cautions that the researcher

7   not use this as a checklist, that they evaluate all of the

8   evidence available.  He provides this as a framework within

9   which to evaluate for causation, but he cautions even in his

10   talk that we should not use it as a checklist.

11   Q.   Sure.  That makes sense, but that's not what I asked you.

12   I asked you, Dr. Hill believes, doesn't he, Mr. Hill, that it

13   is legitimate to use observational data to reach causal

14   conclusions?

15   A.   I don't think that's what he says.  I haven't read this

16   paper in a while, but I can certainly look at it.

17   Q.   Well, if you want to look at it, go ahead.  I thought

18   this was, as I said, a seminal paper in your field.

19   A.   I don't think that that is what he's saying here.

20   Q.   Okay.  What do you think he's saying?

21   A.   I think that what he was trying to do -- and he states

22   this very clearly -- is that when we observe an association,

23   what aspects of that association -- and he says, quote, should

24   we especially consider before deciding that the most likely

25   interpretation of it is causation.  And he provides us a

Kuehn - Cross

1  framework to evaluate the associations that we are observing.

2  Q.   So what he does is he gives us a list of factors.  I

3  won't call it a checklist, but a list of factors that he

4  believes should be used when trying to establish causation,

5  right?

6  A.   Yeah, he gives us a list of things we should consider

7  about the associations that we observe.

8  Q.   And those have been passed down since this paper in the

9  field of epidemiology and is still constantly referred to in

10  the field, right?

11  A.   I think that's a fair statement.  I don't know about

12  constantly.

13  Q.   Okay.

14  A.   Okay.

15  Q.   Okay.  So let's just look at a couple of them.  I don't

16  know how we use it not as a checklist.  I don't know how we do

17  that, but --

18  A.   Well --

19  Q.   Let's look at them as factors.

20  A.   Yeah.  The caution is that you not simply go through this

21  in rote as a checklist and say, "Oh, I have this.  I have

22  that.  I must have causation."

23  Q.   Sure, and that makes sense, because you might not have

24  them all, as he says, and still have causation.

25  A.   Well, you might not have them all and still have

Kuehn - Cross

1  causation, correct, or you might have them all and not have

2  causation.

3  Q.   Exactly.  But this is the roadmap that we follow.

4  A.   It's a framework.

5  Q.   Okay.  So the first thing we look at is the strength of

6  the relationship, right?

7  A.   That's correct.

8  Q.   And he says, you know, a nice sentence down, "I have now

9  reflected for over fifteen years, prospective inquiries into

10  smoking have shown that the death rate from cancer of the lung

11  in cigarette smokers is nine to ten times the rate in

12  non-smokers and the rate in heavy cigarette smokers is twenty

13  to thirty times as great."

14      So that's strong association, right?

15  A.   That's correct.  He was talking about the strength of the

16  risk estimates that had been calculated using statistical

17  techniques; so those risk ratios and odds ratios that we've

18  been talking about.

19  Q.   So that's observational data, correct?

20  A.   That's correct.

21  Q.   And he's taking those observational data and he's using

22  them to show the first prong of his test or factors.

23  A.   He's using it to illustrate a particularly strong effect

24  between an exposure and an outcome.  There are other exposures

25  and outcomes that he could have used as an example, though I

Kuehn - Cross

1    don't know if they were available in 1965, but there are other

2    examples of that, yeah.

3    Q.   Well, 1965, there were still a lot of people arguing that

4    cigarette smoking didn't cause cancer, right?

5    A.   Yeah.

6    Q.   Because they didn't have lab tests.

7    A.   Well, they didn't have all of the available preponderance

8    of evidence that we have now.

9    Q.   Okay.  But he knew in 1965 -- well, strike that.

10   A.   No.

11   Q.   Consistency, the second prong.  "Next on my list of

12   features to be specially considered I would place the

13   consistency of the observed association.  Has it been

14   repeatedly observed by different persons, in different places,

15   circumstances and times?"

16        Do you agree that that's a good thing to look at?

17   A.   Yes.

18   Q.   And isn't that just what we have here?  We have a series

19   of different examiners who have gone out, looked at something,

20   and have all reached the same conclusion, except for you and

21   Dr. Menzie?

22   A.   Well, as I said, I have not looked at the body of

23   literature on this topic.  I have looked at what the EPA did

24   and their analysis and the methods that they used, and I have

25   provided my testimony regarding those analyses and the

Kuehn - Cross

1    methods.

2         Whether or not there is consistency depends on whether or

3    not the appropriate methods have been used on the data that is

4    available, and I have not examined that at this point.

5    Q.   Okay.   I'm not going to go through all these because some

6    of them aren't directly relevant, things like specificity and

7    temporality.   Or they may be relevant and I don't understand

8    why.

9         Let's go to the biological gradient.   No.   Plausibility,

10   number six.

11   A.   Sure.

12   Q.   "It will be helpful if the causation we suspect is

13   biologically plausible."

14   A.   Sure.   It has to be possible that the exposure could

15   cause the outcome.

16   Q.   Not possible, but plausible.

17   A.   Well, for example, our discussion about gray hair and

18   death, obviously there's no plausible way.

19   Q.   Right.

20   A.   Right.

21   Q.   But with conductivity, certainly it's plausible that

22   conductivity is the cause of impairment, isn't it?

23   A.   That's outside the area of my expertise, but based on the

24   testimony I've heard, yes.

25   Q.   All right.   That's fair.   Coherence.   "Cause-and-effect

Kuehn - Cross

 1   interpretation of our data should not seriously conflict with

 2   the generally known facts of the natural history and biology

 3   of the disease - in the expression of the Advisory Committee

 4   to the Surgeon-General."

 5        Now, is that true here too in terms of the question we're

 6   looking at with conductivity?  It doesn't conflict with

 7   generally known facts of natural history, does it?

 8   A.   I have not studied the natural history of conductivity

 9   and the effects on these bugs or on these streams.

10   Q.   Sure.

11   A.   So I don't have a good answer for you on that.

12   Q.   And all of these are based on observational data,

13   correct?

14   A.   I don't know that Sir Bradford Hill is requiring that the

15   data being evaluated be entirely observational.

16   Q.   In fact, let's have you read the last paragraph of the

17   paper, if you would -- or the second to the last paragraph of

18   the paper.

19   A.   Where it says, "All scientific"?

20   Q.   Uh-huh.

21   A.   He states, "All scientific work is incomplete - whether

22   it be observational or experimental.  All scientific work is

23   liable to be upset or modified by advancing knowledge.  That

24   does not confer upon us a freedom to ignore the knowledge we

25   already have, or to postpone the action that it appears to

Kuehn - Cross

 1  demand at a given time."

 2          MR. LOVETT:  Thank you.  That's all I have.

 3          THE COURT:  All right.  Do you have redirect?

 4          MR. HARVEY:  (Nods head up and down)

 5          THE COURT:  Let's go ahead and take a break.  It's

 6  almost noon.  We're going to stand in recess until 1:00 p.m.

 7      You may step down.  Don't discuss your testimony.

 8          THE WITNESS:  So can I get my lunch with them?

 9          THE COURT:  As far as I'm concerned.  As long as

10  counsel understands and explains to the witness you can't

11  discuss your testimony, that's fine with me.

12          THE WITNESS:  Thank you.

13          THE COURT:  As a matter of fact, they should buy

14  your lunch.

15          THE WITNESS:  I believe they are.

16          THE COURT:  All right.  We'll stand in recess until

17  one.

18          THE WITNESS:  Thank you, Your Honor.

19      (Lunch recess from 11:58 a.m. to 1:05 p.m.)

20                      AFTERNOON SESSION

21          THE COURT:  All right.  Redirect?

22          MR. HARVEY:  Yes, Your Honor.

23                  REDIRECT EXAMINATION

24  BY MR. HARVEY:

25  Q.   Miss Kuehn, it was EPA that proposed using epidemiology

Kuehn - Redirect

1    to address issues of causation, correct?

2    A.    Yes.

3    Q.    And you've read the benchmark?

4    A.    Yes, I have.

5    Q.    Did EPA express any concerns in the benchmark about

6    epidemiology having roots in the examination of human

7    exposures?

8    A.    No, they did not.

9    Q.    They embraced epidemiology, correct?

10   A.    Yes.

11   Q.    Did they suggest in any way that the rules of statistics

12   or epidemiology change for ecological data as opposed to human

13   data?

14   A.    No, they did not.

15   Q.    Do you recall the pass/fail table that Dr. King prepared

16   in his initial report?  You and Mr. Lovett discussed that.

17   A.    Yes, I do.

18   Q.    I think it's Plaintiffs' Exhibit 25.

19   A.    Yes.

20   Q.    I'm sorry.  It's Joint Exhibit 25.

21   A.    Yes.  I have it in front of me still here.

22   Q.    I think that you and Mr. Lovett had some disagreement

23   about how much weight Dr. King placed on that table.  Do you

24   recall that?

25   A.    Yes, I do.

Kuehn - Redirect

1    Q.   I'd like to put up on the screen that part of Dr. King's

2    expert report, or not.

3         Let's do it this way.  Your Honor, may I approach?

4              THE WITNESS:  There it goes.

5    BY MR. HARVEY:

6    Q.   Is that the pass/fail table that is in his expert report?

7    A.   Yes, it is.

8    Q.   And then below that pass/fail table, there is some

9    discussion of his conclusions from that pass/fail table.  Do

10   you see that?

11   A.   That's correct.

12   Q.   Could you scroll down, Mr. Tyree?

13        And, Miss Kuehn, can you read for me his ultimate

14   conclusion?

15   A.   He states, "Thus, placing Stillhouse Branch into the

16   broader context of data across the entire state once again

17   shows strong support that conductivity is the principal cause

18   of biological impairment."

19   Q.   So he didn't find this just to be some interesting

20   demonstration of data.  He relied on this heavily, didn't he?

21   A.   It would appear so, yes.

22   Q.   Was there any other statistical analysis in his expert

23   report, his initial report?

24   A.   In his initial report, I would need to look at it.  I'm

25   sorry.  Thank you.

Kuehn - Redirect/Recross

1  Q.   And let me ask it this way.  Just looking briefly, do you
2  see any other tables or graphs that have statistical
3  conclusions drawn from them?
4  A.   No.
5            MR. HARVEY:  No further questions, Your Honor.
6            THE COURT:  All right.  Recross?
7            MR. LOVETT:  Very briefly, Your Honor.
8                          RECROSS EXAMINATION
9  BY MR. LOVETT:
10  Q.   EPA didn't say it was going to use epidemiology, did it?
11  It said it was going to adapt epidemiological principles to
12  its study, right?
13  A.   I would need to look at the exact wording, but they
14  certainly stated that they were relying on epidemiologic
15  principles.
16  Q.   Is it fair to say that's what they did?  They relied on
17  epidemiologic principles and applied them to their own
18  discipline?
19  A.   They applied them incorrectly to their data.
20  Q.   I understand that's your view, but they applied them to
21  their own discipline, right?
22  A.   Yes.
23            MR. LOVETT:  Okay.  That's all I have.  Thank you.
24            THE COURT:  All right.  Any other questions?
25            MR. HARVEY:  No further questions, Your Honor.

 1                THE COURT:  All right.  Miss Kuehn, you may step

 2      down, and you're excused.

 3                THE WITNESS:  Thank you.

 4                MR. LOVETT:  Your Honor, I have three exhibits that

 5      I used that were not in the notebook.

 6                THE COURT:  Use the microphone, please.

 7                MR. LOVETT:  Three exhibits that I used that were

 8      not in the notebooks, the order from the Southern District of

 9      New York, the Fola third supplemental response, and the

10      Bradford Hill paper.  And I'd like to mark those as 26, 27,

11      and 28, Plaintiffs', and move their admission.

12                THE COURT:  The order in which you --

13                MR. LOVETT:  Yes, the Southern District -- the order

14      from the Southern District of New York is 26.  27.  I'm sorry.

15      27.

16         The Fola third supplemental response is 28.  And the

17      Bradford Hill is 29.

18                THE COURT:  All right.  Any objection?

19                MR. HARVEY:  Not to the Bradford Hill exhibit.  I

20      take that as a learned treatise.

21         The Fola information I think was from a document in this

22      case.  I'm not sure under what, you know, hearsay rule he's --

23      exception to the hearsay rule he's using to admit the court

24      document.

25                THE COURT:  As to which one?  As to 27, the opinion

1    out of the New York District Court?

2              MR. HARVEY:  Yes, Your Honor.

3              MR. LOVETT:  The opinion from the New York District

4    Court?

5              MR. HARVEY:  Yes.

6              MR. LOVETT:  Well, the Court can take judicial

7    notice of it.

8              THE COURT:  Is that microphone on?

9              MR. LOVETT:  How do I turn it on?  Is that better?

10             THE COURT:  It is.

11             MR. LOVETT:  The Court can certainly take judicial

12   notice of another order from a court.  It's a government

13   document too, but I don't care so much if it's admitted.  It

14   should be admitted, though, but the Court can certainly rely

15   on it.  It's an opinion from another federal court.

16             THE COURT:  Well, I'll reserve ruling on the

17   District Court of New York opinion and order.

18        I'll admit 29.  28 is the Fola supplemental response.  My

19   recollection is that the discovery rules provide that --

20             MR. HARVEY:  I didn't mean to object to that, Your

21   Honor.

22             THE COURT:  Okay.

23             MR. HARVEY:  I have no problem with that.

24             THE COURT:  All right.  28 is in and 29 is in.  And

25   I'll reserve on 27.  All right.  Ready to call your next

Menzie - Direct

1    witness?

2           MR. MCLUSKY:  We are, Your Honor.  Dr. Charles

3    Menzie.

4           CHARLES MENZIE, DEFENDANT'S WITNESS, SWORN

5           THE COURT:  Before you start, are you going to be

6    using the notebooks?

7           MR. MCLUSKY:  Not a lot of them.

8           THE COURT:  Well, I'm going to ask you to come up

9    and help order these notebooks so that -- you know what you're

10   going to be asking to refer to.  It's difficult for the

11   witnesses to find them all up here.

12          MR. MCLUSKY:  Do you mind if I spend a moment with

13   Mr. Tyree --

14          THE COURT:  That would be fine.

15          MR. MCLUSKY:  -- to determine which volume they're

16   in?

17          THE COURT:  Sure.  That would be fine.

18      I'm trying to keep you from having to do heavy work here.

19          THE WITNESS:  I had mentioned it looks like a

20   workout.

21          THE COURT:  All right.

22                      DIRECT EXAMINATION

23   BY MR. MCLUSKY:

24   Q.   Dr. Menzie, can you tell us your full name, please.

25   A.   Dr. Charles A. Menzie.

Menzie - Direct

1    Q.   For whom do you work and where do you live?

2    A.   I work for a company Exponent, Inc., and I live in Troy,

3    New York.

4    Q.   What do you do for Exponent?

5    A.   I'm the practice director of their biological and

6    ecological sciences practice.

7    Q.   Okay.  But tell us what you actually -- kind of what

8    disciplines you practice.  What do you do?

9    A.   My primary area of expertise and practice is in the areas

10   of risk assessment, causal analysis, and ecology, especially

11   aquatic ecology.

12   Q.   Okay.  And then within the fields of risk assessment and

13   causal assessment or causal analysis, is it environmental and

14   health-related primarily, or are you off into physics and

15   other things?

16   A.   It's exclusively environmental and health.

17   Q.   Explain briefly what those fields are and what

18   disciplines they entail.

19   A.   Risk assessment is a discipline that involves estimating

20   the health or environmental risk to either people or the

21   environment or the ecology as a result of either chemical

22   exposures or physical exposures or biological exposure.

23        Causal analysis is an evaluation of the factors that have

24   caused or might cause a particular set of conditions to come

25   into being.  So causal analysis is often applied after the

Menzie - Direct

1   fact; for example, a fish kill or change in biological

2   community, and the question is what is causing that, to apply

3   causal analysis.

4   Q.   And what scientific disciplines are involved in a

5   day-to-day basis in your work?

6   A.   Basically understanding the nature of exposures, so fate

7   and transport, the implications of magnitudes of exposure

8   either for temperature or chemistry, and then toxicology,

9   aquatic ecology, and decision analysis.

10  Q.   Let's look briefly, then, at your history with each of

11  those disciplines, and I direct your attention to Joint

12  Exhibit 68, which I believe is your -- can you confirm it's

13  your CV?

14  A.   It is.

15  Q.   Can you tell us briefly your educational background?

16  A.   All my degrees are in biology.  I have a bachelors, a

17  masters, and a Ph.D. in biology, with an emphasis in my Ph.D.

18  on ecological sciences.

19  Q.   And what was your Ph.D. thesis in?

20  A.   It was on the production of insect communities, aquatic

21  insect communities in a part of the Hudson River.

22  Q.   Since you obtained your Ph.D., can you give us a brief

23  summary of what you've been doing?

24  A.   I received my Ph.D. in the mid '70s, and I have been

25  working in the consulting field in these fields of risk

Menzie - Direct

1    assessment, aquatic ecology, ecology, and causal analysis

2    pretty much ever since.

3         In the early '80s I formed a company that specialized in

4    these fields, and then in 2006 I joined the company Exponent

5    to head up their practice in this area.

6    Q.   In your experience, your professional experience, have

7    you had opportunities to use the type of multi-metric indices

8    that have been testified to in this trial?

9    A.   Those go back a long way, and so I remember seeing them

10   when I was first working in the field and working with EPA and

11   helping them kind of review their various programs.  So these

12   are familiar techniques.

13   Q.   And did you utilize them in your work for the past

14   several decades?

15   A.   Yes.

16   Q.   Routinely?

17   A.   Excuse me?

18   Q.   Routinely?

19   A.   Yes.

20   Q.   Are you a member of any societies that -- professional

21   societies that relate to aquatic ecology or risk assessment?

22   A.   The two main societies that I'm a member of are the

23   Society of Environmental Toxicology and Chemistry and the

24   Society for Risk Analysis.

25        I'm also a member of other societies that deal with

Menzie - Direct

1    ecology and estuarian sciences, for example, the Estuarian

2    Research Federation and a variety of other societies.

3    Q.    What is the society of Risk -- is it Analyst or Analysis?

4    A.    Analysis.  That's the society of professionals that deal

5    in the field of risk assessment, and it can be risk assessment

6    that would include the engineering as well as the health and

7    environmental sciences.

8    Q.    And then the other outfit was called what?

9    A.    It's the Society of Environmental Toxicology and

10   Chemistry, or SETAC.  It's the society where most of the

11   professionals that work in the field of environmental

12   toxicology, chemistry, and risk assessment have as their

13   professional home.

14   Q.    And does that involve a fair amount of work in the area

15   of toxicology to aquatic organisms?

16   A.    Much of the early work for SETAC related to evaluating

17   toxicities, toxicology, or aquatic organisms.

18   Q.    Have you held any leadership positions with the governing

19   councils of either of those organizations?

20   A.    I was a member of the board for SETAC North America and

21   then served on the SETAC World Council.  And then I was also a

22   member of council for the Society for Risk Analysis.

23   Q.    And how many people were on the board of councils of

24   those two organizations?

25   A.    Might be eight people.

Menzie - Direct

1    Q.    On each?

2    A.    On each.

3    Q.    SETAC, do they have a journal?

4    A.    They have two journals.  One is *Environmental Toxicology*

5    *and Chemistry*, and there's another one called *IEAM*.

6    Q.    And the first you just mentioned, is that the same

7    journal in which Suter and Cormier published the papers we've

8    talked about here in this trial?

9    A.    Yes, it is.

10   Q.    Do you have publications in peer-reviewed journals?

11   A.    Yes, I do.

12   Q.    Do you know approximately how many?

13   A.    Approximately 50.

14   Q.    Directing your attention to your CV, which is Joint

15   Exhibit 68 -- and I'll start on page 934, I believe -- and I

16   just want to go through a couple of these.

17         There's a paper on the first page, I think it's

18   pronounced Richkus, Menzie et al.  "Application of an

19   ecological risk assessment for evaluation of alternatives

20   considered for restoration of oysters in the Chesapeake Bay."

21   A.    That's correct.

22   Q.    Can you tell us what that's about?

23   A.    It was a novel risk assessment.  This basically was in

24   response to a proposal to introduce a new oyster species to

25   the Chesapeake Bay, and I was asked to construct and provide

Menzie - Direct

1    an analysis of all the ecological risks that might emanate

2    from that action, as well as all the alternatives to that

3    action.

