```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC., and
SIERRA CLUB,

             Plaintiffs,

v.                                CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,
                                    Huntington, West Virginia
             Defendant.             August 4, 2014



                  TRANSCRIPT OF PRETRIAL CONFERENCE
              BEFORE THE HONORABLE ROBERT C. CHAMBERS
                    UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiffs:        J. MICHAEL BECHER, ESQ.
                           APPALACHIAN MOUNTAIN ADVOCATES
                           P. O. Box 507
                           Lewisburg, WV  24901

For the Defendant:         M. SHANE HARVEY, ESQ.
                           MATTHEW S. TYREE, ESQ.
                           JENNIFER HUGHES, ESQ.
                           JACKSON KELLY
                           1600 Laidley Tower
                           P. O. Box 553
                           Charleston, WV  25322

Court Reporter:            Teresa M. Ruffner, RPR
                           Sidney Christie Federal Building
                           845 5th Avenue, Room 101
                           Huntington, WV  25701
                           (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

```
 1   Monday, August 4, 2014, at 10:30 a.m. in open court
 2           THE COURT:  All right.  We've got this matter
 3   scheduled today for a pretrial.
 4       As I understand it, there are two pending motions.  I
 5   went over the integrated pretrial order.  It appears that
 6   other than these two motions, there's really nothing that the
 7   Court need do before we can start the trial; is that right?
 8           MR. HARVEY:  I think that's right.  I'm not sure --
 9   I want to make sure I understand which two motions you're
10   referring to.  I assume it's the motion to exclude Carrie
11   Kuehn, the epidemiologist, and then perhaps our motion to
12   strike.  Is that --
13           THE COURT:  Yes, that's the only two I'm aware of.
14           MR. HARVEY:  Okay.  With respect to the second
15   motion, Mr. Becher approached me this morning.  We were
16   talking.  We may be able to resolve that without having the
17   Court hear that issue today if that's okay.
18           THE COURT:  Probably.  But how are you trying to
19   resolve it?
20           MR. BECHER:  We would propose a compromise, Your
21   Honor.  There were two studies.  Just the supplemental expert
22   reports, there are two studies that came out after the reports
23   and after depositions.  We had submitted supplemental expert
24   reports that deal with those studies.
25       Our view is that they're both in line with the original
```

1   opinions of our experts.  However, we do recognize that one is
2   more tangential perhaps than another and we may compromise
3   by --
4           THE COURT:  All right.  How soon do you think you
5   can either resolve it or tell me that you can't?
6           MR. HARVEY:  Perhaps by the end of the day --
7           THE COURT:  Okay.
8           MR. HARVEY:  -- or by tomorrow.
9           THE COURT:  All right.  Well, then, we'll defer
10  further consideration of that matter until you can report back
11  to Amanda, my clerk, about whether or not it's resolved.
12      Then with respect to the plaintiffs' motion to strike --
13          MR. BECHER:  Your Honor, could I make one more
14  matter on the pretrial order?  I guess it's not completely
15  worked out yet, but we may be able to slim down the witness
16  list by one extra witness as well --
17          THE COURT:  Okay.  That would be great.
18      All right.  Well, I've read --
19      (The Court and court reporter conferred privately off the
20  record.)
21          THE COURT:  The power went off in this building and
22  we're on a generator and I'm not sure -- and the microphones
23  didn't seem to be working.  Bear with us just a minute and
24  we'll see if Terry can figure it out.
25      All right.  Well, the microphones aren't going to work,

```
 1   so make sure that you speak slowly and loudly so that my court
 2   reporter can hear you.
 3          All right.  Then with regard to --
 4              THE CLERK:  Now it's on.
 5              THE COURT:  It just came on.
 6       With regard, then, to the plaintiffs' motion, I've read
 7   everything, read the deposition, read the report.
 8       Is there any further argument that the parties want to
 9   offer or summarize?
10              MR. BECHER:  Briefly, Your Honor, if I may.
11              THE COURT:  Go ahead.
12              MR. BECHER:  Under Rule 702 an expert must be
13   qualified by knowledge, experience, skill, or training; and it
14   must apply that knowledge, skill, experience, or training to
15   the facts and methodologies of the case.
