IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

                Plaintiffs,

v.                                 CIVIL ACTION NO. 2:13-5006

FOLA COAL COMPANY, LLC,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

On October 6, 2015, the Court held a trial in this case to resolve issues of appropriate injunctive relief and/or civil penalties.[1] The Court **FINDS** that injunctive relief is appropriate and necessary to remedy Defendant's violations. As explained below, the Court is inclined to appoint a Special Master to further assist it in determining an appropriate remedy. The Court also orders Defendant to submit a memorandum of law by **October 21, 2015** addressing the authority and regulatory scheme under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") on which Defendant relies in arguing that water management strategies are in compliance with the Act and, if successful, can bring Defendant into compliance with narrative water quality standards.

**I.    BACKGROUND**

---

[1] Pursuant to this Court's June 21, 2013, Scheduling Order, ECF No. 16, the trial of this case proceeded in two phases. Phase 1 resolved issues of jurisdiction and liability, where the Court ultimately found the Defendant liable for at least one violation of its permits as discussed *infra*. This phase of the trial, Phase II, will resolve issues of appropriate injunctive relief and/or civil penalties.

Plaintiffs bring this action pursuant to the citizen suit provisions of the Clean Water Act and the Surface Mining Control and Reclamation Act ("SMCRA"). Plaintiffs allege that Defendant Fola Coal Company, LLC ("Fola") violated these statutes by discharging excessive amounts of ionic pollution, measured as conductivity and sulfates, into the waters of West Virginia in violation of their National Pollutant Discharge Elimination System ("NPDES") permits and their West Virginia Surface Mining Permits. The Court will first discuss the relevant regulatory framework.

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of an NPDES permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982). All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]." This is an enforceable permit condition. *Ohio Valley Envtl. Coal. V. Elk Run Coal Co., Inc.*, 24 F.Supp.3d 532, 537 (S.D.W.Va. 2014) ("*Elk Run*").

Coal mines are also subject to regulation under the SMCRA, which prohibits any person

from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. In 1981, West Virginia received conditional approval of its state-run program, which is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

West Virginia's water quality standards are violated if wastes discharged from a surface mining operation "cause . . . or materially contribute to" 1) "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or 2) "[a]ny other condition . . . which adversely alters the integrity of the waters of the State." *Id.* § 47-2-3.2.e, -3.2.i. Additionally, "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." *Id.* § 47-2-3.2.i.

This Court has previously determined that a West Virginia Stream Condition Index ("WVSCI") score below the EPA-approved impairment threshold of 68 indicates a violation of

West Virginia's biological narrative water quality standards, as embodied in § 47-2-3.2.e and -3.2.i. *Elk Run*, 24 F.Supp.3d at 556. In *Elk Run*, Defendants argued that liability based on conductivity levels would effectively create a water qualify effluent limit, which according to a federal district court in *Nat'l Mining Ass'n v. Jackson*, 880 F.Supp.2d 119, 137–42 (D.D.C. 2012), exceeded EPA authority. Though already recognized as inapposite to the issues presented in *Elk Run*—as well as the case at hand—the Court now also notes that *Jackson* has since been reversed. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C.Cir. 2014) (concluding that EPA's Final Guidance amounted to a general statement of policy explaining how the agency would enforce existing rules and was not a final agency action subject to pre-enforcement judicial review).

This Court has also previously determined Plaintiffs' substantive burden in the case at hand upon Defendant's oral motion for a judgment on partial findings at the close of Plaintiff's evidence. *See* Memorandum Opinion and Order, ECF No. 114. After reviewing all the evidence then before the Court and legal arguments briefed by the parties, the Court denied Fola's motion, finding instead that Plaintiffs had provided some evidence that a pollutant had caused or materially contributed to biological impairment at Stillhouse Branch in violation of Fola's permits. *Id.* Specifically, the Court determined that Plaintiffs' burden is to show that the high conductivity measured at Stillhouse Branch is composed of a particular mixture of ions that is known to cause or materially contribute to impairment. *Id.* at 7. Upon reviewing Plaintiffs' evidence, the Court then concluded that Plaintiff had produced sufficient evidence that high conductivity in central Appalachian waterways receiving alkaline mine drainage, e.g., Stillhouse Branch, is dominated by a unique mixture of ions and that particular variety of ionic pollution is known to cause or materially contribute to biological impairment. *Id.* at 21.