4        So it required considering the overall ecological

5    structure of the Chesapeake and all the organisms and their

6    interactions.  And that work was used to underpin the

7    decisions that were made about that particular action for the

8    Bay.

9    Q.   On page 936 there's a paper by Magar or "Mager."  I'm not

10   sure how you pronounce that.  M-a-g-a-r, et al.  It's entitled

11   "Parsing ecological impacts in watersheds."

12       What's that about?

13   A.   This is one of a number of pieces of work I was involved

14   in.  This relates to recognizing that watersheds have many

15   things going on within them that can affect the ecology and

16   biology.  And so this is a paper about how to distinguish

17   among those causal factors.

18   Q.   The next one on the same page is von Stackelberg and

19   Menzie.  What's the title of that one?

20   A.   "A cautionary note on the use of species presence and

21   absence data in deriving sediment quality criteria."

22   Q.   And what is that about?

23   A.   There had been a fair amount of work being done on using

24   species presence and absence data to derive levels of exposure

25   in sediments that were considered potentially problematic to

Menzie - Direct

1    the ecosystem.  And that work had involved a number of

2    statistical manipulations.

3        And so Dr. von Stackelberg and I looked at that and

4    recognized that the statistical manipulations that had been

5    made were creating artifacts, and so that the values that were

6    being derived were not informative about the levels that were

7    causing effects.  And so we presented it to the -- in the

8    *Journal of Environmental Toxicology and Chemistry*, basically

9    our results of that and reported that out.

10   Q.   On page 398, there's one, Menzie on chironomids.

11   A.   Yes.  This one goes back a ways.  This one relates to

12   some of my early work on the insect fauna, aquatic insect

13   fauna in the Hudson River, and whether it be looking at the

14   community of insects or the secondary production.

15       That work was used to -- by many since to kind of

16   estimate secondary production in aquatic systems.

17   Q.   And secondary production refers to --

18   A.   Production of insect biomass.

19   Q.   As opposed to primary --

20   A.   Primary production, that's correct, which is plants.

21   Q.   I'm sorry.  Go ahead.

22   A.   That it's.

23   Q.   There's an article by Mauer, I believe Leathem, and

24   Menzie on 938 as well?

25   A.   Yes.  Back in the -- I would guess it's probably in the

Menzie - Direct

1    1980's, I was looking at the influence of discharges to marine

2    environments on the benthic community structure out in the

3    outer continental shelf.  And this paper concerns that work

4    where myself and two professors from the University of

5    Delaware got together and presented the results of that work.

6    Q.    And then on the same page, I believe there's one, Menzie

7    and Cura.  You may be on the wrong page.

8    A.    Menzie and Skinner -- Menzie, Cura, and Skinner on page

9    938.

10   Q.    What's that about?

11   A.    Throughout much of my career -- in fact, most of my

12   career -- I've looked at the effects of temperature on

13   communities.  And in this particular -- for this particular

14   paper, I had been working with the State of Pennsylvania and

15   with the utility to kind of come up with a methodology for

16   evaluating the implications of temperature modifications in

17   the Susquehanna River.  And so this particular paper put

18   together a methodology that kind of combined the various

19   lethal but also sublethal kinds of influences of temperature

20   on aquatic biota and put that together with a spatial model

21   that was able to predict where those effects might occur.

22   Q.    All right.  Is that a fair sampling of some of the

23   literature you've prepared?  Is there anything else you want

24   to call to our attention?

25   A.    I think probably the one thing I've been working on quite

Menzie - Direct

 1   a bit -- it's been used by the National Academy of Sciences

 2   and others -- is approaches for dealing with multiple stressor

 3   problems.  So when you have many things going on

 4   simultaneously in the environment, how do you put that

 5   together, how do you come to understand that.

 6        And so I was asked by EPA to develop a methodology for

 7   thinking about that some years ago.  And one of the papers in

 8   here concerns that particular work.  It appeared in the

 9   National Institute of Health's journal and has been since

10   picked up and is being utilized to guide ways of thinking

11   about multiple stressor problems in the future.

12   Q.   Putting aside your publications for a minute, let's talk

13   briefly about some projects you've worked on in the recent

14   past.

15        You told me about one you've worked on for Uruguay and

16   the International Court of Justice I think it is.

17   A.   Yeah.  That was an international dispute between

18   Argentina and Uruguay.  I mentioned it because it exemplifies

19   a causal analysis in which Argentina was making some claims

20   with regard to the Uruguay River and bringing those claims

21   against Uruguay.

22        Because it was two countries involving an international,

23   you know, border -- that is, the Uruguay River -- the case

24   itself was elevated to the International Court of Justice.

25   Q.   And you served as an expert in that case?

Menzie - Direct

1   A.   That's correct.

2   Q.   In what areas?

3   A.   Basically the issues were what factors related to the

4   operations in Uruguay -- it was a mill plant -- might affect

5   the aquatic ecology of the Uruguay River, and it addressed

6   claims that had been made by Argentina that certain things had

7   happened in the Uruguay River, or might happen, were valid or

8   not.

9   Q.   And you mentioned you've written papers or continued to

10  work on the thermal effects of -- I presume it's cooling water

11  from electric generating units on receiving waters?

12  A.   That's correct.

13  Q.   What type of work have you continued to do after your

14  publications?

15  A.   There continues to be evaluations of thermal discharges

16  on aquatic systems, and these generally fall under what are

17  known as 316(a) of the Clean Water Act.  So they're thermal

18  variances.

19       So every few years there's reassessments made of those

20  kinds of effects.  So a number of power plants where there are

21  questions about what stressors are causing certain things to

22  happen and temperature is involved, that problem becomes part

23  of what I do and take a look at.

24  Q.   Has some of that involved the review or analysis of

25  impacts on macroinvertebrates?

Menzie - Direct

1   A.   It has over the years, yes.

2   Q.   And what kind of things have you found in those --

3   A.   Well, near the regions where thermal discharges enter

4   aquatic waters, it is possible to get shifts in benthic

5   macroinvertebrates, as well as redistribution of fish

6   populations in other parts of the community.

7   Q.   Even with nonlethal temperatures?

8   A.   Yes.   It's simply a response to the temperature variance.

9   Q.   Do you have any teaching experience?

10  A.   I do.   I have teaching experience.

11  Q.   Would you tell us a little bit about that?

12  A.   The major universities I've taught at are Boston

13  University, University of Massachusetts, and University of

14  Maryland at Baltimore County.

15  Q.   And what have you taught?

16  A.   The most common course I've taught is on risk assessment,

17  environmental risk assessment, but I've also taught courses on

18  ecology, oceanography.

19  Q.   Were you asked by EPA to review the benchmark that's at

20  issue in this case?

21  A.   I was.

22  Q.   Who at EPA asked you, if you know?

23  A.   It probably came to me by either -- it usually comes

24  through a company that has contracted with EPA.   So I think in

25  this particular case, I believe it came through Versar.   And

Menzie - Direct

1   basically Versar is a company that has a contract, as do other

2   companies, with EPA for identifying peer reviewers for various

3   EPA issues.  I've done a lot of peer review for EPA.

4   Q.   And you conducted a review for EPA of the benchmark, as I

5   understand it.

6   A.   I did.

7   Q.   Have you qualified before this Court in the past as an

8   expert in risk assessment and aquatic ecology?

9   A.   I believe so.

10  Q.   Do you regard causal analysis as part of the risk

11  assessment discipline?

12  A.   Yes.

13       MR. MCLUSKY:  Your Honor, I'd move to qualify him as

14  an expert in those fields again.

15       THE COURT:  I'm satisfied.

16  BY MR. MCLUSKY:

17  Q.   Dr. Menzie, your work in this case -- I assume you've sat

18  through those parts of the testimony you were permitted to sit

19  through since the beginning of the trial, haven't you?

20  A.   That's correct.

21  Q.   Have you read the expert reports of the plaintiffs?

22  A.   Yes, I have.

23  Q.   And presumably you reviewed the benchmark since EPA asked

24  you to do that, correct?

25  A.   Yes, that's correct.

Menzie - Direct

1   Q.   You've reviewed the Suter and Cormier papers that have

2   been discussed?

3   A.   I have.

4   Q.   Have you reviewed the databases that the -- the database

5   that the benchmark relies on?

6   A.   Pretty extensively, yes.

7   Q.   Have you been to the Stillhouse site?

8   A.   I have been.

9   Q.   Have you reviewed reports by DEP of its visits to the

10  Stillhouse site?

11  A.   I've reviewed those.

12  Q.   Okay.  Is it fair to say that at least as to the general

13  causation question, the plaintiffs rely primarily on the

14  presence or absence of certain types of bugs to demonstrate

15  that conductivity causes WVSCI scores to drop below 68?

16  A.   Yes, that's correct.

17  Q.   Do you agree generally that those conclusions are

18  supported by the benchmark and the other literature you've

19  heard testified about here?

20  A.   With respect to Stillhouse, I believe --

21  Q.   Well, let's go just generally to the benchmark.  Put

22  Stillhouse aside for a moment.

23  A.   Okay.

24  Q.   Do you believe that the conclusions of the benchmark are

25  generally supportable based on the testimony you've heard and

Menzie - Direct

1    in your own review of the benchmark?

2    A.   I don't.

3    Q.   Why is that, just very briefly?

4    A.   When I had an opportunity to review in depth the database

5    on which the benchmark relies, in addition to my own

6    observations at -- in previous cases, I came to realize that

7    the -- that there were some problems associated with reliance

8    upon the underlying data and the way in which those data had

9    been statistically evaluated and presented.  That became much

10   more clear to me as I looked into it.

11   Q.   Okay.  We'll get into that in a little more detail in a

12   second.

13        Do you believe that the site-specific or specific

14   causation analysis presented by the plaintiffs stands up?

15   A.   I don't.

16   Q.   Why not?

17   A.   I think that the plaintiffs rely primarily on literature

18   and basically say, "Well, if it happened elsewhere or if this

19   report says it's so, then it must be so here too."  And that's

20   basically applying general causation to a specific set of

21   circumstances without considering a full range of causal

22   factors at that location.

23   Q.   All right.  And before we go any further, I think some of

24   this was covered by Dr. Palmer, and I apologize.  As I

25   understand it, conductivity is just a measure of the ability

Menzie - Direct

1    in your own review of the benchmark?

2    A.   I don't.

3    Q.   Why is that, just very briefly?

4    A.   When I had an opportunity to review in depth the database

5    on which the benchmark relies, in addition to my own

6    observations at -- in previous cases, I came to realize that

7    the -- that there were some problems associated with reliance

8    upon the underlying data and the way in which those data had

9    been statistically evaluated and presented.  That became much

10   more clear to me as I looked into it.

11   Q.   Okay.  We'll get into that in a little more detail in a

12   second.

13        Do you believe that the site-specific or specific

14   causation analysis presented by the plaintiffs stands up?

15   A.   I don't.

16   Q.   Why not?

17   A.   I think that the plaintiffs rely primarily on literature

18   and basically say, "Well, if it happened elsewhere or if this

19   report says it's so, then it must be so here too."  And that's

20   basically applying general causation to a specific set of

21   circumstances without considering a full range of causal

22   factors at that location.

23   Q.   All right.  And before we go any further, I think some of

24   this was covered by Dr. Palmer, and I apologize.  As I

25   understand it, conductivity is just a measure of the ability

Menzie - Direct

1    of water to conduct electricity.

2         Is that a fair characterization of it?

3    A.   That's what it measures.

4    Q.   And ions are positively or negatively charged molecules

5    or atoms?

6    A.   That's correct.

7    Q.   And the accumulation of those can create conductivity?

8    Is that a --

9    A.   Conductivity can increase as the ionic composition

10   changes.

11   Q.   Okay.  Is it fair to say conductivity is a characteristic

12   of many substances but is not itself a substance?

13   A.   That's correct.

14   Q.   Okay.  Let me divert here for just a moment because I'm

15   not sure this has really been asked this way.

16        Is it your understanding that EPA or Suter and Cormier

17   have determined that some synergistic properties of alkaline

18   mine drainage cause impairment and that the role of individual

19   ions can't be teased out or that it's likely there are one or

20   more ions that are part of that mixture that may have a causal

21   influence on biota but that no one has done that work to

22   actually tease them out?

23   A.   I think it's the latter case.

24   Q.   Okay.  And Mr. Lovett talked about pH being a

25   characteristic and not a thing itself and is regulated.  Do

Menzie - Direct

 1   you know whether pH is different in the sense that it is

 2   regulated at pH per se as opposed to conductivity?

 3   A.   Yes.   PH has been something recognized for a long time as

 4   being harmful, whether it's too much or too little; in other

 5   words, high or low, basic or acid.

 6   Q.   And is it considered harmful regardless of what the

 7   substances are that are causing the pH to be high or low?

 8   A.   Yes.

 9   Q.   So that if it was sulfuric acid or carbonic acid causing

10   a low pH, that wouldn't matter in terms of regulating pH.

11   A.   Right.   It would still be pH.

12   Q.   All right.   The WVSCI, the West Virginia Stream Condition

13   Index, I think we have a demonstrative exhibit, but could you

14   tell us briefly what the WVSCI is?

15       And, Mr. Tyree, if you could -- you have a demonstrative

16   exhibit just to explain the WVSCI for us.

17   A.   Sure.   If we could bring that up.

18   Q.   And it's up now.   You can see it?

19   A.   Sure.

20           THE COURT:   You also have a monitor.

21           THE WITNESS:   You have this one?

22           THE COURT:   Yes, I have this one.

23           THE WITNESS:   Yes.

24           THE COURT:   If you bend down, would you take that

25   microphone with you.

Menzie - Direct

1           THE WITNESS:  I think I'm going to look at the one

2    on my left.

3       Basically the whole idea behind the WVSCI or the West

4    Virginia Stream Condition Index was to capture the

5    characteristics of what the animal life looks like in a

6    reference water body.

7       So EPA contracted with Tetra Tech to develop something

8    very specific for West Virginia and which has become basically

9    the value, the procedure, that the state uses to evaluate

10   waters with regard to biological condition.

11      So the WVSCI is made up -- the key idea behind the WVSCI

12   is that it doesn't depend on one thing.  So it's not, for

13   example, numbers of mayflies or numbers of chironomid insects,

14   but rather it kind of puts all the information together on the

15   various invertebrate taxa that are present at a location.

16      So there are these components that are brought together

17   to kind of provide a more complete picture of the ecological

18   conditions and perhaps even ecological function to some degree

19   of an area as represented by these animals.

20      And so the groups include the number of -- the first

21   group of animals being mayflies, stoneflies, and caddisflies,

22   how many of those there might be.  And when those go up, the

23   WVSCI goes up, the reason being is that in the reference water

24   bodies, those water bodies have a lot of those kinds of

25   animals.  So it's closer to what the reference water body

Menzie - Direct

1   looks like.

2        And then the number of families or the number of taxa.

3   The more of those, the higher the WVSCI.  The percent

4   composition that the mayflies, stoneflies, and caddisflies

5   make of the total amount of animals that might be present.  So

6   a low amount might be 5 percent.  A higher amount might be

7   90 percent, for example.  And as that goes up, the WVSCI goes

8   up.

9        Now, there's some things that decrease the WVSCI that are

10  present, again on a fractional basis or a percentage basis.

11  So if you have a lot of these midges called Chironomidae --

12  and you heard about them a lot yesterday.  Those are the

13  little tiny guys that if you're a fly fisherman or woman, you

14  put on to catch, you know, to catch fish.  They're very, very

15  tiny.  But because they're not represented very much in

16  reference water bodies, the WVSCI goes down if they increase

17  in percentage.  So the WVSCI also goes down if there's a lot

18  of one or two things.  So if you have, like, a bloom or a huge

19  amount of any of these things -- could be any of these

20  groups -- that would decrease the WVSCI score.

21       And then finally there's an index that Hilsenhoff

22  developed sometime ago called the HBI, and that's a mechanism

23  for kind of considering tolerant and intolerant animals and

24  calculating this score.  And when that increases, the WVSCI

25  just decreases.  So the idea is kind of pull all things

Menzie - Direct

1    together to get an overall sense of what's there, but the key

2    thing is that this is ground truth to the reference areas.  So

3    the WVSCI changes as you depart from reference area

4    conditions.

5    BY MR. MCLUSKY:

6    Q.    And, Doctor, let me stop you.  A reference area, is that

7    an area chosen from a group of relatively undisturbed streams?

8    A.    Yeah.  What Tetra Tech did was to collect information

9    from many reference areas or reference dataset to construct

10   the WVSCI score and then used that -- they did a fair amount

11   of analysis to kind of come up with a metric that would be

12   most useful for West Virginia.

13   Q.    Okay.  And I think it goes without saying, but all the

14   animals you talked about, they're all aquatic insects, right?

15   A.    They're almost all aquatic insects.  This HBI, this last

16   index, can include things that are not aquatic insects, some

17   things like worms and some other kinds of things that might be

18   in there.

19   Q.    What kind of things can affect WVSCI scores?

20   A.    Well, anything that can affect the populations of any of

21   those animals that are in the score can affect the WVSCI

22   score.  So if, for example, you have a habitat alteration or

23   change in temperature or change in flow velocities or anything

24   that is different about the aquatic habitat relative to the

25   reference water body can affect those populations.

1    Q.    That can include things like embeddedness?

2    A.    Very much so, because if -- much of the reference water

3    bodies provide opportunities in the substrate for animals to

4    hide out, tuck in behind rocks and pebbles and whatnot.   And

5    if you cover those with a silt or some other material and kind

6    of fill those spaces in, those animals that would be there

7    taking advantage of that habitat would not have a home.

8    Q.    Do you agree that the multi-metric indices themselves

9    were not designed to predict or determine the precise cause of

10   changes to the insect makeup in a stream?

11   A.    It's not intended for that.   It's just really a

12   representation of what you should expect that reference -- in

13   the reference dataset.

14   Q.    We'll return to this in a minute, but based on your trip

15   or trips to Stillhouse and your review of the DEP data, does

16   Stillhouse resemble a reference stream at all?

17   A.    It doesn't look like a reference stream.   It is quite

18   different from a reference stream.

19   Q.    Let's go to the database and the data used in the

20   database.   Did you examine the database that was used in the

21   benchmark?

22   A.    I did.

23   Q.    Where did you get it?   Where did it come from?

24   A.    Ultimately it comes from West Virginia.   They maintain

25   the database.   There are probably several sets of the database

Menzie - Direct

1   around.  I think we have one of the more recent sets of the

2   complete database, but it originates with West Virginia DEP.

3   Q.   Was it specifically compiled for the purpose of

4   discerning whether particular inputs to a stream cause changes

5   to the benthic macroinvertebrates?

6   A.   It wasn't really designed to be diagnostic in that way.

7   Q.   What was it designed to do, if you know?

8   A.   Part of it, certainly the biology part of it was designed

9   to provide the biologists in the West Virginia DEP with some

10  sense for how different a particular water body was from the

11  reference dataset.  So that is shown by a lowered WVSCI score,

12  and that can be a basis then for listing.

13       Along with the collection of the biology data, various

14  measurements are made at each location, but that program was

15  not established to be a diagnostic program but to collect

16  information specific to a location at a particular point in

17  time.

18  Q.   Now, your review of the -- and this is the same data that

19  was used in the benchmark, then; is that correct?

20  A.   That's correct.

21  Q.   And some subset of that data was used in "How Many

22  Mountains Can We Mine?"

23  A.   Yes.

24  Q.   When you reviewed that database, did you make any

25  determination whether the data was of sufficient quality to

579

Menzie - Direct

1    adequately analyze potential impacts of things like

2    temperature and habitat?

3    A.   Well, I did.  I looked at it from that point of view to

4    see what you could really say about the influence of these

5    other factors.  In particular, at the time I was looking at

6    temperature because I had noticed in a previous case that

7    there was a systematic difference in temperatures between

8    different water bodies.  And so I went and looked at the

9    database to see how temperature had been dealt with and the

10   nature of the temperature data; and I noticed that it was

11   basically, as you've heard before, you know, snapshot data.

12   Q.   And we've heard a little bit about this, but what are the

13   problems with snapshot data in determining the role of

14   temperature with respect to the macroinvertebrates?

15   A.   Well, any measurement of temperature would not be

16   considered representative of the stream but yet has been used

17   by most folks that have -- well, certainly by EPA, as if it

18   were.

19   Q.   So a temperature recorded in April would essentially be

20   used to characterize a stream throughout the year, for

21   example?

22   A.   It would be the only temperature measurement available

23   for the stream.

24   Q.   It wouldn't catch the variability and the seasonal data.

25   A.   That's correct.

Menzie - Direct

1    Q.    I think people talked about it's like trying to take

2    clips from different movies and assemble a whole new movie

3    together.