16        We have a couple of problems with Miss Kuehn's testimony.
17   First, she clearly points and testifies to matters outside of
18   her knowledge and skill base.  She makes statements such as
19   her review of the DEP data confirm that temperatures strongly
20   associated with the viability of sensitive invertebrate, and
21   there's an abundance of information and other factors that may
22   explain the relationship between conductivity and the WVSCI
23   score.
24       Miss Kuehn is not an ecologist and she freely admits
25   that.  These statements are clearly within the field of
```

1   ecology and not within her relevant expertise of epidemiology
2   or statistics.  In fact, when she was asked to support these
3   statements, she simply pointed to graphs which she had copied
4   verbatim from Dr. Menzie, defendant's other proffered expert
5   witness's expert report.
6        She admitted in deposition she had done no analysis of
7   that data herself, and in fact deferred all questions about
8   those analyses to Dr. Menzie.  Because of this, she not only
9   testifies to matters on ecology, but the limited relevant
10  experience she may have to analyze data was not applied to
11  generate these graphs and these exhibits, and we feel that
12  those should clearly be excluded.
13       Because she did not analyze the facts and data that were
14  directly relevant to this case, Miss Kuehn goes to general
15  challenges of the causal method used by EPA in developing the
16  benchmark.  We point out this is the very causal mechanism
17  that the defendant's other expert, Dr. Menzie, in a similar
18  case referred to as basically the gold standard and criticized
19  plaintiffs' experts for not following.
20       I want to make two points.  The first is argued by
21  plaintiffs in that same case.  While we do believe this is a
22  good method, we do not believe it's the only method.  We
23  believe that it allows for flexibility, and the science itself
24  is flexible.  It does not need some sort of rigid analysis to
25  progress and determine things like causation of two factors.

1       What Miss Kuehn tried to do is point out that this method
2  is different from her own field of epidemiology.  Plaintiffs
3  recognize that there are principles of epidemiology that have
4  been adopted to form this causal mechanism used by EPA.
5  However, it has been adapted.  It has not been taken verbatim.
6  And those adaptations are critical.  And that's what
7  Miss Kuehn cannot testify about.
8       She can explain to us why -- or, excuse me -- how this is
9  different from epidemiological methods, but she has no insight
10 or background in ecology to explain why those differences may
11 matter or why they may or may not be appropriate.
12      This gap in her knowledge became evident during
13 deposition when she admitted she could not do a causal
14 analysis of the relevant factors herself, that she would need
15 to rely on an ecological expert such as Dr. Menzie or
16 plaintiffs' experts.
17      She struggled to give examples of what she would have
18 done differently with the data that was available, and when
19 pressed, only -- could only answer that there was not lab data
20 to confirm this relationship.  And I think this fixation with
21 lab data, as we pointed out in our brief, shows the key
22 difference in Miss Kuehn's field and the relevant field here.
23      In a field like ecology, studying complicated systems,
24 it's not always possible to replicate the environmental
25 conditions in a lab.  Because of that, the field of ecology

1  has principles and methods that are adapted to account for
2  that limitation.  That does not mean the science is wrong.
3  That does not mean the lab data cannot be incorporated or it's
4  helpful when it is available, but there are many situations
5  when it is not available, and that does not discount the
6  science and the findings of that science.  And that's
7  something that Miss Kuehn just simply does not seem to grasp.
8       I'll leave it at that.  Thank you, Your Honor.
9            THE COURT:  All right.  Thank you.
10      Mr. Harvey?
11           MR. HARVEY:  Thank you, Your Honor.
12      Your Honor, the Clean Water Act is over 40 years old; and
13  in its entire history, EPA has always used laboratory data to
14  set water quality standards.  Essentially it takes test
15  organisms and exposes them to pollutants in a lab, studies the
16  reaction, and it sets a standard.
17      The conductivity benchmark was different.  For the first
18  time ever, the EPA based conclusions on observational data,
19  not data generated in a laboratory.  They took data gathered
20  by agencies like the DEP, as the Court is well aware, ran
21  correlation analyses on that data, looked at confounding
22  factors, and reached conclusions regarding causation.