The case then moved to Phase I of trial where the Court considered whether Plaintiffs met their ultimate persuasive burden of showing that one or more violations occurred by a preponderance of the evidence. At the conclusion of Phase I, the Court found that Plaintiffs did meet their burden and that Defendant has committed at least one violation of its permits by discharging high levels of ionic pollution, as measured by conductivity, into Stillhouse Branch. ECF No. 123. This Court found that this violation caused or materially contributed to a significant adverse impact to the chemical and biological components of the applicable stream's aquatic ecosystem, in violation of the narrative water quality standards that are incorporated into those permits. *Id.* As such, the Court now considers the appropriate remedies for these violations.

## II.  INJUNCTIVE RELIEF

Plaintiffs are not seeking civil penalties. Therefore, this Court will only consider remedies by injunctive relief.

An injunction is an equitable remedy a court should issue only where such intervention "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). "[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Id.* (citations omitted). Thus, a plaintiff is entitled to a permanent injunction only if it can demonstrate:

> (1) [I]t has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir.2007) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

First, Plaintiffs have established an irreparable injury. As concluded in the liability phase of this trial, Defendant has committed at least one violation of its permits by discharging high levels of ionic pollution into Stillhouse Branch. This has caused or materially contributed to a significant adverse impact to the chemical and biological components of the stream's aquatic ecosystem, in violation of the narrative water quality standards incorporated into those permits. This is sufficient to establish irreparable harm, as well as the inadequacy of monetary damages. *See Amoco Prod. Co. v. Village of Gambell, A.K.*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by monetary damages and is often permanent or at least of long duration, i.e., irreparable."); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (same).

The balance of hardships also weighs in favor of the issuance on an injunction. To begin, "[i]f [environmental] injury is sufficiently likely ... the balance of harms will usually favor issuance of an injunction to protect the environment." *Amoco Prod.*, 480 U.S. at 545. Furthermore, "[h]arm to [the] environment outweighs a defendant's financial interests, particularly where the violations are of a longstanding and continual nature." *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F.Supp.2d 1148, 1161 (D. Idaho 2012). The Supreme Court has also held that when fashioning an equitable remedy under an environmental statute, a district court should focus on "the underlying substantive policy the [statute] was designed to effect." *Amoco Prod.*, 480 U.S. at 544. Here, achievement of water quality standards is "one of the Act's central objectives." *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992). Additionally this Court has previously found that protecting water uses "is the overriding purpose of West Virginia's water quality standards and the goal of the state's permit requirements." *Elk Run*, 24 F.3d at 579. As such, the equities favor an injunction

to ensure compliance with West Virginia water quality standards and to protect the State's aquatic resources.

Finally, the public interest will not be disserved by injunctive relief. There is a clear public interest in environmental protection, including the protection of aquatic resources. Protecting water quality is "a critical public interest that profoundly outweighs a company's bottom line." *Atlanta Gold*, 879 F.Supp.2d at 1162. Furthermore, this interest is served by the citizen-suit and will be achieved through the issuance of an injunction. *See Nat. Res. Def. Council v. Train*, 510 F.2d 696, 699–700 (D.C.Cir. 1974). ("[The citizen suit] reflects Congress's recognition that citizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike."). *See also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 62 (1987); *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md*, 523 F.3d 453, 456 (4th Cir. 2008).

As such, all four factors support the issuance of permanent injunctive relief, requiring Defendant to comply with water quality standards to protect the biological and chemical integrity of Stillhouse Branch.

### III.    REMEDIES

#### A.    Plaintiffs' Proposal

During the Phase II trial, Plaintiffs urged this court to require Defendant to install a water treatment system at Stillhouse Branch; more particularly, Plaintiff's propose a membrane filtration system utilizing reverse osmosis. Plaintiffs argue that such a system could treat discharges from Outlet 029 into Stillhouse Branch and achieve a conductivity level of 300 μS/cm within 3 years.[2]

---

[2] In measurements relied on in this case, current conductivity levels in Stillhouse Branch

Plaintiffs did not provide expert testimony regarding the size, location, sound issues, energy requirements, etc., of a reverse osmosis system, and instead argued that those issues would be better addressed during the design phase of such a system. It is estimated that a reverse osmosis water treatment system would cost $136 million to build, install, operate, and maintain for 35 years.