4    A.    That's right.  It's like having a frame from a couple

5    hundred different movies collected over different years and

6    different seasons and different days and trying to make a

7    story out of that.

8    Q.    Had you figured that out when you did the review of the

9    benchmark for EPA?

10   A.    I had not figured that out.

11   Q.    Why not?

12   A.    We were not asked to review that.  I had no knowledge of

13   the quality of the data at that time.

14   Q.    Did you even have the data -- access to the database when

15   you reviewed the benchmark for EPA originally?

16   A.    I wasn't provided with any of the data or any summary of

17   the data.

18   Q.    Would you have expected members of the SAB panel or the

19   SAB to actually review the underlying databases as part of

20   their review of the benchmark?

21   A.    I wouldn't.

22   Q.    That would be an unreasonable assumption, that they would

23   spend that kind of time?

24   A.    I think so.  It takes considerable time to kind of dig

25   into it.

Menzie - Direct

1    Q.   All right.  So did you take any steps, then, to figure

2    out whether -- how did you figure out the data was inadequate

3    to characterize your own temperature, and did you do anything

4    to try and see if the data could be assembled in a different

5    way to tell you anything?

6    A.   Well, I was aware that -- of the limitations of the data

7    in terms of temperature, and I also had a priori knowledge of

8    the importance of temperature because I had worked with

9    temperature for decades.  So I knew that temperature was

10   important and really shouldn't be dismissed.

11          And so then I kind of wondered why it was that

12   temperature was not considered as important as it should be

13   and had been dismissed really in some of the previous cases

14   that we've been involved in.  And a large explanation of that

15   is sort of the nature of the data.  All of the data that

16   you've seen so far on temperature is snapshot data from all

17   the studies done everywhere, as far as I know.

18          And then I sat down and thought about, well, how can we

19   work with snapshot data to get a better sense for the role

20   temperature might be playing here.  We have all these frames

21   from different movies.  Is there some way to kind of distill

22   that down to make any sense of it?  And that's what I set out

23   to do.

24   Q.   And what was the first step you took in doing that?

25   A.   Well, the first thing was, as a biologist, I said, well,

Menzie - Direct

1    let us, you know, let us have the animals inform us about what

2    temperatures they prefer to live in.  And I knew that

3    temperature was varying throughout the year, but I concluded,

4    as you kind of heard earlier, that the -- at least in terms of

5    thinking about possible thermal stresses and optimal

6    temperatures for animals, that I would select the summer

7    months when temperatures would be at their highest.

8        And so I, being a biologist and being familiar with

9    temperature and invertebrates and fish and whatnot, I chose to

10   start there and have the animals inform us about the

11   temperatures in which they prefer to live.

12   Q.   Okay.  Now, did you look at all the animals that were in

13   the EPA database, or did you narrow it down to the animals

14   that were considered either sensitive or tolerant to

15   conductivity?

16   A.   Well, the issue was -- the thing that I had noticed was

17   that -- and I knew this a little while back from looking at

18   the data -- was that I saw that in the summer that the animals

19   that were being considered sensitive to conductivity were also

20   animals that were typically associated with cooler waters.

21       And so I thought there was a possibility that as

22   landscape changes were occurring, not only was, you know,

23   conductivity changing as a result of landscape alterations,

24   which happens in any kind of landscape alteration, but perhaps

25   conditions were being set in motion for being able to increase

Menzie - Direct

1    temperature; these things were happening together.

2    Q.   I want to take a step back.   How did you identify -- you

3    mentioned there were insects that were sensitive to

4    conductivity.

5        How did you identify the world of insects that were

6    sensitive to conductivity and those that were not, were more

7    tolerant?

8    A.   Well, there were two lists I could work from.   And the

9    question I asked was, are the animals that are sensitive or

10   tolerant to conductivity also found in cooler or warmer

11   waters?   Could temperature be explaining this shift that has

12   been attributed to conductivity?

13       So I looked at two lists, and I looked at the work that

14   Bernhardt et al. had done, including Dr. King's part of that,

15   and the work that EPA had done.   And they had identified

16   genera that were either sensitive or tolerant --

17   Q.   To --

18   A.   -- to conductivity.   And so then the question is, are

19   they also -- do these also separate from one another not only

20   on the basis of conductivity but on the basis of temperature.

21   Q.   All right.   Mr. Tyree, could you put up Joint Exhibit 70,

22   which is page JE 954.

23       If Mr. Tyree makes that a little bit bigger, maybe we can

24   talk about it.

25   A.   So, Your Honor, this is just a figure from my expert

Menzie - Direct

1  report; and what it shows is just contrasting, to begin the

2  discussion, on the top are two panels that are genera of

3  insects that are considered sensitive to conductivity, and on

4  the bottom are examples of two genera that are considered

5  tolerant.  And on the X axis is temperature, and on the Y axis

6  is sort of the probability of finding that particular insect

7  in the water.

8      So I selected three months in which to extract data from

9  the West Virginia database to do this analysis.  They are

10  June, July, and August, with the idea being that this would be

11  a time of the year, a period of the year that would likely be

12  more stressful to aquatic insects such that the animals that

13  prefer cooler waters would be in those waters, and the animals

14  that could live in warmer waters would be found in those

15  waters.

16      The dashed line along the bottom of the figure is at the

17  90th percentile.  So you kind of see that if you -- you

18  would read that, if you could come down and hit that dashed

19  line and to the left of that would be where 90 percent of the

20  animals were found during those months.  And as you can see

21  from comparing the top to the bottom, the two sensitive

22  species tend to be found in cooler waters relative to the two

23  that are at the bottom.

24      So that was something that I looked at for all of these

25  genera.

Menzie - Direct

1  Q.   And to make sure I understand, we have some demonstrative

2  slides that explain a little bit more about how you made Joint

3  Exhibit 70.  Do you have some slides that help explain that?

4  A.   I do.

5  Q.   Okay.  Mr. Tyree?

6  A.   So just to give you an example, this is a -- one of

7  the --

8  Q.   Let me back up.  Is this line, the stair step line on

9  this demonstrative exhibit actually taken from the prior

10  exhibit?

11  A.   Yes.  So this is an example of how I arrived at the

12  statistics.

13          MR. LOVETT:  I'm sorry.  Where is this?

14          MR. MCLUSKY:  This is a demonstrative exhibit.  It's

15  data taken from Joint Exhibit 70 and just explains how the --

16          MR. LOVETT:  When was it prepared?

17          MR. MCLUSKY:  We're not moving it as an exhibit.

18  It's a demonstrative exhibit just to explain how he made Joint

19  Exhibit 70 and how he did his work.

20          MR. LOVETT:  Do you have a copy of it that we could

21  have?

22          MR. MCLUSKY:  I do not.

23          MR. LOVETT:  Well, will you make it available to us?

24          MR. MCLUSKY:  Yeah, sure.

25          THE WITNESS:  So this is one of the -- well, this

Menzie - Direct

1    particular animal, *Bezzia*, is the one that was found to be

2    most sensitive to conductivity in the "How Many Mountains"

3    paper.  And this is that same plot.  So basically you follow

4    that line down, and this says that 50 percent of those animals

5    are present above and below the median value, which I've shown

6    there so you can kind of recognize what that is, a little bit

7    above 15 degrees Centigrade in the summer.  So 50 percent is

8    to the left, 50 percent to the right of that dashed line.

9         Okay.  Next.  And then compare that to a genus that's

10   tolerant to conductivity.  I've plotted -- just put this plot

11   together.  This is just comparing one genus that's sensitive

12   to conductivity and one genus that's tolerant to conductivity,

13   but in this case I'm comparing them in terms of temperature.

14        So one of these lives in cooler waters, and one of them

15   lives in warmer waters in the summer.

16   BY MR. MCLUSKY:

17   Q.   So this shows me the dropped -- the vertical dotted lines

18   are showing the median point of the population of two

19   different types of insects, a sensitive one and a tolerant

20   one; is that correct?

21   A.   That's right.  So the first one, its median is a little

22   above 15; and the second one is above, as you can see, well

23   above 20 degrees.

24        So these two animals would be expected to be found in

25   waters of different temperatures based on this analysis.

Menzie - Direct

1    Q.   And did you do some analysis like this for 20 insects

2    that were deemed -- or 30 --

3    A.   I did the analysis for the 30 most sensitive genera and

4    the 20 most tolerant genera --

5    Q.   Okay.

6    A.   -- to kind of contrast those two groups.

7    Q.   And was that work then embodied in the Defendant's

8    Exhibit 6, which is appendix E to your report?

9    A.   That's correct.

10   Q.   Just scroll through that very quickly, Mr. Tyree.  I

11   don't intend to spend any time on it.

12        Appendix E just shows the same thing essentially as Joint

13   Exhibit 70 but for 50 different insects; is that correct?

14   A.   Right.

15   Q.   All right.  What was the next step you did with these

16   data, then?

17   A.   Well, for each of those, as you see in this picture for a

18   moment, I calculated the statistics, the median at which that

19   animal -- you know, the temperature at which that animal is

20   found in West Virginia waters.  And then I also calculated the

21   90th percentile, the value that bounds 90 percent of the

22   animals.

23   Q.   All right.  Mr. Tyree, would you put up Joint Exhibits 71

24   and 72, please.

25        And, Dr. Menzie, can you confirm that these are the

Menzie - Direct

1    product of the work you've just described?

2    A.   That's correct.  So, Your Honor, on the left panel there

3    are the 30 most sensitive genera to conductivity, but now I'm

4    showing the temperature for them; and on the right, the 20

5    most tolerant ones.  And, again, I'm showing the median

6    temperatures in blue and, at the 90th percentile, the number

7    that bounds 90 percent of them, in green.

8    Q.   Now, the 90 percentile number means 90 percent live to

9    the left of the little green marks?

10   A.   Right.

11   Q.   And just looking at these, were you able to discern any

12   patterns?  The left-hand one is which?  The sensitive insects?

13   A.   That's correct.  Those are the ones that would be

14   considered sensitive to conductivity.

15   Q.   And Exhibit 72, which is on the right there on the same

16   page here, are the tolerant insects?

17   A.   That's correct.

18   Q.   Looking at those -- and I have a hard time seeing it from

19   here, but can you discern patterns of where those bugs live

20   temperature-wise as between the sensitive and the tolerant

21   bugs?

22   A.   Well, if you generally go down the -- the median values

23   for the sensitive ones on the left panel, you'll see that most

24   of those blue squares are down below 20 degrees Centigrade.

25   And if you go over to the right panel, you'll see many of

Menzie - Direct

1   those blue squares the median values are above 20 degrees.

2        So, for example, that could be a way of kind of quickly

3   contrasting the two groups.

4   Q.   And did you take these data and plot them in some other

5   fashion to show us a little bit more information?

6   A.   Yes.  A customary way of plotting these is to use

7   something called a cumulative probability plot, which just

8   kind of takes these data and orders them from least to most.

9   So I did do that.

10  Q.   Mr. Tyree, would you put up Joint Exhibit 73, please?

11       And, Dr. Menzie, can you confirm that this is the product

12  of the work you just mentioned?

13  A.   It is.

14  Q.   Okay.  Explain to us briefly what this is.  And I

15  understand you have some demonstrative exhibits to explain how

16  you did it, but tell us briefly what Joint Exhibit 73

17  represents.

18  A.   Well, I've talked about two groups of insects, the

19  insects that are considered sensitive and the insects that are

20  considered tolerant.  And I've talked about two statistics,

21  the median value, which is sort of the center point of where

22  you'll find these, and the 90th percentile, which is sort of

23  an upper bound.

24       So on this particular figure, there are four lines.

25  There's a median for each of the sensitive and the tolerant

Menzie - Direct

1    ones, and then there's a 90th percentile, and I can build this

2    up, kind of explain it a little bit further.

3    Q.   Mr. Tyree, would you go to the first demonstrative slide

4    here.

5        And explain, if you could, Dr. Menzie, how you put Joint

6    Exhibit 73 together.

7    A.   Okay.  So this first line for those 30 sensitive genera,

8    this is the median values from the lowest to the highest, just

9    kind of arrayed in what's called a cumulative probability

10   distribution, from the lowest to the highest, for all 30 that

11   are considered most sensitive to conductivity.  So that's the

12   first line.

13   Q.   Okay.  The next line up?  The next line shows what?

14   A.   This next line is the median for all of the 20 genera

15   that are considered most tolerant to conductivity.  And as you

16   can see, it's shifted to the right of the first line.

17              THE COURT:  This is the green line on Exhibit 73?

18              THE WITNESS:  Let me see 73.

19              MR. MCLUSKY:  It should be, Your Honor.  Yeah.  We

20   should have used the same colors, but --

21              THE COURT:  I just wanted to be sure.

22              THE WITNESS:  Okay.

23   BY MR. MCLUSKY:

24   Q.   And then --

25   A.   Then added the 90th percentile to that graph.  And then

Menzie - Direct

1    so you can distinguish the two groups for the purpose of

2    visualization here, as an example, filled in the colors on

3    those.  So that would be the color that represents the --

4              THE COURT:  Excuse me.  Back up, because it appeared

5    to me that on Exhibit 73, the blue dotted line, which is the

6    95th percentile, as I understand it, fell to the left of the

7    green or orange line, which is the tolerant taxa median.  And

8    on what you just showed, doesn't -- okay.

9         Now, go back to -- see, there's a difference there where

10   that blue dotted line --

11             MR. MCLUSKY:  I agree.  These are just

12   demonstrative, but I agree.

13        Dr. Menzie -- may I approach, Your Honor?

14             THE COURT:  You may.

15             MR. MCLUSKY:  I'd like to show him what you're

16   talking about.

17   BY MR. MCLUSKY:

18   Q.   I'm going to show you Joint Exhibit 73.  The judge is

19   saying on the demonstrative exhibit, the dotted line is to the

20   right of the --

21   A.   Yeah.  I can maybe take this and explain it to the judge.

22             THE COURT:  Well, you need to do it on the record.

23   And if you're saying that it's, on the demonstrative exhibit,

24   it's just --

25             THE WITNESS:  A little bit different.

592

Menzie - Direct

1      THE COURT:  -- mislocated a bit and that it is based

2  upon and should be the same relationship between the blue

3  dotted line and the green line on Exhibit 73, that's fine.

4      THE WITNESS:  Okay.

5      THE COURT:  I just didn't understand if it was

6  suddenly something different or significant.

7      THE WITNESS:  Okay.

8      THE COURT:  Okay.

9  BY MR. MCLUSKY:

10  Q.   In any event, the demonstrative exhibit generally

11  explains how you compiled Joint Exhibit 73; is that correct?

12  A.   That's correct.

13  Q.   Now, is the 90th percentile -- I'm sorry -- the median

14  temperature line for tolerant taxa misplaced on the

15  demonstrative exhibit?

16  A.   I don't believe so.

17  Q.   Well, the judge pointed --

18  A.   I'd have to look at them together, yeah.

19  Q.   In any event, what -- go ahead to the next two slides, if

20  you would.  Just explain what they generally show.

21  A.   So this would fill in the space between the median and

22  the 90th for each of the sensitive and the tolerant.

23  Q.   Okay.  What are they telling -- what is the picture

24  telling us?

25  A.   That basically these two groups of insects also were

Menzie - Direct

1   separated from one another on the basis of temperature.

2   Q.    So the left-hand lines, the solid lines, are the ones

3   that show that 50 percent of the animals live below that,

4   50 percent above?

5   A.    That's correct.

6   Q.    And then the 90th percentile lines are the line below

7   which 90 percent of the bugs and only 10 percent live.

8   A.    That's correct.

9   Q.    All right.  Did this tell you anything about -- so you

10  see a difference in where bugs live based on temperature,

11  whether sensitive or tolerant, to conductivity; is that

12  correct?

13  A.    That's right.

14  Q.    Okay.  So does this tell you whether it was a thermal

15  zone or area where you saw a shift from one type to the other?

16  A.    Well, what I wanted to do is then to see whether the

17  waters of West Virginia -- the water temperatures of West

18  Virginia were such that one might expect the presence of one

19  or the other of these groups or some combination of them.  And

20  that would be important because it could represent how

21  temperature might bring about a shift in the composition of

22  the macroinvertebrate fauna.

23       So using the literature and using these figures, I chose

24  to -- I chose two temperatures to kind of -- as a gauge for

25  the eye and kind of thinking about how water temperatures

Menzie - Direct

1   might influence the presence and composition of different

2   invertebrate taxa, including insects.  And those temperatures

3   were 19 degrees Centigrade and 21 degrees Centigrade.

4   Q.   Okay.  Let's go to the next exhibit, which would be Joint

5   Exhibit 77, I believe.  I'm sorry.  You've got on the -- this

6   thermal transition you talked about, you just put it up on a

7   demonstrative exhibit; is that correct?

8   A.   Yes.  And this is really used to -- I'll be talking about

9   this because it's used to guide the eye, but I drew these

10  lines at the approximate locations of where the 50th

11  percentiles kind of top out.

12       So if you look on the left-most, you'll see that the

13  median values increase and then begin to taper out around 19

14  degrees.  And on the second line, it kind of gives you the

15  same piece of information roughly for the warmer water

16  animals.

17       So I figured through this temperature gradient, you would

18  begin to see a transition from animals that are considered

19  sensitive but also like cooler waters to animals that are a

20  little more tolerant but seem to like and prefer warmer

21  waters.

22  Q.   Okay.  What was the next step you took?  And let's go to

23  Joint Exhibit 77.

24  A.   The next step was to deal with the issue of snapshot data

25  because virtually all the data for the, you know, in the West

Menzie - Direct

1   Virginia database and elsewhere have been snapshot data; and

2   because we know from the ecology of aquatic invertebrates that

3   it's not one measurement that's important, it's sort of the

4   regime, I came up with a way of sort of representing what the

5   seasonal pattern might look like for temperatures in waters

6   that had different levels of conductivity in them.

7        And on this particular figure, it plots the -- those data

8   represented by box -- what are called box and whisker plots

9   for waters of different conductivity, and this particular

10  figure also includes the temperature for Stillhouse.  And I

11  can walk through how this is constructed.

12  Q.   So this is -- but before you do that, let's go back to

13  the Joint Exhibit 77 and make sure I understand.  You have

14  these box and whisker plots, which in the middle is a dark

15  line which is the median value of the data within that little

16  oblong colored box, right?

17  A.   Right.  So to read a box and whisker plot, it's

18  constructed of a couple of different parts.  In the middle of

19  the box is a horizontal line that represents what's known as

20  the median value.  And it's -- above and below that horizontal

21  line in the middle of the box is where 50 percent -- in this

22  case, 50 percent of the temperatures have been recorded for --

23  you know, in the West Virginia dataset I'm looking at here --

24  50 percent of them would be higher than that median and

25  50 percent would be less.

Menzie - Direct

1        Then there's the box itself.  The top and the bottom of

2   the box capture the central -- basically represent the center

3   of the distribution of temperatures.  So the bottom of the

4   box, not the line that goes down, but the bottom of the box

5   itself is at the 25th percentile.

6        So what that means is that 25 percent of the values are

7   colder than that.  And the top of the box is at the 75th

8   percentile, which means that 75 percent of the temperatures

9   are colder than that.  In other words, 25 percent are warmer.

10       And then the line that comes out of each box and the

11  little crosshatch on it, it represents the range of

12  temperature.

13  Q.   Again, these are out of the WV -- the DEP database.

14  A.   These are from the West Virginia database.  So these have

15  been collected over many years and many days and many months.

16  And this is a way of putting it all together so that this will

17  be the first time probably this has been done.  You can

18  actually look at what the temperature distribution is of

19  different waters.

20       So rather than looking at a single temperature, this

21  gives a picture of what the temperature regime looks like for,

22  say, low conductivity waters or waters with higher

23  conductivity.  You can visualize it and see it on this figure.

24       In those boxes can be hundreds of measurements taken, but

25  they're all taken in June or July or August.  But they could

Menzie - Direct

1    be from different years.  So that's --

2    Q.   And different places as well.

3    A.   And different places.  They're what is in the database.

4    Q.   All right.  And then going to the next demonstrative

5    slide here, can you explain how you constructed Joint Exhibit

6    77?

7    A.   So the first thing I did was to kind of think about how

8    temperature changes relative to two things, conductivity

9    and -- let me take a closer look at it myself so I can see it.

10   Yeah, basically temperature.  I put on the two temperatures

11   that I had referred to before at which I have some expectation

12   that there would be a shift in the composition of the benthic

13   fauna from cooler to warmer.

14        So one of those temperatures is 19 degrees.  It's the

15   horizontal line.  And the other one is 21.  So I started with

16   that.

17   Q.   All right.  Next line?

18   A.   And then from the entire -- you know, from the West

19   Virginia database for headwaters, of all headwater streams

20   similar to, like, Stillhouse, we extracted --

21            MR. LOVETT:  Bob, I'm sorry.  Is this a

22   demonstrative --

23            MR. MCLUSKY:  It's demonstrative.  It's off of Joint

24   77.

25            THE WITNESS:  So this would be a plot of all the low

Menzie - Direct

1   conductivity waters that are in the dataset.

2   BY MR. MCLUSKY:

3   Q.   This is all conductivities under 50 microsiemens?

4   A.   Right, this is under 50 microsiemens.  These are, again,

5   box plots.  And so from all the headwater streams for which we

6   have data in West Virginia, if you extract temperature data

7   throughout the year, plot it like this, this is what the

8   pattern looks like.  So, not surprisingly, it's cold in the

9   winter, rises through the spring, tapers off in June, July,

10  and August, and then descends through the fall and back down

11  to the winter.

12       And all of those values for the low conductivity, the

13  lowest conductivity, less than 50, are less than 19 degrees

14  Centigrade.  They kind of fall mostly below that line.

15  Q.   Ready for the next one?

16  A.   And then I plotted the reference stations.  So basically

17  these are the kind of data that are used by the state to make

18  judgments about community composition and WVSCI for unaffected

19  water bodies or mildly affected water bodies.  These are the

20  tier one reference stations that have been collected over the

21  years by the State of West Virginia.  And I've done the same

22  exercise.

23       I plotted all those data for each month.  So each of

24  those box plots contains every bit of data for West Virginia

25  headwaters that are collected at different locations,

Menzie - Direct

1    different years, but distills it down to kind of a

2    representative distribution of what temperatures are like in

3    reference water bodies.

4        And so this is a really good baseline for judging

5    departures from temperature.  So if you were to compare water

6    that might be warm, you could compare it to this baseline to

7    see whether the water of that -- the temperature of that water

8    body was different or not.  So this is sort of the baseline

9    for all the reference data.

10            THE COURT:  And the dotted lines that run vertically

11   from the boxes, that indicates the absolute range.

12            THE WITNESS:  Right, that's the absolute range.  And

13   in this particular one, I know it's there, but I can't really

14   see it on the screen from here.  I know there's a little

15   circle.  You might see it above the month of --

16   BY MR. MCLUSKY:

17   Q.   Actually, if you go to page 961, Dr. Menzie, you might be

18   able to see those circles better.

19   A.   Yeah.  But basically if there's a value that seems to

20   fall out of the distribution, the program for plotting these

21   box plots will show a value that is considered to be an

22   outlier.  So you can see there's an outlier value.  But

23   essentially reference water bodies in West Virginia typically

24   are less than about -- you know, the central temperatures or

25   the median temperatures were all less than 20 degrees

Menzie - Direct

1   Centigrade, even in the summer, and 75 percent of the values

2   are less than about, you know, 19 -- as you can see, they're

3   19 degrees, and occasionally you get values that are higher.

4   But that's an excellent baseline, then, for judging departure.

5        So you'd expect that animals that evolved over time in

6   West Virginia streams would have experienced this temperature

7   regime.

8   Q.   And then your next box, I think, was conductivity over

9   300 microsiemens.

10  A.   Right.

11  Q.   That's shown on the next slide, I think.

12  A.   So then from this dataset, I extracted the data for

13  headwater streams that had conductivities in excess of 300

14  microsiemens to see whether those temperatures were different

15  from the temperatures in reference water bodies.  And as you

16  can see, they're significantly different.  They're higher.

17  And that exists throughout the summer, that they're much

18  higher than the temperatures you'll find in reference water

19  bodies.  This is everything from 300 up.  But there are some

20  months where they're similar.

21       So, for example, if you look at May or if we look here

22  at -- yeah, if we look at May, you'll see that there's

23  actually -- they may not be as dissimilar at some times of the

24  year, but during the summer, these waters are significantly

25  higher if you're greater than 300 microsiemens than if you're

Menzie - Direct

1  a reference water body.

2  Q.   And I've managed to put a yellow squiggly on the bottom

3  of your exhibit, and I apologize.

4       All right.  So, Dr. Menzie, before we put the Stillhouse

5  data on, generally what does this tell us about what you see

6  in increasing conductivity in waters?

7  A.   Well, there's a couple of things you can see here.  One

8  is that, as I just mentioned, the waters are significantly

9  higher in temperature than are the reference water bodies.

10 Q.   How did you bin -- you've grouped these data.  So you've

11 got reference and low conductivity, and I think I generally

12 understand that.  And then you have conductivity over 300.

13      How did you choose the bins of data here?

14 A.   Well, in this examination, recognizing again that they're

15 all snapshot data that I'm kind of pulling together, I chose

16 to use the benchmark value as a basis for separating values or

17 waters that were warmer than or had higher conductivities than

18 the benchmark as compared to the reference water body set.

19      So I used that as a basis of binning.  So it's got all

20 the values that are greater than 300.

21      And the thing I was looking for here was to see whether,

22 one, they were significantly different.  They are.  But you'll

23 also notice that these temperatures are well below the

24 temperature value of, like, around 30 degrees that has been

25 called out by EPA and others as being sort of the cutoff for

Menzie - Direct

1    reference water bodies.  There's no reference water bodies

2    that come close to that.

3        And if we believe in the idea behind evolution of benthic

4    communities, insect communities, with respect to the streams

5    that they live in, the blue would indicate where you would

6    have communities that are reflective of streams that are in

7    the headwaters of these West Virginia mountains, while the

8    yellows depart from that.  They push up.  And they push up

9    into and beyond the zone of what I would consider a transition

10   zone between cooler water animals and warmer water animals.

11   You'd expect a shift on the --

12   Q.   And the shift from the sensitive species to tolerant

13   species, what effect does that have on things like WVSCI

14   scores?

15   A.   Well, because the WVSCI score is based on a reference

16   water set and departures from it, it would decrease the WVSCI

17   score.

18   Q.   You lumped all of the over 300 conductivity into the

19   yellow bins.  If you had re-binned that so it was 300 to 1000

20   and 1000 to 3000 and you'd broken it up more, would it have

21   any substantial impact on the way the graph would appear to

22   you now?

23   A.   It might a little bit.  All the -- the values would still

24   be higher, but also I've noticed that the influence of

25   temperature is very profound initially and then kind of tapers

Menzie - Direct

1    out a bit for a variety of reasons so that you would see this

2    kind of an effect, but you wouldn't see it linearly.  It

3    doesn't -- it's not linear.

4    Q.   All right.  Let's go ahead and lay the Stillhouse data on

5    this to complete the Joint Exhibit 77.

6         What does this tell us about Stillhouse, both in terms of

7    conductivities and its temperature with respect to all of the

8    other sites you examined?

9    A.   So one of the opinions I put forward was that the

10   temperature in Stillhouse is such that I would expect warmer

11   water organisms to be present, and the cooler warmer animals

12   reflective of reference water bodies might not be.

13   Q.   Let me just stop you for a minute.  Stillhouse.  The rest

14   of these data are all snapshot data from the DEP database; is

15   that correct?

16   A.   That's correct.

17   Q.   Stillhouse data, where does that come from and how much

18   is there?

19   A.   It's a number of years of monitoring.  Measurements are

20   made twice a month.  So these are representative of the data

21   in the water forming Stillhouse.  And I received those data

22   and created the box and whisker plots you see here.

23        So you see in the summer months, Stillhouse can get quite

24   warm.  It's not surprising because of a pond.  There's a pond

25   there.  And any time you slow up water and remove trees and

Menzie - Direct

1   vegetation, you're going to get hotter water.  It's going to

2   heat up.  So you basically have that.

3       But the important thing with respect to my opinion was

4   that those warmer waters are sufficiently warm to result in --

5   certainly be one of the key factors in influencing the kinds

6   of animals that you would expect to be present in waters at

7   those temperatures.

8   Q.   And to make sure I understand, based solely on the places

9   where insects live as measured in the DEP database, you would

10  expect here to find a tolerant type of community -- is that a

11  fair statement? -- at Stillhouse?

12  A.   That's correct.

13  Q.   And what effect would that have on a WVSCI score at

14  Stillhouse?

15  A.   Again, because WVSCI scores are departures from the blue,

16  the cool waters, I would expect the WVSCI score to go down.

17  Q.   So you see a general shift from sensitive to tolerant

18  bugs somewhere between 19 and 21 or 22 degrees C.  Is that a

19  fair statement?

20  A.   There's a shift that goes through here.  The precision of

21  this is obviously influenced by snapshot data and all the

22  rest, but this is what is -- you know, there's no question

23  that the yellow bars are significantly above the blue;

24  basically elevated conductivity is higher than reference

25  areas.  And Stillhouse is above that in terms of temperature.

Menzie - Direct

1   Q.   All right.   Anything else this tells us?

2   A.   I think it's important to understand the seasonal pattern

3   of temperature before making conclusions about the influence

4   of temperature on biota.

5   Q.   Okay.   Mr. Tyree, would you turn to Joint Exhibit 58,

6   page 493, which I think is table B-20 of the benchmark.

7        Dr. Menzie, I don't know if you can see that, but I want

8   to point your attention to paragraph 5.   Can you read that?

9   A.   Yes, I can read that.

10  Q.   What does EPA -- this is a paragraph in which EPA -- why

11  don't you blow that up just a little.

12       See, EPA gives a minus.   Why don't you go ahead and tell

13  us what they say here about -- this is a table in which EPA

14  determines that temperature is not a confounding factor in the

15  benchmark; is that correct?

16  A.   Yeah.   You know, I think this is really critical because

17  this piece of information has been carried through so many

18  things.   But basically this says temperature limits are highly

19  taxon-specific, but temperatures rarely exceeded the West

20  Virginia limits for reference sites, which is you have to be

21  less than 30 degrees Centigrade during -- basically during the

22  summer or from spring to fall.

23       And what struck me about that is, first of all, I have no

24  idea where that number came from, but it's being used to say,

25  well, if temperatures are less than that, things are probably

Menzie - Direct

1   like reference water bodies.  But, you know, as I've shown

2   already, reference water bodies are generally less than 20

3   degrees Centigrade, 10 degrees less than this number.

4   Q.    So to the extent this is a statement that the

5   non-reference data is not confounded by temperature, it's

6   based on a mischaracterization of what reference streams

7   actually show.  Is that a fair statement?

8   A.    Right.  I think -- I have no idea where that value came

9   from, but it would not be a value that would be reflective of

10   what a reference water body in headwaters would be in West

11   Virginia.

12   Q.    Is it your belief that temperatures have to reach a

13   lethal range to show a shift from sensitive to tolerant bugs,

14   or does the DEP database itself show that that occurs at

15   levels below those that would be deemed lethal to even

16   sensitive insects?

17   A.    Yeah.  The work that I've done, at least for West

18   Virginia waters, shows that those shifts are occurring.  And

19   based on my experience going back to the '70s to the present

20   on the effects of temperature, you don't have to kill things

21   to have them not be there.  Basically they -- so many things

22   are affected by temperature, including reproduction and

23   choice, you know, whether you want to be in that kind of water

24   or not, you know, such that you expect to see warm water

25   communities, cooler water communities, and that's a reflection

Menzie - Direct

1    of the temperature.  It doesn't have to kill them.

2    Q.    If we had not had the measured temperature at Stillhouse

3    over time, do you have some sense of what a single snapshot

4    might have revealed to us or not revealed to us about

5    Stillhouse, and do you have a demonstrative slide to show

6    that?

7    A.    I do, but I would also say that as an ecologist, I would

8    have been suspicious or expected -- expecting that temperature

9    could be important just by the physical layout of the system,

10   recognizing that the role of ponds have in warming waters.

11        So I would have already had a priori knowledge that

12   temperature is likely to be an important factor.

13   Q.    Right.  And I think the point of the demonstrative slide

14   is just to show what happens with snapshot data generally if

15   it's misused.

16   A.    Okay.

17   Q.    Go ahead.  Explain to us the first demonstrative exhibit

18   here, what it is.

19   A.    So this is a measurement that plaintiffs produced for

20   Stillhouse.

21   Q.    What does it show?

22   A.    It's a temperature of about 18 degrees Centigrade

23   collected on September 30th.  And it was the extent of

24   information that they had at the time about temperature.  But

25   as I've shown you from the data already, this tells you very

Menzie - Direct

1   little about Stillhouse.

2   Q.   All right.  Do you have another demonstrative slide?

3   A.   This is the temperature.  It's a little lower.  This is

4   the temperature in April from Stillhouse.  Those are two

5   different temperatures.  Had you only that one piece of

6   information, either the September 30th number or the 18

7   degrees or this number and you were asked to say something

8   about the role of temperature in Stillhouse, you really

9   wouldn't have much to say I don't think.

10  Q.   So do you have a slide that demonstrates that here?

11  A.   Yes.  So this is the temperature in Stillhouse.  And you

12  can see on here the one measurement that the plaintiffs'

13  expert made and concluded was normal and then a value from

14  April.

15       So you really can't say anything much about temperature

16  in a water body without understanding something like this or

17  at least having some a priori knowledge about how temperature

18  might be influenced by physical conditions.

19  Q.   Let's go to Joint Exhibit 74, if we could.

20       Doctor, we have Joint Exhibit 74 up on the screen.  Can

21  you tell us what this is or what it tells us in addition to

22  the information you've already imparted?

23  A.   This is a bit separate from what we've talked about, but

24  I was aware that the extirpation of sensitive benthic species

25  with regard to conductivity was occurring between low

Menzie - Direct

1   conductivities and 300.  So by the time you get to around 300,

2   whether you're looking at EPA or you're looking at, you know,

3   the work that Bernhardt et al. did, you've lost species and

4   genera.

5       So the question was, is that a range of conductivity

6   through which you might also be losing genera based on

7   temperature.  And that's what this exercise is.  So I looked

8   separately at June, July, and August for the West Virginia

9   headwater data and plotted the low conductivity water.  That's

10  basically all waters that are less than a hundred.

11  Q.   And that's in the aquamarine or blue?

12  A.   Those are in aquamarine.

13  Q.   Right.

14  A.   Conductivity waters between two -- let's see, 100 and 200

15  in yellow, and then conductivity waters being between 200 and

16  300.  And I plotted that for those three months.  And, again,

17  these are snapshot data that have been brought together to see

18  whether there's a pattern, whether there's a possibility that

19  as temperature would change through this regime along with

20  conductivity, you might have been -- that might have been

21  bringing about a shift in the animals, you were losing animals

22  that were restricted to cool water as you increase the

23  temperature and simultaneously the conductivity.  So both

24  those things were going on.

25      And what that shows is that those two things happen at

Menzie - Direct

1   the same time; and, again, that's not something that should be

2   surprising because both temperature and salts in the water are

3   responding to the change in the landscape.

4   Q.    So to summarize what you see is that as the conductivity

5   shifts from two to three hundred to the benchmark value,

6   you're also passing through your normal change zone from a

7   sensitive to a tolerant species?

8   A.    Correct.  You could be losing species here either due to

9   conductivity or due to temperature.

10  Q.    All right.  And, again, why do you choose the summer data

11  here?

12  A.    They provide us with a period of the year when conditions

13  might be most restrictive for the types of animals that can

14  live there.

15  Q.    Okay.  Were you here for Dr. Kuehn's -- or Carrie Kuehn's

16  direct examination?

17  A.    Yes.

18  Q.    Okay.  Did you hear her suggest that Dr. King, when he

19  tried to run a regression line, I think it was called, through

20  all of the temperature data in the DEP database, shouldn't

21  have truncated the data or cut it into just the summer months?

22  A.    Yeah.  I think we're addressing different types of

23  questions.

24  Q.    Explain that to me.

25  A.    So I'm looking at a period of the year where we can

Menzie - Direct

1    derive temperature data for the animals that might be

2    stressful to them, that might be restrictive.  We couldn't see

3    this in the spring or the fall because of the varying and

4    changing temperature.  But we can presume that it exists, you

5    know, in the summer.  And so I've chosen summer to kind of, in

6    my analysis, to kind of look at whether temperature and/or

7    conductivity might be affecting animals in the summer and that

8    they might be changing together in the summer.  So that is why

9    I chose summer to be the basis for examination.

10       If, on the other hand, you were looking at whether, over

11   the course of the year, whether conductivity is related to

12   temperature for a variety of factors, then the analysis that

13   EPA would -- did would be the proper analysis just to kind of

14   take a look at that.

15   Q.   Okay.  So is it fair to say what you did -- the EPA

16   database is a snapshot database that really doesn't tell you

17   much about individual sites.  Is that a fair statement?

18   A.   That's correct.

19   Q.   What you tried to do was to organize the data in

20   different ways to see if we could find some patterns in the

21   data that hadn't been examined by EPA.

22   A.   Right.  Don't rely on a single value.  Almost all of the

23   plots that I've seen are all snapshot data.  And given the

24   variability that there can be in temperature on any one day,

25   the value put on a figure could be 10 degrees different from

Menzie - Direct

1   that, as we've heard.

2       So looking at that snapshot data in a regression or a

3   correlation introduces an enormous amount of uncertainty so

4   that you really shouldn't, I don't think, rely upon that.

5       So what I did that's different than, you know, kind of

6   relying on the snapshot data directly as indicative of what is

7   there, is I kind of pool those data into bins so you can kind

8   of see these patterns without relying on any one value.

9   Q.   Did the DEP do this at all in its benchmark?

10  A.   No, but I've shared this information with them.   So --

11  Q.   Recently?

12  A.   Recently.

13  Q.   Now, without doing this kind of analysis, do you believe

14  that EPA properly discounted temperature as either a

15  confounding factor or a cause of WVSCI scores at locations

16  where temperature exceeds 21 or 22 C?

17  A.   I think they did improperly discount it.   I am guessing

18  from having, you know, worked with them a little bit before,

19  they may not have recognized it.   They just may not have seen

20  this or understood.

21  Q.   There's no evidence in the benchmark that anyone

22  organized or reviewed the data in this way, is there?

23  A.   No.

24  Q.   Based on your review of the temperatures and the animals

25  living as compiled in the DEP database, what would you expect

Menzie - Direct

1    the WVSCI -- to happen to WVSCI scores in Stillhouse with the

2    temperatures you saw in Joint Exhibit 77 I think it was?

3    A.    Well, they will be, you know, certainly lower.  They will

4    be lower.  And based on my examination of the conditions, you

5    know, temperature and others, I think that the probability is

6    that they would be below 68.

7    Q.    Okay.  Do you believe your analysis proves that

8    temperature is the sole cause of impairment at Stillhouse?

9    A.    No.

10   Q.    Okay.  What does it prove, then?

11   A.    What it shows is that temperature is playing a

12   potentially important role here.  My personal belief on all

13   this is that all of these are bundled together and so that --

14   and we can call that confounding.  So that things that are

15   being attributed to conductivity may be related to

16   temperature, that because of the uneven quality of the data,

17   these things can't easily be teased apart with what we have to

18   work with.

19        So for that reason, these can't serve as a proof.  All

20   that can be said is that, you know, the evidence is that based

21   on what I've demonstrated here and our a priori knowledge of

22   the importance of temperature, that temperature certainly

23   could be a factor that leads to lowered WVSCI scores

24   immediately below the pond.

25   Q.    Do you believe that the plaintiffs have adequately ruled

614

Menzie - Direct

1   out temperature as the causal factor for impairment in

2   Stillhouse?

3   A.   I don't think that -- personally I don't think that the

4   plaintiffs seriously have considered it, you know, as a causal

5   factor.

6   Q.   But based solely on the DEP database that would suggest

7   that there -- you would not expect there to be sensitive taxa

8   in Stillhouse based solely on the distribution of the insects

9   by temperature in the DEP database.

10  A.   That's correct.

11  Q.   Let's turn to habitat, if we could for a moment, then.

12  How is habitat accounted for in the DEP database used in the

13  benchmark?

14  A.   The DEP database relies on a number, a numerical value,

15  that's derived using something called the rapid bioassessment

16  protocol.

17  Q.   That's the RBP we've heard about before?

18  A.   Right.  Those are generally referred to as RBP scores.

19  Q.   Okay.  Can you tell us a little bit about the RBP and how

20  the number is derived?

21  A.   Well, the idea behind the RBP was to allow a biologist or

22  environmental, you know, technician basically to visit a

23  stream for the purpose of collecting bugs and make some

24  measurements, but also to observe what the conditions were

25  like at that stream that might be relevant to thinking about

Menzie - Direct

1    the habitat.

2        So these are things that can be easily seen, like what do

3    the banks look like, whether the substrate has some silt or

4    cover on it, whether there's vegetation next to the bank,

5    things that, you know, somebody can record easily in a book.

6    Q.   Is it a multi-metric scoring system, essentially?

7    A.   Well, what it is, is it's 10 separate types of

8    observations about the stream, sort of the physical features

9    of the stream, each of which is given a number from zero to

10   20.  And then the number itself, the RBP, is tabulated by

11   adding those 10 numbers together.

12   Q.   So it's an aggregate score of --

13   A.   It's an aggregate score.

14   Q.   -- 10 different metrics?

15   A.   Right.

16   Q.   Okay.  Does that suffer -- is that causing limitations in

17   the ability of the RBP to discern impacts on -- or to properly

18   characterize the potential impacts on macroinvertebrates?

19   A.   It is really a very rough measure.  It gives a sense of

20   the general quality of the habitat in the immediate area,

21   things that might be important to be aware of.  As an

22   ecologist, you would look at that and you'd say, you know,

23   well, we have vegetation, we don't have embeddedness, you

24   know, certain things that may be important, but there's a

25   couple of things about it that are limiting.

Menzie - Direct

1        One is that it's presuming that there's not other stuff

2    going on that could be important from a habitat point of view.

3    So it's restricted to a spot.  So you go to a spot or a short

4    stretch and you make some observations, but it's almost as if

5    you put blinders on with respect to anything else that's going

6    on.

7        So it's very useful I think for getting a gauge for the

8    general condition, but it's not diagnostic of habitat.

9    Q.   So it addresses a relatively short reach of the stream

10   and a relatively narrow width outside of the stream bank?

11   A.   That's correct.

12   Q.   Let's put up -- I think it's Defendant's 37, which is the

13   DEP assessment form for Stillhouse.

14       If you'd blow that up a little bit, Mr. Tyree.

15       I think we established yesterday, Dr. Menzie, this is

16   actually the RBP form that DEP used at one of its site

17   inspections at Stillhouse; is that correct?

18   A.   That's correct.

19   Q.   I just want to use an example.  I see the first criterion

20   is epifaunal substrate and available fish cover.  Do you see

21   that?

22   A.   Yes.

23   Q.   And then I think you said there's a scoring system under

24   there of zero to 20, I think; is that correct?

25   A.   Right, from -- to the right is the lower scores and to

Menzie - Direct

1    the left is the higher scores.

2    Q.   All right.  And then someone actually goes out in the

3    field and looks at the habitat and then rates it zero to 20;

4    is that correct?

5    A.   That's correct.

6    Q.   Is there a certain level of subjectivity in the rating?

7    A.   Obviously, since this is just personal observation.

8    There's no quantitative measurements really.

9    Q.   And then is it fair to say that what we end up with is an

10   aggregate score?  That is, each of these 10 criterion have a

11   score of zero to 20 or zero to some number, and then the total

12   number -- if you'd scroll down, Mr. Tyree -- is added up.  So

13   we have in this case a 94?

14   A.   That's correct.

15   Q.   So it's an aggregate score.  Does that pose any problems

16   in the use of the data to glean whether the score is

17   indicative of good or bad macroinvertebrate habitat?

18   A.   Well, I think the -- you know, obviously the lower the

19   score, low scores, you're moving in the direction of being

20   poor; and high scores, you're moving in the direction where

21   more things are better.  But the score itself can be a bit

22   unreliable for a variety of reasons.

23   Q.   Let's look at -- well, let's use an example.  Let's look

24   at -- scroll back down, Mr. Tyree, to criteria number two,

25   which I think is embeddedness.  What was the score in May of

618

Menzie - Direct

1    2012 that DEP gave for embeddedness?

2    A.    It received a 2.

3    Q.    Okay.  And notes that there are metal hydroxides in

4    places; is that correct?

5    A.    That's correct.

6    Q.    What type of impact can a high level of embeddedness or a

7    poor embeddedness score cause to macroinvertebrates?

8    A.    Well, this is something that would affect the habitat and

9    change it away from a reference water body.  So embeddedness

10   can close up basically the homes for certain types of

11   invertebrates by filling in the spaces in and around the

12   rocks.

13   Q.    Is it possible that with a low enough score in one of

14   these criterions, such as embeddedness, that you might have a

15   virtual elimination of the benthic community?

16   A.    Well, that's very possible, and certainly you would

17   eliminate all of the types of animals that would depend upon

18   living in and around and under rocks if you've closed it off.

19   Q.    So if I have a zero score in some of these criterion, I

20   may end up with a severely impaired stream.  Is that a fair

21   statement?

22   A.    Yes.

23   Q.    And then if I scroll down, like criterion number 7,

24   Mr. Tyree, I don't know if I can read that from here.

25         That's channel flow status?

Menzie - Direct

1    A.    Yes.

2    Q.    And I think it's described here as -- the description of

3    what it means is whether water reaches the banks, both banks

4    of the stream.

5    A.    Fills the banks.  And, you know, Stillhouse is basically

6    a discharge.  So the water is just flowing out, and the banks

7    are filled.

8    Q.    And with respect to channel flow status, this rater gave

9    the stream a fairly high score; is that correct?

10   A.    That's correct.

11   Q.    Now, you would add the 2 for embeddedness and the channel

12   flow 18 score to get the 20 for those two criterion.

13        Do you believe that the 18, the high score of the channel

14   flow status, raises or cancels out the impacts of a low

15   embeddedness score?

16   A.    No.  They really are independent of one other.

17   Q.    Okay.  So that's an example of how an aggregate score

18   here may not tell the whole story.  Is that fair?

19   A.    That's correct.

20             THE COURT:  Let's take a -- we'll take a ten-minute

21   recess.

22        You may step down.  Don't discuss your testimony.

23        (Recess from 2:46 p.m. to 3:05 p.m.)

24             THE COURT:  Doctor?

25        All right.  Go ahead.

Menzie - Direct

1    BY MR. MCLUSKY:

2    Q.    Dr. Menzie, you were talking about the RBP score and

3    Defendant's Exhibit 37, which is the May 2012 DEP RBP or site

4    evaluation for Stillhouse.  Do you recall that?

5    A.    Yes, I do.

6    Q.    Mr. Tyree, would you turn to page 1070 of Defendant's

7    Exhibit 37.

8         I think we established yesterday, Dr. Menzie -- do you

9    have a copy of that in front of you?

10   A.    I do.

11   Q.    -- that there's a -- on the DEP form, after the RBP score

12   of 94 DEP gave this, there are a couple of additional criteria

13   that DEP itself adds to the RBP form.  Is that a fair

14   statement?

15   A.    Yes.

16   Q.    Okay.  And one of those is macroinvertebrate habitat?

17   A.    Correct.

18   Q.    And DEP gave it what score here?

19   A.    A 2.

20   Q.    Okay.  Does that suggest to you the point you made

21   earlier is accurate, that you might have a high epifaunal

22   substrate or a high riffle pool score or high flow score, but

23   none of that will give you necessarily -- overcome a bad score

24   in other areas?  So you may have -- end up with a very low

25   macroinvertebrate score.

Menzie - Direct

1   A.   Yes, that's possible.  The DEP biologists in this case

2   basically render an opinion as indicated, you know, in this

3   particular score regarding habitat quality for the benthic

4   macroinvertebrates.

5   Q.   What was that opinion?

6   A.   It was poor.

7   Q.   Notwithstanding the limitations in the RBP that you've

8   talked about to discern impacts or to characterize an entire

9   stream, we have at least the May 2012 RBP score from DEP for

10  Stillhouse; is that correct?

11  A.   That's correct.

12  Q.   I think we established yesterday that that site is in the

13  lower reaches of Stillhouse; is that correct?

14  A.   That's correct.

15  Q.   Okay.  Are you aware of another RBP score that DEP has

16  from 2003?

17  A.   Yes.  West Virginia DEP visited the site in 2003,

18  calculated a score somewhere around 93, I think; 92, 93.

19  Q.   Did Exponent also -- do you recall anything else about

20  that site investigation from --

21  A.   Much of the same kind of reporting, a highly modified

22  substrate.  At the time, they were -- the DEP biologist that

23  was making a record of conditions noted a lot of deposits,

24  things being stirred up, which I believe they may have thought

25  were manganese precipitates.

1    Q.    Black deposits?

2    A.    Black materials.

3    Q.    Did Exponent, your company, conduct at least some site

4    investigation on Stillhouse?

5    A.    We did, and our two biologists were much the same in that

6    particular stretch of Stillhouse as reported out by the DEP.

7    Q.    Now, did your biologists look at the entire segment of

8    Stillhouse, the entire reach?

9    A.    No.  We were apparently -- and DEP too -- were looking

10   for a reach that was sort of representative of a stream reach

11   where you could do this kind of an assessment.  And both DEP

12   and our scientists went to the lower reach as being

13   representative of that.

14   Q.    Mr. Tyree, would you show Joint Exhibit 76 so we can just

15   confirm those locations.

16        Dr. Menzie, looking at Joint Exhibit 76 on the screen,

17   can you kind of tell us -- we probably already heard this

18   yesterday, but where you believe DEP conducted its RBP and

19   WVSCI scoring and where you looked?

20   A.    Your Honor, where you see the reach that refers to

21   Exponent, reach where Exponent conducted, sort of in the

22   bottom-most part of the slide, that would be the same stretch

23   where DEP went and did their investigation.  It's immediately

24   adjacent to the Twentymile, and there's a little culvert there

25   through which Stillhouses passes and then drops into

Menzie - Direct

1   Twentymile Creek.

2   Q.   Do you know -- and you heard Dr. Palmer's testimony, I

3   think yesterday, didn't you?

4   A.   Yes, I did.

5   Q.   Do you know where Dr. Swan did his site investigation?

6   A.   As I understand from that testimony, Dr. Swan worked the

7   stretch of stream that was immediately below the spillway.  So

8   you have this steep, wide spillway where the pond water is

9   coming down, and then there's a very small stretch of stream

10  between the base of that spillway and down to where that road

11  is and that first culvert.  It's in there that Dr. Swan made

12  his observations.

13  Q.   And that's shown by a little window saying Approximate

14  Area Where Swan Sampled --

15  A.   That's correct, yeah.

16  Q.   Have you or your people walked the entire length of

17  Stillhouse, though?

18  A.   Yes.

19  Q.   Do you know what RBP score Dr. Swan got when he did his

20  investigation upstream of the place both you and DEP

21  investigated?

22  A.   He got a 130.

23  Q.   And what does that tell you about the ability of the RBP

24  to characterize the entire stream, if it's an accurate score?

25  A.   Well, it shows that, from my point of view anyway, sort

Menzie - Direct

1    of by-the-numbers kind of scoring at a spot can give a number

2    like that that might not really reflect anything else that's

3    going on in the watershed.

4    Q.   And even if his RBP score was one we would all agree on,

5    is it fair to say that Stillhouse flows from wherever he

6    sampled into an area where both you -- that is, Exponent --

7    and DEP sampled and found much lower RBP scores?

8    A.   That's correct.

9    Q.   Do you recall any negative aspects of the Stillhouse

10   stream that were found by Dr. Swan?

11   A.   Dr. Swan found -- well, he found some positive things,

12   which is it continues to flow and fill the banks, which is,

13   basically, is a discharge.  So it gets high scores for that.

14   And then he found poor to marginal conditions for stream bank

15   stability and for the presence of vegetation along the edge of

16   the stream.

17   Q.   Okay.  And also notwithstanding the limitations of the

18   RBP, did you attempt to take the categories of the RBP -- that

19   is, the optimal, the marginal, whatever those ranges are --

20   and plot them over a range of conductivities to see what type

21   of patterns you could see in the DEP database?

22   A.   Yeah, I did that.  I did that analysis.

23   Q.   Okay.  Why don't you explain to us what you did.

24        And let's put up Joint Exhibit 75, if we could.

25   A.   Well, basically I did an analysis to help answer the

Menzie - Direct

1  question whether habitat made a difference regardless of

2  conductivity.  And so I looked at small streams, smaller

3  streams in the database.  These are ones that would be

4  basically no wider than 10 meters or 30 feet or so; so, you

5  know, thinking in terms of Stillhouse as a smaller stream.

6      And I extracted from the -- for all these small streams

7  the WVSCI scores and the characterization of the habitat as

8  provided by DEP.  And then what I did was for three sets of

9  data, the entire database that West Virginia has, the database

10  for the small streams in the middle, and then for the data

11  that Emily Bernhardt and co-workers utilized for their "How

12  Many Mountains" report, I looked at the comparison of WVSCI

13  scores for habitats that were marginal or poor, basically kind

14  of a degraded habitat by those metrics, as compared to optimal

15  habitat.

16      And what I wanted to do here was to see whether, if you

17  had an optimal habitat, whether that would give you basically

18  a higher, what we call maybe a passing WVSCI score, even if

19  you were exceeding the benchmark of 300, and whether you had

20  a -- if you had a marginal habitat, you would be below, even

21  if you were less than 300.  So that was the idea behind this

22  particular comparison.

23  Q.   And this is a little busy I know.  Do you have some

24  demonstrative exhibits to explain how you put this thing

25  together?

Menzie - Direct

1    A.    I do.

2    Q.    Okay.  Do you want us to walk through those?

3    A.    So, again, we have these three datasets.  The West

4    Virginia dataset is going to be in the left-most panel, all

5    the small streams in the West Virginia database in the middle

6    panel, and then the Bernhardt et al. data that, you know, King

7    and others have been co-authors of in the third panel.

8    Q.    All right.  And before we go on, now, all the records --

9    you didn't screen the DEP data for those sites that had

10   non-alkaline drainage, that is, acid mine drainage or a

11   chlorides-based discharge, did you?

12   A.    No.

13   Q.    Are there a lot of those in the database?

14   A.    There are just a few, relative to the entire database.

15   Q.    All right.  And you didn't screen those out of the less-

16   than-10-meter-wide stream category either?

17   A.    Right.

18   Q.    But to the extent they were screened, they -- you said

19   they were screened in "How Many Mountains."  They're screened

20   in your exhibit as well; is that correct?

21   A.    Right.  So the Bernhardt data on the far left would be

22   sort of exactly the same dataset, you know, with all the

23   screening that went into that, which is a lot more screening

24   than has gone into other datasets.

25   Q.    All right.  And so to make sure I'm clear on the record,

Menzie - Direct

1    the Bernhardt data is the data that was screened from the DEP

2    database to compile the paper "How Many Mountains Can We

3    Mine?"

4    A.    That's correct.

5    Q.    Okay.  All right.

6    A.    So the first thing, what this shows is if we just look at

7    optimal habitats and ask the question, if you have an optimal

8    habitat, what kind of WVSCI score can you expect?

9         And so plotted horizontally are the two bars that

10   represent numbers that have been talked about for judging

11   WVSCI scores.  So there's the 68.  That's a solid line.  And

12   there's a number that's a little above 60.  That's a dashed

13   line because --

14   Q.    That's the 60.6, the gray zone area we talked about?

15   A.    That's the gray zone that's sometimes referred to.  And

16   then what you're seeing here are all the WVSCI scores for

17   optimal habitats that fall into these particular categories.

18   And what you'll notice is that -- let me look at the screen

19   here.

20        For all these categories, the -- and, again, this is a

21   box and whisker plot.  So you've got the 50th percentile

22   with that horizontal bar in the middle of the box.  Then

23   you've got the lower 25th percentile at the bottom of the

24   box.  And the 75th percentile is at the top.  And then you've

25   got what look like little cross bars that come up and down

Menzie - Direct

1    there that are the ranges.

2         But the median values for all of these are greater than

3    68, you know, which indicates that greater than 50 percent of

4    the observations that have optimal habitat are going to have a

5    passing WVSCI score.  And that --

6              THE COURT:  I'm sorry to interrupt you, but I just

7    want to make sure I understand you before you get off of this.

8         So the green box, the top of the green box is the 75th

9    percentile, the bottom is the 25th.

10             THE WITNESS:  Right.

11             THE COURT:  The two vertical lines with the

12   horizontal endings represent the range.

13             THE WITNESS:  Exactly.

14             THE COURT:  Then what are all the little --

15             THE WITNESS:  Okay.

16             THE COURT:  Are those that somehow fell outside the

17   range?

18             THE WITNESS:  They are referred to as outlier

19   values.  They're sometimes -- in these programs, there are

20   data points that are, by the algorithm that's used to generate

21   it, are judged to be outliers.  And so they're kind of shown

22   as, you know, as points.

23   BY MR. MCLUSKY:

24   Q.   They're real data, though, are they not?

25   A.   Yes, they're real data.  Those are pure values there.

Menzie - Direct

1        THE COURT:  Just guessing, it looks like in the All

2   Records column that we're talking about, that there might be

3   15 to 20 of these so-called outliers.

4        THE WITNESS:  Sure.  That's right.

5        THE COURT:  I assume, then, they're characterized as

6   outliers because even if there are 20 of them, they are such a

7   small portion of the overall sample -- in this case, this

8   overall sample of optimal habitat sites -- that it would

9   somehow skew the range to include them?

10        THE WITNESS:  Well, it would definitely bring the

11   range down.  So, Your Honor, if you want to think about where

12   the range -- the absolute range is, you could drop that cross

13   bar down.  There's a couple of thousand values sort of in

14   there.  But, you know, that would be another way of thinking

15   about it.

16        THE COURT:  All right.  So basically the 20 are

17   considered such a small portion that you eliminate them from

18   what might be otherwise a misleading statement of the range of

19   value.

20        THE WITNESS:  That's one way to look at it.  It's

21   definitely a statistical representation; and as individuals,

22   we could say, well, I think those are important, and they can

23   get as low as that because we've seen evidence that it can get

24   as low as that, but the statistics of it in terms of the

25   population of the sample kind of use those as outliers either

Menzie - Direct

1  high or low.

2          THE COURT:  Here, I guess if it's about 2000 samples

3  and there are about 20 of these outliers, it's about

4  1 percent.

5          THE WITNESS:  Something like that.

6          THE COURT:  So this would be the bottom 1 percent of

7  the optimal habitat findings.

8          THE WITNESS:  That's correct.

9  BY MR. MCLUSKY:

10  Q.   Is there anything else to this slide, Dr. Menzie, or do

11  you want to move to the next one?

12  A.   Just generally, just to recap, I had, you know, looked at

13  this in terms of values, optimal values, if you have

14  conductivities greater than 300, but optimal habitat you have

15  a better than 50/50 if you're going to have a WVSCI score

16  that's greater than 68.  And then we can add in in comparison

17  the marginal and poor habitat.

18      If you've got that kind of habitat, obviously the WVSCI

19  scores go down.  That's obvious right away.  So at first

20  glance at this, you know, habitat makes a difference

21  obviously.  But what I was looking for here was to see

22  whether, if you in the face of having marginal or poor

23  habitat, if you were able to have areas that had

24  conductivities less than 300, which is the benchmark --

25  Q.   Right.

Menzie - Direct

1    A.   -- would you expect a WVSCI score to be elevated.   If the

2    conductivity was low but the habitat --

3    Q.   And remind me, the RBP scores that DEP got in the lower

4    end of Stillhouse were characterized as marginal?

5    A.   Marginal.

6    Q.   Okay.

7    A.   So what this tells us is that if we look at the Bernhardt

8    data, for example, if you've got a value that is less than 300

9    but you have marginal or poor habitat, you're more likely than

10   not to have a WVSCI score that's less than 68 rather than

11   greater than 68.

12       So I felt it was important, rather than to speculate

13   about that, to kind of look at the database and see what it

14   tells us if we're thinking about the possible role of habitat

15   in influencing WVSCI at Stillhouse.   And you see that for the

16   small stream dataset in the middle.   And, of course, you see

17   that for the complete dataset on the far left.

18   Q.   Generally you see the same pattern across all three

19   datasets?

20   A.   Yes, same pattern.

21   Q.   A couple of questions.   Again, Stillhouse in the section

22   that your people looked at and DEP evaluated had a marginal

23   score, which is reflected -- is lumped in with the poor on

24   your blue box; is that correct?

25   A.   That's correct.

Menzie - Direct

1    Q.    Are there many poor scores in the database?

2    A.    No.   Looked at these with and without poor scores.

3    There's very few.

4    Q.    If you pulled the poor out and just put the marginal in,

5    does it substantially influence the location of the blue bars?

6    A.    No.   It will look like this.

7    Q.    And then Dr. Swan's score of 130, as I recall, puts it

8    into the suboptimal category, which is between optimal and

9    marginal; is that correct?

10   A.    That is correct.

11   Q.    And you didn't plot the suboptimal data on Joint Exhibit

12   75.

13   A.    No, I didn't.

14   Q.    Because you were plotting the score of the site that was

15   actually measured by DEP and examined by your folks; is that

16   correct?

17   A.    That's what I knew at the time I -- you know, basically

18   as I went into this, correct.

19   Q.    All right.   Now, if you were to take the suboptimal data

20   and either put them into the optimal category or even the

21   lower blue bar -- if you put them in the green bar instead of

22   the optimal category, what effect would have that on the

23   chart?   Do you know?

24   A.    Well, it moves these around.   If you want to treat one

25   category as if it was the other, it will move things up and

Menzie - Direct

1   down.  I chose not to do that for two reasons.  One was that,

2   you know, I knew the stream could really be marginal.  I knew

3   that there were a lot of other conditions, you know, in the

4   watershed around the stream that influenced it, so that I

5   felt, you know, marginal was very representative for

6   Stillhouse.  But also the purpose of this was to really point

7   out that habitat can make a difference.

8       And I had done a close examination of the RBP scores and

9   came to know that there's literally dozens, if not hundreds,

10  of ways of producing the same score, so that the score itself

11  begins to lose meaning.  And what I wanted to show here was

12  that if you have a lot of things that are going well for you

13  in the habitat and a number of things that are not going so

14  well for you in the habitat, does that make a difference?

15      So we don't really know for the area that Swan looked at

16  what might be the most important thing that might be affecting

17  benthic invertebrates.  We have a number of things on the

18  table.  So in the face of that, I did a comparison like that

19  to see whether -- just to answer the question whether habitat

20  makes a difference.

21  Q.   Okay.  And, again, what we see then on Exhibit 75 is that

22  across all of the three different categories of data here, if

23  you were to reduce conductivity to 300, at least the database

24  would suggest that you still would not achieve a passing WVSCI

25  score if you are in a marginal habitat; is that correct?

Menzie - Direct

1    A.   You definitely cannot conclude that that would occur.   It

2    doesn't mean that it's impossible, but you shouldn't have an

3    opinion that that's what's going to occur, or an expectation.

4    Q.   We started off with a short discussion of how much is

5    Stillhouse like a reference stream, and I think you said not

6    much.

7         Let's -- Mr. Tyree, if you could put Joint Exhibit 37

8    back up.

9         Let's go to the first page of that, which I think is page

10   1064.   That's the drawing.   Let's blow that up if we can.

11        And there was a little confusion I think at the end of

12   some of the testimony yesterday, but I'll see if I can't

13   clarify this.

14        Looking at the drawing, Twentymile Creek is somewhere off

15   to the left but off of this drawing.   Is that a fair

16   statement?

17   A.   That is correct.

18   Q.   And at its terminus, as you said earlier, Stillhouse

19   falls through a culvert into Twentymile Creek; is that

20   correct?

21   A.   That's right.   I waded that area.   And when you walk down

22   Stillhouse, you have to, like, slide over a bank and drop down

23   into Twentymile.   And then as you walk in Twentymile, which

24   maybe is a foot or so deep there, you come to this culvert,

25   which is basically what Stillhouse flows into, flows through,

Menzie - Direct

1   and then it drops -- the water drops into Twentymile.  So the

2   whole system is basically engineered.

3   Q.   That's off of the drawing before you.

4   A.   Well, that would be off to the left.

5   Q.   Right.  So we're moving upstream as we move from left to

6   right.

7   A.   Yes.  Yes, that's correct.

8   Q.   And that's denoted -- I think if you look on the left,

9   you'll see a "DS," which I presume means downstream.

10       Do you see that along the left margin, midway?

11  A.   Right.

12  Q.   Then on the far right of the paper, you'll see a "US,"

13  which I assume means upstream.

14  A.   That's correct.

15  Q.   And the ponds that we see pictures of below the valley

16  fill would be off this picture to the right.

17  A.   They would be off to our right.

18  Q.   Okay.  And then as we walk through at least this part

19  shown on Exhibit 37 of Stillhouse, starting on the left we see

20  a culvert -- road and then a culvert.  We see a steep eroding

21  bank.  Is that fair?

22  A.   Yes.

23  Q.   Okay.  What effect does that have, if any, on the habitat

24  for macroinvertebrates in the stream?

25  A.   Well, it tells us a couple of things.  One is that, you

Menzie - Direct

 1   know, there have been events that have sort of been sufficient

 2   enough to kind of erode and work into this bank, but also the

 3   soil that was part of that bank probably is, you know,

 4   depositing into the creek.

 5   Q.   And we have erosion on the other side of the creek as we

 6   go upstream next to old stump.  Do you see that?

 7   A.   Yes.

 8   Q.   And then coming further upstream, we have another

 9   undercut bank and a culvert and then, it appears, railroad

10   tracks; is that correct?

11   A.   That's correct.

12   Q.   And then we go through another -- you see power lines,

13   another road and culvert, and then eventually we come up to

14   the flume we saw yesterday?

15   A.   Yeah.  I don't think the flume is on --

16   Q.   Right.

17   A.   -- this particular map.

18   Q.   Right.  Describe the water coming off that flume that you

19   saw.

20   A.   Well, it's kind of like a raceway.  So you have water

21   that tops over the pond and flows rapidly down the flume, and

22   the flume is concrete so that it, you know, transmits that

23   water into the rest of Stillhouse.

24   Q.   Let's go to page 1066, if we could, Mr. Tyree.

25        I think we went through with Dr. Palmer yesterday there

Menzie - Direct

1   is in the top box here a -- where it says Rate Sediment

2   Deposits, do you see that box?

3        May I approach, Your Honor?

4            THE COURT:   You may.

5            THE WITNESS:   Yeah, I see that.

6   BY MR. MCLUSKY:

7   Q.   And on this form next to that, there's a rating system of

8   zero to 4, from none to extreme, for sediment; is that

9   correct?

10  A.   Yes.

11  Q.   And then there is also a 4 to the next of that which

12  presumably describes the nature of that sediment.  Do you see

13  that?

14  A.   Yes, I do.

15  Q.   What does it say?

16  A.   Manganese, black hydroxide.

17  Q.   Okay.  So do you read this to say that the sediment

18  that's present is dirt or that it's manganese hydroxide type

19  of materials?

20  A.   Well, there are -- you know, in terms of the sediment

21  that -- this deposited sediment that the DEP saw down there,

22  they're characterizing it as manganese hydroxide.

23  Q.   I'm sure the plaintiffs will ask you this, but manganese

24  hydroxide you would not expect in a reference stream, would

25  you?

Menzie - Direct

1    A.    No.

2    Q.    Okay.    Manganese hydroxide is a product of what, if you

3    know?

4    A.    This particular mine during its operation, and I guess

5    through 2012 anyway, has a requirement to treat for manganese

6    when manganese is evaluated, and they have various treatments,

7    and those treatments contain -- create -- can create a

8    precipitate.    And that precipitate, while mostly is supposed

9    to settle in a pond, some of it can be carried over and become

10   deposited.

11   Q.    And that resulted in the conditions DEP found in 2012.

12   Is that fair?

13   A.    That's fair.

14   Q.    And were those conditions noted also in 2003, I think, as

15   well?    Is that correct?

16   A.    Right.    That's been -- during the operation, yeah.

17   Q.    All right.    Are the types of the severe deposits of

18   manganese hydroxide, are those the kind of things that could

19   cause an impaired WVSCI score?

20   A.    Certainly.

21   Q.    Did Drs. Palmer or Swan or King ever visit this part of

22   the stream?

23   A.    In re-reading Dr. Swan's, he may have walked along a

24   little bit.    It says he was, like, looking around for where he

25   could sample.    So he might have looked at this a little bit,

Menzie - Direct

1   but otherwise, no.  I know that Dr. Palmer visited the place

2   where Drs. Swan and Hansen were sampling, but Dr. King did not

3   visit the site.

4   Q.   So their conclusions were reached without ever seeing the

5   area that DEP actually evaluated in its TMDL assessment; is

6   that correct?

7   A.   I don't think any of them, including Dr. Swan, went into

8   the water here.

9   Q.   Okay.  Is it conductivity that precipitates out of the

10  water column or is it a particular substance that precipitates

11  out of it?

12  A.   It's a substance.

13  Q.   Okay.  Do you believe that an adequate specific causal

14  assessment could be done without visiting the area that DEP

15  actually assessed here?

16  A.   No.  I think you would have to do the work necessary, you

17  know, including visiting, seeing, measuring, to do a proper

18  causal assessment.

19  Q.   Okay.  I want to go back and clean up a few things I may

20  have missed.

21       Pond 2014 -- and I may be confused on my Pond articles,

22  there have been so many; but one of them that we confirmed, he

23  had temperature data, but it was only from April at a number

24  of sites, but it was all the same month.  Is that a fair

25  characterization?

Menzie - Direct

1    A.   I think that's correct.  I think any of these references

2    to not seeing differences with temperature and referring to

3    Pond are incorrect in terms of making an assessment because

4    Pond only sampled and did these kinds of comparisons based on

5    April and/or May, somewhere in there.

6    Q.   And in the 2004 Pond article that was testified to

7    yesterday, I believe we confirmed -- I think it was table 4 --

8    that there was a relatively high correlation between the

9    percent forest and changes in benthic macroinvertebrates.  Is

10   that fair?

11   A.   That's correct.

12   Q.   And that the unmined sites had a higher percent of forest

13   than the mined sites.  Is that fair as well?

14   A.   That's one of the most distinctive differences between

15   mined and unmined sites.

16   Q.   How did Pond account for the differences between the

17   mined and the unmined sites in terms of the percent forest and

18   the potential -- its correlation with macroinvertebrate

19   scores?

20   A.   Well, he recognized that it existed, that it was an

21   important factor, but then he stepped away from that and

22   looked only at the mined sites.

23   Q.   So he looked, in terms of trying to discriminate on

24   landscape effects on insects, he tried to discriminate between

25   the mined sites but not between the mined and the unmined

Menzie - Direct

1   sites.  Is that fair?

2   A.   That's correct.

3   Q.   There's been talk about multiple lines of evidence.

4   Don't the benchmark and the "How Many Mountains Can We Mine"

5   articles rely on subsets of the same database?

6   A.   Those two pieces of work rely on the West Virginia

7   database that we've discussed so far.  So they're largely

8   based on that.

9   Q.   And I think we established yesterday, reading various

10  abstracts into the record, that none of the Pond articles that

11  I recall make the claim that conductivity is causing any

12  particular effect.

13           MR. LOVETT:  Objection, Your Honor.  This is not in

14  his report, and it's not cited -- these articles are not cited

15  in his report as articles he relied upon.

16           MR. MCLUSKY:  Well, there was testimony about it

17  yesterday, and much of this came up in their rebuttal reports

18  that we had never -- that Dr. Menzie never had an opportunity

19  to respond to.  They chose --

20           MR. LOVETT:  It's not in our rebuttal reports.

21           THE COURT:  Wait a minute.  Finish your statement.

22           MR. MCLUSKY:  Much of this I believe was listed in

23  the rebuttal reports.  You may recall that I raised there are

24  11 listed in the initial report.  Mr. Lovett's response was

25  much of it is in the rebuttal report.  We did not object to

Menzie - Direct

1    letting them put a rebuttal case on as part of their case in

2    chief, but we have, I think, a right to respond to it.

3           MR. LOVETT:  If he can point to the rebuttal report

4    that we have citing the article that he is now relying on,

5    that would be something that may be admissible.

6           THE COURT:  Well --

7           MR. LOVETT:  But, honestly, this is not something

8    that this expert, we had any notice that he was ever going to

9    testify about.  It is not -- we didn't have the opportunity to

10   examine him in deposition about it.  It was not relied on by

11   him.  It's not listed in his references, and it wasn't part of

12   his report.

13          MR. MCLUSKY:  May I respond here?  The Pond 2014

14   article was the one just revealed.

15          MR. LOVETT:  I agree about the '14.  I'm not

16   objecting about the '14.  You have the right to ask questions

17   about that.  But all the other Pond article, the only one

18   that's cited in his report is Pond 2008.

19          MR. MCLUSKY:  I'm finished along these lines, Your

20   Honor.

21          THE COURT:  You're finished?  Move on, then.

22          MR. MCLUSKY:  Mr. Tyree, could up put up -- I think

23   we have a slide with Joint Exhibit 75 and 77 next to each

24   other.

25

Menzie - Direct

1    BY MR. MCLUSKY:

2    Q.    Dr. Menzie, I've got up on the screen Joint Exhibit 75,

3    which I believe is the review of the effect of habitat and

4    suggests, at least in the data you looked at, that even with a

5    low conductivity below 300 at a marginal site, the data

6    suggests you would not get a passing WVSCI score; is that

7    correct?

8    A.    That's correct.

9    Q.    And that's the category into which Stillhouse fits in the

10   area that you and DEP looked at; is that correct?

11   A.    That's right.

12   Q.    And then on the right, we have the information about the

13   temperature divided in the DEP database by conductivity; is

14   that right?

15   A.    That's right.

16   Q.    And then we also have laid on that the Stillhouse

17   temperature data; is that correct?

18   A.    That is correct.

19   Q.    And those data also suggest that with the temperatures at

20   Stillhouse, the animals that you would expect to find at

21   Stillhouse based solely on their distribution in the DEP

22   database would be animals that are tolerant and not sensitive

23   and could well or likely fail a WVSCI test; is that correct?

24   A.    That's correct.

25   Q.    Now, when you take those two together, do you believe

Menzie - Direct

1    that the plaintiffs have adequately determined that

2    Stillhouse's impairment there has been caused by conductivity

3    and not these other factors?

4    A.    As I understand the testimony of plaintiffs' experts, it

5    is conductivity is the primary cause, I think is what I've

6    heard, and that these things don't matter.  And I -- my

7    opinion differs with that because not only do we have marginal

8    habitat, but we have elevated temperature, and there may be

9    other aspects of the watershed that are modified.

10        I work in the field very much of cumulative risk

11   assessment, thinking of multiple stressors, and these things

12   don't act independently.  They kind of combine together to

13   kind of influence the nature of the organisms that are there,

14   the community.  And when I look at data like this where you've

15   got elevated temperature, which happens because, naturally,

16   the pond is there and it gets warm, and you've got marginal

17   habitat, both of which we know will influence WVSCI scores in

18   the community structure; when you have both of those together,

19   I'm pretty certain that they will influence and control the

20   WVSCI scores in Stillhouse.

21   Q.    And at least according to the way the animals are

22   distributed in the DEP database, you would not expect a

23   passing WVSCI score at the site based on the temperature and

24   habitat.  Is that fair?

25   A.    Based on the work that I've done so far in looking at

Menzie - Direct

1   that database, that would be my expectation; I would not have

2   an expectation of a passing WVSCI score.

3   Q.   Even if the conductivity --

4   A.   Even if the conductivity was brought down.

5   Q.   And I think you also have said earlier that you believe

6   these same types of factors were not adequately accounted for

7   in the benchmark for the reasons you testified before, right?

8   A.   That's correct.

9                MR. MCLUSKY:  May I have just a moment, Your Honor?

10               THE COURT:  You may.

11               THE WITNESS:  Your Honor, may I ask for a short side

12   break?

13               THE COURT:  I think he's about to finish.

14               THE WITNESS:  Okay.  Good.

15               THE COURT:  Are you about to finish?  The witness

16   would like a break.

17               MR. MCLUSKY:  Oh, yeah.  I have one clarifying

18   question.

19               THE COURT:  Go ahead and then we'll take a break.

20   BY MR. MCLUSKY:

21   Q.   I was informed, Dr. Menzie, that one of us -- and

22   probably me -- used the "mean" rather than "median."  Is it

23   fair that the horizontal lines in your box and whisker plots

24   represent a median value rather than a mean value?

25   A.   They do represent a median value.

Menzie - Direct

1    Q.    Median?

2    A.    Median.

3            MR. MCLUSKY:  Okay.  Thank you.

4            THE COURT:  All right.  Let's take a ten-minute

5    recess.  You may step down.

6        (Recess from 3:42 p.m. to 3:52 p.m.)

7            THE COURT:  All right.

8            MR. MCLUSKY:  Your Honor, I did not want to wait

9    until the end of trial because I'd never find my notes again.

10   So I just wanted to, if I could, move the exhibits that I

11   used.

12           THE COURT:  Okay.

13           MR. MCLUSKY:  And they would be Joint Exhibits 68,

14   70, 71 and 72, 73, 74, 75, 76 and 77, and Defendant's 6, which

15   is the appendix E to Menzie's report, and then 37, which may

16   already have been -- Defendant's 37 may have already been

17   admitted.  That's the DEP inspection sheet.

18           THE COURT:  All right.  Any objection?

19           MR. BECHER:  No objection, Your Honor.

20           THE COURT:  They're each admitted.

21           MR. BECHER:  I've been asked to introduce the

22   introduction of plaintiffs' exhibits from Dr. King.

23           THE COURT:  All right.

24           MR. BECHER:  These are all reports in plaintiffs'

25   exhibits.  They are studies that were read into evidence that

```
 1    fall under learned treatises.  So as we agreed, we're only
 2    introducing the portions that were actually read and provide
 3    copies to the court reporter of those sections.  But those are
 4    Plaintiff's Exhibits 2, 5, 8, 10, and 12.
 5             THE CLERK:  I lost you.
 6             THE COURT:  2, 5, 8, 12.
 7             MR. BECHER:  2, 5, 8, 10, and 12.
 8             THE COURT:  Any objection?
 9             MR. HARVEY:  Not as long as it's subject to the
10    earlier understanding, Your Honor.
11             THE COURT:  And that is that they're just excerpts
12    of learned treatises?
13             MR. HARVEY:  For the court reporter's purposes.
14    And, Your Honor, as long as I'm on my feet, we would like to
15    also admit Defendant's Exhibit 1 from --
16             THE COURT:  CV?
17             MR. HARVEY:  CV from Miss Kuehn.  I'm sorry.  It was
18    the diagram from Miss Kuehn's testimony, the C, the E, and
19    the Y.
20             THE COURT:  Any objection to --
21             MR. BECHER:  Just to clarify, there were a couple of
22    triangles.  Some were demonstrative exhibits and some were --
23    one was from her report.  We're only talking about the one
24    from her report?
25             MR. HARVEY:  Yes.
```

Menzie - Cross

1    MR. BECHER:  No objection.

2    THE COURT:  All right.  It's admitted.

3    All right.

4                    CROSS EXAMINATION

5    BY MR. LOVETT:

6    Q.   Good afternoon, Dr. Menzie.

7    A.   Good afternoon.

8    Q.   You were testifying about the RBP, I think, that DEP took

9    and that Dr. Swan took.  Do you remember that?

10   A.   Yes.

11   Q.   Now, Dr. Swan did his RBP on Stillhouse, just in a

12   different spot from the DEP, right?

13   A.   Correct.

14   Q.   I think he did it upstream closer to the pond and to the

15   mine, right?

16   A.   Yes.

17   Q.   You're not saying, are you, that that portion of the

18   stream doesn't comply with what Dr. Swan found, are you?

19   A.   Can you --

20   Q.   The portion of the stream that Dr. Swan performed the RBP

21   on, you're not testifying that his RBP is not accurate for

22   that portion of the stream, are you?

23   A.   I'm not second-guessing him.

24   Q.   You didn't perform an RBP yourself, correct?

25   A.   Yes; I did not.

Menzie - Cross

1   Q.   Did somebody from Exponent or somebody from your shop

2   perform an actual RBP?

3   A.   Yes.

4   Q.   Okay.  And what was the score?

5   A.   Well, what they reported out was something in the

6   neighborhood of either 100 and/or 72.  There were two values.

7   Q.   Okay.  You didn't bring that for testimony today?

8   A.   No.

9   Q.   It's not introduced into evidence, is it?

10  A.   No.

11  Q.   All right.  Now, you say you had published approximately

12  50 papers in peer-reviewed journals over your career?

13  A.   I think so.

14  Q.   And do you find the peer-review process to be a rigorous

15  method for validating scientific theories?

16  A.   It is the process that we have, yes, and it should work

17  well.

18  Q.   Okay.  In this case, the published data and the published

19  theories regarding that data are very consistent, aren't they?

20  A.   Can you be more explicit about that?

21  Q.   Well, they all reach the conclusion that large-scale

22  surface mining in Central Appalachia is raising conductivity

23  significantly, don't they?

24  A.   That would be the Bernhardt papers and the Pond papers,

25  yes.

Menzie - Cross

1   Q.   Okay.   There's no dispute about that in the published

2   literature, right?

3   A.   That's correct.

4   Q.   And you don't disagree with that either, do you?

5   A.   No.

6   Q.   Okay.   So you agree with all those papers that say that

7   conductivity is being raised because of surface mining in this

8   region.

9   A.   That's correct.

10   Q.   And those papers also show that WVSCI scores below

11   surface mines are, for want of a better word, very poor,

12   aren't they?

13   A.   There's different kind of scales for WVSCI scores.   So do

14   you have a number?

15   Q.   Many of them are below 68, aren't they?

16   A.   Yeah, below 68.

17   Q.   Most of them, right?

18   A.   I don't have that in my head, but, yes, many.

19   Q.   How many have you looked at?

20   A.   I've looked at the database, but what I'm telling you is

21   that I don't have a numerical value of percentage.

22   Q.   But it's true, isn't it, that many more than 50 percent

23   are below the 68?

24   A.   I don't have a percentage.

25   Q.   And you don't disagree, do you, that the impairment below

Menzie - Cross

 1    large-scale surface mines is being caused by the mining?

 2    A.    I think mining is a contributor to lowering WVSCI scores

 3    in terms of modifying the streams.

 4    Q.    At Stillhouse you agree, don't you, that mining is the

 5    only reason that the WVSCI score is so low?

 6    A.    I think that's correct.

 7    Q.    And it's Fola's mine that is the reason for that,

 8    correct?

 9    A.    Yes.

10    Q.    And you agree that the conductivity there is elevated

11    usually over 3000, correct?

12    A.    Yes.

13    Q.    You agree that the sulfates there are over 2000, don't

14    you --

15    A.    Yes.

16    Q.    -- for the most part?  And you agree that it's an

17    impaired stream.

18    A.    Yes.

19    Q.    And that it's impaired because of mining.

20    A.    Yes.

21    Q.    You just don't agree that the plaintiffs have shown that

22    it's the conductivity and its associated ions that have caused

23    that impairment, right?

24    A.    That's correct.

25    Q.    You don't have an opinion, though, do you, that the

Menzie - Cross

1   temperature is the cause of that impairment?

2   A.   That's correct.

3   Q.   You don't have an opinion that it is the habitat that's

4   causing it, right?

5   A.   That's correct.  I think all of these things contribute.

6   Q.   Right.  You think that -- and in your previous testimony,

7   I think you said that when conductivity reaches the level of

8   2000, that you expect that to have a significant impact on an

9   aquatic ecosystem in this region; is that right?

10  A.   I don't think I said that.

11  Q.   What did you say?

12  A.   I think at a level of about 2000 is when you would begin

13  to think about conductivity as having an effect upon biota.

14  Q.   You wouldn't think about it before then?

15  A.   With respect to my testimony at that time?  That's what I

16  said, and I was referring to the studies that had been present

17  at the time, and I was talking not about WVSCI scores or

18  stream conditions but when you might see effects.

19  Q.   At what point now would you think about conductivity as a

20  potential concern for impairment below valley fills?

21  A.   I still have the same opinion.

22  Q.   So in this case where you have a habitat score of either

23  suboptimal or -- by our account, or marginal by your

24  account --

25  A.   Yes.

Menzie - Cross

1   Q.   -- and you have sulfates at 2000 and conductivity at 3000

2   and the temperature -- high temperature, the highest

3   temperature point at approximately 24 degrees C, do you think

4   it's a combination of those factors together that contribute

5   to the impairment?

6   A.   I think all of those factors, you know, may be involved.

7   Q.   Okay.

8   A.   But we haven't determined what their relative importance

9   are.

10  Q.   Okay.  How many times have you been -- how many times

11  have you been hired as an expert witness in a civil action?

12  A.   You'll have to give me a little bit more definition on

13  that.

14  Q.   A civil case, a case where one party is suing or thinking

15  about suing another.

16  A.   If that -- could that involve two companies suing one

17  another?

18  Q.   Absolutely.  Any two entities, one of which may sue the

19  other.

20  A.   Perhaps a dozen.

21  Q.   A dozen?  Okay.  And how many times have you testified in

22  court, except for your testimony in -- before this court?

23  A.   Maybe four or five times.

24  Q.   Okay.  Now, you said that you were asked to review the

25  benchmark by, I think you said, an organization called Versar;

Menzie - Cross

1    is that right?

2    A.    That's right.

3    Q.    And I think you described them as peer reviewers for EPA?

4    A.    They're a company that has a contract with EPA to obtain

5    and coordinate peer review.

6    Q.    Okay.  And when you reviewed the benchmark, you didn't

7    have any problems with it, right?

8    A.    Well, I think I have relayed my comments on it, which

9    were that the general methodology seemed to be sound and that

10   I had some reservations and concerns about the misuse of the

11   numbers that were coming out of it.

12   Q.    But you didn't express those reservations, or did you, to

13   the -- well, did you express those reservations to the EPA at

14   the time of the review of the benchmark?

15   A.    I believe so.

16   Q.    Okay.  And what did EPA do when it -- did you ever --

17   were you ever able to locate your comments to EPA?

18   A.    No, I haven't been.

19   Q.    Okay.  Did you get a response from EPA?

20   A.    No.

21   Q.    And tell me, as best as you can remember, exactly what

22   you told EPA about the benchmark after your review.

23   A.    Those are the two things that I recall.

24   Q.    Did you do that in writing or orally --

25   A.    In writing.

Menzie - Cross

1    Q.    -- if you remember?

2    A.    In writing.

3    Q.    Now, when did you first acquire the DEP database and

4    start to analyze it?

5    A.    I think I was seeing pieces of it when I first became

6    engaged in work on this subject.  So it would have been in the

7    first -- in the *Reylas* case is when I might have first been

8    aware of it and what the data were in it, but -- and I may

9    have had, you know, some of that available to me at that time.

10   Q.    But you never expressed serious concern about those data

11   until your report in this case; is that true?

12   A.    I was aware that -- in the *Elk Run* case, I had begun

13   looking at it in connection with that case, but I had not gone

14   far enough into reviewing it to share with the Court at that

15   time.

16   Q.    But in the *Reylas* case and in the *Elk Run* case, you

17   rendered an opinion that there were factors other than

18   conductivity causing the impairment, right?

19   A.    That's correct.

20   Q.    So that opinion was not formed originally based on your

21   review of the DEP data, correct?

22   A.    It wasn't reliant upon that, no.

23   Q.    Okay.  You've read the benchmark pretty carefully by now

24   I imagine.

25   A.    Yes, I have.

Menzie - Cross

1   Q.   More than once, right?

2   A.   Yes.

3   Q.   Okay.   And what is the purpose of the benchmark

4   document?

5   A.   The benchmark document, I would say it has two purposes.

6   Q.   Okay.

7   A.   One is to provide a benchmark, which is expressed in

8   terms of conductivity that could be used to judge when

9   conductivity of this nature in waters might be potentially

10   problematic, and I think the other part of it would be to

11   present a case that there's -- that conductivity is playing a

12   role.

13   Q.   When you say it's problematic and it's playing a role, do

14   you think that it was derived to show the level at which

15   conductivity causes impairment as measured by WVSCI and/or

16   GLIMPSS or some metric like that?

17        MR. MCLUSKY:   Your Honor, I object.   He's asking him

18   to characterize the benchmark.   The benchmark says what it

19   says.

20        MR. LOVETT:   I'm testing his knowledge of the

21   benchmark.

22        THE COURT:   Overruled.   It's cross-examination.

23        THE WITNESS:   The benchmark -- it may have been

24   generated by that, stimulated by that, but the benchmark

25   itself is an exercise of looking at genera that are extirpated

Menzie - Cross

1   at increasing levels of conductivity.  So the exercise really

2   is a species or genus sensitivity distribution.  That's how

3   it's constructed.  It has nothing to do with informing us

4   about GLIMPSS or WVSCI in terms of the benchmark value.

5   BY MR. LOVETT:

6   Q.   So how was the benchmark value derived?

7   A.   As I just described, from a species sensitivity

8   distribution.

9   Q.   Explain that.

10  A.   Okay.  Basically a species sensitivity distribution, or

11  in this case a genus sensitivity distribution, is derived by

12  examining the available data and identifying at what

13  concentrations of something -- it could be anything -- the

14  species are either harmed or not harmed or presumed to be

15  harmed or not harmed by that type of material.

16       So in the case of the benchmark, the presumption is that

17  it's conductivity; and the way it works is that a list is made

18  of the animals, and a statistical analysis is made of where

19  they're present or absent at different levels of conductivity.

20  And then a line is drawn at a particular percentile to say

21  that at this percentile, we're going to say that this is the

22  benchmark value.

23  Q.   Okay.  Now, you criticized the DEP database as containing

24  snapshot data, especially for temperature, I think.  Is that

25  fair?

Menzie - Cross

1    A.    I don't really criticize the database because I -- you

2    know, the purpose of the database was not to be doing this

3    kind of exercise, but I criticized the use of the database for

4    this purpose.

5    Q.    Okay.   And the use by EPA and others who use it for that

6    purpose.

7    A.    Especially with respect to believing that they have dealt

8    adequately with understanding what else might be affecting the

9    communities.

10   Q.    How many temperature points are there in the DEP database

11   that you reviewed?

12   A.    Thousands.

13   Q.    Thousands.   So within that database are more than 3000?

14   A.    At least.

15   Q.    At least 3000 or more data points for temperature,

16   correct?

17   A.    Right.

18   Q.    And when you take all those together, those snapshots add

19   up to a full picture, don't they?

20   A.    Well, as I said earlier, it's a little bit like taking

21   frames from thousands of movies and trying to create a single

22   movie from it; and if you think that that frame tells you what

23   the movie is about, then you're misled.

24   Q.    If you can put them in order, then you can flip through

25   and get a fair picture of the situation, like a movie, can't

Menzie - Cross

1  you?

2  A.    That's what I've done.

3  Q.    Okay.  And that's what you've done.  You've taken those

4  snapshots, put them in order, and created a film rather

5  than -- or a movie rather than a --

6  A.    A black and white --

7  Q.    -- series of snapshots.

8  A.    A fuzzy movie, that's correct.

9  Q.    Fair enough.  One of those old flip-card things.

10  A.    That's the best that can be done with that data.

11  Q.    Okay.  So that's how working with -- that's how one would

12  effectively work, and you did work with a whole lot of

13  snapshot data, right?

14  A.    I worked with it, yeah.

15  Q.    And that's what EPA and King and Bernhardt et al. did

16  too, isn't it?

17  A.    Well, EPA made use of the temperature data; Bernhardt

18  et al. did not.  And EPA did not treat the data the way I just

19  described.  They left it as a series of frames on the floor.

20  Q.    Do you have the joint exhibit book before you?  You

21  probably do somewhere.

22  A.    I have Joint Exhibits 1 through 58.

23  Q.    I think we need 70.  I'm not sure of that.

24  A.    70?

25           THE COURT:  There's another book behind you there.

Menzie - Cross

1   BY MR. LOVETT:

2   Q.   It would be a series of four graphs or tables.  I guess

3   they're graphs.  Is that it?

4   A.   They are graphs.

5   Q.   Page JE 954.

6   A.   Got it.

7   Q.   Okay.  And I think you started your testimony here by

8   saying that you looked at the temperatures that the animals

9   prefer to live in, right?

10  A.   Yes.

11  Q.   And you divided them into sensitive and tolerant taxa,

12  correct?

13  A.   Those are the two groups I looked at.  My groupings were

14  derived from the information provided by EPA and Bernhardt

15  et al.

16  Q.   Did Bernhardt and EPA all agree on which were sensitive

17  and which were tolerant?

18  A.   There was a lot of overlap, but not exact agreement.

19  Q.   And this is sensitive and tolerant to conductivity,

20  correct?

21  A.   That's correct.

22  Q.   So how often were there disagreements between Bernhardt

23  and EPA?

24  A.   I don't recall.  We went through a process of where we

25  put the data together and then examined the data to try to get

Menzie - Cross

1    the most common denominators.  We were going to pick 30.  So,

2    for example, the *Bezzia* group, you know, that's on here, is I

3    think the one that's considered most sensitive in the

4    Bernhardt paper, but it was lower in the list on the EPA.

5    Q.   Now, the sensitive ones are the *Bezzia* and the

6    *Rhyacophila*?  Is that what it is?

7    A.   Yes.

8    Q.   And so those are both sensitive.

9    A.   Yes.

10   Q.   In your grouping, right?

11   A.   In the grouping.

12   Q.   And neither of those are mayflies, are they?

13   A.   No.

14   Q.   Okay.  And the tolerant ones are the *Hydropsyche* and the

15   *Rheocricotopus* or something like that.

16   A.   It's a chironomid.  *Rheocricotopus*.

17   Q.   Okay.  I can say "chironomid."

18   A.   Chironomid.

19   Q.   All right.  Now, you in these charts plotted these two

20   sensitive species and tried to show a comparison between those

21   and the tolerant species, right?

22   A.   Right.  These are just four of the fifty that I looked

23   at.

24   Q.   And you did that for a three-month period; June, July,

25   and August?

Menzie - Cross

1    A.    Right.   I used that window to extract data from.

2    Q.    Why did you use that window?

3    A.    I had looked at the temperature data that I had presented

4    earlier on the patterns in the streams, and I had seen that

5    June, July, and August were very similar in their median

6    temperatures.   And so that provided a logical breakout of that

7    period of the year.

8    Q.    And if it's your theory that high temperatures are

9    partially at least responsible for causing the impairment, it

10   makes sense to look at the summer, right?

11   A.    That would be the time of year to look.

12   Q.    So that's not a flaw or a truncation, an illegitimate

13   truncation of the data.   It's a way of sifting through the

14   data to make sure it's correct data.

15   A.    That comes down to what question are you addressing, and

16   I was addressing a particular question here, yes.

17   Q.    Okay.   Does it take some judgment to determine which of

18   these are -- which of the species are sensitive and which are

19   tolerant?

20   A.    I simply adopted the list that Bernhardt et al. and EPA

21   had put together.

22   Q.    How many of them were there disagreements about?

23   A.    I can go back and look at the list.   I don't have it off

24   the top of my head.

25   Q.    You don't remember?

Menzie - Cross

1    A.    No.

2    Q.    Okay.  Now, the next figure on Joint Exhibit 71 and 72,

3    the next two, those are exhibits you produced, again the

4    sensitive and tolerant insects, right?

5    A.    That's correct.

6    Q.    Okay.  And, again -- or, strike that.  Let's move to

7    figure 5, which is tab 73, Joint Exhibit 957.

8         The plot shows, doesn't it, according to the figure, the

9    description, that there are two groups of insects, sensitive

10   and tolerant, that are distinctly different in their

11   occurrence within temperature regimes; is that right?

12   A.    I'm sorry.  I was at the wrong page.

13   Q.    Okay.  Page JE 957.  And I was reading from the bottom

14   there.  "There are two groups of insects that are distinctly

15   different."  Do you see that?

16   A.    Yes.

17   Q.    What do you mean by "distinct"?

18   A.    There's one group that has median temperatures that are

19   generally for the summer months that are generally below about

20   19 degrees, and there is a second group that has their median

21   temperatures that are generally above that kind of

22   temperature.  So they -- you know, there's an apparent

23   difference between these two groups.

24   Q.    Did you mean that in a statistical way or did you test

25   for significance there?

Menzie - Cross

1    A.    No.

2    Q.    Do you know of a test of significance called ANOVA,

3    A-N-O-V-A?

4    A.    Yes.

5    Q.    Why did you not use that?

6    A.    I have used that in other parts of this, but I thought

7    these were so obviously different that it was not necessary to

8    do any kind of additional testing on it.

9    Q.    Have you used it in the past?

10   A.    Oh, I have, yes.

11   Q.    It's a common tool?

12   A.    It is a common tool.

13   Q.    Can you tell me, if you know, what assumptions would have

14   to be met to use the ANOVA test here on these data?

15   A.    The assumptions would have to be with respect to

16   normality, variance.  And those would be the two main ones.

17   Those could be corrected for through a proper transformation

18   if necessary.

19   Q.    Would you have done that had you had the time?

20   A.    I didn't think it was necessary.

21   Q.    Okay.

22   A.    And, you know, this is really comparing sort of the

23   characteristics of the two groups, not a particular

24   temperature.

25   Q.    All right.  Can you tell me -- you took the DEP database

Menzie - Cross

1    and used it.  Did you filter the DEP database in any way?

2    A.    Yes.  We looked at headwater streams.

3    Q.    And what's the definition of a headwater stream?

4    A.    About 10 square miles of the watershed area.

5    Q.    So you filtered out any stream that was in the watershed

6    larger than 10 square miles?

7    A.    Right.

8    Q.    And how did you choose 10 square miles?

9    A.    It's based on our review of the literature and our

10   discussions with my other scientists at Exponent.  That seemed

11   like a reasonable selection.  That includes a lot of the

12   headwater streams in the database, and it excludes the larger

13   water bodies where there may be other things going on.

14   Q.    Did you review any literature to see if that was a

15   definition of a headwater stream or anything like that?

16   A.    It seemed to make sense based on the number of water

17   bodies.  It represented the nature of the water bodies in West

18   Virginia.

19   Q.    Okay.  Ten-square-mile watershed, how -- do you get third

20   order streams, generally, and how big do the streams get in a

21   watershed of that size?

22   A.    It would depend on a number of factors, but these would

23   be -- tend to be smaller streams.

24   Q.    Second and third order streams, though, surely, right?

25   A.    Second order might be included.

Menzie - Cross

1    Q.   Third order as well.

2    A.   I don't know.  It would depend.

3    Q.   Now, Stillhouse is a first order stream, right?

4    A.   Right.

5    Q.   Okay.  What else did you filter the data for?

6    A.   For most of our work, that was the main filtering that we

7    did.

8    Q.   Is that the only filter you did for all these?

9    A.   For looking at habitat, we filtered by stream size.  So

10   those would be streams less than 10 meters in width; so the

11   smaller streams.

12   Q.   Is that in addition to the 10 square miles?

13   A.   No, that's separate from.

14   Q.   It's probably the case, though, that most of the 10-meter

15   streams are within the 10-square-mile block, right?

16   A.   Well, they tend to be smaller streams.

17   Q.   Okay.  How did you measure the 10 meters?

18   A.   They're in the database.  So it can be extracted as such.

19   Q.   Okay.  How do they -- do you have any idea how DEP

20   measures them?

21   A.   Across the width.

22   Q.   From --

23   A.   Bank to bank.

24   Q.   -- highwater mark to highwater mark or --

25   A.   I think it's bank to bank.

Menzie - Cross

1    Q.   Bank to bank.

2    A.   Yeah.

3    Q.   Top of the bank.  Okay.  And how did you choose

4    10 meters?

5    A.   Thinking about Stillhouse and its size, we wanted to -- I

6    wanted to look at small streams.  Ten meters seemed to be a

7    reasonable width to capture a majority of small streams.

8    Q.   Did you measure Stillhouse from bank to bank at the point

9    that DEP took its sample?

10   A.   It's about 3 meters.

11   Q.   Three meters?  Okay.  You measured it?

12   A.   Yeah.  I walked it.

13   Q.   That's the only way you filtered the database, right?

14   A.   That's right.

15   Q.   Do you know how Drs. Palmer -- excuse me -- Bernhardt,

16   King et al. filtered their database?

17   A.   I do, and I use their database as well.  So, you know,

18   that was part of my analysis.

19   Q.   Okay.  And what did they filter for?

20   A.   They used basically a subset of the EPA database, which

21   was filtered.  I don't know whether they used that database

22   directly or just applied some of the criteria that EPA

23   utilized.  And then they further filtered it to exclude

24   development in their watershed that would exceed something

25   like around 4 percent.  So they wanted to be exclusively

Menzie - Cross

1    looking at mining.

2    Q.    They filtered urban development, right?

3    A.    Yes.

4    Q.    Because that raises the water temperature significantly,

5    doesn't it?

6    A.    Yes, of course it does.

7    Q.    Because there are paved surfaces, and water that runs off

8    hot paved surfaces is about the hottest water you're going to

9    get, right?

10   A.    Any place in the watershed where you have a town, a

11   parking lot, a farm, anything like that is going to raise the

12   water temperature.

13   Q.    So if you're looking at mining impacts, it makes sense to

14   filter those sites out, doesn't it?

15   A.    If that's all you're looking at.

16   Q.    And they also filtered the database, didn't they, for the

17   ecoregion?

18   A.    Yes.

19   Q.    You didn't do that, did you?

20   A.    No.

21   Q.    So how many ecoregions are included in their database --

22   excuse me -- in the data that you used from the database?

23   A.    Well, the majority are the same ecoregions, plus

24   basically West Virginia as a whole.

25   Q.    Okay.  So that includes the eastern mountains as well as

669

Menzie - Cross

1   the coal-producing counties, right?

2   A.   Right.

3   Q.   Streams are much different in those mountainous areas up

4   in, you know, Pocahontas County or Tucker County than they are

5   in, say, Logan or Mingo County, right?

6   A.   Well, I had reviewed the WVSCI development document.

7   There's very little difference that matters between these

8   regions.  It's a small -- it's a small source of variance from

9   what I was looking at.

10  Q.   Really?

11  A.   Yes.

12  Q.   And what were you looking at for which there was a small

13  source of variance?

14  A.   Basically the development of the WVSCI and community

15  structures, so -- that's in the WVSCI development document.

16  Q.   What about water temperatures?

17  A.   Water temperatures can vary, certainly.

18  Q.   Water is much colder in the eastern mountains at

19  3500 feet than it is down near a river in Southern West

20  Virginia, isn't it?

21  A.   Well, what I was interested in looking at are the water

22  temperatures in which the animals are found, and that's

23  specifically genus.  So it's much -- makes much more sense to

24  be more open about that, but within West Virginia, than it is

25  to exclude stuff.

Menzie - Cross

1    Q.   Now, you criticized EPA for extending the temperature

2    range of reference streams to -- I believe it was 30.6

3    degrees; is that right?

4    A.   I'm not sure it was a criticism.   It was an observation

5    that such a number, which I think they may have gotten from

6    some kind of source, was really irrelevant for judging the

7    effects of temperature --

8    Q.   Uh-huh.

9    A.   -- on WVSCI.   It just makes no sense.

10   Q.   And it makes no sense because reference streams aren't

11   that hot.

12   A.   That's correct.   They tend to be 10 degrees cooler than

13   that.

14   Q.   Okay.   And that's based on your review of the data that

15   you -- from the DEP database?

16   A.   It's actually based on data from the database.

17   Q.   Let's turn to tab 75, please, which is page JE 959.

18        Now, all of the ecoregions are included in these,

19   correct?

20   A.   Correct.

21   Q.   And it's also the less than 10 meters wide, correct?

22   A.   Right.   Those would be, as we described -- and, of

23   course, we have the Bernhardt data, which is very specific.

24   Q.   Right.   Is it filtered -- is all the data here filtered

25   like the Bernhardt data?   Only the data on the right-hand box

Menzie - Cross

1   is the Bernhardt data.  The other two are the All Records and

2   unfiltered or the Less Than 10.

3   A.   Right.  It allows you to look across and compare right

4   across the panels.

5   Q.   Did you test for statistically significant differences

6   within each of these groups?

7   A.   No.

8   Q.   Why not?

9   A.   I was using this as a pictorial to take a look at the

10  likelihood of being above and below a score of 68, but I did

11  not do any statistical tests as to the likelihood of being

12  above or below 68, but you can see by eye what it is.

13  Q.   For the All Records and the Less Than 10 Meters Wide

14  groups, what were the sample sizes within each category?

15  A.   I don't know that number off the top of my head.

16  Q.   Well, do you have it here somewhere so you could tell us?

17  A.   I could -- I could provide it tomorrow.

18  Q.   You can provide it tomorrow?

19  A.   Sure.

20  Q.   Okay.  You'll probably say the same thing for the next

21  question, but for all the records -- for the All Records and

22  Less Than 10-Meter Wide groups, what were the sample sizes

23  within each category?

24  A.   I can provide you with that tomorrow.

25  Q.   Okay.  Thank you.  Also, I'm a bit confused.  If the RBP

Menzie - Cross

1   data are unreliable in the way you describe them, why do you

2   use them here to test for what -- you know, why do you use

3   them here?

4   A.   Well, first of all, there's nothing else available.

5   Q.   Uh-huh.

6   A.   And then, secondly, what I did was not use the individual

7   values but the broad characterizations that the RBP reflects.

8   So if a lot of things are going all right with a stream, its

9   conditions are optimal, then, you know, a lot of the factors

10  that might be compromising the stream are on the good side of

11  the equation.

12       If, on the other hand, a number of things are going

13  potentially wrong with the stream, then they're on the other

14  side of the equation.  So these categories of optimal and

15  marginal provide a way of getting at whether or not habitat is

16  important --

17  Q.   Uh-huh.

18  A.   -- without relying on an individual RBP value, which I

19  consider to be highly unreliable.

20  Q.   But because it relies on RBP data, which you described

21  well, I think, in the Stillhouse example where there was a

22  score of 2 for embeddedness and 18 for flow or some other

23  category, and your testimony is that it's that embeddedness

24  that is the important number there and that averaging them

25  together really skews the understanding of the stream, right?

Menzie - Cross

1  A.   Right.

2  Q.   And that's true across RBP scores.

3  A.   That's correct.

4  Q.   So this isn't a very useful chart, is it, because it's

5  based on those unreliable RBP scores?

6  A.   As I said, I didn't rely on any one score.  I grouped

7  them into characteristics that were a lot of things were good,

8  a lot of things were not so good, without trying to understand

9  which of the things might be important to the habitat or which

10 score might be important.  So I've looked at the scores, and I

11 recognize that there's an enormous uncertainty about any one

12 score.

13 Q.   A group of unreliable scores is still unreliable, isn't

14 it?

15 A.   They're unreliable as individual scores.

16 Q.   Why are they not -- why are not a group of unreliable

17 individuals unreliable as a group?

18 A.   Well, that's why I contrasted optimal and marginal, poor

19 conditions, so it could show that if you were to spread this

20 apart, you would -- and take a look at whether habitat matters

21 or not, you'd be able to see it, as opposed to trying to do a

22 regression or something with individual RBP scores.

23 Q.   The remarkable thing to me here is that you left out the

24 suboptimal category.  Do you know how many -- let's look at

25 the Bernhardt data, for instance.  Do you know how many of the

Menzie - Cross

1   streams -- well, first of all, do you know how large the

2   dataset was for that for RBPs?

3   A.   I think -- for the Bernhardt data?

4   Q.   Uh-huh.

5   A.   I think somewhere in the neighborhood of -- I might

6   confuse it with my own numbers and stuff, but maybe in the

7   neighborhood of 400.

8   Q.   Okay.  I think it's smaller than that, but I'm not sure.

9   A.   Maybe 223, something like that.

10   Q.   Of those, do you know how many were optimal?

11   A.   Not off the top of my head.

12   Q.   I'll tell you what I think, and I just asked and got

13   these answers.  You tell me if they sound right to you.

14        Optimal would have been at 58.  Poor or marginal together

15   would have been 28.  And suboptimal, there were 137 sites.

16        So you left out two-thirds of the sites, didn't you?

17   A.   Well, I was contrasting obviously marginal and poor with

18   optimal in this.

19   Q.   Yeah, but how can you do that?  I mean that doesn't give

20   you -- that so skews the data that -- well, strike that.

21        How can you know -- if it's an imprecise measurement, how

22   do you know that something that was labeled suboptimal

23   shouldn't have been optimal for your purposes, or vice versa?

24   A.   I think there's enormous subjectivity in those numbers.

25   Q.   So it doesn't make sense to me that you would eliminate

Menzie - Cross

1   the largest -- by far the largest category from your

2   assessment given that all of the measurements are unreliable.

3   Why did you do it?

4   A.   Well, I've continued the analysis on this, and I have

5   looked at the influence of these various categories together

6   with temperature on WVSCI.  So I have an even deeper

7   understanding of how temperature and habitat work together for

8   suboptimal, optimal, and marginal.

9        I think that's the kind of work that's needed to really

10  resolve some of this.

11  Q.   More work is needed to resolve it?

12  A.   Well, what I've seen is that combinations of habitat

13  that's either suboptimal or marginal and elevated temperatures

14  will lead to lower WVSCI scores.

15  Q.   Did you do that box plot, or whatever that's called, the

16  last number at page JE 959, did you do that with the

17  suboptimal included at one point and then --

18  A.   No.

19  Q.   You did not?

20  A.   Never.

21  Q.   Let's turn to tab 77, which is at JE 961.  Do you see

22  that?

23  A.   Yes.

24  Q.   The Stillhouse data I think you described just now as

25  there was twice-monthly sampling of temperature data there?

Menzie - Cross

1    A.   Yes.

2    Q.   How long has that been going on?

3    A.   I don't know how long it's been going on.  I think this

4    represents years' worth of data, but I don't know when they

5    initiated it.

6    Q.   You used one year's worth of data?

7    A.   A couple of years.  So at least two or three years' worth

8    of data.

9    Q.   How many years of data did you use?

10   A.   I think three.

11   Q.   What years?

12   A.   Recent years.  So maybe the most recent is like around

13   2012, 2011, somewhere in there.

14   Q.   So the quality of that data, would you consider that good

15   quality data?

16   A.   I think it's pretty representative over, you know, a

17   number of years and a couple of times a month to kind of give

18   a feel for what the temperatures are in the pond.

19   Q.   Could you tell me the years that you used tomorrow?

20   A.   Sure.  I'll get that for you.

21   Q.   Now, the West Virginia -- the other data all comes from

22   the West Virginia database, right?

23   A.   Yes.

24   Q.   So you're comparing the snapshots from the database with

25   this more complete record of sampling from Stillhouse, right?

Menzie - Cross

1    A.    Yes.   I've put the snapshots together so that they are

2    organized by month.

3    Q.    Uh-huh.

4    A.    So they can give us a picture of what -- you kind of

5    think of all the snapshots as random measurements carried out

6    in waters of a particular characteristic over years and

7    locations.   For the month of June, for example, that's what

8    that represents.   So they'll have possibly hundreds of

9    measurements in it.

10   Q.    So you're comparing the database from West Virginia that

11   includes ecoregions not within this ecoregion, right?

12   A.    Uh-huh.   Correct.

13   Q.    And urban catchments included in that, right, snapshot

14   data, with a very specific set of numbers?

15   A.    Well, my dataset are all small watersheds.

16   Q.    Uh-huh.

17   A.    They're not urban catchments, and, you know, we're not

18   looking at towns here.   We're looking at headwaters.

19   Q.    Ten square miles.

20   A.    Ten square miles or less.

21   Q.    That's the only filter.

22   A.    That's correct.   And for the reference dataset, those are

23   the reference water bodies of the state.   So that's what the

24   state relies upon as the reference dataset.

25   Q.    Okay.   And do you think that what the state relies on is

Menzie - Cross

1   the right thing to rely on?

2   A.    I think so for getting the baseline of what reference

3   water bodies look like.

4   Q.    Okay.  Let's turn to the joint exhibit book, the second

5   joint exhibit book, to tab 58 of that book.

6         I don't think it's in that one.

7               THE COURT:  Volume 1?

8               MR. LOVETT:  I believe it's Volume -- yes, it is

9   Volume 1, the first volume.

10        Don't take that one too far away.

11              THE WITNESS:  Did you say Exhibit 58?

12              MR. LOVETT:  Pardon?

13              THE WITNESS:  Did you say Exhibit 58?

14              THE COURT:  It's split into two volumes.  So you're

15   looking for Joint Exhibits 1 through 58.

16              THE WITNESS:  Got you.  That would be this.

17   BY MR. LOVETT:

18   Q.    Okay.  Would you turn to Joint Exhibit page 493.

19   A.    Got it.

20   Q.    Now, this is where -- it's number 5.  EPA says that

21   West Virginia limits for reference sites are 30.6 degrees or

22   less, right?

23   A.    Right.

24   Q.    And Stillhouse, I think your highest reading there was

25   about 24?

Menzie - Cross

1    A.   Probably around there, yeah.

2    Q.   Which is much lower than at least EPA purports that the

3    West Virginia limits for reference sites are, right?

4    A.   It's higher than -- it's lower than 30.6 degrees.

5    Q.   Significantly lower.

6    A.   Yes.

7    Q.   Do temperatures have to reach a lethal range to show a

8    shift in the WVSCI in your view?

9    A.   No.

10   Q.   Okay.  Because you think that when you get at a certain

11   level -- what? -- bugs go somewhere else and WVSCI decreases?

12   A.   Well, aside from WVSCI, all animals would -- including

13   ourselves -- will have temperatures in which we want to live

14   or find appropriate for ourselves.  And bugs are no different.

15   Bugs in particular, because they're cold water animals, will

16   live in waters with particular temperature regimes.

17   Q.   And when you used in your work -- when you determined a

18   reference stream under the West Virginia DEP, you used the DEP

19   database to decide what was a reference?

20   A.   They specify what the reference streams are.

21   Q.   And they have different levels of reference, don't they?

22   A.   Yes.

23   Q.   And how many levels are there?

24   A.   Three.

25   Q.   And you didn't use all three levels, did you?

Menzie - Cross

1   A.   No.

2   Q.   You didn't tell us that here, though.   Why not?

3   A.   I used reference level 1.   Basically those are the

4   majority of the ones that are considered the good reference

5   areas.

6   Q.   Well, why didn't you specify that until just now when I

7   asked you?   Isn't that an important distinction?

8   A.   It's in my figures.   It's in the report.

9   Q.   It's in your report?

10   A.   Yes.

11   Q.   Okay.   What are the -- why did you choose to use only

12   reference level 1 instead of 2 and 3 as well?

13   A.   Because I know from viewing the development of the

14   reference dataset that reference areas 2 and 3 are reference

15   areas that are compromised in various degrees.

16   Q.   I'm sorry.

17   A.   So they're not as good quality environments as are

18   reference area 1.   Reference area 1 have samples or areas

19   of -- the kinds of areas that the WVSCI was developed from.

20   Q.   Is that true, or was the WVSCI really derived from all

21   three levels?

22   A.   I think it was derived from level 1.   That's my

23   understand anyway.

24   Q.   But if it wasn't derived from level 1, that's a problem

25   for you, isn't it?

Menzie - Cross

1    A.    No, I don't think so.

2    Q.    You don't?

3    A.    I don't believe so, no.

4    Q.    Okay.  Now, you said just now that you rely on DEP to

5    determine what a reference stream is in West Virginia.  You

6    just testified to that, didn't you?

7    A.    Yes.

8    Q.    And it determined that levels 1, 2, and 3 are all

9    reference, correct?

10   A.    It has some 2's and 3's, but most of them are reference

11   level 1's.

12   Q.    But there are three levels of reference streams, right?

13   A.    Right.

14   Q.    Now, do you know what the mean summer temperature is in

15   reference level 1?

16   A.    The mean?

17   Q.    Uh-huh.  Yeah, the mean.

18   A.    I don't know what the mean is.  I know what the median

19   is.

20   Q.    What's the median?

21   A.    If we can go to my report, it would be on there.

22   Q.    Okay.  I don't know where your report is.  Maybe -- we'll

23   see if we can find it here.

24   A.    The mean would be really the wrong statistic to use for

25   this kind of thing, but I can tell you the median.

Menzie - Cross

1   Q.   Okay.  We're going to find them now.  I'm going to ask

2   you the maximum too, and I expect that's in the same place,

3   right?

4   A.   That's correct.

5           MR. LOVETT:  I think that the report is not a part

6   of the exhibits for the case, but I have a copy of it.  If I

7   can approach.

8           THE COURT:  You can refresh his recollection.

9   BY MR. LOVETT:

10  Q.   So I've handed you what I believe is the report you're

11  talking about, a copy of it.

12      Could you tell me from that what the mean summer

13  temperatures are for levels 1, 2, and 3?

14  A.   Well, as I mentioned, the mean would be an inappropriate

15  statistic to use here.

16  Q.   Or if you have median instead.

17  A.   So the median value, if --

18  Q.   Could you tell us what page of the report you're

19  referring to?

20  A.   Page 8.

21  Q.   Okay.

22  A.   And I see that the median for the warmest month, which is

23  July, is somewhere around 18 degrees.

24  Q.   And that's in level 1?

25  A.   Yeah, that's reference level 1.

Menzie - Cross

1   Q.   Okay.  And how did you determine that?

2   A.   From the statistical analysis of the database.

3   Q.   Did you do a statistical analysis on the database to

4   reach that conclusion?

5   A.   This box and whisker plot indicates that the median is

6   about 18 degrees.

7   Q.   And how did you -- how did you -- tell me the procedure

8   you used to determine that that was the median.

9   A.   Well, basically for the West Virginia database, all the

10  values that are available for July are taken as one set of

11  data.

12  Q.   Okay.

13  A.   And so the median, then, is the 50th percentile of that

14  dataset.

15  Q.   So you took every piece of data from the West Virginia

16  dataset, filtered for less than 10 square miles, or not?

17  A.   Well, this would be -- yes, this would be -- and I'll

18  check that for you specifically, but this is for the reference

19  level 1 dataset that we have in here and that, you know, was

20  provided to you.  And I see the median value for July from my

21  figure at about -- it looks like it's about 17 or 18 degrees.

22  Q.   Okay.  17 or 18?

23  A.   Somewhere in there.

24  Q.   Why is the mean incorrect, improper, and the median is

25  the right one?

684

Menzie - Cross

1   A.   Because we're talking about frequency, you know, numbers

2   of streams.  We're not talking about -- an animal, for

3   example, doesn't experience the mean temperature of all the

4   streams.

5   Q.   Okay.

6   A.   It only experiences the temperature in a particular

7   stream.

8   Q.   Fine.  Thank you.  And for level 2, what is the median,

9   then?

10  A.   That's not calculated on here.

11  Q.   It's not?

12  A.   No.

13  Q.   You don't know the answer?

14  A.   No.

15  Q.   Do you know the answer for level 3?

16  A.   No.

17  Q.   Do you know what the maximum temperature is on level 1 in

18  the summer months?

19  A.   For level 1, in July, the maximum temperature was about,

20  roughly, 22 degrees.

21  Q.   And what about level 2?

22  A.   I don't have level 2 or level 3.

23  Q.   Okay.  So it's not fair -- okay.  It's not then true

24  that -- strike that.

25       Now, how many sites did you use from the database here,

Menzie - Cross

1   how many total sites?

2   A.   I'll get you the number, but it's upwards -- in terms of

3   samples, it may be in the low thousands.

4   Q.   In terms of total sites, how many total sites did you

5   use?

6   A.   I'll provide you with that in the morning.

7   Q.   Okay.  Do you know about what percentage of the sites in

8   the DEP database that you used for about what percentage of

9   the total sites you used?

10  A.   By that, do you mean how many sites in the database were

11  reference sites that I may have used, like what percentage of

12  the sites or -- or if we screen by less than 10 square miles,

13  what fraction that is of the total?

14  Q.   Of all the temperature assessments that you did, how many

15  sites were there, if you know?

16  A.   We'll get that to you --

17  Q.   Let's just wait until tomorrow.

18           MR. LOVETT:  Your Honor, I have several questions

19  that follow on this, and I know it's five minutes early, but

20  this would be a good place to quit so we can start with those

21  data.

22           THE COURT:  All right.  We'll go ahead and stop.

23  We'll resume at 9:00 a.m. tomorrow.

24       You may step down.  Don't discuss your testimony.

25           THE WITNESS:  Okay.  Thanks.

1          THE COURT:  I'd like to see counsel informally here,

2     but we'll stand in recess and we'll reconvene at 9:00 a.m.

3     tomorrow.

4          (Proceedings adjourned at 4:53 p.m.)

```
1                        I N D E X

2

3    Defendant's Witnesses      Direct   Cross   Redirect   Recross

4    CARRIE KUEHN (resumed)       445     476      551       554

5    CHARLES MENZIE               557     648

6

7    Joint Exhibits                                        Admitted

8    No. 68 Charles Menzie CV                                646

9    No. 70 Menzie expert report, Figure 2                  646

10   No. 71 Menzie expert report, Figure 3                  646

11   No. 72 Menzie expert report, Figure 4                  646

12   No. 73 Menzie expert report, Figure 5                  646

13   No. 74 Menzie expert report, Figure 6                  646

14   No. 75 Menzie expert report, Figure 7                  646

15   No. 76 Menzie expert report, Figure 8                  646

16   No. 77 Menzie expert report, Figure 9                  646

17

18   Plaintiffs' Exhibits

19   No. 2  Bernhardt, et al. "How Many Mountains"...       647

20   No. 5  Cormier, et al. "Assessing causation of the"... 647

21   No. 8  Suter, et al. "A method for assessing the"...   647

22   No. 10 Kunz, et al. "Use of Reconstituted Waters to"...647

23   No. 12 Merriam, et al. "Additive effects of mining"... 647

24   No. 28 Fola's third supplemental response             556

25   No. 29 Hill paper                                     556
```

1    <u>Defendant's Exhibits</u>

2    No. 1   Kuehn expert report, Figure 1                    648

3    No. 6   Menzie report, Appendix E                        646

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24

25        /s/Teresa M. Ruffner              September 15, 2014
      _____    _____