23      To do this, which was a first for the agency, it relied
24  upon principles of epidemiology, and it was very explicit in
25  doing so.  If you read our response, you will see throughout

 1    the benchmark and the supporting papers, they say on multiple
 2    occasions we're using principles of epidemiology.  We're using
 3    epidemiological methods.  We are borrowing from human health
 4    epidemiology.  And that was appropriate, because that is what
 5    epidemiologists do.  They take observational data and they
 6    address issues of general causation.
 7         The link between smoking and lung cancer was established
 8    by epidemiologists studying observational data.  It's a
 9    well-accepted science, and EPA was right to rely upon it.
10    It's also a very rigorous science.  It took decades to
11    establish the link between smoking and lung cancer.
12         EPA -- I mean, epidemiologists not only had to show that
13    there was a correlation between the two, they spent decades
14    determining whether or not there were confounding factors like
15    alcohol use or urbanization that had been taken into account.
16         The process is very rigorous.  The courts have accepted
17    it; and if it's done right, it can give you a correct
18    conclusion.  If it's done incorrectly, it can give you a
19    spurious conclusion.  And there are many examples of those
20    over the last 50 years.
21         So we asked a trained epidemiologist to look at what EPA
22    had done, to see if they had properly borrowed from
23    epidemiology and used proper epidemiological methods.  She
24    found that their work and the work of Dr. King was severely
25    lacking in that regard.  The way they treated confounding

1    factors was inappropriate and not the way an epidemiologist
2    would conduct the analysis.
3         Plaintiffs have shown us nothing to suggest that for
4    ecology the rules are different, that somehow you can use a
5    half-baked analysis for ecology. The rules are the same. You
6    can reach statistically inappropriate conclusions if you apply
7    the wrong methodology to ecological data.
8         The plaintiffs do not want the Court to hear this
9    testimony. Their expert is not a trained epidemiologist. He
10   is not a trained statistician. Dr. King is an ecologist. He
11   will tell you that the benchmark was rigorous and
12   peer-reviewed, but he does not have the background to spot
13   errors in the benchmark or in his own analysis in our view.
14        We think the testimony from Miss Kuehn, a trained
15   epidemiologist, will inform the Court as to whether errors
16   were made. In fact, we think it would be wrong for the Court
17   to reach conclusions about causation if there are still open
18   questions about issues like confounding.
19        The plaintiffs, to avoid the testimony of Miss Kuehn,
20   have thrown the Court a curve ball. They have suggested that
21   she should not be allowed to testify because she is not an
22   ecologist, to which we respond, so what?
23        The epidemiologists who established the link between
24   smoking and lung cancer were not oncologists. They were not
25   medical doctors. Sir Bradford Hill, the most famous and the

1   lead epidemiologist, was a statistician.  That is what
2   epidemiologists do.  They look at observational data.  They
3   run statistical analyses to see if you can infer causation
4   from that data.  They do not have to be experts in the
5   underlying field.  Normally, they are not.  They're not
6   medical doctors.  They're trained in the field of epidemiology
7   and statistics.  That is what Miss Kuehn is.
8       We think her testimony is highly relevant and very
9   reliable and appropriate under the Rules of -- under Rule 702
10  of the Rules of Evidence.
11      The plaintiffs say that she was fixated on laboratory
12  data.  She does not believe that he can establish causation
13  without it.  I don't know if you read the entire deposition,
14  but I sat there and what I saw was simply a difference in
15  semantics or terminology.
16      Here is the Federal Reference Manual on Epidemiology.  It
17  says as follows:  Epidemiology -- and this is on page 598,
18  Third Edition.
19      Epidemiology cannot prove causation.  Rather causation is
20  a judgment for epidemiologists and others interpreting the
21  epidemiological data.
22      I think all Miss Kuehn was saying is that philosophically
23  you cannot use epidemiology to prove anything.  You can infer
24  it from all the lines of evidence, but you cannot prove it.
25  If you want to prove it, you need laboratory data.  But I did

1   not take her to say that ecology was some inferior science or
2   epidemiology was superior in some way.  She simply said, look,
3   EPA borrowed principles of epidemiology in establishing the
4   benchmark.  They did it incorrectly.
5            THE COURT:  All right.
6            MR. HARVEY:  Thank you.
7            THE COURT:  Mr. Becher, do you want a brief reply?
8            MR. BECHER:  Briefly, Your Honor.
9            THE COURT:  Go ahead.
10           MR. BECHER:  Just a couple of points.  First, it may
11  be a fairly minor point in the motion, but I do want to
12  address the criticism of Dr. King as not being expert in
13  statistics.  In deposition and also in front of this Court
14  back in December, Dr. King was very careful to say that he was
15  an expert in ecological data analysis because he thought
16  statistics was too broad a field for anyone to be expert in.
17      In fact, Dr. King had, beyond taking several statistics
18  courses in undergrad and grad school, teaches statistic
19  courses and even designed a well-accepted and well-used
20  statistical method in the field of ecology.
21      I just want to make sure -- I know we'll get to
22  qualification later, but I did want to respond to that
23  criticism.
24      Also, when it comes to the data in the benchmark, I think
25  what is important here is to recognize that the benchmark,

1    while it borrowed from epidemiological principles, adapted
2    those methods to the relevant field of ecology.  It was
3    created by EPA, reviewed by several of the EPA scientists
4    before being submitted to a Scientific Advisory Board for EPA
5    and being promulgated that way.
6        Since then, these methods have been reviewed by peer
7    reviewers in independent published articles.  And if
8    Miss Kuehn wants to, you know, criticize the entire field for
9    those oversights that she finds from, you know, misapplying
10   epidemiological principles, I mean that is one thing, but to
11   be able to criticize the adaptation of that to the relevant
12   field is something we do not believe she should be able to do.
13       I also do want to briefly address the issue of smoking
14   and lung cancer.  It did, of course, take, you know, decades
15   to improve -- or, excuse me -- to prove the association
16   between smoking and lung cancer.
17       During those decades, many, many people died, but I think
18   there was rigorous science and evidence supporting that link
19   well before that could have prevented that.  And I would
20   submit that it was obfuscation that caused the link to take so
21   long to be made.  And that's something we definitely want to
22   avoid in matters of science going forward, especially when
23   there are significant problems that result.
24           THE COURT:  All right.  Thank you.
25       Well, as I've indicated, I've read through everything,

1   including the deposition and the report, and I appreciate the
2   arguments made here today.
3       I'm going to deny the motion.  I think that Miss Kuehn is
4   permitted -- should be permitted to testify as an
5   epidemiologist.  It's clear that the benchmark developed by
6   EPA relies in part upon epidemiological methods, and I think
7   that it's fair for the defense to criticize those methods.  It
8   may well be that the rebuttal to that criticism is that you
9   can't apply those principles the same way Miss Kuehn would in
10  the field of ecology, but I think that's for the experts to
11  argue about and for the Court to hear testimony about.
12      I would not want to preclude that debate.  So I'm going
13  to deny the motion, and she'll be permitted to testify.
14      You've indicated that you might have some stipulation
15  that would reduce by one the number of witnesses.  If that's
16  not the case, how long is it going to take to have the
17  plaintiff put on its case?
18          MR. BECHER:  We were discussing this among counsel
19  this morning, Your Honor, and had basically come to the
20  agreement somewhere between three and four days.  Hopefully
21  with this stipulation, we can keep it at three.
22          THE COURT:  Are you saying three days to four days
23  to put your case on?
24          MR. BECHER:  No, Your Honor --
25          THE COURT:  Total?

```
 1                MR. BECHER:  -- total.
 2                THE COURT:  All right.  At this point, then, how
 3   many witnesses do you expect to have, assuming no stipulations
 4   to reduce the number?
 5                MR. BECHER:  Assuming no stipulation, we would have
 6   three witnesses on direct, and then two of those would also be
 7   rebuttal witnesses, and then one additional rebuttal witness.
 8   So four witnesses total.
 9                THE COURT:  And then what about the defense?
10                MR. HARVEY:  Two witnesses.
11                THE COURT:  The two experts?
12                MR. HARVEY:  Yes, Your Honor.
13                THE COURT:  All right.  Well, one of the reasons I'm
14   asking is I've got another case that is also scheduled for
15   trial that week.  The parties are coming in here about 11:30
16   for the pretrial conference in that.  I'm not sure yet how I'm
17   going to adjust or deal with this.  It may be that it affects
18   how quickly we can start this trial or not.
19        I think that the other case, it will be a jury trial, and
20   it will be relatively brief, certainly no more than two days,
21   but I'm not sure yet.
22        So I just bring that to your attention.  If it looks like
23   the trial date -- commencement date is going to be affected by
24   this other matter, then I'll just have to let you know as soon
25   as I can.  I know you've got experts scheduled to be in that
```

1  week, so I'll certainly try to avoid affecting this trial
2  date.
3       You mentioned at the beginning that there might be some
4  agreement that would moot the defendant's motion with respect
5  to the supplemental reports.
6       Is there any chance that as a result of those
7  supplemental reports and the defendant's objection that you
8  all will want to postpone the trial some short time while
9  these new reports are analyzed and the defendant can rebut?
10           MR. BECHER:  Your Honor, with respect to that and
11  with respect to any delay of the trial generally, I think
12  plaintiffs would ask that we try to make all efforts to have
13  the trial happen at all time -- on time.  Of course, I realize
14  the Court has a congested docket, but we do have multiple
15  experts coming in from various parts of the country, and they
16  are by and large academics who are much more free during the
17  summer than later on during the academic year.
18           THE COURT:  Well, all right.
19           MR. HARVEY:  Not much to add, Your Honor.  If we can
20  work out that issue, my sense is there would be no reason to
21  move the trial date.  If we can't --
22           THE COURT:  All right.  So I expect you to report
23  back let's say by the end of business tomorrow or sooner
24  obviously if you've resolved the second -- the defendant's
25  motion.  And if you haven't, then my guess is that I'm going

1    to convene some type of a hearing later this week, perhaps by
2    telephone to accommodate everybody's schedules, but we'll take
3    that up and I'll have a much better idea also about whether
4    this other case is even going to go to trial or not.
5         All right.  Is there anything else that we need to
6    address?
7              MR. HARVEY:  One short question, Your Honor, that
8    may make it easier on us later.  The exhibits in this case are
9    cumbersome.  The last trial we put them in a notebook.  My
10   preference would be, where we can, to put those exhibits on
11   the screen for the Court's review.  And if the Court or the
12   parties want to refer to the notebook, they can, but not to
13   break the flow if we can avoid it by using electronic means.
14             THE COURT:  That's fine, and it probably would work
15   better.  It's awful hard for us to appear -- and I know it is
16   for you as well -- to have all these notebooks and have to go
17   searching through the things in the notebook by exhibit
18   number.
19        So I'm certainly amenable to doing it some different way.
20   It was really difficult for me to follow, but it would also
21   seem to me that -- I realize when you prepare these notebooks
22   in advance, you really can't be sure at what point in the
23   testimony they're going to be addressed, and so they're not
24   necessarily in any sort of chronological, in the terms of the
25   presentation, any chronological order.  It may be better if --

1        MR. HARVEY:  We're learning from the last trial.
2   We'll try to do better in that regard, and my promise to the
3   Court and Mr. Becher is if we are moving too fast and someone
4   actually wants to see the paper copy of the exhibit in the
5   notebook, we can always slow down.
6        THE COURT:  Well, and to be honest with you, while I
7   certainly also like to use the monitors and rely upon them, I
8   really like to have the documents up here too.  So I'm going
9   to want to have copies of all these.
10        MR. HARVEY:  We'll try to do the best we can with
11   the pace.
12        THE COURT:  All right.  Is there anything else we
13   need to address, then?
14        MR. BECHER:  No, Your Honor.
15        THE COURT:  You'll need to speak with Terry at least
16   the week before the trial to talk about using the electronic
17   system.  I know you've all used it, but we make everybody go
18   through it again before the trial just to make sure that we
19   don't run into any glitches.  And since we aren't trying many
20   cases, we're not using this system regularly, and so
21   sometimes, you know, we haven't used it for a few months and
22   we've got a trial and we find out something is wrong and --
23        MR. HARVEY:  Terry has been extremely helpful, and
24   we wouldn't think of showing up here without having a trial
25   run.

1          THE COURT: All right. All right. If there's
2  nothing further, then, we'll stand in recess and expect to
3  hear back from you by tomorrow afternoon sometime.
4          (Hearing concluded at 10:59 a.m.)

21     I, Teresa M. Ruffner, certify that the foregoing is a
22  correct transcript from the record of proceedings in the
23  above-entitled matter.

25       /s/Teresa M. Ruffner                May 15, 2015