Plaintiffs also recommend that this Court set a definite compliance date of three years and direct Defendant to develop a plan that contains the specific steps to achieve compliance with water quality standards by the end of that period. They propose appointing a Special Master to oversee the Defendant's activities in carrying out its compliance plan. The Special Master would be in charge of setting interim milestones for completing the treatment plan, approving modifications to such plan, and supervising Defendant's compliance with the treatment plan. Any disputes amongst the parties would be submitted to the Special Master for resolution, subject to review by this Court.

### B. Defendant's Proposal

On the other hand, Defendant proposes utilizing water management strategies to lower conductivity levels at Stillhouse Branch. Defendant claims these strategies will reduce conductivity more economically than reverse osmosis. The water management strategies proposed by Defendant were presented in a four phase approach by Defendant's expert witness, Mr. Meek.

---

range from 3,000-4,000 μS/cm. Motion for Summary Judgment, Ex. 5 at 23, 24, 31, and 33; ECF No. 57-8. The EPA has found that in central Appalachian streams, when conductivity reach 300 μS/cm and above, it is more likely than not that the subject stream will be biologically impaired. EPA's Joint Benchmark, Joint Ex. 58 at JE464; Tr. at 63−64. As such, Plaintiffs would like the conductivity in Stillhouse Branch to be reduced to 300 μS/cm.

The first phase of these strategies involves isolating the high conductivity water from Stillhouse Branch and pumping it directly into Twentymile Creek. Defendant claims this technique would lower the conductivity in Stillhouse Branch below 300 µS/cm (some of the time) and would also not affect the conductivity in Twentymile Creek (since the same water is already entering Twentymile Creek through Stillhouse Branch).

If this phase is not successful in lowering conductivity levels to the extent required, Defendant next proposes habitat restoration. If habitat improvement proves unsuccessful, phase three of Defendant's water management strategy involves supplementing the water flow in Stillhouse Branch, as needed, with water from Twentymile Creek. Finally, Phase four involves continuing to segregate the underflow from Stillhouse Branch, pumping it directly into Twentymile Creek, and then supplementing the water flow in Stillhouse Branch with water from the Gauley River.

Defendant believes that these water management strategies could lower the conductivity in Stillhouse enough to achieve passing WVSCI scores, costing an estimated $164,000 to build, install, operate, and maintain for 35 years.

## IV. DISCUSSION

The Court does not take lightly its decision in determining an appropriate remedy. The remedies proposed by both Plaintiffs and Defendant are complex and costly. As such, although the Court has determined that injunctive relief is appropriate and necessary here, the Court will not order a specific remedy at this point. Rather, pursuant to Federal Rule of Civil Procedure 53(a)(1), the Court is inclined to appoint a Special Master, with expertise in this particular field, to further assist it in the determination of an appropriate remedy. Specifically, the Court is inclined to appoint

James H. Kyles of O'Brien and Gere as Special Master in this action. If Plaintiffs or Defendant objects or otherwise wishes to be heard regarding this appointment, either party must do so by **October 19, 2015**. Fed. R. Civ. P. 53(b)(1).

Additionally, during the Phase II trial, Defendant requested an opportunity to brief the Court regarding the authority and regulatory scheme under the CWA on which Defendant relies in arguing that its water management strategies are in compliance with the Act and can, if successful, bring Defendant into compliance with narrative water quality standards. Defendant has until **October 21, 2015** to provide the Court with a memorandum of law in support of its position. Plaintiffs have until **October 28, 2015**, to respond to Defendant's memorandum.

## V. CONCLUSION

As such, the Court **FINDS** that injunctive relief is appropriate and necessary to remedy Defendant's violations. The Court is inclined to appoint a Special Master to further assist it in determining an appropriate remedy. Objections to this notice of appointment are due by **October 19, 2015**. The Court also orders Defendant to submit a memorandum of law by **October 21, 2015** addressing the authority and regulatory scheme under the CWA on which Defendant relies in arguing that water management strategies are in compliance with the Act and, if successful, can bring Defendant into compliance with narrative water quality standards.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: October 14, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE